Rachel C. Strickland
James H. Burbage
M. Annie Houghton-Larsen
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
rstrickland@willkie.com
jburbage@willkie.com
mhoughton-larsen@willkie.com

Michael J. Gottlieb (*pro hac vice* pending)
Meryl Governski (*pro hac vice* pending)
Aaron E. Nathan
WILLKIE FARR & GALLAGHER LLP
1875 K Street NW
Washington, DC 20006
mgottlieb@willkie.com
mgovernski@willkie.com
anathan@willkie.com

Von A. DuBose (*pro hac vice* forthcoming)
DUBOSE MILLER LLC
75 14th Street NE
Suite 2110
Atlanta, GA 30309
Telephone: (404) 720-8111
dubose@dubosemiller.com

Rachel Goodman
John Langford
UNITED TO PROTECT DEMOCRACY
82 Nassau Street, #601
New York, NY 10038
Telephone: (202) 579-4582
rachel.goodman@protectdemocracy.org
john.langford@protectdemocracy.org

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>RUDOLPH W. GIULIANI<br>a/k/a RUDOLPH WILLIAM GIULIANI<br><br>                Debtor. | Chapter 11<br><br>Case No. 23-12055 (SHL) |

### OBJECTION OF RUBY FREEMAN
### AND WANDREA' ARSHAYE MOSS TO DEBTOR'S MOTION
### FOR AN ORDER MODIFYING THE STAY FOR THE LIMITED PURPOSES OF
### ALLOWING THE DEBTOR TO FILE POST TRIAL MOTIONS TO MODIFY THE
### JUDGMENT AND ON FOR A NEW TRIAL AND TO FILE A NOTICE OF APPEAL

**TABLE OF CONTENTS**

<u>Page</u>

PRELIMINARY STATEMENT ...............................................................................1

BACKGROUND ......................................................................................................4

   I.    FACTUAL BACKGROUND OF THE FREEMAN LITIGATION .............................4

         **a.**   Mr. Giuliani Launched a Campaign Falsely Accusing Ms. Freeman
             and Ms. Moss of Election Fraud. .................................................4

         **b.**   Mr. Giuliani's Campaign Devastated The Lives of Ms. Freeman and
             Ms. Moss. .......................................................................8

   II.   PROCEDURAL BACKGROUND OF THE FREEMAN LITIGATION ...................10

         **a.**   The District Court Denied Mr. Giuliani's Motion to Dismiss the
             Amended Complaint. .......................................................10

         **b.**   Mr. Giuliani Refused to Engage in Fact Discovery. ...................10

         **c.**   The District Court Granted Ms. Freeman's and Ms. Moss' Motion
             for Discovery Sanctions and Entered Default Judgment Against Mr.
             Giuliani. .......................................................................12

         **d.**   A Federal Jury Awarded Nearly $150 Million in Compensatory and
             Punitive Damages. .........................................................14

         **e.**   Mr. Giuliani's Motion to Avoid Posting a Bond is Denied by the
             District Court Post-Trial. ..................................................16

          **f.**   Mr. Giuliani Has Continued to Defame Ms. Freeman and Ms. Moss. ......17

   III.   MR. GIULIANI'S CHAPTER 11 FILING ...................................................18

OBJECTION...........................................................................................................19

   IV.   THE STAY RELIEF MOTION IMPROPERLY SEEKS TO WIELD THE
       AUTOMATIC STAY AS A SHIELD AND A SWORD. ....................................19

   V.   THE COURT SHOULD DENY THE STAY RELIEF MOTION BECAUSE
      MR. GIULIANI HAS NOT MET HIS BURDEN TO ESTABLISH CAUSE ..............24

         **a.**   The Court Should Deny the Stay Relief Motion Because it Fails to
             Make a *Prima Facie* Showing that Cause Exists for Lifting the Stay .......25

         **b.**   The Sonnax Factors Do Not Support Granting the Stay Relief
             Motion.......................................................................26

i

**c.**    If the Court Grants the Stay Relief Motion, It Should Only Be To
Preserve Mr. Giuliani's Post-Trial Rights ...................................................33

CONCLUSION..............................................................................................................................33

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Adelphia Commc'ns Corp.*,
  361 B.R. 337  (S.D.N.Y. 2007)............................................................21

*Barcelona Capital, LLC v. Neno Cab Corp.*,
  648 B.R. 5782 (E.D.N.Y. 2023) ..........................................................25

*In re Bogdanovich*,
  292 F.3d 104 (2d Cir. 2002)...........................................................22, 25

*In re Cicale*,
  No. 05-14462, 2007 Bankr. LEXIS 2252 (Bankr. S.D.N.Y. June 29, 2007)..........................29

*In re Cinnabar 2000 Haircutters, Inc.*,
  20 B.R. 575 (Bankr. S.D.N.Y. 1982).............................................20, 22, 31

*In re Ditech Holding Corp.*,
  No. 19-10412 (JLG), 2022 Bankr. LEXIS 3220, 3 (Bankr. S.D.N.Y. Nov. 14,
  2022) .................................................................................28, 32

*Fed. Prescription Serv., Inc. v. Am. Pharma Ass'n*,
  636 F.2d 755 (D.C. Cir. 1980) ............................................................21

*Freeman v. Giuliani*,
  No. 21-cv-03354 (BAH) (D.D.C. 2021) ............................................... *passim*

*Hawkins v. Tyree*,
  483 B.R. 598 (S.D.N.Y. 2012)............................................................27

*Holzer v. Barnard*,
  No. 15-cv-6277, 2016 U.S. Dist. LEXIS 98175 (E.D.N.Y. July 27, 2016)............................25

*In re Little Creek Dev. Co.*,
  779 F.2d 1068 (5th Cir. 1986) ...........................................................23

*Marshall v. Marshall (In re Marshall)*,
  264 B.R. 609 (C.D. Cal. 2001) ...........................................................27

*In re Mazzeo*,
  167 F.3d 139 (2d Cir. 1999)..............................................................25

iii

*In re Mildred Deli Grocery, Inc.*,
   No. 18-10077 (MG), 2018 Bankr. LEXIS 546 (Bankr. S.D.N.Y. Feb. 28,
   2018) ............................................................................................................21, 22

*Moldea v. New York Times Company*,
   15 F.3d 1137 (D.C. Cir. 1994) ...............................................................................10

*In re Motors Liquidation Co.*,
   539 B.R. 676 (Bankr. S.D.N.Y. 2015) ...................................................................21

*In re Nassau Cnty. Strip Search Cases*,
   783 F.3d 414 (2d Cir. 2015)...................................................................................20

*In re New York Medical Group, P.C.*,
   265 B.R. 408 (Bankr. S.D.N.Y. 2001) ...................................................................22

*Pagones v. Mason (In re Mason)*,
   Adv. Pro. No. 95-1653A (JLG), 1999 Bankr. LEXIS 90 (Bankr. S.D.N.Y. Jan.
   28 1999) .................................................................................................................27

*In re Residential Cap, LLC*,
   501 B.R. 624 (Bankr. S.D.N.Y. 2013).....................................................................28

*In re Residential Capital, LLC*,
   No. 12-12020 (MG), 2012 Bankr. LEXIS 3777 (Bankr. S.D.N.Y. Aug. 16,
   2012) .......................................................................................................................32

*In re Residential Capital*,
   No. 12-12020 (MG), 2012 Bankr. LEXIS 3624 (Bankr. S.D.N.Y. Aug. 7,
   2012) .......................................................................................................................19

*In re Rochester Drug Coop., Inc.*,
   No. 20-20230-PRW, 2020 Bankr. LEXIS 1935 (Bankr. W.D.N.Y. July 22,
   2020) ...................................................................................................................32, 33

*In re Sletteland*,
   260 B.R. 657 (Bankr. S.D.N.Y. 2001) ...................................................................22

*In re Sonnax Indus., Inc.*,
   907 F.2d 1280 (2d Cir. 1990)......................................................................... *passim*

*Stasko v. Motors Liquidation (In re Motors Liquidation Co.)*,
   No. 10-CV-4322 (JGK), 2011 U.S. Dist. LEXIS 67750 (S.D.N.Y. June 17,
   2011) .......................................................................................................................31

*Sternberg v. Johnston*,
   582 F.3d 1114 (9th Cir. 2009) ...............................................................................19

*In re Taub*,
470 B.R. 273 (E.D.N.Y. 2012) ............................................................................21

*In re Tribune Co.*,
477 B.R. 465 (Bankr. D. Del. 2012) ...................................................................21

*U.S. Bank Tr. Nat'l Ass'n v. Am. Airlines, Inc. (In re AMR Corp.)*,
485 B.R. 279 (Bankr. S.D.N.Y. 2013)..................................................................24

*In re Uchitel*,
No. 20-11585 (JLG), 2022 WL 3134217 (Bankr. S.D.N.Y. Aug. 4, 2022) ...........19

*In re Wally Findlay Galleries (New York), Inc.*,
36 B.R. 849 (Bankr. S.D.N.Y. 1984)..............................................................22, 23

*Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC*,
776 F.3d 1 (D.C. Cir. 2015) ................................................................................26

**Statutes**

11 U.S.C. § 523(a)(2)(A) ..........................................................................................22

11 U.S.C. § 523(a)(6)..........................................................................................16, 27

Fed. R. Bankr. P. 7062 ..............................................................................................21

Fed. R. Civ. P. 62(b) .................................................................................................20

**Other Authorities**

Ga. Sec'y of State, *Risk-Limiting Audit Report: Georgia Presidential Contest,
November 2020* (Nov. 19, 2020), available at: https://perma.cc/3CT8-W9BC........5

Rudy W. Giuliani (@RudyGiuliani), *America's Mayor Live E315 Joe Biden Says
My Name in Re-Election Campaign Announcement - My Response* (Jan. 5,
2024, 8:00 PM),
https://x.com/RudyGiuliani/status/1743437296396013678?s=20..........................18

Ms. Ruby Freeman and Ms. Wandrea' ArShaye "Shaye" Moss (the "Objecting Parties"), as creditors and parties-in-interest of Mr. Rudolph W. Giuliani a/k/a Rudolph William Giuliani (the "Debtor"), by and through their undersigned counsel, respectfully submit this objection (the "Objection") to the *Debtor's Motion for an Order Modifying the Stay for the Limited Purposes of Allowing the Debtor to File Post Trial Motions to Modify the Judgment and on for a New Trial and to File a Notice of Appeal* [Docket No. 25] (the "Stay Relief Motion").  In support thereof, Ms. Freeman and Ms. Moss respectfully represent as follows:

## PRELIMINARY STATEMENT

1.     On December 3, 2020, Mr. Giuliani posted the following message on Twitter: "WATCH: Video footage from Georgia shows suitcases filled with ballots pulled from under a table AFTER supervisors told poll workers to leave room and 4 people stayed behind to keep counting votes."  Mr. Giuliani's tweet included a link to a clip of video surveillance footage from the State Farm Arena in Fulton County, Georgia on election night showing Ms. Ruby Freeman and Ms. Shaye Moss working as election workers.  Later that same day, Mr. Giuliani posted another message on Twitter that stated: "ELECTION IN GEORGIA IS NOW PROVEN TO BE A FRAUD."

2.     Mr. Giuliani's tweets were part of an aggressive campaign he orchestrated and led to sow disinformation about the 2020 federal election.  This campaign included numerous baseless allegations that Ms. Freeman and Ms. Moss participated in a scheme to overturn the election results in Georgia.  Despite the lack of any truth to any of Mr. Giuliani's claims, in the days that followed, Ms. Freeman, Ms. Moss, and Ms. Moss' teenage son began receiving hateful, racist messages by the thousands, including death threats on their cell phones, social media, and email accounts.

- 1 -

3.       After losing a job, being forced to move, and having the FBI warn them about major security concerns, Ms. Freeman and Ms. Moss sought to hold the perpetrators of these baseless and horrific attacks accountable.  In December 2021, Ms. Freeman and Ms. Moss sued Mr. Giuliani for defamation, intentional infliction of emotional distress, and civil conspiracy (the "Freeman Litigation").  For more than two years, Mr. Giuliani had an opportunity to participate in the Freeman Litigation.  Rather than play by the rules of discovery, Mr. Giuliani chose a strategy of obstruction and willful disobedience.  That strategy backfired and Mr. Giuliani eventually stipulated to his liability.  Thereafter, District Judge Beryl A. Howell entered sanctions against Mr. Giuliani: a default judgment on his liability for Ms. Freeman's and Ms. Moss' claims, leaving only the quantification of damages to be determined by a jury.  In December 2023, a federal jury awarded Ms. Freeman and Ms. Moss approximately $148 million in damages, which precipitated Mr. Giuliani's chapter 11 filing.  The record from the Freeman Litigation is overwhelmingly clear: Mr. Giuliani had every opportunity to defend himself and chose not to participate.

4.       Thus, it is the height of irony that the first substantive relief sought by Mr. Giuliani in his chapter 11 case—to be heard on an expedited basis no less—is a motion to lift the automatic stay so that he can pursue an appeal in the Freeman Litigation.  Through this motion, Mr. Giuliani is looking to have his cake and eat it too: he wants to appeal the Freeman Litigation, not post a bond, and use the automatic stay to bar Ms. Freeman and Ms. Moss from enforcing their judgment.  As a matter of law, there is no basis for granting the relief Mr. Giuliani seeks.  Mr. Giuliani cannot simultaneously use the automatic stay as a shield to hold off creditors and as a sword to gut their legal rights.  If Mr. Giuliani truly wanted to appeal the Freeman Litigation, all he needed to do was *not* file for chapter 11 protection.  Mr. Giuliani's sudden desire to participate in the Freeman

- 2 -

Litigation, conditioned on a half-way lift of the automatic stay, calls the good faith of his chapter 11 filing into question.

5.      What's more, Mr. Giuliani has not established cause to lift the automatic stay. Courts analyze motions to lift the automatic stay by balancing the harms using the *Sonnax* factors. As Mr. Giuliani has extremely limited resources to satisfy creditor claims, case efficiency is critical.  Thus, no cause exists to permit Mr. Giuliani to incur substantial legal fees in order to pursue meritless appeals of non-dischargeable claims.  Mr. Giuliani's unrealistic expectations for his appeal aside, the most he could achieve even in a successful appeal would be to return the Freeman Litigation back to a posture in which Ms. Freeman and Ms. Moss simply hold unliquidated, rather than liquidated, claims.  Permitting Mr. Giuliani to pursue such a futile strategy would be detrimental to Ms. Freeman, Ms. Moss, and all general unsecured creditors.  In addition to seeing the distributable value in Mr. Giuliani's estate devoured by legal fees, granting the Stay Relief Motion would ensure that little to no progress is made in this chapter 11 case for months (if not years) as Mr. Giuliani pursues his appeals.

6.      To be clear, Ms. Freeman and Ms. Moss do not oppose the Court lifting the stay for the narrow purpose of allowing Mr. Giuliani to preserve post-trial and appellate rights in connection with the Freeman Litigation.  Because Ms. Freeman and Ms. Moss hold non-dischargeable claims based on actions that Mr. Giuliani himself stipulated were "willful" and "malicious," Mr. Giuliani should be able to pursue these post-trial rights whenever the chapter 11 case ends.  However, the Stay Relief Motion goes well beyond such narrow relief.  Indeed, Mr. Giuliani has made his appeal of the Freeman Litigation the center of this chapter 11 case.  As a result, absent the one-sided relief Mr. Giuliani seeks, it would not be surprising if Mr. Giuliani sought to dismiss his own chapter 11 case.

7.     The Stay Relief Motion is a flawed, impermissible litigation tactic from an actor with a history of engaging the judicial system in bad faith.  For those reasons, Mr. Giuliani's Stay Relief Motion should be denied.

## **BACKGROUND**

### I.     **FACTUAL BACKGROUND OF THE FREEMAN LITIGATION**

#### a.     **Mr. Giuliani Launched a Campaign Falsely Accusing Ms. Freeman and Ms. Moss of Election Fraud.**

8.     Ruby Freeman and her daughter, Shaye Moss, served as election workers in the 2020 federal election in Fulton County, Georgia.  Ex. 1 at 25:24–26:3, Ex. 2 at 105:25–106:2.[1] Ms. Moss began working for the Department of Registration and Elections in Fulton County in 2012, starting in the mailroom and ultimately serving as an interim elections supervisor in 2020. Ex. 1 at 26:7–13, 31:13–19.  Ms. Freeman volunteered to serve as a temporary worker in the 2020 election in support of her daughter, Fulton County, and democracy.  Ex. 2 at 105:17–106:21.

9.     Both women arrived at the State Farm Arena in Fulton County on November 3, 2020, the date of the presidential election, before the sun came up and counted absentee ballots until after midnight.  Ex. 1 at 31:13–21, 32:12–17; Ex. 2 at 108:3–13; Ex. 3 at 23:12–14.  It was a busy, but rather uneventful, work day.  Ex. 2 at 108:3–13.

---

[1]   Contemporaneously herewith, Ms. Freeman and Ms. Moss are filing the *Declaration of Aaron E. Nathan in Support of the Objection of Ruby Freeman and Wandrea' Arshaye Moss to Debtor's Stay Relief Motion* (the "Declaration").  Due to the voluminous nature of the materials cited herein, the Ms. Freeman and Ms. Moss have not filed the exhibits to that Declaration on the docket.  Exhibits 1, 2, and 3 are transcripts of Ms. Moss' and Ms. Freeman's testimony in the December 2023 jury trial regarding the amount of damages Mr. Giuliani's actions caused Ms. Freeman and Ms. Moss.  Exhibits 4 through 60 are each exhibits admitted into evidence in the same December 2023 trial.  Counsel to Ms. Freeman and Ms. Moss will provide copies of any exhibits to any requesting party in interest.  All additional cited materials relating to the Freeman Litigation are publicly available on the Freeman Litigation's case docket located at *Freeman v. Giuliani*, No. 21-cv-03354 (BAH) (D.D.C. 2021).

10.    Within a few days, news outlets projected Joseph Biden the winner of the 2020 presidential election in Georgia.  *See, e.g.*, Ex. 4.  On November 11, 2020, Georgia Secretary of State, Brad Raffensperger, ordered a hand recount of every ballot in the state, and he joined Georgia Governor Brian Kemp in certifying the Georgia election for President Joseph Biden on November 20, 2020.  *See* Ga. Sec'y of State, *Risk-Limiting Audit Report: Georgia Presidential Contest, November 2020* (Nov. 19, 2020), available at: https://perma.cc/3CT8-W9BC.

11.    Mr. Giuliani refused to accept the outcome.  Instead, Mr. Giuliani convened a team of lawyers to devise and implement a plan to undermine the legitimacy of the election.  Freeman Litigation Dkt. No. 112-2 at 93:16–25; *see also* Freeman Litigation Dkt. No. 63-5.

12.    Mr. Giuliani and the "Giuliani Presidential Legal Defense Team" memorialized their intended efforts in a "Strategic Communication Plan" that expressed as its "GOAL: Nationwide communications outreach campaign to educate the public on the fraud numbers, and inspire citizens to call upon legislators and Members of congress to disregard the fraudulent vote count and certify the duly-elected President Trump."  Freeman Litigation Dkt. No. 63-5 at 4 ("Giuliani Strategic Communications Plan").

13.    The Giuliani Strategic Communications Plan detailed "Voter Fraud Highlights For 2020 US Election" in certain battleground states and, for the state of Georgia, identified Ms. Freeman and Ms. Moss ***by name*** and described video surveillance that showed them counting votes at the State Farm Arena as evidence of a crime, including by stating:

- "Video of Ruby and Shay [*sic*] at midnight
    - That is the time of the 200,000 vote bump
        - Similar interruptions at same time in other states
    - No Watermain Break – a lie to get the Republican observers and media to leave at 10:30pm" (*Id.* at 12);

- "Election Official Ruby Freeman is seen surreptitiously & illegally handing off hard-drives ON CAMERA in the Georgia counting facility" (*Id.* at 6);

- "'**Suitcase Gate**'- Video of 'ballot stuffing' when 'suitcases' (container type) filled with ballots (approximately 6,000 in each container) were rolled out from under table at GA arena and placed in tabulation machines (one batch repeatedly tabulated at least 3 times) by [X number] of poll workers who remained AFTER all Poll Watchers (GOP and the like), press and all third parties were required to leave the premises per announcement at or about [___ AM] until [___ AM] in violation of election laws enacted by GA state legislature. Ruby Freeman (woman in purple shirt on video), now under arrest and providing evidence against GA SOS Stacey Abrams and DNC on advanced coordinated effort to commit voter / election fraud [*need confirmation of arrest and evidence*]." *Id.* at 22.

14.     Beginning on December 3, 2020, Mr. Giuliani and members of his team began publicly making the same false claims later articulated in the Giuliani Strategic Communications Plan, claiming the surveillance footage of Ms. Freeman and Ms. Moss at the State Farm Arena provides video proof of election fraud, and the reason then-President Trump lost the election in Georgia. *See, e.g.*, Ex. 5.

15.     The very next day, on December 4, 2020, law enforcement and Republican officials in Georgia began to publicly refute Mr. Giuliani's statements in public, including in a tweet in which Gabriel Sterling, Georgia Secretary of State's Chief Operating Officer, publicly confirmed via Twitter that the "90 second video of election workers at State Farm area, purporting to show fraud, was watched in its entirety (hours) by @GASecofState investigatory" and shows "normal ballot processing." Ex. 6.

16.     Mr. Sterling made a similar statement during a television press conference on December 7, 2020:

> "And what's really frustrating is the President's attorneys had this same videotape. ***They saw the exact same things the rest of us could see, and they chose to mislead state senators and the public about what was on that video***. I am quite sure that they will not characterize the video, if they try to enter it into evidence, because that is the kind of thing that could lead to sanctions; because it's obviously untrue. They knew it was untrue and they continue to do things like this."

- 6 -

Ex. 7 at 9:19–10:5 (emphasis added).

17.    Despite this, Mr. Giuliani continued to spread, and encouraged others to spread, the false statements about Ms. Freeman and Ms. Moss, accusing them of excluding election observers under false pretenses, hiding illegal ballots in suitcases, counting illegal ballots multiple times, and passing a USB drive for the purposes of altering the vote counts.[2]

18.    For example, on December 10, 2020, Mr. Giuliani referenced "a tape earlier in the day of Ruby Freeman and Shaye Freeman Moss and one other gentleman quite obviously surreptitiously passing around USB ports as if they're vials of heroin or cocaine."  Ex. 8 at 21:22–21:36.  He continued:

> "I mean, it's out – it's obvious to anyone who's a criminal investigator or prosecutor they are engaged in surreptitious, illegal activity again that day, and a week ago they're still walking around Georgia. Why? Should have been -- they should have been questioned already. Their places of work, their homes should have been searched for evidence of ballots, for evidence of USB ports, for evidence of voter fraud, because they obviously were engaged in it and it's available to 300 million Americans to watch." Ex. 8 at 21:36–22:13.

19.    Mr. Giuliani's character assassination of Ms. Freeman and Ms. Moss continued and accelerated in late December 2020 and early January 2021.  For example, on Christmas Day 2020, Mr. Giuliani made the following statement on his Internet show, *Common Sense*:

> "Live from Fulton County. Let's watch the Democrats steal the election!  And there you see it.  Ruby Freeman and her crew getting everybody out of the center. Creating a false story that there was a—that there was a water main break.  No water main break.  They get everybody out.  They wait, they wait, they wait.  They check, they check, they check, like they're going to do a heist. And all of a sudden the crooks sprang into action.  They go under a desk covered like a casket, and they start pulling ballots out.  Tremendous numbers of ballots. And they bring them over

---

[2]    Actionable statements put into evidence during the Freeman Litigation trial can be found at Exhibit 5 and Exhibits 8-54.

to one counting stand, all the way over here, another counting stand, another—and they keep looking around to make sure there's nobody in the room! Every once in a while, you look closely, you can see them doing this—one ballot [gestures scanning a ballot multiple times]. You know what that does? That takes Biden and multiplies it by 5."

Ex. 35 at 19:08–20:2; Ex. 36 at 28:31–29:38.

> **b.    Mr. Giuliani's Campaign Devastated The Lives of Ms. Freeman and Ms. Moss.**

20.    Beginning on and continuing after December 3, 2020—the date Mr. Giuliani first defamed them—Ms. Freeman and Ms. Moss suffered immediate and devastating effects from Mr. Giuliani's conduct. Strangers called, emailed, texted, and messaged Ms. Freeman, Ms. Moss, and even Ms. Moss' then fourteen-year old son, acting on what Mr. Giuliani told them: that Ms. Freeman and Ms. Moss were criminals and traitors who had stolen the election. Ex. 1 at 62:16–20, 73:7–20; Ex. 2 at 109:12–16. They received hundreds of messages, using racist slurs and profanities and saying they deserved to hang from trees and the United States Capitol "close enough to hear your necks snap!" Ex. 55. at Freeman_Giuliani-00000395. One person told Ms. Freeman that that they "know. Where. You. Sleep," and another emailed: "Pack your shit. They are coming for you. I'm not far behind. I'm coming for you also. Trash will be taken to the street in bags." *Id.* at Freeman_Giuliani-00000090–91. Perhaps most devastating were the anonymous voicemails left for Ms. Freeman and Ms. Moss, portions of which are excerpted below:

- Ex. 56 (Ms. Freeman): "Lady Ruby, you're going to prison you f**king c***! You c*** f**king bitch. You racist piece of shit. You're going to go to f**k prison and you're going to sit there and you're going to live with the rats and the f**king maggots. You f**king piece of sh*t, you and that fat f**king daughter c*** of yours. You f**king dumb f**king whores, you got used, you got abused, and now you're going to prison. Eat sh*t and die you f**king racist c**** you and your fat f**king daughter that scrawny f**king piece of sh*t that helped you pulled this f**king USB shit off. You are f**king done you f**king whore!"

- 8 -

- Ex. 57 (Ms. Freeman): "Hey Ruby, um, we are going to burn your store down and we are going to burn all those n***** clothes that you sell that nobody wants. Oh and your daughter, she's a f**king whore."

- Ex. 58 (Ms. Freeman): "n***** n*****  n***** n***** n***** n*****"

- Ex. 59 (Ms. Moss' son's phone): "Hey Shaye Shaye, You might want to go read the President Trump's executive order from 2018 and turn yourself in before you get caught for treason and go to Gitmo. Have a nice life, what left of it you have! Bye!"

21.     People showed up at the house of Ms. Freeman's mom, Ms. Moss' grandmother, demanding to make a citizen's arrest. Ex. 1 at 68:9–69:17.  On January 5, 2021—the day before the Capitol insurrection—a dozen strangers, carrying flags and blowing horns, gathered outside of Ms. Freeman's house. Ex. 2 at 133:6–16.  She wasn't there because she had fled that morning at the direction of the FBI, who told her that she should leave her home, which she did for a number of months. *Id.* at 133:17–134:8.

22.     Ms. Moss has since left her job with Fulton County, after being passed over for a promotion and being told that she would never be allowed to touch another ballot. Ex. 1 at 50:15–52:1.  She has been diagnosed with acute stress disorder and major depressive disorder with acute distress, fears her son finding her hanging outside their front door, and is terrified of going anywhere alone, ever. Ex. 1 at 63:5–9, 64:3–22, 66:5–67:21.

23.     Ms. Freeman sold the home where she lived for more than 20 years and which she never wanted to leave, moving to a new neighborhood where she knows no one and is scared to introduce herself to anyone. Ex. 2 at 104:20–21, 135:6–16, 137:21–138:16.  She lives in fear of hearing her name, and has changed the name of the business she spent years building around her name, Lady Ruby. *Id.* at 146:23–147:3.

## II.    PROCEDURAL BACKGROUND OF THE FREEMAN LITIGATION

24.    On December 21, 2021, Ms. Freeman and Ms. Moss filed a lawsuit in the United

States District Court for the District of Columbia ("District Court") against Mr. Giuliani, as well

as One America News Network ("OAN") and its owners and agents.  Freeman Litigation Dkt. No.

1.  After reaching a settlement with OAN, Ms. Freeman and Ms. Moss filed an Amended

Complaint on May 10, 2022 against Mr. Giuliani as the sole defendant for (i) defamation per se,

(ii) intentional infliction of emotional distress ("IIED"), and (iii) civil conspiracy.  Freeman

Litigation Dkt. No. 22 ("Amended Complaint").

### a.    The District Court Denied Mr. Giuliani's Motion to Dismiss the Amended Complaint.

25.    On June 6, 2021, Mr. Giuliani filed a motion to dismiss, which the District Court

found "unpersuasive" and denied in full.  Freeman Litigation Dkt. No. 31 at 12.  The District Court

found that the Amended Complaint sufficiently stated claims for defamation, IIED, and civil

conspiracy.  As far as defamation, the District Court rejected Mr. Giuliani's attempts to seek

protection in the opinion doctrine:

> "Giuliani's alleged statements accuse plaintiffs of criminal activity—which can be
> proven to be true or false in court— and, consequently, he cannot seek refuge under
> the opinion doctrine for the same reasons articulated in *Moldea v. New York Times
> Company*. Even if Giuliani made clear that his statements were his own subjective
> views, those statements still included accusations of election fraud that can be
> verified as true or false."

*Id.* at 18 (referencing *Moldea*, 15 F.3d 1137, 1144 (D.C. Cir. 1994)).

### b.    Mr. Giuliani Refused to Engage in Fact Discovery.

26.    Fact discovery opened on May 18, 2022, and Ms. Freeman and Ms. Moss served

their first set of discovery requests on Mr. Giuliani on May 20, 2022.  Freeman Litigation Dkt. No.

44 at 4.

27.     Mr. Giuliani confirmed that he used multiple phones, email addresses, and messaging applications in the months following the 2020 presidential election.  Freeman Litigation Dkt. No. 81-5 at 17:14–19, 21:5–11, 22:24–25:6.  One witness testified that Mr. Giuliani was "getting like 10,000 emails a day" during the relevant time period, including about Georgia.  Freeman Litigation Dkt. No. 81-6 at 40:16–41:21.

28.     During discovery, Mr. Giuliani produced a few hundred documents, missing from which were many of the communications known to exist by virtue of discovery from third parties in response to subpoenas in the Freeman Litigation, as well as to the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol.  Freeman Litigation Dkt. No. 81 at 6–9.

29.     Mr. Giuliani produced additional documents after the close of discovery, virtually all of which were non-usable, non-readable raw data or junk.  *See* Freeman Litigation Dkt. Nos. 44 & 81 at 12; *see also* Freeman Litigation Dkt. No. 94 at 3 (District Court noting that the sum of his production "aside from his initial production of 193 documents, is largely a single page of communications, blobs of indecipherable data, a sliver of the financial documents required to be produced, and a declaration and two stipulations").

30.     Over the course of nearly a year, Ms. Freeman and Ms. Moss attempted to gain information about Mr. Giuliani's preservation and search methodologies, and to understand why his limited productions were almost entirely non-substantive, non-responsive, and did not include many of the otherwise known materials.  Freeman Litigation Dkt. No. 81 at 2–3.

31.     Unable to obtain any clarity from Mr. Giuliani or his counsel, Ms. Freeman and Ms. Moss sought and received leave to file a motion on April 17, 2023 to compel Mr. Giuliani to

explain in detail the extent of those efforts (if any), as well as to produce all responsive materials.

April 11, 2023 Min. Order; Freeman Litigation Dkt. No. 44.

32.     Beginning in May 2023, the District Court held multiple discovery conferences and

hearings that Mr. Giuliani attended.   The District Court entered various orders, including

instructing Mr. Giuliani to produce all responsive materials and to file declarations subject to

penalty of perjury that, *inter alia*, detailed all "efforts taken to preserve, collect, and search

potentially responsive data and locations that may contain responsive materials to all" of the

discovery requests.   May 19, 2023 Minute Order; *see* May 31, 2023, Minute Order; June 22, 2023

Minute Orders; June 23, 2023 Minute Order; July 13, 2023 Minute Order; July 26, 2023 Minute

Order.

> **c.     The District Court Granted Ms. Freeman's and Ms. Moss' Motion for Discovery Sanctions and Entered Default Judgment Against Mr. Giuliani.**

33.     After Mr. Giuliani repeatedly failed to comply with the District Court's orders or

indicate any intent to produce additional responsive materials, Ms. Freeman and Ms. Moss filed a

motion for sanctions pursuant to Federal Rule of Civil Procedure 37.   Freeman Litigation Dkt. No.

81 ("Motion for Sanctions").

34.     In response to the Motion for Sanctions, Mr. Giuliani did not attempt to justify his

discovery conduct, or try to adduce evidence to support his defense on the merits.   Instead, Mr.

Giuliani filed two stipulations in which he "agreed to stipulate to the factual aspects of liability as

to Plaintiffs' claims."   Freeman Litigation Dkt. Nos. 84-2 & 90.

35.     Mr. Giuliani's counsel subsequently confirmed that his client "is stipulating to the

malice element" as "he would have to for punitive damages[.]"   Freeman Litigation Dkt. No. 86-

6.   Mr. Giuliani told the Court "that liability in this case on Plaintiffs' causes of action should be

treated as though there is default liability."   Freeman Litigation Dkt. No. 90 ¶ 6.   In his stipulations,

Mr. Giuliani attempted to preserve "his arguments that the statements complained of are protected and non-actionable opinion for purposes of appeal." *Id.*; *see also* Freeman Litigation Dkt. No. 86-6.[3]

36.     On August 30, 2023, in response to the Motion for Sanctions, the Court ordered that "default judgment will be entered against defendant Rudolph W. Giuliani on his liability for plaintiffs' defamation, intentional infliction of emotional distress, civil conspiracy, and punitive damage claims, pursuant to Federal Rules of Civil Procedure 37(e)(2)(C) and 37(b)(2)(A)(vi)." Freeman Litigation Dkt. No. 93.

37.     The 57-page opinion granting default judgment did not rest on or accept Mr. Giuliani's attempts to stipulate to liability, which the District Court explained amounted to Mr. Giuliani's attempt "to have his proverbial cake and eat it too: He wants to bypass his discovery obligations now with stipulations that would leave him, somehow, free to raise his affirmative defenses to plaintiffs' claims on appeal, with a record predicated on deficient discovery." Freeman Litigation Dkt. No. 94 ("Default Judgment Order") at 46. Such a "discovery shortcut is simply unfair" and, accordingly, the Court found that instead of "granting entry of default based on Giuliani's stipulations, with their various carve-outs and reservations, default is entered here as a straight-up sanction for his discovery failures." *Id.*

38.     The District Court described what it called Mr. Giuliani's "willful shirking of his discovery obligations in anticipation of and during this litigation, including the failure to preserve potentially relevant evidence." *Id.* at 2. "The only reasonable explanation for Giuliani's blatant

---

[3]   One does not have to be a constitutional scholar to know that Mr. Giuliani's problematic statements—including whether an individual (a) has a "history of voter fraud participation," (b) used a USB drive to "invade Dominion [voting] machines" or (c) scanned a ballot multiple times to increase the amount of votes for a certain candidate fivefold—are not opinions.

disregard for satisfying his preservation obligations—despite fully understanding them—is that he

intentionally and willfully ignored them." *Id.* at 39–40, 46. The District Court further explained:

> "Defendant Rudolph W. Giuliani is taken at his word that he understands these
> obligations. He assured this Court directly that he 'understand[s] the obligations'
> because he has 'been doing this for 50 years[.]'" Transcript of May 19, 2023 Mot.
> Hearing ('May 19 Hr'g. Tr.') at 67:21–68:6, Freeman Litigation Dkt. No. 75. In
> this case, however, Giuliani has given only lip service to compliance with his
> discovery obligations and this Court's orders by failing to take reasonable steps to
> preserve or produce his ESI. Instead, Giuliani has submitted declarations with
> concessions turned slippery on scrutiny and excuses designed to shroud the
> insufficiency of his discovery compliance. ***The bottom line is that Giuliani has
> refused to comply with his discovery obligations and thwarted plaintiffs Ruby
> Freeman and Wandrea' ArShaye Moss' procedural rights to obtain any
> meaningful discovery in this case.***"

*Id.* at 2 (emphasis added).

> **d.      A Federal Jury Awarded Nearly $150 Million in Compensatory and
> Punitive Damages.**

39.      The District Court ordered a trial on the only remaining issues of "the amount of

compensatory and punitive damages." *Id*. at 56. It provided Mr. Giuliani and his businesses with

additional time to produce materials relevant to damages in order to avoid the imposition of

mandatory adverse inferences. *Id*. at 56. The Default Judgment Order explained, for example,

that documents about the reach of and income generated by Mr. Giuliani's statements about Ms.

Freeman and Ms. Moss were "plainly relevant to the quantification of punitive damages," which

"are warranted when the defendant engaged in 'outrageous conduct which is malicious, wanton,

reckless, or in willful disregard for another's rights.'" *Id*. at 52 (case citation omitted).

40.      Despite the District Court's order, Mr. Giuliani did not produce any additional

materials. As a result, Ms. Freeman and Ms. Moss filed a motion for additional sanctions,

including in the form of adverse inferences regarding his financial condition (Freeman Litigation

Dkt. No. 101), which the Court granted on October 13, 2023 based on Mr. Giuliani's "continued and flagrant disregard" of the Court's order.  Freeman Litigation Dkt. No. 102 at 2.

41.     The damages-only case proceeded to a four-day jury trial beginning on December 11, 2023.  Ms. Freeman and Ms. Moss testified and presented additional live testimony from a number of fact and expert witnesses.  Mr. Giuliani "participated," but did not present any witnesses or testimony.

42.     On December 15, 2023, the jury returned a unanimous verdict awarding Ms. Freeman and Ms. Moss approximately $148 million in combined compensatory and punitive damages:

We, the Jury, unanimously find the following on the questions submitted to us:

**COMPENSATORY DAMAGES:**

DEFAMATION CLAIM

1.  What amount of compensatory damages, if any, would fairly and reasonably compensate Ms. Freeman for defamation caused by Mr. Giuliani and his co-conspirators?

    AMOUNT: $ 16,171,000.00

2.  What amount of compensatory damages, if any, would fairly and reasonably compensate Ms. Moss for defamation caused by Mr. Giuliani and his co-conspirators?

    AMOUNT: $ 16,998,000.00

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

3.  What amount of compensatory damages, if any, would fairly and reasonably compensate Ms. Freeman for emotional distress caused by Mr. Giuliani and his co-conspirators?

    AMOUNT: $ 20,000,000.00

4.  What amount of compensatory damages, if any, would fairly and reasonably compensate Ms. Moss for emotional distress inflicted by Mr. Giuliani and his co-conspirators?

    AMOUNT: $ 20,000,000.00

**PUNITIVE DAMAGES:**

5.  What amount of punitive damages, if any, should be awarded to Ms. Freeman and Ms. Moss for Mr. Giuliani's conduct?

    AMOUNT: $ 75,000,000.00

Freeman Litigation Dkt. No. 135.

>    **e.    Mr. Giuliani's Motion to Avoid Posting a Bond is Denied by the District
>    Court Post-Trial.**

43.    On December 18, 2023, Mr. Giuliani, Ms. Freeman, and Ms. Moss entered a joint

Stipulation Regarding Entry of Final Judgment, in which Mr. Giuliani agreed that the Court should

enter declaratory relief which included the following:

> *It is further hereby **DECLARED*** pursuant to 28 U.S.C. § 2201(a), as between
> Plaintiffs and Defendant: (1) *that Defendant Giuliani engaged in extreme and
> outrageous conduct which (2) intentionally and maliciously* (3) caused the
> Plaintiffs to suffer severe emotional distress.
>
> …
>
> *It is hereby **DECLARED*** pursuant to 28 U.S.C. § 2201(a), as between Plaintiffs
> and Defendant: *that Defendant's conduct was intentional, malicious, wanton, and
> willful, such that Plaintiffs are entitled to punitive damages*.

Freeman Litigation Dkt. No. 138 (emphasis added).  Thus, Mr. Giuliani himself has repeatedly

stipulated that his conduct towards Ms. Freeman and Ms. Moss was both willful and malicious—

the exact words used in one of the Bankruptcy Code's non-dischargeability provisions.  *See* 11

U.S.C. § 523(a)(6).

44.    Also on December 18, 2023, Ms. Freeman and Ms. Moss moved the District Court

to dissolve Federal Rule of Civil Procedure 62(a)'s automatic 30-day stay of enforcement, and to

permit Ms. Freeman and Ms. Moss to immediately register the forthcoming final judgment in any

other judicial district.  Freeman Litigation Dkt. No. 139 ("Motion to Dissolve Stay").  The Motion

to Dissolve Stay argued that such relief was necessary given Mr. Giuliani demonstrated an

"unwillingness to comply with judicial process" and the risk that he will "find a way to dissipate"

his assets before Ms. Freeman and Ms. Moss are able to recover.  *Id.* at 1.

45.     Shortly thereafter on the same day, the District Court entered judgment in the total amount of $146,206,113.00 plus post-judgment interest, along with the declaratory relief described above.  Freeman Litigation Dkt. No. 142.

46.     On December 20, 2023, after considering pleadings from both sides, the District Court granted Ms. Freeman and Ms. Moss' Motion to Dissolve Stay, finding such relief "both appropriate and warranted" under Federal Rule 62(a) of Civil Procedure given Mr. Giuliani's "repeated failures" to comply with District Court orders and "the ample record in this case of Giuliani's efforts to conceal or hide his assets by failing to comply with discovery requests, including 'plaintiffs' requests for financial information.'"  Freeman Litigation Dkt. No. 144 at 1, 7–8.  The District Court added:

> "Moreover, should this case be appealed, Giuliani can avoid any claimed prejudice and obtain a stay of enforcement 'at any time by posting a full supersedeas bond pursuant to Federal Rule of Procedure 62(b).'"

*Id*. at 11-12 (citation omitted).

47.     The District Court explained that a "full supersedeas bond should be the requirement in normal circumstances" because a stay pending appeal "operates for the appellant's benefit and deprives the appellee of the immediate benefits of his judgment[.]"  *Id*. (citations omitted).  Rather than appeal, the next day—December 21, 2023—Mr. Giuliani filed this chapter 11 bankruptcy case.

**f.     Mr. Giuliani Has Continued to Defame Ms. Freeman and Ms. Moss.**

48.     Mr. Giuliani continued to defame Ms. Freeman and Ms. Moss before, during, and after the damages trial, notwithstanding the District Court's entry of default judgment and Mr. Giuliani's own stipulations in which he did not contest the factual allegations in the Amended Complaint.  (Freeman Litigation Dkt. Nos. 84, 90, 93–94, 102 & 103–2).

49.     For example, on December 11, 2023—more than three months after the entry of

default judgment and minutes after the end of the first day of trial, during which he heard opening

statements detailing the harm he caused Ms. Freeman and Ms. Moss—Mr. Giuliani walked outside

the District Court house and had the following exchange with a reporter:

> GIULIANI:        … [E]verything I said about them is true.
>
> REPORTER:        Do you regret what you did to Sh- Ruby Freeman?
>
> GIULIANI:        Of course I don't regret it, I told the truth. They, they were engaged in changing votes.

Ex. 60.

50.     Mr. Giuliani continued to accuse Ms. Freeman and Ms. Moss of committing voter

fraud postpetition.  On January 5, 2024, Mr. Giuliani appeared on his daily Twitter live cast,

*America's Mayor Live*, and said:

> "[t]he case was in Georgia, the two women, I could play the tapes for you right now of one of them counting ballots four times,… Submit to the lie that these women didn't do multiple counts of the ballot. Submit to the lie that Atlanta, Georgia didn't engage in election fraud, it would almost be inconsistent in who they are if they didn't engage in election fraud."[4]

## III.   MR. GIULIANI'S CHAPTER 11 FILING

51.     Rather than appeal the $148 million verdict, on December 21, 2023, the Debtor

filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101–1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern

District of New York (the "Court").  The Debtor is authorized to continue to operate as a debtor in

---

[4]   Rudy W. Giuliani (@RudyGiuliani), *America's Mayor Live E315 Joe Biden Says My Name in Re-Election Campaign Announcement - My Response*, (Jan. 5, 2024, 8:00 PM), https://x.com/RudyGiuliani/status/1743437296396013678?s=20 at 15:03–16:04.

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the chapter 11 case.

52.     On January 5, 2024, the Debtor filed the Stay Relief Motion.  Other than motions to retain counsel and extend the period of time by which to file his bankruptcy schedules, the Stay Relief Motion is the only motion Mr. Giuliani has filed in this case.

53.     On January 12, 2024, the United States Trustee formed an Official Committee of Unsecured Creditors, on which Ms. Moss serves.

## **OBJECTION**

## IV.     THE STAY RELIEF MOTION IMPROPERLY SEEKS TO WIELD THE AUTOMATIC STAY AS A SHIELD AND A SWORD

54.     The Stay Relief Motion seeks impermissible relief.  It is black letter bankruptcy law that the automatic stay can only be used as a shield and not a sword.  *See Sternberg v. Johnston*, 582 F.3d 1114, 1124 (9th Cir. 2009) ("We have never said the stay should aid the debtor in pursuing his creditors . . . . The stay is a shield, not a sword."); *In re Uchitel*, No. 20-11585 (JLG), 2022 WL 3134217, at *13 (Bankr. S.D.N.Y. Aug. 4, 2022) ("To hold otherwise would be to impermissibly enable the Debtor to use bankruptcy as a sword, rather than as a shield."); *see also In re Residential Capital*, No. 12-12020 (MG), 2012 Bankr. LEXIS 3624 (Bankr. S.D.N.Y. Aug. 7, 2012) (denying creditor's lift stay motion and rejecting partial lifting of the automatic stay). Through the Stay Relief Motion, Mr. Giuliani seeks one-sided relief from the automatic stay, while depriving Ms. Freeman and Ms. Moss of their rights under the Federal Rules of Civil Procedure ("FRCP").  Specifically, the Stay Relief Motion notes that it "would not [] authorize [Ms. Freeman and Ms. Moss] to take any steps to perfect additional liens or otherwise proceed with further collection of the judgment except to participate in the post-judgment litigation."  Stay Relief Motion ¶ 9.

55.    As an initial matter, Mr. Giuliani impermissibly seeks to use the Stay Relief Motion as a sword against his creditors by performing an end-run around the District Court's December 20, 2023 order granting the Motion to Dissolve Stay.  That order suspended the standard 30-day stay pending appeal and allowed Ms. Freeman and Ms. Moss to begin enforcing their judgment immediately.  Mr. Giuliani "may not use the automatic stay as a strategy device to circumvent its failure to obtain a stay pending appeal." *In re Cinnabar 2000 Haircutters, Inc.*, 20 B.R. 575, 577 (Bankr. S.D.N.Y. 1982).  Moreover, "bankruptcy laws should not be a haven for contumacious conduct" of debtors.  *Id.*  In granting the motion, the District Court determined that there were legitimate concerns about Mr. Giuliani rapidly dissipating his assets and his "unwillingness to comply with judicial process."  Freeman Litigation Dkt. No. 144 (citation omitted).  Mr. Giuliani should not be allowed to use the bankruptcy process for his own strategic litigation advantage.

56.    Mr. Giuliani is also seeking to use the automatic stay as a sword to attack Ms. Freeman's and Ms. Moss' rights.  As judgment creditors, Ms. Freeman and Ms. Moss have special rights under the Federal Rules of Civil Procedure.  Specifically, FRCP 62 authorizes plaintiffs to execute on money judgments pending appeal, unless the defendant posts a bond securing the full amount of the judgment, or other "adequate" security.  Fed. R. Civ. P. 62(b); *see also In re Nassau Cnty. Strip Search Cases*, 783 F.3d 414, 417 (2d Cir. 2015) ("The purpose of [Rule 62] is to ensure that the prevailing party will recover in full, if the decision should be affirmed, while protecting the other side against the risk that payment cannot be recouped if the decision should be reversed.") (internal citation omitted).  Put simply, the FRCP provide at least as much protection to a plaintiff's rights in his or her money judgment as they do to a defendant's right to appeal that judgment.  That makes good sense: Mr. Giuliani has already litigated (and lost) whether he is liable to Ms. Freeman and Ms. Moss on these claims.  If this case were proceeding outside of bankruptcy, Mr. Giuliani

only could have stayed execution by providing Ms. Freeman and Ms. Moss with adequate security,

which would normally secure the full amount of his liability.[5]  Instead, Mr. Giuliani chose to file

a bankruptcy petition as a direct response to the judgment in the Freeman Litigation.  Mr. Giuliani

now seeks selective and one-sided relief from the automatic stay—a transparent attempt to use the

bankruptcy process as a sword to achieve an outcome the FRCP would not permit.[6]

57.     None of the law Mr. Giuliani cites in the Stay Relief Motion supports granting such

one-sided relief.  The Stay Relief Motion cites no statutory authority for the proposition that the

Bankruptcy Court has the authority to partially lift the automatic stay or deny judgment creditors

their protection under FRCP 62.  Further, Mr. Giuliani cites to *In re Mildred Deli Grocery, Inc.*,

No. 18-10077 (MG), 2018 Bankr. LEXIS 546 (Bankr. S.D.N.Y. Feb. 28, 2018), but that case does

not support a partial lifting of the automatic stay.  There, creditors moved to lift the automatic stay

to continue a litigation against the debtor that was set *for trial* so that a claim against the debtor (if

---

[5]  "Because the stay operates for the appellant's benefit and deprives the appellee of the immediate benefits of his judgment, a full supersedeas bond should be the requirement in normal circumstances[,]" but the district court in its discretion may lower the amount of the bond if doing so "do[es] not unduly endanger the judgment creditor's interest in ultimate recovery." *Fed. Prescription Serv., Inc. v. Am. Pharma Ass'n*, 636 F.2d 755, 760–61 (D.C. Cir. 1980).

[6]  Mr. Giuliani's effort to use the automatic stay as an impermissible sword against the FRCP is further buttressed by an analysis of the Federal Rules of Bankruptcy Procedure ("FRBP").  FRBP 7062 incorporates FRCP 62 into adversary proceedings.  *See* FRBP 7062 ("Rule 62 F.R.Civ.P. applies in adversary proceedings, except that proceedings to enforce a judgment are stayed for 14 days after its entry.").  Bankruptcy courts are no different in requiring movants pursuing an appeal of a bankruptcy court order to file a bond to stay enforcement of such order during the appeal process.  *See, e.g., In re Tribune Co.*, 477 B.R. 465, 482-83 (Bankr. D. Del. 2012) (granting movants' request for a stay pending appeal of bankruptcy court's confirmation order conditioned upon the posting of a supersedeas bond); *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 368 (S.D.N.Y. 2007) (same) (stay subsequently vacated for failure to post bond); *In re Motors Liquidation Co.*, 539 B.R. 676, 687 (Bankr. S.D.N.Y. 2015) (finding a bond "necessary" and granting plaintiffs' request for a stay pending appeal from a judgment rendering a $135 million distribution from the general unsecured creditors' trust pool, subject to the posting of a bond in the amount of $10.6 million); *see also In re Taub*, 470 B.R. 273, 280 (E.D.N.Y. 2012) (denying stay on procedural grounds, but noting that "[t]he Court would require the Debtor to post a bond of one million dollars if it granted the requested stay").  Accordingly, even a chapter 11 debtor who wishes to appeal a judgment rendered in an adversary proceeding must comply with FRCP 62.  Mr. Giuliani's position—that the Bankruptcy Court can partially lift the automatic stay and ignore FRCP 62's requirements—is therefore in contravention of the Federal Rules of Bankruptcy Procedure.

any) could become "fixed." *Id.* at \*3, \*9. *Mildred Deli* says nothing about a debtor's right to pursue litigation without complying with the Federal Rules of Civil Procedure.[7]

58.     Equitable considerations also dictate that Mr. Giuliani should be prevented from using the automatic stay as a sword. The Stay Relief Motion is a thinly veiled attempt by Mr. Giuliani to appeal the Freeman Litigation without posting a supersedeas bond. The closest case law parallel to the facts here are those cases involving bad-faith filings or otherwise improper uses of the bankruptcy system. *See, e.g.*, *In re Cinnabar 2000 Haircutters, Inc.*, 20 B.R. at 576 (lifting the automatic stay and holding that chapter 11 should not be used to avoid a permanent injunction issued as part of a judgment entered before the bankruptcy petition); *In re Wally Findlay Galleries (New York), Inc.*, 36 B.R. 849, 851 (Bankr. S.D.N.Y. 1984) (holding that debtor with insufficient assets to post bond to obtain stay pending appeal filed for chapter 11 to use bankruptcy court as "an appellate forum to review the state court's grant of summary judgment" and stating that the "***court should not, and will not, act as a substitute for a supersedeas bond of state court proceedings***") (emphasis added); *In re Sletteland*, 260 B.R. 657, 662 (Bankr. S.D.N.Y. 2001) (explaining that cases filed with an "intent to use the bankruptcy process solely as a means to

---

[7]     None of the other cases cited by Mr. Giuliani address the Bankruptcy Court's authority to partially lift the automatic stay in order to allow a debtor to pursue an appeal without otherwise complying with the FRCP. In *In re Bogdanovich*, 292 F.3d 104 (2d Cir. 2002), two prepetition creditors had a $3.25 million state court judgment against the debtor. *Bogdanovich*, 292 F.3d at 108–09. The creditors obtained an order from the Bankruptcy Court finding their claim to be non-dischargeable and moved to lift the automatic stay in order to enter the state court judgment. *Id.* at 109. The Bankruptcy Court granted plaintiffs' motion to lift the stay so that they could enter the judgment. The Second Circuit reversed the holding and found that the Bankruptcy Court abused its discretion in lifting the stay given open questions about whether the plaintiffs' claim satisfied the non-dischargeable claim standard of 11 U.S.C. § 523(a)(2)(A). *Id.* at 115. If anything, *In re Bogdanovich* undermines Mr. Giuliani's position and shows he should first litigate the dischargeability of Ms. Freeman's and Ms. Moss' claims before seeking to resume the Freeman Litigation in the District Court. Separately, in *In re New York Medical Group, P.C.*, 265 B.R. 408 (Bankr. S.D.N.Y. 2001), a court granted a creditor's motion to lift the automatic stay to litigate a medical malpractice claim because such litigation would not involve the time or attention of the debtor's current personnel or affect the debtor's ability to confirm the plan of reorganization. *Id.* at 413.

delay, frustrate and relitigate State court issues" and with no "intent to reorganize" are filed in bad faith); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986) (noting findings of bad faith to include "the debtor and one creditor [having] proceeded to a stand-still in state court litigation, and the debtor [having] lost or [having] been required to post a bond which it cannot afford"). Moreover, allowing an appeal of the Freeman Litigation to go forward would ensure that whatever limited distributable value is left in Mr. Giuliani's estate is used to prioritize and pay Mr. Giuliani's outside litigators rather than his unsecured creditors.

59.    Mr. Giuliani's strategy in bankruptcy continues a pattern of behavior that he established throughout discovery and trial in the Freeman Litigation. In that litigation, Mr. Giuliani repeatedly violated court orders and avoided his discovery obligations, all part of a strategy that depended on an intentional abuse of the civil justice system. That willful litigation misconduct led to the default judgment sanction that Mr. Giuliani now hopes to appeal. As Judge Howell noted when issuing final judgment, Mr. Giuliani engaged in sanctionable "willful shirking of his discovery obligations in anticipation of and during this litigation[.]" Freeman Litigation Dkt. No. 142 at 1 (internal quotations omitted). It would be highly inequitable to permit Mr. Giuliani to exploit the Bankruptcy Code to the same ends. Bankruptcy is not "a substitute for a supersedeas bond," or "a litigating tactic" to allow a debtor "to avoid the consequences of adverse [district] court decisions while [he] continues litigating." *See In re Wally Findlay Galleries (New York), Inc.*, 36 B.R. at 851 (dismissing a Chapter 11 petition where debtors sought to relitigate an underlying judgment that motivated the petition, despite the debtors' limited resources to post a bond). Mr. Giuliani's one-sided motion to lift the stay would upend the design of the Federal Rules of Civil Procedure and subvert the Bankruptcy Code's purposes in favor of his own abusive litigation strategy.

## V.    THE COURT SHOULD DENY THE STAY RELIEF MOTION BECAUSE MR. GIULIANI HAS NOT MET HIS BURDEN TO ESTABLISH CAUSE

60.    Section 362(d)(1) of the Bankruptcy Code allows the Bankruptcy Court to lift the automatic stay on request of a party in interest and after notice and a hearing for "cause."  11 U.S.C. § 362(d)(1).  While the Bankruptcy Code does not define the term "for cause," such term is a "broad and flexible concept that must be determined on a case-by-case basis."  *U.S. Bank Tr. Nat'l Ass'n v. Am. Airlines, Inc. (In re AMR Corp.)*, 485 B.R. 279, 295 (Bankr. S.D.N.Y. 2013).  Courts in this district evaluate whether or not cause exists by considering the following, non-exhaustive list of twelve factors:

- (1) whether relief would result in a partial or complete resolution of the issues;

- (2) lack of any connection with or interference with the bankruptcy case;

- (3) whether the other proceeding involves the debtor as a fiduciary;

- (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

- (5) whether the debtor's insurer has assumed full responsibility for defending it;

- (6) whether the action primarily involves third parties;

- (7) whether litigation in another forum would prejudice the interests of other creditors;

- (8) whether the judgment claim arising from the other action is subject to equitable subordination;

- (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;

- (10) the interests of judicial economy and the expeditious and economical resolution of litigation;

- 24 -

- (11) whether the parties are ready for trial in the other proceeding; and

- (12) impact of the stay on the parties and the balance of harms.

*In re Sonnax Indus., Inc.*, 907 F.2d 1280 (2d Cir. 1990). No one of these factors—the so-called "Sonnax" factors—is dispositive. Whether cause exists to lift the automatic stay "depends upon the facts underlying a given motion." *In re Bogdanovich*, 292 F.3d at 110 (citation omitted). Importantly, the moving party (i.e., Mr. Giuliani) bears the burden of making an initial showing of cause for relief from the stay. *In re Mazzeo*, 167 F.3d 139, 142 (2d Cir. 1999). "Only if the movant makes such a showing does any burden shift to the debtor; absent a showing of cause, the court should simply deny relief from the stay." *Id.*[8]

### a.    The Court Should Deny the Stay Relief Motion Because it Fails to Make a *Prima Facie* Showing that Cause Exists for Lifting the Stay

61.    Even if the relief was for both sides equally, the Bankruptcy Court should deny the Stay Relief Motion because it makes no effort to apply the *Sonnax* factors to the facts of this case. Courts applying the *Sonnax* factors have emphasized that a motion merely articulating the factors—rather than applying them—cannot be deemed to constitute a showing of cause. *See Barcelona Capital, LLC v. Neno Cab Corp.*, 648 B.R. 578, 59192 (E.D.N.Y. 2023) (emphasizing that a failure to describe how the *Sonnax* factors weigh in favor of granting relief from the automatic stay constitutes reason alone to deny relief from the automatic stay for failure to demonstrate "cause"); *Holzer v. Barnard*, No. 15-cv-6277, 2016 U.S. Dist. LEXIS 98175, at *41 (E.D.N.Y. July 27, 2016) (affirming bankruptcy court's denial of relief from the automatic stay when creditor "failed to make an initial showing of cause"). Here, the application of the *Sonnax*

---

[8]    Notably, virtually all case law addressing section 362(d)(1) involves a *creditor's* motion for relief from stay. Here, where the Debtor seeks such relief, if, and only if, the Debtor can meet its burden would the burden shift to the opposing creditors.

factors is a single, conclusory statement that "[e]fficient resolution of the Debtor's post-judgment motion(s) and/or appeal(s) from the judgment in the District Court will assist resolution of the bankruptcy action."  Stay Relief Motion ¶ 13.  Such "analysis" is wholly inadequate to establish cause for many reasons, including: (a) it lacks a discussion about how each of the applicable *Sonnax* factors apply, (b) it does not clearly relate to any of the *Sonnax* factors, and (c) there is no explanation why squandering estate assets to resolve appeals in the Freeman Litigation—which involve non-dischargeable claims—will help resolve the chapter 11 case.  Accordingly, this Court should deny the Stay Relief Motion on its face.

#### b.      The Sonnax Factors Do Not Support Granting the Stay Relief Motion

62.     Even if Mr. Giuliani were to attempt to satisfy his burden of proving that "cause" exists to lift the automatic stay (which he has not), the *Sonnax* factors support denial of the Stay Relief Motion.

##### i.   *Factor 1:   Whether Relief Would Result in a Partial or Complete Resolution of the Issues*

63.     Lifting the automatic stay to allow Mr. Giuliani to pursue an appeal will not result in a partial or complete resolution of the Freeman Litigation.  The Freeman Litigation involves a default judgment entered against Mr. Giuliani as a sanction for his numerous and willful discovery violations in the District Court.  On appeal, Mr. Giuliani could not simply challenge the District Court's finding of liability without first succeeding in a challenge to Judge Howell's decision to impose discovery sanctions on Mr. Giuliani.  Such a challenge would be subject to abuse-of-discretion review and, in any event, would be meritless in light of Mr. Giuliani's own stipulations to liability, as well as the egregious and willful nature of Mr. Giuliani's violations.  *See Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC*, 776 F.3d 1, 4 (D.C. Cir. 2015) (affirming entry of default judgment as a discovery sanction under the abuse of discretion

standard).  Most importantly, even if Mr. Giuliani were successful in winning vacatur of the default judgment, the *only* result would be a remand to the District Court for further proceedings on Ms. Freeman and Ms. Moss' now-unliquidated claims.  Even if Mr. Giuliani "won" every appeal, the result would not be a partial or complete resolution of the Freeman Litigation.  Instead, the Freeman Litigation would simply return to a posture where Ms. Freeman and Ms. Moss hold unliquidated prepetition claims against Mr. Giuliani.

64.     The fact that claims in the Freeman Litigation are non-dischargeable also means that lifting the stay will not result in a complete or partial resolution of these claims.  Under the Bankruptcy Code, a debtor may not discharge debts arising from "willful and malicious" injuries. *See* 11 U.S.C. § 523(a)(6).  Bankruptcy courts routinely find that claims relating to defamation and intentional infliction of emotional distress are the exact type of "willful and malicious" injuries that section 523(a)(6) renders non-dischargeable.  *See, e.g.*, *Pagones v. Mason (In re Mason)*, Adv. Pro. No. 95-1653A (JLG), 1999 Bankr. LEXIS 90, at*8 (Bankr. S.D.N.Y. Jan. 28 1999) ("The intentional tort of defamation may constitute 'willful and malicious injury' by the debtor to another entity under § 523(a)(6) of the Bankruptcy Code, as long as the debtor knew the published statements were false."); *Marshall v. Marshall (In re Marshall)*, 264 B.R. 609, 630 (C.D. Cal. 2001) (noting defamation as non-dischargeable); *Hawkins v. Tyree*, 483 B.R. 598, 600 (S.D.N.Y. 2012) (collecting cases about non-dischargeability of intentional infliction of emotional distress claims).  Importantly, Mr. Giuliani stipulated that his actions were "willful" and "malicious" during the Freeman Litigation—the exact words needed to satisfy the section 523(a)(6) standard.

65.     In light of Ms. Freeman's and Ms. Moss' intent to have their claims be found non-dischargeable, efficient case management dictates that Mr. Giuliani should first litigate non-dischargeability in the Freeman Litigation, rather than pursue a meritless appeal.  Federal Rule of

Bankruptcy Procedure 4007(c) requires a party in interest to file a complaint to establish the non-dischargeability of a claim within sixty days of the Section 341 meeting.  Thus, the FRBP provide a clear and expedited path for resolving questions of non-dischargeability.  If this Court determines that the claims in the Freeman Litigation are non-dischargeable, then there is no possible justification for granting any stay relief motion (let alone a motion for one-sided relief).  In that case, Mr. Giuliani could simply resume his appeal *after* the resolution of the chapter 11 case without prejudice.  As a result, addressing the non-dischargeability issue first would better ensure that both (a) Mr. Giuliani's limited estate assets are not spent appealing claims that will ultimately be unaffected by the chapter 11 plan and (b) this chapter 11 case is not paused until the resolution of the Freeman Litigation appeal.

ii.   *Factor 2:  Lack of any Connection with the Bankruptcy Case*

66.     When analyzing the second *Sonnax* factor, courts assess the extent to which lifting the stay will impact the broader bankruptcy.  *See In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2022 Bankr. LEXIS 3220, at *4243 (Bankr. S.D.N.Y. Nov. 14, 2022) (analyzing how continuing non-bankruptcy litigation during the chapter 11 case can interfere with the administration of claims process and bankruptcy case generally); *In re Residential Cap, LLC*, 501 B.R. 624, 644 (Bankr. S.D.N.Y. 2013) ("Litigation in non-bankruptcy courts would hinder the Debtors' attempts to reorganize by forcing the Debtors to utilize time and resources that would otherwise be spent in resolution of the Debtors' chapter 11 cases.").  Here, Mr. Giuliani seeks authority to expend significant estate resources on an appeal that (a) is meritless,[9] (b) would not resolve the claims in

---

[9]   For example, to win on appeal, Mr. Giuliani would need to get an appellate court to agree that not just a handful, but substantially *all* of his statements were opinions.  These statements include the false factual allegations that (a) Ms. Freeman has a "history of voter fraud participation," (b) Ms. Freeman and Ms. Moss used USB drives to "invade Dominion [voting] machines," and (c) Ms. Freeman and Ms. Moss illegally kicked out election observers

the Freeman Litigation, and (c) involves non-dischargeable claims.  Granting the Stay Relief

Motion would be devastating for potential creditor recoveries, as the legal costs needed to

prosecute these appeals will eat a substantial portion of the less than $10 million of value in the

estate.[10]  As noted above, if there is a dispute, judicial efficiency—and, therefore, the interest of

unsecured creditors generally—would be better served by first litigating non-dischargeability.

Accordingly, the second *Sonnax* factor cuts against granting the Stay Relief Motion.

   iii. *Factor 10:  The Interests of Judicial Economy and the Expeditious and*
     *Economical Resolution of Litigation*

  67. The interests of judicial economy and the expeditious and economical resolution of

the litigation also weigh against lifting the automatic stay.  In order for considerations of judicial

economy to cut in favor of lifting the stay, the litigation must (a) not result in a delay of the chapter

11 case and (b) alleviate the need for further proceedings in the bankruptcy court.  *See In re Cicale*,

No. 05-14462, 2007 Bankr. LEXIS 2252, at \*12 (Bankr. S.D.N.Y. June 29, 2007).[11]  Here, neither

condition is satisfied.  Mr. Giuliani has taken the position that: "[t]he sooner the *Freeman* judgment

---

under false pretenses and then used the absence of those observers to engage in the scanning of ballots multiple
times to increase the amount of Biden votes fivefold.

[10] Mr. Giuliani has filed a retention application seeking to employ Camara & Sibley, LLP as special litigation counsel
for the Freeman Litigation.  *See Debtor's Application for Retention and Employment of Camara & Sibley, LLP as
Special Litigation Counsel Effective December 21, 2023* [Docket No. 40] ("C&S Application").  The C&S
Application states that third-party legal defense funds have provided "assurances and representations that all future
costs and fees will be reimbursed/paid for by the legal defense funds and C&S will look to those funds first and
foremost for any fees or expenses incurred in this representation."  To the extent Mr. Giuliani attempts to point to
this arrangement as evidence that his appeal will be cost-neutral to the estate, it is worth emphasizing that C&S
does not waive its right to seek fees from the estate.  For the avoidance of doubt, Ms. Freeman and Ms. Moss
reserve all rights to object to the C&S Application, including as a result of insufficient disclosure.

[11] In *In re Cicale*, the parties disagreed whether the amount owed by debtor under a mortgage (arising from the
debtor's forgery) was non-dischargeable under section 523(a)(2)(A).  2007 Bankr. LEXIS 2252, at \*2.  There, the
court lifted the automatic stay so that a non-bankruptcy court could address the issue of liability despite an open
question of non-dischargeability.  *Id.* at \*9.  The facts here are quite different given the procedural posture of the
Freeman Litigation.  Even if Mr. Giuliani "won" every appeal, the result would not be a partial or complete
resolution of the Freeman Litigation.  Accordingly, allowing Mr. Giuliani to pursue an appeal will not "alleviate
the need for any future [dischargeability] proceedings in the bankruptcy court."  *Id.* at \*4.

can be addressed, the sooner [Mr. Giuliani] will be in a position to file a proposed Plan of Reorganization." *See Application in Support for an Order Scheduling an Expedited Hearing* [Dkt. No. 26] ¶ 5.  In other words, the sooner Mr. Giuliani exhausts his Freeman Litigation appeals— which could take months or years—the sooner he will be able to move his chapter 11 case forward. The Court does not need to squint to see that the Stay Relief Motion is designed to delay this chapter 11 case and divert his estate's limited assets to paying his lawyers rather than creditors. Moreover, successfully appealing the Freeman Litigation for Mr. Giuliani means returning to square one with Ms. Freeman and Ms. Moss holding unliquidated claims (which will not obviate the need for proceedings on dischargeability and, potentially, claims estimation).  For this reason, the second condition noted above also cannot be satisfied.

68.    Mr. Giuliani's conduct during the Freeman Litigation also should preclude a finding that his proposed path forward is in the interest of the expeditious resolution of litigation. Mr. Giuliani is facing a $148 million liability as a result of *default judgment*, to which he stipulated. He was given every opportunity (and then some) to meaningfully participate in the Freeman Litigation and chose not to do so.  During the course of that litigation, Mr. Giuliani routinely and repeatedly refused to comply with the District Court's orders, based on his strategic assessment that defaulting was a preferable strategy to litigating, which (along with his stipulations) left Judge Howell no choice but to enter a default judgment.  *See* Default Judgment Order at 2.  ("The bottom line is that Giuliani has refused to comply with his discovery obligations and thwarted plaintiffs Ruby Freeman and Wandrea' ArShaye Moss' procedural rights to obtain any meaningful discovery in this case.").  Against that backdrop, the Stay Relief Motion should be seen as another litigation tactic by Mr. Giuliani designed to evade his creditors, rather than promote judicial efficiency.  Accordingly, this factor cuts against granting the Stay Relief Motion.

iv. *Factor 12: Impact of the Stay on the Parties and the Balance of Harms*

69.     The twelfth *Sonnax* factor is a broader inquiry and balances the harms of parties-in-interest if the automatic stay were to be lifted. *Stasko v. Motors Liquidation (In re Motors Liquidation Co.)*, No. 10-CV-4322 (JGK), 2011 U.S. Dist. LEXIS 67750, at *5 (S.D.N.Y. June 17, 2011) (noting the twelfth factor as "one of the most important" of the *Sonnax* factors).   On one side of the scale is Mr. Giuliani.   He will not be harmed if the Stay Relief Motion is denied (especially if permitted to file a notice preserving his right to appeal).   Either the Freeman Litigation claims cannot be discharged (and Mr. Giuliani can pursue his appeal after the chapter 11 case concludes) or they can be discharged (and Mr. Giuliani can then move to lift the automatic stay *in full for all* if he intends to comply with the Federal Rules of Civil Procedure).   Conversely, granting the Stay Relief Motion will significantly harm all general unsecured creditors who will endure the erosion of the estate's limited resources.[12]   For this reason alone, the balance of harms cuts in favor of denying the Stay Relief Motion.   Factoring in the particular effects on Ms. Freeman and Ms. Moss, who would suffer the same harms, but without the protection ordinarily afforded by FRCP 62, the balance of harms becomes even more one-sided.   Accordingly, the twelfth *Sonnax* factor cuts against lifting the stay.

---

[12]   To further ensure that Mr. Giuliani's limited estate resources are not wasted, Ms. Freeman and Ms. Moss are considering commencing an adversary proceeding for injunctive relief that would seek to bar Mr. Giuliani from making additional defamatory statements about them and in connection with the 2020 federal election.   *See In re Cinnabar 2000 Haircutters, Inc.*, 20 B.R. at 576 (granting lift stay motion filed by judgment creditor to ensure debtor could not use bankruptcy to not observe injunctive relief).   Such relief would benefit all creditors by ensuring Mr. Giuliani does not further erode his limited estate resources by incurring additional liability from postpetition tortious actions.

v.   *All Other Sonnax Applicable Factors Cut Against Lifting the Stay*

70.     While not all of the *Sonnax* factors will be relevant in each case, the remaining

applicable factors all weigh heavily in favor of denying Mr. Giuliani's relief from the automatic

stay:

- *Factor Three:  Whether the Other Proceeding Involves the Debtor as a Fiduciary.*  Mr. Giuliani was not acting as a fiduciary when he committed intentional torts against Ms. Freeman and Ms. Moss.  Accordingly, Mr. Giuliani cannot cite this factor as a basis for lifting the stay.  *In re Residential Capital, LLC*, No. 12-12020 (MG), 2012 Bankr. LEXIS 3777, at *9 (Bankr. S.D.N.Y. Aug. 16, 2012) (denying motion to lift automatic stay and noting that "generally, proceedings in which the debtor is a fiduciary . . . need not be stayed because they bear no relationship to the purpose of the automatic stay, which is debtor protection from his creditors") (citation omitted).

- *Factor Five:   Whether the Debtor's Insurer Has Assumed Full Responsibility for Defending It.*  No insurer has assumed responsibility for Mr. Giuliani's conduct in the Freeman Litigation.  As a result, Mr. Giuliani would be required to pay all expenses in connection with defending any post-judgment litigation or appeal with funds from the bankruptcy estate, unnecessarily draining limited estate resources.  This factor weighs heavily in favor of denying relief from the automatic stay.

- *Factor Six:  Whether the Action Primarily Involves Third Parties.*  Mr. Giuliani is the only party adverse to Ms. Freeman and Ms. Moss in the Freeman Litigation.  This factor weighs heavily in favor of denying relief from the automatic stay.

- *Factor Seven:  Whether Litigation in Another Forum Would Prejudice the Interests of Other Creditors.*  As noted above, granting the Stay Relief Motion would allow Mr. Giuliani to incur significant legal fees litigating previously resolved issues.  Courts have found that requests to re-litigate issues cut against lifting the automatic stay.  *See In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2022 Bankr. LEXIS 3220, at *4849 (Bankr. S.D.N.Y. Nov. 14, 2022) ("The Court finds that because the claim was already adjudicated, there is no need for the Debtor to expend additional funds or relitigate closed matters. Therefore, this factor weighs against granting the Motion.").  Accordingly, this factor weighs in favor of denying relief from the automatic stay.

- *Factor Eight:  Whether the Judgment Claim Arising from the Other Action is Subject to Equitable Subordination.*  Courts have found that where questions of priority that can be resolved by the Bankruptcy Court are an open issue, the eighth *Sonnax* factor cuts against lifting the automatic stay.  *See In In re Rochester Drug Coop., Inc.*, No. 20-20230-PRW, 2020 Bankr. LEXIS 1935, at *12 (Bankr. W.D.N.Y. July 22, 2020) (denying motion to lift the automatic stay when claims to be litigated involved potential issues of section 510(b) subordination).   Here, because dischargeability questions hang over the Freeman Litigation, there is a question of priority that falls squarely within the Bankruptcy Court's

"province to hear and determine." *Id.*  Accordingly, this factor weighs in favor of denying relief from the automatic stay.

- *Factor Eleven: Whether the Parties Are Ready for Trial in the Other Proceeding*.  In the unlikely event that Mr. Giuliani wins his appeal, the Freeman Litigation will be remanded to the District Court where the parties will then need to begin preparing for trial.  This factor weighs heavily against lifting the automatic stay.

### c.    If the Court Grants the Stay Relief Motion, It Should Only Be to Preserve Mr. Giuliani's Post-Trial Rights

71.    For the reasons explained above, Mr. Giuliani's one-sided motion to lift the stay should be denied.  That said, Ms. Freeman and Ms. Moss would not oppose a much narrower Stay Relief Motion that would authorize lifting the stay for the limited purpose of allowing Mr. Giuliani to file notices to preserve his post-trial rights that are currently being tolled pursuant to Bankruptcy Code Section 108(b).  To that end, Ms. Freeman and Ms. Moss would be willing to support a proposed form of order attached hereto as **Exhibit A**.

### CONCLUSION

72.    For all of the foregoing reasons, Ms. Freeman and Ms. Moss respectfully request that the Court deny the Stay Relief Motion or enter an order consistent with the proposed form of order attached hereto.

Dated: January 18, 2024

By: */s/ Rachel C. Strickland*

Rachel C. Strickland
James H. Burbage
M. Annie Houghton-Larsen
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
rstrickland@willkie.com
jburbage@willkie.com
mhoughton-larsen@willkie.com

Michael J. Gottlieb (*pro hac vice* pending)
Meryl C. Governski (*pro hac vice* pending)
Aaron E. Nathan
WILLKIE FARR & GALLAGHER LLP
1875 K Street NW
Washington, DC 20006
mgottlieb@willkie.com
mgovernski@willkie.com
anathan@willkie.com

Von A. DuBose (*pro hac vice* forthcoming)
DUBOSE MILLER LLC
75 14th Street NE
Suite 2110
Atlanta, GA 30309
Telephone: (404) 720-8111
dubose@dubosemiller.com

Rachel Goodman
John Langford
UNITED TO PROTECT DEMOCRACY
82 Nassau Street, #601
New York, NY 10038
Telephone: (202) 579-4582
rachel.goodman@protectdemocracy.org
john.langford@protectdemocracy.org

## **<u>Exhibit A: Proposed Form of Order</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RUDOLPH W. GIULIANI <br> a/k/a RUDOLPH WILLIAM GIULIANI | Case No. 23-12055 (SHL) |
| Debtor. | **Ref. Docket Nos. 25, 26, & 50** |

**ORDER GRANTING LIMITED RELIEF**
**FROM THE AUTOMATIC STAY TO PRESERVE CERTAIN POST-TRIAL RIGHTS**

Upon consideration of the motion (the "Motion")[1] of Mr. Rudolph W. Giuliani a/k/a

Rudolph William Giuliani (the "Debtor") in the above-caption case, pursuant to section 362 of

title 11 of the United States Code, 11 U.S.C. §§ 101-1532 and Rule 4001(a) of the Federal Rules

of Bankruptcy Procedure, for the entry of an order modifying the automatic stay to permit the

Debtor to file post-trial motions to modify the final judgment entered in *Freeman v. Giuliani*, No.

21-cv-03354 (BAH) (D.D.C. 2021) (the "Freeman Litigation" and such judgment, the "Freeman

Judgment"), move for a new trial, and file a notice of appeal; and the Court having jurisdiction

to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334,

and the *Amended Standing Order of Reference* M-431, dated January 31, 2012 (Preska, C.J.); and

this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been

given; and such notice having been adequate and appropriate under the circumstances and it

appearing that no other or further notice need be provided; and the Court having reviewed the

---

[1] Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the
*Objection of Ruby Freeman and Wandrea' ArShaye Moss to the Debtors' Motion for an Order Modifying the
Stay for the Limited Purposes of Allowing the Debtors to File Post-Trial Motions to Modify the Judgment and
on For a New Trial and to File a Notice of Appeal* [Docket No. 50 ].

Motion; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and all parties-in-interest; and after due deliberation and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      To the extent applicable, the automatic stay is modified, pursuant to Bankruptcy Code section 362(d)(1) and Bankruptcy Rule 4001, solely as to the Debtor and the Objecting Parties and solely to the extent necessary to permit and authorize the Debtor to file either (a) a post-trial motion in the Freeman Litigation under (i) Federal Rule of Civil Procedure 50 and/or (ii) Federal Rule of Civil Procedure 59; or (b) a notice of appeal from the Freeman Judgment entered on December 18, 2023 (each, a "Post-Trial Filing").

3.      For the avoidance of doubt, the automatic stay is modified solely for the purpose of the Debtor's filing of the foregoing Post-Trial Filings.  Any further proceedings with respect to those filings shall remain subject to the automatic stay.  The Debtor shall not be authorized to litigate, pursue, or otherwise exercise any rights in the Freeman Litigation except as provided for in this Order.

4.      At least five (5) business days prior to filing any Post-Trial Filing, the Debtors shall provide notice of such filing and/or action to (a) the Objecting Parties and (b) the official committee of unsecured creditors appointed in this chapter 11 case (the "Committee").  Any Post-Trial Filing filed by the Debtor during this chapter 11 case shall be in a form reasonably acceptable to the Objecting Parties and the Committee.

5.      This Court shall retain exclusive jurisdiction to hear and determine all matters

arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2024
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE