# Exhibit 3

```
1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3    Ruby Freeman,                      ) Civil Action
     Wandrea Moss,                      ) No. 21-cv-3354
4                                       )
                         Plaintiffs,    ) JURY TRIAL
5                                       ) PUBLIC
     vs.                                )
6                                       ) DAY 2 - Afternoon
     Rudolph Giuliani,                  ) Washington, DC
7                                       ) December 12, 2023
                         Defendant.     ) Time:  1:30 p.m.
8    _____

9                    TRANSCRIPT OF JURY TRIAL
                          HELD BEFORE
10            THE HONORABLE JUDGE BERYL A. HOWELL
                    UNITED STATES DISTRICT JUDGE
11   _____

12                    A P P E A R A N C E S

13   For Plaintiffs:    John Langford
                        Protect Democracy
14                      555 W. 5th Street
                        Los Angeles, CA  90013
15                      (919) 619-9819
                        Email:  John.langford@protectdemocracy.org
16
                        Michael J. Gottlieb
17                      Meryl Conant Governski
                        Marie Annie Houghton-Larsen
18                      Willkie Farr & Gallagher, LLP
                        1875 K Street, NW
19                      Washington, DC  20006
                        (202) 303-1442
20                      Email:  Mgottlieb@willkie.com
                        Email:  Mgovernski@willkie.com
21                      Email:  Mhoughton-larsen@willkie.com

22                      Von DuBose
                        DuBose Miller
23                      75 14th Street NE, Suite 2110
                        Atlanta, GA  30309
24                      (404) 720-8111
                        Email:  Dubose@dubosemiller.com

25
```

1   For Defendant:          **Joseph D. Sibley, IV**
                            Camara & Sibley, LLP
2                           1108 Lavaca Street, Suite 110263
                            Austin, TX  78701
3                           (713) 966-6789

4       _____

5   Court Reporter:         Janice E. Dickman, RMR, CRR, CRC
                            Official Court Reporter
6                           United States Courthouse, Room 6523
                            333 Constitution Avenue, NW
7                           Washington, DC  20001
                            (202) 354-3267
8                               *   *   *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Excerpted

1          THE COURT:  Okay.  Let's bring the jury in.

2          Ms. Moss, could you resume the stand for

3     cross-examination?

4          Make yourself comfortable.

5          THE WITNESS:  Yes, ma'am.

6          (Whereupon, the jurors enter the courtroom.)

7          THE COURT:  Mr. Sibley, are you prepared to proceed

8     with your cross-examination?

9          MR. SIBLEY:  Yes, Your Honor.

10                    CROSS-EXAMINATION

11    BY MR. SIBLEY:

12    Q.  Good afternoon, Ms. Moss.

13    A.  Good afternoon, Mr. Sibley.

14    Q.  Nice to finally meet you.

15    A.  You as well.

16    Q.  My client, as you saw last night, likes to talk a lot,

17    unfortunately.  And have you -- you've been -- I mean, this

18    case is very important to you, isn't it?

19    A.  Yes.

20    Q.  Okay.  Have you been kind of following what's happened with

21    the case, like when there's, I don't know, depositions taken,

22    things like that?

23    A.  No, not the depositions and stuff like that.

24    Q.  Okay.  And I'm not saying attend the depositions, but like,

25    for example, did you look at Mr. Giuliani's deposition?

1    A.   No.

2    Q.   Okay.  There was some suggestion, and I believe it was in

3    opening statements by DuBose, I believe he talked about how

4    some of the witnesses that we may hear from, I believe during

5    this trial by deposition, took the Fifth Amendment.  Do you

6    recall that?

7    A.   Yes.

8    Q.   Do you have an understanding of what that means, "the Fifth

9    Amendment"?

10   A.   Yes.

11   Q.   And what's your understanding of that?

12   A.   Basically they don't want to answer the question because

13   they will probably incriminate themselves, something like that.

14   Q.   Right.  And my question for you is:  Are you aware of any

15   time that Rudy Giuliani has taken the Fifth Amendment in this

16   case?

17            MR. LANGFORD:  Objection.

18            THE COURT:  He's just asking if she's aware.

19   Overruled.

20            MR. LANGFORD:  Okay.

21            THE WITNESS:  I'm sorry.  I thought Mr. Giuliani

22   didn't participate in anything dealing with the case.

23   BY MR. SIBLEY:

24   Q.   Okay.  I'm just asking if you're aware of him saying:  I'm

25   taking the Fifth?

1   A.  I'm not aware of him doing anything with this case.  I

2   thought he wasn't cooperating.  I don't know much about it;

3   that's it.

4   Q.  Okay.  Well, would it surprise you to learn that

5   Mr. Giuliani didn't take the Fifth during his deposition?

6   A.  It would surprise me to learn that he took a deposition,

7   yes.

8   Q.  That he didn't take the Fifth Amendment?

9   A.  Yes.  That would surprise me as well.

10  Q.  Okay.  I want to go back and talk about the night of the

11  election in 2020, okay?

12  A.  Yes, sir.

13  Q.  I wasn't sure if I caught everything you said, but I

14  believe what I heard you say -- and correct me if I'm wrong --

15  was that it was kind of a stressful night; is that fair?

16  A.  No, sir.  I didn't say that.

17  Q.  Okay.  I thought you said maybe you were frustrated, there

18  was some frustrations about trying to get all the votes

19  counted, or something like that?

20          MR. LANGFORD:  Your Honor, mischaracterizes the

21  testimony.  Objection.

22          THE COURT:  Sustained.

23  BY MR. SIBLEY:

24  Q.  Well, were there any frustrations by the crew at the State

25  Farm center about counting those votes that night?

1  A.  Not on my part, no.  I -- I know how it goes, I wasn't

2  frustrated.

3  Q.  Were there frustrations there on anyone else's part, I

4  guess?

5          MR. LANGFORD:  Your Honor, objection.  I mean,

6  personal knowledge.

7          THE COURT:  Sustained.

8  BY MR. SIBLEY:

9  Q.  Okay.  And the reason I'm asking is that it seems to me,

10  you have to understand as a layperson who has never counted

11  votes, you know how you sit up at night, you watch the election

12  results and you're waiting on all the precincts to report and

13  everyone wants to get the votes in and figure out who won.  But

14  you know what I'm talking about, right?

15  A.  I'm familiar with people who -- you mean -- I don't

16  understand -- was that a question?

17  Q.  Yeah.

18  A.  Can you ask it again?

19  Q.  Sure.

20          I mean, you understand people sitting at home, they're

21  relying on people, on people like you, who are counting votes

22  to get the results in so that we can figure out who won the

23  election?

24  A.  No.  I wasn't aware of that, but I -- I work in absentee.

25  I'm not a poll worker, I do not work at polls.  And usually

1    those is what you are waiting to watch.  I do the elderly,

2    disabled, military.  And once you all are celebrating who won,

3    I'm still counting until that Friday.  I do provisional, I do

4    paper ballots.  So it's usually not me that -- you know,

5    they're waiting on the polls, but because no one went to the

6    polls, all eyes were on me.  Does that make sense?

7    Q.  I understand.  So now I understand.

8         So what you're saying is the ballots you were counting

9    were the absentee votes that were not done at the poll, they

10   were paper ballots, right?

11   A.  All the paper ballots -- correct.  For people who are

12   unable to make it to the polls, and they get a mail-in ballot,

13   and that's called an absentee ballot.

14   Q.  Understand.

15        And all those votes have to be counted?  You have to

16   count those?

17   A.  Every vote.  But usually it's already decided who won, and

18   we are still counting by hand.

19   Q.  Got it.

20        The video -- we've seen a lot of videos with the State

21   Farm Arena, with the vote counting and things like that going

22   on.  Just -- do you know how many videos there are that

23   circulated?

24   A.  No.  I'm not sure how many there were.

25   Q.  Well, how many videos have you seen of the State Farm Arena

1    with you and your mom and some of the other ladies on there?

2    A.  I saw the same video that Mr. Giuliani and Team Trump

3    Tweeted; that's what I saw.

4    Q.  Okay.  You didn't see any other videos?

5    A.  Not that I know of, just that same one showing us working.

6    It was, like -- we were there from 5:30 a.m. to, like,

7    midnight.  So I saw that same couple of seconds that was going

8    around with us taking the ballots.  I saw that video.  I saw a

9    video where I'm in a lot of pain and my mom gives me the ginger

10   mint and I put it in my back pocket.  I saw that video.  But I

11   don't know which other.

12   Q.  So you all were there from 5:30 a.m. on Election Day until

13   midnight?

14   A.  Probably around -- um-hum, around midnight.

15   Q.  Okay.  So if someone was to watch the entire video, that's

16   like 18 hours of video, right?

17   A.  We were there for two weeks before Election Day, so if they

18   watched from the first day we came to the end, they would see

19   us doing the repeating the same thing every day, all day.

20   Q.  Understand.

21       I think one of the suggestions that have been made here

22   is that the video that was portrayed -- I think to the Georgia

23   Senate, or maybe the one you're talking about that was

24   published by Mr. Giuliani or someone else -- was a shortened

25   version of the video.  Am I right about that?

1    A.   Yes.  It was an edited version, yes, sir.

2    Q.   Okay.  Do you know how long the unedited version was?

3    A.   No, sir.

4    Q.   It would have been a lot longer, right?

5    A.   You mean the edited clip?

6    Q.   The unedited version, like --

7    A.   Oh, right.  It would have been all day.  It would have been

8    all day.

9    Q.   So to get the whole context, you would have had to

10   literally sit and watch an 18-hour video to understand the

11   whole context of what happened on that day?

12              MR. LANGFORD:  Your Honor, objection.  This issue has

13   been decided already.

14              THE COURT:  Overruled.

15   BY MR. SIBLEY:

16   Q.   Right?  To get the whole context, you would have to watch

17   the whole video?

18   A.   The full context of what?

19   Q.   Of what happened on Election Day at the State Farm center.

20   A.   If you want to know what happened that day, yes, sir, you

21   would have to watch the video from that day.

22   Q.   Okay.  And let me just ask you, because you're -- I mean,

23   you worked for a long time in vote counting with Fulton County,

24   right?

25   A.   I worked in registration, yes, sir.

1   Q.  How many years was it?

2   A.  Five years temporary; five years permanent.

3   Q.  And there's training and manuals and things like that you

4   had to go through and read in order to get -- I guess, to have

5   that job; am I right?

6   A.  There are standard operating procedures for each task, and

7   there is an election code book that's given by the Secretary of

8   State that lists all of the election laws that we must follow

9   in order to complete those tasks.

10  Q.  And that's what I'm getting at.  Thank you.

11  A.  Yes, sir.

12  Q.  I think you mentioned that earlier, I just wanted to

13  clarify.

14      So you, as opposed to somebody off the street who is not

15  familiar with the process of counting, say, absentee ballots,

16  you're going to know more about that process than the average

17  person; would you agree with me?

18  A.  Incorrect.  No, I would not.

19  Q.  Okay.  So you think --

20  A.  We have monitors, there -- you can go and watch the

21  process.  You can ask.  There's so many people.  Usually it's

22  the same people.  I don't know their parties.  There are a lot

23  of people at every election.  There are monitors.  There are

24  observers.  There are watchers.  And I have to administer them

25  the oath.  They know whoever is in charge, they go up to them

1  and they say:  Well, what are you doing over here?  Why is this

2  like this?  Why is that like this?

3          So the people who actually are actually interested in

4  the process, they come and educate themselves.

5  Q.  I understand that.

6          I guess my question is more if I'm someone who doesn't

7  know the first thing about how absentee votes are counted and I

8  see a video of, you know, pulling out some containers having

9  ballots and having the ballots go through the machine multiple

10  times, can you see how someone who is not familiar with the

11  process -- like you, who is a professional at that, can you see

12  how they might think, Hey, it looks like the votes are being

13  counted multiple times?  Can you see that?

14          MR. LANGFORD:  Objection, Your Honor.  I mean, calls

15  for speculation, and this is just --

16          THE COURT:  This is getting a little bit into areas

17  that have already been resolved.  So why don't we see where

18  you're going with this, Mr. Sibley.

19          (Whereupon, a bench conference was held:)

20          THE COURT:  So, Mr. Sibley, I take it that plaintiffs

21  counsel's concern is you're sort of doing a cross-examination

22  about liability and whether what he did and what his beliefs

23  were were true.  That's already been resolved.  So where are

24  you going with this?

25          MR. SIBLEY:  I guess I'm going where I mentioned

1   earlier, that, yes, it's absolutely the case that the

2   statements that there was election misconduct were false, but

3   I'm just trying to get to the point that at least for her it's

4   easy to look at it and say it's easy to happen.  But for those

5   who understood the law, that's perfectly normal.  But for

6   someone off the street who doesn't understand how these votes

7   are counted, you can see how, hey, maybe there's something

8   there.

9        THE COURT:  Maybe you think that on December 3,

10   December 4, but after all the Georgia elections defamatory

11   statements, after that, where is -- isn't that going towards

12   liability?  I mean, so why isn't this just a waste of time?

13        MR. SIBLEY:  Because I think it's different to look

14   at the video and draw the conclusion that something is fishy.

15   And maybe it takes time -- if it was so blatantly obvious, why

16   did there need to be an investigation that lasted so long?

17        THE COURT:  Because there were powerful people making

18   accusations.

19        MR. LANGFORD:  This goes to the issue of actual

20   malice, which has already been decided as alleged in the

21   complaint.  Actual malice is knowledge or reckless disregard of

22   the falsity.  Not only that we pled that to the defamation

23   claim and IIED claim, which goes back to the December 3rd, I

24   mean the falsity intent; it was willful, it was done with

25   actual malice.  This is completely -- this is resolved.

1        MR. SIBLEY:  But it was malice on steroids.

2        THE COURT:  You're entitled to have malice on

3    steroids.

4        I am going to sustain the objection.  I don't know

5    where you're going on this liability business.  Okay?  And

6    where you're going has already been resolved.  Okay.

7        (Open court:)

8        THE COURT:  Objection is sustained.

9    BY MR. SIBLEY:

10   Q.  Okay.  Ms. Moss, let me ask you, you mentioned something

11   earlier about the fact that you are a member of the public, you

12   can actually come in and observe, if you want to, the absentee

13   votes being counted; is that correct?

14   A.  Correct.

15   Q.  Is that "yes"?

16   A.  Yes.

17   Q.  Okay.  You mentioned that you had to learn about the law

18   with respect to counting absentee ballots.  Do you have an

19   understanding of whether, under Georgia law, you were required

20   to have observers there when you counted votes, or not?

21   A.  You are not required.

22   Q.  So it's not a requirement that anyone observe, I guess, the

23   persons counting the votes in the State Farm center?

24   A.  No.  This is the only time where absentee is just, like,

25   the entire county voted absentee.  We have plenty of elections.

1    For example, if someone passes away and we have to vote someone

2    else in their seat.  It's a small election, we've had --

3    there's like 20 absentee ballots and we go and we scan those

4    ballots.

5    Q.  Okay.  So, I mean, you probably know -- I'm sure you do

6    know more about this law than I do, I'm not an election lawyer,

7    but it sounds to me what you're saying is if someone wants to

8    observe, they can, but it's not a requirement that when you're

9    counting you have to have someone necessarily observing; am I

10   right?

11   A.  Correct.

12   Q.  Okay.  Now, you know there's been some suggestion -- or,

13   there was some suggestion that people who wanted to observe

14   were excluded from observing.  Do you recall that?

15   A.  I recall those lies.

16   Q.  And that's not true, is it?

17   A.  No.  It's a lie.

18   Q.  Okay.  Are you aware of some people that signed affidavits

19   that suggested that maybe they were excluded from the State

20   Farm center?

21           MR. LANGFORD:  Objection, Your Honor.  Same grounds.

22           THE COURT:  Sustained.

23   BY MR. SIBLEY:

24   Q.  There was an investigation into whether these allegations

25   of fraudulent activity actually occurred, was there not?

1    A.  Yes, sir.

2    Q.  Were you involved in questions, I guess, in that

3    investigation?

4    A.  Yes, sir.

5    Q.  Who did you interact with?  Who questioned you?

6          MR. LANGFORD:  Objection.  I guess the question I

7    have is:  How is this relevant?

8          THE COURT:  Overruled.

9    BY MR. SIBLEY:

10   Q.  Who questioned you?

11   A.  The Secretary of State office, the Georgia Bureau of

12   Investigations, the Federal Bureau of Investigations, the

13   Fulton County Attorney's Office.  Yep, those are the people.

14   Q.  Understood.

15         Okay.  That's a lot of law enforcement or administrative

16   agencies, I guess, that looked into this, right?

17   A.  Yes.

18   Q.  Do you remember the timeframe that that went on, where they

19   were kind of looking into it?

20   A.  As soon as the -- as soon as the lies were spread.  In

21   December they were looking into it.  It depends on what you

22   mean by "they" because it -- it -- it was, like, a snowball

23   effect.  So after your client went on TV, it prompted a lot of

24   other people to also try to file cases with the county that I,

25   then had to, like, stop working and resolve.

1    Q.   Okay.  You said you're an Atlanta sports fan; did I get

2    that right?

3    A.   Kind of, sort of.

4    Q.   Who is your teams?

5    A.   Atlanta Braves, Atlanta Falcons, Georgia Bull Dogs, and the

6    Atlanta Hawks.

7    Q.   Okay.  Well, your Braves took on my Astros in 2021, and I'm

8    in the city that also beat us in 2019, so this isn't a great

9    baseball moment for me.

10   A.   Oh, sorry.

11   Q.   Have you watched games where they have, like, the instant

12   replay where somebody tries to steal second, and they may get

13   caught out and they go and look at it?

14   A.   Yes, sir.

15   Q.   And that's something you can just look at the video and

16   you'd say:  Oh, runner's foot was on the base before he was

17   tagged, right?

18   A.   Right.

19   Q.   Okay.  This clearly wasn't the kind of thing you could look

20   at the video and say:  Well, clearly, you know, there wasn't

21   any election fraud --

22           MR. LANGFORD:  Objection, Your Honor.

23   BY MR. SIBLEY:

24   Q.   -- because as you just mentioned there was a large

25   investigation with multiple law enforcement agencies that

1    looked into this for quite some time.  So you would agree with

2    me, this wasn't an instant replay kind of thing where you could

3    just throw the coach a challenge and look at the video and

4    figure out what happened?

5              MR. LANGFORD:  Objection, Your Honor.  Same grounds.

6              THE COURT:  Sustained.  Liability has been

7    established because of the default.

8    BY MR. SIBLEY:

9    Q.  Do you know who Jacki Pick is?

10   A.  I heard my lawyers mention to the judge that person will be

11   speaking; that's about it.

12   Q.  Okay.  By the way, what was the deal with the water leak?

13   Apparently there was a water leak, but --

14   A.  So, the room that we were in, when you look up in the

15   ceiling, it didn't look nice like this.  You would actually see

16   pipes and things like that, and one of those pipes burst

17   because there were -- there was a urinal above us, and that's

18   what leaked.

19   Q.  Understand.  Okay.

20        Is this the only lawsuit that you're involved in over

21   statements that persons made, false statements that persons

22   made about you and your mother engaging in election fraud?

23             MR. LANGFORD:  Objection, Your Honor.

24             THE COURT:  Overruled.

25             THE WITNESS:  No, sir.

1    BY MR. SIBLEY:

2    Q.  How many other lawsuits have you filed on the grounds that

3    statements about you and your mother making -- or, engaging in

4    election fraud were false?

5    A.  One other lawsuit.

6    Q.  Okay.  And who did you sue?

7    A.  *The Gateway Pundit*.

8    Q.  Okay.  What is *The Gateway Pundit*?

9    A.  They are a media-based group that re-Tweets everything

10   Mr. Giuliani and Mr. Trump likes to say negatively about us.

11   Q.  Okay.  Would it surprise you to learn that *The Gateway*

12   *Pundit* may actually have been the first media outlet to publish

13   the video that Mr. Giuliani later re-Tweeted?

14             MR. LANGFORD:  Objection, Your Honor.  This goes to

15   proximate cause, which has been decided here.

16             THE COURT:  Overruled.

17             THE WITNESS:  Can you ask it again?

18   BY MR. SIBLEY:

19   Q.  Yeah.

20             Would it surprise you to learn that *The Gateway Pundit*

21   was actually the first media outlet to publish the video of you

22   and your mother at the State Farm Arena and accuse you and your

23   mother of election fraud falsely?

24   A.  They were the first to mention our names, I believe.

25   Q.  Are you suing *The Gateway Pundit* for reputational injury?

1    A.   I would have to look at the -- that -- you know, I would

2    have to look at it to say what is the exact words.  I'm not --

3    Q.   Okay.  But you would agree that *The Gateway Pundit*, by

4    making false claims about you engaging in election fraud,

5    damaged your reputation; is that correct?

6    A.   Correct.

7    Q.   And they did that on December -- November 3rd -- got my

8    dates wrong.  Sorry.  Strike that -- December 3rd of 2020,

9    correct?

10   A.   Correct.  The same day Giuliani told those lies, yes, sir.

11   Q.   I'm sorry.  Is it the case that you're alleging

12   Mr. Giuliani made his first statements about you and your

13   mother on December 3rd or December 4th?

14   A.   No.  He said it on December 3rd.  I found out about it on

15   December 4th, at work.

16   Q.   Okay.  And I think what you said earlier, though, is that

17   since your son had your phone, you didn't realize that he was

18   getting messages on December 3rd, correct?

19   A.   Correct.

20   Q.   Okay.

21   A.   It happened on December 3rd, they started calling on

22   December 3rd.  When I went to work on the 4th, that's when I

23   found out.  On the 4th is when I found out that I had

24   message -- messages.  On the 4th, that evening after work, is

25   when I found out about my son telling me that he's been

1   receiving these all through the night and all through that day.

2   Q.  Okay.  And did *The Gateway Pundit*, by publishing those

3   false claims about you and your mother being involved in

4   election fraud, did that cause you mental anguish?

5   A.  Yes.  Everyone who -- yes, it did.

6   Q.  Did it cause you emotional distress?

7   A.  Yes, sir.

8   Q.  Okay.  They actually named you and your mother, correct?

9   A.  Correct.

10  Q.  Okay.  By the way, just out of curiosity, how did anyone

11  get, you know, like -- if you were just someone reading that

12  *Gateway Pundit* article, how would you know what your cell phone

13  number was or the cell phone number that was tied to you that,

14  I guess, your son used?  How would someone know that?

15          MR. LANGFORD:  Objection, Your Honor.  Calls for

16  speculation.

17          THE COURT:  If she knows.  Overruled.

18          THE WITNESS:  I believe it's called doxxing.  I was

19  doxxed, I believe.

20  BY MR. SIBLEY:

21  Q.  Sure.

22      But was your number listed somewhere, like on a -- I

23  don't know, is it the Yellow Pages or something?  I mean, how

24  would you someone get your number?  Or did you know?

25  A.  I'm not in that career.  I don't know how they did things

1    that they did.  I don't know.  Sorry.

2    Q.  Okay.  How are the damages that *The Gateway Pundit* caused

3    you different from the damages that Mr. Giuliani and the

4    co-conspirators in this case caused you?

5    A.  They're no different.  They were all on the same hate train

6    together.  Mr. Giuliani was just driving the bus, picking up

7    these people, and they were helping spread his lies.

8    Q.  Okay.  Was there anyone else that posted false claims about

9    you and your mother committing election fraud, other than *The*

10   *Gateway Pundit* and Mr. Giuliani?

11            MR. LANGFORD:  Objection, Your Honor.  Goes to

12   proximate cause, which has already been decided.

13            MR. SIBLEY:  Your Honor, the --

14            THE COURT:  I think -- overruled.  You presented

15   exhibits of the same thing, so overruled.

16            THE WITNESS:  Team Trump as well.

17   BY MR. SIBLEY:

18   Q.  Okay.  Who else?

19   A.  Another media outlet that I will not name.

20   Q.  Well, who is it?

21   A.  The other media outlet that we settled with, the one that

22   was on the same lawsuit with you guys before you decided to

23   separate yourselves from them.

24   Q.  I see.

25            *One America News Network*, is that who it is?

1    A.  Yes.

2    Q.  Okay.  And you originally filed -- because some of the

3    statements that you're complaining about Mr. Giuliani made were

4    actually on *One America News*, correct?

5    A.  His statements were everywhere, sir.  I was not -- that's

6    my --

7    Q.  Okay.  All right.  So you originally sued *One America News*,

8    I believe it was Chanel Rion, a reporter; Charles Herring; and

9    Rudy Giuliani all in this case; is that right?

10   A.  No, sir.  Those are different lawsuits.

11   Q.  Well --

12   A.  Herring is Gateway --

13   Q.  Okay.

14   A.  -- I'm not sure, I would have to see it and then let you

15   know, since you don't know.

16   Q.  But you settled with *One America News*, right?

17   A.  Yes, sir.

18        MR. LANGFORD:  Objection, Your Honor.  May we use the

19   telephones?

20        (Whereupon, a bench conference was held:)

21        THE COURT:  Yes?

22        MR. LANGFORD:  I apologize for objecting so much, but

23   the consent motion in limine, ECF No. 108, specifically

24   provided -- okay, Your Honor understands that he may not

25   reference an OAN settlement.  He's not referencing

1   co-conspirators that the jury may have forgotten are

2   co-conspirators.  I'm not sure what to do about this right now.

3           THE COURT:  I think he's picking up on the fact that

4   the witness mentioned that there was a settlement, so that was

5   just a gift to Mr. Sibley.

6           But, Mr. Sibley, where are you going with this?

7           MR. SIBLEY:  Well, Your Honor, if we're talking about

8   injuries that they're claiming, she's already said the ones

9   she's claiming from Giuliani are the ones that are parties that

10  are not even in this case, not even listed as co-conspirators.

11  So I'm entitled to probe whether there's been a segregation or

12  bifurcation of the harm that was caused by these other parties

13  or -- I mean, if she's claiming harm from multiple parties and

14  it's the same injury, essentially, I'm entitled to probe what

15  the differences are and whether there's any differences.  And,

16  I mean, she's just brought it out.  We have to --

17          THE COURT:  You're not going to be probing into the

18  nature of the settlement with OAN or anything like that.  And I

19  think on redirect you can clarify that this reporter and

20  Herring are connected to OAN and who they are.

21          MR. LANGFORD:  Yes.

22          THE COURT:  Okay.  So just be prepared on redirect.

23  So it's based on that you're objecting.  I'm going to overrule

24  it.

25          (Open court:)

```
1    BY MR. SIBLEY:

2    Q.  Okay.  Let me ask you this, Ms. Moss:  How much are you

3    asking the jury to award you to compensate you for the harm

4    that Mr. Giuliani caused you in this case?

5    A.  I'm relying on the experts.

6    Q.  Okay.  And that's -- I believe her name is Ms. Humphreys,

7    correct?

8    A.  I believe so.

9    Q.  Have you spoken with her, been interviewed by her, anything

10   like that?

11   A.  No, sir.

12   Q.  Okay.  You never met with her?

13   A.  Not that I know of, no.

14   Q.  Any kind of email correspondence with her?

15   A.  No.

16   Q.  Text messages?

17   A.  I've not spoken with her, sir.

18   Q.  Okay.  Well, sometimes people can take "spoken" to mean,

19   like, orally speaking --

20   A.  I know what speaking means.  You text, means you're

21   speaking to me.

22   Q.  All right.  Well, that's what I think, too.

23            All right.  So you're relying on your expert.

24            And, from what I understand, Ms. Humphreys -- or,

25   Dr. Humphreys is going to testify that it's going to cause an
```

1    extensive amount of money to repair your reputation; is that

2    right?

3    A.  Yes, sir.

4    Q.  Okay.  And then we heard Mr. DuBose in opening talk about

5    value of a name.  Do you recall that?

6    A.  Yes.

7    Q.  Okay.  And that's really what this case is about for you;

8    it's about restoring you and your mother's good name, not about

9    making money, right?

10   A.  I want to vindicate myself, yes.  I want to receive some

11   type of justice for everything that me and my family has been

12   through.

13   Q.  Okay.  How much -- what steps have you taken as of now to

14   try to repair your reputation?  Like, I don't know, paying

15   someone to, you know, do something on the internet to make your

16   search results go down, things like that?  Have you done

17   anything like that?

18   A.  Yes, I have.

19   Q.  What have you done?

20   A.  I have subscribed to DeleteMe, so they can constantly

21   monitor where my information is online and have it removed so I

22   can't be found.

23   Q.  Okay.  How much does that cost you?

24   A.  I think it's about $140 a year for that service.

25   Q.  Okay.  Anything else you've done?

1    A.  As far as what, again?

2    Q.  Is there anything else you've done to try to, I don't know,

3    repair your reputation?  Any money that you've expended to do

4    that?

5    A.  It's kind of difficult for me to do that when there are

6    extremely powerful people still spewing lies about me.

7    Q.  Okay.  Do you know how much money that's going to cost you

8    to -- I mean, to get that done?  Anyone given you an estimate

9    of, kind of, what the -- you know, what the repair would be on

10   your reputation?

11   A.  No, sir.  I don't -- I have no idea.  That's why we have

12   expert witnesses, that's their job to quantify that.  I don't

13   know.

14   Q.  Okay.  But if your expert testifies that the jury needs to

15   pay you money so that you can use that money to repair your

16   reputation, that's what you're going to do with the money,

17   right?

18   A.  Well, what I'm going to do with the money is something

19   totally different.  What I remember hearing, that we need to

20   make a statement.  We need to ensure that the election workers

21   that are still there don't have to go through this.  There are

22   election workers that are now wearing bulletproof vests.  And

23   I'm sure by hitting someone in the pockets, especially someone

24   whose whole career is about their pockets, that will definitely

25   leave an impression for the next person that tries to spew lies

1    about the next election worker.  We matter.  So, that's what

2    stood out to me in the opening --

3    Q.  Okay.

4    A.  -- about -- concerning the money.

5    Q.  Well, one other thing -- and that did stand out.  I

6    appreciate you reminding me of that.

7         But another thing that stood out to me, I think

8    Mr. DuBose said if somebody commits arson and burns down your

9    house, they need to pay to rebuild the house, right?

10        MR. LANGFORD:  Objection, Your Honor.  That

11   mischaracterizes the opening.  I believe that what Mr. Gottlieb

12   said was if someone burns down your house, one way he would

13   measure the damages is by figuring out much the house --

14   further, it's not evidence.  But that just mischaracterizes

15   what Mr. Gottlieb said.

16        THE COURT:  We now have it corrected.

17   BY MR. SIBLEY:

18   Q.  Okay.  Let me ask you the question:  You know how, like,

19   sometimes you make an insurance claim and, you know, they give

20   you a certain amount of money for the damage that maybe was

21   done to your property?  Do you know what I'm talking about?

22   A.  Correct.  I know that.

23   Q.  So if the jury gives you a check for the damage done to

24   your reputation, are you going to repair your reputation or are

25   you just going to use the money to -- I don't know, do

1    something else, get a real nice --

2              MR. LANGFORD:  Objection, Your Honor.  This is an

3    improper hypothetical.

4              THE COURT:  Sustained.

5              MR. SIBLEY:  May I --

6              THE COURT:  Confer with your client?  Yes.

7              MR. SIBLEY:  No, Your Honor.  May I use the --

8              THE COURT:  Oh.

9              MR. SIBLEY:  -- walkie-talkie.

10             THE COURT:  No, you may not.

11             MR. SIBLEY:  Okay.

12   BY MR. SIBLEY:

13   Q.  Well, is one of the reasons why you haven't been able to

14   repair your reputation, sitting here today, is you haven't --

15   you don't have enough money to do that?  Is that fair?

16   A.  I disagree.

17   Q.  You do have enough money?

18   A.  I disagree.

19   Q.  Do you have enough money, or do you not have enough money,

20   sitting here this day, to repair your reputation?

21   A.  Like I stated before, I personally cannot repair my

22   reputation at the moment because your client is still lying on

23   me and ruining my reputation further.  How -- how could I do

24   that?  Like, how could you work in law if everybody was saying

25   that you're, like, a horrible lawyer and stuff like that?

1   Like --

2   Q.  Well, you would be surprised actually, but --

3   A.  I'm sure.

4   Q.  Well, I guess my question is, is:  What you're telling me

5   is that your reputation really can't be repaired as long as

6   Mr. Giuliani is allowed to say things about you, right?

7   A.  No.  What I'm saying, it's not just black and white, it's

8   not one thing that's going to happen and my reputation is -- is

9   repaired.  I might have to spend money, people might have to

10  change, people might have to tell the truth.  Maybe the truth

11  needs to be screamed just as loud and just as many times as the

12  law -- I mean as the lies, like -- I'm not sure because I'm not

13  there yet.

14  Q.  What if the statements, the false statements about you are

15  just taken down from wherever they are, off the internet?

16  Wouldn't that be -- would that be sufficient?

17  A.  Will they be replaced with the truth by the same people who

18  spew the lies?

19  Q.  Well, it's -- I'll let you -- we'll talk about that, but

20  can you answer my question?  Would it not be good enough for --

21          MR. LANGFORD:  Objection, Your Honor.  Asked and

22  answered.  I mean, she's answered the question.

23          THE COURT:  I don't know what the next question is

24  going to be.

25          THE WITNESS:  Same one he just asked.

1    BY MR. SIBLEY:

2    Q.  Well, is that what happened with OAN?  I mean, I'm

3    asking --

4            MR. LANGFORD:  Objection, Your Honor.  We've just

5    gone over this.

6            THE COURT:  Sustained.

7    BY MR. SIBLEY:

8    Q.  Did *One America News Network* take off the stories, false

9    stories they posted about you?

10           MR. LANGFORD:  Objection.  Same grounds.

11           THE COURT:  Overruled.  That objection is overruled.

12   If she knows.

13   BY MR. SIBLEY:

14   Q.  Do you know?

15   A.  I'm sorry.  What did you say?

16   Q.  Do you know whether *One America News Network* took down the

17   postings, the news stories it made about you and your mother

18   that were false?

19   A.  Yes.  And as many times as they said the lie, they had to

20   say the truth, leave it up for the same amount of time, like --

21   yes.  It was a lot that they had to do.

22   Q.  They took it down, right?

23   A.  (Nods head.)

24   Q.  Did they -- and did they replace it with, as you say, the

25   truth after they took it down?

1    A.  I think I just -- yes, sir.  That's what I just said,

2    um-hum.

3    Q.  They did replace it with the truth?

4    A.  I believe so, yes.

5    Q.  What did they say?

6    A.  I do not know verbatim what they said, but I know that they

7    basically, like, recanted their story.  And just the same

8    amount of times as they spread their lies, that was the same

9    amount of times that they spread -- that they said that

10   basically -- they recanted it.

11   Q.  Okay.  Did you review any documents in preparation for your

12   testimony today?

13   A.  Any documents?  Um, I'm not sure what you mean.

14   Q.  Do you know what a document is?

15   A.  Yes.

16   Q.  Okay.  Like, the binders --

17   A.  A piece of paper?  Did I -- are you just saying a piece of

18   paper?  Or what -- what are you -- what are you talking about?

19   What do you mean?

20   Q.  Well, anything in writing, like, any materials?  Did you

21   review anything in preparation for your testimony today?  I

22   don't want to know what your lawyers might have told you, but I

23   just want to know if you looked at any materials?

24   A.  Any materials that would prepare me for today?

25   Q.  In preparing to come here and testify to the jury today,

1   did you review any materials to prepare and come testify?

2   A.  No, sir.  I'm -- I'm answering my truth.  There is no

3   materials that's going to give you my -- my truth and what

4   happened to me and what I did on my job, I don't believe so.

5   Q.  Okay.  It's just -- I'm just wondering, like, for example,

6   if you reviewed the documents that are in front of you in that

7   binder before you testified to that?

8   A.  Yes.  I went over the -- yes.  The pictures that were in

9   here -- like, a lot of these documents, it's blank.  And they

10  show -- they show the video.  Of course I reviewed the horrible

11  calls because, you know, they came to me and I gave it to them.

12  So, I'm kind of -- I'm kind of -- does that answer your

13  question?

14  Q.  Yeah.

15      Other than that stuff, did you review any other

16  documents?

17  A.  Not that I can think of, sir.

18  Q.  Okay.  There were other -- it wasn't just you and your mom

19  that were in the State Farm Arena that night that were kind of

20  the subject of this -- these false claims, there were other

21  women there, too, correct?

22  A.  It was me and my mom that they claim pulled the suitcase

23  from under the table.  It was me and my mom that they claim

24  passed a USB drive.  It was me that they claimed kicked

25  everyone out and lied about a water main break.  So, yeah, that

1   was us.

2   Q.   I'm just wondering if the other persons that were at the

3   State Farm Arena that night, other than you and your mother,

4   received any kind of death threats or any negative treatment

5   for being kind of associated with that vote counting, I guess?

6   A.   Every employee that worked there -- like, they were

7   actively there, you know, as we were working, they were on a

8   bridge, they had their picket signs, the confederate flags,

9   they threw things over the bridge at us at night as we left.

10  Yes.  We were asked many times, Do we need security to be able

11  to come in here?  Because as I said, you are able to walk in

12  and view tabulations.  So my entire staff was tormented for the

13  two weeks we were there leading up until Election Day.

14  Q.   Okay.  I'm going to move now onto something that's

15  uncomfortable to talk about.  But, we saw in opening

16  presentation and during your testimony with Mr. Langford, we

17  saw a lot of very unfortunate racist messages that were sent to

18  your phone, correct?

19  A.   Correct.

20  Q.   And actually, I think what you said is you let your son use

21  the phone, and unfortunately he may have seen -- or did see, I

22  guess, those messages, correct?

23  A.   Correct.

24  Q.   Okay.  Now, we've seen a lot of things that Mr. Giuliani

25  has said about you and your mother and about what happened at

1   State Farm Arena, but there's nothing that he said that

2   mentioned you or your mother's race; am I correct?

3   A.  Mr. Giuliani assumed that everyone was a dem, and

4   basically --

5            MR. SIBLEY:  Objection.  Not responsive.

6            THE COURT:  Overruled.  Continue.

7            THE WITNESS:  Basically, he's saying everyone is dem

8   because we were all Black.  Like, he has no idea how many Trump

9   voters that are Black that are in Atlanta, probably until when

10  he had to turn himself in and saw the Black guys out -- Black

11  folks out there with just the "Blacks For Trump" or something

12  like that.

13           But, yes, he made it very clear that we were

14  segregated, that no one in there was a Republican, like him.

15  And because he saw we were all Black -- I have some white

16  workers, but they were already gone -- he assumed because we

17  are Black, we are Dems.  So I felt like that is the beginning

18  of the race issue.  They wouldn't have known -- I mean, like --

19  BY MR. SIBLEY:

20  Q.  How would he have -- how do you know that he assumed that?

21  A.  Because he called us "Dems," and he didn't know me from a

22  hole in the wall.  He doesn't know who I vote for.  And in

23  Georgia, we do not identify you by party.  I couldn't look at

24  someone's record and it will say one election Republican,

25  Democrat, Democrat, Republican, Republican.  Like, we don't

1   identify you by party here in Georgia.  So it was obvious that

2   he assumed we were all Democrats because we were all Black.

3   Q.  There were no non-Black persons --

4   A.  Not in the video that he watched and scrutinized and lied

5   about.

6   Q.  What about outside the video?  Is it a diverse group of

7   people --

8   A.  He was talking about the videos.  He listened to it, he

9   said:  The Dems kicked everybody out.  The Dems went (witness

10  makes sound).  Like, that's his words.

11  Q.  Wouldn't you just presume that if you believed someone was

12  stealing an election for the Democratic candidate, that they

13  were probably a Democrat, as opposed to their race?

14  A.  (Shakes head.)

15  Q.  That's a "no"?  You have to use words.

16  A.  I would not assume that.  There are -- wasn't it just a

17  Black guy running for the Republican party?  I wouldn't assume

18  that.  Someone ignorant would assume that, but I would not.

19  Q.  Okay.  Do you think those horrible racist messages you

20  received, do you think Mr. Giuliani intended for persons to

21  react to his statements and send those messages to you?

22         MR. LANGFORD:  Objection, Your Honor.  Calls for

23  speculation.

24         THE COURT:  True.  Sustained.

25  BY MR. SIBLEY:

1    Q.  Do you have any --

2          THE COURT:  It does call for speculation.  What does

3    she know about his intent?  I mean, I don't know -- you can

4    rephrase the question.

5    BY MR. SIBLEY:

6    Q.  Do you have any reasons to believe that Mr. Giuliani

7    intended for persons to act on his statements about you and

8    your mother and then make racist comments to you?

9    A.  Yes, I do.  He did not go to *BET Nightly News* to spew his

10   lies.  He was not on the *Rickey Smiley Morning Show* spewing his

11   lies.  He went to places where he knew his people would believe

12   the lies and have his back, and call into action.

13   Q.  So do you think he wanted you to receive racist messages?

14   A.  No, sir.  I can't say what he wanted, but I can say that he

15   was not spewing the lies where there are majority Black people

16   as viewers.

17   Q.  Okay.  Well, that's a good -- that's kind of a good point.

18          Do most of the people that are kind of in your community

19   and you associate with, do they -- are they subscribers to

20   Mr. Giuliani's podcast, that you know of?

21   A.  I don't know.  We don't talk.

22          MR. LANGFORD:  Objection.

23          THE WITNESS:  I'm sorry.

24          MR. LANGFORD:  I was going to say:  Objection.  Calls

25   for speculation and beyond the witness's personal knowledge.

1          THE COURT:  She's already answered it.  I think,

2     Counsel, we'll move on.

3     BY MR. SIBLEY:

4     Q.  Okay.  Well, part of what you're claiming to the jury is

5     how you've been damaged in the community, right?

6     A.  No.  All over.

7     Q.  Okay.  Do you -- I mean, do you think that the average

8     person sitting here today believes that you and your mother

9     committed election fraud?

10    A.  Not ever since we have been standing up for ourselves and

11    speaking our truth and calling these liars to the front, no.

12    We have a lot of people on our side now.

13    Q.  Okay.  How many people do you know who listen to Rudy

14    Giuliani's podcast?

15          MR. LANGFORD:  Objection, Your Honor.  Calls for

16    speculation.  But --

17          MR. SIBLEY:  How many people does she know?

18          THE COURT:  How would she know that?  Sustained.

19    BY MR. SIBLEY:

20    Q.  Has anyone told you, that you know, that they listen to

21    Rudy Giuliani's podcast?

22    A.  No, sir.  Not his podcast.

23    Q.  Okay.  Has anyone you know told you that they follow

24    Mr. Giuliani on social media?

25    A.  No.  Not on social media.

1    Q.  Okay.  So is it fair to say that your group of friends are

2    probably not fans of Mr. Giuliani and his social media and

3    publishing activities?  Is that fair?

4    A.  No, that's not fair.  Because you don't have to be a fan of

5    Mr. Giuliani to just so happen to hear his lies.

6    Q.  Okay.  But you would have to go -- I mean, he's not on CNN,

7    right?

8    A.  Yes, he is.  He's -- he's on TV.

9    Q.  Okay.  Did he make statements about you on CNN?

10   A.  I don't know if it was CNN.  Like, I'm not sure which

11   station it was.

12   Q.  Okay.  I mean, Alex Jones, for example, you know who that

13   is?

14           MR. LANGFORD:  Objection, Your Honor.  I mean, where

15   is this going?

16           MR. SIBLEY:  Well, it's --

17           THE COURT:  I'm not sure.  Does she know Alex Jones

18   or who he is?  Overruled.

19   BY MR. SIBLEY:

20   Q.  Do you know who Alex Jones is?

21   A.  No, sir.

22   Q.  Okay.  Well, let me ask you this:  Do you think

23   Mr. Giuliani intended for there to be violence against you and

24   your mother as a result of this --

25           MR. LANGFORD:  Again, calls for speculation.  He's

1   asking her what Mr. Giuliani intended.

2            THE COURT:  Sustained.  And it's irrelevant to

3   damages, what she thought he thought.  Come on, Mr. Sibley.

4   BY MR. SIBLEY:

5   Q.  Okay.  Do you have any evidence that Mr. Giuliani intended

6   violence to result against you and your mother as a result of

7   his statements?

8   A.  I don't have any evidence that he intended violence, just

9   that he wanted people to search our homes and lock us up.  He

10  didn't say who should do that, so the world felt like they

11  should do that for him.

12  Q.  Okay.  How do you know, for example, the racist comments

13  that were directed at you were not the result of *The Gateway*

14  *Pundit* and their stories about you and your mother?

15  A.  They were sharing the same video with the same caption, the

16  same -- same re-Tweet and publishing it that he re-Tweeted,

17  that Team Trump re-Tweeted.  It was -- wasn't anything

18  different; it was the same.  It was like a torch for the

19  Olympics when someone lights it and they pass it from person to

20  person and person until they get to the Olympic torch.  They're

21  all on the bus together.

22  Q.  So those racist messages we've looked at throughout the

23  trial, those could have easily been spawned by someone reading

24  *The Gateway Pundit*?

25  A.  I'm sorry?

1    Q.  The racist messages we saw earlier and throughout the

2    trial, those could have just as easily been caused by

3    statements made by *The Gateway Pundit*, right?

4              MR. LANGFORD:  Objection.  Calls for speculation.

5              THE COURT:  Overruled.

6              THE WITNESS:  I don't really understand.

7    BY MR. SIBLEY:

8    Q.  Okay.  How do you know that the people who contacted you

9    and made racist comments, how could you know whether that was

10   because they read something Mr. Giuliani published?

11   A.  Because they were parroting his exact words.  They were

12   speaking of the exact video he was speaking of.  They were

13   saying the same things that made no sense, that he repeatedly

14   was saying.  They -- they were parroting each other.

15   Q.  And they were also parroting *The Gateway Pundit,* right?

16   A.  All of them were.  And Team Trump as well.

17   Q.  Okay.  Do you know who Jensen Hughes is?  Do you know

18   Jensen Hughes?

19   A.  I'm learning about them through this trial, yes.

20   Q.  You remember Ms. Scott from yesterday, correct?

21   A.  Yes, sir.

22   Q.  Okay.  I believe there was some suggestion that she had

23   provided security to you and your mother.  Do you recall that?

24   A.  Yes, sir.

25   Q.  Okay.  What kind of security did she provide?

1    A.  Well, protection.

2    Q.  Like, as, like, a police security person?  Or how did they

3    do it?

4    A.  Yes.

5    Q.  Okay.  Are they involved with -- Jensen Hughes, are they

6    involved with any other cases besides this one?

7    A.  I'm not sure.

8    Q.  Are they involved in *The Gateway Pundit* case?

9    A.  That is my other case, so I'm not sure, sir.

10   Q.  Okay.  All right.  How much money a year did you make --

11   how much were you making a year in 2020?

12   A.  I'm not sure how much I made in 2020.  We had a major

13   pandemic, so there was a lot of overtime, and we had a lot of

14   elections that year.  And as I stated, during election we work

15   7:00 to 7:00, seven times a week.  So during the election year

16   we make a little bit more than our normal range of 34- to

17   36,000 before taxes.

18   Q.  Okay.  Was the -- you may have discussed this with

19   Mr. Langford and I missed it, but were you working any other

20   jobs in 2020 besides the Fulton County job?

21   A.  That was all.

22   Q.  Okay.  But you stayed -- I guess you stayed working there

23   until 2023?

24   A.  Yes.

25   Q.  And I think you mentioned something about a promotion that

1    you were passed over for?

2    A.  Yes.

3    Q.  Okay.  What would you have made -- how much more money, I

4    guess, would you have made if you had gotten that promotion?

5    A.  I'm not sure because I didn't get it.  I didn't go back to

6    see what they were paying the person that got it.

7    Q.  What was the job title, again?

8    A.  It was an absentee supervisor.

9    Q.  Okay.  And there was another job you mentioned that you

10   said you felt like you got passed over for because of all the

11   statements about the election fraud.  Do you recall that?

12   A.  Incorrect.  I said there was another job that I walked out

13   of the interview because they started to ask me about the lies.

14   Q.  I see.  I thought they were two separate occasions.  You're

15   talking about the Chick-fil-A position, right?

16   A.  Correct.

17   Q.  Okay.  Do you still live in Fulton County?

18   A.  I've never lived in Fulton County.

19   Q.  Oh, okay.  Well, do you still live in the same place that

20   all of these horrible events took place, where people were

21   showing up and terrorizing the home and things like that?

22   A.  Of course not.

23   Q.  Okay.  What was the -- I'm interested to know, when the

24   Chick-fil-A person turned the computer around and showed your

25   face, what -- was that a -- what was that?  Do you remember

1    whether it was, like, a news story or just like an internet

2    image search?

3    A.   No.  It was -- it was a news article, I believe.  I'm not

4    quite sure.  I'm just assuming it was -- he turned it around

5    and it was a picture, a side-by-side of my mom, and it had

6    "fraud" written across.  And I just bailed out of there.  I

7    didn't ask him where did he find his research or anything.  I

8    don't know for sure.

9    Q.   But that wasn't a Giuliani Twitter feed or something, was

10   it?

11   A.   I'm not sure.  I didn't see the URL or anything.  I told

12   you exactly what I saw.

13   Q.   What date was that?

14   A.   I'm not sure.  It was in 2021.

15   Q.   Okay.  So you were trying to get the Chick-fil-A job while

16   you were still working for Fulton County?

17   A.   Yes.

18   Q.   Okay.  I see.

19        What do you do -- are you working now?

20   A.   No, sir.

21   Q.   What do you do for money?  How do you support yourself?

22   A.   I have my savings that I am depleting.

23   Q.   Are they depleted?

24   A.   They are.

25   Q.   So you're pretty much -- I mean, one of the reasons it's

1   difficult to repair your reputation right now is you're pretty

2   much -- this has caused you to be financially -- you don't have

3   any money, I guess, right?

4   A.   That's mostly correct.



60



1

2

3

4             (Open court:)

5    BY MR. SIBLEY:

6    Q.   Okay.  Ms. Moss, I think what you told me is that you had a

7    savings that had been depleted.  Is that fair?

8    A.   Incorrect.  That's not what I said.

9    Q.   Okay.

10   A.   I said that I am using some savings that are depleting

11   because I have a set amount of savings.  But I don't have a

12   job, so that's what I'm living off of.

13   Q.   Okay.  Do you have an annuity as well?

14   A.   I put -- I took a lump for my savings.

15   Q.   And put it in an annuity.  Okay.  Right?  Yes?

16   A.   Yes.  So I could get a little at a time instead of just --

17   Q.   So there's no threat that you're about to be out on the

18   street because your savings are depleted, right?

19   A.   No.  I didn't say they were depleted, they are depleting.

20   They're getting smaller and smaller.

21   Q.   Okay.  Have you looked for other work recently?

22   A.   No.  I have not looked for other work because,

23   unfortunately, I am suffering major depressive disorder and

24   anxiety.  I am not going to go to a job where I cannot do -- be

25   my best self.  I'm on a lot of medication and I'm trying to get

1   my mental health together before I try to be someone's

2   employee.

3   Q.  Do you have any kind of prognosis on returning to work?

4   A.  You mean, like, from my therapist?

5   Q.  Sure.

6   A.  No.  She didn't give me a day where I'm going to -- a

7   prognosis, no, sir.

8   Q.  It's a she, I suppose?

9   A.  Yes, it's a she.

10  Q.  Did she say that you can't work right now?

11  A.  She suggested that I take time and work on my -- myself.

12  Q.  It's not stressful to be in litigation?  You don't think

13  that adds stress to you?

14  A.  Only talking to you.  I love my lawyer.

15  Q.  Okay.  All right.  Outside of talking to me, litigation is

16  not that big of a deal for you, I guess, with your --

17  A.  It's not stressful.  I'm telling them what I'm going

18  through.  I'm telling them what has happened to me.  Basically

19  everything that I've said until today, I've been telling them

20  little by little over almost three years.

21  Q.  Okay.  When was the last time you received, I don't know,

22  threatening -- a threatening message?

23  A.  The last time I received, like, that came directly to me?

24  Is that what you're speaking of?

25  Q.  Yeah.  Let's start with that.

1    A.   No, I -- I don't want that in my life.  I blocked that.  No

2    one has access to send me anything.  But, you know, I wouldn't

3    say "threatening."  People try to intimidate me.  They, of

4    course, found where I -- they have found my new home.  I have

5    had people sending me in the mail clippings, like a cut-up

6    clipping of my face; things, yeah.

7    Q.   Okay.  Have you contacted -- well, how long ago was that

8    that happened?

9    A.   It was a couple months ago.

10   Q.   Okay.  Do you ever contact the authorities when you receive

11   things like that and report these incidents?

12   A.   To tell them I received a clipped-up newspaper clipping of

13   my face?

14   Q.   No, ma'am.  The threatening messages.

15   A.   I've -- I've made it so that people cannot send me

16   threatening messages any longer.

17   Q.   What did you do to do that?

18   A.   Blocked everything.  I have it all blocked.  You can't send

19   me a message or anything like that on where -- where they were

20   sending me before -- I mean, going into detail, I have cut it

21   off on Facebook, you cannot message me.  Unfortunately, I love

22   Pinterest, they were on there.  I shut that down.  The

23   LinkedIn, they were coming through there.  I deleted that.  And

24   I just -- I -- I blocked it.

25              I told you, I did the DeleteMe to just remove me from

1    the places that I didn't even know that I was there.  I'm

2    working to prevent me or my son to have to keep reliving that

3    because it's still being spewed, you know, as lies.  Like, I

4    received a picture of a cell phone hanging from a noose and I

5    had to, like, contact Facebook and -- and really just get it

6    blocked because once I blocked them, then they were sending --

7    going to my SPAM messages.  And I spoke with the people in

8    social media to assist me into just blocking -- blocking it

9    all.

10   Q.  I think Mr. Langford talked to you a little bit about the

11   effects of all this on your family.  Do you recall that?

12   A.  Yes, sir.

13   Q.  And, obviously, your mother is going to testify.  We're

14   going to hear from her eventually.

15        But based on your observations of your mother, do you

16   feel like this was harder on her than you, or easier?  I mean,

17   maybe she didn't have as much social media?  I don't know.  Can

18   you -- can you tell us how it affected her and how that

19   compared with what you dealt with?

20   A.  No, sir.  I can't do it.

21   Q.  You can't you us how this affected your mom?

22   A.  I mean, it affect her in a negative way.  It affected her

23   the same way it affected me.

24   Q.  Okay.  Can't say whether it was worse or not for her than

25   it was for you?

1   A.  No.  I can't.  It's like two people getting jumped and

2   deciding which one got jumped worse.  I don't know.

3   Q.  I see.

4       Well, does she have any kind of -- she getting treatment

5   for any of these issues that you're having that you went to

6   therapy for?

7            MR. LANGFORD:  Objection, Your Honor.

8            THE COURT:  If she knows.  Overruled.

9            THE WITNESS:  I'm not sure.  This -- this experience

10  has been very embarrassing because I just let my mom know that

11  I am taking medicine.  I tried to, you know, be as strong as I

12  can.  You know, when I'm around people, I don't want to be a

13  Debbie Downer.  So a lot of people are going to know all of my

14  business now, and that's not something I just go screaming out,

15  that I'm on meds.  And I'm not going to ask my mom if she is as

16  well.

17  BY MR. SIBLEY:

18  Q.  Okay.  She hasn't told you that "I'm on medication" or "I'm

19  suffering from posttraumatic stress disorder," anything like

20  that?

21  A.  No, sir.

22  Q.  Okay.  Is she still working?

23  A.  She had to shut her business down.

24  Q.  Okay.  I remember seeing something in the documents about a

25  business.  What kind of business did she have?

1    A.   She -- she had a travelling boutique.  Like, she -- she --

2    she had to change all of that.  She doesn't -- she doesn't go

3    about her business the way she used to.  She had her business,

4    but she had to change things so they couldn't find her, and she

5    has to work differently.

6    Q.   Okay.  And how long ago did she shut that business down?

7    A.   Well, she made -- she had to just make changes, and she has

8    to work differently.  We're not just as free as we used to be.

9    So, when everything happened.

10   Q.   Is she still working as an election -- in elections in

11   Fulton County?

12   A.   No.  She was a temporary worker, but she -- she left before

13   the holidays even came.

14   Q.   Oh, you mean like in 2020?

15   A.   Correct.

16   Q.   I see.

17        You mentioned you started going to therapy, I think, in

18   June of 2021?

19   A.   Yes.

20   Q.   Okay.  And I think what you said is well-spoken, a lot of

21   people don't appreciate the significance of mental health.  And

22   it sounds like you did that in June of 2021, correct?

23   A.   I'm sorry.  I didn't understand the question.

24   Q.   I thought what you said is the reason you didn't go to

25   therapy sooner is that it just wasn't something you were used

1   to doing or didn't really know much about.  Maybe I

2   misunderstood that, but --

3   A.  Right.  It was something that I've never done, I've never

4   had the reason to do.  It's something that I've seen people --

5   I've seen it on TV, but I've -- I was a very happy person.  I

6   never -- I never thought I would be in that situation, so I --

7   I didn't know anything about it.

8   Q.  Okay.  And you claim that you have some diagnosis of --

9   that you mentioned earlier with Mr. Langford from going to

10  therapy, right?

11  A.  Yes, sir.

12  Q.  Okay.  And what are those?

13  A.  Major depressive disorder.  Acute stress disorder.

14  Q.  Is that it?

15  A.  Those are the ones that I spoke about today.

16  Q.  Okay.  Are there any other ones that you didn't speak

17  about?

18  A.  Yes.

19  Q.  What are those?

20      Well, let me ask you this:  What other ones are you

21  contending to the jury that were caused by Mr. Giuliani's

22  conduct?

23  A.  I -- I believe that all of my medical records are

24  submitted.

25  Q.  All of your medical -- issues?  Did I understand that

1    correctly?

2    A.  All of my medical records.  So it's everything from my

3    doctor, they have it.

4    Q.  Okay.  What are -- what other issues do you have besides

5    maybe the major depressive disorder and --

6            MR. LANGFORD:  Objection, Your Honor.  What other

7    issues does she have?

8            THE COURT:  Let's talk.

9            (Whereupon, a bench conference was held:)

10           THE COURT:  Have all of the plaintiff's medical

11   records been turned over to the defense?

12           So, Mr. Sibley, are you fishing for something you

13   found in the medical records that you want to make public?

14           MR. SIBLEY:  I don't, Your Honor.  I'm just

15   wondering -- I mean, I don't know --

16           THE COURT:  Let me ask plaintiff's counsel.

17   Plaintiff's counsel turn over medical records for this

18   plaintiff?

19           MR. LANGFORD:  We have turned over redacted medical

20   records that detail the specific things that we are seeking as

21   damages for the intentional inflection of emotional distress.

22   It's a very narrow universe.

23           THE COURT:  And that is what she's testified about?

24           MR. LANGFORD:  Exactly.

25           THE COURT:  Mr. Sibley, what are you fishing for?

1          MR. SIBLEY:  I'm not fishing necessarily, it came up.

2          THE COURT:  You've asked her:  What else are you

3     seeking damages for?

4          And she's seeking damages for what she's testified

5     about.  So other things that are in the medical records that

6     have been redacted, she is clearly not seeking damages for

7     those.  So what more are you trying to get out of this witness?

8          MR. SIBLEY:  I wasn't until she said that she felt

9     like he was responsible for all of her medical problems, and I

10    wanted to make sure -- since I don't get a recross, I want to

11    make sure --

12         THE COURT:  So, plaintiff's counsel, you weren't

13    planning on bringing up anything else from her medical records

14    that has not already been discussed?

15         MR. LANGFORD:  No, Your Honor.

16         THE COURT:  Okay.  So there you have it, Mr. Sibley.

17         (Open court:)

18         THE COURT:  Objection is sustained.

19    BY MR. SIBLEY:

20    Q.  Who was the therapist that made those diagnoses that you

21    just mentioned, Ms. Moss?

22    A.  Dr. Shin, Dr. Womack.  And I cannot remember the lady that

23    I went to that one time in June of 2021.

24    Q.  Okay.  Do you know what kind of doctors they were?

25    A.  Well, Dr. Shin is my primary care physician.  She's the

1    first one that diagnosed me, gave me medication.

2            And, well, the first lady, I don't remember her name,

3    that I went to in June, I never went back.  But according to my

4    records, she diagnosed me with acute stress disorder.  And then

5    fast forward over a year later, September 2022, I went to

6    Dr. Shin and she diagnosed me with things.  But -- it was major

7    depressive disorder.

8            And then I went to Dr. Womack, that's my therapist.

9    She also diagnosed me with major depressive disorder and acute

10   anxiety -- with acute anxiety.

11   Q.  Do you know whether there's anything in your medical

12   records that attributed the cause of these conditions to

13   Mr. Giuliani?

14   A.  Say that again.  Sorry.

15   Q.  Is there anything in your medical records that attribute

16   the cause of these conditions that you mentioned to

17   Mr. Giuliani?

18   A.  Do you mean, like, did my doctor say:  Mr. Giuliani is why

19   you have major depressive disorder?

20   Q.  There might be something in the records where you told the

21   therapist that, I don't know, I'm suffering from, you know,

22   nightmares, et cetera, because of the things that Mr. Giuliani

23   said about me.

24           I'm just asking you whether there are.

25   A.  Correct.  I said the former president and his -- his

1   allies.

2   Q.  Okay.  But that wouldn't be necessarily reflected in the

3   medical records, right?

4   A.  I'm not sure how they would write in my medical records or

5   if they're like the court reporter and writing every single

6   word I say and put it in there.  I know that I told them my

7   story, and it started with Trump and his allies, meaning Rudy

8   Giuliani and his crew were the start of it all.  They lit the

9   torch.

10  Q.  You didn't talk about *The Gateway Pundit*?

11  A.  When I started to -- so, yes, I said Trump and his allies

12  spread the rumors at their rallies and their -- their

13  appearances.  And a lot of media outlets grabbed it and helped

14  spread their lies; the one that, you know, I've settled with

15  and the one that I am currently still in process of, you know,

16  have my suit with.

17  Q.  Okay.  I want to show you, these are exhibits Mr. DuBose

18  already talk to you about.  It's in the binder, it's

19  Exhibit 270 -- it's not in the binder, but let me get the --

20          MR. LANGFORD:  It's an audio file?  Is that what

21  you're looking for?

22          THE COURT:  We have a blank page in our notebooks

23  here, Mr. Sibley.  Plaintiffs' Exhibit 270.  So what is it that

24  you want to --

25          MR. SIBLEY:  I thought there was a -- trying to

1    demonstrate -- I thought it had a message.

2           THE COURT:  Instead of speaking out loud on the

3    record, why don't you just confer with plaintiffs' counsel and

4    see if they can help you.

5           (Off-the-record discussion between counsel.)

6    BY MR. SIBLEY:

7    Q.  Okay.  Let me look.  It's -- all right.  Let me ask you

8    this, ma'am:  Do you have any messages from -- that have

9    been -- that we've seen so far in this case, do you have any

10   messages -- voice messages, text messages, whatever -- from

11   December 3rd that are -- that you believe were generated as a

12   result of Mr. Giuliani's conduct?

13   A.  Yes, sir.

14   Q.  Okay.  Okay.  Can you tell us which ones those were?  Do

15   you recall?

16   A.  I can't recall -- it was a lot of them that I've seen

17   throughout the --

18   Q.  Okay.  Well, some of the exhibits we looked at -- or, you

19   looked at with Mr. Langford were Plaintiffs' Exhibit 270, 275,

20   and 278.  Do you see them in that binder in front of you?

21   There's not actually a document, but it has a blank page that's

22   a placeholder.  Do you see that?

23   A.  Yes.

24   Q.  Okay.  Would it surprise you that those messages are

25   actually from December 4th and not December 3rd?

1     A.  No, it wouldn't.

2     Q.  Okay.  Other than those, can you think of any messages that

3     could be from December 3rd that we've looked at or we will look

4     at in this case?

5     A.  I'm not sure which all -- the ones that we will look at or

6     have looked at.  I think I've had my fill of looking at them.

7     But I know that my son's cell phone was riddled with a lot of

8     things from the 3rd, as well as my Facebook.

9     Q.  Understand.  Okay.

10          I'm almost done, Ms. Moss.  Give me one second.

11          MR. SIBLEY:  All right.  I'll pass the witness, Your

12     Honor.

13          THE COURT:  All right.  I don't know how long your

14     redirect is going to be, but would it make sense, given the

15     length of what it might be, for us to take a break now?

16          MR. LANGFORD:  Yes, Your Honor.

17          THE COURT:  All right.  We'll take a ten-minute

18     break.

19          (Whereupon, the jurors leave the courtroom.)

20          THE COURT:  All right.

21          (Recess from 3:23 to 3:39.)

22          THE COURT:  All right.  Are you ready to proceed with

23     redirect?

24          MR. LANGFORD:  Yes, Your Honor.

25          THE COURT:  Okay.  Let's bring the jury in.

 1              (Whereupon, the jurors enter the courtroom.)

 2              MR. LANGFORD:  Thank you.

 3                        REDIRECT EXAMINATION

 4    BY MR. LANGFORD:

 5    Q.  Ms. Moss, Mr. Giuliani's attorney asked you about working.

 6    If you could right now, would you like to be working?

 7    A.  Yes.

 8    Q.  Tell us more about that.

 9    A.  Um, I mean, if it was a perfect world, I would love to work

10    at the only job I've known.  Anywhere that I work now cannot be

11    in a registration or elections department, not even at a

12    secretary of state's office because of all the things that are

13    being said about me.

14              But I would definitely have to start off again at the

15    bottom and work my way up.  I am wanting to do that, but I am

16    not mentally able to do that with things the way they are now.

17    It's a little difficult.  I -- I have to work on my mental

18    health, unfortunately.

19    Q.  Do you enjoy being without a job?

20    A.  No, I do not.  Before I had purpose, I had a reason.  No, I

21    do not enjoy this.  Most days I pray that God does not wake me

22    up and I just disappear.

23    Q.  Ms. Moss, Mr. Sibley also asked you about whether -- about

24    Jensen Hughes.  Why do you have security?

25    A.  Because my safety is at risk.

1   Q.  Do you feel safe going out in public without security?

2   A.  No, I do not.

3   Q.  In fact, how many times have you been out to dinner in the

4   last year?

5   A.  I've been out -- I can't count.  Like, a few times.  Not

6   alone, no.

7   Q.  Do you ever go out alone?

8   A.  No, I do not.  And actually, that was my homework from one

9   of my -- from my therapist, was to try to go out alone, and I

10  did.  I did once.  And -- and I made sure it was a restaurant

11  that when you walk in, the bar is right there.  So I just said:

12  I'm going to sit at the end of the bar and I'm going to try to

13  do this.

14          And I did it that one time.  I was so terrified.  I

15  was extremely nauseous.  But, thankfully, there was this guy at

16  the bar, and he was a Jewish guy, and he literally talked the

17  entire time about -- about this -- about this movie, about this

18  family that is in the pharmaceuticals -- I can't remember the

19  name of it.  But the guy was just talking.  And -- and I -- I

20  did it, and I was very proud of myself.  But, unfortunately, I

21  have not -- I have not been able to do that again.  But I did

22  do it, do it once.

23  Q.  Do you have security that's with you here in D.C.?

24  A.  For sure, yes.

25  Q.  They're protecting you to come to this trial?

1    A.  Correct.

2    Q.  Is that because you're unsafe?

3    A.  Correct.

4    Q.  Did you ever have a need before security -- did you ever

5    have a need for security before December 3, 2020?

6    A.  No.  No.  That was unheard of in my life.  Never.

7    Q.  You have a number of lawyers here, right?

8    A.  Yes.  A whole lot.

9    Q.  And Mr. Sibley mentioned that you have sued some other

10   defendants?

11   A.  Yes, sir.

12   Q.  Did you ever want to be in a position where you needed to

13   have these lawyers and security?

14   A.  No.  Never.  I enjoined my life before all of this.  I

15   enjoyed having a purpose to live.  I enjoyed, you know, helping

16   people.  I enjoyed educating people about their right to vote.

17   Like, I enjoyed being able to, like, ditch everyone and have my

18   day, where I am, like, shopping, going different places, don't

19   have to worry about picking up nobody from school.  You know,

20   I -- I enjoyed -- I enjoyed that.  I actually, you know, was

21   able to live my life.  This is not what I want.

22   Q.  Mr. Sibley also asked you about whether you thought that

23   Mr. Giuliani intended people to send you certain messages.  Are

24   you aware that Mr. Giuliani compared you to bank robbers?

25   A.  Yes.

1    Q.   That he accused you of being like a drug dealer?

2    A.   Yes.

3    Q.   That he accused you of passing vials of heroin and cocaine?

4    A.   Correct.

5    Q.   What do you understand that to mean?

6    A.   That's what he think about Black folks when he see them.

7    Q.   Mr. Sibley also talked about a number of other entities and

8    individuals that spread lies.  Is it true that *One America*

9    *News*, Chanel Rion were co-conspirators with this case?

10   A.   Right.  They were with this case, this one, yes.

11   Q.   Isn't it true that Team Trump, the Trump campaign members

12   thereof were co-conspirators in this case?

13   A.   Yes, sir.

14   Q.   Another entity that Mr. Sibley talked about was *The Gateway*

15   *Pundit*, and he asked you about your lawsuit against *Gateway*

16   *Pundit*.

17        Have you ever said that Mr. Giuliani was the only person

18   that spread lies about you?

19   A.   No.

20   Q.   Do you think that everyone who helped spread lies about you

21   should be held accountable?

22   A.   Yes.

23   Q.   Are you familiar with the complaint you filed in your

24   *Gateway Pundit* case?

25   A.   Yes.

1    Q.  Ms. Moss, do you know the date of the first *Gateway Pundit*

2    story that you're suing over?

3    A.  December 3, 2020.

4         MR. LANGFORD:  Your Honor, I would like to approach

5    the bench to have an exhibit marked for identification.

6         THE COURT:  Um-hum.

7         MR. LANGFORD:  That would be marked Plaintiffs'

8    Exhibit 607, I believe.

9         Your Honor, may I approach the witness to hand her --

10        THE COURT:  You may approach.

11   BY MR. LANGFORD:

12   Q.  Ms. Moss, what is this?

13   A.  This looks like an article from *The Gateway Pundit's*

14   website.

15   Q.  Is that the first article you're suing over in this case?

16   A.  Yes.

17        MR. LANGFORD:  Your Honor, I would like to offer

18   Plaintiffs' Exhibit 607 into evidence.

19        THE COURT:  Any objection?

20        MR. SIBLEY:  No objection, Your Honor.

21        THE COURT:  Okay.  It will be admitted.

22        MR. LANGFORD:  Your Honor, may we publish this to the

23   jury?

24        THE COURT:  Yes, you may.

25        (Plaintiffs' Exhibit 607, was admitted and

1    published.)

2    BY MR. LANGFORD:

3    Q.  Ms. Moss, can you read the headline of this article?

4    A.  "Huge!  Video footage from Georgia shows suitcases filled

5    with ballots pulled from under a table after supervisor told

6    GOP poll workers to leave tabulation center."

7            MR. LANGFORD:  Now, Mr. Spaulding, can you scroll

8    down to page 2, Zoom in on this second Team Trump Tweet.

9    BY MS. LANGFORD:

10   Q.  Ms. Moss, can you read the second Team Trump Tweet in this

11   article?

12   A.  "Watch:  Video footage from Georgia shows suitcases filled

13   with ballots pulled from under a table after supervisors told

14   poll workers to leave the room and four people stayed behind to

15   keep counting votes."

16   Q.  You said Team Trump is a part of this co-conspirator?

17           MR. SIBLEY:  Objection, Your Honor.  That -- number

18   one, I raised the objection that this is beyond the scope of

19   the pleadings.

20           And number two --

21           THE COURT:  Excuse me.  Do you have a speaking

22   objection which is -- I've already cautioned you about.  Let's

23   get on the bench phones.

24           (Whereupon, a bench conference was held:)

25           THE COURT:  Mr. Sibley, you didn't object to

1    introduction of this, so what are you complaining about now?

2           MR. SIBLEY:  Because he's asking the question whether

3    this is some conspiracy in this case with Team Trump.  And the

4    problem with it is the issues we've already raised, which Your

5    Honor ruled on.

6           THE COURT:  You opened the door to *Gateway Pundit*,

7    and you opened the door to December 3.  You opened the door to

8    this entire redirect, so objection overruled.

9           MR. SIBLEY:  But that's --

10          (Open court:)

11   BY MR. LANGFORD:

12   Q.  Ms. Moss, I was just asking you, you said Team Trump is a

13   co-conspirator in this case?

14          MR. SIBLEY:  Objection.  Foundation.  Objection --

15          THE COURT:  Overruled.

16   BY MR. LANGFORD:

17   Q.  Ms. Moss?

18   A.  Yes.

19   Q.  You said -- is Team Trump a co-conspirator with

20   Mr. Giuliani in this lawsuit?

21   A.  Yes, sir.

22   Q.  I'm going to ask:  How do you think you ended up on the

23   *Gateway Pundit's* radar?

24   A.  Because of the whole conspiracy from Mr. Giuliani and Team

25   Trump.

1          MR. LANGFORD:  Thank you.  No further questions, Your

2     Honor.

3          THE COURT:  All right.  Ms. Moss, you're excused.

4     Thank you.

5          And the plaintiffs' next witness.

6          MR. GOTTLIEB:  Your Honor, the plaintiffs call by

7     deposition testimony Mr. Bernard Kerik.

8          Before playing that testimony, I would like to batch

9     admit the documents that will be referenced in the deposition.

10          Counsel for Mr. Giuliani has indicated that his

11     objections to these exhibits are the 402, 403 objections.

12     Those exhibits are Plaintiffs' Exhibits 287, 342, 343.  And we

13     would also move the designation transcript of Mr. Kerik, which

14     is Exhibit No. 592.

15          THE COURT:  All right.  Mr. Sibley, do you have

16     objections to 287?

17          MR. SIBLEY:  Yes, Your Honor.

18          THE COURT:  Do you have objections to 342?

19          MR. SIBLEY:  Yes, Your Honor.

20          THE COURT:  Do you have objections to 343?

21          MR. SIBLEY:  Yes, Your Honor.

22          THE COURT:  And do you have objections to 592?

23          MR. SIBLEY:  592?

24          THE COURT:  Correct.  That's what's pending before

25     us, admission of those four exhibits.  That's the deposition

# Excerpted

CERTIFICATE OF OFFICIAL COURT REPORTER


     I, JANICE DICKMAN, do hereby certify that the above and

foregoing constitutes a true and accurate transcript of my

stenographic notes and is a full, true and complete transcript

of the proceedings to the best of my ability.

                         Dated this 12th day of December, 2023




                         /s/_____

                         Janice E. Dickman, CRR, CMR, CCR
                         Official Court Reporter
                         Room 6523
                         333 Constitution Avenue, N.W.
                         Washington, D.C.  20001