AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Philip C. Dublin
Abid Qureshi
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Rachel Biblo Block (admitted *pro hac vice*)
2300 N. Field St., Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

*Proposed Counsel to the Official Committee*
*of Unsecured Creditors of Rudolph W. Giuliani*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
In re:                                              :       **Chapter 11**
                                                    :
**RUDOLPH W. GIULIANI**                             :       **Case No. 23-12055 (SHL)**
**a/k/a RUDOLPH WILLIAM GIULIANI,**                 :
                                                    :
              Debtor.                               :
-------------------------------------------------------------------x

**OBJECTION OF**
**THE OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS OF RUDOLPH W.**
**GIULIANI TO THE DEBTOR'S AMENDED APPLICATION**
**FOR RETENTION AND EMPLOYMENT OF CAMARA & SIBLEY, LLP**
**AS SPECIAL LITIGATION COUNSEL EFFECTIVE DECEMBER 21, 2023**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

chapter 11 case of Rudolph W. Giuliani a/k/a Rudolph William Giuliani (the "Debtor"), by and

through its undersigned proposed counsel, hereby submits this objection (this "Objection") to the

*Debtor's Amended Application for Retention and Employment of Camara & Sibley, LLC as Special*

*Litigation Counsel Effective December 21, 2023* [Docket No. 87-1] (the "Amended C&S Application").[1]  In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      By the Amended C&S Application, the Debtor seeks to retain Camara & Sibley, LLP ("C&S") as his special litigation counsel in connection with the Freeman Litigation (as defined below).  Specifically, the Debtor seeks to retain C&S in connection with the filing in the United States District Court for the District of Columbia (the "D.C. District Court") of (x) a post-trial motion (or motions) (a "Post-Trial Filing") in the Freeman Litigation under Rule 50 or 59 of the Federal Rules of Civil Procedure (and potential litigation in connection therewith) and (y) a notice of appeal (a "Notice of Appeal") from the judgment entered in the Freeman Litigation, which together represent the limited relief that the Court indicated it was inclined to grant following a hearing on the Debtor's Lift Stay Motion (as defined below).  The Court stated, however, that it would not enter an order providing for a limited lifting of the automatic stay to enable the Debtor to make a Post-Trial Filing or file his Notice of Appeal unless and until issues raised by the Committee, the Freeman Plaintiffs (as defined below) and the Office of the United States Trustee (the "U.S. Trustee") with respect to C&S's proposed retention were resolved, including ensuring that the costs associated with the limited stay relief would not be borne by the Debtor's estate.  Unfortunately, as of the date hereof, the Debtor has refused to provide the Committee with much of the information it requested to evaluate the propriety of the Debtor's proposed retention of C&S.

---

[1]     In support of the Amended C&S Application, the Debtor filed the *Amended Declaration of Joseph Sibley, Esq. in Support of the Application for an Order Authorizing the Retention and Employment of Camara & Sibley, LLP as Special Counsel to the Debtor Effective December 21, 2023* [Docket No. 87-2] (the "Sibley Declaration"), the *Declaration of Andrew Giuliani* [Docket No. 87-5] (the "Giuliani Declaration") and the *"Lar Dan" Affidavit* [Docket No. 87-6] (the "Menges Affidavit").

2.      As set forth in the Amended C&S Application, the Debtor proposes that C&S's fees and expenses be paid by two separate legal defense funds identified as (x) Giuliani Defense and (y) Giuliani Freedom Fund Legal Defense T.R. Fund (the "<u>Giuliani Freedom Fund</u>" and, together with Giuliani Defense, the "<u>Legal Defense Funds</u>").  Giuliani Defense purports to be a hybrid political action committee whose president is the Debtor's son.  The Giuliani Freedom Fund is a purported Florida trust of which the Debtor is the grantor and sole beneficiary.  Together, these two entities have submitted affidavits in support of the Amended C&S Application indicating that they have agreed to pay all of C&S's fees and that none of C&S, Giuliani Defense or the Giuliani Freedom Fund will seek reimbursement from the Debtor or his estate.  Yet, in the Amended C&S Application, the Debtor provides virtually no detail about these entities, their operations, what the sources of their funds are and how the funds are managed and disbursed.

3.      Additionally, the Amended C&S Application contains limited information regarding C&S's ongoing representation of a principal of one of the Debtor's creditors, Robert Costello, along with the Debtor and certain of his wholly-owned businesses, as co-defendants in a pending lawsuit.  Following the Petition Date, C&S has continued to represent Mr. Costello and the Debtor's businesses.  Given the Debtor's admitted prepetition practice of disregarding corporate formalities and using his personal funds for the expenses of his businesses, the Committee is concerned that estate assets may be funding this representation, which could give rise to avoidance actions against C&S.  The cursory disclosures in the Sibley Declaration do not allay this concern or satisfactorily address whether C&S's continuing representation of Mr. Costello and the Debtor's affiliated businesses pose conflicts of interest.

4.      The Debtor's failure to provide necessary disclosures plagues the entire Amended C&S Application and, unfortunately, the Committee's repeated requests for information largely

have gone unanswered.  Accordingly, the Debtor falls short of his burden to demonstrate that the retention of C&S is in the best interest of his estate and there are no conflicts with respect to the Debtor's retention of C&S and the proposed compensation arrangement.  Without adequate additional disclosures from the Debtor evidencing that C&S satisfies the standards for retention under Bankruptcy Code section 327(e), the Amended C&S Application should not be approved.

## **BACKGROUND**

### A.  General Background

5.      On December 21, 2023, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor has continued in possession of his property and is managing his affairs as a debtor and debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request for the appointment of a trustee or examiner has been made in this chapter 11 case.

6.      On January 12, 2024, the Committee was appointed by the U.S. Trustee [Docket No. 46].  On January 16, 2024, the Committee selected Akin Gump Strauss Hauer & Feld LLP ("Akin") as its proposed counsel.

### B.  The Amended C&S Application

7.      On January 11, 2024, on notice of presentment, the Debtor filed the *Debtor's Application for Retention and Employment of Camara & Sibley, LLP as Special Litigation Counsel Effective December 21, 2023* [Docket No. 40-1], seeking authority to continue to employ C&S as special litigation counsel in connection with the lawsuit (the "Freeman Litigation") brought by Ms. Wandrea' ArShaye "Shaye" Moss ("Ms. Moss") and Ms. Ruby Freeman ("Ms. Freeman" and, together with Ms. Moss, the "Freeman Plaintiffs") in the D.C. District Court.[2]

---

[2]      *Freeman et al. v. Giuliani*, United States District Court for the District of Columbia, No. 1:21-cv-03354-BAH.

8.     On January 19, 2024, at the hearing (the "Stay Relief Hearing") on the *Debtor's Motion for an Order Modifying the Stay for the Limited Purposes of Allowing the Debtor to File Post Trial Motions to Modify the Judgment and on for a New Trial to File a Notice of Appeal* [Docket No. 25] (the "Lift Stay Motion"), the Committee, the U.S. Trustee and counsel for the Freeman Plaintiffs each expressed concerns that (i) should the automatic stay be lifted to allow the Debtor to make a Post-Trial Filing in the Freeman Litigation, any fees incurred by the Debtor in connection with such litigation would deplete the Debtor's estate and (ii) the C&S Application contained insufficient disclosures with respect to the third-party legal defense funds that had allegedly agreed to pay C&S in connection with the firm's representation of the Debtor in the Freeman Litigation.  *See, e.g.*, *In re Rudolph W. Giuliani*, No. 23-12055 (SHL) (Bankr. S.D.N.Y. Jan. 19, 2024), Hr'g Tr. (the "Stay Relief Hearing Transcript") at 53:14-16, 36:7-11, 80:17-20, 63:6-10.  Ultimately, in response to these concerns, an agreement was reached that entry of an order lifting the automatic stay would not be entered before entry of an order with respect to C&S's retention.  *Id.* at 79:24-25-80:2, 17-23.  The sequence in which these two orders would be entered was an important factor for the Committee in reaching an agreement at the Stay Relief Hearing to modify the automatic stay.

9.     Eleven days after the Stay Relief Hearing,[3] on January 30, 2024, the Debtor filed the Amended C&S Application on notice of presentment.  The Amended C&S Application states that C&S has worked on "several matters" for the Debtor since February 2021 and has been paid approximately $578,035.15 for such work—of which only $30,000 was paid by the Debtor.  Sibley

---

[3]     Despite the Court's unequivocally conditioning entry of an order modifying the automatic stay upon the prior entry of an order approving C&S's retention, the Debtor waited over a week and a half to file the Amended C&S Application.

Declaration ¶ 16.  The balance of C&S's fees has been paid by "third party sources" characterized as "third-party legal defense funds.  Sibley Declaration ¶ 16; C&S Application ¶ 11, Schedule B.[4]

10.     Neither the C&S Application nor the Amended C&S Application discloses pertinent information about the Legal Defense Funds, including the identity of their administrators, directors, officers and employees, the source of their funds and for what the funds have historically been used, which information is necessary to determine, among other things, (i) whether any of the Legal Defense Funds' assets may be property of the Debtor's estate, such that they should not be available to pay C&S and the stay should not be modified and (ii) whether there may be conflicts among the Debtor's estate, C&S and the Legal Defense Funds or whether a potential conflict could arise.

11.     While the Committee's proposed counsel has tried to engage with the Debtor's counsel regarding the insufficient disclosures in the Amended C&S Application, most of the Committee's repeated requests for specific information concerning the Legal Defense Funds have gone unanswered.[5]

## OBJECTION

12.     The Amended C&S Application should be denied because (i) the Debtor has not provided sufficient information to show that estate assets will not be used to pay C&S's fees and

---

[4]     The Amended C&S Application also discloses two postpetition payments by Giuliani Freedom Fund to C&S: (i) on January 3, 2024, a payment of $2,535.15 for the reimbursement of expenses related to the Freeman Litigation; and (ii) on January 16, 2024, a payment of $25,000.00 as part of the flat fee for C&S's representation of the Debtor in the appeal in the Freeman Litigation.  Sibley Declaration, Schedule B.

[5]     Attached as Exhibit A, Exhibit B and Exhibit C to the *Declaration of Rachel Biblo Block in Support of the Objection of the Official Committee of Unsecured Creditors of Rudolph W. Giuliani to the Debtor's Amended Application for Retention and Employment of Camara & Sibley, LLP as Special Litigation Counsel Effective December 21, 2023*, filed contemporaneously herewith, are emails exchanged between Akin and the Debtor's counsel through which Akin requests information regarding the Legal Defense Funds.  Akin sent emails to the Debtor's counsel requesting information on January 29, 2024, February 2, 2024, February 3, 2024, February 8, 2024 and February 13, 2024.  The Debtor's counsel responded to one email but, in that response, did not provide any information about the Legal Defense Funds.  As discussed below, the Debtor's counsel did provide the trust agreement for Giuliani Freedom Fund; however, that document has led to more questions than answers.

expenses; (ii) the Debtor has not satisfied the five-factor test to show that the Legal Defense Funds' payment of C&S's fees and expenses is not an impermissible conflict of interest; and (iii) the Debtor has not shown that the proposed retention of C&S is in the best interest of the estate given the potential conflicts between the Debtor, his affiliated businesses and other parties that C&S continues to represent.

## I. The Debtor Has Not Provided Sufficient Information to Show that Estate Assets Will Not Be Used to Pay C&S's Fees and Expenses.

13.     The question of whether relief from the automatic stay was appropriate was inextricably linked with whether post-judgment litigation in the Freeman Litigation would deplete the Debtor's assets available for distribution to his creditors.  *See* Stay Relief Hearing Transcript at 17:23-18:3, 22:12-18, 36:7-13, 44:22-24, 49:8-12, 53:14-16, 74:25-75:4, 75:14-19.  Lifting the automatic stay was conditioned on the premise that estate funds would not be used in connection with the Debtor's continuation of the Freeman Litigation.[6]

14.     In response to the Court's guidance during the Stay Relief Hearing, the Debtor filed the Amended C&S Application,[7] which unmasked the Legal Defense Funds but continued to describe them as "third party sources."  Amended C&S Application ¶ 10.  Based on the Debtor's continued characterization of the Legal Defense Funds as "third party," the Committee was surprised to learn that neither Legal Defense Fund is truly a "third party."  Instead, according to The Rudy Giuliani Freedom Fund Legal Defense Trust Fund Agreement (the "<u>Giuliani Freedom</u>

---

[6]    Stay Relief Hearing Transcript at 77:2-4 ("This is all contingent upon verifying that no estate funds will be used in connection with the Freeman litigation and these additional steps."), 80:5-13 ("[T]he proposed order would be emailed . . . with a notation that this order is agreed to, and also with some representation about the status of the funds issues so that I know it's appropriate to enter the order, meaning that people have gotten to a point where they understand estate funds won't be used[.]")

[7]    The Sibley Declaration filed with the Amended C&S Application provides that, except with respect to an initial retainer and a subsequent payment by the Debtor, the Legal Defense Funds are the source of all payments "received by C&S since the inception of its representation of the Debtor."  Sibley Declaration ¶ 16; Amended Sibley Declaration, Schedule B (Giuliani Defense has paid $260,000 to C&S; Giuliani Freedom Fund has paid $288,035.15).

Trust Agreement")[8], Giuliani Freedom Fund is a Florida trust established by the Debtor in 2021,[9] the Debtor is the grantor and sole beneficiary and the Debtor was required to establish a board of directors "responsible for all decisions related to the Trust, not explicitly granted to the Trustee."[10] Moreover, as set forth in the Giuliani Declaration, the Debtor's son, Andrew Giuliani, is the "President of Giuliani Defense." Giuliani Declaration ¶ 1.

15.    On February 14, 2024, the Debtor's counsel finally responded to the Committee's repeated requests for governing and formation documents for Giuliani Defense; however, no documents were provided because, according to the Debtor's counsel, Giuliani Defense has no governing or formation documents. While there is limited publicly available information reported by Giuliani Defense to the Federal Election Commission ("FEC") through the end of December 2023, and such information lists Giuliani Defense's bank as Wells Fargo,[11] it is unclear how Giuliani Defense opened two accounts at Wells Fargo without providing any governing or formation documents.[12] Additionally, the FEC's website contains a list of donors to Giuliani Defense through December 2023; however, the Giuliani Declaration contains no information regarding the relationship between those donors and the Debtor.[13] As of the date hereof, the Debtor

---

[8]    The Debtor's counsel provided the Committee with the Giuliani Freedom Trust Agreement, which is attached hereto as **Exhibit A**.

[9]    As set forth in the Giuliani Freedom Trust Agreement, the Debtor assigned to the trustee "the sum of $10 and such other property, monies, and assets payable to or contributed to the Trust which shall hereinafter come into his possession." Giuliani Freedom Trust Agreement ¶ 1. This seems to conflict with the Debtor's schedules of assets and statement on financial affairs, in which (i) he answered "No" to the question: "Within 10 years before you filed for bankruptcy, did you transfer any property to a self-settled trust or similar device of which you are a beneficiary?" and (ii) he answered "No" to the question: "Do you own or have any legal or equitable interests in any of the following items? "Trusts". Statement, Part 7, Question 19; Schedule A/B, Part 1, Question 25.

[10]    Giuliani Freedom Trust Agreement at 1, ¶¶ 3, 16.

[11]    Giuliani Defense, FEDERAL ELECTION COMMISSION, https://docquery.fec.gov/cgi-bin/forms/C00847327 /1745830/ (last visited Feb. 15, 2024).

[12]    *See* Registering as a Hybrid PAC, FEDERAL ELECTION COMMISSION, https://www.fec.gov/help-candidates-and-committees/filing-pac-reports/registering-hybrid-pac/ (last visited Feb. 15, 2024) (explaining that hybrid PACs are required to maintain two separate accounts).

[13]    Giuliani Defense, FEDERAL ELECTION COMMISSION, https://docquery.fec.gov/cgi-bin/forms/C00847327 /1745830/sa/ALL (last visited Feb. 15, 2024).

still has not provided the Committee with any information regarding the source of funding for the Giuliani Freedom Fund.

16.    Bankruptcy Code section 541 broadly defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. §541(a)(1).  Bankruptcy Code section 1115(a) expands this definition for an individual debtor:

> (1)    all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, 13, whichever occurs first; and
>
> (2)    earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13, whichever occurs first.

11 U.S.C. § 1115(a).  Without additional information about the Legal Defense Funds, in particular, the sources of their funding to date and those sources' relationships with the Debtor, it is impossible to determine whether the Legal Defense Funds' assets may be property of the Debtor's estate, the use of which to pay C&S would violate the agreement reached by the parties, and sanctioned by this Court, at the Stay Relief Hearing.[14]  For example, no information has been provided with respect to what the Debtor, the grantor and sole beneficiary of the Giuliani Freedom Fund, has contributed (either directly or indirectly) to that purported trust, and such contributions may be assets of the Debtor's estate.  Furthermore, to the extent the Debtor has any claims against parties that have contributed to the Legal Defense Funds, contributions from those parties may likewise be assets of the Debtor's estate.  Accordingly, the Debtor needs to provide more information to

---

[14]    *See, e.g.*, *In re Givans*, 631 B.R. 930 (Bankr. M.D. Fla. 2021) (finding that a debtor's interest in a trust was part of the bankruptcy estate subject to administration); *In re Cameron*, 223 B.R. 20 (Bankr. S.D. Fla. 1998) (finding that the debtor's interest in a trust was property of the estate); Fla. Stat. § 736.0505(1)(a) (providing that property of a revocable trust is subject to the claims of a settlor's creditors during the settlor's lifetime to the extent such property would not otherwise be exempt by law if owned directly by the settlor).

show that the assets in the Legal Defense Funds are not property of his estate before C&S's

retention can be approved.

## II.    The Debtor Has Not Met the Five-Factor Test to Show that the Legal Defense Funds' Payment of C&S's Fees and Expenses Is Not an Impermissible Conflict of Interest.

17.    Although compensation of a debtor's professional by a third party does not give

rise to a *per se* impermissible conflict of interest, such a payment arrangement necessarily gives

rise to concerns regarding a professional's allegiance and potential conflicts.  *See In re Lar Dan*

*Enters.*, 221 B.R. 93, 95-96 (Bankr. S.D.N.Y. 1998).  Courts confronted with this issue have

employed a five-factor test to analyze whether compensation from a third party constitutes an

impermissible conflict of interest:

(1)    the arrangement must be fully disclosed to the debtor/client and the third party payor/insider;

(2)    the debtor must expressly consent to the arrangement;

(3)    the third party payor/insider must retain independent legal counsel and must understand that the attorney's duty of undivided loyalty is owed exclusively to the debtor/client;

(4)    the factual and legal relationship among the third party payor/insider, the debtor, the respective attorneys, and their contractual arrangement concerning the fees, must be fully disclosed to the [c]ourt at the outset of the debtor's bankruptcy representation; [and]

(5)    the debtor's attorney/applicant must demonstrate and represent, to the court's satisfaction, the absence of facts which otherwise create non disinterestedness, actual conflict, or impermissible potential for a conflict of interest.

*Id.* at 96 (citing *In re Kelton Motors Inc.*, 109 B.R. 641, 648 (Bankr. D. Vt. 1989)).

18.    In the Amended C&S Application, the Debtor failed to meet the five-factor test set

forth in *Lar Dan*.  *See In re Lar Dan Enters.*, 221 B.R. at 96.  In particular, the third, fourth and

fifth *Lar Dan* factors plainly have not been met.  *See id.*

19.     With respect to the third *Lar Dan* factor, it is difficult to assess how C&S can be deemed to be an independent counsel with a duty owed only to the Debtor when it is simultaneously representing the Debtor, the Debtor's affiliated businesses and a creditor's principal, and there is an absence of disclosure as to whether the Legal Defense Funds are paying all of these parties' legal fees or only the fees of the Debtor.

20.     With respect to the fourth *Lar Dan* factor, there is a lack of detail in both the Giuliani Declaration and the Menges Declaration regarding the factual and legal relationship between Giuliani Defense, Giuliani Freedom Fund, the Debtor and C&S.  As noted herein, there is no way to assess these relationships, given that, other than merely naming the trustee and the president of the Giuliani Freedom Fund and Giuliani Defense, respectively, the Amended C&S Application contains virtually no information about the Legal Defense Funds.

21.     For example, the Giuliani Freedom Trust Agreement requires that the Debtor establish a board of directors comprised of three to five individuals responsible for all decisions related to the Trust not explicitly granted to the Trustee in paragraphs 5 and 6 of the Giuliani Freedom Trust Agreement, but the Menges Declaration does not refer to a board or identify any of the directors.  Giuliani Freedom Trust Agreement ¶ 16.  Additionally, according to the Debtor's counsel, Giuliani Defense has no governing documents at all, so nothing is known about how that entity makes funding or other decisions and who makes those decisions.

22.     However, it is important to understand the process by which the Legal Defense Funds determine how their funds are spent and who makes those determinations, as well as their relationship with the Debtor and C&S.  For example, to the extent either of the Legal Defense Funds is also funding litigation expenses for a party that is a co-defendant with the Debtor in a lawsuit, such an arrangement could present a conflict of interest.  Moreover, neither the Giuliani

Declaration nor the Menges Declaration describes whether the applicable Legal Defense Fund and C&S have contractual payment arrangements or how the parties decided on the arrangements.

23. Finally, this factor requires disclosure at the *outset* of the professional's postpetition representation; however, the Amended C&S Application shows that C&S has already received postpetition payments from the Giuliani Freedom Fund on account of an "appeal partial fee" and "expense reimbursement from Freeman trial" without providing the required disclosures. *See* Amended C&S Application, Schedule B.

24. The fifth *Lar Dan* factor also has not been met. The fifth factor requires that C&S demonstrate and represent the absence of facts that create non-disinterestedness, actual conflict or impermissible potential for a conflict. *In re Lar Dan Enters.*, 221 B.R. at 96. As previously noted, without disclosures regarding who is managing, funding and working for each of the Legal Defense Funds, their relationships with the Debtor, his affiliated entities and C&S, and how and where funds are distributed, there is no way to know if an actual or potential conflict of interest exists.

### III. The Debtor Has Not Shown that the Retention of C&S Is in the Best Interest of the Estate.

25. More generally, the Amended C&S Application contains insufficient disclosures to determine whether the requirements of Bankruptcy Code section 327(e) have been met. In relevant part, Bankruptcy Code section 327(e) provides that a debtor,

> with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e). Although "best interest of the estate" and "adverse interest" are not defined in the Bankruptcy Code, courts have delineated the contours of these phrases' meanings. Courts

have interpreted the phrase "best interest of the estate" to mean that retention of an attorney under section 327(e) "must be for the benefit of the estate and not merely for the personal benefit of the debtor." *In re Johnson*, 433 B.R. 626, 639 (Bankr. S.D. Tex. 2010) (quoting *In re J.S. II, L.L.C.*, 371 B.R. 311, 320 (Bankr. N.D. Ill. 2007)) (internal quotations omitted).

26.     The Second Circuit interprets the term "adverse interest" as (1) possessing or asserting "any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant" or (2) possessing "a predisposition under circumstances that render such a bias against the estate." *In re AroChem Corp.*, 176 F.3d at 623 (quoting *In re Roberts*, 46 B.R. 815, 827 (Bankr. D. Utah 1985)).  The determination of whether an adverse interest exists is objective and is concerned with the "appearance of impropriety." *In re Mercury*, 280 B.R. 35, 54 (Bankr. S.D.N.Y. 2002) (quoting *In re Angelika Films 57th, Inc.*, 227 B.R. 29, 38 (Bankr. S.D.N.Y. 1998)).

27.     Additionally, Bankruptcy Rule 2014 imposes certain disclosure requirements for retention applications, including categories of specific facts that must be included to support retention of a given professional, and Local Bankruptcy Rule 2014-1 requires that an application state specific facts showing the reasonableness of the terms and conditions of the employment. Fed. R. Bankr. P. 2014(a); Local Bankruptcy Rule 2014-1.

28.     The Amended C&S Application fails to disclose sufficient information necessary to satisfy the requirements of Bankruptcy Code section 327(e).  First, the Sibley declaration leads to more questions than answers with respect to the relationship between C&S and the Debtor and his wholly-owned companies and the Debtor's creditors.  In the Sibley Declaration, Mr. Sibley discloses that C&S represents Robert Costello (a principal of one of the Debtor's creditors) and "certain of the Debtor's affiliated companies" in another pending lawsuit, *Biden v. Giuliani, et al.*,

pending before the United States District Court for the Central District of California.[15]  Sibley

Declaration ¶ 11.  However, Mr. Sibley summarily concludes that "the parties' interests are aligned

and there is no reasonable belief at this point that representation of Costello . . . creates any actual

or potential conflict of interest."  *Id.* ¶ 11.  Without further information regarding the lawsuit and

the parties' roles therein, the Committee is unable to reach the same conclusion.

29.     Moreover, on a postpetition basis, C&S is continuing to represent Mr. Costello

along with three entities that are wholly-owned by the Debtor—Giuliani Partners, LLC, Giuliani

Group, LLC and Giuliani Security & Safety, LLC.[16]  On January 17, 2024, on behalf of the

foregoing parties, C&S filed a motion to dismiss the lawsuit.[17]  Given the limited disclosures in

the Sibley Declaration, the Committee does not know how the Debtor's wholly-owned companies

are paying C&S for this postpetition work and whether estate assets are being used for this

endeavor.  To this point, at the Debtor's section 341 meeting on February 7, 2024, the Debtor

provided sworn statements concerning a lack of corporate formalities with respect to the

relationship between him and his wholly-owned businesses and no clearly defined cash

management system.[18]  Indeed, the Debtor explained that historically, he paid for many of his

businesses' expenses from his personal account and about forty percent of the expenses listed in

---

[15]   *Biden v. Giuliani, et al.*, United States District Court for the Central District of California, No. 2:23-cv-08032-HDV-KS.

[16]   *See* Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest [Docket No. 81].

[17]   Docket No. 23, *Biden v. Giuliani, et al.*, No. 2:23-cv-08032-HDV-KS.  Schedule B to the Sibley Declaration discloses that, on November 27, 2023, $60,000 was paid by Giuliani Defense to C&S in connection with this matter.  Sibley Declaration, Schedule B; *see also* Giuliani Defense, FEDERAL ELECTION COMMISSION, https://docquery.fec.gov/cgi-bin/forms/C00847327/1745830/sb/ALL.

[18]   *See In re Rudolph W. Giuliani*, No. 23-12055 (SHL) (Bankr. S.D.N.Y. Feb. 7, 2024), 341 Meeting Tr. at 26:24-25, 27:1-20.  The cited excerpts of the section 341 meeting transcript are attached hereto as **Exhibit B**.

his schedules of assets and liabilities and statement of financial affairs are actually expenses of his businesses.[19]

30.     Additionally, in the Amended C&S Application, rather than provide additional disclosure to assure the Court and other stakeholders that the proposed retention arrangement with C&S is in the best interest of the estate and that no adverse interest exists or could arise through C&S's representation of the Debtor, the Debtor adduced two bare bones disclosures that provide no information about the Legal Defense Funds' actual sources of funds.  This lack of detail regarding the Legal Defense Funds prevents the completion of the necessary analysis of whether an adverse interest exists, which can only be accomplished by probing any "appearance of impropriety," as well as relationships or interests that could draw a professional's independence and impartiality into question.  *In re Mercury*, 280 B.R. at 54 (quoting *In re Angelika Films 57th, Inc.*, 227 B.R. at 38).

31.     Given the limited information contained in the Amended C&S Application and the Debtor's counsel's silence with respect to the Committee's requests for additional information, the Amended C&S Application also fails to meet the requirements of Bankruptcy Rule 2014 and Local Bankruptcy Rule 2014-1.  With insufficient disclosure regarding who is involved with the Legal Defense Funds, the sources of the funds for the Legal Defense Funds and how moneys are allocated and disbursed, there is no way to assess the reasonableness of the terms and conditions of the proposed retention.  Moreover, the availability of certain information on the Federal Election Commission's website regarding one of the two Legal Defense Funds is not sufficient to meet the Bankruptcy Code, Bankruptcy Rule and Local Rule requirements applicable to C&S's retention.  Indeed, stakeholders are not required to rummage through filings or conduct independent fact

---

[19]    *See id.* at 137:23-25, 138:1-25, 139:1-19.  The cited excerpts of the section 341 meeting transcript are attached hereto as **Exhibit B**.

finding investigations to try to assess the propriety of the proposed terms of a professional's retention.  *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998).

## **RESERVATION OF RIGHTS**

32.     The Committee reserves all of its rights and remedies with respect to the Amended C&S Application, the Debtor and all other matters related to this chapter 11 case.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Committee requests that the Court deny the relief requested in the Amended C&S Application.

Dated: February 15, 2024
New York, New York

*/s/ Philip C. Dublin*
**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira S. Dizengoff
Philip C. Dublin
Abid Qureshi
One Bryant Park
New York, New York 10036
Tel:    (212) 872-1000
Fax:    (212) 872-1002
Email:  idizengoff@akingump.com
        pdublin@akingump.com
        aqureshi@akingump.com

- and -

Rachel Biblo Block (admitted *pro hac vice*)
2300 N. Field St., Suite 1800
Dallas, Texas 75201
Tel:    (214) 969-2800
Fax:    (214) 969-4343
Email:  rbibloblock@akingump.com

*Proposed Counsel to the Official Committee*
*of Unsecured Creditors of Rudolph W. Giuliani*

## **Exhibit A**

**Giuliani Freedom Trust Agreement**

THE RUDY GIULIANI FREEDOM FUND
LEGAL DEFENSE TRUST FUND

THIS AGREEMENT, dated the last date executed below, shall constitute a Trust Agreement between Rudolph W. Giuliani (hereinafter called the "Grantor") and James "Jake" Menges (hereinafter called the "Trustee").

This Agreement establishes the Rudy Giuliani Freedom Fund Legal Defense Trust Fund (the "Trust").

RECITALS

A. The Grantor, an individual, has incurred and is responsible for expenses in connection with his role as advisor and lawyer to former President of the United States of America, Donald J. Trump. These expenses relate to his role as described in the prior sentence, and also among other matters, include his role as a defendant in several lawsuits stemming from the 2020 U.S. Presidential Election (the "Election"), the period before the Election and the Election's aftermath, including, but not limited to lawsuits in New York, Washington, D.C., Pennsylvania, and Colorado (collectively, the "Election Lawsuits"), as well as an investigation by the United States Department of Justice (the "DOJ Investigation"), other investigations by state or federal law enforcement agencies, and state bar association inquiries or actions.

B. It is the desire of the Grantor to create a trust for the purpose of accepting funds and making expenditures in connection with legal expenses incurred by the Grantor and other parties in connection with matters described *supra* in sub-paragraph A, including but not limited to the DOJ Investigation, the Election Lawsuits, any other allegations of impropriety stemming from his handling of the Election, and any other legal expenses that have arisen or may arise in any judicial, civil, criminal, administrative, state Bar associations, state, Federal, or Congressional inquiries or proceedings arising from the same operative facts and circumstances under inquiry by the DOJ, in a manner consistent with and in compliance with the laws of the United States and the State of Florida.

NOW, THEREFORE, in accordance with the above-stated purposes, laws and rules, the parties agree as follows:

1. **Trust Property.** The Grantor does hereby assign to the Trustee the sum of $10.00 and such other property, monies, and assets payable to or contributed to the Trust which shall hereinafter come into his possession. Negotiable instruments made payable "Legal Defense Fund" shall be considered as being donated to the Trust.

2. **Trust Purposes.** The sole purpose of this Trust is to receive funds and to pay all expenses reasonably related to the legal representation of the Grantor in connection with the matters described in Paragraph B *supra*, relating to or arising by virtue of the Grantor's service in the State of New York, Florida, and elsewhere, on behalf of the former President of the United States and related actions stemming from the 2020 Presidential Election and its aftermath, and to pay all taxes which arise from the existence of this Trust or for which the Grantor may become liable as a result of the establishment of this Trust. This Trust will be established, administered, and terminated in conformity with the Florida Trust Code.

3. **Beneficiary.** The beneficiary of this Trust shall be the Grantor, but he shall exercise absolutely no control over the Trust property and shall receive no tangible or intangible benefit from the Trust other than such benefit that is incident to or may have arisen from past legal representation.

4. **Qualifications of the Trustee.** The Trustee hereunder, or any successor trustee appointed in accordance with this instrument, if an individual, shall be at least 25 years of age. Said Trustee shall not be a full-time employee of Grantor or any company owned by Grantor; a

member of the Grantor's immediate family; counsel for Grantor in any legal proceedings connected to proceedings necessitating the creation of the trust fund, or a member, partner, associate, or employee of the firm employing that counsel. Nothing in this Agreement shall prohibit Trustee from being an independent contractor of a company owned by Grantor. For the purposes of this agreement, Goldberg Segalla, LLP shall not be considered counsel for Grantor in any legal proceedings connects to proceedings necessitating the creation of the trust fund.) The Trustee herein named, and any successor Trustee, warrants and represents to the Grantor that he will at all times faithfully comply with Chapter 736 of the Florida Trust Code (the "Florida Code") and all applicable statutes of the United States and Florida State. The Trustee herein named, and any successor, further warrants, represents, and recognizes that he will be acting in a fiduciary capacity and will be bound by the laws of Florida State regulating the conduct of such fiduciaries and by the strict terms of this instrument. It is understood that the powers, duties and rights of said Trustee are controlled by said laws and the terms of this instrument which are not inconsistent therewith.

5.    Trustee's Powers. In the administration of the Trust, the Trustee shall have the following powers, which, subject to the restrictions contained elsewhere herein, may be exercised in the sole and absolute discretion of the Trustee without resort to any person or court for further authority and which shall be in addition to the powers conferred upon the Trustee by law or by other provisions of this instrument:

A. to invest Trust property to make it income producing;

B. to incur reasonable expenses on behalf of the Trust where necessary to make the Trust productive and to pay invoices incurred by Grantor in relation to legal defense costs;

C. to hold cash uninvested for such length of time as the Trustee shall determine is advisable;

D. to sell, exchange or otherwise dispose of any of the Trust property as the Trustee may deem expedient;

E. to employ such agents, custodians, investment counsel and attorneys which the Trustee deems expedient and to pay them reasonable compensation for their services out of either principal or income of the Trust property;

F. to allocate to income or principal any receipt, gain, loss, or expenditure as he deems just and equitable under the circumstances of each case as it arises;

G. to compound, compromise, settle, and adjust all claims and demands in favor of or against the Trust estate on such terms as the Trustee shall deem just; and

H. to set up reserves from principal or income for the purpose of making provision for any liability or obligation of the Trust including reserves for the payment of any and all taxes referred to in Article II.

6.    Duties of the Trustee. In addition to the duties imposed by applicable state laws, and the duties stated elsewhere in this Agreement, the Trustee shall have the duty to:

A. enter into any legal agreements with legal counsel selected by the Grantor, including agreements relating to compensation, as may be necessary to effectuate the purposes of this Agreement;

B. pay expenses and legal bills of all attorneys retained by the Grantor and other approved expenses and bills related to the litigation of lawsuits stemming from the 2020 Presidential Election;

C. transfer to the Trust property all property, monies, and assets payable or contributed to the Trust which the Trustee may hereafter come to possess, from or through the Grantor or any other source, unless the Trustee in his discretion determines that such property, monies, and assets shall be returned to their source;

8

D. keep Trust property separate from any of the Trustee's personal funds or any other funds;

E. operate as a fiduciary in relation to the Trust property and the Trust purpose as stated in this Agreement;

F. file all reports required under the Florida Code; and

G. comply with all regulations promulgated by any federal, state or local agency.

7.      Liability of the Trustee. The Trustee shall not be liable for any act, in his capacity as Trustee, undertaken in good faith and with the purpose of advancing the best interests of the Trust.  .No bond or other security shall be exacted or required of the Trustee in any jurisdiction.

8.      Compensation of the Trustee. The Trustee, if an individual, shall be compensated from either income or principal of the Trust per hour spent in administration of this Trust in accordance with his or her usual hourly rate for professional services, and in consultation with the Trust's Board. In the event that the Trustee shall be the trust department of a national banking institution, the Trustee shall be compensated in accordance with the usual, customary, and published Trustee's rates of said institution for a trust of this type and size. The Trustee may waive compensation.

The Trustee shall keep a log of the time spent and a record of services performed, which log shall be available for inspection by the Grantor or his agents at reasonable times and places.

The Trustee shall further maintain documentation and an itemization of all expenses incurred in the administration of this Trust. The Grantor reserves the right to inspect such documentation at reasonable times and places.

The Trustee shall be reimbursed for all reasonable expenses incurred in the administration of this Trust.

Fees incurred by the Trustee and all expenses incurred by the Trustee shall be submitted and paid monthly, and said Trustee's fees and expenses shall have priority over other payments made to accomplish the purpose of this Trust.

9.      Prohibited Contributions. The Trustee shall not accept any gift or donation prohibited by or in excess of the limits established by the Florida Code. In particular:

A. The Trust shall not accept any contribution from a foreign national, or an agent of a foreign principal.

B. The Trust shall not accept any contribution from any corporation or labor organization (as defined in the Federal Election Campaign Act, 2 U.S.C. § 441(b)(1)).

If any prohibited contribution is inadvertently accepted, the Trustee shall, as soon as practical after becoming aware of the prohibited nature of the contribution, return it in its entirety to the donor (if from a prohibited source) or return the excess over $10,000 to the donor (if prohibited because of the amount).

10.     Segregation of Funds. All contributions to the Rudy Giuliani Freedom Fund Legal Defense Trust Fund must be kept in a separate bank account established therefore. All property, monies, and assets payable to or contributed to the Trust shall be segregated from, and may not be comingled with, the personal, political, or official funds of the Grantor, or the funds of any other individual or legal entity.

11.     Disclosure and Reporting Provisions. The Trustee is authorized and directed to

supply to the Grantor or his agents any and all information regarding contributions, gifts and expenditures as may be necessary and required by law to permit the Grantor to comply fully with the Florida Code.

The Trustee shall file quarterly reports with the as required pursuant to the Florida Code.

12.    Trust Term and Disposition of Residual Funds. The Trust established by this Agreement may be terminated at any time by the Trustee upon the direction of the Grantor. The Trust shall terminate, in any event, no later than six months following the completion of the legal proceedings involving the Grantor as a result of the matter described in Article I for which the Trust was created, unless, upon application, the Government Agency extends the life of the Trust, in which event the Trust will terminate upon the expiration of all extensions.

Upon termination of the Trust, no further contributions shall be accepted, and no further expenditures shall be made.

13.    Distribution of Unexpended Funds Upon Termination. Funds remaining upon the termination of the Trust shall, within thirty days thereafter, be donated and distributed to one or more organizations described in Section 501(c)(3) of the Internal Revenue Code of 1954 and made exempt from taxation under Section 501(a) thereof, or returned to contributors to the Trust on a pro rata basis.

14.    Successor Trustees. In the event that the original, named Trustee herein shall desire at any time to be relieved of his duties herein, said Trustee may resign by written notice to the Grantor, who may appoint a successor Trustee with the same qualifications set forth in paragraph 4 above, without the need of Court approval. The Grantor shall have the same power to appoint a substitute Trustee in the event of the death, incapacity, or failure to act in accordance with the terms of this instrument of any Trustee. In the event of Grantor's inability to act as a result of incapacity or other reasonable cause, the proper legal representative of the Grantor shall have the right and authority to seek the appointment of a substitute Trustee in any court of competent jurisdiction for such purposes in Florida State.

15.    Trustee's Accounts. The Trustee shall keep or, in the Trustee's sole and absolute discretion, shall cause others to keep, accurate written records and books of account of the Trust Estate, showing the manner in which the Trust Estate is invested and all receipts, disbursements, and other transactions involving the Trust Estate. All such records and books of account shall be the property of the Trustee during the duration of this Trust and they, together with the Trust property and all reasonable evidence thereof, plus any accounts, shall not be made available to the Grantor during the Trust term except as hereinabove provided or as may be required by applicable law.

16.    Board of Directors. Within thirty days of the execution of the Agreement, Grantor will establish a Board of Directors for the Trust comprised of a minimum of three individuals and a maximum of five individuals. The Board of Directors shall be responsible for all decisions related to the Trust, not explicitly granted to the Trustee in paragraphs 5 and 6, *supra*, including, but not limited to decisions related to compensation of the Trustee and removal of the Trustee.

17.    Situs. The Trust shall be executed and delivered in the State of Florida and shall be construed and administered according to the laws of the State of Florida.

IN WITNESS WHEREOF, said Grantor has hereunto set his hand and said Trustee has signed this instrument, all parties intending to be legally bound hereby on the day, month and year written below.

[Remainder of the Page Intentionally Left Blank]



Commonwealth of Pennsylvania

## AFFIDAVIT OF GRANTOR, RUDOLPH W. GIULIANI

State of     )   P𝑒NNSYLVANIA
               ) ss
County of     )    ADAMS

I, Rudolph W. Giuliani, of full age, being first duly sworn and upon my oath according to law, depose and say:

1. I am an individual seeking to establish a Legal Defense Trust Fund

2. This fund is necessitated by, and intended to defray, legal expenses and related expenses incurred in connection with several lawsuits stemming from my role as an advisor and lawyer for the former President of the United States, and the 2020 U.S. Presidential Election (the "Election"), the period before the Election and the Election's aftermath, including, but not limited to lawsuits in New York, Washington, D.C., Pennsylvania, and Colorado (collectively, the "Election Lawsuits"), as well as an investigation by the United States Department of Justice, related to Grantor's relationship with several foreign nationals (the "DOJ Investigation"). These legal expenses arose by virtue of, and were related to, my service in or to United States President Donald J. Trump.

3. I agree to be bound by the rules of the Florida Code which govern the establishment, administration and termination of legal expense trusts; and any and all other relevant rules and regulations.

4. Although a trustee of the Trust has been designated, I agree to bear ultimate responsibility for the proper administration of the Rudy Giuliani Freedom Fund Legal Defense Fund in conformity with the aforesaid regulations and the rules.

_____
Grantor

Subscribed and sworn to before me

this _14TH_ day of MAY 2021.

_____

Notary Public of the State of
The State of New York.

AFFIDAVIT OF TRUSTEE, JAMES MENGES

State of        ) Florida
                                    ) ss
County of    ) Palm Beach

I, James K. Menges, of full age, being first duly sworn and upon my oath according to law, depose and say:

1. I am not a Member, officer, or employee of any company owned by or affiliated with Grantor, Rudolph Giuliani ("Mr. Giuliani"); a member of Mr. Giuliani's immediate family; counsel for Mr. Giuliani, or a member, partner, associate, or employee of the firm employing counsel for Mr. Giuliani in the proceedings necessitating the creation of this trust fund.

2. I am the designated Trustee of the Rudy Giuliani Freedom Fund Legal Defense Trust Fund, a Trust created for the purpose of receiving contributions to defray the legal expenses and related expenses of Rudolph W. Giuliani incurred in connection his role as an advisor and lawyer for the former President of the United States, and the 2020 U.S. Presidential Election (the "Election"), the period before the Election and the Election's aftermath, including, but not limited to lawsuits in New York, Washington, D.C., Pennsylvania, and Colorado (collectively, the "Election Lawsuits"), as well as an investigation by the United States Department of Justice, related to Grantor's relationship with several foreign nationals (the "DOJ Investigation").

3. I have read and understand the provisions of the regulations promulgated the Florida Code which govern the establishment, administration and termination of legal expense trusts.

4.        Furthermore, I consent to administer the Rudy Giuliani Freedom Fund Legal Defense Fund in conformity with the laws of Florida State and the United States of America.

James Menges

Subscribed and sworn to before me
this 10th day of May 2021.

Notary Public

29954603.v1

SUZANNE YAGOUB
Notary Public - State of Florida
Commission # HH 009477
My Comm. Expires Jun 27, 2024
Bonded through National Notary Assn.

Dated this
Day of May 2021

_____

Grantor, Rudolph W. Giuliani

_____
Witness
Date: May 14, 2021

_____
James Menges, as Trustee

_____
Witness        Date: may 14, 2021

State of              )
                     ) ss
County of            )

On this        day of May 2021, before me personally appeared        to me known, and known to me to be the individual described in and who executed the foregoing Trust as Grantor and who acknowledged the execution of the same to be his free act and deed.

_____
Notary Public

Commonwealth of Pennsylvania
Notarial Seal
HARRY JOHN HARTMAN – Notary Public
CUMBERLAND TWP, ADAMS COUNTY
My Commission Expires Aug 28, 2021

State of    )  PennSYLAniA
                     ) ss
County of   )   ADANS  County

On this        day of May 2021, before me personally appeared        to me known, and known to me to be the individual described in and who executed the foregoing Trust as Trustee and who acknowledged the execution of the same to be his free act and deed.

**<u>Exhibit B</u>**

**Excerpts of Section 341 Meeting Transcript**

1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - -x

5

6  In the Matter of:

7  RUDOLPH W. GIULIANI,                    Main Case No.

8          Debtor.                        23-12055-shl

9

10  - - - - - - - - - - - - - - - - - - - -x

11

12                Office of the United States Trustee

13                One Bowling Green

14                New York, New York

15

16                February 7, 2024

17                3:00 PM

18

19

20

21  B E F O R E:

22  ANDREA BETH SCHWARTZ, ESQ.

23  OFFICE OF THE UNITED STATES TRUSTEE

24

25  ECRO:   ELECTRONICALLY RECORDED

1   California --

2            MS. SCHWARTZ:  Well, like. For example, let's say I

3   worked on a case in Texas, but I'm employed here.

4            MR. GIULIANI:  Yeah, but I -- you probably getting

5   paid then through your law firm.

6            MS. SCHWARTZ:  Well, I'm getting paid by you, the

7   American taxpayer.

8            MR. GIULIANI:  Well, you --

9            UNIDENTIFIED SPEAKER:  Touche.

10           MR. GIULIANI:  Well, you wouldn't have to worry.

11  You're being paid by the United States Government.  But if

12  you -- like, a baseball player has to do that.  A baseball

13  player has to file returns in all the states --

14           MS. SCHWARTZ:  They play games.

15           MR. GIULIANI:  -- they play games where there are

16  taxes, separate tax returns.  In fact, that's the -- that's the

17  model that we used when I first realized I had -- I had to do

18  this.

19           MS. SCHWARTZ:  Because of course you're --

20           MR. GIULIANI:  When I do originally had to do it --

21           MS. SCHWARTZ:  -- it's your passion, right?

22           MR. GIULIANI:  -- I had no idea that I had to do that.

23           MS. SCHWARTZ:  Now, what about a bookkeeper?  You have

24  one?

25           MR. GIULIANI:  Yes.

**RUDOLPH W. GIULIANI**

27

1          MS. SCHWARTZ:  And who is that?

2          MR. GIULIANI:  Ryan,, Ryan Medrano.

3          MS. SCHWARTZ:  Okay.  And who pays for him?

4          MR. GIULIANI:  Giuliani Partners pays for him.

5          MS. SCHWARTZ:  Partners pays for him?

6          MR. GIULIANI:  Uh-huh.

7          MS. SCHWARTZ:  And what about the accountant?

8          MR. GIULIANI:  Same thing.

9          MS. SCHWARTZ:  Giuliani Partners?

10         MR. GIULIANI:  Yes.

11         MS. SCHWARTZ:  Now, where does Giuliani Partners --

12  Giuliani partners get money?  You just said it's pretty much

13  inactive.

14         MR. GIULIANI:  From Giuliani Communications.

15         MS. SCHWARTZ:  Okay.  So there's kind of --

16         MR. GIULIANI:  Right now --

17         MS. SCHWARTZ:  -- like an intercompany type of --

18         MR. GIULIANI:  Correct.

19         MS. SCHWARTZ:  -- cash management system?

20         MR. GIULIANI:  Yes.

21         MS. SCHWARTZ:  Okay.  Are there any other employees of

22  Giuliani Partners besides you?  Are you an employee of --

23         MR. GIULIANI:  Yes.

24         MS. SCHWARTZ:  Okay.  You and Ryan.

25         MR. GIULIANI:  And Maria Ryan, Ryan Medrano.

**RUDOLPH W. GIULIANI**

137

1          MS. SCHWARTZ:  Where is that?  That's where you have

2    the ninety-day transfers.

3          MR. BERGER:  Correct.

4          MS. SCHWARTZ:  Right?  All right.  Let's stay here for

5    a minute, okay, just on your expenses.  All right.  And the

6    reason I'm saying this is because it appears that the expenses

7    you've listed here don't track the transfers that have been

8    made in the past ninety days, so I want to go over that.

9          MR. GIULIANI:  Okay.

10          MS. SCHWARTZ:  All right.  So now you've got here

11    utilities, 550.  Is that for New York or is that for Florida?

12          MR. GIULIANI:  Could I see it?

13          MS. SCHWARTZ:  Just page 2 of your expenses.

14          MR. FISCHOFF:  If you look at 21, it specifies Florida

15    utilities.

16          MR. GIULIANI:  This all New York.

17          MS. SCHWARTZ:  Okay.

18          MR. GIULIANI:  This is New York, yes.

19          MS. SCHWARTZ:  So that's New York, right?  Okay.

20          MR. GIULIANI:  (Indiscernible).

21          MS. SCHWARTZ:  Okay.  And telephone, your telephone

22    bill is 267 dollars a month?

23          MR. GIULIANI:  Well, could I explain something?

24          MS. SCHWARTZ:  Yes.  I would like  you to.

25          MR. GIULIANI:  Overview of all the expenses.  Until

1  now, I paid a lot of business expenses.  Always have because

2  they're my businesses.  I pay them out of my personal account.

3  And I'm really not good about getting reimbursement for them

4  because they were my businesses.  So for example --

5          MS. SCHWARTZ:  Well, it's like six of one, half dozen

6  of another, right?

7          MR. GIULIANI:  Yeah.  For example, a lot of the

8  equipment that I use --

9          MS. SCHWARTZ:  For the podcast and the radio.

10         MR. GIULIANI:  For the -- right.  A lot of it -- I

11  mean, some of it's from ABC, the Comcast.

12         MS. SCHWARTZ:  Yeah.

13         MR. GIULIANI:  But the cameras, I bought all those.

14         MS. SCHWARTZ:  Mics.

15         MR. GIULIANI:  Yeah, I bought them personally.  And

16  I --

17         MS. SCHWARTZ:  And you could have actually bought them

18  through Giuliani Communications --

19         MR. GIULIANI:  I should have.

20         MS. SCHWARTZ:  -- is what you're saying?

21         MR. GIULIANI:  I probably should have.  Even to keep

22  record of it, I should have.

23         MS. SCHWARTZ:  Okay.

24         MR. GIULIANI:  But I --

25         you know, it was a different period of time.  I was

**RUDOLPH W. GIULIANI**

139

1  making unlimited amounts of money.

2          MS. SCHWARTZ:  Right.

3          MR. GIULIANI:  And it almost seemed like, well, this

4  is a nice thing, I'll help the business by -- by doing that.

5          MS. SCHWARTZ:  Yeah.

6          MR. GIULIANI:  And I got used to that.  So I really am

7  trying now to go back and list it all because --

8          MS. SCHWARTZ:  It's not so easy.

9          MR. GIULIANI:  No, it's not.  I mean, I, but I am.  I

10  am doing it.  But a lot of the -- when we go through these

11  expenses and they seem, well, what's that for and what's that

12  for, about half of them are going to be for the business.

13          MS. SCHWARTZ:  All right.  Well, I'm not --

14          MR. GIULIANI:  Maybe half.

15          MS. SCHWARTZ:  -- going through every single solitary

16  things.

17          MR. GIULIANI:  Maybe forty percent.

18          MS. SCHWARTZ:  But, you know --

19          MR. GIULIANI:  And some of the big ones --

20          MS. SCHWARTZ:  Well, I think it's more really like --

21  okay.  So number 9, clothing, laundry, and dry cleaning, 500

22  dollars a month.  Are these just like estimated numbers?

23          MR. BERGER:  They're estimated based upon reviewing

24  his check registry and working with the accountant.

25          MS. SCHWARTZ:  All right.  And then we've got number