1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - -x

5

6  In the Matter of:

7  RUDOLPH W. GIULIANI,                    Main Case No.

8        Debtor.                           23-12055-shl

9

10  - - - - - - - - - - - - - - - - - - - -x

11

12              United States Bankruptcy Court

13              One Bowling Green

14              New York, New York

15

16              January 19, 2024

17              11:14 AM

18

19

20

21  B E F O R E:

22  HON. SEAN H. LANE

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  ANA VARGAS

2

1

2   Doc. #25 Debtor's Motion For An Order Modifying The Stay For

3   The Limited Purpose Of Allowing The Debtor To File Post-Trial

4   Motions To Modify The Judgment And For A New Trial And To File

5   A Notice Of Appeal

6

7   Doc. #28 Order Scheduling Emergency Hearing On Debtors

8   Application For Order Authorizing Modification Of The Stay For

9   Purposes Of Post Judgment Motions And Appeals

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  River Wolfe

21   eScribers, LLC

22   7227 North 16th Street, Suite #207

23   Phoenix, AZ 85020

24   (800) 257-0885

25   operations@escribers.net

3

1

2   A P P E A R A N C E S:

3   BERGER, FISCHOFF, SHUMER, WEXLER & GOODMAN, LLP

4          Attorneys for Debtor

5          6901 Jericho Turnpike

6          Suite 230

7          Syosset, NY 11791

8

9   BY:   HEATH S. BERGER, ESQ.

10         GARY C. FISCHOFF, ESQ.

11

12

13  WILLKIE FARR & GALLAGHER LLP

14         Attorneys for Ms. Ruby Freeman and Ms. Wandrea ArShaye

15           Moss

16         787 Seventh Avenue

17         New York, NY 10019

18

19  BY:   ALISON R. AMBEAULT, ESQ. (ZOOM)

20         JAMES BURBAGE, ESQ.

21         JESSICA GRABER, ESQ. (ZOOM)

22         M. ANNIE HOUGHTON-LARSEN, ESQ. (ZOOM)

23         MARINE LOISON, ESQ. (ZOOM)

24         RACHEL C. STRICKLAND, ESQ.

25

4

```
 1
 2   WILLKIE FARR & GALLAGHER LLP
 3        Attorneys for Ms. Ruby Freeman and Ms. Wandrea ArShaye
 4          Shaye Moss
 5        1875 K Street, Northwest
 6        Washington, DC 20006
 7
 8   BY:   MICHAEL GOTTLIEB, ESQ. (ZOOM)
 9        MERYL GOVERNSKI, ESQ. (ZOOM)
10        MAGGIE MACCURDY, ESQ. (ZOOM)
11        AARON E. NATHAN, ESQ.
12
13
14   DUBOSE MILLER
15        Attorneys for Ms. Ruby Freeman and Ms. Wandrea ArShaye
16          Shaye Moss
17        75 14th Street, Northeast
18        Suite 2110
19        Atlanta, GA 30309
20
21   BY:   VON DUBOSE, ESQ.
22
23
24
25
```

5

1

2   PROTECT DEMOCRACY

3           Attorneys for Ms. Ruby Freeman and Ms. Wandrea ArShaye

4           Shaye Moss

5           82 Nassau Street

6           Suite 601

7           New York, NY 1003

8

9   BY:   RACHEL GOODMAN, ESQ. (ZOOM)

10          JOHN LANGFORD, ESQ. (ZOOM)

11

12

13   AKIN GUMP STRAUSS HAUER & FELD LLP

14          Attorneys for the Official Committee of Unsecured

15           Creditors

16          2300 North Field Street

17          Suite 1800

18          Dallas, TX 75201

19

20   BY:   RACHEL BIBLO BLOCK, ESQ. (ZOOM)

21

22

23

24

25

6

1

2  AKIN GUMP STRAUSS HAUER & FELD LLP

3       Attorneys for the Official Committee of Unsecured

4          Creditors

5       One Bryant Park

6       New York, NY 10036

7

8  BY:   AMELIA DANOVITCH, ESQ.

9        IRA S. DIZENGOFF, ESQ.

10       PHILIP DUBLIN, ESQ. (ZOOM)

11       ABID QURESHI, ESQ.

12

13

14  BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP

15       Attorneys for Smartmatic

16       1313 North Market Street

17       Suite 1201

18       Wilmington, DE 19801

19

20  BY:   DANIEL BROGAN, ESQ.

21

22

23

24

25

7

1

2  DAVIDOFF HUTCHER & CITRON LLP

3       Attorneys for Davidoff Hutcher & Citron LLP

4       605 Third Avenue

5       New York, NY 10158

6

7  BY:   JEFFREY CITRON, ESQ. (ZOOM)

8        ROBERT J. COSTELLO, ESQ. (ZOOM)

9        JAMES B. GLUCKSMAN, ESQ. (ZOOM)

10       JONATHAN S. PASTERNAK, ESQ. (ZOOM)

11       JOSEPH N. POLITO, ESQ. (ZOOM)

12       ROBERT L. RATTET, ESQ. (ZOOM)

13

14

15  SUSMAN GODFREY L.L.P.

16       Attorneys for US Dominion, Inc.

17       1000 Louisiana

18       Suite 5100

19       Houston, TX 77702

20

21  BY:   JONATHAN ROSS, ESQ. (ZOOM)

22

23

24

25

8

1

2  BUCHAITER, A PROFESSIONAL CORPORATION

3        Attorneys for US Dominion, Inc.

4        1000 Wilshire Blvd.

5        Suite 1500

6        Los Angeles, CA 90017

7

8  BY:   JOEL G. SAMUELS, ESQ. (ZOOM)

9

10

11  OFFICE OF THE NYS ATTORNEY GENERAL

12        Attorneys for NYS Department of Taxation and Finance

13        28 Liberty Street

14        New York, NY 10005

15

16  BY:   LEO V. GAGION, ESQ. (ZOOM)

17        ENID NAGLER STUART, ESQ. (ZOOM)

18

19

20

21

22

23

24

25

9

1

2 U.S. DEPARTMENT OF JUSTICE

3          Attorneys for the Office of the U.S. Trustee

4          One Bowling Green

5          New York, NY 10004

6

7 BY:   ANDREA B. SCHWARTZ, ESQ. (ZOOM)

8          ANNIE WELLS, ESQ.

9

10

11 ALSO PRESENT:

12          NICKI BROWN, CNN (ZOOM)

13          STEVEN CHURCH, Bloomberg (ZOOM)

14          KENNETH J. COX (ZOOM)

15          UDAY GORREPATI, ABI Project (ZOOM)

16          DIETRICH KNAUTH, Reuters (ZOOM)

17          ELLA LEE, The Hill (ZOOM)

18          JAMES J. NANI, Bloomberg Law (ZOOM)

19          EVAN OCHSNER, Bloomberg Law (ZOOM)

20          JONATHAN RANDLES, Bloomberg News (ZOOM)

21          ZACHARY SCHONFELD, The Hill (ZOOM)

22          JESSICA STEINHAGEN, Reorg (ZOOM)

23          MICHAEL TOMBACK, Reorg (ZOOM)

24          DAVID VOREACOS, Bloomberg (ZOOM)

25          BECKY YERAK, Wall Street Journal (ZOOM)

10

```
1                   P R O C E E D I N G S

2          THE COURT:  Good morning.  Please be seated.

3          MR. FISCHOFF:  Good morning.

4          THE COURT:  We are here this morning -- oh, let me

5   just turn on my microphone for the folks who are on Zoom.

6          Good morning.  My name is Judge Sean Lane, and we're

7   here in the United States Bankruptcy Court for the Southern

8   District of New York for hearing in this Chapter 11 case of

9   Rudolph W. Giuliani and more particularly, on the debtor's

10  motion seeking to modify the automatic stay.

11         So we'll start, as we always do, by getting

12  appearances.  And we'll start with the folks here in the

13  courtroom, and then we'll circle the virtual room of Zoom.  So

14  we'll start on this side of the room.

15         MR. FISCHOFF:  Good morning, Your Honor.  Berger,

16  Fischoff, Shumer, Wexler & Goodman by Gary Fischoff on behalf

17  of the debtor.

18         MR. BERGER:  Good morning, Your Honor.  Heath Berger,

19  Berger, Fischoff, Shumer, Wexler & Goodman, attorney for the

20  debtor.

21         THE COURT:  All right.  Good morning.

22         MS. STRICKLAND:  Good morning, Your Honor.  Rachel

23  Strickland, Willkie Farr & Gallagher, on behalf of Ruby Freeman

24  and Shaye Moss.

25         MR. BURBAGE:  Good morning, Your Honor.  James
```

1    Burbage, Willkie Farr & Gallagher.

2         MR. NATHAN:  Aaron Nathan, Willkie Farr & Gallagher.

3         MR. QURESHI:  Good morning, Your Honor.  Abid Qureshi,

4    Akin Gump Strauss Hauer & Feld.  We are proposed counsel to the

5    official committee of unsecured creditors.  With me in the

6    courtroom is my partner Ira Dizengoff, Amelia Danovich, and on

7    the phone, my partner Phil Dublin.

8         THE COURT:  All right.  Good morning to you all.

9         MS. WELLS:  Good morning, Your Honor.  For the record,

10   Annie Wells on behalf of the United States Trustee.  And I

11   believe I see my colleague Ms. Andrea Schwartz, and she will be

12   taking the lead today.

13        THE COURT:  All right.  Good morning.

14        Anyone else here in the courtroom?

15        All right.  We'll turn it over to appearances for

16   Zoom.  And we'll start with Ms. Schwartz, who I know is -- a

17   helpful segue by Ms. Wells.  So let me get that appearance.

18        MS. SCHWARTZ:  Thank you.  Good morning, Your Honor.

19   Andrea Schwartz for the U.S. Trustee.

20        THE COURT:  Good morning.

21        And on behalf of the official committee of unsecured

22   creditors.

23        MR. DUBLIN:  Good morning.  Phil Dublin, Akin.

24        THE COURT:  All right.  Good morning.

25        As is often the circumstance with large cases of

**RUDOLPH W. GIULIANI**

12

1    interest, there are many, many pages of appearances.  I don't

2    go through them all, as that's not efficient.  So at this

3    point, I will throw it open to anyone else who has not yet made

4    appearance who'd like to do so, with the understanding that for

5    somebody who doesn't anticipate speaking and does, they can

6    always identify themselves later on in the proceeding.

7            But anyone else who needs to make an appearance at

8    this time?

9            MR. RATTET:  Robert Rattet for Davidoff Hutcher &

10   Citron and for Robert Costello.

11           THE COURT:  All right.  Good morning.

12           Anyone else?

13           MR. SAMUELS:  Good morning, Your Honor.  Joel Samuels

14   of the Buchalter firm on behalf of Dominion.

15           THE COURT:  Good morning.

16           Anyone else?  All right.

17           MR. BROGAN:  Good morning, Your Honor.  Daniel Brogan,

18   Benesch, Friedlander, on behalf of Smartmatic.

19           THE COURT:  All right.  Good morning.

20           Anyone else?

21           All right.  As you all have no doubt surmised, today

22   is a hybrid hearing.  The court is back open.  Today's not an

23   evidentiary hearing, which we always do in person.  We're back

24   to the old days.  Thank goodness.  All of us.  But we are fully

25   hybrid.

**RUDOLPH W. GIULIANI**

13

1        The one thing I will say, there are different kinds of

2   microphones here in the courtroom.  These microphones that are

3   the longneck ones are ones that amplify the sound in this room.

4   But unbeknownst to any of you, without an explanation, these

5   are the ones that pick up the sound for Zoom.  So just make

6   sure you're within hailing distance of those so that everybody

7   who is on Zoom can hear you.  And obviously, if anybody is

8   having trouble hearing on Zoom, I can't promise a solution, but

9   we can certainly do the best we can to address the problem.

10       And with that, we are here for the motion to lift

11  stay.  I have read the papers.  I have read the oppositions.  I

12  think it's worth noting, this matter was originally requested

13  to be put on shortened notice for the 12th.  It was put on

14  shortened notice at that time.  It was noted that given the

15  shortened time, anybody could file anything without a deadline

16  and can even show up at the hearing and make themselves be

17  heard without previously filing papers.

18       It got adjourned for another week, which essentially

19  puts it on regular notice.  I did get pleadings yesterday in

20  opposition.  I was in hearing most of yesterday but did make

21  sure to read everything.  I confess, I have not read all the

22  exhibits.  I know there were voluminous, and I didn't have a

23  hard copy of those.  But I have gotten through everything, so

24  just to let you know where I stand in terms of the state of

25  play for the motion.

14

1        So with that, as it is the debtor's motion, I'll start

2    off with the debtor and hear from you first.

3        MR. FISCHOFF:  Good morning, Your Honor.  So it is the

4    debtor's motion, and the debtor is seeking -- and by the way,

5    we have not had a court status conference yet.  Would the Court

6    want me to advise of a little bit of status?  I can, or go

7    right --

8        THE COURT:  I think a status on the case is helpful.

9    I think, as you can tell from the objections that were filed,

10   there are a lot of questions that a lot of interested parties

11   have, rightly so, about the case and where things are going.

12   So a status would be helpful.

13       MR. FISCHOFF:  Okay.  So this case was filed on

14   December 21st, 2023.  And it was filed -- it was precipitated

15   by the entry the prior day by Judge Howell in the Federal

16   District Court for the District of Columbia, where the court

17   entered an order authorizing the Freeman plaintiffs to enter

18   and force their judgment on an expedited basis.  So while the

19   debtor had been reviewing options, the entry of that judgment

20   on -- of that order late on December 20th accelerated the

21   debtor's thinking, and this petition was filed the next

22   afternoon.

23       Now, ideally, as attorneys for the debtor, we would

24   have liked additional lead time to prepare and get everything

25   assembled.  So we're now in the process of getting the

1    schedules prepared and filed.  We're getting the retentions in

2    place.  But the debtor has counsel who has been representing

3    him in both the Freeman matter and some other matters pre-

4    petition, and we're working on getting those retentions

5    straight with the U.S. Trustee so they can continue with the

6    retention going forward.  But since there's a history of

7    payment, we need to get those details.  So we're a little bit

8    behind the eight ball, but we hope by next week it'll be

9    straightened out.

10           I can tell you that the debtor's schedules -- and

11   there's obviously a lot of press about this case.  So the

12   debtor's schedules are going to indicate no surprises.  The

13   debtor owns two pieces of real estate, has some exempt IRAs,

14   and he's trying to earn a living with his radio and podcast

15   show.  So there's no pot of gold at the end of the rainbow, and

16   the debtor is going to give full and complete disclosure.

17           The debtor doesn't have an intention of dismissing

18   this Chapter 11 by somehow, as it may have been stated in some

19   papers, using this bankruptcy as a sword and then maybe

20   dismissing it later.  The debtor has needs for this

21   reorganization, not only because of the judgment of

22   approximately 148 million by the Freeman parties against him,

23   which obviously, the potential immediate enforcement of that

24   was the precipitating cause, but he has other financial issues.

25   He's currently suspended from the practice of law, so he can't

16

1  earn any income right now as a lawyer.  So his income is

2  limited.  And he has some obligations that have to be dealt

3  with, and we intend to deal with it.

4       Now, as far as this motion goes, there was a deadline

5  to either file motions to address the judgment, either to

6  vacate the verdict or to modify the verdict and/or to file a

7  notice of appeal.  The outcome of whatever the status of that

8  finding might be is important to the debtor's estate and the

9  debtor's creditors.  148 million swamps the creditor body.  And

10 whether that's dischargeable or not is something the Court will

11 ultimately decide down the road.

12      But right now, it's important for the debtor to

13 preserve and exercise its rights to address that verdict with

14 the post-verdict motions and/or if necessary, at the conclusion

15 of those motions, to file the appropriate notices of appeal.

16 The sooner the debtor processes those post-judgment motions,

17 the sooner this case has a better indication of where it's

18 headed.  Now, I know --

19      THE COURT:  So let me ask, and this sort of segues

20 into the motion, what is it that the debtor actually wants to

21 do?  Because there's some discussion in -- I know the Freeman

22 judgment creditors have -- they're okay with certain things,

23 but what's clear from their objection is the notion that it's

24 lifted so the debtor can do whatever the debtor wants is not a

25 notion that they're comfortable with.

1        And certainly, there is case law that says it's

2    inappropriate to lift the stay to relitigate adjudicated

3    issues, to just continually relitigate issues.  And there

4    certainly also is the backdrop of this case, where there's a

5    concern about republicizing the statements that were the source

6    of the litigation in Freeman.  And so there are quite a few

7    guardrails that the objectors are concerned about.

8        And so rather than thinking about this theoretically,

9    the question is what does the debtor actually want to do.

10    Right.  Do you do this appeal.  I certainly would understand,

11    based on my prior life as a litigator, you file a motion for a

12    new trial or to challenge something about what the district

13    court has done, but you file it in the district court, that

14    that would extend the time to file an appeal.

15        So perhaps it makes sense, rather than think about

16    this theoretically in terms of carte blanche, but to think

17    about it very specifically in terms of exactly what the debtor

18    wants to do.

19        MR. FISCHOFF:  Okay.  So what the debtor wants to

20    do -- and there is counsel, Joseph Sibley, who's a

21    representative of the debtor in that matter, he intends to

22    continue.  We'll be filing retention papers for him.  And by

23    the way, it's not a drain on the estate because there are -- I

24    know I'm getting off to the side for a minute, but I just want

25    to address it.  His fees have been paid by two legal defense

**RUDOLPH W. GIULIANI**

18

1   funds and will continue to be paid by those legal defense

2   funds.  So it's not a drain on the debtor's assets, nor a drain

3   on the creditors --

4           THE COURT:  Although there was a concern raised in one

5   of the papers about there's no disclaimer of the notion that

6   those fees have paid.  That way, there won't be a request to

7   have the estate compensate for those fees if they're paid by

8   another party.  So is there anything you can tell me about

9   that?  In other words, if there's a representation those fees

10  are going to be paid by somebody else, there's going to be no

11  recourse against the estate for those fees that are going to be

12  paid --

13          MR. FISCHOFF:  Correct.

14          THE COURT:  -- by that third-party.

15          MR. FISCHOFF:  We'll be filing the appropriate Lar Dan

16  affidavit, and I can even disclose who those funds are, if the

17  Court requires, or we can wait until the retention papers are

18  filed next week.  But that was just an aside.

19          What the debtor wants to do, and this is based on

20  discussions with counsel who's been representing the debtor in

21  this matter -- I'm not litigation counsel in it, so I'm just

22  passing on my knowledge from my discussions with him -- is he

23  wants to file a motion either for a new trial or to modify the

24  verdict because he believes the verdict on its face is

25  unreasonable.  And when we say --

**RUDOLPH W. GIULIANI**

19

1   THE COURT: Well, let me ask you more specifically

2 about that. I have gotten up to speed in the papers that have

3 been filed about some of the history of the Freeman litigation.

4 I obviously don't profess to be an expert or even have complete

5 knowledge of all the basics, but I certainly have been given a

6 lot of information that's helpful.

7   And one of the concerns that's been raised, one of the

8 many concerns that have been raised, is what is it that's the

9 focus of the requests. And that concern has been informed by

10 the debtor's involvement or lack thereof in the Freeman

11 litigation. Right. So there's a judgment that has a fairly, I

12 guess, lack of a different adjective, colorful history leading

13 up to it in terms of -- I'm sure the district judge wouldn't

14 use that term, but dealing with discovery, lack of compliance,

15 and various things and the judgment being entered as a result

16 of the debtor's lack of involvement in certain activities that

17 are traditional leading up to a trial. Then there's the

18 damages phase.

19   So I'm trying to get a sense, and I think it would be

20 helpful for all parties to get a sense, of exactly what it is

21 that is requested to be done here. The motion itself that I

22 received is exceedingly brief. It's fairly pro forma. I think

23 it's probably five pages of content. One page is the double-

24 spaced recitation of the Sonnax factors that are relevant in

25 these kinds of motions. And there's only really two paragraphs

20

1   about what it is that -- how those apply or what what's going

2   to happen and what the debtor wants to do.

3           And obviously, there's been a lot of litigation, so as

4   expected -- and probably you anticipated it; certainly I

5   anticipated it -- a lot of parties have weighed in.  So a lot

6   of the concerns are heightened by the fact that people don't

7   know what it is that the debtor wants to do, and that really

8   affects how you look at the motion and how you analyze what

9   should happen, whether the motion should be granted.

10          MR. FISCHOFF:  Understood.  So the debtor believes the

11  dollar amount of the damages in its face is unreasonable and

12  should be readdressed by the Court, and that would be the

13  motion that the debtor would be seeking to file, whether it's

14  called to vacate the verdict in the dollar amount or to modify

15  the verdict.

16          THE COURT:  So it's a damages-only motion?

17          MR. FISCHOFF:  Yes, Judge.

18          THE COURT:  All right.  My understanding is that the

19  debtor didn't present any witnesses in the damages phase.  So

20  that's another concern that I think has been raised by the

21  parties about what is it that the debtor is going to seek now

22  in light of the fact that the debtor had an opportunity and

23  chose not to present any witnesses.  How are we to understand

24  what's going on here in light of that?

25          MR. FISCHOFF:  Okay.  Well, I'm not the litigation

**RUDOLPH W. GIULIANI**

21

1    counsel in that case, but my understanding is that they want to

2    address the calculation of damages because they think the

3    amount alone establishes that they're punitive and grossly

4    unrelated to the actual damages.  So and then upon addressing

5    that, they will have created a record for the appeal because if

6    that motion is denied, then their right to appeal arises and

7    they'll appeal it.

8         And I think it's important that the debtor be allowed

9    to do that in order to find out is this a real 148 million that

10   has to be dealt with in this Chapter 11, or is it some other

11   number that might be redetermined.  As I said, we're not

12   looking to litigate the merits, only to the extent that they

13   affect the damages.  But agreed, the liability portion was

14   entered without testimony, and I don't think that's subject to

15   challenge at this.

16        THE COURT:  So again, I'm not familiar enough with the

17   Freeman litigation to understand the exact scope of what

18   happened or didn't happen in the damages phase and what the

19   extent to which, if any, the debtor availed himself of his

20   opportunities to present evidence and be heard.  That's for

21   something that obviously the district court and the parties in

22   that case to address.

23        The other or one other issue that's been identified

24   relates specifically to the stipulation that was filed in that

25   case and the language used in terms of the conduct.  And that's

22

1    raised in the context of dischargeability, and as we all know,

2    the Bankruptcy Code provides for certain kinds of debts to be

3    nondischargeable.  There are many different categories of debts

4    and many different standards within the statute.  But here, the

5    as one of the objections notes, that Section 523(a)(6) of the

6    Bankruptcy Code is one of those provisions, and the objectors

7    point out that the language that was agreed upon by the debtor

8    tracks, in the objector's view, the language in the statute.

9          And it gets to the very legitimate question of is

10   nondischargeability already been conceded.  Again, it's not an

11   issue in front of me today.  I'm raising the arguments and

12   concerns that have been raised to me.  But that, I think, is a

13   legitimate question in the sense of what is appropriate to

14   spend money of the estate on.  You said there's no pot of gold

15   at the end of the rainbow, so there's limited estate resources.

16   So the point is that in making Sonnax findings and findings of

17   cause for lifting the stay, these are the kinds of issues to,

18   to grapple with.

19         So as that issue has been raised -- and again, I

20   mentioned the language used in the Freeman litigation in the

21   joint stipulation regarding entry of final judgment because

22   that's what the parties raised, and that says to me that they

23   have a very legitimate basis for raising the issue and the

24   concern.  So what can you tell me about that?

25         MR. FISCHOFF:  Well, I think that's why it's important

23

1   to allow the debtor to pursue these post-verdict motions in

2   order to find out the exact amount that may or may not be

3   dischargeable.  I think today, it's premature.  I know in the

4   opposition they said, well, we should determine

5   dischargeability first.  And I think it should be the other

6   way.  We should know what we're talking about as to what may or

7   may not be dischargeable, and then we could --

8       THE COURT:  Well, for that verdict, the argument

9   really is that that's the amount of what the Freeman judgment

10  plaintiffs say.  That's a question of what amount is

11  nondischargeable.  But that the finding itself, and they cite

12  to the docket 138 saying what the language is in the joint

13  stipulation regarding entry of final judgment, that Defendant

14  Giuliani engaged in extreme and outrageous conduct, which

15  intentionally and maliciously caused the plaintiffs to suffer

16  emotional distress.  And it goes on to, "defendant's conduct

17  was intentional malicious, one, and willful".  And again

18  references the statute, the bankruptcy statute, that uses the

19  terms willful and malicious.

20      So the idea is if, again, the argument's made -- and

21  it's not a frivolous argument; it's a legitimate question --

22  whether there's a point to this.  If it's nondischargeable,

23  it's going to pass outside of bankruptcy anyway.  And so I

24  don't know what it would mean in terms of exactly the ordering

25  of what things should happen in this case, but it's a

1  legitimate question.

2          So what, if anything, views do you have as to this

3  joint stipulation and the nondischargeability question?

4          MR. FISCHOFF:  Well, I think that in order for the

5  Court to make a determination under 523, it would have to have

6  before it if the question presented appropriately in an

7  adversary proceeding, and after that adversary proceeding is

8  commenced, then the Court can address whether or not that

9  particular stipulation is binding on the debtor and meets all

10  the appropriate elements to sustain a nondischargeability

11  complaint.  But I understand the Court's interest in that.  But

12  it's not before the Court today, and I think it's --

13          THE COURT:  I understand, but I guess I think what I'm

14  hearing from the objectors is that they're trying to get a

15  sense of what the preview is.  Is there a -- and again, they

16  can speak for themselves when they stand up, that in their

17  view, there's nothing to talk about.  And so they're trying to

18  get a sense of, well, if you're going to challenge that, what

19  are you actually going to say, and if you have nothing to say,

20  Judge, why should we be spending money on this litigation.

21          MR. FISCHOFF:  We know it's an issue.  We're all

22  bankruptcy professionals here, so we know that's an issue.

23  Maybe it's the elephant in the room, but I'm not prepared to

24  concede such an issue at this point.

25          THE COURT:  All right.  So what other things do you

**RUDOLPH W. GIULIANI**

25

1    want to tell me in connection with the motion that you filed?

2            MR. FISCHOFF:  Well, I think you've addressed kind of

3    a summary of all the issues.  I could go through -- I mean, the

4    Court's now aware of all the facts.  You're aware of -- the

5    Court's intention -- I know the papers by both the creditors

6    committee and the Freeman plaintiffs have raised the issue

7    about that the debtor is using the bankruptcy stay to avoid

8    posting a bond.  But we know, in April of 1988, the seventh-

9    largest oil company in America filed Chapter 11 in this --

10   well, not this building, but in the White Plains division,

11   because they could not post a bond when Pennzoil had about a

12   nine-billion-dollar judgment against them --

13           THE COURT:  No, we're aware of --

14           MR. FISCHOFF:  -- which was real money then.  Yeah.

15           THE COURT:   -- the Texaco case, and I've had Texaco

16   cases, so to speak, that are filed because of a judgment.  And

17   I think the authority is that that doesn't necessarily -- it

18   comes up in the context, as I understand it, of people arguing

19   whether a filing is a bad-faith filing or not.  I don't have

20   that issue in front of me.  I don't have such a motion, so I

21   don't need to address that.  I think what those cases stand for

22   are the fact that, as a theoretical matter, a judgment that

23   motivates a bankruptcy is not in and of itself necessarily

24   dictate that it's a bad-faith filing.  I think courts look at

25   the facts and circumstances of each case.

**RUDOLPH W. GIULIANI**

26

1          MR. FISCHOFF:  Okay.  So I believe, then, we've -- I

2    believe we've explained to the Court more clearly than in the

3    papers the debtor's intentions and plans, and at this point,

4    I'll defer to my colleagues and just reserve a few minutes if

5    necessary when they've concluded.

6          THE COURT:  All right.  So with that --

7          MS. SCHWARTZ:  Judge, before we get to the motion, can

8    we just address the status for a moment?

9          THE COURT:  Let me do this.  Let me hear from parties

10   in terms of their issues because I think status bleeds into the

11   motion, as I think we've already discovered.  So let me hear

12   from everybody here in the courtroom, and then I will make sure

13   everybody gets a full chance to be heard.

14         MS. SCHWARTZ:  Okay.  Thank you, Your Honor.

15         THE COURT:  Hybrid hearings are wonderful in theory.

16   They can be a little bit more challenging in real life.  But

17   with that --

18         MS. SCHWARTZ:  Thank you.

19         THE COURT:  -- let me hear from the Freeman

20   plaintiffs, and if there's another nomenclature you'd prefer

21   that I use.  I don't think judgment debtor is a good one since

22   we have a bankruptcy debtor so --

23         MS. STRICKLAND:  This is not going to work.

24         THE COURT:  Feel free to do it from the table.

25   Whatever --

27

1           MS. STRICKLAND:  Okay.

2           THE COURT:  -- works best for you.

3           MS. STRICKLAND:  Great.

4           THE COURT:  And just, exactly, make sure that your

5   other microphone is handy.

6           MS. STRICKLAND:  I'm not used to doing this sitting

7   down.

8           THE COURT:  Well, you can stand, sit.

9           MS. STRICKLAND:  No, it's okay.

10          THE COURT:  Whatever works.

11          MS. STRICKLAND:  I got it.  Good morning, Your Honor.

12  For the record, Rachel Strickland of Willkie Farr & Gallagher.

13  We are counsel to Ms. Ruby Freeman and Ms. Shaye Moss.  My

14  presentation is remarkably longer, but Your Honor has read a

15  lot, and I can tell from the questions that much of this will

16  not be new to you.  So I would encourage you to cut me off or

17  have me skip things as Your Honor sees fit.

18          THE COURT:  Well, your papers are extensive.  I've

19  read them.  I've marked them up.  I have stickies.  I have

20  notes.  So I don't need you to go through them all.

21          I guess I would say two things.  One is to hit the

22  highlights of points you think particularly resonate.  And the

23  second, and maybe we should start with the second, is in light

24  of hearing what you've heard, I do note that you have language

25  in your opposition about what your clients can live with and

1    what they can't live with.  And I'm interested in hearing your

2    thoughts about the dividing line and the thinking behind that

3    as to what makes sense and what you're most concerned about

4    because it sounds like there's certain things you -- you, in

5    fact, helpfully attached to a proposed form of order saying,

6    well, Judge, here's what we could live with.

7           But obviously, this is where, as somebody who didn't

8    participate in the Freeman litigation, I am not nearly as well

9    informed as you all, and I never will be.  So the thinking

10   behind your dividing line and what's acceptable and what's not

11   and why, it would be really helpful.

12          MS. STRICKLAND:  Understood, Your Honor.  Our clients

13   are obviously the centerpiece of this case.  I'm not aware of

14   any other Chapter 11 case where the first hearing was convened

15   solely for a debtor's motion to lift stay.  The relief that Mr.

16   Giuliani is seeking is even more unusual, since our claims are

17   liquidated already and in all likelihood, as Your Honor noted,

18   are nondischargeable.

19          Before I go through the merits and the dividing lines,

20   I'd like to address two things.  One, I want to propose a road

21   map for the cases for Your Honor's consideration that we think

22   will drive efficiency so that creditors who have been wronged

23   by Mr. Giuliani can get compensated.  And then second, I'd like

24   to give you some background on our client's claims.

25          So for the road map, it will be no surprise that at

29

1  the end of today, I'm going to ask Your Honor to deny Mr.

2  Giuliani's stay relief motion.  And then following that, if he

3  doesn't seek to dismiss his own case, I suggest that Your Honor

4  first consider the issue of whether my client's claims are

5  nondischargeable.  And from there, after parties kick the tires

6  on the schedules and statements and investigate the extent of

7  Mr. Giuliani's assets, it can be determined whether there's any

8  prospect whatsoever for a plan of reorganization or emergence

9  or whether this case is yet another diversion.

10       So for background on the claims, at the outset, I want

11  to note that this is not about politics at all.  My clients

12  have liquidated a 148-million claim against Mr. Giuliani that

13  Your Honor should think of as a self-inflicted wound.  He said

14  and did despicable things and then when he was sued, sat in

15  court and did very, very little.  He flouted district court

16  orders.  He deliberately ignored discovery requests.  And he's

17  not just some guy who was mayor.  Mr. Giuliani was a Southern

18  District of New York U.S. Attorney and a DOJ Associate Attorney

19  General, a man literally in charge of the civil division.  So

20  he has made his bed here.

21       On Election Day, November 3rd, 2020, Ms. Freeman and

22  Ms. Moss served as election workers at the State Farm Arena in

23  Fulton County, Georgia, and their job was to help process

24  absentee ballots.  Being that it was the middle of the

25  pandemic, there were a lot of them.  And election day was very

**RUDOLPH W. GIULIANI**

30

1   busy, but it was pretty uneventful, and really, nothing

2   happened to them for the next couple of weeks.

3         That all changed on December 3rd, 2020.  On that day,

4   Giuliani began claiming on television, radio, and social media

5   that surveillance footage of Ms. Freeman and Ms. Moss from

6   Election Day was proof of fraud.  He cited Ms. Freeman and Ms.

7   Moss as the definitive reason then-President Trump lost the

8   election in Georgia.  And to put these statements in context,

9   Giuliani, an experienced lawyer, made these statements after

10  the Georgia state election officials had conducted multiple

11  recounts and confirmed that the results were valid.

12        And Giuliani got very granular in his discussion of

13  Ms. Freeman and Ms. Moss.  He said that they were picked --

14  that they had kicked out election observers for the purpose of

15  counting illegal ballots, hid illegal ballots in suitcases

16  under tables, counted the same ballots multiple times, and

17  passed around a USB port like it was crack cocaine to upload

18  illegal ballots.  They also accused Ms. Freeman of having a

19  criminal record.

20        The targeting of these two women was intentional.  In

21  fact, there is a strategic plan bearing Mr. Giuliani's name

22  that was provided to the Trump campaign.  And if there was any

23  lingering doubt, the day after his very first public statements

24  on December 4th, and the days after, law enforcement and

25  Republican officials in Georgia publicly and repeatedly refuted

1   Mr. Giuliani's statements.

2          THE COURT:  Ms. Strickland, I don't want to -- I

3   understand how important this hearing is and that your clients

4   are heard in the bankruptcy.  But you do have to recognize I'm

5   not the district court in DC who has entertained all this.  So

6   I do have the sad story in front of me in your papers.  So I'm

7   okay if you hit the highlights briefly, but just in the

8   interest of efficiency today, I'd ask that you keep to the

9   highlights, just, again, recognizing your clients, how

10  important it is that people feel heard in court.  That's very

11  important.  But I do realize we probably have quite a bit to

12  talk about as to the motion itself.

13         MS. STRICKLAND:  Very good.  Skipping.  So he gets

14  sued.  Moves to the discovery phase.  He sits there.  He barely

15  participates.  He doesn't preserve materials.  He produces

16  almost nothing.  Let me give you a sense of what he produces:

17  Hundreds of documents consisting of nonreadable computer code,

18  emails advertising a year-long spiritual apprenticeship course,

19  memes about George Floyd, and death notices for The Washington

20  Post.  Other parties produce things that we know he has.  He

21  doesn't produce them.

22         This goes on for months and months.  The district

23  court is frustrated.  He's ignoring orders.  My clients file a

24  motion for sanctions, and in response to that motion, he

25  doesn't defend his conduct.  He files two documents in which he

1   stipulates to all of the elements of the claims.  He conceded

2   that he defamed our clients, intentionally caused them

3   emotional distress, and told the court that liability should be

4   treated as though there's default liability.

5           Your Honor, I have the stipulations.  I can pass them

6   up to you if you would like.

7           THE COURT:  Well, that's the one thing I didn't see a

8   copy listed in the exhibits of the judgment.  And I don't know

9   that I have -- I don't know if the stipulations are -- I think

10  it's just referenced the docket.  So I would appreciate those

11  because I think they are helpful background for purposes of

12  understanding things that are relevant for the bankruptcy going

13  forward.

14          MS. STRICKLAND:  Certainly.  May I approach?

15          THE COURT:  Yeah.  Please.  Thank you.  It is helpful

16  to have the documents from the District Court in the District

17  of Columbia, an old stomping ground of mine, as they speak

18  directly to what that court did.  And so that's helpful.

19          So what you handed me is a small binder of some six

20  tabs, all of which contain, well, either pleadings or orders or

21  decisions of the district court in that case and various docket

22  numbers.  And so thank you for that.  Proceed.

23          MR. FISCHOFF:  Thank you, Your Honor.  So the first

24  two tabs are actual stipulations, where they are signed by Mr.

25  Giuliani.  I would point you to tab 2, which is a very short

1   stipulation.  In paragraph 1, he stipulates he's made the

2   statements, that they were defamatory.  Paragraph 2 says he

3   published the statements to third parties; 3, if they were

4   facts, they were false; 4, he doesn't contest the factual

5   elements of intentional infliction of emotional distress; 5,

6   he's liable for punitive damages; and 6, that there's default

7   liability.

8        Throughout this, and this goes to what is it he could

9   actually appeal, he preserves three things, the right to argue

10  that the things he said were his opinions or constitutionally

11  protected, the right to seek set off, and you'll see in a later

12  order, there actually was a two-million-dollar set off, and a

13  reservation as to whether his statements cause damages and what

14  amounts.  So --

15       THE COURT:  And that's in paragraph 3, if I'm looking

16  in the right spot?

17       MS. STRICKLAND:  The reservations are littered

18  throughout, but they're repetitive.

19       THE COURT:  All right.

20       MS. STRICKLAND:  It's the last sentence of a couple --

21       THE COURT:  Okay.

22       MS. STRICKLAND:  -- of them.

23       THE COURT:  I see it.

24       MS. STRICKLAND:  So following these stipulations, on

25  August 30th, District Judge Howell enters an order approving

1    the motion for sanctions.  But she doesn't rely on these

2    stipulations, which are qualified.  Instead, she goes to her

3    record.  She's got deposition testimony, numerous witnesses,

4    documents others have produced, and she independently

5    determined that the elements of the causes of action had been

6    satisfied.  So not only do we have this stipulation, we also

7    have the record.

8         Following the entry of the sanctions order, Judge

9    Howell orders that a jury trial be held to determine the amount

10   of compensatory and punitive damages owed to Ms. Freeman and

11   Ms. Moss.  That's where the 148 comes in.  And then there's

12   something else that bears noting in the binder I gave you,

13   which is in tab 6.

14        When you go to tab 6, you look at what is the

15   reasonable likelihood that there could be an appeal here.  So

16   the procedural posture would be to go back to Judge Howell and

17   say what the jury did was outrageous and these numbers are

18   super high.  But if you look at tab 6, which is the memorandum

19   and order that Judge Howell entered at docket 144, and you turn

20   to page 11 of that document, Judge Howell has considered this

21   and weighed in on it.

22        Towards the bottom of that page 11, she says:

23        "The obvious fact that the jury's unanimous awards

24        were conservative as to plaintiffs' requested

25        compensation for reputational harm due to Giuliani's

1          defamation, per se, based on the expert's calculation

2          of the cost of repairing their reputations and the

3          jury's punitive damages award nearly equivalent to

4          compensatory damages rather than multiplied by up to

5          four times compensatory damages, any attempt to reduce

6          this award faces challenges."

7          So it's not as if this hasn't been asked and answered.

8  All of the issues here are things that have been carefully

9  considered by the district court.  So the notion that Mr.

10 Giuliani is going to be able to quickly file some motion and

11 have something reconsidered is just --

12          THE COURT:  Well, I understand that, and you have good

13 reasons for making the arguments you're making.  Obviously, you

14 recognize that in a traditional bankruptcy case, if there is

15 such a thing, when there's a -- that is motivated by a judgment

16 or involves a judgment as a debt that the debtor's dealing

17 with, bankruptcy courts don't necessarily get behind what's

18 going on in a trial court and say, well, you have whatever

19 rights.  The trial court and the appellate court will sort it

20 out.

21          I do think there's a legitimate concern here about the

22 expenses and the cost and the delay.  I guess my question for

23 you is to how to sort out those principles in this particular

24 case, and maybe you've already done that with your road map in

25 terms of analyzing how these competing interests best play out.

36

1          MS. STRICKLAND:  Sure.  Well, there's no shortcut to

2    what Mr. Giuliani's counsel says his cocounsel litigation firm

3    wants to do.  The process by which Mr. Giuliani could get to

4    the end of the road includes motions that, A, are very unlikely

5    to succeed, but B, largely result in a remand and going back to

6    square one for our clients, where it would be a very long and

7    protracted and expensive process.  And while I appreciate Mr.

8    Fischoff's representation that he's not aware of litigation

9    counsel seeking to dissipate the assets of the estate, the

10   retention filings that they made on Your Honor's docket

11   actually don't say that at all.

12          THE COURT:  No.  I recognize that that's a very

13   legitimate concern, and we don't have that nailed down yet.

14          MS. STRICKLAND:  Right.

15          THE COURT:  But to the extent that -- again, thinking

16   about this case in traditional principles, if somebody said,

17   well, we prevailed on appeal and there's a lesser number that

18   the, that the court thinks is appropriate, that's sort of an

19   odd argument to use to say the stay shouldn't be lifted.  I

20   understand the concern about the amount of money and that

21   concern, coupled with the amount of money involved and the

22   looming nondischargeability case decision that would have to be

23   made.

24          The reason I mentioned nondischargeability, just to

25   sort of get it out there, oftentimes creditors in court, often

1   in state court, will come in and say this is nondischargeable.

2   But what they have just facially and almost immediately can be

3   recognized as not using the language of the Bankruptcy Code,

4   which is very specific.  And the reason why I call this out

5   here as something a little different than what I usually see is

6   it uses language that detracts particular sections of the Code

7   here and makes it look facially to be in a different posture.

8       MS. STRICKLAND:  Not our first rodeo, Your Honor.

9       THE COURT:  Well, so again, no decisions.  That's not

10  a decision that's to be made today.  I'm just pointing out

11  things that have been argued to me, looking at the documents,

12  that it puts it in a different posture than what I usually see.

13      But I guess my thought is what do you think should

14  happen, looking at these principles.  It sounds like in your

15  papers that you were okay with, or may be okay with -- maybe

16  that's a better way of saying it -- what's now been

17  specifically committed to as a specific motion dealing with

18  damages, the damage portion of the trial, and that if the

19  automatic stay is -- I think in a case like this, it may be

20  that it has to be taken step by step by step, as opposed to a

21  broader approach.

22      But is that something you're -- it look like in your

23  papers, that's something your client could live with, with the

24  understanding that the funds were coming elsewhere, again,

25  subject to that being the case as may be played out in the next

1 week or two.  Is that something your client still can live

2 with; am I understanding that correctly?

3      MS. STRICKLAND:  What we're prepared to do -- no one's

4 looking to time someone out or to have their rights expire.  If

5 they want to file pleadings that preserve their right to --

6 whether it be seek a new trial, whether it be revisit damages,

7 and they want to file things so that we aren't looking at

8 tolling and 108 and issues of that nature, we are fine with

9 that, and they need do nothing else.  But then the stay comes

10 down.

11      THE COURT:  But does that mean anything associated

12 with that?  So it's a motion -- these are my words, not

13 counsel's words, but a motion to say the damages should be

14 vacated because here's all the reasons, which presumably would

15 then lead to a response by your client, and then the district

16 court may or may not decide to have argument.  I assume that

17 would all be part of that silo.

18      MS. STRICKLAND:  That would be part of that silo.

19      THE COURT:  All right.

20      MS. STRICKLAND:  But that's it.  For anything else,

21 Mr. Giuliani needs to pass three hurdles that he can't clear.

22 One, our position is he has to actually ask for relief that

23 Your Honor can grant.  Two, he has to meet the burden to show

24 that cause exists, which I don't think it's in the papers, and

25 I certainly didn't hear it today.  And then if all of that were

1   to occur, we get to the Sonnax factors that don't balance in

2   his favor.  I'd like to address those three hurdles.

3        The motion impermissibly seeks to appeal while asking

4   you to stay our clients from proceeding to perfect their liens

5   or otherwise enforce their judgment.  As Your Honor knows, case

6   after case rejects attempts of debtors to use Chapter 11 to

7   obtain a litigation advantage.

8        THE COURT:  I agree there's a concern -- there is a

9   concern about sword, shield here.  Right.  That's what the

10  cases talk about.  Judge Glenn and the ResCap case uses that,

11  and he's quoting from another case.

12       At the same time, I think the case law is a bit mixed

13  about the notion of saying, well, someone would ordinarily have

14  to post a bond to get a stay, and instead, they file for

15  bankruptcy and they get a stay, is that something that's

16  permissible.  Is that kosher, for lack of a more legal term.

17  And cases seem to be a little all over the map on that,

18  sometimes looking at whether it's a judgment that the debtor

19  has the financial wherewithal to actually pay, as opposed to

20  one that the debtor would essentially need the bankruptcy to

21  reorganize.

22       So I don't know -- I understand the concerns and

23  particularly in light of the findings of the district court at

24  various junctures about the case that you all lay out in your

25  papers.  But my thought is that I think there's some benefit to

40

1    taking this step by step by step so the new trial stays any

2    obligation to file an appeal, if such a motion gets filed, and

3    then we can monitor things and see how things go.  Meanwhile,

4    the bankruptcy will proceed.  Schedules will get filed.  There

5    will be discussions.  And I would imagine that your clients

6    will file some sort of pleading, whether it be a

7    nondischargeability, adversary, or something else that tees up

8    other issues.

9            And then my thought is to take it as a developing

10    situation.  We all do better with the specific facts as they

11    unfold, rather than trying to guess.  And again, there's a

12    complicated history in the district court in DC that I want to

13    be respectful of, and taking it on a step-by-step basis, given

14    all those concerns, seems to be the way to go.  And certainly,

15    that's also the message I took from your papers, that what

16    you -- again, you can correct me if I'm wrong, that what you

17    were against is a carte blanche, here, go off and do what you

18    want to do in that litigation and that that's not something

19    that you're comfortable with.  I understand that.

20            MS. STRICKLAND:  Your Honor, I want to back up two

21    steps and unpack a couple of things.  One, we are not looking

22    to litigate again and relitigate again with Rudolph Giuliani

23    during the pendency of these cases.  We believe that Your Honor

24    is going to establish that our claims are nondischargeable.

25    And when it's over, we'll be litigating.

1         If they want to preserve their right to litigate, they

2    can do that.  But we're not looking to be exchanging papers in

3    district court or anywhere else with him while he is elevating

4    his appellate lawyers in priority over general unsecured

5    creditors in these cases and diminishing administrative

6    expenses.

7         THE COURT:  Well, two things on that.  One is I don't

8    think we know yet.  There's a question about where the source

9    of funding is.  The papers are going to get filed.  We have to

10   sort that out.  You're not alone in having that concern.  I

11   know the committee has that concern.  I know the U.S. Trustee's

12   office has that concern.  I see Mr. Schwartz raising your hand.

13   I get it.  And trust but verify, isn't that the phrase, so I

14   understand that.

15        But as to the notion of exchanging papers, I guess I'm

16   a little confused, and maybe I'm not following.  If they file a

17   motion as, as has been represented, that the intent is to lift

18   the stay to file a motion to deal with the damages in the

19   Freeman litigation, I would imagine that would involve the

20   exchange of papers.  And whatever the district court -- it's

21   not my job to micromanage the district court's docket.  It's

22   inappropriate.  And so the district court will do whatever and

23   manage that issue.

24        If the district court says, I don't want to see that

25   motion now or there's a reason not entertain that motion, the

42

1   district court can do that.  If district court says, I get the

2   opposition.  I'm going to have a hearing.  Whatever the

3   district court decides is appropriate.

4          On how to deal with that silo, I would think if it

5   involves the filing of papers, I would think that that's just

6   how it goes.  It would be a logical consequence of the filing

7   of the motion, unless I'm missing something.

8          MS. STRICKLAND:  Well, I also want to go to your --

9          THE COURT:  But let me just see if I can get that

10  nailed down because I want to make sure I understand your

11  position because I thought we had agreed on that, but I might

12  be wrong about that.

13         MS. STRICKLAND:  Your Honor, I think you have gone

14  past our comfort zone in the sense that he can preserve the

15  right to argue whatever he wants at the appropriate time.  We

16  don't believe that appropriate time for that litigation is

17  right now.  We are not looking to toll Mr. Giuliani out.  If he

18  wants to preserve things by making his filings wherever he

19  wants to make them, he can do it, but that's it.

20         And this is where your summary of the case law matters

21  because you're right that the courts looked at a whole bunch of

22  different factors in this type of litigation.  But the cases

23  where courts looked and said, well, is this a litigation

24  tactic, is there an ongoing business, and the factors you

25  articulated were in the context of whether it was a bad-faith

1    filing where the case should be dismissed.

2           What you won't find are debtors who do seek as

3    defendants to go forward with a lift of stay for litigation

4    they've lost who don't have to post the bond.  That, you don't

5    see.  And in fact, if you look at Wally Findlay, if you look at

6    the cases, the courts say, we are not going to be a bankruptcy

7    substitution for supersedeas bond.

8           THE COURT:  But again, I think the cases are

9    complicated, and it depends on the facts and circumstances.

10   But a lot of those cases, it sounds like, have motions to

11   dismiss for various grounds.  And maybe I'll get such a motion,

12   maybe I won't, but I can't essentially assume such a motion.  I

13   have what I have in front of me. And my thought is that, one,

14   there's significant questions as to where the funds are coming

15   from.  That's not yet figured out.  And two is that I wanted to

16   know precisely what the request was.

17          But when it comes to saying, well, he can make the

18   motion but nothing further can happen, that seems to me that

19   I'm then putting myself as telling what the district court in

20   DC should do in terms of -- the district court, it'll be a

21   motion in the district court.  The district court judge will

22   figure out how to handle that in whatever way is appropriate.

23   And if I start telling the district court, well, he's got to

24   file it, but nothing else is going to happen, I'm sticking my

25   nose in where it shouldn't -- where it shouldn't go.

44

1          And so certainly, you have the right to make whatever

2     arguments you want to make in the district court as to how far

3     to go with those things.   Right.   I can understand you have

4     arguments to say, Judge, this should be rejected out of hand.

5     This should be stayed because we've got the bankruptcy and

6     we're making arguments to the bankruptcy of X, Y, and Z.   But

7     to me, that's the proceedings in the district court, and I am

8     not supposed to be -- I don't think it's appropriate for me to

9     be micromanaging what that court does.

10          MS. STRICKLAND:   I agree.   I think that that's -- I

11     think the conclusion is the same.   Right now, we have an

12     automatic stay.   No one's moving.   You're not micromanaging

13     anyone.

14          The debtor is saying, we want you to lift the stay.

15     The district court has already spoken about what happens when

16     the stay is lifted.   The posture that Mr. Giuliani returns to

17     is there is already a district court order that says you don't

18     even get thirty days under Federal Rule of Civil Procedure

19     62(a).   I have dispensed with it --

20          THE COURT:   No, I understand that.   But again, what I

21     understand the request is to file a motion dealing with

22     damages.   And if, in fact, no estate money is going to be

23     spent, which is a significant issue, then the question is how

24     the district court wants to handle that.   There are a lot of

25     things that happen after a judgment, stays, enforcement,

1  different kinds of stays.  We've got a bankruptcy stay here.

2  There are stays, as you said, that sort of arise naturally

3  after a judgment.  And then there are stays that you can

4  request pending appeal.

5          So my thought is if there's a motion seeking to

6  challenge the damages, then the district court will decide what

7  to do with that.  And any other requests for the debtor to do

8  something other than file that motion and do whatever the

9  district court directs in the natural course of business, the

10  debtor would come back here.  And I think, thinking out loud,

11  that's the place I'm comfortable being because this idea of

12  putting in a placeholder and then stopping, that request is

13  something that certainly can make to the district court.

14          But the district court may have strong views one way

15  or the other on exactly what should happen when a motion like

16  that is filed.  And I just don't see myself as a party, that

17  the bankruptcy should not interfere with that.  Whatever

18  naturally comes from the consequence of filing that motion, the

19  district court is more than up to the task and the right place

20  to decide that.

21          So I'm not comfortable, sitting here right now, with

22  sort of a half measure where something's filed, but then I've

23  issued the kind of stay I've never issued before.  You say you

24  can file it, but you can't pursue it.  If I were a district

25  court -- a trial court, I really wouldn't know what to do with

1    that.  And one of the things that we have to do here in

2    bankruptcy court is when interacting with trial courts and

3    state matters is issue things that are clear and that where the

4    trial court doesn't have to parse what is going on in

5    bankruptcy and become an expert in bankruptcy to figure out how

6    to appropriately handle that.

7            So my thought is if that motion's filed, whatever

8    comes as a result of that motion, that's for the district court

9    to address.  That would be clear.  It would be defined.  It

10   would not be hard to follow for anybody.  And then anything

11   else would come back.  So that's, again, thinking out loud

12   here, sitting on the bench.  But I appreciate the colloquy back

13   and forth to try to figure out --

14           MS. STRICKLAND:  Right.

15           THE COURT:  -- some of the concerns we're going to

16   bump into as the case progresses.

17           MS. STRICKLAND:  We're okay going back and forth with

18   the district court on whether or not there should be a new

19   trial.  The piece where I get stuck is appeal.  Mr. Giuliani

20   can't --

21           THE COURT:  Well, I think I -- what I'm hearing is

22   that the request is to make this motion for essentially a new

23   trial on damages or anything dealing with damages and that

24   that's going to come first and that after that, the debtor will

25   come back if it wants to seek to lift the stay to pursue an

1  appeal because you'd have to get a decision on that motion

2  first; am I understanding correctly?

3        MR. FISCHOFF:  Yes and no.  So if the motion is denied

4  or whatever the outcome, the notice of appeal is then due

5  within approximately thirty days.  Different than a motion,

6  after you file a notice of appeal, there's time to perfect.  So

7  we would ask that the Court authorize that if there's an

8  appropriate reason that we can file the notice of appeal, but

9  then we'd have to come back to this court to perfect it, just

10 because we don't --

11       THE COURT:  To take action in the --

12       MR. FISCHOFF:  Correct.  Yes.  So we want to just file

13 the appeal --

14       THE COURT:  Of course, the DC circuit may have some

15 views about an appeal on its docket that's sitting there in

16 perpetuity.  But we'll burn that bridge when we come to it.

17       So there's two observations here.  I'm happy to make

18 myself available if it promotes justice and clarity.  If the

19 district court makes a ruling and then the question comes up

20 and you have thirty days, I'll have a hearing.  That's fine.

21 But if everyone agrees that a notice can be filed -- again, I

22 think this may be a question of drafting, but if it's just a

23 notice, that maybe something Ms. Strickland's client can live

24 with.  It may not be.  I don't know.

25       MS. STRICKLAND:  I want to be -- I want to be clearer

1   than I have been.  What Mr. Fischoff said is --

2          THE COURT:  I will say, I did clerk for a district

3   judge in the District of Columbia.  And so when I think about

4   telling a district judge in the District of Columbia what to

5   do -- what they can do and what they can't do, I do have the

6   voice of Charles R. Richey in my head.  So I will tell you that

7   I think I understand where he would be coming from.  So that

8   informs my decision making.

9          MS. STRICKLAND:  Excellent.

10          THE COURT:  Ms. Strickland.

11          MS. STRICKLAND:  So let's talk about what the district

12   court in the District of Columbia has done.  They have a

13   default judgment.  They have a jury trial.  There's the damages

14   award.  We then go back and forth on whether or not we can

15   enforce immediately or there's going to be any stay.  Forget

16   thirty days.  Thirty seconds.

17          THE COURT:  I got it.

18          MS. STRICKLAND:  Judge rules, no, you can enforce

19   immediately.  Your choice is file a bond.  They say, we'd

20   rather file for bankruptcy.  Now, they're coming back.  They're

21   saying, we want a new trial.  I am telling Your Honor, if they

22   want to file a motion for a new trial, we will agree

23   consensually to go to Your Honor and say, please lift to stay

24   for that purpose only.

25          The minute we get to appeal, they can do one thing and

1   one thing only.  They can file a notice of appeal.  Otherwise,

2   they have two choices.  They are stayed, or the Federal Rules

3   of Civil Procedure still apply.  They apply to debtors.  They

4   apply to parties-in-interest in bankruptcy and out of

5   bankruptcy incorporated into the Federal Rules of Bankruptcy

6   Procedure.

7          THE COURT:  Well, again, the DC circuit may decide to

8   tell all of us something about that if it comes to it.  But the

9   notice of filing, the idea of filing a notice and a notice

10  alone is something that doesn't cost the estate and it doesn't

11  incur further litigation and I think could be drafted

12  appropriately in an order so that everybody understands.  And

13  certainly, if the DC circuit has a different view, my

14  understanding is they certainly have cases on appeal that are

15  subject to bankruptcy proceedings.  And so they're all very

16  smart people.  Understand the concept of a bankruptcy stay.

17         So that seems to be -- I'm not suggesting that a full-

18  blown appeal go forward by virtue of the record I have in front

19  of me.  I am not comfortable with that notion.  There's a lot

20  of unanswered questions and concerns that have been raised.

21  And so I think we're on the same page.

22         MS. STRICKLAND:  Great.  But for our suggestion of

23  where we would be comfortable going, I think the record is

24  pretty clear from my perspective that there's been no cause

25  shown.  And I can go through the Sonnax factors --

**RUDOLPH W. GIULIANI**

50

1          THE COURT:  No, I --

2          MS. STRICKLAND:  -- but nobody else did so --

3          THE COURT:  Well, no.  The committee did as well.

4          MS. STRICKLAND:  No, I don't mean in our papers.  I

5  mean today.  I have not heard the debtors go through the

6  application of the Sonnax factors in their papers or live.

7  So --

8          THE COURT:  Yeah, no, I --

9          MS. STRICKLAND:  -- they haven't met their burden at

10  all.

11          THE COURT:  I understand.  At this point, I think you

12  can keep your powder dry --

13          MS. STRICKLAND:  That's what I thought, Your Honor.

14          THE COURT:  -- on the Sonnax factors, as those are

15  issues that we deal with regularly here in this court, and I do

16  have a briefing by you and by the committee on that subject.

17          So anything else, Ms. Strickland, before I hear from

18  the committee?

19          MS. STRICKLAND:  No, Your Honor.

20          THE COURT:  All right.

21          MS. QURESHI:  Good afternoon, Your Honor.  For the

22  record, Abid Qureshi, Akin Gump Strauss Hauer & Feld.  We are

23  proposed counsel -- excuse me.  We are proposed counsel to the

24  official committee of unsecured creditors.  As Your Honor will

25  hear, when our retention application gets filed, Akin is

**RUDOLPH W. GIULIANI**

51

1    proposing to handle this representation of the committee on a

2    pro bono basis in light of what I will describe as the unique

3    facts that are before the Court.

4              Your Honor, if I could, before jumping into the

5    merits, just give Your Honor a quick background on who is on

6    the committee because I think that that bears relevance to the

7    issue we're talking about today.  There are three members, Your

8    Honor.  US Dominion Inc., they have commenced a lawsuit against

9    Mr. Giuliani, also in district court in DC, seeking 1.3 billion

10   dollars in damages for defamation in connection with false

11   claims made by Mr. Giuliani related to Dominion's voting

12   machines.

13             THE COURT:  And if I understand, that's the lawsuit

14   where it's been settled as to other defendants?

15             MS. QURESHI:  I believe that's correct, Your Honor.

16   That lawsuit as to Dominion has not yet gone to trial.

17             Your Honor, Ms. Dunphy is also a member of the

18   official committee.  She is a plaintiff in a lawsuit against

19   Mr. Giuliani and other related parties that is pending in New

20   York Supreme Court in connection with a host of sexual

21   harassment, sexual discrimination, and related claims.  And

22   that also, Your Honor, has yet to go to trial.

23             And then we Ms. Shaye Moss, who along with her mother,

24   Ms. Freeman, of course, are the judgment creditors.

25             So Your Honor, let me start by saying the committee

52

1   supports the opposition papers that Your Honor saw from Ms.

2   Strickland's firm.  We support their argument.  From the

3   committee's perspective, Your Honor, we of course approach this

4   issue from the perspective of our statutory and fiduciary

5   duties to all unsecured creditors.  And from that vantage

6   point, Your Honor, this also is a motion that we think should

7   be denied.

8        So Your Honor, jumping to this issue of what should

9   Mr. Giuliani be permitted to do at this stage in connection

10  with pursuing a retrial of the damages question, from the

11  committee's perspective, and while no doubt Ms. Moss and Ms.

12  Freeman have suffered egregious harm and need to be compensated

13  for that, we also want to ensure that any lifting of the stay

14  does not have the unintended consequences of allowing certain

15  creditors to jump the queue ahead of others.  And so what we

16  would not want to see is the ability for Ms. Moss and Ms.

17  Freeman to start executing on their judgment the minute the

18  stay is lifted because we have --

19        THE COURT:  Then the status quo is lost.

20        MS. QURESHI:  Right.

21        THE COURT:  Yeah.

22        MS. QURESHI:  Exactly.  And that would defeat the

23  purpose of being in bankruptcy in the first place.  And so Your

24  Honor, if I could, also I just want to revisit the step-by-step

25  approach, which I think is the correct one.  What we would

**RUDOLPH W. GIULIANI**

53

1  propose, and I recognize Your Honor is saying you don't think

2  you have the authority to do this, but let me lay out, if I

3  could, what we think of as the logical progression here.

4          So we understand that Mr. Giuliani has an approaching

5  deadline.  I believe it's February the 18th, A deadline by

6  which if he is going to seek a retrial of damages, that needs

7  to happen or his right to do so will be lost.  Your Honor, we

8  agree, the committee is not, Ms. Freeman and Ms. Moss are not

9  attempting to use bankruptcy to let that deadline lapse such

10  that Mr. Giuliani loses that right.  However, I think there are

11  some things that it makes sense to happen in this court first,

12  before Mr. Giuliani seeks that retrial.

13          Number one, we need clarity on the retention

14  application so we have a clear understanding of if there are

15  going to be legal fees incurred, that those are not going to

16  deplete the estate.  Clearly, a very important issue.

17          Number two, Your Honor, is the dischargeability issue

18  because at the end of the day, if -- and the dischargeability

19  issue, I think, goes hand in hand with the filing of Mr.

20  Giuliani's schedules and statements.  I think the most

21  charitable way to put it with respect to schedules and

22  statements, Your Honor, is that the district court has found

23  that Mr. Giuliani has, at best, a transactional relationship

24  with the truth.

25          It is the committee's intention to use the bankruptcy

54

1   process to investigate what we see from Mr. Giuliani with

2   respect to schedules and statements and his assets and what

3   they consist of and where they may have gone.  And that is all

4   important because Your Honor, if we get to a nondischargeable

5   finding, which we think is highly likely to be the case here,

6   if it hasn't been stipulated to already, subject to what an

7   investigation ultimately shows as to what his assets are, it

8   may be the case, Your Honor, that it's entirely futile for Mr.

9   Giuliani to engage in a new trial with respect to damages.  And

10  at that point, we would have a sense of is there a prospect for

11  reorganization for a viable Chapter 11 plan at all.

12          And so from our perspective, the ideal step-by-step

13  process would be lift the stay for the very limited purpose of

14  allowing Mr. Giuliani to preserve the right ultimately to seek

15  a retrial on damages.  And that would consist of allowing him

16  to make whatever filing needs to be made in order for that

17  deadline not to lapse.  Then immediately reimpose the automatic

18  stay so everything stops.  That --

19          THE COURT:  Well, in mulling this over and at the

20  risk --

21          MS. QURESHI:  Yeah.

22          THE COURT:  -- of overly complicating a already

23  complicated situation, I certainly wouldn't have a problem if

24  the order said this is the extent of the stay.  And to the

25  extent the district court decided in its judgment it was

55

1   appropriate to have that motion made and to not proceed further

2   until the bankruptcy proceeds, that's fine.  Again, I don't

3   think --

4           MS. QURESHI:  Yeah.

5           THE COURT:  -- I have the authority to do that, and I

6   think there are lots of good reasons that I shouldn't stick my

7   nose in a district court's business, particularly in a case

8   that has as many nuances as this.  But certainly, to the extent

9   that the district court may say, what does the bankruptcy judge

10  want to do; I don't want to step on the bankruptcy -- step on

11  the toes of the bankruptcy proceeding, certainly, the order

12  could be drafted in a way to say that the district court should

13  handle that motion, however it deems appropriate, and

14  understanding that the bankruptcy court takes no position on

15  whether the motion needs to be prosecuted at this time or

16  however you wanted to phrase it --

17          MS. QURESHI:  Right.

18          THE COURT:  -- which essentially would serve the needs

19  of preserving the right, and the district court then can make

20  that decision.

21          MS. QURESHI:  Your Honor, from our perspective, I

22  think that's entirely appropriate.  Give the district court the

23  ability to alter that if the district court so chooses.  And

24  again, we would want to ensure that that order is also very

25  clear that the stay is not being lifted for purposes of Ms.

1  Freeman and Ms. Moss actually executing so that the status quo

2  can be preserved.

3          THE COURT:  No, I think that's fair.

4          MS. QURESHI:  Yeah.

5          THE COURT:  And that's the whole sword-shield --

6          MS. QURESHI:  Right.

7          THE COURT:  -- thread in the case law on motions to

8  lift the automatic stay, that it can't be used as a sword and a

9  shield, that it's designed to preserve the status quo for the

10 benefit of all creditors in the posture that they're in.  And

11 so I think everybody agrees that that's the right way to go.

12         I do think Ms. Strickland's comments, I think, are

13 very much of the sword-shield variety, where she's saying if

14 you cross a certain point, that it becomes unfair to the

15 Freeman plaintiffs to say we're now having to fight with one

16 hand tied behind our back.  Whatever metaphor you'd like to use

17 about something being unfair.  So that's how I took the

18 comments.

19         MS. QURESHI:  Yeah, and we agree with that, Your

20 Honor.

21         THE COURT:  All right.

22         MS. QURESHI:  That's all I had, unless the Court has

23 questions.

24         THE COURT:  I don't.

25         MS. QURESHI:  Thank you.

57

```
 1            THE COURT:  And I see counsel for the debtor rising.
 2    I'm going to hear from the --
 3            MR. FISCHOFF:  Yes.
 4            THE COURT:  -- U.S. Trustee's office in a minute, but
 5    if you wanted to chime in.
 6            MR. FISCHOFF:  Yeah.
 7            THE COURT:  A lot of things have been said that that
 8    to the extent there's some clarification you want to make.
 9            MR. FISCHOFF:  Yes.  So I think proposal by creditors
10    committee is making more complicated a complicated issue, as
11    the Court referred to it, already.
12            THE COURT:  I will say, we take the cases in whatever
13    posture they come in.  And sometimes, it's straightforward.
14    And sometimes, it's not.  And I think there's been a very
15    complicated factual scenario that we're walking into.  It is
16    what it is, and so we have to deal with it in the most
17    appropriate way in terms of cause.
18            And the reason why I'm focusing so much on the
19    agreement of the parties and what parties can live with is
20    frankly, the motion doesn't answer the mail.  It doesn't lay
21    out the Sonnax factors.  There's case law that says when you
22    don't engage in an analysis on Sonnax factors, that is alone a
23    basis for denial of a motion.  It's very pro forma.
24            And so I mean, there is a basis to deny it, given the
25    record.  I understand you didn't get a chance to reply to the
```

1    oppositions.  That's sort of a function of the odd procedural

2    posture.  We've made a complicated case even more complicated

3    as we've gone, seeking it on an emergency basis.  Then it got

4    pushed off for another week.  I understand that.  And nothing

5    about -- so my thought is what can be done today to move things

6    forward.

7            And so if -- and I think, no matter where we end up,

8    the notion of a step-by-step process, given all the complicated

9    factors here, I think everybody agrees has some appeal.  But as

10   I said, whatever I do, I'm not going to tell the district court

11   how it should handle things in that case.

12           MR. FISCHOFF:  And that brings up my concern.  We

13   still have to deal with the possibility that the district court

14   says, well, no to the motion.  Then that gives rise to the

15   debtor's need to file a notice of appeal.

16           THE COURT:  Yeah, but I think the tweak that we just

17   discussed -- and again, it's my fault for injecting that

18   additional wrinkle, and that's what it is.  It's a wrinkle to

19   what was already discussed that lays out exactly --

20           MR. FISCHOFF:  Okay.  It sounded like a fold but --

21           THE COURT:  -- the extent of how far you can go,

22   including --

23           MR. FISCHOFF:  Yeah.

24           THE COURT:  -- a notice of appeal, but no further in

25   an appeal.

59

1          MR. FISCHOFF:  Right.

2          THE COURT:  But it also says that to the -- that would

3    probably have a separate paragraph, and that paragraph would

4    say that as to the motion that will be filed, the district

5    court, obviously this Court takes no opinion about how the

6    district court wants to handle that motion and understands that

7    the parties will make an argument to the district court that

8    the motion should be stayed, some parties, in light of the

9    bankruptcy but that this Court believes that that decision

10   about whether to proceed with the motion on damages or not is a

11   question for --

12         MR. FISCHOFF:  Yeah.  Right.

13         THE COURT:  -- the district court to answer on the

14   first instance.

15         MR. FISCHOFF:  Understood.

16         THE COURT:  I'm sure you can say that in a more

17   articulate and nuanced way than I just said it because I could

18   see Ms. Strickland's blood pressure rising --

19         MR. FISCHOFF:  Yeah.

20         THE COURT:  -- where I articulated it.  And I'm just,

21   I'm spitballing here.

22         MR. FISCHOFF:  I'm sure she'll have a draft for me

23   very shortly.

24         THE COURT:  All right.

25         MR. BERGER:  I think it's our desk.

60

1          THE COURT:  I don't want -- I don't want to beat a

2   dead horse.  We'll get to wordsmithing, and we can --

3          MS. STRICKLAND:  Your Honor --

4          THE COURT:  -- talk about --

5          MR. FISCHOFF:  And one other point, if I may.  I just

6   want to say, we will get the necessary update, too, so that the

7   Court is assured, as we have been assured, that the fees will

8   be paid by the two defense funds.

9          THE COURT:  Yeah, that needs to happen quickly.

10         MR. FISCHOFF:  And we'll make sure because I --

11         THE COURT:  And I think that needs to happen before

12  the order is entered.

13         MR. FISCHOFF:  Right.  We're going to work on that

14  simultaneously.

15         THE COURT:  And if there's an issue about that, then

16  we'll have to --

17         MR. FISCHOFF:  Figure it out.

18         THE COURT:  -- get back together --

19         MR. FISCHOFF:  Yeah.

20         THE COURT:  -- and unpack the issue.

21         MS. STRICKLAND:  Your Honor, I just want to make sure

22  that we have our compartments straight.  I'm not trying to

23  draft on the fly.

24         THE COURT:  Well, I just did.  And I think, again,

25  it's a dangerous thing to do.  So I think I understand where

1  you're coming from, and I think you have a sense of what I'm

2  trying to accomplish.

3       MS. STRICKLAND:  I do.  I'd like to --

4       THE COURT:  So what I would suggest is rather than try

5  to make it perfect here on the fly is I'm happy to even take a

6  break and let people noodle around with language and come back,

7  say, after lunch and so that we can actually get it done today.

8  I'm also happy to have people exchange language and then

9  provide me with the most up-to-date thing and have a

10  conference.  It may be more fruitful to do it when we actually

11  have language than to try to do it on the fly here today.

12       MS. STRICKLAND:  I agree, and that wasn't where I was

13  going.  I just want to -- I want to figure out the concept.

14  Forget about the language.  The concept that I hear Your Honor

15  articulating, which is fine, is stay lifted.  Motion to

16  district court for new trial.  District court order says, in

17  some form or fashion, do what you want with this.

18       That happens.  District court does whatever it's going

19  to do.  You are not going to micromanage.  You've been crystal

20  clear.  We are fine.

21       They lose, assume.  If they win, it doesn't -- if they

22  lose, then what has to happen is there is an appeal right.  At

23  that point, my understanding is your order is going to say you

24  can file a notice and no more, and then you've got to come

25  back.

1          THE COURT:  Correct.

2          MS. STRICKLAND:  That's all I wanted to clarify.

3          THE COURT:  Yep.  Yep.  Yep

4          MS. STRICKLAND:  Okay.  And we aren't remanding and

5   doing --

6          THE COURT:  No, no.  It's just a notice and no

7   further.

8          MS. STRICKLAND:  Understood.

9          THE COURT:  And subject to further order of the Court

10  and --

11         MS. STRICKLAND:  Exactly.

12         THE COURT:  -- everybody reserving all rights and all

13  that good stuff.

14         MR. FISCHOFF:  And that's debtors understanding.

15         THE COURT:  All right.

16         MR. BERGER:  And we're good with that, Your Honor.

17         THE COURT:  All right.  We're making progress.  So

18  with that, let me hear from the United States Trustee's office.

19         Oh, you're on mute.

20         UNIDENTIFIED SPEAKER:  Wait.  Oh, she's talking.

21         MS. SCHWARTZ:  I'm unmuted now, correct?

22         THE COURT:  All right.  Yes, we can hear you just

23  fine.  Thank you.

24         MS. SCHWARTZ:  Andrea Schwartz, the United States

25  Trustee.  Judge, I had asked to kind of jump in before you got

63

1   to the merits of the motion because I knew a lot of the issues

2   that were going to be raised as part of the motion were issues

3   that we have already been all over and addressed.  And I wanted

4   to be able to provide the Court with some information in that

5   regard.

6          So let's start with the retentions, which are not a

7   today issue, which are not on for another week and a half, but

8   the bottom line being that one of the missing components of the

9   two retentions that have been filed has been the source of

10  funding and disclosure regarding that.  So I wanted to let the

11  Court know that we had already provided comments to both the

12  Sibley & Camara (sic) firm that is the law firm that is

13  proposed to handle the Freeman litigation, whatever steps are

14  permitted pursuant to the stay, the limited lift stay or

15  modification stay, whatever you want to call it, as well as the

16  Aidala law firm that's proposed to be retained in connection

17  with the various disciplinary actions that are pending

18  regarding Mr. Giuliani.

19         And also let the Court know that it appears, based on

20  our conversations with those lawyers, that their expertise is

21  not bankruptcy, so this is a new process for them, and that we

22  understand also that there's another law firm representing or

23  proposing to represent, purporting to represent, Mr. Giuliani

24  in the Georgia election interference case that we have not yet

25  received an application for.  And we also haven't seen an

64

1   application yet for debtor's counsel.

2           So that's at least four sets of lawyers that we're

3   been exchanging communications with debtor's counsel regarding,

4   inquiring regarding the applications, status of funding,

5   appropriate disclosures, affidavits, and so forth.  And we

6   wanted to give the Court and also the parties present comfort

7   that the U.S. government is paying attention to that issue very

8   acutely and has been requesting that information from the

9   beginning of the case.

10          And also to let the Court know that it sounds like an

11  appropriate and a good procedure to circulate an order because

12  I think that the lawyers that are actually proposed to

13  represent Mr. Giuliani in that DC district litigation have an

14  opportunity to look at that order because based on the

15  recitation today on what has to happen in that court and what

16  the deadlines are, I'm not so certain that everything is a

17  hundred percent accurate that was represented today.  It may

18  be --

19          THE COURT:  Well, just two thoughts on that.  One is

20  if somebody stands up and makes a representation here, I assume

21  it's accurate.  And if it's not, then people need to get take

22  appropriate steps immediately to straighten that out.  I do,

23  however -- I do, however, agree that they need to see the order

24  because exactly what relief is asked for in trial court as a

25  trial -- as the person in the trial court representing the

1  party, they have to be totally on board.  There can't be any

2  daylight, or we're going to end up spending our lives going

3  back and forth and having lots of conversations here.  While

4  I'm always willing to talk to the parties, I'm aware of the

5  litigation burn problem.  We can't have this be unclear --

6           MS. SCHWARTZ:  Right.

7           THE COURT:  -- in a way that will cause further

8  expense and inefficiency.  So yes, so I understand that --

9           MS. SCHWARTZ:  And that's what I meant by that, Judge.

10          THE COURT:  -- that order will be circulated, the

11  proposed order will be circulated, and there's time to do that

12  because we're not going to enter the order until after we have

13  some clarity about the source of funds.

14          MR. FISCHOFF:  That's right.

15          MS. SCHWARTZ:  And that's what I meant by that, Judge,

16  not that there was any intent on my part by saying that someone

17  was misleading the Court but rather, that in speaking with the

18  counsel that's actually litigating that, he was unaware there

19  was even retention --

20          THE COURT:  Yeah.  No, I got it.  We're making the bed

21  that they have to lie in.  So I get it.

22          MS. SCHWARTZ:  Okay.  Good.  So that's important for

23  the Court to know.

24          Also, with respect to the appointment of the creditors

25  committee, just so that the record is clear, that committee was

66

1   solicited on the filing date, that's, I think, December 21st of

2   the top twenty creditors, and the U.S. Trustee solicited

3   interest from those creditors and appointed that committee last

4   week.  And given the fact that counsel was just retained by

5   that committee, the U.S. Trustee waited for counsel to be

6   retained in order to set the date for the 341 meeting of

7   creditors, which we are now discussing and socializing a date

8   for that.  So I just wanted the Court to be aware of that.

9          And thirdly, that the debtor had filed a request for

10  an extension of time to file its schedules.  And as the Court

11  knows, that's a pretty perfunctory motion that gets filed

12  seeking an extension, usually for an additional fifteen days,

13  to give the debtor a total of thirty days to file his schedules

14  of assets and statement of financial affairs.  He's a little

15  bit past that at this point, but we have been in discussions

16  with counsel for the debtor and are advised that that is well

17  underway.  And we expect that those schedules and the statement

18  of financial affairs will be filed not later than January 22nd.

19  And Mr. Fischoff is in the courtroom, so he can advise the

20  Court with respect to that but --

21          THE COURT:  All right.  Well, let's take just a quick

22  interruption to confirm that with debtor's counsel.

23          MR. FISCHOFF:  Yeah.  We've been in touch -- I spoke

24  to U.S. Trustee yesterday, and we talked about a lot of these

25  issues, although we've talked about the retentions numerous

1    times over the past week.  And those are being worked on.  We

2    need a lot of information from third parties.

3            But putting that aside, I was in communication with

4    Mr. Giuliani, and we are scheduling an appointment.  As I

5    explained to U.S. Trustee, he needs to be in our office in

6    person to execute those schedules.  And so we're working on a

7    date of 24th or 25th.  Hasn't been finalized.  So I would say

8    the end of next week.  I'm not sure what day the 24th or 25th

9    is.  But we hope to have those completed and executed next

10   week.

11           I also spoke to her about the date for the 341

12   meeting.  We have two dates under consideration, and we'll make

13   one of those dates work to the convenience of the U.S. Trustee.

14           So we're working on all the administrative issues, and

15   we hope to have them all in order shortly.

16           THE COURT:  All right.  Thank you.

17           Ms. Schwartz, anything else from your office?

18           MS. SCHWARTZ:  Well, I think that's -- I think that's

19   it, Your Honor.  We just wanted to let you know that all of

20   those important bankruptcy processes are all underway, and

21   we're working diligently to ascertain that information from the

22   debtor and make sure that the filings reflect that.

23           THE COURT:  All right.  Thank you very much.

24           So I think I've heard from -- well, let me ask if

25   there's anybody else who wishes to be heard here today.

1       MR. SAMUELS:  Your Honor, Joel Samuels of the

2   Buchalter firm.  I am speaking back to Mr. Giuliani's motion

3   for relief from the stay but with respect to something that is

4   not on calendar today but that did have a notice of presentment

5   process with a deadline of today.

6       THE COURT:  Right.  So I'm glad you mentioned that.

7   It was on my list of things to address.  My rule

8   specifically -- my chambers rules specifically make it clear

9   that you cannot seek to lift the stay by putting something on a

10   notice of presentment.  And in fact, there was an objection

11   that was filed.  And so I assume that the parties will reach

12   out and get a hearing date for my courtroom deputy.  And what I

13   would say is that there then should be a notice of that hearing

14   date and also an appropriate date in that notice for any other

15   party who might want to file an opposition, just so we have it

16   all teed up properly.

17       MR. SAMUELS:  That's fine, Your Honor.  The only thing

18   I want to make clear is the notice of presentment did say a

19   status (audio interference) first.  I think that's unnecessary.

20   I think we should do as Your Honor suggested, which is get a

21   hearing date for a motion, get an objection deadline with a

22   briefing schedule, whatever, not dilly dally, delay, and get

23   this thing resolved.

24       THE COURT:  All right.  Well, again, it's now got to

25   be set for a hearing.  What my view is on status conference is

1   anybody who spent any time in this court, I'm always happy to

2   have status conferences if they can be helpful for a case.  At

3   the same time, it's not a substitute for people talking to each

4   other.  So I always require that people talk to each other

5   first.  And if everybody agrees a status conference will be

6   helpful, then you call chambers and say everybody agrees the

7   status conference would be helpful and who's a party to this

8   issue in dispute, and then we'll get you on the calendar

9   quickly, if that shoe fits, I guess.

10         MS. SCHWARTZ:  Judge, I'll just note for you that

11   there is the initial case conference scheduled for January 31st

12   in this case.

13         THE COURT:  Right.  That is correct.  And so as we do

14   at status conferences, we'll talk about the status of the case

15   and anything else that should be addressed in the interest of

16   moving the case forward and efficiency.  And as folks who may

17   or may not have appeared in front of me before, I like status

18   conferences because they give a chance for people to raise

19   issues and in a way that sometimes we can work through without

20   the need for filing motions or having contested matters.

21   Sometimes, it works.  Sometimes, it doesn't.  But it's always

22   worth the effort.

23         All right.  Counsel, anything else that you wanted to

24   raise?

25         MS. STRICKLAND:  Your Honor, in light --

70

1           THE COURT:  Well, let me just make sure I'm --

2           MS. STRICKLAND:  Sorry.

3           THE COURT:  That's all right.  Let me just make sure

4    everybody else on Zoom that I've heard from.

5           And I apologize, I don't have your name handy.  It's

6    just showing up as "Joel's iPhone", but I want to make sure

7    counsel who's on Joel's iPhone was finished with his comments.

8           MR. SAMUELS:  Yes.  Joel Samuels.  I apologize for

9    that.

10          THE COURT:  No, no.  That's all right.  I apologize

11   for not having your name handy.  No worries.  Zoom hearings are

12   not an exact science, so it's perfectly fine.  But I wanted to

13   make sure I didn't cut you off.  Anything else that you wanted

14   to mention, Counsel?

15          MR. SAMUELS:  No.  We will reach out to the moving

16   party on that, and we'll see if we can put together a process

17   that make senses.

18          THE COURT:  All right.  And thank you for bringing

19   up -- it was on the list of things to address in good order, so

20   I appreciate you mentioning that.

21          Anybody else who's on Zoom who wishes to be heard who

22   has not yet chimed in on today's matters?

23          All right.  Hearing nothing, Ms. Strickland, I think

24   you wanted to chime in.

25          MS. STRICKLAND:  Yes, Your Honor.  Your remarks about

1    people saying things in a status conference to avoid pleadings

2    triggered one other thought, which is that these cases were

3    filed on December 21st.  And on January 5th, Mr. Giuliani went

4    on Twitter TV and repeated statements that have already been

5    deemed actionable about Ms. Freeman and Ms. Moss on Twitter TV.

6    If that continues, we will be before you lickety-split with a

7    request for an injunction.  So just wanted to flag that the

8    behavior --

9          THE COURT:  No, that's a fair --

10         MS. STRICKLAND:  -- continues.

11         THE COURT:  That's a fair point.  And there was a -- I

12    made a comment earlier that may have been too nuanced to sort

13    of understand my motivation.  I mentioned that there's always a

14    concern about lifting the stay to spend time and effort and

15    money on litigating issues that have already been litigated.

16    That's a very clinical way, I guess, of saying that I don't

17    expect that any motions filed in the district court will --

18    obviously, the district court is more than capable of policing

19    this, but as a bankruptcy court, all the constituents here have

20    an interest in making sure that we don't confront that problem

21    for purposes of this case.

22         And so I certainly would ask debtor's bankruptcy

23    counsel to make that clear to folks, that while the district

24    court, again, is more than capable of policing its docket and

25    the actions of parties in cases, the bankruptcy court and all

72

1    the interested parties here also have a vested interest.  So

2    that concern raised by Ms. Strickland is a real one.  And I

3    think everybody in any court that's involved here will take it

4    very, very seriously.  So I want to make sure that message is

5    received.

6            MR. FISCHOFF:  So noted, Your Honor.

7            THE COURT:  All right.  Thank you.

8            So as to the current motion, let me give some comments

9    just to sort of sum up.  So the debtor sought to lift the

10   automatic stay at ECF number 25 because it wants to file a

11   motion for a new trial or to modify the judgment in the Freeman

12   litigation in district court and if necessary, file a notice or

13   notices of appeal in that same case that's pending in the U.S.

14   District Court for the District of Columbia.

15           The debtor contends that he satisfied the requirements

16   for lifting the stay under Section 362(d) of the Bankruptcy

17   Code and applicable case law, and that is stay for cause, and

18   it is memorialized -- the standard for that is memorialized in

19   the twelve-factor test set forth by the Second Circuit in the

20   Sonnax Industries case, 907 F.2d 1280, 1285 (2d Cir. 1990).

21           The motion is opposed by the plaintiffs in that case,

22   that is Freeman the plaintiffs.  See ECF number 50, who filed

23   an extensive opposition.  It's also opposed by the official

24   committee of unsecured creditors at ECF number 56.

25

73

1        We've heard extensively from the debtors, from the

2   Freeman plaintiffs, and from the committee here today on the

3   motion.  So a couple of observations and just to recap what the

4   court's direction will be, first, the debtor's motion is very

5   pro forma.  It's really only five pages, with the signature

6   line on page 6.

7        Beyond listing the twelve Sonnax factors, it actually

8   contains less than one page of actual analysis, and it really

9   doesn't apply the Sonnax factors to the actual facts here.  And

10   that alone provides a basis for denial of the motion.  See

11   Barcelona Capital, LLC v. NENO Cab Corporation, 648 B.R. 578,

12   591 through 92, an Eastern District case from 2023.

13        And it's striking how minimal an effort was made on

14   the motion, given the request was made on an emergency basis,

15   with the debtor seeking to shorten the time normally required

16   for a hearing on such request.  And this minimal effort was

17   also surprising, given the underlying background here, as

18   debtor would have to know this effort, this request to lift the

19   automatic stay to continue the Freeman litigation, would be met

20   with great scrutiny by the Freeman plaintiffs and other

21   creditors.

22        And in fact, as has come to pass, folks in fact did

23   file vigorous opposition.  The two oppositions lay out the

24   concerns of the Freeman plaintiffs and the committee of

25   unsecured creditors in extensive detail and among the concerns

**RUDOLPH W. GIULIANI**

74

1   identified that we've touched on here today include whether

2   debtor is attempting to use inappropriately the automatic stay

3   as both a sword and a shield, which is something that the case

4   law makes clear is of concern.  See In re: Residential Capital,

5   LLC, 2012 WL 3249641, a bankruptcy case from August 7th, 2012.

6          Another issue that's been identified is the spending

7   of more money on the Freeman litigation.  Given the debtor's

8   prior conduct in the case, the objectors are skeptical about

9   the debtor's intentions in the Freeman litigation, given the

10   debtor's lack of participation in the case has previously led

11   to the entry of judgment.  And I'm not going to try to

12   characterize that.  It's all memorialized in the district

13   court's orders and decisions and statements on the record.

14          So in light of all that, the objectors wonder whether

15   the only purpose now is to further delay.  So the Court notes

16   that there is case law making clear that lifting the automatic

17   stay is inappropriate to relitigate matters already

18   adjudicated.  See In re: Ditech Holdings Corporation, 2012

19   Bankr. LEXIS 3220 (S.D.N.Y. Nov. 14, 2022).  That, of course,

20   is not the same, as you do have rights to seek a new trial.

21   You have rights on appeal.  But I mentioned this comment,

22   particularly in light of the concerns raised by Ms. Strickland

23   now, about statements that have been made and may continue to

24   be made and the concerns that would raise.

25          A third concern identified by the objecting parties is

75

1  the notion of spending limited estate funds on the district

2  court case involving Ms. Freeman, where in the objectors view

3  that the judgment debt in the Freeman case is nondischargeable

4  under the Bankruptcy Code.  And that's always an issue or often

5  can be an issue in bankruptcy cases where there's a judgment,

6  but it's particularly acute here, given the record that is the

7  debtor's agreement in a stipulation the Freeman case that the

8  debtor's conduct was intentional, malicious, wanton, and

9  willful.  And so see Pagones v. Mason, 1999 Bankr. LEXIS 90,

10  which notes that an intentional tort of defamation may

11  constitute willful and malicious injury under Section 523(a)(6)

12  of the Bankruptcy Code if the debtor knew the published

13  statements were false.

14       And obviously, this all raises the related issue about

15  the debtor's application to retain special counsel.  That

16  application, as I understand it, represents that all legal fees

17  will be paid by outside sources, but it does not disavow a

18  right to be paid from estate funds.  That issue will bear

19  further watching.

20       A fourth issue that was raised by the objectors is the

21  debtor seeking to use the stay as a substitute for an appeal

22  bond, with the concern once again driven by the debtor's

23  conduct in the Freeman litigation and the argument that that

24  changes the normal calculus.  The case law is split, actually,

25  on the issue sort of in a more generic question of whether the

76

1    stay in a bankruptcy is appropriate, where to avoid the need to

2    post a bond in the underlying litigation.  And that split is

3    set forth in cases like In re: Holm, H-O-L-M, 75 B.R. 86

4    (Bankr. N.D. Cal. 1987).

5           Finally, the fifth sort of general argument that I see

6    in the objections is the committee arguing that lifting the

7    stay could create disparate treatment of one creditor over

8    another.

9           So in looking at the request to the applicable Sonnax

10   factors, it is clear there are considerable problems.  I'm not

11   going to restate these concerns using the Sonnax factors.

12   Those are all laid out in the objectors' papers.  That is, the

13   Freeman plaintiffs and the UCC.  But in the end, dealing with

14   all these concerns today is impossible, and that's only

15   heightened by the fact that the opposition came in about

16   twenty-four hours ago.

17          So where we are is as follows.  The judgment

18   plaintiffs in both their papers and as refined here today have

19   made it clear that they don't -- that is, the Freeman

20   plaintiffs, excuse me, do not oppose the lifting of the stay

21   for the debtor to file a post-trial motion dealing with damages

22   and to file a notice of appeal if the court acts on that, but

23   to take no further step on appeal.

24          And this is all relevant because this does give me a

25   basis to grant some relief because it's agreed to -- the same

1   approach has been agreed to by the committee, and no other

2   party has been heard to oppose it.  This is all contingent upon

3   verifying that no estate funds will be used in connection with

4   the Freeman litigation and these additional steps.

5          It also will be the subject of some noodling of

6   language to make it clear that the district court has the

7   discretion to treat that any motions filed in a way that the

8   district court deems is appropriate and that as a bankruptcy

9   nothing about what the district court wants to do really

10  implicate the bankruptcy concerns.  And parties are free to

11  make their arguments in district court about what they think is

12  the appropriate way to handle it.  But I, as a bankruptcy

13  judge, am not ordering anything one way or the other to explain

14  how I think the district court should handle that motion.

15         And so given that agreement, I agree that it is

16  appropriate to lift the stay along those lines.  Parties will

17  work on a proposed order that does so.  And in the meantime,

18  the parties will work on then submitting that to the Court.  If

19  there are issues, we can have a conference to talk about it and

20  try to work our way through it.  But in the meantime, before

21  there are submitted, there will be hopefully some progress made

22  on the retention issues, as well as the source of the funds and

23  the Lar Dan affidavit and all that goes with it.

24         And today is the first step in what may be further

25  discussions about what should happen in the Freeman litigation.

78

 1   Everybody reserves their rights.  I certainly, after today's

 2   conversation, have a pretty good idea of where people stand.

 3   But we'll take this one step at a time.  I know that makes it

 4   complicated, and it does necessitate that people come back to

 5   this Court, which I know is not necessarily the most efficient

 6   way to do it or the least expensive way to do it, but it seems

 7   to be the most just way to do it.

 8          And so I -- and speaking about status conferences, I'm

 9   happy to use those as a way to chat with folks about where the

10   Freeman litigation stands and to discuss future steps so we can

11   avoid unnecessary litigation and contested issues here in this

12   court.  The only thing I would say is I don't want to have

13   those conversations without all the parties who are here today

14   present because that would set us backwards, as opposed to

15   forward.

16          So if one of the parties wants to raise that issue

17   here in a status conference and say, Judge, in light of the

18   Freeman litigation, here's what we think should happen, and

19   this is a new development or a new thinking on our part, you

20   need to socialize that with all the interested parties, and

21   then we can have a conversation.  But surprise is a bad thing

22   in litigation pretty much always, cross-examination being the

23   notable exception.  But for things like this, surprise is a bad

24   idea, and I want to avoid surprise.  So please talk to each

25   other first.

1           But again, I'm happy to make myself available as

2     needed to chat with the parties and try to find the most

3     efficient way forward in these cases, whatever that looks like.

4     I do appreciate that parties have laid out -- I think every

5     party who's here today, in court, the debtor, the committee,

6     the Freeman plaintiffs, the U.S. Trustee's office, every party

7     that's been actively involved today has sort of laid out a road

8     map or another about what should happen in the case going

9     forward.  And I fully anticipate seeing pleadings and further

10    things in the future that reflect their views.

11          If anyone needs to chat about any of that, again, I'm

12    happy to make myself available.  But with that, that's my

13    ruling that I think sort of memorializes our ongoing discussion

14    here today.  I do appreciate counsel's willingness to have that

15    kind of a dialog to reach a just result and navigate the many

16    shoals that are involved in this particular dispute.

17          So with that, let me circle the virtual room.  See if

18    anything else needs to be addressed here today.

19          Anything else from the debtor?

20          MR. FISCHOFF:  No, Your Honor.  We appreciate Your

21    Honor's help in working this out today.  Thank you very much.

22          THE COURT:  All right.  Thank you.

23          Anything else from the Freeman plaintiffs?

24          MS. STRICKLAND:  No, Your Honor.  We will work on the

25    language.  We assume that no order will be entered until the

80

1    retention issue is nailed down and memorialized by court order.

2              THE COURT:  Correct.

3              MS. STRICKLAND:  Thank you, Your Honor.

4              THE COURT:  Correct.  And so as you know, proposed

5    orders are emailed to chambers.  And in this instance, if

6    everyone agrees upon the order, the proposed order would be

7    emailed to make sure to copy everybody else of interest, so

8    everybody knows it's being conveyed, with a notation that this

9    order is agreed to, and also with some representation about the

10   status of the funds issues so that I know it's appropriate to

11   enter the order, meaning that people have gotten to a point

12   where they understand estate funds won't be used and that's

13   been confirmed, that everybody's on the same page with that.

14   If it's helpful to get together to chat about that, we can do

15   that.  But again, I don't want to prematurely enter an order

16   until the issues we've talked about today are run to ground.

17             MS. STRICKLAND:  Your Honor, I was thinking that the

18   order on this motion would be after the order on the retention,

19   once the disclosure's been formally made, rather than relying

20   on representation.

21             THE COURT:  I think that's fine.  I'm open to

22   suggestion.  That would seem to guarantee that there won't be

23   any sort of miscommunication anywhere.  So I'm happy to do it

24   that way.  I'll just put in the caveat that if everybody agrees

25   that the issues are somehow already resolved but you're going

1 | to give me both orders at the same -- whatever it is, if you

2 | all are on the same page that it's appropriate to move forward

3 | with the order, it's agreed upon, I'm happy to do that.  Again,

4 | just make sure to communicate that to me in a way that is

5 | unambiguous and includes all folks who are parties-in-interest.

6 |         MR. FISCHOFF:  Agreed.

7 |         THE COURT:  All right.

8 |         MS. SCHWARTZ:  Your Honor, just for clarification --

9 |         THE COURT:  Anything else from the committee?

10 |         MS. QURESHI:  Nothing more from the committee, Your

11 | Honor.  Thank you.

12 |         THE COURT:  All right.  Anything else from the UST?

13 |         MS. SCHWARTZ:  Thank you, Your Honor.  Just for

14 | clarification, I think that we're talking only about the one

15 | retention.  That is for the law firm that's proposed to handle

16 | the Freeman litigation.  As I mentioned earlier, there are

17 | numerous retention applications that have been contemplated or

18 | filed.

19 |         THE COURT:  Thank you for that clarification.  I think

20 | that's right.  As to other retentions, everybody reserves all

21 | rights that they have under applicable law.  Again, I think

22 | it's important for debtor's counsel to socialize that so that

23 | people are in the know because those conversations will be more

24 | efficient than having court hearings and things that people are

25 | surprised, obviously, to the extent we're talking about

1    litigation elsewhere, to implicate some of the concerns we've

2    been talking about today.  And so I trust parties will have

3    communications, the U.S. Trustee's office, the committee, the

4    Freeman plaintiffs, to keep on top of what's going on and then

5    figure out where to go from there.  But thank you for the

6    clarification, Ms. Schwartz.

7              All right.  With that --

8              MS. SCHWARTZ:  Thank you, Your Honor.

9              THE COURT:  -- thank you very much.  I appreciate

10   everybody's thoughts here today and look forward to seeing you

11   at the end of the month at the first status conference, which

12   isn't quite the first status conference.  But thank you very

13   much.

14             IN UNISON:  Thank you, Your Honor.

15         (Whereupon these proceedings were concluded at 1:02 PM)

16

17

18

19

20

21

22

23

24

25

83

I N D E X

RULINGS:                                                    PAGE   LINE

Motion to lift stay is approved,              77      15

subject to modifications, as noted on

the record

84

1

2                C E R T I F I C A T I O N

3

4  I, River Wolfe, certify that the foregoing transcript is a true

5  and accurate record of the proceedings.

6

7

8

9  _____

10 River Wolfe (CDLT-265)

11 TTA-Certified Digital Legal Transcriber

12

13 eScribers

14 7227 North 16th Street, Suite #207

15 Phoenix, AZ 85020

16

17 Date:  January 21, 2024

18

19

20

21

22

23

24

25

23-12055-shl    Doc 136    Filed 02/14/24    Entered 03/06/24 11:37:05    Main Document
In the Matter of: RUDOLPH W. GIULIANI                Pg 85 of 101

January 19, 2024

# A

**AARON (2)**
4:11;11:2
**ABI (1)**
9:15
**ABID (3)**
6:11;11:3;50:22
**ability (2)**
52:16;55:23
**able (2)**
35:10;63:4
**absentee (1)**
29:24
**accelerated (1)**
14:20
**acceptable (1)**
28:10
**accomplish (1)**
61:2
**accurate (2)**
64:17,21
**accused (1)**
30:18
**action (2)**
34:5;47:11
**actionable (1)**
71:5
**actions (2)**
63:17;71:25
**actively (1)**
79:7
**activities (1)**
19:16
**acts (1)**
76:22
**actual (4)**
21:4;32:24;73:8,9
**actually (15)**
16:20;17:9;24:19;
33:9,12;36:11;38:22;
39:19;56:1;61:7,10;
64:12;65:18;73:7;
75:24
**acute (1)**
75:6
**acutely (1)**
64:8
**additional (4)**
14:24;58:18;66:12;
77:4
**address (14)**
13:9;16:5,13;17:25;
21:2,22;24:8;25:21;
26:8;28:20;39:2;46:9;
68:7;70:19
**addressed (4)**
25:2;63:3;69:15;
79:18
**addressing (1)**
21:4
**adjective (1)**

19:12
**adjourned (1)**
13:18
**adjudicated (2)**
17:2;74:18
**administrative (2)**
41:5;67:14
**advantage (1)**
39:7
**adversary (3)**
24:7,7;40:7
**advertising (1)**
31:18
**advise (2)**
14:6;66:19
**advised (1)**
66:16
**affairs (2)**
66:14,18
**affect (1)**
21:13
**affects (1)**
20:8
**affidavit (2)**
18:16;77:23
**affidavits (1)**
64:5
**afternoon (2)**
14:22;50:21
**again (31)**
21:16;22:10,19;
23:17,20;24:15;31:9;
36:15;37:9,24;40:11,
16,22,22;43:8;44:20;
46:11;47:21;49:7;
55:2,24;58:17;60:24;
68:24;71:24;75:22;
79:1,11;80:15;81:3,
21
**against (7)**
15:22;18:11;25:12;
29:12;40:17;51:8,18
**ago (1)**
76:16
**agree (8)**
39:8;44:10;48:22;
53:8;56:19;61:12;
64:23;77:15
**agreed (8)**
21:13;22:7;42:11;
76:25;77:1;80:9;81:3,
6
**agreement (3)**
57:19;75:7;77:15
**agrees (7)**
47:21;56:11;58:9;
69:5,6;80:6,24
**ahead (1)**
52:15
**Aidala (1)**
63:16
**AKIN (6)**
5:13;6:2;11:4,23;

50:22,25
**allow (1)**
23:1
**allowed (1)**
21:8
**allowing (3)**
52:14;54:14,15
**almost (2)**
31:16;37:2
**alone (5)**
21:3;41:10;49:10;
57:22;73:10
**along (2)**
51:23;77:16
**alter (1)**
55:23
**Although (2)**
18:4;66:25
**always (10)**
10:11;12:6,23;65:4;
69:1,4,21;71:13;75:4;
78:22
**AMELIA (2)**
6:8;11:6
**America (1)**
25:9
**among (1)**
73:25
**amount (9)**
20:11,14;21:3;23:2,
9,10;34:9;36:20,21
**amounts (1)**
33:14
**amplify (1)**
13:3
**analysis (2)**
57:22;73:8
**analyze (1)**
20:8
**analyzing (1)**
35:25
**and/or (2)**
16:6,14
**ANDREA (4)**
9:7;11:11,19;62:24
**Angeles (1)**
8:6
**ANNIE (2)**
9:8;11:10
**answered (1)**
35:7
**anticipate (2)**
12:5;79:9
**anticipated (2)**
20:4,5
**apologize (3)**
70:5,8,10
**appeal (34)**
16:7,15;17:10,14;
21:5,6,7;33:9;34:15;
36:17;39:3;40:2;45:4;
46:19;47:1,4,6,8,13,
15;48:25;49:1,14,18;

58:9,15,24,25;61:22;
72:13;74:21;75:21;
76:22,23
**appearance (3)**
11:17;12:4,7
**appearances (3)**
10:12;11:15;12:1
**appeared (1)**
69:17
**appears (1)**
63:19
**appellate (2)**
35:19;41:4
**applicable (3)**
72:17;76:9;81:21
**application (7)**
50:6,25;53:14;
63:25;64:1;75:15,16
**applications (2)**
64:4;81:17
**apply (5)**
20:1;49:3,3,4;73:9
**appointed (1)**
66:3
**appointment (2)**
65:24;67:4
**appreciate (8)**
32:10;36:7;46:12;
70:20;79:4,14,20;
82:9
**apprenticeship (1)**
31:18
**approach (5)**
32:14;37:21;52:3,
25;77:1
**approaching (1)**
53:4
**appropriate (25)**
16:15;18:15;22:13;
24:10;36:18;42:3,15,
16;43:22;44:8;47:8;
55:1,13,22;57:17;
64:5,11,22;68:14;
76:1;77:8,12,16;
80:10;81:2
**appropriately (3)**
24:6;46:6;49:12
**approving (1)**
33:25
**approximately (2)**
15:22;47:5
**April (1)**
25:8
**Arena (1)**
29:22
**argue (2)**
33:9;42:15
**argued (1)**
37:11
**arguing (2)**
25:18;76:6
**argument (8)**
23:8,21;36:19;

38:16;52:2;59:7;
75:23;76:5
**arguments (6)**
22:11;35:13;44:2,4,
6;77:11
**argument's (1)**
23:20
**arise (1)**
45:2
**arises (1)**
21:6
**ARONOFF (1)**
6:14
**around (2)**
30:17;61:6
**ArShaye (3)**
4:3,15;5:3
**articulate (1)**
59:17
**articulated (2)**
42:25;59:20
**articulating (1)**
61:15
**ascertain (1)**
67:21
**aside (2)**
18:18;67:3
**assembled (1)**
14:25
**assets (6)**
18:2;29:7;36:9;
54:2,7;66:14
**Associate (1)**
29:18
**associated (1)**
38:11
**assume (6)**
38:16;43:12;61:21;
64:20;68:11;79:25
**assured (2)**
60:7,7
**Atlanta (1)**
4:19
**attached (1)**
28:5
**attempt (1)**
35:5
**attempting (2)**
53:9;74:2
**attempts (1)**
39:6
**attention (1)**
64:7
**ATTORNEY (4)**
8:11;10:19;29:18,
18
**Attorneys (12)**
4:3,15;5:3,14;6:3,
15;7:3,16;8:3,12;9:3;
14:23
**audio (1)**
68:19
**August (2)**

23-12055-shl    Doc 136    Filed 02/14/24    Entered 03/06/24 11:37:05    Main Document
In the Matter of: RUDOLPH W. GIULIANI        Pg 86 of 101

January 19, 2024

33:25;74:5

**authority (3)**
25:17;53:2;55:5
**authorize (1)**
47:7
**authorizing (1)**
14:17
**automatic (9)**
10:10;37:19;44:12;
54:17;56:8;72:10;
73:19;74:2,16
**available (3)**
47:18;79:1,12
**availed (1)**
21:19
**Avenue (1)**
7:4
**avoid (5)**
25:7;71:1;76:1;
78:11,24
**award (3)**
35:3,6;48:14
**awards (1)**
34:23
**aware (7)**
25:4,4,13;28:13;
36:8;65:4;66:8

# B

**back (20)**
12:22,23;34:16;
36:5;40:20;45:10;
46:11,12,17,25;47:9;
48:14,20;56:16;
60:18;61:6,25;65:3;
68:2;78:4
**backdrop (1)**
17:4
**background (5)**
28:24;29:10;32:11;
51:5;73:17
**backwards (1)**
78:14
**bad (2)**
78:21,23
**bad-faith (3)**
25:19,24;42:25
**balance (1)**
39:1
**ball (1)**
15:8
**ballots (5)**
29:24;30:15,15,16,
18
**Bankr (2)**
74:19;75:9;76:4
**Bankruptcy (55)**
10:7;15:19;22:2,6;
23:18,23;24:22;25:7,
23;26:22;31:4;32:12;
35:14,17;37:3;39:15,
20;40:4;43:6;44:5,6;

45:1,17;46:2,5,5;
48:20;49:4,5,5,15,16;
52:23;53:9,25;55:2,9,
10,11,14;59:9;63:21;
67:20;71:19,22,25;
72:16;74:5;75:4,5,12;
76:1;77:8,10,12
**Barcelona (1)**
73:11
**barely (1)**
31:14
**based (5)**
17:11;18:19;35:1;
63:19;64:14
**basics (1)**
19:5
**basis (10)**
14:18;22:23;40:13;
51:2;57:23,24;58:3;
73:10,14;76:25
**bear (1)**
75:18
**bearing (1)**
30:21
**bears (2)**
34:12;51:6
**beat (1)**
60:1
**BECKY (1)**
9:25
**become (1)**
46:5
**becomes (1)**
56:14
**bed (2)**
29:20;65:20
**began (1)**
30:4
**beginning (1)**
64:9
**behalf (6)**
10:16,23;11:10,21;
12:14,18
**behavior (1)**
71:8
**behind (5)**
15:8;28:2,10;35:17;
56:16
**believes (3)**
18:24;20:10;59:9
**bench (1)**
46:12
**benefit (2)**
39:25;56:10
**BENESCH (2)**
6:14;12:18
**Berger (6)**
10:15,18,18,19;
59:25;62:16
**best (4)**
13:9;27:2;35:25;
53:23
**better (3)**

16:17;37:16;40:10
**Beyond (1)**
73:7
**BIBLO (1)**
5:20
**billion (1)**
51:9
**binder (2)**
32:19;34:12
**binding (1)**
24:9
**bit (6)**
14:6;15:7;26:16;
31:11;39:12;66:15
**blanche (2)**
17:16;40:17
**bleeds (1)**
26:10
**BLOCK (1)**
5:20
**blood (1)**
59:18
**Bloomberg (5)**
9:13,18,19,20,24
**blown (1)**
49:18
**Blvd (1)**
8:4
**board (1)**
65:1
**body (1)**
16:9
**bond (8)**
25:8,11;39:14;43:4,
7;48:19;75:22;76:2
**bono (1)**
51:2
**both (6)**
15:3;25:5;63:11;
74:3;76:18;81:1
**bottom (2)**
34:22;63:8
**Bowling (1)**
9:4
**BR (2)**
73:11;76:3
**break (1)**
61:6
**bridge (1)**
47:16
**brief (1)**
19:22
**briefing (2)**
50:16;68:22
**briefly (1)**
31:7
**bringing (1)**
70:18
**brings (1)**
58:12
**broader (1)**
37:21
**BROGAN (3)**

6:20;12:17,17
**BROWN (1)**
9:12
**Bryant (1)**
6:5
**BUCHAITER (1)**
8:2
**Buchalter (2)**
12:14;68:2
**building (1)**
25:10
**bump (1)**
46:16
**bunch (1)**
42:21
**BURBAGE (2)**
10:25;11:1
**burden (2)**
38:23;50:9
**burn (2)**
47:16;65:5
**business (3)**
42:24;45:9;55:7
**busy (1)**
30:1

# C

**CA (1)**
8:6
**Cab (1)**
73:11
**Cal (1)**
76:4
**calculation (2)**
21:2;35:1
**calculus (1)**
75:24
**calendar (2)**
68:4;69:8
**call (3)**
37:4;63:15;69:6
**called (1)**
20:14
**Camara (1)**
63:12
**came (1)**
76:15
**campaign (1)**
30:22
**can (69)**
12:5;13:7,9,9,16;
14:6,9;15:5,10;16:24;
18:8,16,17;22:24;
24:8,16;26:7,16;27:8,
15,25;28:23;29:7;
32:5;37:2;38:1,23;
40:3,16;41:2;42:1,9,
14,19;43:17,18;44:3;
45:3,13,24;47:8,21,
23;48:5,14,18,25;
49:1,25;50:12;55:19;
56:2;57:19;58:5,21;

59:16;60:2;61:7,24;
62:22;66:19;69:2,19;
70:16;75:5;77:19;
78:10,21;80:14
**capable (2)**
71:18,24
**Capital (2)**
73:11;74:4
**carefully (1)**
35:8
**carte (2)**
17:16;40:17
**case (64)**
10:8;14:8,11,13;
15:11;16:17;17:1,4;
21:1,22,25;23:25;
25:15,25;28:13,14;
29:3,9;32:21;35:14,
24;36:16,22;37:19,
25;39:5,6,10,11,12,
24;42:20;43:1;46:16;
54:5,8;55:7;56:7;
57:21;58:2,11;63:24;
64:9;69:2,11,12,14,
16;71:21;72:13,17,20,
21;73:12;74:3,5,8,10,
16;75:2,3,7,24;79:8
**cases (19)**
11:25;25:16,21;
28:21;39:10,17;
40:23;41:5;42:22;
43:6,8,10;49:14;
57:12;71:2,25;75:5;
76:3;79:3
**categories (1)**
22:3
**cause (8)**
15:24;22:17;33:13;
38:24;49:24;57:17;
65:7;72:17
**caused (2)**
23:15;32:2
**causes (1)**
34:5
**caveat (1)**
80:24
**centerpiece (1)**
28:13
**certain (7)**
16:22;19:16;22:2;
28:4;52:14;56:14;
64:16
**certainly (18)**
13:9;17:1,4,10;
19:5;20:4;32:14;
38:25;40:14;44:1;
45:13;49:13,14;
54:23;55:8,11;71:22;
78:1
**challenge (4)**
17:12;21:15;24:18;
45:6
**challenges (1)**

23-12055-shl    Doc 136    Filed 02/14/24    Entered 03/06/24 11:37:05    Main Document
In the Matter of: RUDOLPH W. GIULIANI            Pg 87 of 101

January 19, 2024

35:6
**challenging (1)**
26:16
**chambers (3)**
68:8;69:6;80:5
**chance (3)**
26:13;57:25;69:18
**changed (1)**
30:3
**changes (1)**
75:24
**Chapter (7)**
10:8;15:18;21:10;
25:9;28:14;39:6;
54:11
**characterize (1)**
74:12
**charge (1)**
29:19
**charitable (1)**
53:21
**Charles (1)**
48:6
**chat (4)**
78:9;79:2,11;80:14
**chime (2)**
57:5;70:24
**chimed (1)**
70:22
**choice (1)**
48:19
**choices (1)**
49:2
**chooses (1)**
55:23
**chose (1)**
20:23
**CHURCH (1)**
9:13
**Cir (1)**
72:20
**circle (2)**
10:13;79:17
**circuit (4)**
47:14;49:7,13;
72:19
**circulate (1)**
64:11
**circulated (2)**
65:10,11
**circumstance (1)**
11:25
**circumstances (2)**
25:25;43:9
**cite (1)**
23:11
**cited (1)**
30:6
**CITRON (4)**
7:2,3,7;12:10
**civil (3)**
29:19;44:18;49:3
**claim (1)**

29:12
**claiming (1)**
30:4
**claims (8)**
28:16,24;29:4,10;
32:1;40:24;51:11,21
**clarification (5)**
57:8;81:8,14,19;
82:6
**clarify (1)**
62:2
**clarity (3)**
47:18;53:13;65:13
**clear (17)**
16:23;38:21;46:3,9;
49:24;53:14;55:25;
61:20;65:25;68:8,18;
71:23;74:4,16;76:10,
19;77:6
**clearer (1)**
47:25
**clearly (2)**
26:2;53:16
**clerk (1)**
48:2
**client (4)**
37:23;38:1,15;
47:23
**clients (10)**
27:25;28:12;29:11;
31:3,9,23;32:2;36:6;
39:4;40:5
**client's (2)**
28:24;29:4
**clinical (1)**
71:16
**CNN (1)**
9:12
**cocaine (1)**
30:17
**cocounsel (1)**
36:2
**Code (8)**
22:2,6;31:17;37:3,
6;72:17;75:4,12
**colleague (1)**
11:11
**colleagues (1)**
26:4
**colloquy (1)**
46:12
**colorful (1)**
19:12
**Columbia (6)**
14:16;32:17;48:3,4,
12;72:14
**comfort (2)**
42:14;64:6
**comfortable (6)**
16:25;40:19;45:11,
21;49:19,23
**coming (5)**
37:24;43:14;48:7,

20;61:1
**commenced (2)**
24:8;51:8
**comment (2)**
71:12;74:21
**comments (5)**
56:12,18;63:11;
70:7;72:8
**committed (1)**
37:17
**Committee (29)**
5:14;6:3;11:5,21;
25:6;41:11;50:3,16,
18,24;51:1,6,18,25;
53:8;57:10;65:25,25;
66:3,5;72:24;73:2,24;
76:6;77:1;79:5;81:9,
10;82:3
**committee's (3)**
52:3,11;53:25
**communicate (1)**
81:4
**communication (1)**
67:3
**communications (2)**
64:3;82:3
**company (1)**
25:9
**compartments (1)**
60:22
**compensate (1)**
18:7
**compensated (2)**
28:23;52:12
**compensation (1)**
34:25
**compensatory (3)**
34:10;35:4,5
**competing (1)**
35:25
**complaint (1)**
24:11
**complete (2)**
15:16;19:4
**completed (1)**
67:9
**compliance (1)**
19:14
**complicated (10)**
40:12;43:9;54:23;
57:10,10,15;58:2,2,8;
78:4
**complicating (1)**
54:22
**components (1)**
63:8
**computer (1)**
31:17
**concede (1)**
24:24
**conceded (2)**
22:10;32:1
**concept (3)**

49:16;61:13,14
**concern (20)**
17:5;18:4;19:9;
20:20;22:24;35:21;
36:13,20,21;39:8,9;
41:10,11,12;58:12;
71:14;72:2;74:4,25;
75:22
**concerned (2)**
17:7;28:3
**concerns (16)**
19:7,8;20:6;22:12;
39:22;40:14;46:15;
49:20;73:24,25;
74:22,24;76:11,14;
77:10;82:1
**concluded (2)**
26:5;82:15
**conclusion (2)**
16:14;44:11
**conduct (7)**
21:25;23:14,16;
31:25;74:8;75:8,23
**conducted (1)**
30:10
**conference (11)**
14:5;61:10;68:25;
69:5,7,11;71:1;77:19;
78:17;82:11,12
**conferences (4)**
69:2,14,18;78:8
**confess (1)**
13:21
**confirm (1)**
66:22
**confirmed (2)**
30:11;80:13
**confront (1)**
71:20
**confused (1)**
41:16
**connection (6)**
25:1;51:10,20;52:9;
63:16;77:3
**consensually (1)**
48:23
**consequence (2)**
42:6;45:18
**consequences (1)**
52:14
**conservative (1)**
34:24
**consider (1)**
29:4
**considerable (1)**
76:10
**consideration (2)**
28:21;67:12
**considered (2)**
34:20;35:9
**consist (2)**
54:3,15
**consisting (1)**

31:17
**constituents (1)**
71:19
**constitute (1)**
75:11
**constitutionally (1)**
33:10
**contain (1)**
32:20
**contains (1)**
73:8
**contemplated (1)**
81:17
**contends (1)**
72:15
**content (1)**
19:23
**contest (1)**
33:4
**contested (2)**
69:20;78:11
**context (3)**
22:1;25:18;30:8;
42:25
**contingent (1)**
77:2
**continually (1)**
17:3
**continue (5)**
15:5;17:22;18:1;
73:19;74:23
**continues (2)**
71:6,10
**convened (1)**
28:14
**convenience (1)**
67:13
**conversation (2)**
78:2,21
**conversations (4)**
63:20;65:3;78:13;
81:23
**conveyed (1)**
80:8
**COPLAN (1)**
6:14
**copy (3)**
13:23;32:8;80:7
**CORPORATION (3)**
8:2;73:11;74:18
**correctly (2)**
38:2;47:2
**cost (3)**
35:2,22;49:10
**COSTELLO (2)**
7:8;12:10
**counsel (25)**
11:4;15:2;17:20;
18:20,21;21:1;27:13;
36:2,9;50:23,23;57:1;
64:1,3;65:18;66:4,5,
16,22;69:23;70:7,14;
71:23;75:15;81:22

23-12055-shl    Doc 136    Filed 02/14/24    Entered 03/06/24 11:37:05    Main Document
In the Matter of: RUDOLPH W. GIULIANI    Pg 88 of 101

January 19, 2024

**counsel's (2)**
38:13;79:14
**counted (1)**
30:16
**counting (1)**
30:15
**County (1)**
29:23
**couple (4)**
30:2;33:20;40:21;
73:3
**coupled (1)**
36:21
**course (6)**
31:18;45:9;47:14;
51:24;52:3;74:19
**COURT (264)**
10:2,4,7,21;11:8,13,
20,24;12:11,15,19,22;
14:5,5,8,16,16;16:10,
19;17:13,13;18:4,14,
17;19:1;20:12,16,18;
21:16,21;23:8;24:5,8,
12,13,25;25:13,15;
26:2,6,9,15,19,24;
27:2,4,8,10,18;29:15,
15;31:2,5,10,23;32:3,
7,15,16,18,21;33:15,
19,21,23;35:9,12,18,
19,19;36:12,15,18,25;
37:1,9;38:11,16,19;
39:8,23;40:12;41:3,7,
20,22,24;42:1,1,3,9;
43:8,19,20,21,21,23;
44:2,7,9,15,17,20,24;
45:6,9,13,14,19,25,
25;46:2,4,8,15,18,21;
47:7,9,11,14,19;48:2,
10,12,17;49:7;50:1,3,
8,11,14,15,20;51:3,9,
13,20;52:19,21;53:11,
22;54:19,22,25;55:5,
9,12,14,18,19,22,23;
56:3,5,7,21,22,24;
57:1,4,7,11,12;58:10,
13,16,21,24;59:2,5,5,
6,7,9,13,13,16,20,24;
60:1,4,7,9,11,15,18,
20,24;61:4,16,16,18;
62:1,3,6,9,9,12,15,17,
22;63:4,11,19;64:6,
10,15,19,24,25;65:7,
10,17,20,23;66:8,10,
20,21;67:16,23;68:6,
24;69:1,13;70:1,3,10,
18;71:9,11,17,18,19,
24,25;72:3,7,12,14;
74:15;75:2;76:22;
77:6,8,9,11,14,18;
78:5,12;79:5,22;80:1,
2,4,21;81:7,9,12,19,
24;82:9
**courtroom (7)**

10:13;11:6,14;13:2;
26:12;66:19;68:12
**courts (6)**
25:24;35:17;42:21,
23;43:6;46:2
**Court's (7)**
24:11;25:4,5;41:21;
55:7;73:4;74:13
**COX (1)**
9:14
**crack (1)**
30:17
**create (1)**
76:7
**created (1)**
21:5
**creditor (2)**
16:9;76:7
**Creditors (24)**
5:15;6:4;11:5,22;
16:9,22;18:3;25:5;
28:22;36:25;41:5;
50:24;51:24;52:5,15;
56:10;57:9;65:24;
66:2,3,7;72:24;73:21,
25
**criminal (1)**
30:19
**cross (1)**
56:14
**cross-examination (1)**
78:22
**crystal (1)**
61:19
**current (1)**
72:8
**currently (1)**
15:25
**cut (2)**
27:16;70:13

# D

**Dallas (1)**
5:18
**dally (1)**
68:22
**damage (1)**
37:18
**damages (29)**
19:18;20:11,19;
21:2,4,13,18;33:6,13;
34:10;35:3,4,5;37:18;
38:6,13;41:18;44:22;
45:6;46:23,23;48:13;
51:10;52:10;53:6;
54:9,15;59:10;76:21
**damages-only (1)**
20:16
**Dan (2)**
18:15;77:23
**dangerous (1)**
60:25

**DANIEL (2)**
6:20;12:17
**Danovich (1)**
11:6
**DANOVITCH (1)**
6:8
**date (9)**
66:1,6,7;67:7,11;
68:12,14,14,21
**dates (2)**
67:12,13
**DAVID (1)**
9:24
**DAVIDOFF (3)**
7:2,3;12:9
**day (8)**
14:15;29:21,25;
30:3,6,23;53:18;67:8
**daylight (1)**
65:2
**days (8)**
12:24;30:24;44:18;
47:5,20;48:16;66:12,
13
**DC (9)**
4:6;31:5;40:12;
43:20;47:14;49:7,13;
51:9;64:13
**DE (1)**
6:18
**dead (1)**
60:2
**deadline (8)**
13:15;16:4;53:5,5,
9;54:17;68:5,21
**deadlines (1)**
64:16
**deal (6)**
16:3;41:18;42:4;
50:15;57:16;58:13
**dealing (7)**
19:14;35:16;37:17;
44:21;46:23;76:13,21
**dealt (2)**
16:2;21:10
**death (1)**
31:19
**debt (2)**
35:16;75:3
**debtor (58)**
10:17,20;14:2,4,19,
23;15:2,13,16,17,20;
16:12,16,20,24,24;
17:9,17,19,21;18:19,
20;20:2,7,10,13,19,
21,22;21:8,19;22:7;
23:1;24:9;25:7;26:21,
22;39:18,20;44:14;
45:7,10;46:24;57:1;
66:9,13,16;67:22;
72:9,15;73:15,18;
74:2;75:12,21;76:21;
79:5,19

**debtors (6)**
39:6;43:2;49:3;
50:5;62:14;73:1
**debtor's (28)**
10:9;14:1,4,21;
15:10,12;16:8,9;18:2;
19:10,16,26:3;28:15;
35:16;58:15;64:1,3;
66:22;71:22;73:4;
74:7,9,10;75:7,8,15,
22;81:22
**debts (2)**
22:2,3
**December (6)**
14:14,20;30:3,24;
66:1;71:3
**decide (5)**
16:11;38:16;45:6,
20;49:7
**decided (1)**
54:25
**decides (1)**
42:3
**decision (6)**
36:22;37:10;47:1;
48:8;55:20;59:9
**decisions (3)**
32:21;37:9;74:13
**deemed (1)**
71:5
**deems (2)**
55:13;77:8
**defamation (3)**
35:1;51:10;75:10
**defamatory (1)**
33:2
**defamed (1)**
32:2
**default (3)**
32:4;33:6;48:13
**defeat (1)**
52:22
**defend (1)**
31:25
**Defendant (1)**
23:13
**defendants (2)**
43:3;51:14
**defendant's (1)**
23:16
**defense (3)**
17:25;18:1;60:8
**defer (1)**
26:4
**defined (1)**
46:9
**definitive (1)**
30:7
**delay (3)**
35:22;68:22;74:15
**deliberately (1)**
29:16
**DEMOCRACY (1)**

5:2
**denial (2)**
57:23;73:10
**denied (3)**
21:6;47:3;52:7
**deny (2)**
29:1;57:24
**Department (2)**
8:12;9:2
**depends (1)**
43:9
**deplete (1)**
53:16
**deposition (1)**
34:3
**deputy (1)**
68:12
**describe (1)**
51:2
**designed (1)**
56:9
**desk (1)**
59:25
**despicable (1)**
29:14
**detail (1)**
73:25
**details (1)**
15:7
**determination (1)**
24:5
**determine (2)**
23:4;34:9
**determined (2)**
29:7;34:5
**detracts (1)**
37:6
**developing (1)**
40:9
**development (1)**
78:19
**dialog (1)**
79:15
**dictate (1)**
25:24
**DIETRICH (1)**
9:16
**different (11)**
13:1;19:12;22:3,4;
37:5,7,12;42:22;45:1;
47:5;49:13
**diligently (1)**
67:21
**dilly (1)**
68:22
**diminishing (1)**
41:5
**direction (1)**
73:4
**directly (1)**
32:18
**directs (1)**
45:9

**disavow (1)**
75:17
**dischargeability (4)**
22:1;23:5;53:17,18
**dischargeable (3)**
16:10;23:3,7
**disciplinary (1)**
63:17
**disclaimer (1)**
18:5
**disclose (1)**
18:16
**disclosure (2)**
15:16;63:10
**disclosures (1)**
64:5
**disclosure's (1)**
80:19
**discovered (1)**
26:11
**discovery (3)**
19:14;29:16;31:14
**discretion (1)**
77:7
**discrimination (1)**
51:21
**discuss (1)**
78:10
**discussed (2)**
58:17,19
**discussing (1)**
66:7
**discussion (3)**
16:21;30:12;79:13
**discussions (5)**
18:20,22;40:5;
66:15;77:25
**dismiss (2)**
29:3;43:11
**dismissed (1)**
43:1
**dismissing (2)**
15:17,20
**disparate (1)**
76:7
**dispensed (1)**
44:19
**dispute (2)**
69:8;79:16
**dissipate (1)**
36:9
**distance (1)**
13:6
**distress (3)**
23:16;32:3;33:5
**District (85)**
10:8;14:16,16;
17:12,13;19:13;
21:21;29:15,18;31:5,
22;32:16,16,21;
33:25;35:9;38:15;
39:23;40:12;41:3,20,
21,22,24;42:1,1,3;

43:19,20,21,21,23;
44:2,7,15,17,24;45:6,
9,13,14,19,24;46:8,
18;47:19;48:2,3,4,4,
11,12;51:9;53:22;
54:25;55:7,9,12,19,
22,23;58:10,13;59:4,
6,7,13;61:16,16,18;
64:13;71:17,18,23;
72:12,14,14;73:12;
74:12;75:1;77:6,8,9,
11,14
**Ditech (1)**
74:18
**diversion (1)**
29:9
**dividing (3)**
28:2,10,19
**division (2)**
25:10;29:19
**DIZENGOFF (2)**
6:9;11:6
**docket (8)**
23:12;32:10,21;
34:19;36:10;41:21;
47:15;71:24
**document (1)**
34:20
**documents (5)**
31:17,25;32:16;
34:4;37:11
**DOJ (1)**
29:18
**dollar (2)**
20:11,14
**dollars (1)**
51:10
**Dominion (5)**
7:16;8:3;12:14;
51:8,16
**Dominion's (1)**
51:11
**done (6)**
17:13;19:21;35:24;
48:12;58:5;61:7
**double- (1)**
19:23
**doubt (3)**
12:21;30:23;52:11
**down (6)**
16:11;27:7;36:13;
38:10;42:10;80:1
**draft (2)**
59:22;60:23
**drafted (2)**
49:11;55:12
**drafting (1)**
47:22
**drain (3)**
17:23;18:2,2
**drive (1)**
28:22
**driven (1)**

75:22
**dry (1)**
50:12
**DUBLIN (4)**
6:10;11:7,23,23
**DUBOSE (2)**
4:14,21
**due (2)**
34:25;47:4
**Dunphy (1)**
51:17
**during (1)**
40:23
**duties (1)**
52:5

# E

**earlier (2)**
71:12;81:16
**earn (2)**
15:14;16:1
**Eastern (1)**
73:12
**ECF (3)**
72:10,22,24
**efficiency (3)**
28:22;31:8;69:16
**efficient (4)**
12:2;78:5;79:3;
81:24
**effort (5)**
69:22;71:14;73:13,
16,18
**egregious (1)**
52:12
**eight (1)**
15:8
**either (4)**
16:5,5;18:23;32:20
**Election (8)**
29:21,22,25;30:6,8,
10,14;63:24
**elements (4)**
24:10;32:1;33:5;
34:5
**elephant (1)**
24:23
**elevating (1)**
41:3
**ELLA (1)**
9:17
**else (29)**
11:14;12:3,7,12,16,
20;18:10;34:12;38:9,
20;40:7;41:3;43:24;
46:11;50:2,17;67:17,
25;69:15,23;70:4,13,
21;79:18,19,23;80:7;
81:9,12
**elsewhere (1)**
37:24;82:1
**emailed (2)**

80:5,7
**emails (1)**
31:18
**emergence (1)**
29:8
**emergency (2)**
58:3;73:14
**emotional (3)**
23:16;32:3;33:5
**encourage (1)**
27:16
**end (10)**
15:15;22:15;29:1;
36:4;53:18;58:7;65:2;
67:8;76:13;82:11
**enforce (3)**
39:5;48:15,18
**enforcement (3)**
15:23;30:24;44:25
**engage (2)**
54:9;57:22
**engaged (1)**
23:14
**ENID (1)**
8:17
**enough (1)**
21:16
**ensure (2)**
52:13;55:24
**enter (4)**
14:17;65:12;80:11,
15
**entered (6)**
14:17;19:15;21:14;
34:19;60:12;79:25
**enters (1)**
33:25
**entertain (1)**
41:25
**entertained (1)**
31:5
**entirely (2)**
54:8;55:22
**entry (6)**
14:15,19;22:21;
23:13;34:8;74:11
**equivalent (1)**
35:3
**ESQ (25)**
4:8,9,10,11,21;5:9,
10,20;6:8,9,10,11,20;
7:7,8,9,10,11,12,21;
8:8,16,17;9:7,8
**essentially (5)**
13:18;39:20;43:12;
46:22;55:18
**establish (1)**
40:24
**establishes (1)**
21:3
**estate (15)**
15:13;16:8;17:23;
18:7,11;22:14,15;

36:9;44:22;49:10;
53:16;75:1,18;77:3;
80:12
**EVAN (1)**
9:19
**even (8)**
13:16;18:16;19:4;
28:16;44:18;58:2;
61:5;65:19
**everybody (16)**
13:6;26:12,13;
49:12;56:11;58:9;
62:12;69:5,6;70:4;
72:3;78:1;80:7,8,24;
81:20
**everybody's (2)**
80:13;82:10
**everyone (2)**
47:21;80:6
**evidence (1)**
21:20
**evidentiary (1)**
12:23
**exact (3)**
21:17;23:2;70:12
**exactly (9)**
17:17;19:20;23:24;
27:4;45:15;52:22;
58:19;62:11;64:24
**exceedingly (1)**
19:22
**Excellent (1)**
48:9
**exception (1)**
78:23
**exchange (2)**
41:20;61:8
**exchanging (3)**
41:2,15;64:3
**excuse (2)**
50:23;76:20
**execute (1)**
67:6
**executed (1)**
67:9
**executing (2)**
52:17;56:1
**exempt (1)**
15:13
**exercise (1)**
16:13
**exhibits (2)**
13:22;32:8
**exists (1)**
38:24
**expect (2)**
66:17;71:17
**expected (1)**
20:4
**expedited (1)**
14:18
**expense (1)**
65:8

expenses (2)
35:22;41:6
expensive (2)
36:7;78:6
experienced (1)
30:9
expert (2)
19:4;46:5
expertise (1)
63:20
expert's (1)
35:1
expire (1)
38:4
explain (1)
77:13
explained (2)
26:2;67:5
explanation (1)
13:4
extend (1)
17:14
extension (2)
66:10,12
extensive (3)
27:18;72:23;73:25
extensively (1)
73:1
extent (10)
21:12,19;29:6;
36:15;54:24,25;55:8;
57:8;58:21;81:25
extreme (1)
23:14

**F**

F2d (1)
72:20
face (2)
18:24;20:11
faces (1)
35:6
facially (2)
37:2,7
fact (13)
20:6,22;25:22;28:5;
30:21;34:23;43:5;
44:22;66:4;68:10;
73:22,22;76:15
factors (14)
19:24;39:1;42:22,
24;49:25;50:6,14;
57:21,22;58:9;73:7,9;
76:10,11
facts (7)
25:4,25;33:4;40:10;
43:9;51:3;73:9
factual (2)
33:4;57:15
fair (3)
56:3;71:9,11
fairly (2)

19:11,22
false (3)
33:4;51:10;75:13
familiar (1)
21:16
far (3)
16:4;44:2;58:21
Farm (1)
29:22
FARR (5)
4:2;10:23;11:1,2;
27:12
fashion (1)
61:17
fault (1)
58:17
favor (1)
39:2
February (1)
53:5
Federal (4)
14:15;44:18;49:2,5
Feel (2)
26:24;31:10
fees (8)
17:25;18:6,7,9,11;
53:15;60:7;75:16
FELD (4)
5:13;6:2;11:4;
50:22
few (2)
17:6;26:4
fiduciary (1)
52:4
Field (1)
5:16
fifteen (1)
66:12
fifth (1)
76:5
fight (1)
56:15
figure (6)
43:22;46:5,13;
60:17;61:13;82:5
figured (1)
43:15
file (39)
13:15;16:5,6,15;
17:11,13,14;18:23;
20:13;31:23;35:10;
38:5,7;39:14;40:2,6;
41:16,18;43:24;
44:21;45:8,24;47:6,8,
12;48:19,20,22;49:1;
58:15;61:24;66:10,
13;68:15;72:10,12;
73:23;76:21,22
filed (30)
14:9,13,14,21;15:1;
18:18;19:3;21:24;
25:1,9,16;40:2,4;
41:9;45:16,22;46:7;

47:21;50:25;59:4;
63:9;66:9,11,18;
68:11;71:3,17;72:22;
77:7;81:18
files (1)
31:25
filing (16)
13:17;17:22;18:15;
25:19,19,24;42:5,6;
43:1;45:18;49:9,9;
53:19;54:16;66:1;
69:20
filings (3)
36:10;42:18;67:22
final (2)
22:21;23:13
finalized (1)
67:7
Finally (1)
76:5
Finance (1)
8:12
financial (4)
15:24;39:19;66:14,
18
find (4)
21:9;23:2;43:2;
79:2
finding (3)
16:8;23:11;54:5
findings (3)
22:16,16;39:23
Findlay (1)
43:5
fine (9)
38:8;47:20;55:2;
61:15,20;62:23;
68:17;70:12;80:21
finished (1)
70:7
firm (9)
12:14;36:2;52:2;
63:12,12,16,22;68:2;
81:15
first (19)
14:2;23:5;28:14;
29:4;30:23;32:23;
37:8;46:24;47:2;
52:23;53:11;59:14;
68:19;69:5;73:4;
77:24;78:25;82:11,12
FISCHOFF (46)
10:3,15,16,16,19;
14:3,13;17:19;18:13,
15;20:10,17,25;
22:25;24:4,21;25:2,
14;26:1;32:23;47:3,
12;48:1;57:3,6,9;
58:12,20,23;59:1,12,
15,19,22;60:5,10,13,
17,19;62:14;65:14;
66:19,23;72:6;79:20;
81:6

Fischoff's (1)
36:8
fit (1)
27:17
fits (1)
69:9
five (2)
19:23;73:5
flag (1)
71:7
flouted (1)
29:15
Floyd (1)
31:19
fly (3)
60:23;61:5,11
focus (1)
19:9
focusing (1)
57:18
fold (1)
58:20
folks (7)
10:5,12;69:16;
71:23;73:22;78:9;
81:5
follow (1)
46:10
following (4)
29:2;33:24;34:8;
41:16
follows (1)
76:17
footage (1)
30:5
force (1)
14:18
Forget (2)
48:15;61:14
form (2)
28:5;61:17
forma (3)
19:22;57:23;73:5
formally (1)
80:19
forth (7)
46:13,17;48:14;
64:5;65:3;72:19;76:3
forward (11)
15:6;32:13;43:3;
49:18;58:6;69:16;
78:15;79:3,9;81:2;
82:10
found (1)
53:22
four (2)
35:5;64:2
fourth (1)
75:20
frankly (1)
57:20
fraud (1)
30:6

free (2)
26:24;77:10
Freeman (55)
4:3,15;5:3;10:23;
14:17;15:3,22;16:21;
17:6;19:3,10;21:17;
22:20;23:9;25:6;
26:19;27:13;28:8;
29:21;30:5,6,13,18;
34:10;41:19;51:24;
52:12,17;53:8;56:1,
15;63:13;71:5;72:11,
22;73:2,19,20,24;
74:7,9;75:2,3,7,23;
76:13,19;77:4,25;
78:10,18;79:6,23;
81:16;82:4
FRIEDLANDER (2)
6:14;12:18
frivolous (1)
23:21
front (6)
22:11;25:20;31:6;
43:13;49:18;69:17
fruitful (1)
61:10
frustrated (1)
31:23
full (2)
15:16;26:13
full- (1)
49:17
fully (2)
12:24;79:9
Fulton (1)
29:23
function (1)
58:1
funding (3)
41:9;63:10;64:4
funds (13)
18:1,2,16;37:24;
43:14;60:8;65:13;
75:1,18;77:3,22;
80:10,12
further (12)
43:18;49:11;55:1;
58:24;62:7,9;65:7;
74:15;75:19;76:23;
77:24;79:9
futile (1)
54:8
future (2)
78:10;79:10

**G**

GA (1)
4:19
GAGION (1)
8:16
GALLAGHER (5)
4:2;10:23;11:1,2;

27:12
**Gary (1)**
10:16
**gave (1)**
34:12
**GENERAL (4)**
8:11;29:19;41:4;
76:5
**generic (1)**
75:25
**George (1)**
31:19
**Georgia (5)**
29:23;30:8,10,25;
63:24
**gets (6)**
22:9;26:13;31:13;
40:2;50:25;66:11
**Giuliani (33)**
10:9;23:14;28:16,
23;29:12,17;30:4,9,
12;32:25;35:10;36:3;
38:21;40:22;42:17;
44:16;46:19;51:9,11,
19;52:9;53:4,10,12,
23;54:1,9,14;63:18,
23;64:13;67:4;71:3
**Giuliani's (8)**
29:2,7;30:21;31:1;
34:25;36:2;53:20;
68:2
**given (12)**
13:14;19:5;40:13;
57:24;58:8;66:4;
73:14,17;74:7,9;75:6;
77:15
**gives (1)**
58:14
**glad (1)**
68:6
**Glenn (1)**
39:10
**GLUCKSMAN (1)**
7:9
**GODFREY (1)**
7:15
**goes (8)**
16:4;23:16;31:22;
33:8;34:2;42:6;53:19;
77:23
**gold (2)**
15:15;22:14
**Good (34)**
10:2,3,6,15,18,21,
22,25;11:3,8,9,13,18,
20,23,24;12:11,13,15,
17,19;14:3;26:21;
27:11;31:13;35:12;
50:21;55:6;62:13,16;
64:11;65:22;70:19;
78:2
**GOODMAN (3)**
5:9;10:16,19

**goodness (1)**
12:24
**GORREPATI (1)**
9:15
**GOTTLIEB (1)**
4:8
**government (1)**
64:7
**GOVERNSKI (1)**
4:9
**grant (2)**
38:23;76:25
**granted (1)**
20:9
**granular (1)**
30:12
**grapple (1)**
22:18
**Great (3)**
27:3;49:22;73:20
**Green (1)**
9:4
**grossly (1)**
21:3
**ground (2)**
32:17;80:16
**grounds (1)**
43:11
**guarantee (1)**
80:22
**guardrails (1)**
17:7
**guess (9)**
19:12;24:13;27:21;
35:22;37:13;40:11;
41:15;69:9;71:16
**GUMP (4)**
5:13;6:2;11:4;
50:22
**guy (1)**
29:17

## H

**hailing (1)**
13:6
**half (2)**
45:22;63:7
**hand (5)**
41:12;44:4;53:19,
19;56:16
**handed (1)**
32:19
**handle (11)**
43:22;44:24;46:6;
51:1;55:13;58:11;
59:6;63:13;77:12,14;
81:15
**handy (3)**
27:5;70:5,11
**happen (18)**
20:2,9;21:18;23:25;
37:14;43:18,24;

44:25;45:15;53:7,11;
60:9,11;61:22;64:15;
77:25;78:18;79:8
**happened (2)**
21:18;30:2
**happens (2)**
44:15;61:18
**happy (9)**
47:17;61:5,8;69:1;
78:9;79:1,12;80:23;
81:3
**harassment (1)**
51:21
**hard (2)**
13:23;46:10
**harm (2)**
34:25;52:12
**HAUER (4)**
5:13;6:2;11:4;
50:22
**head (1)**
48:6
**headed (1)**
16:18
**hear (12)**
13:7;14:2;26:9,11,
19;38:25;50:17,25;
57:2;61:14;62:18,22
**heard (13)**
13:17;21:20;26:13;
27:24;31:4,10;50:5;
67:24,25;70:4,21;
73:1;77:2
**hearing (20)**
10:8;12:22,23;13:8,
16,20;24:14;27:24;
28:1,14;31:3;42:2;
46:21;47:20;68:12,
13,21,25;70:23;73:16
**hearings (3)**
26:15;70:11;81:24
**Heath (1)**
10:18
**heightened (2)**
20:6;76:15
**held (1)**
34:9
**help (2)**
29:23;79:21
**helpful (13)**
11:17;14:8,12;19:6,
20;28:11;32:11,15,
18;69:2,6,7;80:14
**helpfully (1)**
28:5
**here's (3)**
28:6;38:14;78:18
**hid (1)**
30:15
**high (1)**
34:18
**highlights (3)**
27:22;31:7,9

**highly (1)**
54:5
**Hill (2)**
9:17,21
**himself (1)**
21:19
**history (4)**
15:6;19:3,12;40:12
**hit (2)**
27:21;31:7
**Holdings (1)**
74:18
**Holm (1)**
76:3
**H-O-L-M (1)**
76:3
**Honor (73)**
10:15,18,22,25;
11:3,9,18;12:13,17;
14:3;26:14;27:11,14,
17;28:12,17;29:1,3,
13;32:5,23;37:8;
38:23;39:5;40:20,23;
42:13;48:21,23;
50:13,19,21,24;51:4,
5,8,15,17,22,25;52:1,
3,6,8,24;53:1,7,17,22;
54:4,8;55:21;56:20;
60:3,21;61:14;62:16;
67:19;68:1,17,20;
69:25;70:25;72:6;
79:20,24;80:3,17;
81:8,11,13;82:8,14
**Honor's (3)**
28:21;36:10;79:21
**hope (3)**
15:8;67:9,15
**hopefully (1)**
77:21
**horse (1)**
60:2
**host (1)**
51:20
**hours (1)**
76:16
**Houston (1)**
7:19
**Howell (6)**
14:15;33:25;34:9,
16,19,20
**hundred (1)**
64:17
**Hundreds (1)**
31:17
**hurdles (2)**
38:21;39:2
**HUTCHER (3)**
7:2,3;12:9
**hybrid (3)**
12:22,25;26:15

## I

**highly (1)**
**idea (5)**
23:20;45:11;49:9;
78:2,24
**ideal (1)**
54:12
**ideally (1)**
14:23
**identified (1)**
21:23;74:1,6,25
**identify (1)**
12:6
**ignored (1)**
29:16
**ignoring (1)**
31:23
**illegal (3)**
30:15,15,18
**imagine (2)**
40:5;41:19
**immediate (1)**
15:23
**immediately (5)**
37:2;48:15,19;
54:17;64:22
**impermissibly (1)**
39:3
**implicate (2)**
77:10;82:1
**important (12)**
16:8,12;21:8;22:25;
31:3,10,11;53:16;
54:4;65:22;67:20;
81:22
**impossible (1)**
76:14
**inappropriate (3)**
17:2;41:22;74:17
**inappropriately (1)**
74:2
**Inc (3)**
7:16;8:3;51:8
**include (1)**
74:1
**includes (2)**
36:4;81:5
**including (1)**
58:22
**income (2)**
16:1,1
**incorporated (1)**
49:5
**incur (1)**
49:11
**incurred (1)**
53:15
**independently (1)**
34:4
**indicate (1)**
15:12
**indication (1)**
16:17
**Industries (1)**
72:20

23-12055-shl    Doc 136    Filed 02/14/24    Entered 03/06/24 11:37:05    Main Document
In the Matter of: RUDOLPH W. GIULIANI    Pg 92 of 101

January 19, 2024

**inefficiency (1)**
65:8
**infliction (1)**
33:5
**information (5)**
19:6;63:4;64:8;
67:2,21
**informed (2)**
19:9;28:9
**informs (1)**
48:8
**initial (1)**
69:11
**injecting (1)**
58:17
**injunction (1)**
71:7
**injury (1)**
75:11
**inquiring (1)**
64:4
**instance (2)**
59:14;80:5
**Instead (2)**
34:2;39:14
**intend (1)**
16:3
**intends (1)**
17:21
**intent (2)**
41:17;65:16
**intention (3)**
15:17;25:5;53:25
**intentional (5)**
23:17;30:20;33:5;
75:8,10
**intentionally (2)**
23:15;32:2
**intentions (2)**
26:3;74:9
**interacting (1)**
46:2
**interest (8)**
12:1;24:11;31:8;
66:3;69:15;71:20;
72:1;80:7
**interested (4)**
14:10;28:1;72:1;
78:20
**interests (1)**
35:25
**interfere (1)**
45:17
**interference (2)**
63:24;68:19
**interruption (1)**
66:22
**into (6)**
16:20;26:10;46:16;
49:5;51:4;57:15
**investigate (2)**
29:6;54:1
**investigation (1)**

54:7
**involve (1)**
41:19
**involved (4)**
36:21;72:3;79:7,16
**involvement (2)**
19:10,16
**involves (2)**
35:16;42:5
**involving (1)**
75:2
**iPhone (2)**
70:6,7
**IRA (2)**
6:9;11:6
**IRAs (1)**
15:13
**issue (34)**
21:23;22:11,19,23;
24:21,22,24;25:6,20;
29:4;41:23;44:23;
46:3;51:7;52:4,8;
53:16,17,19;57:10;
60:15,20;63:7;64:7;
69:8;74:6;75:4,5,14,
18,20,25;78:16;80:1
**issued (2)**
45:23,23
**issues (22)**
15:24;17:3,3,22:17;
25:3;26:10;35:8;38:8;
40:8;50:15;63:1,2;
66:25;67:14;69:19;
71:15;77:19,22;
78:11;80:10,16,25

**J**

**JAMES (3)**
7:9;9:18;10:25
**January (3)**
66:18;69:11;71:3
**JEFFREY (1)**
7:7
**JESSICA (1)**
9:22
**job (2)**
29:23;41:21
**JOEL (4)**
8:8;12:13;68:1;
70:8
**Joel's (2)**
70:6,7
**JOHN (1)**
5:10
**joint (3)**
22:21;23:12;24:3
**JONATHAN (3)**
7:10,21;9:20
**JOSEPH (2)**
7:11;17:20
**Journal (1)**
9:25

**Judge (25)**
10:6;14:15;19:13;
20:17;24:20;26:7;
28:6;33:25;34:8,16,
19,20;39:10;43:21;
44:4;48:3,4,18;55:9;
62:25;65:9,15;69:10;
77:13;78:17
**judgment (30)**
14:18,19;15:21;
16:5,22;19:11,15;
22:21;23:9,13;25:12,
16,22;26:21;32:8;
35:15,16;39:5,18;
44:25;45:3;48:13;
51:24;52:17;54:25;
72:11;74:11;75:3,5;
76:17
**jump (2)**
52:15;62:25
**jumping (2)**
51:4;52:8
**junctures (1)**
39:24
**jury (3)**
34:9,17;48:13
**jury's (2)**
34:23;35:3
**JUSTICE (2)**
9:2;47:18

**K**

**keep (3)**
31:8;50:12;82:4
**KENNETH (1)**
9:14
**kick (1)**
29:5
**kicked (1)**
30:14
**kind (4)**
25:2;45:23;62:25;
79:15
**kinds (5)**
13:1;19:25;22:2,17;
45:1
**KNAUTH (1)**
9:16
**knew (2)**
63:1;75:12
**knowledge (2)**
18:22;19:5
**knows (3)**
39:5;66:11;80:8
**kosher (1)**
39:16

**L**

**lack (6)**
19:10,12,14,16;
39:16;74:10

**laid (3)**
76:12;79:4,7
**Lane (1)**
10:6
**LANGFORD (1)**
5:10
**language (14)**
21:25;22:7,8,20;
23:12;27:24;37:3,6;
61:6,8,11,14;77:6;
79:25
**lapse (2)**
53:9;54:17
**Lar (2)**
18:15;77:23
**large (1)**
11:25
**largely (1)**
36:5
**largest (1)**
25:9
**last (2)**
33:20;66:3
**late (1)**
14:20
**later (4)**
12:6;15:20;33:11;
66:18
**Law (18)**
9:18,19;15:25;17:1;
30:24;39:12;42:20;
56:7;57:21;63:12,16,
22;72:17;74:4,16;
75:24;81:15,21
**lawsuit (4)**
51:8,13,16,18
**lawyer (2)**
16:1;30:9
**lawyers (4)**
41:4;63:20;64:2,12
**lay (4)**
39:24;53:2;57:20;
73:23
**lays (1)**
58:19
**lead (3)**
11:12;14:24;38:15
**leading (2)**
19:12,17
**least (2)**
64:2;78:6
**led (1)**
74:10
**LEE (1)**
9:17
**legal (3)**
17:25;18:1;39:16;
53:15;75:16
**legitimate (7)**
22:9,13,23;23:21;
24:1;35:21;36:13
**LEO (1)**
8:16

**less (1)**
73:8
**lesser (1)**
36:17
**LEXIS (2)**
74:19;75:9
**liability (4)**
21:13;32:3,4;33:7
**liable (1)**
33:6
**Liberty (1)**
8:13
**lickety-split (1)**
71:6
**lie (1)**
65:21
**liens (1)**
39:4
**life (2)**
17:11;26:16
**lift (15)**
13:10;17:2;28:15;
41:17;43:3;44:14;
46:25;48:23;54:13;
56:8;63:14;68:9;72:9;
73:18;77:16
**lifted (6)**
16:24;36:19;44:16;
52:18;55:25;61:15
**lifting (7)**
22:17;52:13;71:14;
72:16;74:16;76:6,20
**light (10)**
20:22,24;27:23;
39:23;51:2;59:8;
69:25;74:14,22;78:17
**liked (1)**
14:24
**likelihood (2)**
28:17;34:15
**likely (1)**
54:5
**limited (5)**
16:2;22:15;54:13;
63:14;75:1
**line (3)**
28:2,10;63:8;73:6
**lines (2)**
28:19;77:16
**lingering (1)**
30:23
**liquidated (2)**
28:17;29:12
**list (2)**
68:7;70:19
**listed (1)**
32:8
**listing (1)**
73:7
**literally (1)**
29:19
**litigate (3)**
21:12;40:22;41:1

23-12055-shl    Doc 136    Filed 02/14/24    Entered 03/06/24 11:37:05    Main Document
In the Matter of: RUDOLPH W. GIULIANI          Pg 93 of 101

January 19, 2024

**litigated (1)**
71:15
**litigating (3)**
40:25;65:18;71:15
**litigation (37)**
17:6;18:21;19:3,11;
20:3,25;21:17;22:20;
24:20;28:8;36:2,8;
39:7;40:18;41:19;
42:16,22,23;43:3;
49:11;63:13;64:13;
65:5;72:12;73:19;
74:7,9;75:23;76:2;
77:4,25;78:10,11,18,
22;81:16;82:1
**litigator (1)**
17:11
**littered (1)**
33:17
**little (8)**
14:6;15:7;26:16;
29:15;37:5;39:17;
41:16;66:14
**live (8)**
27:25;28:1,6;37:23;
38:1;47:23;50:6;
57:19
**lives (1)**
65:2
**living (1)**
15:14
**LLC (2)**
73:11;74:5
**LLP (7)**
4:2;5:13;6:2,14;7:2,
3,15
**logical (2)**
42:6;53:3
**long (1)**
36:6
**longer (1)**
27:14
**longneck (1)**
13:3
**look (10)**
20:8;25:24;34:14,
18;37:7,22;43:5,5;
64:14;82:10
**looked (2)**
42:21,23
**looking (11)**
21:12;33:15;37:11,
14;38:4,7;39:18;
40:21;41:2;42:17;
76:9
**looks (1)**
79:3
**looming (1)**
36:22
**Los (1)**
8:6
**lose (2)**
61:21,22

**loses (1)**
53:10
**lost (4)**
30:7;43:4;52:19;
53:7
**lot (16)**
14:10,10;15:11;
19:6;20:3,5,5;27:15;
29:25;43:10;44:24;
49:19;57:7;63:1;
66:24;67:2
**lots (2)**
55:6;65:3
**loud (2)**
45:10;46:11
**Louisiana (1)**
7:17
**lunch (1)**
61:7

# M

**MACCURDY (1)**
4:10
**machines (1)**
51:12
**MAGGIE (1)**
4:10
**mail (1)**
57:20
**makes (8)**
17:15;28:3;37:7;
47:19;53:11;64:20;
74:4;78:3
**making (11)**
22:16;35:13,13;
42:18;44:6;48:8;
57:10;62:17;65:20;
71:20;74:16
**malicious (4)**
23:17,19;75:8,11
**maliciously (1)**
23:15
**man (1)**
29:19
**manage (1)**
41:23
**many (7)**
12:1,1;19:8;22:3,4;
55:8;79:15
**map (5)**
28:21,25;35:24;
39:17;79:8
**marked (1)**
27:19
**Market (1)**
6:16
**Mason (1)**
75:9
**materials (1)**
31:15
**matter (6)**
13:12;15:3;17:21;

18:21;25:22;58:7
**matters (6)**
15:3;42:20;46:3;
69:20;70:22;74:17
**may (28)**
15:18;23:2,2,6,7;
32:14;37:15,19,25;
38:16,16;45:14;
47:14,22,24;49:7;
54:3,8;55:9;60:5;
61:10;64:17;69:16,
17;71:12;74:23;
75:10;77:24
**maybe (9)**
15:19;24:23;27:23;
35:24;37:15;41:16;
43:11,12;47:23
**mayor (1)**
29:17
**mean (6)**
23:24;25:3;38:11;
50:4,5;57:24
**meaning (1)**
80:11
**meant (2)**
65:9,15
**meantime (2)**
77:17,20
**Meanwhile (1)**
40:3
**measure (1)**
45:22
**media (1)**
30:4
**meet (1)**
38:23
**meeting (2)**
66:6;67:12
**meets (1)**
24:9
**member (1)**
51:17
**members (1)**
51:7
**memes (1)**
31:19
**memorandum (1)**
34:18
**memorialized (4)**
72:18,18;74:12;
80:1
**memorializes (1)**
79:13
**mention (1)**
70:14
**mentioned (6)**
22:20;36:24;68:6;
71:13;74:21;81:16
**mentioning (1)**
70:20
**merits (4)**
21:12;28:19;51:5;
63:1

**MERYL (1)**
4:9
**message (2)**
40:15;72:4
**met (2)**
50:9;73:19
**metaphor (1)**
56:16
**MICHAEL (2)**
4:8;9:23
**micromanage (2)**
41:21;61:19
**micromanaging (2)**
44:9,12
**microphone (2)**
10:5;27:5
**microphones (2)**
13:2,2
**middle (1)**
29:24
**might (4)**
16:8;21:11;42:11;
68:15
**MILLER (1)**
4:14
**million (3)**
15:22;16:9;21:9
**mine (1)**
32:17
**minimal (2)**
73:13,16
**minute (4)**
17:24;48:25;52:17;
57:4
**minutes (1)**
26:4
**miscommunication (1)**
80:23
**misleading (1)**
65:17
**missing (2)**
42:7;63:8
**mixed (1)**
39:12
**modification (1)**
63:15
**modify (5)**
10:10;16:6;18:23;
20:14;72:11
**moment (1)**
26:8
**money (8)**
22:14;24:20;25:14;
36:20,21;44:22;
71:15;74:7
**monitor (1)**
40:3
**month (1)**
82:11
**months (2)**
31:22,22
**more (18)**
10:9;19:1;26:2,16;

28:16;39:16;45:19;
57:10;58:2;59:16;
61:10,24;71:18,24;
74:7;75:25;81:10,23
**morning (24)**
10:2,3,4,6,15,18,21,
22,25;11:3,8,9,13,18,
20,23,24;12:1,11,13,15,
17,19;14:3;27:11
**Moss (16)**
4:4,16;5:4;10:24;
27:13;29:22;30:5,7,
13;34:11;51:23;
52:11,16;53:8;56:1;
71:5
**most (8)**
13:20;28:3;53:20;
57:16;61:9;78:5,7;
79:2
**mother (1)**
51:23
**motion (78)**
10:10;13:10,25;
14:1,4;16:4,20;17:11;
18:23;19:21;20:8,9,
13,16;21:6;25:1,20;
26:7,11;28:15;29:2;
31:12,24,24;34:1;
35:10;37:17;38:12,
13;39:3;40:2;41:17,
18,25,25;42:7;43:11,
12,18,21;44:21;45:5,
8,15,18;46:8,22;47:1,
3,5;48:22;52:6;55:1,
13,15;57:20,23;
58:14;59:4,6,8,10;
61:15;63:1,2;66:11;
68:2,21;72:8,11,21;
73:3,4,10,14;76:21;
77:14;80:18
**motions (12)**
16:5,14,15,16;
19:25;23:1;36:4;
43:10;56:7;69:20;
71:17;77:7
**motion's (1)**
46:7
**motivated (1)**
35:15
**motivates (1)**
25:23
**motivation (1)**
71:13
**move (2)**
58:5;81:2
**Moves (1)**
31:14
**moving (3)**
44:12;69:16;70:15
**much (8)**
27:15;56:13;57:18;
67:23;78:22;79:21;
82:9,13

23-12055-shl Doc 136 Filed 02/14/24 Entered 03/06/24 11:37:05 Main Document
In the Matter of: RUDOLPH W. GIULIANI Pg 94 of 101

January 19, 2024

mulling (1)
54:19
multiple (2)
30:10,16
multiplied (1)
35:4
mute (1)
62:19
myself (5)
43:19;45:16;47:18;
79:1,12

**N**

NAGLER (1)
8:17
nailed (3)
36:13;42:10;80:1
name (4)
10:6;30:21;70:5,11
NANI (1)
9:18
Nassau (1)
5:5
NATHAN (3)
4:11;11:2,2
natural (1)
45:9
naturally (2)
45:2,18
nature (1)
38:8
navigate (1)
79:15
ND (1)
76:4
nearly (2)
28:8;35:3
necessarily (4)
25:17,23;35:17;
78:5
necessary (4)
16:14;26:5;60:6;
72:12
necessitate (1)
78:4
need (14)
15:7;25:21;27:20;
38:9;39:20;52:12;
53:13;58:15;64:21,
23;67:2;69:20;76:1;
78:20
needed (1)
79:2
needs (12)
12:7;15:20;38:21;
53:6;54:16;55:15,18;
60:9,11;67:5;79:11,
18
NENO (1)
73:11
New (24)
5:7;6:6;7:5;8:14;

9:5;10:8;17:12;18:23;
27:16;29:18;38:6;
40:1;46:18,22;48:21,
22;51:19;54:9;61:16;
63:21;72:11;74:20;
78:19,19
News (1)
9:20
next (7)
14:21;15:8;18:18;
30:2;37:25;67:8,9
NICKI (1)
9:12
nine-billion-dollar (1)
25:12
nobody (1)
50:2
nomenclature (1)
26:20
nondischargeability (6)
22:10;24:3,10;
36:22,24;40:7
nondischargeable (9)
22:3;23:11,22;
28:18;29:5;37:1;
40:24;54:4;75:3
nonreadable (1)
31:17
noodle (1)
61:6
noodling (1)
77:5
nor (1)
18:2
normal (1)
75:24
normally (1)
73:15
North (2)
5:16;6:16
Northeast (1)
4:17
Northwest (1)
4:5
nose (2)
43:25;55:7
notable (1)
78:23
notation (1)
80:8
note (3)
27:24;29:11;69:10
noted (3)
13:14;28:17;72:6
notes (4)
22:5;27:20;74:15;
75:10
notice (24)
13:13,14,19;16:7;
47:4,6,8,21,23;49:1,9,
9,9;58:15,24;61:24;
62:6;68:4,10,13,14,
18;72:12;76:22

notices (3)
16:15;31:19;72:13
noting (2)
13:12;34:12
notion (9)
16:23,25;18:5;35:9;
39:13;41:15;49:19;
58:8;75:1
Nov (1)
74:19
November (1)
29:21
nuanced (2)
59:17;71:12
nuances (1)
55:8
number (7)
21:11;36:17;53:13,
17;72:10,22,24
numbers (2)
32:22;34:17
numerous (3)
34:3;66:25;81:17
NY (5)
5:7;6:6;7:5;8:14;
9:5
NYS (2)
8:11,12

**O**

objecting (1)
74:25
objection (3)
16:23;68:10,21
objections (3)
14:9;22:5;76:6
objectors (7)
17:7;22:6;24:14;
74:8,14;75:2,20
objectors' (1)
76:12
objector's (1)
22:8
obligation (1)
40:2
obligations (1)
16:2
observations (2)
47:17;73:3
observers (1)
30:14
obtain (1)
39:7
obvious (1)
34:23
obviously (13)
13:7;15:11,23;19:4;
20:3;21:21;28:7,13;
35:13;59:5;71:18;
75:14;81:25
occur (1)
39:1

OCHSNER (1)
9:19
odd (2)
36:19;58:1
off (8)
14:2;17:24;27:16;
33:11,12;40:17;58:4;
70:13
OFFICE (9)
8:11;9:3;41:12;
57:4;62:18;67:5,17;
79:6;82:3
Official (7)
5:14;6:3;11:5,21;
50:24;51:18;72:23
officials (2)
30:10,25
often (3)
11:25;36:25;75:4
oftentimes (1)
36:25
oil (1)
25:9
old (2)
12:24;32:17
once (2)
75:22;80:19
One (40)
6:5;9:4;13:1;18:4;
19:7,7,23;21:23;22:5,
6;23:17;26:21;27:21;
28:20;32:7;36:6;
38:22;39:20;40:21;
41:7;43:13;45:14;
46:1;48:25;49:1;
52:25;53:13;56:15;
60:5;63:8;64:19;
67:13;71:2;72:2;73:8;
76:7;77:13;78:3,16;
81:14
ones (3)
13:3,3,5
one's (2)
38:3;44:12
ongoing (2)
42:24;79:13
only (12)
15:21;19:25;21:12;
34:6;48:24;49:1;
68:17;73:5;74:15;
76:14;78:12;81:14
open (3)
12:3,22;80:21
opinion (1)
59:5
opinions (1)
33:10
opportunities (1)
21:20
opportunity (2)
20:22;64:14
oppose (2)
76:20;77:2

opposed (5)
37:20;39:19;72:21,
23;78:14
opposition (9)
13:20;23:4;27:25;
42:2;52:1;68:15;
72:23;73:23;76:15
oppositions (3)
13:11;58:1;73:23
options (1)
14:19
order (40)
14:17,20;21:9;23:2;
24:4;28:5;33:12,25;
34:8,19;44:17;49:12;
54:16,24;55:11,24;
60:12;61:16,23;62:9;
64:11,14,23;65:10,11,
12;66:6;67:15;70:19;
77:17;79:25;80:1,6,6,
9,11,15,18,18;81:3
ordering (2)
23:24;77:13
orders (7)
29:16;31:23;32:20;
34:9;74:13;80:5;81:1
ordinarily (1)
39:13
originally (1)
13:12
others (2)
34:4;52:15
otherwise (2)
39:5;49:1
out (38)
15:9;21:9;22:7;
23:2;30:14;35:20,23,
25;36:25;37:4,10,25;
38:4;39:24;41:10;
42:17;43:15,22;44:4;
45:10;46:5,11,13;
49:4;53:2;57:21;
58:19;60:17;61:13;
64:22;68:12;70:15;
73:23;76:12;79:4,7,
21;82:5
outcome (2)
16:7;47:4
outrageous (2)
23:14;34:17
outset (1)
29:10
outside (2)
23:23;75:17
over (8)
11:15;39:17;40:25;
41:4;54:19;63:3;67:1;
76:7
overly (1)
54:22
owed (1)
34:10
own (1)

29:3
**owns (1)**
15:13

# P

**page (8)**
19:23;34:20,22;
49:21;73:6,8;80:13;
81:2
**pages (3)**
12:1;19:23;73:5
**Pagones (1)**
75:9
**paid (9)**
17:25;18:1,6,7,10,
12;60:8;75:17,18
**pandemic (1)**
29:25
**papers (26)**
13:11,17;15:19;
17:22;18:5,17;19:2;
25:5;26:3;27:18;31:6;
37:15,23;38:24;
39:25;40:15;41:2,9,
15,20;42:5;50:4,6;
52:1;76:12,18
**paragraph (5)**
33:1,2,15;59:3,3
**paragraphs (1)**
19:25
**Park (1)**
6:5
**parse (1)**
46:4
**part (5)**
38:17,18;63:2;
65:16;78:19
**participate (1)**
28:8
**participates (1)**
31:15
**participation (1)**
74:10
**particular (4)**
24:9;35:23;37:6;
79:16
**particularly (6)**
10:9;27:22;39:23;
55:7;74:22;75:6
**parties (32)**
14:10;15:22;19:20;
20:5,21;21:21;22:22;
26:9;29:5;31:20;33:3;
51:19;57:19,19;59:7,
8;64:6;65:4;67:2;
68:11;71:25;72:1;
74:25;77:10,16,18;
78:13,16,20;79:2,4;
82:2
**parties-in-interest (2)**
49:4;81:5
**partner (2)**

11:6,7
**party (9)**
18:8;45:16;65:1;
68:15;69:7;70:16;
77:2;79:5,6
**pass (4)**
23:23;32:5;38:21;
73:22
**passed (1)**
30:17
**passing (1)**
18:22
**past (3)**
42:14;66:15;67:1
**PASTERNAK (1)**
7:10
**pay (1)**
39:19
**paying (1)**
64:7
**payment (1)**
15:7
**pendency (1)**
40:23
**pending (4)**
45:4;51:19;63:17;
72:13
**Pennzoil (1)**
25:11
**people (16)**
20:6;25:18;31:10;
49:16;61:6,8;64:21;
69:3,4,18;71:1;78:2,
4;80:11;81:23,24
**per (1)**
35:1
**percent (1)**
64:17
**perfect (4)**
39:4;47:6,9;61:5
**perfectly (1)**
70:12
**perfunctory (1)**
66:11
**perhaps (1)**
17:15
**permissible (1)**
39:16
**permitted (2)**
52:9;63:14
**perpetuity (1)**
47:16
**person (3)**
12:23;64:25;67:6
**perspective (6)**
49:24;52:3,4,11;
54:12;55:21
**petition (2)**
14:21;15:4
**phase (4)**
19:18;20:19;21:18;
31:14
**Phil (2)**

11:7,23
**PHILIP (1)**
6:10
**phone (1)**
11:7
**phrase (2)**
41:13;55:16
**pick (1)**
13:5
**picked (1)**
30:13
**piece (1)**
46:19
**pieces (1)**
15:13
**place (4)**
15:2;45:11,19;
52:23
**placeholder (1)**
45:12
**Plains (1)**
25:10
**plaintiff (1)**
51:18
**plaintiffs (17)**
14:17;23:10,15;
25:6;26:20;56:15;
72:21,22;73:2,20,24;
76:13,18,20;79:6,23;
82:4
**plaintiffs' (1)**
34:24
**plan (3)**
29:8;30:21;54:11
**plans (1)**
26:3
**play (2)**
13:25;35:25
**played (1)**
37:25
**pleading (1)**
40:6
**pleadings (5)**
13:19;32:20;38:5;
71:1;79:9
**Please (4)**
10:2;32:15;48:23;
78:24
**PM (1)**
82:15
**podcast (1)**
15:14
**point (16)**
12:3;22:7,16;23:22;
24:24;26:3;32:25;
50:11;52:6;54:10;
56:14;60:5;61:23;
66:15;71:11;80:11
**pointing (1)**
37:10
**points (1)**
27:22
**policing (2)**

71:18,24
**politics (1)**
29:11
**POLITO (1)**
7:11
**port (1)**
30:17
**portion (2)**
21:13;37:18
**position (3)**
38:22;42:11;55:14
**possibility (1)**
58:13
**post (5)**
25:11;31:20;39:14;
43:4;76:2
**posting (1)**
25:8
**post-judgment (1)**
16:16
**post-trial (1)**
76:21
**posture (7)**
34:16;37:7,12;
44:16;56:10;57:13;
58:2
**post-verdict (2)**
16:14;23:1
**pot (2)**
15:15;22:14
**potential (1)**
15:23
**powder (1)**
50:12
**practice (1)**
15:25
**pre- (1)**
15:3
**precipitated (1)**
14:14
**precipitating (1)**
15:24
**precisely (1)**
43:16
**prefer (1)**
26:20
**premature (1)**
23:3
**prematurely (1)**
80:15
**prepare (1)**
14:24
**prepared (3)**
51:1;24:23;38:3
**PRESENT (6)**
9:11;20:19,23;
21:20;64:6;78:14
**presentation (1)**
27:14
**presented (1)**
24:6
**presentment (3)**
68:4,10,18

**preserve (8)**
16:13;31:15;38:5;
41:1;42:14,18;54:14;
56:9
**preserved (1)**
56:2
**preserves (1)**
33:9
**preserving (1)**
55:19
**press (1)**
15:11
**pressure (1)**
59:18
**presumably (1)**
38:14
**pretty (5)**
30:1;49:24;66:11;
78:2,22
**prevailed (1)**
36:17
**preview (1)**
24:15
**previously (2)**
13:17;74:10
**principles (3)**
35:23;36:16;37:14
**prior (3)**
14:15;17:11;74:8
**priority (1)**
41:4
**pro (4)**
19:22;51:2;57:23;
73:5
**probably (4)**
19:23;20:4;31:11;
59:3
**problem (4)**
13:9;54:23;65:5;
71:20
**problems (1)**
76:10
**procedural (2)**
34:16;58:1
**Procedure (4)**
44:18;49:3,6;64:11
**Proceed (4)**
32:22;40:4;55:1;
59:10
**proceeding (5)**
12:6;24:7,7;39:4;
55:11
**proceedings (3)**
44:7;49:15;82:15
**proceeds (1)**
55:2
**process (10)**
14:25;29:23;36:3,7;
54:1,13;58:8;63:21;
68:5;70:16
**processes (2)**
16:16;67:20
**produce (2)**

23-12055-shl    Doc 136    Filed 02/14/24    Entered 03/06/24 11:37:05    Main Document
In the Matter of: RUDOLPH W. GIULIANI        Pg 96 of 101

January 19, 2024

31:20,21
**produced (1)**
34:4
**produces (2)**
31:15,16
**profess (1)**
19:4
**PROFESSIONAL (1)**
8:2
**professionals (1)**
24:22
**progress (2)**
62:17;77:21
**progresses (1)**
46:16
**progression (1)**
53:3
**Project (1)**
9:15
**promise (1)**
13:8
**promotes (1)**
47:18
**proof (1)**
30:6
**properly (1)**
68:16
**proposal (1)**
57:9
**propose (2)**
28:20;53:1
**proposed (12)**
11:4;28:5;50:23,23;
63:13,16;64:12;
65:11;77:17;80:4,6;
81:15
**proposing (2)**
51:1;63:23
**prosecuted (1)**
55:15
**prospect (2)**
29:8;54:10
**PROTECT (1)**
5:2
**protected (1)**
33:11
**protracted (1)**
36:7
**provide (2)**
61:9;63:4
**provided (2)**
30:22;63:11
**provides (2)**
22:2;73:10
**provisions (1)**
22:6
**public (1)**
30:23
**publicly (1)**
30:25
**published (2)**
33:3;75:12
**punitive (4)**

21:3;33:6;34:10;
35:3
**purporting (1)**
63:23
**purpose (5)**
30:14;48:24;52:23;
54:13;74:15
**purposes (3)**
32:11;55:25;71:21
**pursuant (1)**
63:14
**pursue (3)**
23:1;45:24;46:25
**pursuing (1)**
52:10
**pushed (1)**
58:4
**put (6)**
13:13,13;30:8;
53:21;70:16;80:24
**puts (2)**
13:19;37:12
**putting (4)**
43:19;45:12;67:3;
68:9

## Q

**qualified (1)**
34:2
**queue (1)**
52:15
**quick (2)**
51:5;66:21
**quickly (3)**
35:10;60:9;69:9
**quite (3)**
17:6;31:11;82:12
**quo (3)**
52:19;56:1,9
**quoting (1)**
39:11
**QURESHI (18)**
6:11;11:3,3;50:21,
22;51:15;52:20,22;
54:21;55:4,17,21;
56:4,6,19,22,25;81:10

## R

**RACHEL (4)**
5:9,20;10:22;27:12
**radio (2)**
15:14;30:4
**rainbow (2)**
15:15;22:15
**raise (4)**
69:18,24;74:24;
78:16
**raised (14)**
18:4;19:7,8;20:20;
22:1,12,19,22;25:6;
49:20;63:2;72:2;

74:22;75:20
**raises (1)**
75:14
**raising (3)**
22:11,23;41:12
**RANDLES (1)**
9:20
**rather (8)**
17:8,15;35:4;40:11;
48:20;61:4;65:17;
80:19
**RATTET (3)**
7:12;12:9,9
**re (3)**
74:4,18;76:3
**reach (3)**
68:11;70:15;79:15
**read (6)**
13:11,11,21,21;
27:14,19
**readdressed (1)**
20:12
**real (5)**
15:13;21:9;25:14;
26:16;72:2
**realize (1)**
31:11
**really (9)**
19:25;20:7;23:9;
28:11;30:1;45:25;
73:5,8;77:9
**reason (6)**
30:7;36:24;37:4;
41:25;47:8;57:18
**reasonable (1)**
34:15
**reasons (3)**
35:13;38:14;55:6
**recap (1)**
73:3
**received (3)**
19:22;63:25;72:5
**recitation (2)**
19:24;64:15
**recognize (4)**
31:4;35:14;36:12;
53:1
**recognized (1)**
37:3
**recognizing (1)**
31:9
**reconsidered (1)**
35:11
**record (13)**
11:9;21:5;27:12;
30:19;34:3,7;49:18,
23;50:22;57:25;
65:25;74:13;75:6
**recounts (1)**
30:11
**recourse (1)**
18:11
**redetermined (1)**

21:11
**reduce (1)**
35:5
**referenced (1)**
32:10
**references (1)**
23:18
**referred (1)**
57:11
**refined (1)**
76:18
**reflect (2)**
67:22;79:10
**refuted (1)**
30:25
**regard (1)**
63:5
**regarding (6)**
22:21;23:13;63:10,
18;64:3,4
**regular (1)**
13:19
**regularly (1)**
50:15
**reimpose (1)**
54:17
**rejected (1)**
44:4
**rejects (1)**
39:6
**related (4)**
51:11,19,21;75:14
**relates (1)**
21:24
**relationship (1)**
53:23
**relevance (1)**
51:6
**relevant (3)**
19:24;32:12;76:24
**relief (3)**
28:15;29:2;38:22;
64:24;68:3;76:25
**relitigate (4)**
17:2,3;40:22;74:17
**rely (1)**
34:1
**relying (1)**
80:19
**remand (1)**
36:5
**remanding (1)**
62:4
**remarkably (1)**
27:14
**remarks (1)**
70:25
**Reorg (2)**
9:22,23
**reorganization (3)**
15:21;29:8;54:11
**reorganize (1)**
39:21

**repairing (1)**
35:2
**repeated (1)**
71:4
**repeatedly (1)**
30:25
**repetitive (1)**
33:18
**reply (1)**
57:25
**represent (3)**
63:23,23;64:13
**representation (6)**
18:9;36:8;51:1;
64:20;80:9,20
**representative (1)**
17:21
**represented (2)**
41:17;64:17
**representing (4)**
15:2;18:20;63:22;
64:25
**represents (1)**
75:16
**Republican (1)**
30:25
**republicizing (1)**
17:5
**reputational (1)**
34:25
**reputations (1)**
35:2
**request (12)**
18:6;43:16;44:21;
45:4,12;46:22;66:9;
71:7;73:14,16,18;
76:9
**requested (3)**
13:12;19:21;34:24
**requesting (1)**
64:8
**requests (3)**
19:9;29:16;45:7
**require (1)**
69:4
**required (1)**
73:15
**requirements (1)**
72:15
**requires (1)**
18:17
**ResCap (1)**
39:10
**reservation (1)**
33:13
**reservations (1)**
33:17
**reserve (1)**
26:4
**reserves (2)**
78:1;81:20
**reserving (1)**
62:12

23-12055-shl    Doc 136    Filed 02/14/24    Entered 03/06/24 11:37:05    Main Document
In the Matter of: RUDOLPH W. GIULIANI        Pg 97 of 101

January 19, 2024

**Residential (1)**
74:4
**resolved (2)**
68:23;80:25
**resonate (1)**
27:22
**resources (1)**
22:15
**respect (6)**
53:21;54:2,9;65:24;
66:20;68:3
**respectful (1)**
40:13
**response (2)**
31:24;38:15
**restate (1)**
76:11
**result (4)**
19:15;36:5;46:8;
79:15
**results (1)**
30:11
**retain (1)**
75:15
**retained (3)**
63:16;66:4,6
**retention (12)**
15:6;17:22;18:17;
36:10;50:25;53:13;
65:19;77:22;80:1,18;
81:15,17
**retentions (6)**
15:1,4;63:6,9;
66:25;81:20
**retrial (4)**
52:10;53:6,12;
54:15
**returns (1)**
44:16
**Reuters (1)**
9:16
**reviewing (1)**
14:19
**revisit (2)**
38:6;52:24
**Richey (1)**
48:6
**right (74)**
10:21;11:8,13,15,
24;12:11,16,19,21;
14:7;16:1,12;17:10;
19:11;20:18;21:6;
24:25;26:6;33:9,11,
16,19;36:14;38:5,19;
39:9;41:1;42:15,17,
21;44:1,3,11;45:19,
21;46:14;50:20;
52:20;53:7,10;54:14;
55:17,19;56:6,11,21;
59:1,12,24;60:13;
61:22;62:15,17,22;
65:6,14;66:21;67:16,
23;68:6,24;69:13,23;

70:3,10,18,23;72:7;
75:18;79:22;81:7,12,
20;82:7
**rightly (1)**
14:11
**rights (8)**
16:13;35:19;38:4;
62:12;74:20,21;78:1;
81:21
**rise (1)**
58:14
**rising (2)**
57:1;59:18
**risk (1)**
54:20
**road (6)**
16:11;28:20,25;
35:24;36:4;79:7
**ROBERT (4)**
7:8,12;12:9,10
**rodeo (1)**
37:8
**room (5)**
10:13,14;13:3;
24:23;79:17
**ROSS (1)**
7:21
**Ruby (5)**
4:3,15;5:3;10:23;
27:13
**Rudolph (2)**
10:9;40:22
**Rule (2)**
44:18;68:7
**rules (4)**
48:18;49:2,5;68:8
**ruling (2)**
47:19;79:13
**run (1)**
80:16

## S

**sad (1)**
31:6
**same (11)**
30:16;39:12;44:11;
49:21;69:3;72:13;
74:20;76:25;80:13;
81:1,2
**SAMUELS (9)**
8:8;12:13,13;68:1,
1,17;70:8,8,15
**sanctions (3)**
31:24;34:1,8
**sat (1)**
29:14
**satisfied (2)**
34:6;72:15
**saw (1)**
52:1
**saying (13)**
23:12;28:5;37:16;

39:13;43:17;44:14;
48:21;51:25;53:1;
56:13;65:16;71:1,16
**scenario (1)**
57:15
**schedule (1)**
68:22
**scheduled (1)**
69:11
**schedules (12)**
15:1,10,12;29:6;
40:4;53:20,21;54:2;
66:10,13,17;67:6
**scheduling (1)**
67:4
**SCHONFELD (1)**
9:21
**SCHWARTZ (23)**
9:7;11:11,16,18,19;
26:7,14,18;41:12;
62:21,24,24;65:6,9,
15,22;67:17,18;
69:10;81:8,13;82:6,8
**science (1)**
70:12
**scope (1)**
21:17
**scrutiny (1)**
73:20
**SDNY (1)**
74:19
**se (1)**
35:1
**Sean (1)**
10:6
**seated (1)**
10:2
**second (4)**
27:23,23;28:23;
72:19
**seconds (1)**
48:16
**Section (3)**
22:5;72:16;75:11
**sections (1)**
37:6
**seeing (2)**
79:9;82:10
**seek (10)**
20:21;29:3;33:11;
38:6;43:2;46:25;53:6;
54:14;68:9;74:20
**seeking (11)**
10:10;14:4;20:13;
28:16;36:9;45:5;51:9;
58:3;66:12;73:15;
75:21
**seeks (2)**
39:3;53:12
**seem (2)**
39:17;80:22
**seems (4)**
40:14;43:18;49:17;

78:6
**sees (1)**
27:17
**segue (1)**
11:17
**segues (1)**
16:19
**self-inflicted (1)**
29:13
**sense (12)**
17:15;19:19,20;
22:13;24:15,18;28:3;
31:16;42:14;53:11;
54:10;61:1
**senses (1)**
70:17
**sentence (1)**
33:20
**separate (1)**
59:3
**seriously (1)**
72:4
**serve (1)**
55:18
**served (1)**
29:22
**set (7)**
33:11,12;66:6;
68:25;72:19;76:3;
78:14
**sets (1)**
64:2
**settled (1)**
51:14
**seventh- (1)**
25:8
**sexual (2)**
51:20,21
**Shaye (6)**
4:4,16;5:4;10:24;
27:13;51:23
**shield (3)**
39:9;56:9;74:3
**shoals (1)**
79:16
**shoe (1)**
69:9
**short (1)**
32:25
**shortcut (1)**
36:1
**shorten (1)**
73:15
**shortened (3)**
13:13,14,15
**shortly (2)**
59:23;67:15
**show (3)**
13:16;15:15;38:23
**showing (1)**
70:6
**shown (1)**
49:25

**shows (1)**
54:7
**Shumer (2)**
10:16,19
**Sibley (2)**
17:20;63:12
**sic (1)**
63:12
**side (2)**
10:14;17:24
**signature (1)**
73:5
**signed (1)**
32:24
**significant (2)**
43:14;44:23
**silo (3)**
38:17,18;42:4
**simultaneously (1)**
60:14
**sit (1)**
27:8
**sits (1)**
31:14
**sitting (4)**
27:6;45:21;46:12;
47:15
**situation (2)**
40:10;54:23
**six (1)**
32:19
**skeptical (1)**
74:8
**skip (1)**
27:17
**Skipping (1)**
31:13
**small (1)**
32:19
**smart (1)**
49:16
**Smartmatic (2)**
6:15;12:18
**social (1)**
30:4
**socialize (2)**
78:20;81:22
**socializing (1)**
66:7
**solely (1)**
28:15
**solicited (2)**
66:1,2
**solution (1)**
13:8
**somebody (5)**
12:5;18:10;28:7;
36:16;64:20
**somehow (2)**
15:18;80:25
**someone (3)**
38:4;39:13;65:16
**something's (1)**

23-12055-shl    Doc 136    Filed 02/14/24    Entered 03/06/24 11:37:05    Main Document
In the Matter of: RUDOLPH W. GIULIANI    Pg 98 of 101

January 19, 2024

45:22
**sometimes (6)**
39:18;57:13,14;
69:19,21,21
**Sonnax (13)**
19:24;22:16;39:1;
49:25;50:6,14;57:21,
22;72:20;73:7,9;76:9,
11
**sooner (2)**
16:16,17
**Sorry (1)**
70:2
**sort (17)**
16:19;35:19,23;
36:18,25;40:6;41:10;
45:2,22;58:1;71:12;
72:9;75:25;76:5;79:7,
13;80:23
**sought (1)**
72:9
**sound (2)**
13:3,5
**sounded (1)**
58:20
**sounds (4)**
28:4;37:14;43:10;
64:10
**source (5)**
17:5;41:8;63:9;
65:13;77:22
**sources (1)**
75:17
**Southern (2)**
10:7;29:17
**spaced (1)**
19:24
**speak (3)**
24:16;25:16;32:17
**SPEAKER (1)**
62:20
**speaking (4)**
12:5;65:17;68:2;
78:8
**special (1)**
75:15
**specific (3)**
37:4,17;40:10
**specifically (6)**
17:17;19:1;21:24;
37:17;68:8,8
**speed (1)**
19:2
**spend (2)**
22:14;71:14
**spending (4)**
24:20;65:2;74:6;
75:1
**spent (2)**
44:23;69:1
**spiritual (1)**
31:18
**spitballing (1)**

59:21
**split (2)**
75:24;76:2
**spoke (2)**
66:23;67:11
**spoken (1)**
44:15
**spot (1)**
33:16
**square (1)**
36:6
**stage (1)**
52:9
**stand (5)**
13:24;24:16;25:21;
27:8;78:2
**standard (1)**
72:18
**standards (1)**
22:4
**stands (2)**
64:20;78:10
**start (10)**
10:11,12,14;11:16;
14:1;27:23;43:23;
51:25;52:17;63:6
**state (5)**
13:24;29:22;30:10;
37:1;46:3
**stated (1)**
15:18
**statement (2)**
66:14,17
**statements (16)**
17:5;29:6;30:8,9,
23;31:1;33:2,3,13;
53:20,22;54:2;71:4;
74:13,23;75:13
**States (4)**
10:7;11:10;62:18,
24
**status (25)**
14:5,6,8,12;16:7;
26:8,10;52:19;56:1,9;
64:4;68:19,25;69:2,5,
7,14,14,17;71:1;78:8,
17;80:10;82:11,12
**statute (4)**
22:4,8;23:18,18
**statutory (1)**
52:4
**stay (49)**
10:10;13:11;17:2;
22:17;25:7;28:15;
29:2;36:19;37:19;
38:9;39:4,14,15;
41:18;43:3;44:12,14,
16;45:1,23;46:25;
48:15,23;49:16;
52:13,18;54:13,18,24;
55:25;56:8;61:15;
63:14,14,15;68:3,9;
71:14;72:10,16,17;

73:19;74:2,17;75:21;
76:1,7,20;77:16
**stayed (3)**
44:5;49:2;59:8
**stays (5)**
40:1;44:25;45:1,2,3
**STEINHAGEN (1)**
9:22
**step (11)**
37:20,20,20;40:1,1,
1;55:10,10;76:23;
77:24;78:3
**step-by-step (4)**
40:13;52:24;54:12;
58:8
**steps (5)**
40:21;63:13;64:22;
77:4;78:10
**STEVEN (1)**
9:13
**stick (1)**
55:6
**stickies (1)**
27:19
**sticking (1)**
43:24
**still (3)**
38:1;49:3;58:13
**stipulated (1)**
54:6
**stipulates (2)**
32:1;33:1
**stipulation (8)**
21:24;22:21;23:13;
24:3,9;33:1;34:6;75:7
**stipulations (5)**
32:5,9,24;33:24;
34:2
**stomping (1)**
32:17
**stopping (1)**
45:12
**stops (1)**
54:18
**story (1)**
31:6
**straight (2)**
15:5;60:22
**straighten (1)**
64:22
**straightened (1)**
15:9
**straightforward (1)**
57:13
**strategic (1)**
30:21
**STRAUSS (4)**
5:13;6:2;11:4;
50:22
**Street (7)**
4:5,17;5:5,16;6:16;
8:13;9:25
**STRICKLAND (59)**

10:22,23;26:23;
27:1,3,6,9,11,12;
28:12;31:2,13;32:14;
33:17,20,22,24;36:1,
14;37:8;38:3,18,20;
40:20;42:8,13;44:10;
46:14,17;47:25;48:9,
10,11,18;49:22;50:2,
4,9,13,17,19;60:3,21;
61:3,12;62:2,4,8,11;
69:25;70:2,23,25;
71:10;72:2;74:22;
79:24;80:3,17
**Strickland's (4)**
47:23;52:2;56:12;
59:18
**striking (1)**
73:13
**strong (1)**
45:14
**STUART (1)**
8:17
**stuck (1)**
46:19
**stuff (1)**
62:13
**subject (7)**
21:14;37:25;49:15;
50:16;54:6;62:9;77:5
**submitted (1)**
77:21
**submitting (1)**
77:18
**substitute (2)**
69:3;75:21
**substitution (1)**
43:7
**succeed (1)**
36:5
**sued (2)**
29:14;31:14
**suffer (1)**
23:15
**suffered (1)**
52:12
**suggest (2)**
29:3;61:4
**suggested (1)**
68:20
**suggesting (1)**
49:17
**suggestion (2)**
49:22;80:22
**suitcases (1)**
30:15
**Suite (6)**
4:18;5:6,17;6:17;
7:18;8:5
**sum (1)**
72:9
**summary (2)**
25:3;42:20
**super (1)**

10:22,23;26:23;

34:18
**supersedeas (1)**
43:7
**support (1)**
52:2
**supports (1)**
52:1
**supposed (1)**
44:8
**Supreme (1)**
51:20
**sure (21)**
13:6,21;19:13;
26:12;27:4;36:1;
42:10;59:16,22;
60:10,21;67:8,22;
70:1,3,6,13;71:20;
72:4;80:7;81:4
**surmised (1)**
12:21
**surprise (4)**
28:25;78:21,23,24
**surprised (1)**
81:25
**surprises (1)**
15:12
**surprising (1)**
73:17
**surveillance (1)**
30:5
**SUSMAN (1)**
7:15
**suspended (1)**
15:25
**sustain (1)**
24:10
**swamps (1)**
16:9
**sword (4)**
15:19;39:9;56:8;
74:3
**sword-shield (2)**
56:5,13

## T

**tab (4)**
32:25;34:13,14,18
**table (1)**
26:24
**tables (1)**
30:16
**tabs (2)**
32:20,24
**tactic (1)**
42:24
**talk (10)**
24:17;31:12;39:10;
48:11;60:4;65:4;69:4,
14;77:19;78:24
**talked (3)**
66:24,25;80:16
**talking (7)**

23:6;51:7;62:20;
69:3;81:14,25;82:2
**targeting (1)**
30:20
**task (1)**
45:19
**Taxation (1)**
8:12
**teed (1)**
68:16
**tees (1)**
40:7
**television (1)**
30:4
**telling (4)**
43:19,23;48:4,21
**term (2)**
19:14;39:16
**terms (11)**
13:24;17:16,17;
19:13;21:25;23:19,
24;26:10;35:25;
43:20;57:17
**test (1)**
72:19
**testimony (2)**
21:14;34:3
**Texaco (2)**
25:15,15
**then-President (1)**
30:7
**theoretical (1)**
25:22
**theoretically (2)**
17:8,16
**theory (1)**
26:15
**thereof (1)**
19:10
**thinking (9)**
14:21;17:8;28:2,9;
36:15;45:10;46:11;
78:19;80:17
**Third (4)**
7:4;33:3;67:2;
74:25
**thirdly (1)**
66:9
**third-party (1)**
18:14
**thirty (6)**
44:18;47:5,20;
48:16,16;66:13
**though (1)**
32:4
**thought (10)**
37:13;39:25;40:9;
42:11;43:13;45:5;
46:7;50:13;58:5;71:2
**thoughts (3)**
28:2;64:19;82:10
**thread (1)**
56:7

**three (4)**
33:9;38:21;39:2;
51:7
**Throughout (2)**
33:8,18
**throw (1)**
12:3
**tied (1)**
56:16
**times (3)**
30:16;35:5;67:1
**tires (1)**
29:5
**today (34)**
11:12;12:21;22:11;
23:3;24:12;29:1;31:8;
37:10;38:25;50:5;
51:7;58:5;61:7,11;
63:7;64:15,17;67:25;
68:4,5;73:2;74:1;
76:14,18;77:24;
78:13;79:5,7,14,18,
21;80:16;82:2,10
**Today's (3)**
12:22;70:22;78:1
**toes (1)**
55:11
**together (3)**
60:18;70:16;80:14
**told (1)**
32:3
**toll (1)**
42:17
**tolling (1)**
38:8
**TOMBACK (1)**
9:23
**took (2)**
40:15;56:17
**top (2)**
66:2;82:4
**tort (1)**
75:10
**total (1)**
66:13
**totally (1)**
65:1
**touch (1)**
66:23
**touched (1)**
74:1
**Towards (1)**
34:22
**tracks (1)**
22:8
**traditional (3)**
19:17;35:14;36:16
**transactional (1)**
53:23
**treat (1)**
77:7
**treated (1)**
32:4

**treatment (1)**
76:7
**trial (26)**
17:12;18:23;19:17;
34:9;35:18,19;37:18;
38:6;40:1;45:25;46:2,
4,19,23;48:13,21,22;
51:16,22;54:9;61:16;
64:24,25,25;72:11;
74:20
**triggered (1)**
71:2
**trouble (1)**
13:8
**Trump (2)**
30:7,22
**trust (2)**
41:13;82:2
**Trustee (10)**
9:3;11:10,19;15:5;
62:25;66:2,5,24;67:5,
13
**Trustee's (1)**
41:11;57:4;62:18;
79:6;82:3
**truth (1)**
53:24
**try (6)**
46:13;61:4,11;
74:11;77:20;79:2
**trying (7)**
15:14;19:19;24:14,
17;40:11;60:22;61:2
**turn (3)**
10:5;11:15;34:19
**TV (2)**
71:4,5
**tweak (1)**
58:16
**twelve (1)**
73:7
**twelve-factor (1)**
72:19
**twenty (1)**
66:2
**twenty-four (1)**
76:16
**Twitter (2)**
71:4,5
**two (21)**
15:13;17:25;19:25;
27:21;28:20;30:20;
31:25;32:24;38:1,23;
40:20;41:7;43:15;
47:17;49:2;53:17;
60:8;63:9;64:19;
67:12;73:23
**two-million-dollar (1)**
33:12
**TX (2)**
5:18;7:19
**type (1)**
42:22

**U**

**UCC (1)**
76:13
**UDAY (1)**
9:15
**ultimately (3)**
16:11;54:7,14
**unambiguous (1)**
81:5
**unanimous (1)**
34:23
**unanswered (1)**
49:20
**unaware (1)**
65:18
**unbeknownst (1)**
13:4
**unclear (1)**
65:5
**under (8)**
24:5;30:16;44:18;
67:12;72:16;75:4,11;
81:21
**underlying (2)**
73:17;76:2
**understands (2)**
49:12;59:6
**Understood (4)**
20:10;28:12;59:15;
62:8
**underway (2)**
66:17;67:20
**uneventful (1)**
30:1
**unfair (2)**
56:14,17
**unfold (1)**
40:11
**UNIDENTIFIED (1)**
62:20
**unintended (1)**
52:14
**unique (1)**
51:2
**UNISON (1)**
82:14
**United (4)**
10:7;11:10;62:18,
24
**unless (2)**
42:7;56:22
**unlikely (1)**
36:4
**unmuted (1)**
62:21
**unnecessary (2)**
68:19;78:11
**unpack (2)**
40:21;60:20
**unreasonable (2)**
18:25;20:11

**unrelated (1)**
21:4
**Unsecured (9)**
5:14;6:3;11:5,21;
41:4;50:24;52:5;
72:24;73:25
**unusual (1)**
28:16
**up (22)**
13:5,16;19:2,13,17;
24:16;25:18;27:19;
32:6;35:4;40:7,20;
45:19;47:19;58:7,12;
64:20;65:2;68:16;
70:6,19;72:9
**update (1)**
60:6
**upload (1)**
30:17
**upon (5)**
21:4;22:7;77:2;
80:6;81:3
**up-to-date (1)**
61:9
**USB (1)**
30:17
**use (10)**
19:14;26:21;36:19;
39:6;53:9,25;56:16;
74:2;75:21;78:9
**used (6)**
21:25;22:20;27:6;
56:8;77:3;80:12
**uses (3)**
23:18;37:6;39:10
**using (4)**
15:19;25:7;37:3;
76:11
**UST (1)**
81:12
**usually (2)**
37:5,12;66:12

**V**

**vacate (2)**
16:6;20:14
**vacated (1)**
38:14
**valid (1)**
30:11
**vantage (1)**
52:5
**variety (1)**
56:13
**various (5)**
19:15;32:21;39:24;
43:11;63:17
**verdict (8)**
16:6,6,13;18:24,24;
20:14,15;23:8
**verify (1)**
41:13

**verifying (1)**
77:3
**vested (1)**
72:1
**viable (1)**
54:11
**view (5)**
22:8;24:17;49:13;
68:25;75:2
**views (4)**
24:2;45:14;47:15;
79:10
**vigorous (1)**
73:23
**virtual (2)**
10:13;79:17
**virtue (1)**
49:18
**voice (1)**
48:6
**voluminous (1)**
13:22
**VON (1)**
4:21
**VOREACOS (1)**
9:24
**voting (1)**
51:11

## W

**wait (2)**
18:17;62:20
**waited (1)**
66:5
**walking (1)**
57:15
**Wall (1)**
9:25
**Wally (1)**
43:5
**Wandrea (3)**
4:3,15;5:3
**wanton (1)**
75:8
**wants (18)**
16:20,24;17:18,19;
18:19,23;20:2,7;36:3;
42:15,18,19;44:24;
46:25;59:6;72:10;
77:9;78:16
**Washington (2)**
4:6;31:19
**watching (1)**
75:19
**way (27)**
14:4;17:23;18:6;
23:6;37:16;40:14;
43:22;45:14;53:21;
55:12;56:11;57:17;
59:17;65:7;69:19;
71:16;77:7,12,13,20;
78:6,6,7,9;79:3;

80:24;81:4
**week (10)**
13:18;15:8;18:18;
38:1;58:4;63:7;66:4;
67:1,8,10
**weeks (1)**
30:2
**weighed (2)**
20:5;34:21
**WELLS (4)**
9:8;11:9,10,17
**Wexler (2)**
10:16,19
**what's (8)**
16:23;20:1,24;
28:10,10;35:17;
37:16;82:4
**whatsoever (1)**
29:8
**Whereupon (1)**
82:15
**wherever (1)**
42:18
**wherewithal (1)**
39:19
**White (1)**
25:10
**who'd (1)**
12:4
**whole (2)**
42:21;56:5
**who's (6)**
17:20;18:20;69:7;
70:7,21;79:5
**willful (4)**
23:17,19;75:9,11
**willing (1)**
65:4
**willingness (1)**
79:14
**WILLKIE (5)**
4:2;10:23;11:1,2;
27:12
**Wilmington (1)**
6:18
**Wilshire (1)**
8:4
**win (1)**
61:21
**wishes (2)**
67:25;70:21
**within (3)**
13:6;22:4;47:5
**without (6)**
13:4,15,17;21:14;
69:19;78:13
**witnesses (3)**
20:19,23;34:3
**WL (1)**
74:5
**women (1)**
30:20
**wonder (1)**

74:14
**wonderful (1)**
26:15
**words (3)**
18:9;38:12,13
**wordsmithing (1)**
60:2
**work (8)**
26:23;60:13;67:13;
69:19;77:17,18,20;
79:24
**worked (1)**
67:1
**workers (1)**
29:22
**working (5)**
15:4;67:6,14,21;
79:21
**works (3)**
27:2,10;69:21
**worries (1)**
70:11
**worth (2)**
13:12;69:22
**wound (1)**
29:13
**wrinkle (2)**
58:18,18
**wrong (2)**
40:16;42:12
**wronged (1)**
28:22

## Y

**year-long (1)**
31:18
**Yep (3)**
62:3,3,3
**YERAK (1)**
9:25
**yesterday (3)**
13:19,20;66:24
**York (8)**
5:7;6:6;7:5;8:14;
9:5;10:8;29:18;51:20

## Z

**ZACHARY (1)**
9:21
**zone (1)**
42:14
**ZOOM (41)**
4:8,9,10;5:9,10,20;
6:10;7:7,8,9,10,11,12,
21;8:8,16,17;9:7,12,
13,14,15,16,17,18,19,
20,21,22,23,24,25;
10:5,13;11:16;13:5,7,
8;70:4,11,21

## 1

**1 (1)**
33:1
**1.3 (1)**
51:9
**1:02 (1)**
82:15
**1000 (2)**
7:17;8:4
**10004 (1)**
9:5
**10005 (1)**
8:14
**1003 (1)**
5:7
**10036 (1)**
6:6
**10158 (1)**
7:5
**108 (1)**
38:8
**11 (9)**
10:8;15:18;21:10;
25:9;28:14;34:20,22;
39:6;54:11
**1201 (1)**
6:17
**1280 (1)**
72:20
**1285 (1)**
72:20
**12th (1)**
13:13
**1313 (1)**
6:16
**138 (1)**
23:12
**14 (1)**
74:19
**144 (1)**
34:19
**148 (4)**
15:22;16:9;21:9;
34:11
**148-million (1)**
29:12
**14th (1)**
4:17
**1500 (1)**
8:5
**1800 (1)**
5:17
**1875 (1)**
4:5
**18th (1)**
53:5
**19801 (1)**
6:18
**1987 (1)**
76:4
**1988 (1)**

25:8
**1990 (1)**
72:20
**1999 (1)**
75:9

## 2

**2 (2)**
32:25;33:2
**20006 (1)**
4:6
**2012 (3)**
74:5,5,18
**2020 (2)**
29:21;30:3
**2022 (1)**
74:19
**2023 (2)**
14:14;73:12
**20th (1)**
14:20
**2110 (1)**
4:18
**21st (3)**
14:14;66:1;71:3
**22nd (1)**
66:18
**2300 (1)**
5:16
**24th (2)**
67:7,8
**25 (1)**
72:10
**25th (2)**
67:7,8
**28 (1)**
8:13
**2d (1)**
72:20

## 3

**3 (2)**
33:3,15
**30309 (1)**
4:19
**30th (1)**
33:25
**31st (1)**
69:11
**3220 (1)**
74:19
**3249641 (1)**
74:5
**341 (2)**
66:6;67:11
**362d (1)**
72:16
**3rd (2)**
29:21;30:3

23-12055-shl    Doc 136    Filed 02/14/24    Entered 03/06/24 11:37:05    Main Document
In the Matter of: RUDOLPH W. GIULIANI    Pg 101 of 101

January 19, 2024

**90 (1)**
  75:9
**90017 (1)**
  8:6
**907 (1)**
  72:20
**92 (1)**
  73:12

**4**

**4 (1)**
  33:4
**4th (1)**
  30:24

**5**

**5 (1)**
  33:5
**50 (1)**
  72:22
**5100 (1)**
  7:18
**523 (1)**
  24:5
**523a6 (2)**
  22:5;75:11
**56 (1)**
  72:24
**578 (1)**
  73:11
**591 (1)**
  73:12
**5th (1)**
  71:3

**6**

**6 (5)**
  33:6;34:13,14,18;
  73:6
**601 (1)**
  5:6
**605 (1)**
  7:4
**62a (1)**
  44:19
**648 (1)**
  73:11

**7**

**75 (2)**
  4:17;76:3
**75201 (1)**
  5:18
**77702 (1)**
  7:19
**7th (1)**
  74:5

**8**

**82 (1)**
  5:5
**86 (1)**
  76:3

**9**