AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Philip C. Dublin
Abid Qureshi
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Rachel Biblo Block (admitted *pro hac vice*)
2300 N. Field St., Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

*Counsel to the Official Committee of*
*Unsecured Creditors of Rudolph W. Giuliani*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
| In re: | : | Chapter 11 |
|---|---|---|
| | : | |
| **RUDOLPH W. GIULIANI** | : | Case No. 23-12055 (SHL) |
| a/k/a RUDOLPH WILLIAM GIULIANI, | : | |
| | : | |
| **Debtor.** | : | |
---------------------------------------------------------------x

**REPLY IN SUPPORT OF THE**
**MOTION OF THE OFFICIAL COMMITTEE**
**OF UNSECURED CREDITORS OF RUDOLPH W.**
**GIULIANI TO COMPEL THE DEBTOR TO (I) SELL HIS FLORIDA**
**CONDOMINIUM AND (II) OBTAIN HOMEOWNERS INSURANCE**
**FOR HIS FLORIDA CONDOMINIUM AND NEW YORK CITY APARTMENT**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 case of Rudolph W. Giuliani a/k/a Rudolph William Giuliani (the "Debtor"), by and through its undersigned counsel, hereby files this reply (this "Reply") to the Debtor's objection [Docket No. 155] (the "Objection") to the *Motion of the Official Committee of Unsecured Creditors of Rudolph W. Giuliani to Compel the Debtor to (I) Sell His Florida Condominium and (II) Obtain Homeowners Insurance for His Florida Condominium and New York City Apartment*

[Docket No. 148] (the "Motion").[1]  In further support of the Motion, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1. In the Objection, the Debtor argues that the Committee's Motion is "premature and without legal authority." Objection ¶ 13. The Debtor's argument appears to be at least in part premised on the misguided notion that, on the off chance the Freeman Judgment[2] is vacated or significantly reduced, the value of the property of the estate will so exceed the remaining claims of creditors that it will be unnecessary for him to sell the Florida Condo at all. This argument cannot withstand scrutiny and also speaks volumes about how the Debtor intends to proceed in this chapter 11 case.

2. When the Debtor chose to avail himself of the protections of the Bankruptcy Code, a bankruptcy estate was created—a bankruptcy estate which includes the Florida Condo as one of its two most significant assets. Since the Debtor cannot claim an exemption with respect to the Florida Condo (a fact that the Debtor concedes as "obvious" in the Objection, as he must), the Florida Condo is a significant source of recovery for the Debtor's creditors. It is quite telling that the Debtor does not respond in the Objection to the Committee's argument that it is only a matter of *when*, not *if*, the Debtor must sell the Florida Condo.

3. Yet, although the Debtor has no viable argument that he will be able to maintain the Florida Condo after the conclusion of this chapter 11 case, he insists on continuing to spend thousands of dollars every month on expenses related to this property. While the Debtor tries to

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

[2] The "Freeman Judgment" means the approximately $148 million judgment entered in the lawsuit brought by Ms. Ruby Freeman and Ms. Wandrea' ArShaye Moss against Mr. Giuliani in connection with his relentless public defamation of them following the 2020 presidential election (the "Freeman Litigation").

2

delay the inevitable, he is simultaneously using the bankruptcy case to stay the Freeman Judgment and test his luck for some indefinite period of time on post-trial motions in the Freeman Litigation, a lawsuit in which he previously refused to participate in good faith. This delay tactic benefits no one but the Debtor and is to the detriment of his creditors. The Debtor's creditors are not required to fund a continuation of the Debtor's prepetition lifestyle, and the Debtor, who voluntarily commenced this bankruptcy case and is getting the benefits associated therewith, is not entitled to maintain his prepetition lifestyle. Accordingly, in order to move this chapter 11 case forward and prevent the Debtor from exploiting the benefits of bankruptcy, the Motion should be granted.

## ARGUMENT

**I.    The Motion Is Not Premature.**

4.    By the Objection, the Debtor essentially argues that the Motion is "premature" because the Freeman Judgment may be reduced or vacated, so it may prove unnecessary to sell the Florida Condo in order to satisfy creditors' claims pursuant to a chapter 11 plan. This argument cannot prevail. Most notably, it evidences the Debtor's clear intent to languish in bankruptcy indefinitely while waiting for every post-trial motion in the Freeman Litigation and any appeal of the Freeman Judgment to run their course. This is not what chapter 11 is for, and it is an abuse of the protections the Debtor obtained by filing this case.[3] Furthermore, the Bankruptcy Code has a process for determining the value of contingent and unliquidated claims—claims estimation— which is expressly mandated in situations involving "contingent or unliquidated claim[s], the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c). Yet, that process is not necessary here, at least not with respect to the

---

[3]    A debtor cannot file a petition purportedly for the purpose of reorganizing, then use the benefits of bankruptcy to pursue a litigation tactic without taking steps to put forward a meaningful plan. *In re Wally Findlay Galleries, Inc.*, 36 B.R. 849, 851 (Bankr. S.D.N.Y. 1984) ("[I]t is evident that the debtor seeks to use this court not to reorganize, but to relitigate. This is an impermissible use of Chapter 11 of the Bankruptcy Code.")

3

Freeman Judgment, which is a liquidated claim as a result of a judgment entered by the United States District Court for the District of Columbia. Bankruptcy is not an indefinite vacation from creditors; if a debtor seeks protection in order to reorganize, he is required to make an effort to do so in a timely manner. *See, e.g.*, *id.* § 1121 (initially providing a debtor with only 120 days of plan exclusivity).

5.      In asserting that the Motion is premature because "the Committee is assuming that most if not all of the Freeman judgment will survive on appeal, and is proceeding as if all of the Debtor's assets need to be liquidated now to satisfy a potentially inflated claim," the Debtor avers that he may suffer irreparable harm if he is forced to sell the Florida Condo and the Freeman Judgment is later vacated. Objection ¶ 13. The Debtor makes two sweeping, illogical jumps to reach this conclusion: (1) the Freeman Judgment likely will be vacated or reduced to nearly nothing; and (2) the other claims against the estate do not exceed the value of the estate's assets beyond the value of the Florida Condo. First, with respect to the Debtor's confidence that the Freeman Judgment could be vacated or reduced to nearly nothing, the Committee expresses skepticism. This skepticism is justified in light of the highly questionable merits of the Debtor's appeal following the Debtor's litigation tactics that ultimately led to the entry of "death penalty sanctions" and a default judgment against Giuliani, as well as Giuliani's entry into a stipulation in which he agreed to the entry of declaratory relief providing that he engaged in "intentional, malicious, wanton and willful" conduct entitling Ms. Freeman and Ms. Moss to punitive damages.[4]

---

[4]     *Freeman et al. v. Giuliani*, No. 1:21-cv-03354-BAH [Docket No. 94, at 5]; *id*. [Docket No. 138, at 3]. Upon entry of the *Order Granting Limited Relief from the Automatic Stay to Preserve Certain Post-Trial Rights* [Docket No. 124] (the "Lift Stay Order"), the Court lifted the automatic stay for a narrow list of purposes, including to file a notice of appeal from the Freeman Judgment. *See* Lift Stay Order ¶ 2. The Debtor currently is not authorized to prosecute an appeal of the Freeman Judgment. *See* Lift Stay Order ¶ 3 ("Except with respect to the filing of a Notice of Appeal, any appeal of the Freeman Litigation shall remain subject to the automatic stay."). As argued by the plaintiffs in the Freeman Litigation, Giuliani cannot appeal the Freeman Judgment without posting a bond in satisfaction of Federal Rule of Civil Procedure 62. *See generally Objection of Ruby Freeman and Wandrea' ArShaye Moss to Debtor's Motion for an Order Modifying the Stay for the Limited Purposes of Allowing the*

4

6.  Second, even if the approximately $148 million Freeman Judgment were reduced by 95%, that would still eclipse the Debtor's valuation of all of his non-Florida Condo assets reported in the Schedules, which would necessarily require the Debtor to sell the Florida Condo to satisfy other claims. *See* Schedules, Schedule A/B: Property (listing a total of $10,632,334.28 in assets on Schedule A/B, of which the Florida Condo represents $3,500,000).[5]  Moreover, the Debtor seems to assume that, if the Freeman Judgment is vacated, he has negligible other claims against the estate that he must satisfy, which is a baffling contention.  The Debtor has scheduled $4,870,303.14 in claims other than the Freeman Judgment, and he has also scheduled five other contingent and unliquidated litigation-related claims of "unknown" amount. *See* Amended Schedules, Schedule D: Creditors Who Have Claims Secured by Property; Amended Schedules, Schedule E/F: Creditors Who Have Unsecured Claims.  Beyond that, the Debtor is incurring administrative claims over the course of this chapter 11 case, which he will have to pay in full.  In other words, the Debtor still has plenty of other claims to address before he can reorganize and emerge from bankruptcy, which will necessarily require him to monetize his assets and distribute proceeds pursuant to a chapter 11 plan.

---

*Debtor to File Post Trial Motions to Modify the Judgment and on for a New Trial and to File a Notice of Appeal* [Docket No. 50].  Despite these multiple hurdles, the Objection reads as though the Debtor will be entitled to pursue an appeal of the Freeman Litigation as a matter of right in the near term. *See* Objection ¶ 6 ("Appellate Counsel is still assembling and analyzing several meritorious issues to be raised on appeal.").  The Court's order authorizing the retention of Camara & Sibley, LLP does not authorize any such work to be done on behalf of the Debtor at this time, and the Committee reserves all rights on behalf of itself and its constituents on these issues. *See generally Order Authorizing Employment of Camara & Sibley, LLP as Special Litigation Counsel* [Docket No. 123].

[5]  The Committee reiterates that the self-reported $3,500,000 valuation of the Florida Condo in the Schedules was based on an appraisal conducted in connection with Giuliani's divorce several years prior to the Petition Date. The Committee has requested information regarding this appraisal and, as of the filing of this Reply, has not received any supporting documentation.

5

7.     Throughout the Objection, the Debtor also cites to various alleged harms that would result from a purported premature sale of the Florida Condo. The Committee addresses each of these in turn.

   a. <u>Forced Sale</u>. The Debtor attempts to raise the specter that, if the Motion is granted, the Debtor will be forced to run an expedited sale process or accept a below market offer on the Florida Condo. Objection ¶ 33. Yet, the Debtor fails to provide any explanation as to why this result would follow. Critically, the Motion seeks to compel the Debtor to "take all reasonable steps" to market and sell the Florida Condo, not to force an immediate sale of the property. Motion ¶ 26; Ex. A ¶ 2. The Committee intentionally did not set a specific timeline for any sale process in the proposed order attached to the Motion. *See generally* Motion, Ex. A. Instead, the Committee seeks relief compelling the Debtor to take reasonable steps to monetize this asset, since marketing and selling the Florida Condo at an appropriate price that maximizes the value of the estate will understandably take time to execute properly.

   b. <u>Homelessness</u>. The Debtor also resorts to histrionics, asking "[s]urely the Committee does not intend the Debtor to join the ranks of the homeless?" Objection ¶ 31. It seems hardly worth pointing out that there is a vast gulf of housing options available between residing in an approximately $3.5 million Palm Beach condominium and homelessness. Moreover, there is plenty of case law establishing the fact that "[a] debtor cannot file a chapter 11 petition and claim an entitlement to live in the style to which he or she has become accustomed." *In re Weber*, 209 B.R. 793, 800 (Bankr. D. Mass. 1997). It is likewise "appropriate to examine . . . the use of the debtor's resources during the administration of a [c]hapter 11 case" and look to "belt-tightening" as a way to increase proposed payments to creditors. *Id.* at 798-99; *see also In re Devine*, No. 90-00088-H4-11, 1991 Bankr. LEXIS 1057, at *15-17 (Bankr. S.D. Tex. July 10, 1991) (examining debtor's monthly operating reports and determining living expenses had not been properly curtailed).

   In the Schedules, the Debtor estimates that his monthly expenses related to the Florida Condo total approximately $8,416; however, despite this representation, in other filings, he reports making payments in connection with the Florida Condo far exceeding this amount both in the 90 days before the Petition Date and in the month of January. *See* Initial Schedules, Schedule J: Your Expenses, Part 2, Item 20; Amended SOFA, Part 3, Question 6 (listing maintenance fee payments of $15,995.43 to the Southlake Association on each of September 20, 2023, November 10, 2023 and November 15, 2023 and a payment of $84,408.59 on account of Florida property taxes on November 17, 2023); January MOR (listing maintenance fee payments of $15,995.43 on each of January 11, 2024 and January 17, 2024).[6]

---

[6]   The Committee remains troubled by these inconsistencies. Moreover, the monthly operating report for February was due on March 21, 2024, and the Debtor still has not filed this report nor shared the supporting documentation

6

> Surely, there are suitable apartment rentals in New York City and Florida that cost less on a monthly basis than any one of these maintenance fee payments.

c. <u>Loss of Broadcasting Studio</u>.  The Debtor also alleges that, "[o]nce the New York apartment is sold, the Debtor will need a place to operate the Podcast from if he is to earn money therefrom; the only remaining location would be from the Florida Condominium."  Objection ¶ 32.  The Debtor further absurdly asserts that he is "actually saving money [by keeping the Florida Condo] as he does not need to pay for and maintain both a Podcast studio and a residence in both New York City and Florida."  *Id.*

These statements directly contradict the Debtor's testimony at the 341 Meeting.  There, the Debtor unequivocally stated numerous times that he can record his podcast anywhere.  Specifically, the Debtor explained:

> Sometimes, maybe a third of the time I'm on the road.  So I recently spent four or five days in New Hampshire during the New Hampshire primary.  And I broadcast from a – I think we used a [sic] we used a hotel. . . . At least a third of the time I'm doing it on the road, or I might do it at home because I have a device called a Comcast that allows me to broadcast anywhere in the world. . . . for example, if I go to Florida for a week or two . . . I'll take the device with me.  And I can do the show from Florida. . . . wherever I am, we'll find a place to set up a studio.

341 Transcript at 16:17-17:24.  Not only does this testimony make it clear the Debtor can broadcast from "anywhere in the world," but also it sounds as though the Debtor broadcasts using a portable device that allows him to "set up a studio" anywhere.  341 Transcript at 17:2, 17:23-24.  Accordingly, the argument that the Florida Condo is the "only remaining location" where the Debtor can support his livelihood is untenable.[7]

8. In sum, the Debtor has put forth no sound arguments that the relief requested in the Motion is premature or would cause the Debtor harm—irreparable or otherwise.

## II. Legal Authority Supports the Relief Requested in the Motion.

9. Besides arguing that the Motion is premature, the Debtor also contends that the Motion is "without legal authority."  Objection ¶ 13.  The Debtor's contention that the Motion

---

with the Committee as of the filing of this Reply.  As a result, the Committee cannot assess whether the Debtor's estimates in the Schedules are accurate.

[7] The Debtor also has failed to provide sufficient financial disclosures to show whether his podcasting business even operates at a profit.  Irrespective, he has provided sworn testimony that his podcasting business can be conducted "anywhere in the world."

7

lacks support under the Bankruptcy Code is incorrect, and there are several bases on which the Committee's requested relief should be granted.

### A.     The Debtor Has the Duties of a Trustee and Must Conserve Estate Assets.

10.     Bankruptcy Code section 1107 states that "a debtor in possession shall have all the rights . . . and powers, and shall perform all the functions and duties, . . . of a trustee serving in a case under this chapter." 11 U.S.C. § 1107(a). As a fiduciary with all the duties of a trustee, the debtor in possession holds property of the estate in trust for his creditors and must preserve the assets of the estate.[8] A bankruptcy court also "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *Id.* § 105(a). Accordingly, this Court has the authority to compel the Debtor to act in accordance with his fiduciary duties as a trustee to prevent him from depleting assets by insisting on carrying an expensive piece of property that he is required to sell to satisfy claims against his estate.

11.     The Debtor insists that courts have no authority to interfere with a debtor in possession's day-to-day decisions, especially "when the debtor in possession, as trustee, is not harming the estate in any way." Objection ¶ 20. Yet, after just over three months in bankruptcy, the Committee can point to numerous examples of ways in which the Debtor has harmed and continues to harm and mismanage the estate.

   a.     The Debtor claims that it is not improper to maintain the Florida Condo, since he is using exempt assets to pay for expenses related to such property. Objection ¶¶ 18, 22. However, the Debtor almost immediately thereafter notes that "he is rapidly liquidating his IRA to support the two properties, which is simply unsustainable." *Id.* ¶ 23. He will continue to rapidly deplete his IRA to pay the

---

[8]    The Debtor spent several pages of the Objection distinguishing the cases that the Committee cited for this proposition. *See* Objection ¶¶ 24-29. The Committee purposefully cited cases appointing trustees for this proposition, as courts tend to discuss the contours of a debtor's fiduciary duties in situations where a debtor has shirked them. Moreover, the Committee intended the Motion to be an intermediary step to give the Debtor the opportunity to discharge his duties to creditors and act as a fiduciary before the Committee is required to take additional steps to protect the remaining value of the Debtor's estate, including filing a motion to appoint a chapter 11 trustee, which motion the Committee reserves its right to file.

8

significant maintenance fees and property taxes associated with the Florida Condo, and, when that finite asset inevitably runs out, the Debtor will necessarily have to turn to estate property to fund his expenses. Contrary to the Debtor's claim that "the maintenance of the Florida property has no detrimental effect to creditors," that is simply untrue and by persisting in this way, the Debtor clearly will continue to harm the estate. Objection ¶ 31.

b.   As discussed further in the Motion, in January alone, the Debtor made credit card payments totaling $26,212.87. Motion ¶ 29. Most notably, this included payments that the Debtor made on account of Maria Ryan's credit card, as well as travel and lodging expenses for his employees and associates. *Id.* These are unauthorized payments for which the estate received no benefit and which the Committee will seek to pursue the return of under Bankruptcy Code section 549 if such amounts are not repaid to the estate.

c.   Although the Debtor spends a great deal of time explaining that he is "in the process of obtaining Court approval to list and sell his New York City apartment," the Committee cannot understand why the Debtor is not further along in this process. Within 48 hours of the Debtor's counsel introducing the Committee's counsel to Sotheby's counsel, the Committee and Sotheby's reached agreement with respect to Sotheby's draft retention materials and a revised listing agreement for the NYC Apartment. Since then, however, more than two weeks have passed without a definitive answer on when these materials will be filed. In the meantime, the Debtor doubtless continues to incur substantial expenses related to the NYC Apartment, and the Committee reserves its rights to a file a motion to compel the sale of that property as well.

d.   At the initial case conference on January 31, 2024, the Court noted that "[w]ith bankruptcy, a debtor gets certain benefits, such as the automatic stay, and with that comes certain obligations . . . among them is financial transparency. So I trust that will, again, be the order of the day for this case."[9] Despite this admonishment, the Committee still struggles to obtain complete financial disclosure from the Debtor. For example, at the 341 Meeting, the U.S. Trustee told the Debtor "[y]ou have to file an amended expense report because the one that you have does not match up." 341 Transcript at 160:9-10. To date, the Debtor has not filed further amended schedules of assets and liabilities or a further amended statement of financial affairs to correct inaccuracies and disclose additional information, and the 341 Meeting remains open as a result of this. Additionally, as noted above, the Debtor also recently missed his deadline to file the February monthly operating report.

12.   Perplexingly, the Debtor also includes a lengthy quotation describing the

Committee's duties, presumably to suggest the Committee does not have the authority to seek to

---

[9]   *In re Rudolph W. Giuliani*, No. 23-12055-SHL (Bankr. S.D.N.Y. Jan. 31, 2024), Hr'g Tr. at 35:23-36:3.

9

compel the Debtor to take reasonable steps to sell a key asset of the estate and thereby maximize the value of the estate for his creditors. Objection ¶ 19. Yet, the Committee expressly has the ability to "perform such other services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5). The Committee's actions to ensure that the Debtor discharges his fiduciary duties to creditors constitute such "other services" in the interest of unsecured creditors.

13. In sum, by wasting resources on an asset he cannot keep and refusing to take inevitable steps in furtherance of a reorganization, the Debtor is disregarding his fiduciary duties to creditors to maximize the value of the estate. This Court has authority under the Bankruptcy Code to compel the Debtor to act in accordance with his duties as a trustee or to *sua sponte* appoint a chapter 11 trustee to ensure that the value of the estate is maximized. *Id.* §§ 1104(a), 105(a); *see also In re U.S. Mineral Prods. Co.*, 105 Fed. App'x 428, 430-31 (3d Cir. 2004).

### B. The *Highway Equipment* Decision Supports the Relief Requested in the Motion.

14. In the Objection, the Debtor asserts that the decision in *In re Highway Equipment Co.* is more favorable to the Debtor than the Committee, but this is plainly incorrect. Objection ¶ 30.

15. As an initial matter, it is worth noting that the issue before the court in *Highway Equipment* was whether to compel a debtor's entry into a sale transaction—*i.e.*, whether to force the debtor to accept a particular purchase offer. As noted above, that is *not* what the Committee seeks to do here. The Committee is seeking to compel the Debtor to take reasonable steps to market, list and ultimately sell the Florida Condo at an appropriate price. Any eventual sale transaction would be subject to Court approval under Bankruptcy Code section 363(b).[10]

---

[10] Where the Debtor asserts that the Committee cites Bankruptcy Code section 363 in a heading as a basis for the relief sought in the Motion, the Debtor is simply wrong. Objection ¶ 21. The Committee was referring to the

10

16.  Consequently, although not entirely comparable, the Committee found the *Highway Equipment* decision instructive in that the court in that case found that it had the authority to compel a debtor to accept a purchase offer—which is more aggressive relief than that sought here—because of the court's "power . . . to regulate the conduct of a debtor which, after all, occupies the position of a trustee in bankruptcy." *In re Highway Equipment Co.*, 61 B.R. 58, 60 (Bankr. S.D. Ohio 1986).  The *Highway Equipment* court held that the creditor seeking to compel the sale had to show that the debtor was acting without a business justification in refusing to sell.[11] *Id.*

17.  As the Committee has outlined in the Motion and again here, there is no valid business justification for the Debtor continuing to hold the Florida Condo, which generates thousands of dollars of monthly expenses, when he has no legal basis to keep the nonexempt Florida Condo at the conclusion of this chapter 11 case.  As a result, it is simply a matter of *when* the Debtor must sell this asset, and the sooner the Debtor sells, the fewer resources the Debtor will waste by throwing money at an asset he cannot keep.  The flimsy business justifications that the Debtor outlines in his Objection, such as being forced to look for alternative housing or the baseless contention that the Florida Condo is the only remaining location from which the Debtor may broadcast, are without merit.  Objection ¶ 31-32.

---

fact that any eventual sale of the Florida Condo would be pursuant to Bankruptcy Code section 363, not that it served as a statutory basis for the relief sought in the Motion.

[11]  Based on the particular facts of that case, the court in *Highway Equipment* held that the moving creditor failed to sustain its burden to show that the debtor acted without a valid business justification in refusing to sell. *In re Highway Equipment Co.*, 61 B.R. at 60.  Whereas the moving creditor only established that the purchase offer was reasonable in amount, the debtor presented "substantial evidence" supported by the opinion of real estate counsel to show the reasonableness of its insistence on certain sale restrictions (such as restrictions on use, access, architectural design and traffic) and its refusal to sell if such restrictions were not accepted. *Id.* at 59.  Unlike the moving creditor in *Highway Equipment*, the Committee has shown in the Motion and this Reply that the Debtor lacks any valid business justification for refusing to take steps to sell the Florida Condo and has responded to the Debtor's arguments in opposition.

11

### C. The Best Interests of Creditors Test Is Not the Only Requirement a Chapter 11 Plan Must Meet to Be Confirmed.

18.  Finally, the Debtor states that he "understands that he has an obligation to pay his creditors what they would receive if his assets were liquidated" and that "the purpose of a reorganization is to allow the Debtor to protect his assets as long as creditors are paid what they would be entitled to under a liquidation analysis." Objection ¶¶ 20, 21. This narrow reading of the Bankruptcy Code fails to address the realities of this chapter 11 case.

19.  A chapter 11 plan may not be confirmed unless it satisfies various statutory requirements set forth in Bankruptcy Code section 1129. Among these requirements is Bankruptcy Code section 1129(a)(7), which is also referred to as the "best interests of creditors test." This section provides

> (7) With respect to each impaired class of claims or interests—
>
> (A) each holder of a claim or interest of such class—
>
> (i) has accepted the plan; or
>
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date[.]

11 U.S.C. § 1129(a)(7). In other words, each individual dissenting creditor who holds a claim within an impaired class cannot receive less under a proposed plan than it would under a hypothetical liquidation.

20.  The "best interests of creditors test" is not, however, the only requirement a plan must meet to be confirmed. Relevant here, the Bankruptcy Code also requires that, for each class of claims, such class must either accept the plan or not be impaired under the plan or the plan must otherwise satisfy the terms of Bankruptcy Code section 1129(b). *Id.* § 1129(a)(8). The Debtor has

one class of general unsecured claims, and, based on his exorbitant spending, his self-reported limited assets and the continued accrual of administrative expenses (like professional fees) that must be paid in full, this class will be impaired. *See generally* January MOR (disclosing $26,212.87 in credit card payments in January); Schedules (reporting $10,632,334.28 in total assets and $152,870,303.14 in liabilities).

21.  Given that the single class of general unsecured claims will be impaired and likely will be the only class of creditors entitled to vote on a chapter 11 plan, in order for any chapter 11 plan to be confirmed, the class of general unsecured claims must vote to accept that plan. *See* 11 U.S.C. § 1129(a)(8); Schedules (listing the types and amounts of claims held by the Debtor's creditors). And, as the only impaired class, general unsecured creditors cannot be crammed down under section 1129(b). As a result, in order to achieve confirmation of a plan, the Debtor must propose a plan that unsecured creditors vote to accept. Any chapter 11 plan in which the Debtor proposes to keep the Florida Condo and provide creditors with the bare minimum, liquidation value of his assets will not be acceptable or confirmable.

22.  Thus, again, the Committee stresses that since the Florida Condo will have to be sold and the proceeds thereof distributed pursuant to any chapter 11 plan, the Debtor's delaying the inevitable only depletes finite resources and endangers the estate.

### III. The Sufficiency of the Debtor's Recently Acquired Homeowners Insurance Is an Issue for Another Day.

23.  At the 341 Meeting, the Debtor testified that he did not have homeowners insurance. *See* 341 Meeting Transcript at 143:24-144:12. Since then, according to Exhibit A to the Objection, the Debtor has obtained minimal coverage for the NYC Apartment and the Florida Condo. The Debtor also points to master insurance policies at each property but provides no

evidence thereof. Whether the Debtor's coverage is sufficient to protect critical estate assets is for another day, and the Committee reserves all rights.

## CONCLUSION

24. For all the foregoing reasons and the reasons set forth in the Motion, the Committee respectfully requests that the Court (a) overrule the Objection and (b) grant the relief requested in the Motion and such other and further relief as is just, proper and equitable.

Dated: April 1, 2024
      New York, New York

*/s/ Philip C. Dublin*
**AKIN GUMP STRAUSS HAUER & FELD LLP**
Ira S. Dizengoff
Philip C. Dublin
Abid Qureshi
One Bryant Park
New York, New York 10036
Tel:   (212) 872-1000
Fax:   (212) 872-1002
Email:  idizengoff@akingump.com
          pdublin@akingump.com
          aqureshi@akingump.com

- and -

Rachel Biblo Block (admitted *pro hac vice*)
2300 N. Field St., Suite 1800
Dallas, Texas 75201
Tel:   (214) 969-2800
Fax:   (214) 969-4343
Email:  rbibloblock@akingump.com

*Counsel to the Official Committee of
Unsecured Creditors of Rudolph W. Giuliani*