UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -x


In the Matter of:

RUDOLPH W. GIULIANI,                          Lead Case No.

       Debtor.                                23-12055-shl


- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        April 4, 2024

        2:13 PM


B E F O R E:

HON. SEAN H. LANE

U.S. BANKRUPTCY JUDGE


ECRO:  NAROTAM RAI

Doc. #140 Motion Of The Official Committee of Unsecured
Creditors For The Entry of
an Order Pursuant To Bankruptcy Code Section 105 And Federal
Rule Of Bankruptcy
Procedure 2004 Authorizing Discovery Of The Debtor And Third
Parties

Doc. #142 Motion To Extend Exclusivity Period For Filing A
Chapter 11 Plan And
Disclosure Statement

Doc. #148 Motion To Compel / Motion Of The Official Committee
Of Unsecured
Creditors Of Rudolph W. Giuliani To Compel The Debtor To (1)
Sell His Florida
Condominium And (11) Obtain Homeowners Insurance For His
Florida Condominium
And New York City Apartment

Doc. #150 Application Of The Official Committee Of Unsecured
Creditors To Retain
And Employ Global Data Risk LLC As Specialized Forensic
Financial Advisor,
Effective As Of February 9,2024



Transcribed by:  Cathy L. Kleinbart

eScribers, LLC

7227 North 16th Street, Suite #207

Phoenix, AZ 85020

(800) 257-0885

operations@escribers.net

A P P E A R A N C E S:

BERGER, FISCHOFF, SHUMER, WEXLER & GOODMAN, LLP

     Attorneys for Debtor

     6901 Jericho Turnpike

     Suite 230

     Syosset, NY 11791


BY:  HEATH S. BERGER

     GARY C. FISCHOFF



ABRAMS FENSTERMAN, LLP

     Attorneys for Noelle Dunphy

     3 Dakota Drive

     Suite 300

     Lake Success, NY 11042


BY:  ROBERT ABRAMS, ESQ. (ZOOM)

     JUSTIN TYLER KELTON, ESQ. (ZOOM)

WILLKIE FARR GALLAGHER, LLP

 Attorneys for Ms. Ruby Freeman and Ms. Wandrea ArShaye

  Moss

 787 Seventh Avenue

 New York, NY 10019


BY: ALISON R. AMBEAULT, ESQ. (ZOOM)

  AARON NATHAN, ESQ. (ZOOM)



AKIN GUMP STRAUSS HAUER & FELD LLP

 Attorneys for the Official Committee of Unsecured

  Creditors

 2300 North Field Street

 Suite 1800

 Dallas, TX 75201


BY: RACHEL BIBLO BLOCK, ESQ. (ZOOM)

AKIN GUMP STRAUSS HAUER & FELD LLP

     Attorneys for the Official Committee of Unsecured
      Creditors

     1 Bryant Park

     New York, NY 10036


BY:  AMELIA DANOVITCH, ESQ.

     PHILIP C. DUBLIN, ESQ.

     SHANT K. EULMESSEKIAN, ESQ. (ZOOM)

     DAVID HILL, ESQ.

     ABID QURESHI, ESQ.



BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP

     Attorneys for Smartmatic

     1313 North Market Street

     Suite 1201

     Wilmington, DE 19801


BY:  DANIEL BROGAN, ESQ. (ZOOM)

OFFICE OF THE NYS ATTORNEY GENERAL

      Attorneys for NYS Department of Taxation and Finance

      28 Liberty Street

      New York, NY 10005


BY:   LEO V. GAGION, ESQ. (ZOOM)

      ENID NAGLER STUART, ESQ. (ZOOM)



DAVIDOFF HUTCHER CITRON LLP

      Attorneys for Davidoff Hutcher Citron LLP

      605 Third Avenue

      New York, NY 10158


BY:   JAMES B. GLUCKSMAN, ESQ. (ZOOM)

      ROBERT LESLIE RATTET, ESQ. (ZOOM)



WINSTON STRAWN LLP

      Attorneys for Interested Party

      1901 L Street, NW

      Washington, DC 20036


BY:   KENNETH L. PERKINS, ESQ. (ZOOM)

BUCHALTER, A PROFESSIONAL CORPORATION

 Attorneys for US Dominion, Inc.

 1000 Wilshire Blvd.

 Los Angeles, CA 90017

BY: JOEL G. SAMUELS, ESQ. (ZOOM)

U.S. DEPARTMENT OF JUSTICE

 Attorneys for Office of the U.S. Trustee

 One Bowling Green

 New York, NY 10004

BY: ANDREA BETH SCHWARTZ, ESQ. (ZOOM)

NASON YEAGER GERSON HARRIS & FUMERO, PA

 Attorneys for South Lake II Condominium Association, Inc.

 Seacoast National Centre

 3001 PGA Boulevard, Suite 305

 Palm Beach Gardens, FL 33410

BY: IVAN J. REICH, ESQ. (ZOOM)

ALSO PRESENT:

      NOELLE DUNPHY (ZOOM)

      NEAL KRONLEY (ZOOM)

10

P R O C E E D I N G S

1

2      THE COURT:  Good afternoon.  Please be seated.  This

3  is Judge Lane.  I know we have folks on  Zoom as well as in

4  person for this 2 o'clock hearing in the Rudolph Giuliani

5  Chapter 11 case.  So I think we are fully hybrid.  And the

6  folks who, I think, are going to be most active are here in the

7  courtroom.  But because we're not doing any evidence, it's

8  perfectly appropriate under all applicable guidelines of the

9  Judicial Conference and the AO to conduct this hearing in a

10  fully hybrid way.

11      So with that just to make sure everybody who is on the

12  Zoom can hear, as well as the folks in Court; we have two

13  different sets of microphones.  We have microphones to amplify

14  us here in the Courtroom, which are the long neck ones.  And

15  then we have the ones that get picked up for Zoom, which are

16  the square ones.  So just do me a favor and whatever

17  microphones you want to use, as long as you're near both of

18  those.

19      And if anyone has any problems hearing, who's on the

20  line on Zoom, please just make a gesture of some sort so that

21  we can hear somebody waving for assistance.

22      So with that let me find out who's here in the

23  Courtroom.  So starting with debtor's counsel.

24      MR. FISCHOFF:  Good afternoon, Your Honor.  Berger,

25  Fischoff, Shumer, Wexler, & Goodman by Gary Fischoff for the

11

1  debtor.

2         MR. BERGER:  Good afternoon, Your Honor.  Heath,

3  Berger; Berger, Fischoff Shumer, Wexler, & Goodman, attorneys

4  for the debtor.

5         THE COURT:  All right.  Good morning.  And on behalf

6  of the Official Committee.

7         MS. BLOCK:  Good morning, Your Honor.  Rachel Biblo

8  Block with Akin Gump Strauss Hauer Feld on behalf of the

9  Official Committee of Unsecured Creditors.  I'm joined by my

10 colleague Phil Dublin, Abid Qureshi and Amelia Danovich.

11        THE COURT:  All right.  Good afternoon.  And let me

12 get other appearances from folks who may be on Zoom.  There's a

13 long list of people who are on Zoom.  I'm not going to go

14 through that all.  It'll take a long time and not be

15 particularly productive.  So I'm just going to -- I know that

16 the U.S. Trustee's Office (sic) is here, so let me get that

17 appearance.

18        MS. SCHWARTZ:  Thank you, Your Honor.  Andrea Schwartz

19 for the United States Trustee (sic).  And thank you for letting

20 me appear by Zoom.

21        THE COURT:  All right.  Could we turn that up a little

22 bit?

23        THE CLERK:  Yes, Judge.

24        THE COURT:  Well, let me -- so let me get --

25        MS. SCHWARTZ:  Do you want me to (indiscernible)

12

1  Judge?

2       THE COURT:  Hold on a minute.  Let me get Mr.

3  Glucksman's --

4       MR. GLUCKSMAN:  (Indiscernible) --

5       THE COURT:  No, it's not just her, that's everybody.

6       MR. GLUCKSMAN:  Davidoff Hutcher Citron by James

7  Glucksman of counsel.

8       THE COURT:  All right.  Thank you very much.  So let

9  me find out who else is on the Zoom who wishes to make an

10 appearance?

11      MR. GAGION:  Good morning, Your Honor.  Leo Gagion

12 (indiscernible) the Attorney General for the Department of

13 Taxation and Finance.

14      THE COURT:  Okay.  Mr. Gagion from Department of

15 Taxation and Finance.  I'm just going to repeat that because

16 that came in a little bit low.

17      Anyone else?

18      MR. BURBAGE:  Good afternoon, Your Honor.  James

19 Burbage of Willkie Farr & Gallagher, on behalf of Freeman

20 plaintiffs.

21      THE COURT:  All right.  Good afternoon, I should say.

22      Anyone else?

23      MR. REICH:  Yes, Your Honor.  This is Ivan Reich down

24 here in West Palm Beach.  I'm with the Nason Yeager (sic) firm.

25 I represent the South Lake Condominium Association (sic), which

13

1    is the subject matter of the motion before the Court today.

2            THE COURT:  All right.  Good afternoon.

3            Anyone else?

4            All right.  As I said, I know there are quite a few

5    people who are on -- listed on Zoom and who have not made an

6    appearance.  And to the extent that it becomes necessary for

7    them to later do so, we can cross that bridge when we come to

8    it.

9            And so I do have a copy of the agenda that was filed

10   for today's conference at Docket 160.  It was filed on April

11   3rd and lists a variety of uncontested matters.  And then the

12   one contested matter, which is the motion of the Official

13   Committee of Unsecured Creditors to compel the debtor to sell a

14   Florida condominium and obtain homeowners insurance.  It's at

15   Docket 148.

16           So let me turn it over to debtor's counsel to start us

17   off.

18           MR. BERGER:  Thank you, Your Honor.  Heath Berger, for

19   the debtor.  I'm just going to give a general status update,

20   Your Honor.

21           Please, obviously, there are a number of motions, Your

22   Honor, most of them are uncontested.  We've been working with

23   the Creditor's Committee, the U.S. Trustee, to get things done.

24   There's a 2004 motion which was resolved.  We're actually

25   working on some deposition dates right now.  So that's working

14

1   at this point, along with the production of documents.  The

2   February operating report, Your Honor, hasn't been filed yet.

3   We did have couple of questions with the accountant.  He's on

4   board now.  He's working with the debtor.  Hopefully, we'll

5   have that filed sometime towards the end of next week.  I'm

6   also working on getting his retention done.  Hopefully, I'll

7   have that over the weekend.  I will have Ms. Schwartz review it

8   with me.  And if all is good, then, we submit it to the Court.

9        The other issue we had, Your Honor, is we are working

10  with Sotheby's (sic) in connection with having them retained in

11  connection with selling the debtor's Manhattan apartment.  The

12  U.S. Trustee had a couple of questions in regard to the order,

13  and we're just trying to schedule a conference call with

14  myself, Ms. Biblio (sic), and Ms. Schwartz, and somebody from

15  Sotheby's, either later today or tomorrow.  My goal is, Judge,

16  is that we'll have that resolved and I will, hopefully, have

17  that filed, you know, sometime early next week.  And then we

18  can -- that -- that would get taken care of.

19        Got that.  Other than that, Judge, there will be

20  another application for employment of a attorney who's going to

21  be handling the appeal in regard to the Freeman litigation.  We

22  are just working now on getting all the documents from that

23  attorney is going to be coming in.  I know we've already

24  retained Sibley's (ph.) firm.  He's going to be stepping back

25  on it, and it's going to be -- actually a new attorney coming

15

1   in who handles all these appellate cases.  So once I get that

2   information, we were just advised of that a couple of days ago,

3   we will be working on a retention application, which we will,

4   of course, provide to the Creditor's Committee and to the U.S.

5   Trustee.

6          As far as that, Your Honor, I think that kind of

7   covers the status of the case at this point.  You know, we are

8   continuing in communications on a fairly regular basis with the

9   Creditor's Committee and with the U.S. Trustee to try to

10  continue to move this case forward.

11         THE COURT:  All right.  Thank you for that, on status.

12  So maybe we can go through the matters that are listed as

13  uncontested on the agenda.  And we'll start with the motion of

14  the Official Committee for Rule 2004 order.  And so I'll turn

15  it over to the Committee to start us off on that.

16         MS. DANOVITCH:  Good afternoon, Your Honor.  Amelia

17  Danovich, Akin Gump Strauss Hauer & Feld, counsel for the

18  Committee.  So the Committee filed its bankruptcy Rule 2004

19  motion on March 7, seeking authority to serve document requests

20  on and take depositions of the debtor, representatives of the

21  debtor, his businesses, advisors, and any other relevant

22  parties that the Committee becomes aware of in the course of

23  its investigation into the debtor's assets, liabilities,

24  pre-petition conduct, and financial situation.  The deadline

25  for parties to object to the 2004 motion was March 28th, and

16

1    the Committee received no formal objections to the motion.

2          As Your Honor will hear in connection with the motion

3    to compel.  The Committee is concerned with the amount of

4    information we've been receiving and the rate at which we've

5    been receiving that information.  We hope that entry of the

6    proposed 2004 order will lead to meaningful cooperation.  And

7    if not, we'll be back before Your Honor.

8          To date, the Committee has, as Mr. Berger noted, been

9    engaging in meet and confers with debtor's counsel with respect

10   to a schedule for document production and as well as an initial

11   limited deposition of the debtor.

12         Additionally, the Committee also had conversations

13   with the United States Trustee (sic) regarding the 2004 motion.

14   The U.S. Trustee's Office (sic) requested to have access to

15   documents produced, as well as to be able to participate in any

16   depositions of the debtor and other parties identified by the

17   Committee.  Earlier today, the Committee filed a revised

18   proposed order reflecting that request from the United States

19   Trustee (sic) that was filed at Docket number 161.

20         So unless, Your Honor, has any questions, we would

21   respectfully request entry of the proposed 2004 order.

22         THE COURT:  All right.  Thank you very much.

23         Any party wish to be heard on this request?

24         All right.  I do appreciate -- I think you just handed

25   just before we came out here -- I came out here, a copy of the

1    notice of revised proposed order, black lined or blue lined in

2    this case.  Thank you very much.  I appreciate that.  And

3    that's helpful.  I guess my one question, in light of what you

4    just said in terms of working out some specific deadlines for

5    some specific events whether they be depositions, or documents,

6    whatever, this is a pretty standard form and perfectly

7    acceptable form of order for 2004.  Occasionally, if people

8    want to memorialize their agreements on some specific things,

9    they will add to the sort of standard form of order.  And so

10   while I would say is just think about whether you wanted to add

11   any of those specific things you just mentioned.  If you have

12   them nailed down, great.  I'm just identifying it as a

13   potential way to assist the case moving forward, not as a

14   requirement.  You're in a better position to know whether

15   that's helpful or not, given all your negotiations.

16         So what I will do is I will hold on to this one.  And

17   maybe after the hearing, you can just communicate with chambers

18   and let us know if you want me to enter this order or if you

19   had some additional things that you -- bells and whistles, for

20   lack of a more legal firm that you wanted to add to the order

21   in terms of deposition dates or anything that, again, specific

22   dates can just help to move a case forward.

23         MS. DANOVITCH:  Great.  Thank you, Your Honor.

24         THE COURT:  All right.  But I'm happy to grant your

25   application under rule two, 2004, to authorize discovery of the

1  debtor on third parties for all the reasons that you set forth

2  in the motion in terms of the scope of the information that

3  you're requesting, as well as the parties against whom you're

4  requesting the information.  I think it's pretty well laid out

5  in the motion to the extent there's something in particular you

6  want to highlight for the record, great.  But I think it's

7  pretty well set forth in what you submitted.

8       MS. DANOVITCH:  Thank you, Your Honor.  Nothing

9  further on the 2004, but if I may, while I'm here take one item

10  out of order on the agenda.

11       THE COURT:  Sure.

12       MS. DANOVITCH:  Agenda item 3 is the retention

13  application for Global Data Risk.

14       THE COURT:  Right.

15       MS. DANOVITCH:  So we received informal comments from

16  the Office of the United States Trustee.  And we are working

17  through those comments with Ms. Schwartz, who we thank for

18  working with us on those.  We will plan to submit a revised

19  proposed order in connection with the Global Data Risk

20  Retention application, as well as a supplemental declaration.

21  In support thereof.

22       THE COURT:  All right.  Thank you very much for that

23  update.

24    Ms. Schwartz, anything from the UST on that?

25       MS. SCHWARTZ:  Yes.  Thank you, Your Honor.

19

1    (Indiscernible), Judge?

2         THE COURT:  Well, you know, the joys of remote

3    hearings.  It's always a bit of a challenge.  So you probably

4    turned your microphone up, and then we turned ours up.  And

5    now, of course, they're too loud when combined together.  Give

6    it a shot now.

7         MS. SCHWARTZ:  Okay.

8         THE COURT:  There we go.

9         MS. SCHWARTZ:  (Indiscernible) I'm trying

10   (indiscernible) quietly.

11        THE COURT:  You can speak softly --

12        MS. SCHWARTZ:  (Indiscernible) --

13        THE COURT:  -- according to the edicts of Teddy

14   Roosevelt.

15        MS. SCHWARTZ:  Contrary to public opinion, Your Honor,

16   I can speak softly.

17        Yes.  We're working with Committee counsel on the GDR

18   application, and we have provided comments to the extent that

19   we can't get over a hurdle, which is a rare case, and we'll put

20   it on for a hearing.  Otherwise, I think what, Your Honor,

21   would see is -- if anything, is a supplemental declaration and

22   a proposed form of order.

23        THE COURT:  All right.  Thank you very much.

24        Anybody else who wishes to be heard on the GDR

25   retention application?

20

1        All right.  Hearing no response, I will await further

2   information from the parties on that.  And if we get a

3   consensual order, I'm happy to get it answered promptly.  And

4   if for some reason there's anything that we need to discuss,

5   you'll let me know, and communicate amongst yourselves, and

6   then reach out to chambers, and we'll get it teed up.

7        MS. SCHWARTZ:  Great.  Thank you, Your Honor.

8        THE COURT:  Thank you.  Always great to see young

9   lawyers at the podium.

10        All right, so that leaves the motion by the debtor to

11   extend exclusivity, which is number two on the uncontested

12   matters list.

13        MR. BERGER:  Thank you, Your Honor.  Heath Berger for

14   the debtor.  Your Honor, we brought on a motion to extend the

15   debtor's exclusivity period.  We asked for 120 days.  We've

16   engaged in negotiations with the Creditors Committee (sic), and

17   we kind of agreed on a 60-day extension, subject to anything

18   going further and without prejudice to any party.  We uploaded

19   a new audit to the Court.  I believe it's Docket number 159,

20   which was worked out and agreed between us and the Creditor's

21   Committee (sic).

22        THE COURT:  All right.

23        MR. BERGER:  I think we resolve that issue.

24        THE COURT:  Thank you very much.  Anything from the

25   Creditor's Committee on that on that application?  All right.

21

1    Hearing nothing.  Anybody from anyone else?  All right.

2            I do appreciate the communication among counsel.

3    Again, to set not to sound like a broken record with cases

4    always work much better when that's how things are going.  And

5    that seems to be pretty clearly how things are going here on

6    this.  And so I'm happy to grant the motion to extend the

7    exclusive period and for filing a Chapter 11 plan and

8    disclosure statement as that motion has been amended and now

9    reflects a 60-day request that will be in the proposed order.

10   And I find given the consultation between the Creditors

11   Committee (sic) and the debtors, that sort of helps to inform

12   the results that this is an appropriate path forward and

13   therefore that the 60 days meets the requirements under the

14   statute for an extension.  So that motion is granted.

15           So I think we're three for three.  And that leaves one

16   remaining item, which is the motion of the Official Committee

17   (sic) to compel.  And so I'll turn the virtual podium back

18   over.

19           MR. BURBAGE:  Excuse me, Your Honor.  Excuse me, Your

20   Honor.

21           THE COURT:  Yeah.

22           MS. SCHWARTZ:  Before we move to the contested matter,

23   for the record, it's James Burbage of Willkie Farr and

24   Gallagher on behalf of the Freeman plaintiffs.

25           I just wanted to clarify an item on the record based

22

1    on the comments from debtor's counsel.  Just to be clear, the

2    lift stay order with respect to appealing the Freeman

3    plaintiff's judgment does not currently allow Mr. Giuliani to

4    be pursuing the appeal of that order.  I think that's

5    everybody's understanding of what the lift stay order provides.

6    I did want to make that clear on the record, though that that

7    is what the order provides.  And Mr. Giuliani would not be able

8    to pursue an additional appeal without first coming before this

9    Court for additional relief.

10         THE COURT:  All right.  Let me turn that over to

11   debtor's counsel.

12         MR. BERGER:  That is correct, Your Honor.  The order

13   allowed us to file the notice of appeal and then to proceed

14   forward to perfect it, we will be bringing on an order to the

15   Court to allow us to do that(indiscernible) --

16         THE COURT:  All right.  And I understand that there's

17   it was to allow the motion to be filed with the District Court

18   in connection with the amount of damages, essentially, to --

19         MR. BERGER:  (Indiscernible) --

20         THE COURT:  -- dumb it down a little bit.

21         MR. BERGER:  Basically, it was the two motions.  It

22   was the notice of appeal which was filed in order to preserve

23   the debtor's right.  And then there was the notice to the

24   actual (indiscernible) to the District Court in regard to a new

25   trial.  So (indiscernible) --

1          THE COURT:  Right.  And, I mean,

2          MR. BERGER:  -- them both.

3          THE COURT:  -- just to think about it, based on my

4   prior life, right, until you get a final order in the District

5   Court, they don't want to talk to you in the Court of Appeals

6   anyway; that's sort of how that works.  So I would imagine the

7   motion to deal with damages that's been filed with the trial

8   judge has to be resolved before any other rights would kick in,

9   I assume.  I only mention this just in terms of understanding

10  the timing.  In other words, until the District Court acts on

11  that motion, I don't think there'll be anything else to

12  address.  Right.

13         MR. BERGER:  Judge, I'm not sure about that answer

14  that's being handled by retained counsel.  But I could get back

15  to the Court on that answer on the procedural

16  (indiscernible) --

17         THE COURT:  Yeah.  Well, most importantly, just talk

18  to other folks; the Committee, and Mr. Burbage, and Ms.

19  Strickland about all that stuff.  But I mean, again, I -- my --

20         MR. BERGER:  Makes sense.

21         THE COURT:  I knew no Court of Appeals ever wanted to

22  hear from me as trial counsel until the trial court had done

23  everything it needed to be done.  So -- but, obviously, there

24  may be some need for you to file an application in anticipation

25  of something, but that -- that's fine.  Mr. Burbage does

24

1   that -- those statements solve your problem?

2           MR. BURBAGE:  Yes.  Yes, it does, Your Honor.  And I

3   just want to put a marker down for the Court that to the extent

4   that Mr. Giuliani does seek to lift the stay in order to pursue

5   the appeal the Freeman plaintiffs will be vigorously opposing

6   that motion.  I think we'll be making a lot of the same

7   arguments that we made back in January, including the fact that

8   Mr. Giuliani should not be able to use the automatic stay as

9   both a sword and a shield, and try to appeal that judgment

10  without posting a bond in compliance with the Federal Rules of

11  Civil Procedure.  That's obviously not an issue for today, but

12  I certainly want to make the Court aware that from one

13  perspective that is still a very critical issue and would be

14  opposing any relief on that basis.

15          THE COURT:  All right.  That's a fair point.  I guess,

16  my only question, then, to the parties would they -- I don't

17  know how quickly the District Court will act, obviously the

18  District Court will handle it as that judge feels appropriate.

19  And I have no desire to get in the middle of any of that.  My

20  only concern is, for example, if there's going to be oral

21  argument on whatever motion was filed, then we know we won't

22  hear -- there won't be any need for this Court to address these

23  issues of lifting the automatic stay for purposes of pursuing

24  an or anything else, because we'll have some sense of what's

25  coming and when a decision is coming.  On the other hand, there

25

1   certainly are motions where a court can decide that they don't

2   need oral argument, just issues a decision.  So my only point

3   in raising any of this, is to just make sure we don't end up in

4   an unproductive fire drill.  So I'll ask all of you to talk

5   about these issues.

6           But as I understand it right now, the stay was lifted

7   to allow for the motion to be filed with the district court

8   about damages and then a notice of appeal.  So I would think

9   that would eliminate the possibility of a fire drill in any

10  immediate future, and then the next -- if there was a notice of

11  appeal filed, the next event that would happen is the steps to

12  continue on appeal, whether it's filing various forms, and then

13  a briefing schedule, all that kind of stuff.

14          Am I understanding that right, Mr. Burbage?

15      MR. BURBAGE:  No, especially you're not, Your Honor.

16  I think the next step would be for Giuliani to file an

17  additional motion seeking relief to lift the stay in order to

18  pursue the appeal.  The notice of appeal was filed solely to

19  preserve appellate rights, which has been done, but to the

20  extent that Mr. Giuliani wanted to take any additional steps

21  forward, he would have to come back to your Court and

22  affirmatively seek relief allowing him to --

23      THE COURT:  Yeah.  I think that's what I was trying to

24  say.

25      MR. BURBAGE:  Okay, okay, okay.

26

1          THE COURT:  Maybe I didn't say it particularly

2    artfully.  So yeah.  We've lifted the stay so that to the

3    extent there's a time -- there's a hey, within a certain amount

4    of time, you need to file a notice of appeal.  I know one was

5    filed, but if the district court hasn't yet ruled on a motion,

6    then to the extent there needs to be an additional -- I mean,

7    there are all sorts of jurisdictional questions that I have no

8    desire to opine on here about exactly how that works in terms

9    who has jurisdiction over what as you go back and forth.  So

10   but I understand there is -- the stay has been lifted to the

11   extent someone needs to say, I am appealing, but anything

12   beyond that needs to be the subject of a separate motion.

13          UNIDENTIFIED SPEAKER:  That's our understanding, Your

14   Honor.

15          THE COURT:  Is that your understanding, Mr. Burbage?

16          MR. BURBAGE:  Yes.  That's our understanding --

17          THE COURT:  All right.

18          MR. BURBAGE:  -- I think we are all on the same

19   page --

20          THE COURT:  Right.

21          MR. BURBAGE:  -- with debtor's counsel.

22          THE COURT:  All right.  The reason why I mentioned

23   that is just again is because it means there will be a certain

24   amount of lead time that will allow us deal with a motion --

25   any motion that the debtors would file to go ahead with further

27

1  steps in the appeal in time for you and your clients to file

2  any opposition to that.  That's why I want to make sure we

3  don't -- we're all just cognizant of in terms of avoiding an

4  unnecessary fire drill.

5      UNIDENTIFIED SPEAKER:  That's fine with us, Your

6  Honor.  We try to avoid unnecessary fire drills as much as --

7      THE COURT:  Yeah.

8      UNIDENTIFIED SPEAKER:  -- we can.

9      THE COURT:  And so I would ask you to continue to

10 think about the way to do this efficiently as we move forward

11 just so that nobody finds themselves in a difficult spot,

12 meaning to tee things up in this court, but running up against

13 some appellate deadline.  Maybe the appellate deadline is

14 stayed by the bankruptcy.

15     There's a lot of questions and a lot of issues to

16 think about, and so I'm happy to turn it over to you all to

17 think about them and then provide me with your thoughts when we

18 reach that point, but again, I'm just not a fan of unnecessary

19 fire drills.  Frankly, I'm sure you're not all either.  So

20 you'll help us avoid that problem, but I think we're all on the

21 same page as to what the stay has been lifted to -- lifted for

22 in the proceedings in DC and what has not been lifted for.

23     UNIDENTIFIED SPEAKER:  Correct, Your Honor.  Thank

24 you.

25     THE COURT:  Thank you.  All right.  Before we get to

28

1    the motion, anything else from any other party?  All right.

2    Counsel, I'm going to turn it over to the counsel for the

3    official committee.

4           MS. BLOCK:  Thank you, Your Honor.  For the record --

5           THE COURT:  Just do me a favor, put the microphone a

6    little bit closer.  There we go.  Thank you.

7           MS. BLOCK:  No problem.

8           Good afternoon, Your Honor.  For the record, Rachel

9    Biblo Block with Akin Gump Strauss Hauer & Feld on behalf of

10   the official committee of unsecured creditors.  The committee

11   filed the motion to compel the debtor to sell his Florida condo

12   on March 15th because the committee is concerned about the

13   debtor's intention with respect to his Chapter 11 case.  To

14   date, the debtor has shown an inclination to stall and avoid

15   addressing matters to push his Chapter 11 case forward and has

16   failed to file complete financial disclosures.

17          And based on the objection that the debtor filed to

18   the committee's motion here, it seems as though his plan for

19   this case, it's just wait and see what happens in the Freeman

20   litigation in connection with an appeal, which as Mr. Burbage

21   said is something he doesn't have the authority to pursue and

22   which could take months and even years to resolve.

23          THE COURT:  So let me ask your view about where the

24   appropriate lines are for all that because obviously this case

25   has got very important issues to address, and but it is not a

29

1    unique situation where a debtor will file as a result of a

2    judgment issued by a trial court, and almost uniformly, in my

3    experience, if the debtor is on the wrong side of that

4    judgment, they want to appeal that judgment, and so we end up

5    with a form of this kind of back and forth.

6            So what is the committee's view about the appropriate

7    way to handle it in this case, both respecting the concerns of

8    the bankruptcy creditors, but also the concerns about due

9    process in terms of the ability to get a -- because it's not a

10   final judgment if it's appealed until you get a decision?

11           MS. BLOCK:  The committee's views of the debtor should

12   be taking steps to reorganize.  This is not his only claim.  He

13   has a bunch of other claims to deal with, some that are

14   unliquidated, some that are unknown amounts.  So while we don't

15   have necessarily an issue that he wants to pursue this appeal,

16   like other debtors would want to, we think he needs to make

17   progress on other aspects of his Chapter 11 case while he does

18   that.  Thus far, he's got an agreed modification to the stay

19   and retained two professionals.  We're not seeing the progress

20   that needs to be done to make sure that frankly stayed assets

21   are going out the door that would otherwise go to creditors.

22           THE COURT:  All right.  And so I take it in terms of

23   connecting the dots, that this motion reflects your view about

24   what should happen, including the sale of the Florida -- or

25   that to start the process for selling the Florida property?

30

1          MS. BLOCK:  That's right, Your Honor.

2          THE COURT:  All right.

3          MS. BLOCK:  Any delay here is a serious concern for

4    general and secured creditors.  In particular, given the

5    debtor's spending habits, he spent more than 120,000 dollars in

6    January, alone.  His minimal, self-reported assets, his

7    schedules list 15,000 dollars in nonexempt cash accounts and

8    rapidly decreasing exempt IRA assets from which he may be

9    paying some of his expenses now.

10         THE COURT:  So let me ask you about that -- and maybe

11   I'm wrong party -- but there's a back and forth in the papers

12   about this where I saw the debtor's counsel said that the

13   upkeep for the Florida properties be paid from exempt assets.

14   I -- and maybe this is one of the things that's the subject of

15   the 2004, what visibility, if any, do you have on that

16   situation, meaning is that accurate as far as you know?  If so,

17   what's the burn rate?  How long will that be a viable thing

18   because there's a suggestion in the debtor's papers, oh, this

19   is what we're doing, but it's not sustainable.

20         And I have a gigantic question on the margin when I

21   read that, and so I don't what your view is on all that?

22         MS. BLOCK:  Your Honor, we sort of had the same

23   questions.  It does seem like he doesn't have any cash from

24   which to pay these kinds of expenses.  So the estate, like I

25   said, lists about $15,000 dollars in nonexempt cash accounts,

31

1  and then in the monthly operating report that was filed in

2  January -- we don't have February yet -- he did have a million-

3  plus in exempt IRA amounts, but he also spent over 30,000

4  dollars in Florida maintenance expenses in January.  It's

5  unclear how long the IRA expenses are going to fund that, are

6  going to fund the upkeep in New York, and any administrative

7  claims that come in from professionals or otherwise.

8          THE COURT:  So let me ask you how you would propose to

9  navigate that?  There's obviously a wide number of options.

10 There could be a question, like, well, Judge, we're okay with

11 it as long as they're paying for the upkeep with exempt assets,

12 but we want to know what the plan is, how many months that's

13 going to happen so we're not surprised, or you think, Judge,

14 we, for a variety of reasons, we think that there's no reason

15 to delay, notwithstanding paying for that or there could be

16 other answers?  What's your answer to that question?

17         MS. BLOCK:  Well, we don't think those creditors

18 should have to take on that risk, that this litigation goes on

19 forever, we don't have a plan, and then by the time we get

20 somewhere, the IRA exempt assets are gone, and he's using

21 estate assets.  The debtor chose to file Chapter 11, not the

22 creditors.  We think he should bear that burden, and part of

23 that is meeting his fiduciary duties to conserve estate assets,

24 and here, that would be selling the Florida condo and going

25 into another residence that doesn't quite require 30,000

32

1  dollars in maintenance expenses or similar expenses.

2          THE COURT:  All right.  Let me ask you another

3  question, which you may not have perfect visibility on, there's

4  a discussion about, hey, we're going to -- we want to keep the

5  Florida condo because that's where -- we're going to sell the

6  New York one, and then once you sell that, that's the place to

7  go.  But I also read that he spends -- Mr. Giuliani spends most

8  of his time in New York.

9          So I was left to ponder, more questions in the

10 margins, where's he going to live in New York when the New York

11 property is sold?  Does it really make sense to have the New

12 York property sold as opposed to the first as opposed to the

13 Florida property if that's where he is spending -- I mean, I

14 just had ancillary questions, and I was curious if you had the

15 same, and if so, whether you had any answers to any of those or

16 thoughts on that?

17         MS. BLOCK:  Yeah.  I think we have a lot of the same

18 questions as well, and our view really both should be sold

19 because the maintenance expenses and the upkeep is so high.  I

20 think the Florida property is valued in the schedules at a

21 higher amount.  So maybe it does make sense to sell that first,

22 and they already had a listing agreement with Sotheby's, which

23 will hopefully, a new listing agreement would be entered into

24 and retention papers filed soon so that can get back on the

25 market.  But we ultimately think both should be sold.

33

1          THE COURT:  All right.

2          MS. BLOCK:  So Your Honor, it's against this backdrop

3    that prior to filing the motion, the committee asked the

4    debtor's counsel what the plan is for the Florida condo, and

5    the committee was told the debtor has no plans to sell it, but

6    would like to live there once he sells his New York apartment.

7          Although the debtor's scheduled estimated monthly

8    expenses for the Florida condo at 8,416 dollars, he has spent

9    more on the Florida condo on a monthly basis, both in the

10   ninety days pre-petition as well as in the month of January,

11   more than 160,000 dollars.  And since the debtor hasn't filed

12   his February monthly operating report, the committee remains

13   unable to determine if these significant fees are an anomaly or

14   if the schedules are simply wrong.

15         Since the Florida condo is rapidly depleting the

16   debtor's assets and he's exhibited no motivation to sell the

17   property, the committee has determined it was necessary to file

18   this motion to take steps to sell the Florida condo and for the

19   debtor to act in accordance with his fiduciary duties to

20   maximize and preserve estate assets.

21         So what relief are we actually seeking here?  As noted

22   in our papers, the committee requests entry of an order

23   requiring the debtor to take reasonable steps to list, market,

24   and sell the Florida condo.  We do not seek to compel the

25   debtor into a forced, expedited sale, and the committee

34

1    specifically did not set forth a time line in our motion.  We

2    view our request as an issue of timing and who should be

3    required to bear the risk and the downside of the debtor's

4    decision to relitigate claims against him.

5            First, we don't see a scenario where the debtor will

6    be able to retain the Florida condo at the close of this

7    Chapter 11 case, and the sooner he takes action to sell the

8    condo, the better the outcome for all creditors because every

9    day the debtor insists on carrying his property, he depletes

10   his finite resources and endangers the estate.

11           THE COURT:  So let me ask you to address the response

12   in the papers, which is that the relief that you're asking,

13   which is to compel the sale is not appropriate relief and that

14   as a Chapter 11 debtor-in-possession's business judgment

15   there's not a vehicle for compelling this.  And so I'll add my

16   own little commentary to this, which is one can imagine lots of

17   other avenues for relief, whether it's opposing extensions,

18   further extensions of exclusivity, whether it's seeking to

19   appoint a trustee, or it's an opposition to a plan that doesn't

20   include the sale.  So how do you respond to that question about

21   whether this is an appropriate request for relief?

22           And I will say, just so you don't think I missed it, I

23   did see footnote 8 in the reply that says the committee intends

24   the motion to be an intermediate step to give the debtor an

25   opportunity to essentially get in front of us before you

35

1   actually would resort to some of these other things, but just

2   as putting on the legal bankruptcy -- legal, geek hat for a

3   second, what's the authority in the Code to compel a debtor to

4   take this kind of an action?

5       MS. BLOCK:  Your Honor, we think it's an 1107 and

6   105(a).  It's really asking the debtor to comply with his

7   fiduciary duties.  An 1107 says that the debtor, as the debtor-

8   in-possession, has all rights subject to such limitations or

9   conditions as the court prescribes and duties of the trustee.

10  Here, we're taking a step to preserve and protect the estate.

11  And so we think 1107 and 105 provides that authority.

12      We did see the cases cited in the debtor's objection.

13  We think those are all distinguishable.  There, they cite to

14  cases where a Chapter 11 trustee has actually already been

15  appointed in two of the three cases, and the third case, cites

16  to those two cases.  In those cases, they distinguish between

17  1108 and 1107(a), and they say when a debtor-in-possession is

18  acting as trustee, the court has greater oversight than when a

19  Chapter 11 trustee is making those same kind of business and

20  day-to-day decisions.

21      THE COURT:  All right.  So there is a discussion in

22  the papers about the math to put it bluntly, which is the

23  committee's view that no matter how you slice the math, you're

24  going to have to go ahead and sell this property. So in

25  response, there's a statement saying, well, hope to appeal the

36

1  judgment, and there's -- that's created with skepticism in the

2  reply.

3      When addressing that question, is the committee asking

4  me to delve into the likelihood of success of any appeal that

5  would result in a judgment that overturn the judgment, or are

6  you really asking me to look at the claims as well and just

7  sort of do the big-picture math, or both, or neither --

8      MS. BLOCK:  Yeah.

9      THE COURT:  -- so I just want to make sure I

10  understand the contours of your response on that?

11      MS. BLOCK:  Two points, we are asking you to look at

12  both.  So in order for the Freeman judgment to become kind of a

13  nonplayer here, it would need to be reduced by over ninety-five

14  percent.  We think that's unlikely.  When you look at the other

15  cases -- or the other claims, excuse me, there's over 4.8

16  million dollars in claims, in addition to four lawsuits with

17  unknown amounts, and those lawsuits are millions of dollars

18  they're seeking.  So we think when you add up the claims, and

19  you look at the likelihood of the Freeman judgment being

20  reduced by ninety-five percent, you don't -- it doesn't work.

21  The math doesn't work.  You have to sell the Florida condo.

22      THE COURT:  So tease out for me the facts that you

23  think -- what's appropriate for me to consider or not consider.

24  Obviously, I'm not the trial court in the Freeman litigation,

25  but I know it has an unusual procedural history in terms of how

37

1  it ended up the way it ended up.  What, if anything, in

2  particular that you want me to look to and you think it's

3  appropriate for me to look to?

4          Like, is there certain things that are established.

5  When you have a litigation that's in progress, you don't have a

6  final order so things are still in flux.  So I'm just trying to

7  get a sense of what, in your view, I can appropriately consider

8  and what I can't?

9          MS. BLOCK:  I think you can appropriately consider the

10  fact that he stipulated to liability, and so that's a key

11  component, meaning it's unlikely that the judgment is going

12  away.  So I think we can say that the judgement is going to be

13  there, and even if we can consider it being reduced by ninety-

14  five percent, the numbers still don't work.  So we can assume

15  it gets reduced by ninety-five percent, and the numbers still

16  don't work.

17          THE COURT:  All right.  I know I have asked you a lot

18  of questions, Counsel, and I appreciate your flexibility in

19  hopping around, but I want to give you a chance to say anything

20  else that's on your mind.

21          MS. BLOCK:  Thank you, Your Honor.

22          I think I'll take this time to address a few things on

23  the debtor's objection, and first, Your Honor, I wanted to talk

24  about the Highway Equipment case.  We think that provides

25  support for what we're asking for the Court to do here.  As we

38

1    note in our reply, the circumstances there aren't entirely

2    analogous, since the court there was considering whether to

3    force the debtor to accept a particular purchase offer, whereas

4    here, we're seeking to compel debtor to take further steps to

5    monetize a critical estate asset.

6          But the basis on which the court in Highway Equipment

7    found that it had authority to compel the debtor is what the

8    committee finds instructive here.  That court found that it had

9    the power to regulate the conduct of the debtor, which occupies

10   the position of a trustee in bankruptcy so as to prevent the

11   debtor from acting detrimentally to interest of its creditors.

12         The court there held that it could sustain the

13   debtor's refusal to sell only if the debtor showed a valid

14   business justification.  Here, the debtor has failed to meet

15   that burden.  The debtor claims that he incurred expenses for

16   alternative housing, and without any evidence, claims that

17   renting a new home would be cost-prohibitive and not much less

18   than the maintenance cost of his Florida condo.  Given that the

19   debtor made maintenance payments of over 30,000 dollars to the

20   Florida condo in January, alone, the committee finds that hard

21   to believe.

22         I'll also note that we asked the debtor and the

23   debtor's counsel for documents to support this contention and

24   specific factual allegations in the objection, but they

25   refused.  We also asked the debtor --

39

1          THE COURT:  Could you put a little more details on

2     that in terms of the documents that you're talking about?

3          MS. BLOCK:  Sure.  We wanted something to just -- or

4     to support for what the Florida expenses were going to be

5     because we have three different things that we have on the

6     record.  We have the pre-petition payments in the ninety days

7     leading up to bankruptcy.  We have the January MLR.  And when

8     you combine those two, you have 160,000 dollars of payments for

9     the Florida condo.  Contrast that with the debtor's schedule,

10    which lists the Florida condo payments as 8,416 dollars.  So we

11    wanted to understand, are they 8,416 dollars, or are they

12    something more?  So we want to support for the contention that

13    those payments are limited to 8,416 dollars.

14         THE COURT:  And the documents requested are

15    essentially a breakdown of what the 160 is, presumably?

16         MS. BLOCK:  So for the 160,000, we do have some

17    information on that because it was filed.  So there was, I

18    think, 84,000 dollars in taxes.  Multiple payments of 15,995

19    were for maintenance.  And I think those are the majority.  So

20    we can't find any calculation in the amount that they sent that

21    would add up to 8,416 dollars.

22         THE COURT:  All right.

23         MS. BLOCK:  Next, the debtor argues that he needs the

24    Florida condo to operate his podcast, and the ones in New York

25    City apartment is sold.  It is the only remaining location from

40

1  which he can broadcast.  Yet, he provided sworn testimony at

2  the 341 meeting that clearly contradicts his contention.

3       At the 341 meeting, the debtor stated that he is able

4  to record his podcast from anywhere in the world by using a

5  particular device, and that he actually does so recording on

6  the road about one-third of the time.  It's also worth noting

7  that the January MLR reports total income as a withdrawal from

8  his IRA account, Social Security income, a California tax

9  refund, a transfer from one checking account to another

10  checking account, and $0.66 in interest income.  Notably, the

11  income does not include anything related to his podcasting

12  business.  Therefore, despite the debtor's arguments that this

13  motion is premature or without legal authority, neither

14  contention carries weight.  The motion, if granted, will

15  maximize cost savings and preserve assets of the estate for the

16  benefit of the debtor's creditors.

17       I'll conclude by noting that the motion also sought to

18  compel the debtor to obtain homeowners insurance for both

19  properties.  The debtor attached copies of recently acquired

20  insurance policies to his objection.  But from what we can

21  tell, the debtor appears to have purchased minimal insurance

22  coverage -- it's unclear -- to adequate to protect critical

23  estate assets.  But that can be an issue for another day.

24       We also asked the debtor's counsel to produce the

25  master insurance policies to which the debtor refers in his

41

1  objection, but they refused.

2       THE COURT:  And when you say that, you mean that the

3  insurance policies of the that the properties themselves have?

4       MS. BLOCK:  That's right, Your Honor.

5       THE COURT:  All right.

6       MS. BLOCK:  Unless Your Honor has any further

7  questions, the Committee would respectfully request that the

8  motion be granted.

9       THE COURT:  All right.  Thank you very much.  I do not

10 have any other questions at this time.

11      So let me hear from debtor's counsel.

12      MR. FISCHOFF:  Good afternoon, Your Honor.  Gary

13 Fischoff for the debtor.

14      So the committee's motion really has two components, a

15 factual component and the legal component.  And although the

16 two are mixed, I'm going to start with the legal aspect, and

17 then I'll try to answer some of the Court's factual questions

18 as best I can.

19      But basically, there is no statutory authority for the

20 Committee's motion to compel the debtor to sell this property.

21 The debtor is selling the New York property, and his intention

22 is to relocate to Florida.  He's not remaining in New York.

23 The statutory authority that the Committee cites, both 102 and

24 1107, are kind of catchall that do not address specific

25 authority to compel a debtor to sell this asset.  The debtor is

42

1   managing an operation of its properties, is a trustee to the

2   estate, and it's business judgment should be considered at this

3   point.  And this case is only three months old.  I know there's

4   been a lot going on, but it's only about ninety days, maybe a

5   little bit less.  And so this --

6           THE COURT:  Well, let me ask you this.  Let me assume

7   for a second -- and I agree with you --

8           MR. FISCHOFF:  Sure.

9           THE COURT:  -- that there is an authority to grant the

10  relief here, meaning to compel the debtor-in-possession to sell

11  this particular property and essentially, sort of, wrest

12  control, I think you characterized, wrest control of the

13  business judgment standard.  But that footnote 8 in the reply

14  makes it pretty clear that the Committee's sending the message

15  saying, Judge, there's a lot of other things we could do that

16  are a lot more dramatic and drastic that are in the Code.  And

17  we view this as a lesser request than seeking a trustee than

18  opposing exclusivity, and they just agreed to a sixty-day

19  extension, and that we can't wait until the plan stage.  So

20  what's your view about that?

21          MR. FISCHOFF:  My view is they don't have grounds at

22  this point to file a motion to appoint a trustee.  And as far

23  as a plan goes, we're never going to get a -- it's unlikely

24  we'll be able to approve a plan without the consent of the

25  committee.  That's still down the road.  So a threat of later

43

1   we may do this doesn't really deal with the current situation.

2   And underlying all of this, the elephant in the room, is really

3   the assumption by a lot of parties in this case that the

4   Freeman amount -- now granted, liability was consented to.  And

5   the only thing that's really subject to appeal is the amount.

6   If the motion that's pending is denied, then the debtor will,

7   of course, come back and ask for right to perfect an appeal as

8   to the verdict for the dollar amount.

9       Now, there was a mention of Mr. Caruso (ph.), who

10   we're preparing to have him retained in the eventuality

11   perfection of the appeal is on the board.  And I've spoken to

12   Mr. Caruso, who's an experienced appellate counsel.  And other

13   than -- we've heard some saying, well, the judgment was so

14   large, that makes it appealable.  But I've spoken to him.  I

15   don't think I'm in the position of revealing what we discussed

16   at this point.

17       THE COURT:  No.  And it doesn't matter.  I'm not in a

18   position to make determinations on what's pending in front of

19   another judge.  But as I understand the argument, the argument

20   is, if you can -- if there's an agreement that there's

21   liability, then all you're talking about damages.  And even if

22   they agree with you ninety-five percent of the way, which they

23   don't want to do, you end up with the number that still breaks

24   the case and still -- and that's considering other litigation;

25   other claims that the handwriting is not only on the wall, it's

44

1   on the wall in Sharpie --

2          MR. FISCHOFF:  Well --

3          THE COURT:  -- that the property has to be sold; and

4   that your path, which is to say, well, let's let everything run

5   out, including an appeal on everything means that -- so what --

6   where does that --

7          MR. FISCHOFF:  That's not what I'm saying, Judge.  So

8   what I am saying is that if -- and that's the hypothetical

9   that's thrown around.  If that verdict is reduced by ninety-

10  five percent, then we're looking at seven million; we're

11  looking at 7- or 800,000 for the IRS; we're looking -- the case

12  is fundamentally different than the case is now.  And I don't

13  see why the debtor can't be given the opportunity to propose a

14  plan that deals with a much smaller universe of debt and

15  retains the Florida residences to live there; or if not, at

16  that time, sells it.  But at this point, it's only less than

17  ninety days into the case.  There's a presumption by many in

18  this case that the debtor owes 150 million, and that's not

19  going to change.  And surely, if that's correct --

20         THE COURT:  Well, I'm not making an assumption.  But I

21  am right -- there's a couple of underlying assumptions that do

22  inform, I think, where the Committee is coming from, which is

23  they have to -- the creditors have to get at least as much as

24  they would get in a liquidation.

25         MR. FISCHOFF:  Absolutely.

45

 1          THE COURT:  And that the Florida property is part of

 2   the assets that will be liquidated, as well as the New York,

 3   with the exception carved out; and that that number, when you

 4   think about what those assets are for a 7 liquidation and the

 5   circumstances of all the other debt, as well as the size, that

 6   it becomes increasingly difficult to see how this case works.

 7          MR. FISCHOFF:  Let's just do some quick math.  Let's

 8   assume the property is worth five million, and the debtor gets

 9   a third party to contribute five million to the plan, then the

10   creditors get what they would -- the equivalent of what they'd

11   get on liquidation, and five million gets distributed to

12   creditors, whatever that universe might ultimately end up.  So

13   that, to me, doesn't seem so far-fetched that the debtor --

14          THE COURT:  But the Committee's, I think, saying --

15   and they can speak for themselves when they come back up --

16   there's no guarantee that such a party will materialize.  So

17   right now the --

18          MR. FISCHOFF:  And I have no knowledge of one.

19          THE COURT:  Right.

20          MR. FISCHOFF:  Just --

21          THE COURT:  And so what that means is that it's their

22   money that you're spending, I think, is the idea.  So if

23   somebody's -- I'm beginning to sound like we have one of these

24   Texas two-step cases, where somebody is separately going to

25   fund a plan, and we don't want to have that problem here.  But

46

1  since there isn't such a thing, they're saying, well, these are

2  the assets.  This is the way a plan works in a Chapter 11.  And

3  Judge, we can certainly ratchet up the requests that we have

4  for relief in other contexts that will really throw a wrench

5  into things.  But we're trying to essentially encourage people

6  to take what they view are responsible steps.

7        MR. FISCHOFF:  Well --

8        THE COURT:  So is there anything amiss about starting

9  the process of marketing the property to get a sense, right?

10 It's essentially a form of an appraisal to figure out what the

11 property is worth in terms of marketing, and --

12       MR. FISCHOFF:  I can answer that.  First of all, the

13 debtor is and will pay the charges associated with that

14 apartment for now through exempt funds, which don't come into a

15 calculation for the creditors.  Secondly, I can -- we start the

16 process, and there's an offer, and the Creditors' Committee is

17 going to be here and say, well we have to accept that offer.

18 So if they want to engage in getting an appraisal, that's

19 perfectly reasonable.  But to start the process, where do we go

20 when there's a buyer on the table in a month or two?  Then they

21 said, well, Judge, we have to sell it.

22       THE COURT:  But is the devil in the details?  You just

23 said we'll pay the cost for now.  And I think they don't know

24 and certainly I couldn't tell from the papers what that meant,

25 right?  So does that mean somebody comes in and in June -- it's

47

1   June 27th -- and someone says, Judge, by the way, we run out of

2   that money or a willingness to spend these nonexempt -- these

3   exempt assets to upkeep the property.  At the end of this

4   month, three days, we're done.  And then nothing's been done to

5   sell, to market the property.

6          MR. FISCHOFF:  Well --

7          THE COURT:  So is there a commitment by the debtor to

8   a certain period of time so that people can make a plan as to

9   what they can do, right?

10         MR. FISCHOFF:  I'm --

11         THE COURT:  Trust but verify?

12         MR. FISCHOFF:  I'm not in a position to make that

13  commitment as I stand here.  But we expect the preparation and

14  filing of operating reports to get back on track.  There was an

15  issue with the accountant.  He got upset at one point and

16  wanted out.  He's calmed down.  We persuaded him to stick with

17  the case.  And so we're going to get the February report filed

18  and expect to have all the reports after that to back on track.

19         THE COURT:  But those are backwards looking, right?

20  They're not forwards looking in terms of commitment, so --

21         MR. FISCHOFF:  Well, they will give us a almost real

22  time -- a thirty-day real time position of the debtor's

23  financial situation.  And the Committee is very closely --

24         MR. FISCHOFF:  But that doesn't mean it's -- that

25  reflects the debtor's willingness to pay for those expenses.

48

1    Because the statements in the papers are very careful that way.

2    And I got the message for now, and I think you put it

3    appropriately.

4         And so I think the one way to view the Committee's

5    motion is to say, Judge, under these circumstances, we don't

6    really have any guarantees about anything.  And we don't want

7    to end up holding the bag, for lack of a more refined legal

8    analogy.  So we're all very practical people here in bankruptcy

9    court.  So one way that people work things out is to say, hey,

10   maybe the Committee keeps their powder dry based on the

11   commitment to, say, the upkeep for this property is going to be

12   paid for by the debtor with exempt funds for a period of X

13   amount of time.  And we'll revisit this in advance of that.

14        THE COURT:  That may be a solution, but I can't make

15   that commitment right now.

16        MR. FISCHOFF:  No.  I'm just noodling.

17        THE COURT:  Yeah.

18        THE COURT:  People have to negotiate.  I can throw out

19   ideas and constructs, and you all have to figure out what works

20   and what doesn't.  But that's how I understand the Committee's

21   motion, is they say there are a lot of other things we can do.

22   In the end of the sixty days, we can oppose exclusivity because

23   there's been no progress.  And all the requirements under the

24   statute for extensions, we can tell you we think the plan is a

25   nonstarter.  And we can also file a motion for a trustee.  But

49

1  we're trying to, if we see some progress, then that will allow

2  us to stand down, even if we're not trying to micromanage the

3  exact timing, the sale, any of that.

4         MR. FISCHOFF:  Well, I disagree that they're not

5  trying to micromanage.  And I understand they have an

6  obligation --

7         THE COURT:  Fair point.

8         MR. FISCHOFF:  -- and they're doing what they believe

9  is part of their obligation.  So that's not the issue.  But I

10  do think right now it is early.  And I think that monitoring

11  it -- and we also have discovery set up.  In fact, we're

12  already scheduling.  We've agreed we're going to do two

13  depositions for -- two examinations for Mr. Giuliani.  And

14  we're already talking about dates for around the 16th or so or

15  the 19th of April for the first examination.  We're also

16  gathering documents.

17         And by the way, when the Committee said, oh, we asked

18  for discovery and they refused, they sent us a notice of

19  production and the notice for examination on April 1st for

20  April 2nd.  So I just want to point that out.  We've been

21  cooperating with the Committee, I believe, in almost every way

22  we can.  And they have a very encompassing document demand and

23  discovery demands and parties lined up that they want to

24  examine.  And this seemed a little bit out of that discussions

25  we were having.  So the debtor has been and will be

50

1   cooperating.  But we get a notice on Monday for Tuesday, I

2   believe, was the examination.  So --

3          THE COURT:  Well, let me --

4          MR. FISCHOFF:  I understand their questions, but

5   that's not the way to do it.

6          THE COURT:  Well, let me put the details of that

7   aside, because I'm not, quote Hamilton, in the room where it

8   happens when we're talking about discovery, and I'm acutely

9   aware of that.  But would it be a Pyrrhic victory for your

10  client if, in fact, the motion is denied, and it simply forces

11  the Committee then to ramp up its other alternatives, which are

12  more draconian than simply marketing the Florida property.

13  It's, we're going to oppose the extension of exclusivity in

14  sixty days; we're going to move for a trustee; and all that's

15  going to contain our views about a plan, which everyone seems

16  to agree can't be confirmed without the support of the

17  Committee.

18         MR. FISCHOFF:  Well, I think that I understand that

19  that may be their thinking now.  But we're intending to

20  cooperate and deal with their discovery.  And hopefully, in a

21  short period of time, they can get a true picture of the

22  debtor's pre-petition and post-petition finances.  And maybe

23  then, we can get a better handle on what this case is about.

24  Right now, there's a lot of questions.

25         So with those questions, there may be some suspicions.

51

1    And I believe and would hope that some of these discovery

2    requests and meeting these discovery requests and having Mr.

3    Giuliani begin to appear for his examination may remove some of

4    those suspicions and some of those questions.  And then we can

5    focus more appropriately on dealing with the universe as it

6    really is.  And maybe that will --

7              THE COURT:  But that's part of the equation, right?

8    Which is what the debtor's finances are and certainly a

9    considerable increase built on that.  But the other part is

10   what the liabilities are.  And that's where, again, I think the

11   Committee keeps coming back to; unless I'm missing something,

12   liability was not contested.  All that's contested is damages.

13   And if you win on ninety percent of it, you still don't have

14   enough money to pay creditors because of the --

15             MR. FISCHOFF:  Well --

16             THE COURT:  -- numbers.  And that's not even

17   considering the other litigation.  So I think that I perceive

18   that to be what's motivating the Committee to take action now.

19   That --

20             MR. FISCHOFF:  Well --

21             THE COURT:  -- it just seems highly unlikely that the

22   numbers will ever work out the way that you're hoping.

23             MR. FISCHOFF:  No.  This will never be a hundred

24   percent plan.  I mean, I don't see that.  But it may be, in

25   essence, a pot plan.  And that pot may be -- would have to

52

1   necessarily be equal to the value of -- the liquidation value

2   of the debtor's nonexempt assets.  And so right now, if the

3   debtor is paying the carrying costs with his exempt assets,

4   he's actually preserving that asset for the benefit of the

5   creditors.  So --

6         THE COURT:  Well, but then we get back to how long

7   that's going to go on, right?  So we sort of we started there

8   and we went around and we come back to that question.  Because

9   I think one way to look at it is to say, yes, if that's what's

10  going on, and we all know how long that's going to go on for,

11  we -- that that's a breathing spell.  And it also means that

12  the assets that would be available for a plan are not being

13  dissipated.  But since we don't know how long that's going to

14  go on for, then, "Judge, they're playing with our money", is

15  what I hear the Committee saying.

16        MR. FISCHOFF:  I have a suggestion, then, kind of,

17  it's begging the question at this point.  With the Committee's

18  consent, let's adjourn the motion so I can answer that question

19  that I'm not prepared to answer today.  Is the debtor willing

20  to commit exempt assets, and for how long, to maintaining that

21  apartment?

22        THE COURT:  All right.  Anything else that you wanted

23  to address, Counsel?

24        MR. FISCHOFF:  No, I think the Court has a good

25  picture of the debtor's position as well as the Committee's

53

1   position.  So I don't think there's a need to belabor the cases

2   or --

3        THE COURT:  All right.

4        MR. FISCHOFF:  -- so forth.

5        THE COURT:  All right.  Thank you.

6        MR. FISCHOFF:  You're welcome.

7        THE COURT:  All right.  So I'll ask the Committee and

8   give you the option, do you want me to circle the room and see

9   if anybody else wishes to be heard on these issues, and then,

10  you can bat cleanup?

11       MS. BLOCK:  (Indiscernible) we're thinking again.

12       THE COURT:  And again, nobody else filed anything, but

13  I just -- since there are parties here.  So the Committee will

14  bat cleanup on its -- but any other party that wishes to be

15  heard on this motion, again, recognizing nobody else filed

16  papers.

17       MR. REICH:  Your Honor, this is Mr. Reich, on behalf

18  of the Condo Association.  We would like to speak on the

19  position of the plaintiff.  We're worried about a couple

20  things -- Court's attention for consideration, depending on

21  what you're (indiscernible) is.  One, if a sale is ordered, we

22  just want to make sure that any sale, motion, or order reflects

23  that any new buyer with the Association pursuant to the condo

24  DEX must get Association approval.

25       THE COURT:  No, no.

54

1          MR. REICH:  That's --

2          THE COURT:  All the usual rules apply, and so we'll

3    burn that bridge when we get to it.  So you reserve all rights,

4    and I understand how it works with the condo.

5          MR. REICH:  And the other point that I wanted to raise

6    was just a factual piece of information, Your Honor, that on

7    the schedules, the asset is listed as unencumbered, and they

8    value it as three-and-a-half million dollars.  But there are

9    two groups of claims that were filed in the case, one from the

10   IRS against that property as a secured claim for 566,860.403

11   (sic) under claim number 3, and also the Palm Beach County tax

12   collector with the claim number 2 for 42,450.97.  And the

13   Association's position is obviously that if Mr. Giuliani is

14   capable of making his payments, then we don't oppose his

15   position.  But if the Court finds that he's not capable, then

16   we would support the Committee's position.  That's all.

17         THE COURT:  All right.  All right.  Thank you.  Anyone

18   else who wishes to be heard?

19         All right.  So with that, I'll ask the Committee for

20   their parting comments.

21         MS. BLOCK:  Thank you, Your Honor.  For the record,

22   Rachel Biblo Block, Akin Gump, on behalf of the Committee.

23         Just a few points, Your Honor.  For all of the reasons

24   that we've had today in this discussion, we think the debtor

25   should start this process now.  We don't want to be in a

55

1   position where he commits to use exempt assets and then changes

2   his mind.  We think, start the process now, give it a few

3   months, see if a buyer turns out, see if we get a better

4   financial picture.  And when we have a buyer, if we're so

5   lucky, we can talk about a sale.  But we think the process

6   should start now.

7           And then, I wanted to respond to one thing Mr.

8   Fischoff said.  And he said, we're only three months into the

9   case, give us time to get a handle on the pre-petition and

10  current finances of the debtor.  That's kind of indicative of

11  the problem.  We're three months in, and we're waiting for more

12  information about the debtor's pre-petition financial

13  condition.  We think it's important that we need to start this

14  process now.  We don't want to be left with our unsecured

15  creditors holding the bag while he gets to continue living in

16  this luxurious condo.

17          THE COURT:  All right.  Thank you very much.

18          All right.  Anything else from any other party?

19          MR. FISCHOFF:  I just wanted to point one thing out.

20  I know the Court can do the math, but the debtor has

21  approximately a million dollars of exempt IRA funds, and at

22  8,500 a month, that's a hundred months or more that he could,

23  if he wants to stay there, could sustain it.  I just can't make

24  that commitment --

25          THE COURT:  But --

56

1          MR. FISCHOFF:  -- today, but I can --

2          THE COURT:  -- yeah, no, I understand.

3          MR. FISCHOFF:  Okay.

4          THE COURT:  All right.  So I'm not going to make a

5    ruling today.  I'm going to share some observations.  So it is

6    a bit of a challenging legal position to say that the

7    Committee, however right-minded and legitimately concerned it

8    is, can compel a debtor-in-possession to sell a property.  The

9    debtor-in-possession model, as we know, allows a debtor to run

10   its affairs consistent with the business judgment rule, which

11   is a very liberal rule.  And it is challenging to say we're

12   going to pick this exception or that factual exception and say,

13   we're going to tell you what the business judgment of the

14   debtor should be.  It's very much in tension with the debtor-

15   in-possession model in Chapter 11.

16          That said, however, there are all sorts of other

17   options that the Committee has, legally, to protect the rights

18   of unsecured creditors.  And I perceive this motion to be -- as

19   set forth in the footnote 8 in the reply at docket 157 -- this

20   is a warning shot across the bow.  And as discussed in the

21   colloquy with counsel, the Committee can file a motion to

22   appoint a trustee.  It can file an opposition to an extension

23   of exclusivity.  It chose not to do so now.  For example, it

24   just agreed to sixty days, which, frankly, strikes me as an

25   eminently reasonable position by the Committee.

57

1       And they can also, at the end of the day, oppose the

2  plan because it doesn't give the creditors as much as it would

3  get in liquidation.  And indeed, I think debtor's counsel

4  concedes that this really is going to be a pot plan, meaning

5  that unsecured creditors will not be paid in full.  And

6  therefore, we look at the nonexempt property and assets of the

7  debtor, which includes the Florida property.

8       So again, my comment about being a Pyrrhic victory,

9  the debtor can sort of succeed in fending off this motion, only

10  to be faced with far more draconian requests for relief by the

11  Committee in the future.  And so the Committee, I think, while

12  105 can be a challenging basis to ask for relief if it's,

13  basically, what you've got, but they are teeing up the relevant

14  issues in the case and the relevant concerns.

15       So that leaves us all with where do we go from here?

16  Bankruptcy is a place where practical people try to work out

17  real solutions to problems.  And I think what that means is it

18  is very clear.  And I'm happy to see that the Rule 2004 order

19  will be ready to go, that financial information -- all

20  financial information needs to be available.  And if there are

21  questions that people have, they need to get answered.

22       So there's a legitimate question about what the

23  monthly carrying cost is for the Florida condo because the

24  numbers are sort of all over the place in terms of what was

25  spent pre-petition.  And people, when they don't know the

58

1    precise answers to things, they get nervous.  And when they get

2    nervous, they take steps to protect their legal rights against

3    the unknown.  So the good news is that, as to financial

4    condition of the debtor, that is a fixable problem, and it

5    sounds like it's in progress.  And it needs to continue to make

6    significant progress with all deliberate speed, or we'll be

7    back here discussing all these issues again.  So that's one

8    practical issue, is the financial information; it's a solvable

9    problem, and it needs to be solved promptly.

10          As for the rest of the case, what I'm hearing is the

11   debtor saying, let's wait and see how things go.  People can be

12   amenable to that in bankruptcy court.  Certainly, the Committee

13   has agreed to a sixty-day extension of exclusivity, viewing

14   that as a reasonable posture, which I think it is.

15          At the same time, if parties are concerned about them

16   having to foot the bill financially for a time, that, coupled

17   with uncertainty, will lead people to take action.  And so

18   here -- again, I understand this consistent with that footnote

19   8 -- that this is an intermediate step to give the debtor an

20   opportunity to move its case forward, discharge its duties,

21   before the Committee takes additional steps.

22          And so to the extent that the debtor is saying that it

23   will handle things in a way that will not impair creditors, in

24   terms of the carrying costs of the Florida property, there's no

25   record for me to reach that conclusion at the moment.  We're

59

1  paying -- or the debtor's paying for it with nonexempt assets

2  right now.  And that's all I have.  And that's a significant

3  and legitimate concern of the Committee.  And that's what's led

4  the Committee to say, we're not going to tell you who to sell

5  it to, how much you sell it to (sic), or even the contours of

6  the sale motion, but start the process.

7       To the extent that the debtor decides that there's a

8  way to work with the Committee and unsecured creditors to

9  address those concerns and say, well, we can enter into a

10 stipulation to hold off your motion or hold off other such

11 motions that the committee might file by agreeing to a certain

12 period of time to essentially make clear what our intentions --

13 what the debtor's intention is in terms of paying the carrying

14 costs with nonexempt assets, that's a negotiation.  I can't

15 make anybody do that.  But certainly, that seems to be an

16 option that I'm not -- one doesn't have to be particularly

17 clever to figure out that that's one way to allow the case to

18 move forward, and consistent with how cases often move forward;

19 protecting people's rights while giving people an opportunity

20 to try to figure things out.

21      There is looming in the backdrop a question of what

22 exactly will happen with the Freeman litigation, how far that

23 process will go or needs to go.  It's probably not productive

24 to spend too much time trying to figure that out now because

25 it's premature.  There is a motion filed with the district

1  court.  The district court, that's next up, and then we'll see

2  where we are after that.

3       But to the extent that creditors are being asked to

4  potentially foot the bill, they will take action.  And fending

5  off such a motion like today, if a debtor's able to fend it

6  off, only to force the Committee to take more extreme action, I

7  don't think is a sign of any progress.  So sixty days is not a

8  lot of time.  And so I encourage people to think proactively

9  about practical solutions going forward.  I think there are

10 practical solutions available here that allow the case to move

11 forward.

12      So what I'd like to do is hold off on this motion for

13 the moment.  I think you probably have a fairly good sense of

14 where I am and what's resonated with me in terms of concerns

15 that I share, as well as my view about the law.  And rather

16 than take action formally ruling on it, I think it's best to

17 just take it under advisement.  And I won't issue any ruling

18 without giving the parties a heads up on that.

19      But I encourage the parties to have meaningful

20 conversations about practical solutions going forward.  I'm a

21 blunt instrument, so I will rule on things that I'm presented

22 with.  That doesn't mean that that's the best path forward by

23 any stretch of the imagination.  So I think you can interpret

24 my actions today in that vein.

25      Certainly, it is the Committee's motion, and I don't

61

1  want to deprive somebody of a ruling.  You're entitled to have

2  a ruling.  And so I'll take it under advisement as of today.

3  And if the Committee decides at a certain point, Judge, we're

4  not getting anywhere, and we want a ruling, you can submit a

5  letter.

6           You okay over there?  All right.  Get some water.

7           If you want a ruling, that's fine.  Again, I don't

8  want to deprive anybody of getting that ruling.  But I think,

9  as Judge Chapman used to say, sometimes it's best to keep your

10  powder dry and allow things to work out.  So that's what I'm

11  going to do today.

12           And let me ask when we're next together?

13           MR. BERGER:  I don't believe, Judge, we have another

14  date scheduled.  I think we -- oh, let me reverse that, Judge.

15  There is a date.  There's a pre-trial conference date on the

16  adversary proceeding.  I think we scheduled it for -- was it

17  May -- was it May 11th or 16th?

18           THE COURT:  All right.

19           MR. BERGER:  So I --

20           THE COURT:  So I'm happy to use whatever that date is

21  as a holding date for the whole case in the interest of

22  efficiency.  If anybody, obviously, needs something before

23  that, talk to each other, and then, reach out to chambers.

24           Oh, I think we've got something on -- yes, May -- is

25  that 14th --

62

1          MR. BERGER:  Yes, Judge.

2          THE COURT:  -- May 14th at 11 a.m.

3          MR. BERGER:  Okay.

4          THE COURT:  So we'll use the May 14th date at 11

5    o'clock.  Again, if somebody needs something from the Court

6    before then, you can reach out to chambers; just talk to each

7    other first if -- even you want, for example, the Committee

8    wants a ruling, or there's a discovery dispute, or if you just

9    want to have a status conference to talk through a problem and

10   avoid the filing of motions.

11         So again, whatever is helpful for the case and for the

12   parties, I'm happy to do that.  But we'll use May 14th, not

13   only as the status conference on the adversary, but we'll also

14   use that as a status conference of the case and a holding gate

15   for anything else that might need to be filed.  Again, if you

16   need something before then, please reach out to chambers.

17         So with that, let me ask the debtor if there's

18   anything else we need to address here today?

19         MR. BERGER:  Nothing, Your Honor.  Thank you, again,

20   for the Court's courtesy in all of this.

21         THE COURT:  All right.  Anything else from the

22   Committee?

23         MR. DUBLIN:  Good afternoon, Your Honor.  Phil Dublin,

24   Akin Gump for the Committee.  Nothing further from us.

25         THE COURT:  All right.  Thank you very much.

63

1          So I appreciate the very helpful arguments today by

2   all counsel -- and very practical and your willingness to

3   interrupt, no doubt, with wonderful speeches to answer my

4   questions.  And so I really do appreciate that.  I want to make

5   sure to get your views on things, and that's why I jump in

6   there.  So I also appreciate you being here.  It's a little

7   easier to do that with you here as opposed to on Zoom.  So I

8   like to have -- it's a benefit.

9          And last but not least, always happy to see young

10  lawyers at the podium.  And I, with all my colleagues, we

11  definitely encourage that.  So that's good to see.  So unless

12  anyone has anything else, the Court will be adjourned until May

13  14th in this case at 11 o'clock.  And with that, I wish you all

14  a very good day.

15          UNIDENTIFIED SPEAKER:  Thank you very much, Your

16  Honor.

17          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

18          MR. REICH:  Thank you.

19          MS. SCHWARTZ:  Thank you, Your Honor.

20      (Whereupon these proceedings were concluded at 3:30 PM)

21

22

23

24

25

64

1                              I N D E X

2    RULINGS:                                   PAGE   LINE

3    Motion for extension granted                21     14

4    Application to authorize discovery of       17     24

5        debtor on third parties granted

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

65

C E R T I F I C A T I O N

I, Cathy L. Kleinbart, certify that the foregoing transcript is
a true and accurate record of the proceedings.


_____

Cathy L. Kleinbart

eScribers

7227 North 16th Street, Suite #207

Phoenix, AZ 85020


Date:  April 5, 2024

## $

**$0.66 (1)**
40:10
**$15,000 (1)**
30:25

## A

**Abid (1)**
11:10
**ability (1)**
29:9
**able (7)**
16:15;22:7;24:8;
34:6;40:3;42:24;60:5
**Absolutely (1)**
44:25
**accept (2)**
38:3;46:17
**acceptable (1)**
17:7
**access (1)**
16:14
**accordance (1)**
33:19
**according (1)**
19:13
**account (3)**
40:8,9,10
**accountant (2)**
14:3;47:15
**accounts (2)**
30:7,25
**accurate (1)**
30:16
**acquired (1)**
40:19
**across (1)**
56:20
**act (2)**
24:17;33:19
**acting (2)**
35:18;38:11
**action (3)**
34:7;35:4;51:18;
58:17;60:4,6,16
**actions (1)**
60:24
**active (1)**
10:6
**acts (1)**
23:10
**actual (1)**
22:24
**actually (7)**
13:24;14:25;33:21;
35:1,14;40:5;52:4
**acutely (1)**
50:8
**add (6)**
17:9,10,20;34:15;

36:18;39:21
**addition (1)**
36:16
**additional (7)**
17:19;22:8;9;25:17,
20;26:6;58:21
**Additionally (1)**
16:12
**address (9)**
23:12;24:22;28:25;
34:11;37:22;41:24;
52:23;59:9;62:18
**addressing (2)**
28:15;36:3
**adequate (1)**
40:22
**adjourn (1)**
52:18
**adjourned (1)**
63:12
**administrative (1)**
31:6
**advance (1)**
48:13
**adversary (2)**
61:16;62:13
**advised (1)**
15:2
**advisement (2)**
60:17;61:2
**advisors (1)**
15:21
**affairs (1)**
56:10
**affirmatively (1)**
25:22
**afternoon (11)**
10:2,24;11:2,11;
12:18,21;13:2;15:16;
28:8;41:12;62:23
**again (17)**
17:21;21:3;23:19;
26:23;27:18;51:10;
53:11,12,15;57:8;
58:7,18;61:7;62:5,11,
15,19
**against (6)**
18:3;27:12;33:2;
34:4;54:10;58:2
**agenda (4)**
13:9;15:13;18:10,
12
**ago (1)**
15:2
**agree (3)**
42:7;43:22;50:16
**agreed (7)**
20:17,20;29:18;
42:18;49:12;56:24;
58:13
**agreeing (1)**
59:11
**agreement (3)**

32:22,23;43:20
**agreements (1)**
17:8
**ahead (2)**
26:25;35:24
**Akin (5)**
11:8;15:17;28:9;
54:22;62:24
**allegations (1)**
38:24
**allow (9)**
22:3,15,17;25:7;
26:24;49:1;59:17;
60:10;61:10
**allowed (1)**
22:13
**allowing (1)**
25:22
**allows (1)**
56:9
**almost (3)**
29:2;47:21;49:21
**alone (2)**
30:6;38:20
**along (1)**
14:1
**alternative (1)**
38:16
**alternatives (1)**
50:11
**Although (2)**
33:7;41:15
**always (4)**
19:3;20:8;21:4;
63:9
**Amelia (2)**
11:10;15:16
**amenable (1)**
58:12
**amended (1)**
21:8
**amiss (1)**
46:8
**among (1)**
21:2
**amongst (1)**
20:5
**amount (10)**
16:3;22:18;26:3,24;
32:21;39:20;43:4,5,8;
48:13
**amounts (3)**
29:14;31:3;36:17
**amplify (1)**
10:13
**analogous (1)**
38:2
**analogy (1)**
48:8
**ancillary (1)**
32:14
**Andrea (1)**
11:18

32:22,23;43:20
**anomaly (1)**
33:13
**answered (2)**
20:3;57:21
**anticipation (1)**
23:24
**AO (1)**
10:9
**apartment (5)**
14:11;33:6;39:25;
46:14;52:21
**appeal (23)**
14:21;22:4,8,13,22;
24:5,9;25:8,11,12,18,
18;26:4;27:1;28:20;
29:4,15;35:25;36:4;
43:5,7,11;44:5
**appealable (1)**
43:14
**appealed (1)**
29:10
**appealing (2)**
22:2;26:11
**Appeals (2)**
23:5,21
**appear (2)**
11:20;51:3
**appearance (3)**
11:17;12:10;13:6
**appearances (1)**
11:12
**appears (1)**
40:21
**appellate (5)**
15:1;25:19;27:13,
13;43:12
**applicable (1)**
10:8
**application (9)**
14:20;15:3;17:25;
18:13,20;19:18,25;
20:25;23:24
**apply (1)**
54:2
**appoint (3)**
34:19;42:22;56:22
**appointed (1)**
35:15
**appraisal (2)**
46:10,18
**appreciate (7)**
16:24;17:2;21:2;
37:18;63:1,4,6
**appropriate (9)**
10:8;21:12;24:18;
28:24;29:6;34:13,21;
36:23;37:3
**appropriately (4)**
37:7;9:48:3;51:5
**approval (1)**
53:24
**approve (1)**
42:24

**approximately (1)**
55:21
**April (2)**
13:10;49:15,19,20
**argues (1)**
39:23
**argument (4)**
24:21;25:2;43:19,
19
**arguments (3)**
24:7;40:12;63:1
**around (4)**
37:19;44:9;49:14;
52:8
**artfully (1)**
26:2
**aside (1)**
50:7
**aspect (1)**
41:16
**aspects (1)**
29:17
**asset (4)**
38:5;41:25;52:4;
54:7
**assets (25)**
15:23;29:20;30:6,8,
13;31:11,20,21,23;
33:16,20;40:15,23;
45:2,4;46:2;47:3;
52:2,3,12,20;55:1;
57:6;59:1,14
**assist (1)**
17:13
**assistance (1)**
10:21
**associated (1)**
46:13
**Association (4)**
12:25;53:18,23,24
**Association's (1)**
54:13
**assume (4)**
23:9;37:14;42:6;
45:8
**assumption (2)**
43:3;44:20
**assumptions (1)**
44:21
**attached (1)**
40:19
**attention (1)**
53:20
**Attorney (4)**
12:12;14:20,23,25
**attorneys (1)**
11:3
**audit (1)**
20:19
**authority (10)**
15:19;28:21;35:3,
11;38:7;40:13;41:19,
23,25;42:9

**authorize (1)**
17:25
**automatic (2)**
24:8,23
**available (3)**
52:12;57:20;60:10
**avenues (1)**
34:17
**avoid (4)**
27:6,20;28:14;
62:10
**avoiding (1)**
27:3
**await (1)**
20:1
**aware (3)**
15:22;24:12;50:9
**away (1)**
37:12

**B**

**back (18)**
14:24;16:7;21:17;
23:14;24:7;25:21;
26:9;29:5;30:11;
32:24;43:7;45:15;
47:14,18;51:11;52:6,
8;58:7
**backdrop (2)**
33:2;59:21
**backwards (1)**
47:19
**bag (2)**
48:7;55:15
**bankruptcy (9)**
15:18;27:14;29:8;
35:2;38:10;39:7;48:8;
57:16;58:12
**based (4)**
21:25;23:3;28:17;
48:10
**Basically (3)**
22:21;41:19;57:13
**basis (5)**
15:8;24:14;33:9;
38:6;57:12
**bat (2)**
53:10,14
**Beach (2)**
12:24;54:11
**bear (2)**
31:22;34:3
**become (1)**
36:12
**becomes (3)**
13:6;15:22;45:6
**begging (1)**
52:17
**begin (1)**
51:3
**beginning (1)**
45:23

**behalf (7)**
11:5,8;12:19;21:24;
28:9;53:17;54:22
**belabor (1)**
53:1
**bells (1)**
17:19
**benefit (1)**
40:16;52:4;63:8
**Berger (21)**
10:24;11:2,3,3;
13:18,18;16:8;20:13,
13,23;22:12,19,21;
23:2,13,20;61:13,19;
62:1,3,19
**best (4)**
41:18;60:16,22;
61:9
**better (5)**
17:14;21:4;34:8;
50:23;55:3
**beyond (1)**
26:12
**Biblio (1)**
14:14
**Biblo (3)**
11:7;28:9;54:22
**big-picture (1)**
36:7
**bill (2)**
58:16;60:4
**bit (8)**
11:22;12:16;19:3;
22:20;28:6;42:5;
49:24;56:6
**black (1)**
17:1
**BLOCK (25)**
11:7,8;28:4,7,9;
29:11;30:1,3,22;
31:17;32:17;33:2;
35:5;36:8,11;37:9,21;
39:3,16,23;41:4,6;
53:11;54:21,22
**blue (1)**
17:1
**blunt (1)**
60:21
**bluntly (1)**
35:22
**board (2)**
14:4;43:11
**bond (1)**
24:10
**both (11)**
10:17;23:2;24:9;
29:7;32:18,25;33:9;
36:7,12;40:18;41:23
**bow (1)**
56:20
**breakdown (1)**
39:15
**breaks (1)**

43:23
**breathing (1)**
52:11
**bridge (2)**
13:7;54:3
**briefing (1)**
25:13
**bringing (1)**
22:14
**broadcast (1)**
40:1
**broken (1)**
21:3
**brought (1)**
20:14
**built (1)**
51:9
**bunch (1)**
29:13
**BURBAGE (15)**
12:18,19;21:19,23;
23:18,25;24:2;25:14,
15,25;26:15,16,18,21;
28:20
**burden (2)**
31:22;38:15
**burn (2)**
30:17;54:3
**business (8)**
34:14;35:19;38:14;
40:12;42:2,13;56:10,
13
**businesses (1)**
15:21
**buyer (4)**
46:20;53:23;55:3,4

**C**

**calculation (2)**
39:20;46:15
**California (1)**
40:8
**call (1)**
14:13
**calmed (1)**
47:16
**came (3)**
12:16;16:25,25
**can (54)**
10:12,21;13:7;
14:18;15:12;17:17,
22;19:11,16;25:1;
27:8;32:24;34:16;
37:7,9,12,13,14;40:1,
20,23;41:18;43:20;
45:15;46:3,12,15;
47:8,9;48:18,21,22,
24,25;49:22;50:21,
23;51:4;52:18;53:10;
55:5,20;56:1,8,21,22;
57:1,9,12;58:11;59:9;
60:23;61:4;62:6

**capable (2)**
54:14,15
**care (1)**
14:18
**careful (1)**
48:1
**carries (1)**
40:14
**carrying (5)**
34:9;52:3;57:23;
58:24;59:13
**Caruso (2)**
43:9,12
**carved (1)**
45:3
**case (37)**
10:5;15:7,10;17:2,
13,22;19:19;28:13,15,
19,24;29:7,17;34:7;
35:15;37:24;42:3;
43:3,24;44:11,12,17,
18;45:6;47:17;50:23;
54:9;55:9;57:14;
58:10,20;59:17;
60:10;61:21;62:11,
14;63:13
**cases (11)**
15:1;21:3;35:12,14,
15,16,16;36:15;
45:24;53:1;59:18
**cash (3)**
30:7,23,25
**catchall (1)**
41:24
**certain (6)**
26:3,23;37:4;47:8;
59:11;61:3
**certainly (8)**
24:12;25:1;46:3,24;
51:8;58:12;59:15;
60:25
**challenge (1)**
19:3
**challenging (3)**
56:6,11;57:12
**chambers (5)**
17:17;20:6;61:23;
62:6,16
**chance (1)**
37:19
**change (1)**
44:19
**changes (1)**
55:1
**Chapman (1)**
61:9
**Chapter (12)**
10:5;21:7;28:13,15;
29:17;31:21;34:7,14;
35:14,19;46:2;56:15
**characterized (1)**
42:12
**charges (1)**

46:13
**checking (2)**
40:9,10
**chose (2)**
31:21;56:23
**circle (1)**
53:8
**circumstances (3)**
38:1;45:5;48:5
**cite (1)**
35:13
**cited (1)**
35:12
**cites (2)**
35:15;41:23
**Citron (1)**
12:6
**City (1)**
39:25
**Civil (1)**
24:11
**claim (4)**
29:12;54:10,11,12
**claims (17)**
29:13;31:7;34:4;
36:6,15,16,18;38:15,
16;43:25;54:9
**clarify (1)**
21:25
**cleanup (2)**
53:10,14
**clear (5)**
22:1,6;42:14;57:18;
59:12
**clearly (2)**
21:5;40:2
**CLERK (1)**
11:23
**clever (1)**
59:17
**client (1)**
50:10
**clients (1)**
27:1
**close (1)**
34:6
**closely (1)**
47:23
**closer (1)**
28:6
**Code (2)**
35:3;42:16
**cognizant (1)**
27:3
**colleague (1)**
11:10
**colleagues (1)**
63:10
**collector (1)**
54:12
**colloquy (1)**
56:21
**combine (1)**

23-12055-shl    Doc 166    Filed 04/05/24    Entered 04/16/24 15:31:32    Main Document
In the Matter of: RUDOLPH W. GIULIANI                Pg 68 of 78

April 4, 2024

39:8
**combined (1)**
19:5
**coming (7)**
14:23,25;22:8;
24:25,25;44:22;51:11
**comment (1)**
57:8
**commentary (1)**
34:16
**comments (5)**
18:15,17;19:18;
22:1;54:20
**commit (1)**
52:20
**commitment (6)**
47:7,13,20;48:11,
15;55:24
**commits (1)**
55:1
**Committee (73)**
11:6;9;13:13,23;
15:4,9,14,15,18,18,
22;16:1,3,8,12,17,17;
19:17;20:16,21,25;
21:11,16;23:18;28:3,
10,10,12;33:3,5,12,
17,22,25;34:23;36:3;
38:8,20;41:7,23;
42:25;44:22;46:16;
47:23;48:10;49:17,
21;50:11,17;51:11,
18;52:15;53:7,13;
54:19,22;56:7,17,21,
25;57:11,11;58:12,
21;59:3,4,8,11;60:6;
61:3;62:7,22,24
**committee's (14)**
28:18;29:6,11;
35:23;41:14,20;
42:14;45:14;48:4,20;
52:17,25;54:16;60:25
**communicate (2)**
17:17;20:5
**communication (1)**
21:2
**communications (1)**
15:8
**compel (14)**
13:13;16:3;21:17;
28:11;33:24;34:13;
35:3;38:4,7;40:18;
41:20,25;42:10;56:8
**compelling (1)**
34:15
**complete (1)**
28:16
**compliance (1)**
24:10
**comply (1)**
35:6
**component (3)**
37:11;41:15,15

**components (1)**
41:14
**concedes (1)**
57:4
**concern (3)**
24:20;30:3;59:3
**concerned (4)**
16:3;28:12;56:7;
58:15
**concerns (5)**
29:7,8;57:14;59:9;
60:14
**conclude (1)**
40:17
**concluded (1)**
63:20
**conclusion (1)**
58:25
**condition (2)**
55:13;58:4
**conditions (1)**
35:9
**condo (22)**
28:11;31:24;32:5;
33:4,8,9,15,18,24;
34:6,8;36:21;38:18,
20;39:9,10,24;53:18,
23;54:4;55:16;57:23
**Condominium (2)**
12:25;13:14
**conduct (3)**
10:9;15:24;38:9
**Conference (7)**
10:9;13:10;14:13;
61:15;62:9,13,14
**confers (1)**
16:9
**confirmed (1)**
50:16
**connecting (1)**
29:23
**connection (6)**
14:10,11;16:2;
18:19;22:18;28:20
**consensual (1)**
20:3
**consent (2)**
42:24;52:18
**consented (1)**
43:4
**conserve (1)**
31:23
**consider (5)**
36:23,23;37:7,9,13
**considerable (1)**
51:9
**consideration (1)**
53:20
**considered (1)**
42:2
**considering (3)**
38:2;43:24;51:17
**consistent (3)**

56:10;58:18;59:18
**constructs (1)**
48:19
**consultation (1)**
21:10
**contain (1)**
50:15
**contention (4)**
38:23;39:12;40:2,
14
**contested (4)**
13:12;21:22;51:12,
12
**contexts (1)**
46:4
**continue (5)**
15:10;25:12;27:9;
55:15;58:5
**continuing (1)**
15:8
**contours (2)**
36:10;59:5
**contradicts (1)**
40:2
**Contrary (1)**
19:15
**Contrast (1)**
39:9
**contribute (1)**
45:9
**control (2)**
42:12,12
**conversations (2)**
16:12;60:20
**cooperate (1)**
50:20
**cooperating (2)**
49:21;50:1
**cooperation (1)**
16:6
**copies (1)**
40:19
**copy (2)**
13:9;16:25
**cost (4)**
38:18;40:15;46:23;
57:23
**cost-prohibitive (1)**
38:17
**costs (3)**
52:3;58:24;59:14
**counsel (25)**
10:23;12:7;13:16;
15:17;16:9;19:17;
21:2;22:1,11;23:14,
22;26:21;28:2,2;
30:12;33:4;37:18;
38:23;40:24;41:11;
43:12;52:23;56:21;
57:3;63:2
**County (1)**
54:11
**couple (5)**

14:3,12;15:2;44:21;
53:19
**coupled (1)**
58:16
**course (4)**
15:4,22;19:5;43:7
**COURT (146)**
10:2,12;11:5,11,21,
24;12:2,5,8,14,21;
13:1,2;14:8;15:11;
16:22;17:24;18:11,
14,22;19:2,8,11,13,
23;20:8,19,22,24;
21:21;22:9,10,15,16,
17,20,24;23:1,3,5,5,
10,15,17,21,22;
24:3,12,15,17,18,22;
25:1,7,21,23;26:1,5,
15,17,20,22;27:7,9,
12,25;28:5,23;29:2,
22;30:2,10;31:8;32:2;
33:1;34:11;35:9,18,
21;36:9,22,24;37:17,
25;38:2,6,8,12;39:1,
14,22;41:2,5,9;42:6,9;
43:17;44:3,20;45:1,
14,19,21;46:8,22;
47:7,11,19;48:9,14,
17,18;49:7;50:3,6;
51:7,16,21;52:6,22,
24;53:3,5,7,12,25;
54:2,15,17;55:17,20,
25;56:2,4;58:12;60:1,
1;61:18,20;62:2,4,5,
21,25;63:12
**courtesy (1)**
62:20
**courtroom (3)**
10:7,14,23
**Court's (3)**
41:17;53:20;62:20
**coverage (1)**
40:22
**covers (1)**
15:7
**created (1)**
36:1
**Creditors (26)**
11:9;13:13;20:16;
21:10;28:10;29:8,21;
30:4;31:17,22;34:8;
38:11;40:16;44:23;
45:10,12;46:15;
51:14;52:5;55:15;
56:18;57:2,5;58:23;
59:8;60:3
**Creditors' (1)**
46:16
**Creditor's (5)**
13:23;15:4,9;20:20,
25
**critical (3)**
24:13;38:5;40:22

**cross (1)**
13:7
**curious (1)**
32:14
**current (2)**
43:1;55:10
**currently (1)**
22:3

---

**D**

**damages (5)**
22:18;23:7;25:8;
43:21;51:12
**Danovich (2)**
11:10;15:17
**DANOVITCH (5)**
15:16;17:23;18:8,
12,15
**Data (2)**
18:13,19
**date (8)**
16:8;28:14;61:14,
15,15,20,21;62:4
**dates (4)**
13:25;17:21,22;
49:14
**Davidoff (1)**
12:6
**day (4)**
34:9;40:23;57:1;
63:14
**days (12)**
15:2;20:15;21:13;
33:10;39:6;42:4;
44:17;47:4;48:22;
50:14;56:24;60:7
**day-to-day (1)**
35:20
**DC (1)**
27:22
**deadline (3)**
15:24;27:13,13
**deadlines (1)**
17:4
**deal (5)**
23:7;26:24;29:13;
43:1;50:20
**dealing (1)**
51:5
**deals (1)**
44:14
**debt (2)**
44:14;45:5
**debtor (76)**
11:1,4,13,13,19;
14:4;15:20,21;16:11,
16;18:1;20:10,14;
28:11,14,17;29:1,3,
11;31:21;33:5,11,19,
23,25;34:5,9,24;35:3,
6,7;38:3,4,7,9,11,13,
14,15,19,22,25;39:23;

23-12055-shl    Doc 166    Filed 04/05/24    Entered 04/16/24 15:31:32    Main Document
In the Matter of: RUDOLPH W. GIULIANI                    Pg 69 of 78

April 4, 2024

40:3,18,19,21,25;
41:13,20,21,23,25;
43:6;44:13,18;45:8,
13;46:13;47:7;48:12;
49:25;52:3,19;54:24;
55:10,20;56:9,14;
57:7,9;58:4,11,19,22;
59:7;62:17
**debtor- (2)**
35:7;56:14
**debtor-in-possession (4)**
35:17;42:10;56:8,9
**debtor-in-possession's (1)**
34:14
**debtors (3)**
21:11;26:25;29:16
**debtor's (38)**
10:23;13:16;14:11;
15:23;16:9;20:15;
22:1,11,23;26:21;
28:13;30:5,12,18;
33:4,7,16;34:3;35:12;
37:23;38:13,23;39:9;
40:12,16,24;41:11;
47:22,25;50:22;51:8;
52:2,25;55:12;57:3;
59:1,13;60:5
**decide (1)**
25:1
**decides (2)**
59:7;61:3
**decision (4)**
24:25;25:2;29:10;
34:4
**decisions (1)**
35:20
**declaration (2)**
18:20;19:21
**decreasing (1)**
30:8
**definitely (1)**
63:11
**delay (2)**
30:3;31:15
**deliberate (1)**
58:6
**delve (1)**
36:4
**demand (1)**
49:22
**demands (1)**
49:23
**denied (2)**
43:6;50:10
**Department (2)**
12:12,14
**depending (1)**
53:20
**depletes (1)**
34:9
**depleting (1)**
33:15
**deposition (3)**

13:25;16:11;17:21
**depositions (4)**
15:20;16:16;17:5;
49:13
**deprive (2)**
61:1,8
**desire (2)**
24:19;26:8
**despite (1)**
40:12
**details (3)**
39:1;46:22;50:6
**determinations (1)**
43:18
**determine (1)**
33:13
**determined (1)**
33:17
**detrimentally (1)**
38:11
**device (1)**
40:5
**devil (1)**
46:22
**DEX (1)**
53:24
**different (3)**
10:13;39:5;44:12
**difficult (2)**
27:11;45:6
**disagree (1)**
49:4
**discharge (1)**
58:20
**disclosure (1)**
21:8
**disclosures (1)**
28:16
**discovery (9)**
17:25;49:11,18,23;
50:8,20;51:1,2;62:8
**discuss (1)**
20:4
**discussed (2)**
43:15;56:20
**discussing (1)**
58:7
**discussion (3)**
32:4;35:21;54:24
**discussions (1)**
49:24
**dispute (1)**
62:8
**dissipated (1)**
52:13
**distinguish (1)**
35:16
**distinguishable (1)**
35:13
**distributed (1)**
45:11
**District (10)**
22:17,24;23:4,10;

24:17,18;25:7;26:5;
59:25;60:1
**Docket (5)**
13:10,15;16:19;
20:19;56:19
**document (3)**
15:19;16:10;49:22
**documents (8)**
14:1,22;16:15;17:5;
38:23;39:2,14;49:16
**dollar (1)**
43:8
**dollars (18)**
30:5,7,25;31:4;
32:1;33:8,11;36:16,
17;38:19;39:8,10,11,
13,18,21;54:8;55:21
**done (8)**
13:23;14:6;23:22,
23;25:19;29:20;47:4,
4
**door (1)**
29:21
**dots (1)**
29:23
**doubt (1)**
63:3
**down (7)**
12:23;17:12;22:20;
24:3;42:25;47:16;
49:2
**downside (1)**
34:3
**draconian (2)**
50:12;57:10
**dramatic (1)**
42:16
**drastic (1)**
42:16
**drill (3)**
25:4,9;27:4
**drills (2)**
27:6,19
**dry (2)**
48:10;61:10
**Dublin (3)**
11:10;62:23,23
**due (1)**
29:8
**dumb (1)**
22:20
**duties (5)**
31:23;33:19;35:7,9;
58:20

**E**

**Earlier (1)**
16:17
**early (2)**
14:17;49:10
**easier (1)**
63:7

**edicts (1)**
19:13
**efficiency (1)**
61:22
**efficiently (1)**
27:10
**either (2)**
14:15;27:19
**elephant (1)**
43:2
**eliminate (1)**
25:9
**else (20)**
12:9,17,22;13:3;
19:24;21:1;23:11;
24:24;28:1;37:20;
52:22;53:9,12,15;
54:18;55:18;62:15,
18,21;63:12
**eminently (1)**
56:25
**employment (1)**
14:20
**encompassing (1)**
49:22
**encourage (4)**
46:5;60:8,19;63:11
**end (9)**
14:5;25:3;29:4;
43:23;45:12;47:3;
48:7,22;57:1
**endangers (1)**
34:10
**ended (2)**
37:1,1
**engage (1)**
46:18
**engaged (1)**
20:16
**engaging (1)**
16:9
**enough (1)**
51:14
**enter (2)**
17:18;59:9
**entered (1)**
32:23
**entirely (1)**
38:1
**entitled (1)**
61:1
**entry (3)**
16:5,21;33:22
**equal (1)**
52:1
**equation (1)**
51:7
**Equipment (2)**
37:24;38:6
**equivalent (1)**
45:10
**especially (1)**
25:15

**essence (1)**
51:25
**essentially (7)**
22:18;34:25;39:15;
42:11;46:5,10;59:12
**established (1)**
37:4
**estate (10)**
30:24;31:21,23;
33:20;34:10;35:10;
38:5;40:15,23;42:2
**estimated (1)**
33:7
**even (7)**
28:22;37:13;43:21;
49:2;51:16;59:5;62:7
**event (1)**
25:11
**events (1)**
17:5
**eventuality (1)**
43:10
**everybody (2)**
10:11;12:5
**everybody's (1)**
22:5
**everyone (1)**
50:15
**evidence (2)**
10:7;38:16
**exact (1)**
49:3
**exactly (2)**
26:8;59:22
**examination (4)**
49:15,19;50:2;51:3
**examinations (1)**
49:13
**examine (1)**
49:24
**example (3)**
24:20;56:23;62:7
**exception (3)**
45:3;56:12,12
**exclusive (1)**
21:7
**exclusivity (8)**
20:11,15;34:18;
42:18;48:22;50:13;
56:23;58:13
**Excuse (3)**
21:19,19;36:15
**exempt (12)**
30:8,13;31:3,11,20;
46:14;47:3;48:12;
52:3,20;55:1,21
**exhibited (1)**
33:16
**expect (2)**
47:13,18
**expedited (1)**
33:25
**expenses (11)**

30:9,24;31:4,5;
32:1,1,19;33:8;38:15;
39:4;47:25
**experience (1)**
29:3
**experienced (1)**
43:12
**extend (3)**
20:11,14;21:6
**extension (6)**
20:17;21:14;42:19;
50:13;56:22;58:13
**extensions (3)**
34:17,18;48:24
**extent (11)**
13:6;18:5;19:18;
24:3;25:20;26:3,6,11;
58:22;59:7;60:3
**extreme (1)**
60:6

**F**

**faced (1)**
57:10
**fact (4)**
24:7;37:10;49:11;
50:10
**facts (1)**
36:22
**factual (5)**
38:24;41:15,17;
54:6;56:12
**failed (2)**
28:16;38:14
**fair (2)**
24:15;49:7
**fairly (2)**
15:8;60:13
**fan (1)**
27:18
**far (6)**
15:6;29:18;30:16;
42:22;57:10;59:22
**far-fetched (1)**
45:13
**Farr (2)**
12:19;21:23
**favor (2)**
10:16;28:5
**February (4)**
14:2;31:2;33:12;
47:17
**Federal (1)**
24:10
**feels (1)**
24:18
**fees (1)**
33:13
**Feld (3)**
11:8;15:17;28:9
**fend (1)**
60:5

**fending (2)**
57:9;60:4
**few (4)**
13:4;37:22;54:23;
55:2
**fiduciary (3)**
31:23;33:19;35:7
**figure (5)**
46:10;48:19;59:17,
20,24
**file (15)**
22:13;23:24;25:16;
26:4,25;27:1;28:16;
29:1;31:21;33:17;
42:22;48:25;56:21,
22;59:11
**filed (28)**
13:9,10;14:2,5,17;
15:18;16:17,19;
22:17,22;23:7;24:21;
25:7,11,18;26:5;
28:11,17;31:1;32:24;
33:11;39:17;47:17;
53:12,15;54:9;59:25;
62:15
**filing (5)**
21:7;25:12;33:3;
47:14;62:10
**final (3)**
23:4;29:10;37:6
**Finance (2)**
12:13,15
**finances (3)**
50:22;51:8;55:10
**financial (9)**
15:24;28:16;47:23;
55:4,12;57:19,20;
58:3,8
**financially (1)**
58:16
**find (4)**
10:22;12:9;21:10;
39:20
**finds (4)**
27:11;38:8,20;
54:15
**fine (3)**
23:25;27:5;61:7
**finite (1)**
34:10
**fire (5)**
25:4,9;27:4,6,19
**firm (3)**
12:24;14:24;17:20
**first (8)**
22:8;32:12,21;34:5;
37:23;46:12;49:15;
62:7
**FISCHOFF (37)**
10:24,25,25;11:3;
41:12,13;42:8,21;
44:2,7,25;45:7,18,20;
46:7,12;47:6,10,12,

21,24;48:16;49:4,8;
50:4,18;51:15,20,23;
52:16,24;53:4,6;55:8,
19;56:1,3
**five (5)**
37:14;44:10;45:8,9,
11
**fixable (1)**
58:4
**flexibility (1)**
37:18
**Florida (31)**
13:14;28:11;29:24,
25;30:13;31:4,24;
32:5,13,20;33:4,8,9,
15,18,24;34:6;36:21;
38:18,20;39:4,9,10,
24;41:22;44:15;45:1;
50:12;57:7,23;58:24
**flux (1)**
37:6
**focus (1)**
51:5
**folks (5)**
10:3,6,12;11:12;
23:18
**foot (2)**
58:16;60:4
**footnote (4)**
34:23;42:13;56:19;
58:18
**force (2)**
38:3;60:6
**forced (1)**
33:25
**forces (1)**
50:10
**forever (1)**
31:19
**form (6)**
17:6,7,9;19:22;
29:5;46:10
**formal (1)**
16:1
**formally (1)**
60:16
**forms (1)**
25:12
**forth (8)**
18:1,7;26:9;29:5;
30:11;34:1;53:4;
56:19
**forward (15)**
15:10;17:13,22;
21:12;22:14;25:21;
27:10;28:15;58:20;
59:18,18;60:9,11,20,
22
**forwards (1)**
47:20
**found (2)**
38:7,8
**four (1)**

36:16
**Frankly (3)**
27:19;29:20;56:24
**Freeman (11)**
12:19;14:21;21:24;
22:2;24:5;28:19;
36:12,19,24;43:4;
59:22
**front (2)**
34:25;43:18
**full (1)**
57:5
**fully (2)**
10:5,10
**fund (3)**
31:5,6;45:25
**fundamentally (1)**
44:12
**funds (3)**
46:14;48:12;55:21
**further (8)**
18:9;20:1,18;26:25;
34:18;38:4;41:6;
62:24
**future (2)**
25:10;57:11

**G**

**GAGION (3)**
12:11,11,14
**Gallagher (2)**
12:19;21:24
**Gary (2)**
10:25;41:12
**gate (1)**
62:14
**gathering (1)**
49:16
**GDR (2)**
19:17,24
**geek (1)**
35:2
**General (3)**
12:12;13:19;30:4
**gesture (1)**
10:20
**gets (4)**
37:15;45:8,11;
55:15
**gigantic (1)**
30:20
**Giuliani (11)**
10:4;22:3,7;24:4,8;
25:16,20;32:7;49:13;
51:3;54:13
**given (5)**
17:15;21:10;30:4;
38:18;44:13
**giving (2)**
59:19;60:18
**Global (2)**
18:13,19

**GLUCKSMAN (3)**
12:4,6,7
**Glucksman's (1)**
12:3
**goal (1)**
14:15
**goes (2)**
31:18;42:23
**Good (20)**
10:2,24;11:2,5,7,
11;12:11,18,21;13:2;
14:8;15:16;28:8;
41:12;52:24;58:3;
60:13;62:23;63:11,14
**Goodman (2)**
10:25;11:3
**grant (1)**
17:24;21:6;42:9
**granted (4)**
21:14;40:14;41:8;
43:4
**great (5)**
17:12,23;18:6;20:7,
8
**greater (1)**
35:18
**grounds (1)**
42:21
**groups (1)**
54:9
**guarantee (1)**
45:16
**guarantees (1)**
48:6
**guess (2)**
17:3;24:15
**guidelines (1)**
10:8
**Gump (5)**
11:8;15:17;28:9;
54:22;62:24

**H**

**habits (1)**
30:5
**Hamilton (1)**
50:7
**hand (1)**
24:25
**handed (1)**
16:24
**handle (5)**
24:18;29:7;50:23;
55:9;58:23
**handled (1)**
23:14
**handles (1)**
15:1
**handling (1)**
14:21
**handwriting (1)**
43:25

**happen (4)**
  25:11;29:24;31:13;
  59:22
**happens (2)**
  28:19;50:8
**happy (8)**
  17:24;20:3;21:6;
  27:16;57:18;61:20;
  62:12;63:9
**hard (1)**
  38:20
**hat (1)**
  35:2
**Hauer (3)**
  11:8;15:17;28:9
**heads (1)**
  60:18
**hear (7)**
  10:12,21;16:2;
  23:22;24:22;41:11;
  52:15
**heard (6)**
  16:23;19:24;43:13;
  53:9,15;54:18
**hearing (8)**
  10:4,9,19;17:17;
  19:20;20:1;21:1;
  58:10
**hearings (1)**
  19:3
**Heath (3)**
  11:2;13:18;20:13
**held (1)**
  38:12
**help (2)**
  17:22;27:20
**helpful (4)**
  17:3,15;62:11;63:1
**helps (1)**
  21:11
**hey (3)**
  26:3;32:4;48:9
**high (1)**
  32:19
**higher (1)**
  32:21
**highlight (1)**
  18:6
**highly (1)**
  51:21
**Highway (2)**
  37:24;38:6
**history (1)**
  36:25
**Hold (5)**
  12:2;17:16;59:10,
  10;60:12
**holding (4)**
  48:7;55:15;61:21;
  62:14
**home (1)**
  38:17
**homeowners (2)**

13:14;40:18
**Honor (53)**
  10:24;11:2,7,18;
  12:11,18,23;13:18,20,
  22;14:2,9;15:6,16;
  16:2,7,20;17:23;18:8,
  25;19:15,20;20:7,13,
  14;21:19,20;22:12;
  24:2;25:15;26:14;
  27:6,23;28:4,8;30:1,
  22;33:2;35:5;37:21,
  23;41:4,6,12;53:17;
  54:6,21,23;62:19,23;
  63:16,17,19
**hope (3)**
  16:5;35:25;51:1
**Hopefully (5)**
  14:4,6,16;32:23;
  50:20
**hoping (1)**
  51:22
**hopping (1)**
  37:19
**housing (1)**
  38:16
**hundred (2)**
  51:23;55:22
**hurdle (1)**
  19:19
**Hutcher (1)**
  12:6
**hybrid (2)**
  10:5,10
**hypothetical (1)**
  44:8

**I**

**idea (1)**
  45:22
**ideas (1)**
  48:19
**identified (1)**
  16:16
**identifying (1)**
  17:12
**imagination (1)**
  60:23
**imagine (2)**
  23:6;34:16
**immediate (1)**
  25:10
**impair (1)**
  58:23
**important (2)**
  28:25;55:13
**importantly (1)**
  23:17
**inclination (1)**
  28:14
**include (2)**
  34:20;40:11
**includes (1)**

57:7
**including (3)**
  24:7;29:24;44:5
**income (4)**
  40:7,8,10,11
**increase (1)**
  51:9
**increasingly (1)**
  45:6
**incurred (1)**
  38:15
**indeed (1)**
  57:3
**indicative (1)**
  55:10
**indiscernible (13)**
  11:25;12:4,12;19:1,
  9,10,12;22:19,24,25;
  23:16;53:11,21
**inform (2)**
  21:11;44:22
**informal (1)**
  18:15
**information (12)**
  15:2;16:4,5;18:2,4;
  20:2;39:17;54:6;
  55:12;57:19,20;58:8
**initial (1)**
  16:10
**in-possession (2)**
  35:8;56:15
**insists (1)**
  34:9
**instructive (1)**
  38:8
**instrument (1)**
  60:21
**insurance (6)**
  13:14;40:18,20,21,
  25;41:3
**intending (1)**
  50:19
**intends (1)**
  34:23
**intention (3)**
  28:13;41:21;59:13
**intentions (1)**
  59:12
**interest (3)**
  38:11;40:10;61:21
**intermediate (1)**
  34:24;58:19
**interpret (1)**
  60:23
**interrupt (1)**
  63:3
**into (10)**
  15:23;31:25;32:23;
  33:25;34:4;44:17;
  46:5,14;55:8;59:9
**investigation (1)**
  15:23
**IRA (6)**

30:8;31:3,5,20;
  40:8;55:21
**IRS (2)**
  44:11;54:10
**issue (11)**
  14:9;20:23;24:11,
  13;29:15;34:2;40:23;
  47:15;49:9;58:8;
  60:17
**issued (1)**
  29:2
**issues (8)**
  24:23;25:2,5;27:15;
  28:25;53:9;57:14;
  58:7
**item (4)**
  18:9,12;21:16,25
**Ivan (1)**
  12:23

**J**

**James (3)**
  12:6,18;21:23
**January (8)**
  24:7;30:6;31:2,4;
  33:10;38:20;39:7;
  40:7
**joined (1)**
  11:9
**joys (1)**
  19:2
**Judge (24)**
  10:3;11:23;12:1;
  14:15,19;19:1;23:8,
  13;24:18;31:10,13;
  42:15;43:19;44:7;
  46:3,21;47:1;48:5;
  52:14;61:3,9,13,14;
  62:1
**judgement (1)**
  37:12
**judgment (18)**
  22:3;24:9;29:2,4,4,
  10;34:14;36:1,5,5,12,
  19;37:11;42:2,13;
  43:13;56:10,13
**Judicial (1)**
  10:9
**jump (1)**
  63:5
**June (2)**
  46:25;47:1
**jurisdiction (1)**
  26:9
**jurisdictional (1)**
  26:7
**justification (1)**
  38:14

**K**

**keep (2)**

32:4;61:9
**keeps (2)**
  48:10;51:11
**key (1)**
  37:10
**kick (1)**
  23:8
**kind (10)**
  15:6;20:17;25:13;
  29:5;35:4,19;36:12;
  41:24;52:16;55:10
**kinds (1)**
  30:24
**knew (1)**
  23:21
**knowledge (1)**
  45:18

**L**

**lack (2)**
  17:20;48:7
**laid (1)**
  18:4
**Lake (1)**
  12:25
**Lane (1)**
  10:3
**large (1)**
  43:14
**last (1)**
  63:9
**later (3)**
  13:7;14:15;42:25
**law (1)**
  60:15
**lawsuits (2)**
  36:16,17
**lawyers (2)**
  20:9;63:10
**lead (3)**
  16:6;26:24;58:17
**leading (1)**
  39:7
**least (2)**
  44:23;63:9
**leaves (3)**
  20:10;21:15;57:13
**led (1)**
  59:3
**left (2)**
  32:9;55:14
**legal (9)**
  17:20;35:2,2;40:13;
  41:15,16;48:7;56:6;
  58:2
**legally (1)**
  56:17
**legitimate (2)**
  57:22;59:3
**legitimately (1)**
  56:7
**Leo (1)**

23-12055-shl   Doc 166   Filed 04/05/24   Entered 04/16/24 15:31:32   Main Document
In the Matter of: RUDOLPH W. GIULIANI          Pg 72 of 78

April 4, 2024

12:11
**less (3)**
38:17;42:5;44:16
**lesser (1)**
42:17
**letter (1)**
61:5
**letting (1)**
11:19
**liabilities (2)**
15:23;51:10
**liability (4)**
37:10;43:4,21;
51:12
**liberal (1)**
56:11
**life (1)**
23:4
**lift (4)**
22:2,5;24:4;25:17
**lifted (6)**
25:6;26:2,10;27:21,
21,22
**lifting (1)**
24:23
**light (1)**
17:3
**likelihood (2)**
36:4,19
**limitations (1)**
35:8
**limited (2)**
16:11;39:13
**line (2)**
10:20;34:1
**lined (3)**
17:1,1;49:23
**lines (1)**
28:24
**liquidated (1)**
45:2
**liquidation (5)**
44:24;45:4,11;52:1;
57:3
**list (4)**
11:13;20:12;30:7;
33:23
**listed (3)**
13:5;15:12;54:7
**listing (2)**
32:22,23
**lists (3)**
13:11;30:25;39:10
**litigation (8)**
14:21;28:20;31:18;
36:24;37:5;43:24;
51:17;59:22
**little (9)**
11:21;12:16;22:20;
28:6;34:16;39:1;42:5;
49:24;63:6
**live (3)**
32:10;33:6;44:15

**living (1)**
55:15
**location (1)**
39:25
**long (11)**
10:14,17;11:13,14;
30:17;31:5,11;52:6,
10,13,20
**look (8)**
36:6,11,14,19;37:2,
3;52:9;57:6
**looking (5)**
44:10,11,11;47:19,
20
**looming (1)**
59:21
**lot (12)**
24:6;27:15,15;
32:17;37:17;42:4,15,
16;43:3;48:21;50:24;
60:8
**lots (1)**
34:16
**loud (1)**
19:5
**low (1)**
12:16
**lucky (1)**
55:5
**luxurious (1)**
55:16

## M

**maintaining (1)**
52:20
**maintenance (6)**
31:4;32:1,19;38:18,
19;39:19
**majority (1)**
39:19
**Makes (3)**
23:20;42:14;43:14
**making (4)**
24:6;35:19;44:20;
54:14
**managing (1)**
42:1
**Manhattan (1)**
14:11
**many (2)**
31:12;44:17
**March (3)**
15:19,25;28:12
**margin (1)**
30:20
**margins (1)**
32:10
**marker (1)**
24:3
**market (3)**
32:25;33:23;47:5
**marketing (3)**

46:9,11;50:12
**master (1)**
40:25
**materialize (1)**
45:16
**math (6)**
35:22,23;36:7,21;
45:7;55:20
**matter (5)**
13:1,12;21:22;
35:23;43:17
**matters (4)**
13:11;15:12;20:12;
28:15
**maximize (2)**
33:20;40:15
**may (19)**
11:12;18:9;23:24;
30:8;32:3;43:1;48:14;
50:19,25;51:3,24,25;
61:17,17,24;62:2,4,
12;63:12
**maybe (11)**
15:12;17:17;26:1;
27:13;30:10,14;
32:21;42:4;48:10;
50:22;51:6
**mean (9)**
23:1,19;26:6;32:13;
41:2;46:25;47:24;
51:24;60:22
**meaning (5)**
27:12;30:16;37:11;
42:10;57:4
**meaningful (2)**
16:6;60:19
**means (5)**
26:23;44:5;45:21;
52:11;57:17
**meant (1)**
46:24
**meet (2)**
16:9;38:14
**meeting (4)**
31:23;40:2,3;51:2
**meets (1)**
21:13
**memorialize (1)**
17:8
**mention (2)**
23:9;43:9
**mentioned (2)**
17:11;26:22
**message (2)**
42:14;48:2
**micromanage (2)**
49:2,5
**microphone (2)**
19:4;28:5
**microphones (3)**
10:13,13,17
**middle (1)**
24:19

**might (3)**
45:12;59:11;62:15
**million (8)**
36:16;44:10,18;
45:8;9,11;54:8;55:21
**million- (1)**
31:2
**millions (1)**
36:17
**mind (2)**
37:20;55:2
**minimal (2)**
30:6;40:21
**minute (1)**
12:2
**missed (1)**
34:22
**missing (1)**
51:11
**mixed (1)**
41:16
**MLR (2)**
39:7;40:7
**model (2)**
56:9,15
**modification (1)**
29:18
**moment (2)**
58:25;60:13
**Monday (1)**
50:1
**monetize (1)**
38:5
**money (4)**
45:22;47:2;51:14;
52:14
**monitoring (1)**
49:10
**month (4)**
33:10;46:20;47:4;
55:22
**monthly (5)**
31:1;33:7,9,12;
57:23
**months (7)**
28:22;31:12;42:3;
55:3,8,11,22
**more (15)**
17:20;30:5;32:9;
33:9,11;39:1,12;
42:16;48:7;50:12;
51:5;55:11,22;57:10;
60:6
**morning (3)**
11:5,7;12:11
**most (4)**
10:6;13:22;23:17;
32:7
**motion (60)**
13:1,12,24;15:13,
19,25;16:1,2,13;18:2,
5;20:10,14;21:6,8,14,
16;22:17;23:7,11;

24:6,21;25:7,17;26:5,
12,24,25;28:1,11,18;
29:23;33:3,18;34:1,
24;40:13,14,17;41:8,
14,20;42:22;43:6;
48:5,21,25;50:10;
52:18;53:15,22;
56:18,21;57:9;59:6,
10,25;60:5,12,25
**motions (5)**
13:21;22:21;25:1;
59:11;62:10
**motivating (1)**
51:18
**motivation (1)**
33:16
**move (9)**
15:10;17:22;21:22;
27:10;50:14;58:20;
59:18,18;60:10
**moving (1)**
17:13
**much (19)**
12:8;16:22;17:2;
18:22;19:23;20:24;
21:4;27:6;38:17;41:9;
44:14,23;55:17;
56:14;57:2;59:5,24;
62:25;63:15
**Multiple (1)**
39:18
**must (1)**
53:24
**myself (1)**
14:14

## N

**nailed (1)**
17:12
**Nason (1)**
12:24
**navigate (1)**
31:9
**near (1)**
10:17
**necessarily (2)**
29:15;52:1
**necessary (2)**
13:6;33:17
**neck (1)**
10:14
**need (12)**
20:4;23:24;24:22;
25:2;26:4;36:13;53:1;
55:13;57:21;62:15,
16,18
**needed (1)**
23:23
**needs (12)**
26:6,11,12;29:16,
20;39:23;57:20;58:5,
9;59:23;61:22;62:5

23-12055-shl    Doc 166    Filed 04/05/24    Entered 04/16/24 15:31:32    Main Document
In the Matter of: RUDOLPH W. GIULIANI          Pg 73 of 78

April 4, 2024

**negotiate (1)**
48:18
**negotiation (1)**
59:14
**negotiations (2)**
17:15;20:16
**neither (2)**
36:7;40:13
**nervous (2)**
58:1,2
**new (17)**
14:25;20:19;22:24;
31:6;32:6,8,10,10,11,
23;33:6;38:17;39:24;
41:21,22;45:2;53:23
**news (1)**
58:3
**next (8)**
14:5,17;25:10,11,
16;39:23;60:1;61:12
**ninety (5)**
33:10;39:6;42:4;
44:17;51:13
**ninety- (2)**
37:13;44:9
**ninety-five (4)**
36:13,20;37:15;
43:22
**nobody (3)**
27:11;53:12,15
**nonexempt (5)**
30:7,25;47:2;52:2;
57:6;59:1,14
**nonplayer (1)**
36:13
**nonstarter (1)**
48:25
**noodling (1)**
48:16
**Notably (1)**
40:10
**note (2)**
38:1,22
**noted (2)**
16:8;33:21
**nothing's (1)**
47:4
**notice (11)**
17:1;22:13,22,23;
25:8,10,18;26:4;
49:18,19;50:1
**noting (2)**
40:6,17
**notwithstanding (1)**
31:15
**number (9)**
13:21;16:19;20:11,
19;31:9;43:23;45:3;
54:11,12
**numbers (5)**
37:14,15;51:16,22;
57:24

# O

**object (1)**
15:25
**objection (6)**
28:17;35:12;37:23;
38:24;40:20;41:1
**objections (1)**
16:1
**obligation (2)**
49:6,9
**observations (1)**
56:5
**obtain (2)**
13:14;40:18
**obviously (9)**
13:21;23:23;24:11,
17;28:24;31:9;36:24;
54:13;61:22
**Occasionally (1)**
17:7
**occupies (1)**
38:9
**o'clock (3)**
10:4;62:5;63:13
**off (8)**
13:17;15:15;57:9;
59:10,10;60:5,6,12
**offer (3)**
38:3;46:16,17
**Office (1)**
11:16;16:14;18:16
**Official (7)**
11:6,9;13:12;15:14;
21:16;28:3,10
**often (1)**
59:18
**old (1)**
42:3
**once (3)**
15:1;32:6;33:6
**one (24)**
13:12;17:3,16;18:9;
21:15;24:12;26:4;
30:14;32:6;34:16;
40:9;45:18,23;47:15;
48:4,9;52:9;53:21;
54:9;55:7,19;58:7;
59:16,17
**ones (4)**
10:14,15,16;39:24
**one-third (1)**
40:6
**only (16)**
23:9;24:16,20;25:2;
29:12;38:13;39:25;
42:3,4;43:5,25;44:16;
55:8;57:9;60:6;62:13
**operate (1)**
39:24
**operating (4)**
14:2;31:1;33:12;

47:14
**operation (1)**
42:1
**opine (1)**
26:8
**opinion (1)**
19:15
**opportunity (4)**
34:25;44:13;58:20;
59:19
**oppose (4)**
48:22;50:13;54:14;
57:1
**opposed (3)**
32:12,12;63:7
**opposing (4)**
24:5,14;34:17;
42:18
**opposition (3)**
27:2;34:19;56:22
**option (2)**
53:8;59:16
**options (2)**
31:9;56:17
**oral (2)**
24:20;25:2
**order (30)**
14:12;15:14;16:6,
18,21;17:1,7,9,18,20;
18:10,19;19:22;20:3;
21:9;22:2,4,5,7,12,14,
22;23:4;24:4;25:17;
33:22;36:12;37:6;
53:22;57:18
**ordered (1)**
53:21
**Otherwise (3)**
19:20;29:21;31:7
**ours (1)**
19:4
**out (32)**
10:22;12:9;16:25,
25;17:4;18:4,10;20:6,
20;29:21;36:22;44:5;
45:3;46:10;47:1,16;
48:9,18,19;49:20,24;
51:22;55:3,19;57:16;
59:17,20,24;61:10,23;
62:6,16
**outcome (1)**
34:8
**over (15)**
13:16;14:7;15:15;
19:19;21:18;22:10;
26:9;27:16;28:2;31:3;
36:13,15;38:19;
57:24;61:6
**oversight (1)**
35:18
**overturn (1)**
36:5
**owes (1)**
44:18

**own (1)**
34:16

# P

**page (2)**
26:19;27:21
**paid (3)**
30:13;48:12;57:5
**Palm (2)**
12:24;54:11
**papers (9)**
30:11,18;32:24;
33:22;34:12;35:22;
46:24;48:1;53:16
**part (5)**
31:22;45:1;49:9;
51:7,9
**participate (1)**
16:15
**particular (6)**
18:5;30:4;37:2;
38:3;40:5;42:11
**particularly (3)**
11:15;26:1;59:16
**parties (14)**
15:22,25;16:16;
18:1,3;20:2;24:16;
43:3;49:23;53:13;
58:15;60:18,19;62:12
**parting (1)**
54:20
**party (8)**
16:23;20:18;28:1;
30:11;45:9,16;53:14;
55:18
**path (3)**
21:12;44:4;60:22
**pay (5)**
30:24;46:13,23;
47:25;51:14
**paying (7)**
30:9;31:11,15;52:3;
59:1,1,13
**payments (7)**
38:19;39:6,8,10,13,
18;54:14
**pending (2)**
43:6,18
**people (15)**
11:13;13:5;17:7;
46:5;47:8;48:8,9,18;
57:16,21,25;58:11,17;
59:19;60:8
**people's (1)**
59:19
**perceive (2)**
51:17;56:18
**percent (8)**
36:14,20;37:14,15;
43:22;44:10;51:13,24
**perfect (3)**
22:14;32:3;43:7

**perfection (1)**
43:11
**perfectly (5)**
10:8;17:6;46:19
**period (6)**
20:15;21:7;47:8;
48:12;50:21;59:12
**person (1)**
10:4
**perspective (1)**
24:13
**persuaded (1)**
47:16
**ph (2)**
14:24;43:9
**Phil (2)**
11:10;62:23
**pick (1)**
56:12
**picked (1)**
10:15
**picture (3)**
50:21;52:25;55:4
**piece (1)**
54:6
**place (3)**
32:6;57:16,24
**plaintiff (1)**
53:19
**plaintiffs (1)**
12:20;21:24;24:5
**plaintiff's (1)**
22:3
**plan (22)**
18:18;21:7;28:18;
31:12,19;33:4;34:19;
42:19,23,24;44:14;
45:9,25;46:2;47:8;
48:24;50:15;51:24,
25;52:12;57:2,4
**plans (1)**
33:5
**playing (1)**
52:14
**Please (4)**
10:2,20;13:21;
62:16
**plus (1)**
31:3
**PM (1)**
63:20
**podcast (2)**
39:24;40:4
**podcasting (1)**
40:11
**podium (3)**
20:9;21:17;63:10
**point (16)**
14:1;15:7;24:15;
25:2;27:18;42:3,22;
43:16;44:16;47:15;
49:7,20;52:17;54:5;
55:19;61:3

**points (2)**
36:11;54:23
**policies (3)**
40:20,25;41:3
**ponder (1)**
32:9
**position (15)**
17:14;38:10;43:15,
18;47:12,22;52:25;
53:1,19;54:13,15,16;
55:1;56:6,25
**possibility (1)**
25:9
**posting (1)**
24:10
**post-petition (1)**
50:22
**posture (1)**
58:14
**pot (3)**
51:25,25;57:4
**potential (1)**
17:13
**potentially (1)**
60:4
**powder (2)**
48:10;61:10
**power (1)**
38:9
**practical (7)**
48:8;57:16;58:8;
60:9,10,20;63:2
**precise (1)**
58:1
**prejudice (1)**
20:18
**premature (2)**
40:13;59:25
**preparation (1)**
47:13
**prepared (1)**
52:19
**preparing (1)**
43:10
**pre-petition (7)**
15:24;33:10;39:6;
50:22;55:9,12;57:25
**prescribes (1)**
35:9
**presented (1)**
60:21
**preserve (5)**
22:22;25:19;33:20;
35:10;40:15
**preserving (1)**
52:4
**presumably (1)**
39:15
**presumption (1)**
44:17
**pre-trial (1)**
61:15
**pretty (5)**

17:6;18:4,7;21:5;
42:14
**prevent (1)**
38:10
**prior (2)**
23:4;33:3
**proactively (1)**
60:8
**probably (3)**
19:3;59:23;60:13
**problem (8)**
24:1;27:20;28:7;
45:25;55:11;58:4,9;
62:9
**problems (2)**
10:19;57:17
**procedural (2)**
23:15;36:25
**Procedure (1)**
24:11
**proceed (1)**
22:13
**proceeding (1)**
61:16
**proceedings (2)**
27:22;63:20
**process (11)**
29:9,25;46:9,16,19;
54:25;55:2,5,14;59:6,
23
**produce (1)**
40:24
**produced (1)**
16:15
**production (3)**
14:1;16:10;49:19
**productive (2)**
11:15;59:23
**professionals (2)**
29:19;31:7
**progress (8)**
29:17,19;37:5;
48:23;49:1;58:5,6;
60:7
**promptly (2)**
20:3;58:9
**properties (4)**
30:13;40:19;41:3;
42:1
**property (25)**
29:25;32:11,12,13,
20;33:17;34:9;35:24;
41:20,21;42:11;44:3;
45:1,8;46:9,11;47:3,
5;48:11;50:12;54:10;
56:8;57:6,7;58:24
**propose (2)**
31:8;44:13
**proposed (7)**
16:6,18,21;17:1;
18:19;19:22;21:9
**protect (4)**
35:10;40:22;56:17;

58:2
**protecting (1)**
59:19
**provide (2)**
15:4;27:17
**provided (2)**
19:18;40:1
**provides (4)**
22:5,7;35:11;37:24
**public (1)**
19:15
**purchase (1)**
38:3
**purchased (1)**
40:21
**purposes (1)**
24:23
**pursuant (1)**
53:23
**pursue (5)**
22:8;24:4;25:18;
28:21;29:15
**pursuing (2)**
22:4;24:23
**push (1)**
28:15
**put (7)**
19:19;24:3;28:5;
35:22;39:1;48:2;50:6
**putting (1)**
35:2
**Pyrrhic (2)**
50:9;57:8

**Q**

**quick (1)**
45:7
**quickly (1)**
24:17
**quietly (1)**
19:10
**quite (2)**
13:4;31:25
**quote (1)**
50:7
**Qureshi (1)**
11:10

**R**

**Rachel (3)**
11:7;28:8;54:22
**raise (1)**
54:5
**raising (1)**
25:3
**ramp (1)**
50:11
**rapidly (2)**
30:8;33:15
**rare (1)**
19:19

**ratchet (1)**
46:3
**rate (2)**
16:4;30:17
**rather (1)**
60:15
**reach (6)**
20:6;27:18;58:25;
61:23;62:6,16
**read (2)**
30:21;32:7
**ready (1)**
57:19
**real (3)**
47:21,22;57:17
**really (13)**
32:11,18;35:6;36:6;
41:14;43:1,2,5;46:4;
48:6;51:6;57:4;63:4
**reason (3)**
20:4;26:22;31:14
**reasonable (4)**
33:23;46:19;56:25;
58:14
**reasons (3)**
18:1;31:14;54:23
**received (2)**
16:1;18:15
**receiving (2)**
16:4,5
**recently (1)**
40:19
**recognizing (1)**
53:15
**record (11)**
18:6;21:3,23,25;
22:6;28:4,8;39:6;
40:4;54:21;58:25
**recording (1)**
40:5
**reduced (5)**
36:13,20;37:13,15;
44:9
**refers (1)**
40:25
**refined (1)**
48:7
**reflecting (1)**
16:18
**reflects (4)**
21:9;29:23;47:25;
53:22
**refund (1)**
40:9
**refusal (1)**
38:13
**refused (3)**
38:25;41:1;49:18
**regard (3)**
14:12,21;22:24
**regarding (1)**
16:13
**regular (1)**

15:8
**regulate (1)**
38:9
**Reich (7)**
12:23,23;53:17,17;
54:1,5;63:18
**related (1)**
40:11
**relevant (3)**
15:21;57:13,14
**relief (13)**
22:9;24:14;25:17,
22;33:21;34:12,13,17,
21;42:10;46:4;57:10,
12
**relitigate (1)**
34:4
**relocate (1)**
41:22
**remaining (3)**
21:16;39:25;41:22
**remains (1)**
33:12
**remote (1)**
19:2
**remove (1)**
51:3
**renting (1)**
38:17
**reorganize (1)**
29:12
**repeat (1)**
12:15
**reply (5)**
34:23;36:2;38:1;
42:13;56:19
**report (4)**
14:2;31:1;33:12;
47:17
**reports (3)**
40:7;47:14,18
**represent (1)**
12:25
**representatives (1)**
15:20
**request (8)**
16:18,21,23;21:9;
34:2,21;41:7;42:17
**requested (2)**
16:14;39:14
**requesting (2)**
18:3,4
**requests (6)**
15:19;33:22;46:3;
51:2,2;57:10
**require (1)**
31:25
**required (1)**
34:3
**requirement (1)**
17:14
**requirements (2)**
21:13;48:23

**requiring (1)**
33:23
**reserve (1)**
54:3
**residence (1)**
31:25
**residences (1)**
44:15
**resolve (2)**
20:23;28:22
**resolved (3)**
13:24;14:16;23:8
**resonated (1)**
60:14
**resort (1)**
35:1
**resources (1)**
34:10
**respect (3)**
16:9;22:2;28:13
**respectfully (2)**
16:21;41:7
**respecting (1)**
29:7
**respond (2)**
34:20;55:7
**response (4)**
20:1;34:11;35:25;
36:10
**responsible (1)**
46:6
**rest (1)**
58:10
**result (2)**
29:1;36:5
**results (1)**
21:12
**retain (1)**
34:6
**retained (5)**
14:10,24;23:14;
29:19;43:10
**retains (1)**
44:15
**retention (6)**
14:6;15:3;18:12,20;
19:25;32:24
**revealing (1)**
43:15
**reverse (1)**
61:14
**review (1)**
14:7
**revised (3)**
16:17;17:1;18:18
**revisit (1)**
48:13
**right (74)**
11:5,11,21;12:8,21;
13:2,4,25;15:11;
16:22,24;17:24;
18:14,22;19:23;20:1,
10,22,25;21:1;22:10,

16,23;23:1,4,12;
24:15;25:6,14;26:17,
20,22;27:25;28:1;
29:22;30:1,2;32:2;
33:1;35:21;37:17;
39:22;41:4,5,9;43:7;
44:21;45:17,19;46:9,
25;47:9,19;48:15;
49:10;50:24;51:7;
52:2,7,22;53:3,5,7;
54:17,17,19;55:17,18;
56:4;59:2;61:6,18;
62:21,25
**right-minded (1)**
56:7
**rights (7)**
23:8;25:19;35:8;
54:3;56:17;58:2;
59:19
**Risk (4)**
18:13,19;31:18;
34:3
**road (2)**
40:6;42:25
**room (3)**
43:2;50:7;53:8
**Roosevelt (1)**
19:14
**Rudolph (1)**
10:4
**Rule (7)**
15:14,18;17:25;
56:10,11;57:18;60:21
**ruled (1)**
26:5
**Rules (2)**
24:10;54:2
**ruling (9)**
56:5;60:16,17;61:1,
2,4,7,8;62:8
**run (3)**
44:4;47:1;56:9
**running (1)**
27:12

**S**

**sale (9)**
29:24;33:25;34:13,
20;49:3;53:21,22;
55:5;59:6
**same (8)**
24:6;26:18;27:21;
30:22;32:15,17;
35:19;58:15
**savings (1)**
40:15
**saw (1)**
30:12
**saying (10)**
35:25;42:15;43:13;
44:7,8;45:14;46:1;
52:15;58:11,22

**scenario (1)**
34:5
**schedule (4)**
14:13;16:10;25:13;
39:9
**scheduled (3)**
33:7;61:14,16
**schedules (4)**
30:7;32:20;33:14;
54:7
**scheduling (1)**
49:12
**Schwartz (15)**
11:18,18,25;14:7,
14;18:17,24,25;19:7,
9,12,15;20:7;21:22;
63:19
**scope (1)**
18:2
**seated (1)**
10:2
**second (2)**
35:3;42:7
**Secondly (1)**
46:15
**secured (2)**
30:4;54:10
**Security (1)**
40:8
**seeing (1)**
29:19
**seek (3)**
24:4;25:22;33:24
**seeking (7)**
15:19;25:17;33:21;
34:18;36:18;38:4;
42:17
**seem (2)**
30:23;45:13
**seemed (1)**
49:24
**seems (5)**
21:5;28:18;50:15;
51:21;59:15
**self-reported (1)**
30:6
**sell (21)**
13:13;28:11;32:5,6,
21;33:5,16,18,24;
34:7;35:24;36:21;
38:13;41:20,25;
42:10;46:21;47:5;
56:8;59:4,5
**selling (4)**
14:11;29:25;31:24;
41:21
**sells (2)**
33:6;44:16
**sending (1)**
42:14
**sense (4)**
23:20;24:24;32:11,
21;37:7;46:9;60:13

**sent (2)**
39:20;49:18
**separate (1)**
26:12
**separately (1)**
45:24
**serious (1)**
30:3
**serve (1)**
15:19
**set (6)**
18:1,7;21:3;34:1;
49:11;56:19
**sets (1)**
10:13
**seven (1)**
44:10
**share (2)**
56:5;60:15
**Sharpie (1)**
44:1
**shield (1)**
24:9
**short (1)**
50:21
**shot (2)**
19:6;56:20
**showed (1)**
38:13
**shown (1)**
28:14
**Shumer (2)**
10:25;11:3
**Sibley's (1)**
14:24
**sic (15)**
11:16,19;12:24,25;
14:10,14;16:13,14,19;
20:16,21;21:11,17;
54:11;59:5
**side (1)**
29:3
**sign (1)**
60:7
**significant (3)**
33:13;58:6;59:2
**similar (1)**
32:1
**simply (3)**
33:14;50:10,12
**situation (5)**
15:24;29:1;30:16;
43:1;47:23
**sixty (4)**
48:22;50:14;56:24;
60:7
**sixty-day (2)**
42:18;58:13
**size (1)**
45:5
**skepticism (1)**
36:1
**slice (1)**

35:23
**smaller (1)**
44:14
**Social (1)**
40:8
**softly (2)**
19:11,16
**sold (6)**
32:11,12,18,25;
39:25;44:3
**solely (1)**
25:18
**solution (1)**
48:14
**solutions (4)**
57:17;60:9,10,20
**solvable (1)**
58:8
**solve (1)**
24:1
**solved (1)**
58:9
**somebody (6)**
10:21;14:14;45:24;
46:25;61:1;62:5
**somebody's (1)**
45:23
**someone (2)**
26:11;47:1
**sometime (2)**
14:5,17
**sometimes (1)**
61:9
**somewhere (1)**
31:20
**soon (1)**
32:24
**sooner (1)**
34:7
**sort (10)**
10:20;17:9;21:11;
23:6;30:22;36:7;
42:11;52:7;57:9,24
**sorts (2)**
26:7;56:16
**Sotheby's (3)**
14:10,15;32:22
**sought (1)**
40:17
**sound (2)**
21:3;45:23
**sounds (1)**
58:5
**South (1)**
12:25
**speak (4)**
19:11,16;45:15;
53:18
**SPEAKER (6)**
26:13;27:5,8,23;
63:15,17
**specific (7)**
17:4,5,8,11,21;

23-12055-shl    Doc 166    Filed 04/05/24    Entered 04/16/24 15:31:32    Main Document
In the Matter of: RUDOLPH W. GIULIANI            Pg 76 of 78

April 4, 2024

38:24;41:24
**specifically (1)**
34:1
**speeches (1)**
63:3
**speed (1)**
58:6
**spell (1)**
52:11
**spend (2)**
47:2;59:24
**spending (3)**
30:5;32:13;45:22
**spends (2)**
32:7,7
**spent (4)**
30:5;31:3;33:8;
57:25
**spoken (2)**
43:11,14
**spot (1)**
27:11
**square (1)**
10:16
**stage (1)**
42:19
**stall (1)**
28:14
**stand (2)**
47:13;49:2
**standard (3)**
17:6,9;42:13
**start (12)**
13:16;15:13,15;
29:25;41:16;46:15,
19;54:25;55:2,6,13;
59:6
**started (1)**
52:7
**starting (2)**
10:23;46:8
**stated (1)**
40:3
**statement (2)**
21:8;35:25
**statements (2)**
24:1;48:1
**States (4)**
11:19;16:13,18;
18:16
**status (6)**
13:19;15:7,11;62:9,
13,14
**statute (2)**
21:14;48:24
**statutory (2)**
41:19,23
**stay (12)**
22:2,5;24:4,8,23;
25:6,17;26:2,10;
27:21;29:18;55:23
**stayed (1)**
27:14;29:20

**step (4)**
25:16;34:24;35:10;
58:19
**stepping (1)**
14:24
**steps (10)**
25:11,20;27:1;
29:12;33:18,23;38:4;
46:6;58:2,21
**stick (1)**
47:16
**still (8)**
24:13;37:6,14,15;
42:25;43:23,24;51:13
**stipulated (1)**
37:10
**stipulation (1)**
59:10
**Strauss (3)**
11:8;15:17;28:9
**stretch (1)**
60:23
**Strickland (1)**
23:19
**strikes (1)**
56:24
**stuff (2)**
23:19;25:13
**subject (6)**
13:1;20:17;26:12;
30:14;35:8;43:5
**submit (3)**
14:8;18:18;61:4
**submitted (1)**
18:7
**succeed (1)**
57:9
**success (1)**
36:4
**suggestion (2)**
30:18;52:16
**supplemental (2)**
18:20;19:21
**support (7)**
18:21;37:25;38:23;
39:4,12;50:16;54:16
**sure (12)**
10:11;18:11;23:13;
25:3;27:2,19;29:20;
36:9;39:3;42:8;53:22;
63:5
**surely (1)**
44:19
**surprised (1)**
31:13
**suspicions (2)**
50:25;51:4
**sustain (2)**
38:12;55:23
**sustainable (1)**
30:19
**sword (1)**
24:9

**sworn (1)**
40:1

## T

**table (1)**
46:20
**talk (8)**
23:5,17;25:4;37:23;
55:5;61:23;62:6,9
**talking (4)**
39:2;43:21;49:14;
50:8
**tax (2)**
40:8;54:11
**Taxation (2)**
12:13,15
**taxes (1)**
39:18
**tease (1)**
36:22
**Teddy (1)**
19:13
**tee (1)**
27:12
**teed (1)**
20:6
**teeing (1)**
57:13
**tension (1)**
56:14
**terms (16)**
17:4,21;18:2;23:9;
26:8;27:3;29:9,22;
36:25;39:2;46:11;
47:20;57:24;58:24;
59:13;60:14
**testimony (1)**
40:1
**Texas (1)**
45:24
**thatindiscernible (1)**
22:15
**therefore (3)**
21:13;40:12;57:6
**there'll (1)**
23:11
**thereof (1)**
18:21
**thinking (2)**
50:19;53:11
**third (3)**
18:1;35:15;45:9
**thirty-day (1)**
47:22
**though (2)**
22:6;28:18
**thoughts (2)**
27:17;32:16
**threat (1)**
42:25
**three (8)**
21:15,15;35:15;

39:5;42:3;47:4;55:8,
11
**three-and-a-half (1)**
54:8
**throw (2)**
46:4;48:18
**thrown (1)**
44:9
**Thus (1)**
29:18
**timing (3)**
23:10;34:2;49:3
**today (14)**
13:1;14:15;16:17;
24:11;52:19;54:24;
56:1,5;60:5,24;61:2,
11;62:18;63:1
**today's (1)**
13:10
**together (2)**
19:5;61:12
**told (1)**
33:5
**tomorrow (1)**
14:15
**total (1)**
40:7
**towards (1)**
14:5
**track (2)**
47:14,18
**transfer (1)**
40:9
**trial (6)**
22:25;23:7,22,22;
29:2;36:24
**true (1)**
50:21
**Trust (1)**
47:11
**Trustee (20)**
11:19;13:23;14:12;
15:5,9;16:13,19;
18:16;34:19;35:9,14,
18,19;38:10;42:1,17,
22;48:25;50:14;56:22
**Trustee's (2)**
11:16;16:14
**try (6)**
15:9;24:9;27:6;
41:17;57:16;59:20
**trying (9)**
14:13;19:9;25:23;
37:6;46:5;49:1,2,5;
59:24
**Tuesday (1)**
50:1
**turn (7)**
11:21;13:16;15:14;
21:17;22:10;27:16;
28:2
**turned (2)**
19:4,4

**turns (1)**
55:3
**two (15)**
10:12;17:25;20:11;
22:21;29:19;35:15,
16;36:11;39:8;41:14,
16;46:20;49:12,13;
54:9
**two-step (1)**
45:24

## U

**ultimately (2)**
32:25;45:12
**unable (1)**
33:13
**uncertainty (1)**
58:17
**unclear (2)**
31:5;40:22
**uncontested (4)**
13:11,22;15:13;
20:11
**under (8)**
10:8;17:25;21:13;
48:5,23;54:11;60:17;
61:2
**underlying (2)**
43:2;44:21
**unencumbered (1)**
54:7
**UNIDENTIFIED (6)**
26:13;27:5,8,23;
63:15,17
**uniformly (1)**
29:2
**unique (1)**
29:1
**United (4)**
11:19;16:13,18;
18:16
**universe (3)**
44:14;45:12;51:5
**unknown (3)**
29:14;36:17;58:3
**unless (2)**
16:20;41:6;51:11;
63:11
**unlikely (4)**
36:14;37:11;42:23;
51:21
**unliquidated (1)**
29:14
**unnecessary (3)**
27:4,6,18
**unproductive (1)**
25:4
**Unsecured (7)**
11:9;13:13;28:10;
55:14;56:18;57:5;
59:8
**unusual (1)**

23-12055-shl   Doc 166   Filed 04/05/24   Entered 04/16/24 15:31:32   Main Document
In the Matter of: RUDOLPH W. GIULIANI      Pg 77 of 78

April 4, 2024

**36:25**
**up (25)**
10:15;11:21;19:4,4;
20:6;25:3;27:12,12;
29:4;36:18;37:1,1;
39:7,21;43:23;45:12,
15;46:3;48:7;49:11,
23;50:11;57:13;60:1,
18
**update (2)**
13:19;18:23
**upkeep (6)**
30:13;31:6,11;
32:19;47:3;48:11
**uploaded (1)**
20:18
**upset (1)**
47:15
**use (7)**
10:17;24:8;55:1;
61:20;62:4,12,14
**used (1)**
61:9
**using (2)**
31:20;40:4
**UST (1)**
18:24
**usual (1)**
54:2

**V**

**valid (1)**
38:13
**value (3)**
52:1,1;54:8
**valued (1)**
32:20
**variety (2)**
13:11;31:14
**various (1)**
25:12
**vehicle (1)**
34:15
**vein (1)**
60:24
**verdict (2)**
43:8;44:9
**verify (1)**
47:11
**viable (1)**
30:17
**victory (2)**
50:9;57:8
**view (14)**
28:23;29:6,23;
30:21;32:18;34:2;
35:23;37:7;42:17,20,
21;46:6;48:4;60:15
**viewing (1)**
58:13
**views (3)**
29:11;50:15;63:5

**vigorously (1)**
24:5
**virtual (1)**
21:17
**visibility (2)**
30:15;32:3

**W**

**wait (3)**
28:19;42:19;58:11
**waiting (1)**
55:11
**wall (2)**
43:25;44:1
**wants (3)**
29:15;55:23;62:8
**warning (1)**
56:20
**water (1)**
61:6
**waving (1)**
10:21
**way (19)**
10:10;17:13;27:10;
29:7;37:1;43:22;46:2;
47:1;48:1,4,9;49:17,
21;50:5;51:22;52:9;
58:23;59:8,17
**week (2)**
14:5,17
**weekend (1)**
14:7
**weight (1)**
40:14
**welcome (1)**
53:6
**West (1)**
12:24
**Wexler (2)**
10:25;11:3
**what's (11)**
24:24;30:17;31:16;
35:3;36:23;42:20;
43:18;51:18;52:9;
59:3;60:14
**whereas (1)**
38:3
**where's (1)**
32:10
**Whereupon (1)**
63:20
**whistles (1)**
17:19
**whole (1)**
61:21
**who's (4)**
10:19,22;14:20;
43:12
**wide (1)**
31:9
**willing (1)**
52:19

**willingness (3)**
47:2;25;63:2
**Willkie (2)**
12:19;21:23
**win (1)**
51:13
**wish (2)**
16:23;63:13
**wishes (5)**
12:9;19:24;53:9,14;
54:18
**withdrawal (1)**
40:7
**within (1)**
26:3
**without (8)**
20:18;22:8;24:10;
38:16;40:13;42:24;
50:16;60:18
**wonderful (1)**
63:3
**words (1)**
23:10
**work (10)**
21:4;36:20,21;
37:14,16;48:9;51:22;
57:16;59:8;61:10
**worked (1)**
20:20
**working (12)**
13:22,25,25;14:4,6,
9,22;15:3;17:4;18:16,
18;19:17
**works (6)**
23:6;26:8;45:6;
46:2;48:19;54:4
**world (1)**
40:4
**worried (1)**
53:19
**worth (3)**
40:6;45:8;46:11
**wrench (1)**
46:4
**wrest (2)**
42:11,12
**wrong (3)**
29:3;30:11;33:14

**Y**

**Yeager (1)**
12:24
**years (1)**
28:22
**York (11)**
31:6;32:6,8,10,10,
12;33:6;39:24;41:21,
22;45:2
**young (2)**
20:8;63:9

**Z**

**Zoom (10)**
10:3,12,15,20;
11:12,13,20;12:9;
13:5;63:7

**1**

**102 (1)**
41:23
**105 (2)**
35:11;57:12
**105a (1)**
35:6
**11 (15)**
10:5;21:7;28:13,15;
29:17;31:21;34:7,14;
35:14,19;46:2;56:15;
62:2,4;63:13
**1107 (4)**
35:5,7,11;41:24
**1107a (1)**
35:17
**1108 (1)**
35:17
**11th (1)**
61:17
**120 (1)**
20:15
**120,000 (1)**
30:5
**148 (1)**
13:15
**14th (5)**
61:25;62:2,4,12;
63:13
**15,000 (1)**
30:7
**15,995 (1)**
39:18
**150 (1)**
44:18
**157 (1)**
56:19
**159 (1)**
20:19
**15th (1)**
28:12
**160 (2)**
13:10;39:15
**160,000 (3)**
33:11;39:8,16
**161 (1)**
16:19
**16th (2)**
49:14;61:17
**19th (1)**
49:15
**1st (1)**
49:19

**2**

**2 (2)**
10:4;54:12
**2004 (12)**
13:24;15:14,18,25;
16:6,13,21;17:7,25;
18:9;30:15;57:18
**27th (1)**
47:1
**28th (1)**
15:25
**2nd (1)**
49:20

**3**

**3 (2)**
18:12;54:11
**3:30 (1)**
63:20
**30,000 (3)**
31:3,25;38:19
**341 (2)**
40:2,3
**3rd (1)**
13:11

**4**

**4.8 (1)**
36:15
**42,450.97 (1)**
54:12

**5**

**566,860.403 (1)**
54:10

**6**

**60 (1)**
21:13
**60-day (2)**
20:17;21:9

**7**

**7 (2)**
15:19;45:4
**7- (1)**
44:11

**8**

**8 (4)**
34:23;42:13;56:19;
58:19
**8,416 (5)**
33:8;39:10,11,13,
21

23-12055-shl    Doc 166    Filed 04/05/24    Entered 04/16/24 15:31:32    Main Document
In the Matter of: RUDOLPH W. GIULIANI    Pg 78 of 78

April 4, 2024

**8,500 (1)**
  55:22
**800,000 (1)**
  44:11
**84,000 (1)**
  39:18