**Hearing Date and Time:  June 17, 2024 at 11:00 a.m. (prevailing Eastern Time)**
**Objection Deadline:  June 10, 2024 at 4:00 p.m. (prevailing Eastern Time)**

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Philip C. Dublin
Abid Qureshi
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Rachel Biblo Block (admitted *pro hac vice*)
2300 N. Field St., Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

*Counsel to the Official Committee of*
*Unsecured Creditors of Rudolph W. Giuliani*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **RUDOLPH W. GIULIANI** | : | **Case No. 23-12055 (SHL)** |
| **a/k/a RUDOLPH WILLIAM GIULIANI,** | : | |
| | : | |
| **Debtor.** | : | |

---------------------------------------------------------------x

**NOTICE OF HEARING ON MOTION OF THE**
**OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF**
**RUDOLPH W. GIULIANI FOR ENTRY OF AN ORDER DIRECTING THE**
**IMMEDIATE APPOINTMENT OF A TRUSTEE PURSUANT TO 11 U.S.C. § 1104**

     **PLEASE TAKE NOTICE** that, on May 28, 2024, the Official Committee of Unsecured

Creditors (the "Committee") appointed in the chapter 11 case of the above-captioned debtor and

debtor in possession filed the *Motion of the Official Committee of Unsecured Creditors of Rudolph*

*W. Giuliani for Entry of an Order Directing the Immediate Appointment of a Trustee Pursuant to*

*11 U.S.C. § 1104* (the "Motion").

     **PLEASE TAKE FURTHER NOTICE** that a hearing to consider the Motion

(the "Hearing") will be held before the Honorable Sean H. Lane, United States Bankruptcy Judge,

United States Bankruptcy Court for the Southern District of New York (the "Court"), 300 Quarropas Street, White Plains, New York 10601, on **June 17, 2024 at 11:00 a.m. (prevailing Eastern Time)**.  Parties wishing to appear at the Hearing, whether making a "live" or "listen only" appearance before the Court, must make an electronic appearance (an "eCourt Appearance") through the Court's website at *https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl*.  eCourt Appearances must be made by **June 14, 2024 at 4:00 p.m. (prevailing Eastern Time).**

 **PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Motion shall: (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (iii) be filed electronically with the Court on the docket of this chapter 11 case by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at *http://www.nysb.uscourts.gov*); and (iv) be served so as to be actually received by the Court and the Committee no later than **June 10, 2024 at 4:00 p.m. (prevailing Eastern Time).**

 **PEASE TAKE FURTHER NOTICE** that if you oppose the relief requested in the Motion, or if you want the Court to hear your position on the Motion, then you or your attorney must attend the Hearing.  If you or your attorney do not follow the foregoing steps, the Court may decide that you do not oppose the relief requested in the Motion and may enter an order granting the relief requested by the Committee.  If no responses or objections are timely filed and served with respect to the Motion, the Committee may submit to the Court an order substantially in the

form of the proposed order attached to the Motion as **Exhibit A**, which order may be entered with

no further notice or opportunity to be heard.

   **PLEASE TAKE FURTHER NOTICE** that copies of the Motion and other pleadings

filed in this chapter 11 case may be obtained by visiting the Court's website at

*http://www.nysb.uscourts.gov* in accordance with the procedures and fees set forth therein.

Dated: May 28, 2024       */s/ Philip C. Dublin*
   New York, New York    **AKIN GUMP STRAUSS HAUER & FELD LLP**
             Ira S. Dizengoff
             Philip C. Dublin
             Abid Qureshi
             One Bryant Park
             New York, New York 10036
             Tel: (212) 872-1000
             Fax: (212) 872-1002
             Email: idizengoff@akingump.com
                pdublin@akingump.com
                aqureshi@akingump.com

             - and -

             Rachel Biblo Block (admitted *pro hac vice*)
             2300 N. Field St., Suite 1800
             Dallas, Texas 75201
             Tel: (214) 969-2800
             Fax: (214) 969-4343
             Email: rbibloblock@akingump.com

             *Counsel to the Official Committee of*
             *Unsecured Creditors of Rudolph W. Giuliani*

**Hearing Date and Time:  June 17, 2024 at 11:00 a.m. (prevailing Eastern Time)**
**Objection Deadline:  June 10, 2024 at 4:00 p.m. (prevailing Eastern Time)**

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff
Philip C. Dublin
Abid Qureshi
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

Rachel Biblo Block (admitted *pro hac vice*)
2300 N. Field St., Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

*Counsel to the Official Committee of*
*Unsecured Creditors of Rudolph W. Giuliani*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re:                                              :        Chapter 11
                                                    :
**RUDOLPH W. GIULIANI**                             :        Case No. 23-12055 (SHL)
**a/k/a RUDOLPH WILLIAM GIULIANI,**                 :
                                                    :
                    **Debtor.**                     :
-------------------------------------------------------------x

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**OF RUDOLPH W. GIULIANI FOR ENTRY OF AN ORDER DIRECTING THE**
**IMMEDIATE APPOINTMENT OF A TRUSTEE PURSUANT TO 11 U.S.C. § 1104**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

JURISDICTION AND VENUE ..............................................................................4

BACKGROUND ......................................................................................................5

A.      General Background ...................................................................................5

B.      Prepetition Conduct in the Freeman Litigation......................................5

C.      Postpetition Conduct...................................................................................7

        1.      The Debtor's Schedules and Statement ........................................7

        2.      The Monthly Operating Reports ...................................................8

        3.      The Committee's Budget Proposal ...............................................11

        4.      The Committee's Rule 2004 Discovery Efforts............................13

        5.      The Committee's Motion to Compel the Sale of the Debtor's
                Florida Condominium.....................................................................14

        6.      General Lack of Progress in Chapter 11 Case ............................15

RELIEF REQUESTED............................................................................................16

BASIS FOR RELIEF ..............................................................................................17

A.      Pursuant to Bankruptcy Code Section 1104(a)(1), "Cause" Exists to Require the
        Appointment of a Chapter 11 Trustee.............................................................17

        1.      Since Day One, the Debtor's Bankruptcy Case Has Been Marred
                by His Dishonesty. ..........................................................................18

        2.      The Debtor's Prepetition and Postpetition Conduct Has Revealed
                Incompetence, Gross Mismanagement of His Affairs and
                Inadequate Record-keeping and Reporting..........................................22

        3.      The Temptation for Self-Dealing Has Proven to Be Too Much for
                the Debtor and Has Resulted in Incurable Conflicts of Interest and
                Inappropriate Relations with His Businesses......................................28

4.      The Debtor Cannot be Bothered to Comply with His Fiduciary
        Duties as a Debtor in Possession. ..........................................................................34

B.      The Appointment of a Chapter 11 Trustee Is in the Interests of the Debtor's
        Creditors and the Estate. ...................................................................................36

        1.      The Debtor is Not Trustworthy. ...........................................................................37

        2.      The Debtor's Past and Present Performance Lead to One
                Conclusion: There Can Be No Reorganization Without a Chapter
                11 Trustee. ......................................................................................................39

        3.      Simply Put, the Creditors Have No Confidence in the Debtor. ...........................40

        4.      The Benefits to Be Derived from the Appointment of a Trustee Far
                Exceed the Costs of Such Appointment. ...............................................................41

NOTICE .............................................................................................................................42

CONCLUSION ...................................................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ashley River Consulting, LLC*,
2015 Bankr. LEXIS 1008 (Bankr. S.D.N.Y. Mar. 31, 2015) ......................................17, 18, 37

*In re Deena Packaging Indus., Inc.*,
29 B.R. 705 (Bankr. S.D.N.Y. 1983) .......................................................................................18

*In re Denrose Diamond*,
49 B.R. 754 (Bank. S.D.N.Y. 1985) ...................................................................................23, 24

*In re Grasso*,
490 B.R. 500 (Bankr. E.D. Pa. 2013) ......................................................................................37

*In re McCorhill Pub., Inc.*,
73 B.R. 1013 (Bankr. S.D.N.Y. 1987) ................................................................................23, 28

*Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*,
295 B.R. 502 (D.N.J. 2003) ......................................................................................................17

*In re Plaza de Retiro, Inc.*,
417 B.R. 632 (Bankr. D.N.M. 2009) ...................................................................................18, 23

*In re Sillerman*,
605 B.R. 631 (Bankr. S.D.N.Y. 2019) ................................................................28, 34, 37, 41

*In re Vascular Access Ctrs., L.P.*,
611 B.R. 742 (Bankr. E.D. Pa. 2020) ......................................................................................37

*In re W.R. Grace & Co.*,
285 B.R. 148 (Bankr. D. Del. 2002) .........................................................................................17

**Statutes**

11 U.S.C. § 1104 ..........................................................................................................................5

11 U.S.C. § 1104(a)(1) ..........................................................................................17, 18, 22, 37

11 U.S.C. § 1104(a)(2) ..........................................................................................17, 36, 37

28 U.S.C. § 157 .............................................................................................................................4

28 U.S.C. § 1334 ..........................................................................................................................4

28 U.S.C. § 1408 ............................................................................................................................5

28 U.S.C. § 1409 ............................................................................................................................5

**Other Authorities**

Fed. R. Bankr. P. 2007.1 ................................................................................................................5

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 case of Rudolph W. Giuliani a/k/a Rudolph William Giuliani (the "Debtor"), by and through its undersigned counsel, hereby files this motion (this "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), immediately appointing a chapter 11 trustee for the Debtor's estate.  In support of this Motion, the Committee submits the Declaration of Rachel Biblo Block (the "Decl. in Support"), filed contemporaneously herewith, and respectfully represents as follows.

### PRELIMINARY STATEMENT[1]

1.      More than five months ago, the Debtor commenced his bankruptcy case.  One might ask what he has accomplished during that time.  An objective review leads to one conclusion:  he has accomplished almost nothing.  He has filed inaccurate financial disclosures, which, months later, contain the same mistakes that parties have identified repeatedly for the Debtor, along with new mistakes and details of repeated unauthorized payments.  He has filed five retention applications, only two of which have been approved, and one of those two professionals recently expressed a desire to withdraw from the representation and be replaced by the Debtor's longtime friend.  The Debtor has filed two motions for relief from the automatic stay, asking now to participate in the Freeman Litigation (as defined below) after years of choosing intentional obstruction, including discovery violations that resulted in a default judgment entered by the D.C. District Court (as defined below), and a $148 million jury award.  The first stay relief motion was granted based on the Freeman Plaintiffs' (as defined below) and the Committee's agreement to limited, narrowly tailored relief.  The second stay relief motion was denied.  After asking for a

---

[1]    The Committee reserves the right to supplement this Motion, the facts contained herein and the relief requested herein as additional information is received through discovery or otherwise.

120-day extension of his exclusive period to file a plan, the Debtor obtained an agreed upon 60-day extension.  The Debtor repeatedly has failed to file monthly operating reports on time and the information included in those reports raises more questions than answers.  The Debtor has flagrantly defied this Court's 2004 Order (as defined below), making just one initial production before the Court-ordered deadline of the most readily available documents and nothing more.  And the Debtor, on behalf of his businesses, has produced absolutely nothing.  After months of empty promises, he finally filed an application to retain a broker to list his New York City apartment, yet he continues to refuse to list his Palm Beach condominium, despite such property not being an exempt asset.  That is how the Debtor spent the last five months in his bankruptcy case:  filing false and misleading financial reports, delaying the inevitable monetization of his assets, ignoring this Court's orders, trying to retain professionals and attempting to relitigate the Freeman Judgment (as defined below).

2.     All the while, and to the surprise of the Committee and the Debtor's own counsel, the Debtor enters into agreements with no notice and on terms intended to shield assets from his creditors.  Everyone—including the Debtor's counsel—learned of his new agreement to promote a coffee brand from social media and press reports on May 15, 2024, rather than from the Debtor himself, approximately a month after the Debtor signed a contract.  Unfortunately, in this case, good news always seems to be accompanied with bad.  Disturbingly, it has been disclosed that the Debtor structured this deal so that all income earned from this endeavor will go not to the Debtor's estate but to the Debtor's wholly-owned business.  This revelation led to additional disturbing revelations:  contrary to the Debtor's representations to the Committee and this Court that he earned income personally, all of the Debtor's known income is paid under arrangements structured in the same way.  The Debtor will do the work, and his wholly-owned business will receive the

income.  And, while his businesses purportedly pay all of their non-Debtor employees (including individuals that purportedly provide services directly to the Debtor), the Debtor purportedly is paid nothing.  As if that were not bad enough, throughout the bankruptcy case, the Debtor has personally paid his wholly-owned business's credit card bills, along with certain of the bills and expenses of the business's employees and his reported girlfriend.

3.      And with Mr. Giuliani, when it rains, it pours.  On May 22, 2024, he pleaded not guilty to criminal felony charges in Arizona, including charges for conspiracy, fraudulent schemes and artifices, fraudulent schemes and practices and forgery.  To make matters worse, Mr. Giuliani now has less than thirty days to appear in Arizona and post a $10,000 bond.

4.      So, where does this leave Mr. Giuliani and his bankruptcy case?  Mr. Giuliani is a criminally indicted debtor who claims no income except social security payments.  He has been suspended from his job at WABC, and his WABC radio show has been cancelled.  The Debtor previously identified this radio show as a source of income for him personally (though he never reported such on monthly operating reports).  He has been suspended from the practice of law and thus cannot earn income as a lawyer.  He is facing a judgment of $148 million, other claims of many millions more, and self-reports just $10 million of assets.  His financial reporting and record-keeping are abysmal, as he commingles his personal affairs with those of his shill businesses.  And it follows therefrom that the Debtor cannot find even one accountant willing to work for him. Among other things, the chapter 11 trustee and the Committee will now need to investigate whether the Debtor is liable for bankruptcy crimes through the use of his businesses to divert resources away from his estate and creditors in connection with his purported income that he allegedly never personally received.

5.      Simply put, Mr. Giuliani and his bankruptcy case have reached an impasse.  The Debtor's only goal for this case—re-litigating the Freeman Judgment—has been put on ice for the foreseeable future.  So, the Debtor has resorted to what he knows:  choosing to engage again in the same behavior that led to the Freeman Judgment and this bankruptcy case.  Since the Petition Date (as defined below), the Debtor has gone on various social media and other platforms and defiantly spewed the same defamatory statements about the Freeman Plaintiffs and even declared his intention to continue doing so.  Instead of attempting to make any progress toward reorganization, the Debtor created another unnecessary and expensive fire drill that resulted in the Freeman Plaintiffs' commencing an adversary proceeding against the Debtor, which led to an agreement for a consensual permanent injunction barring the Debtor from repeating the defamatory statements.  Time will tell whether the Debtor decides to comply with this latest court order.  Moreover, in connection with the postpetition statements, the Freeman Plaintiffs filed yet to be quantified administrative expense claims.

6.      Over and over again, the Debtor has shown his preference for delay, diversion and theatrics over progress, rehabilitation and maximization of value for his creditors.  His creditors do not need to accept this as their plight, and the Committee refuses to do so.  Accordingly, the time has come for the immediate appointment of a chapter 11 trustee to take control of the Debtor's assets and financial affairs, including his wholly-owned businesses.

## JURISDICTION AND VENUE

7.      The United States Bankruptcy Court for the Southern District of New York (this "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York entered February 1, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157, and the Committee confirms its consent to the Court's entering a final order in

connection with this Motion to the extent that it is later determined that the Court, absent consent of the Committee, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory bases for the relief requested are section 1104 of title 11 of the United States Code (the "Bankruptcy Code") and rule 2007.1 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

### A.      General Background

10.      On December 21, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor has continued in possession of his property and is managing his affairs as a debtor and debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

11.      On January 12, 2024, the Committee was appointed by the United States Trustee for the Southern District of New York (the "U.S. Trustee") [Docket No. 46].  On January 16, 2024, the Committee selected Akin Gump Strauss Hauer & Feld LLP as its counsel.  On February 9, 2024, the Committee selected Global Data Risk LLC as its specialized forensic financial advisor.

### B.      Prepetition Conduct in the Freeman Litigation

12.      Following the 2020 presidential election, Mr. Giuliani set in motion a course of conduct that paved the way to the filing of this chapter 11 case.  In particular, he targeted Ms. Ruby Freeman ("Ms. Freeman") and Ms. Wandrea' ArShaye Moss ("Ms. Moss" and, together with Ms. Freeman, the "Freeman Plaintiffs") through his relentless public defamation of them, which led to

the Freeman Plaintiffs' filing a complaint against Mr. Giuliani in the U.S. District Court for the District of Columbia (the "D.C. District Court" and such litigation, the "Freeman Litigation").[2]

13.    As the Freeman Litigation progressed, Mr. Giuliani utterly failed to comply with his discovery obligations and generally thwarted the Freeman Plaintiffs' procedural rights to obtain discovery.  Ultimately, this behavior culminated in the D.C. District Court's entry of default judgment against Mr. Giuliani as sanctions pursuant to Federal Rules of Civil Procedure 37(e)(2)(C) and 37(b)(2)(A)(vi), holding him civilly liable on the Freeman Plaintiffs' claims for defamation, intentional infliction of emotional distress, civil conspiracy and punitive damages.[3]

14.    Following entry of the D.C. District Court's order, the Freeman Litigation proceeded to trial on the issue of damages, and, on December 15, 2023, the jury returned a verdict awarding the Freeman Plaintiffs approximately $148 million in compensatory and punitive damages.[4]  On December 18, 2023, (i) Mr. Giuliani entered into a stipulation with the Freeman Plaintiffs with respect to the declaratory relief to be entered by the D.C. District Court, (ii) the Freeman Plaintiffs moved for leave to dissolve the automatic thirty-day stay of execution on the judgment and for authority to immediately register the final judgment in any other judicial district and (iii) the D.C. District Court entered the judgment in the total amount of $146,206,113.00 plus post-judgment interest (the "Freeman Judgment").[5]  Two days later, on December 20, 2023, the D.C. District Court granted the Freeman Plaintiffs' motion to dissolve the stay of execution, and Mr. Giuliani filed this chapter 11 case the following day.[6]

---

[2]    *Freeman et al. v. Giuliani*, United States District Court for the District of Columbia, No. 1:21-cv-03354-BAH.

[3]    *Freeman et al. v. Giuliani*, No. 1:21-cv-03354-BAH [Docket No. 94, at 5].

[4]    *Id.* at Docket No. 135.

[5]    *Id.* at Docket Nos. 138, 139, 142.

[6]    *Id.* at Docket No. 144.

C.       **Postpetition Conduct**

1.       **The Debtor's Schedules and Statement**

15.       On January 26, 2024, the Debtor filed his schedules of assets and liabilities [Docket No. 70] (the "Initial Schedules") and statement of financial affairs [Docket No. 73] (the "Initial SOFA"); however, the Initial Schedules and the Initial SOFA were missing key information and contained inaccuracies.  On February 5, 2024, the Debtor filed amended schedules of assets and liabilities [Docket No. 100] (the "Amended Schedules") and an amended statement of financial affairs [Docket No. 99].

16.       On February 7, 2024, the U.S. Trustee commenced the Debtor's meeting of creditors pursuant to Bankruptcy Code section 341(a) (the "341 Meeting").  As a result of the 341 Meeting, the Debtor was required to file further amended schedules of assets and liabilities and a further amended statement of financial affairs to disclose missing information and correct inaccuracies.

17.       On February 27, 2024, the Debtor filed further amended schedules of financial affairs [Docket No. 129] (the "Further Amended Schedules" and, collectively with the Initial Schedules and the Amended Schedules, the "Schedules").  The Further Amended Schedules made certain updates to *Schedule A/B: Property*:  (i) in line 1.2, the Debtor's Florida condominium was designated as a "condominium or cooperative" (since it had previously been disclosed to be a "single-family home"); (ii) in line 18, the Debtor reported 925,186 shares of Decision Sciences LLP; and (iii) in line 26, the Debtor listed patents for Giuliani Partners and a "book in progress." *See* Further Amended Schedules.  In addition, as part of the Further Amended Schedules, the Debtor included a new *Schedule G: Executory Contracts and Unexpired Leases*, which disclosed a publishing agreement for the Debtor's forthcoming book, "The Biden Crime Family."  *Id.*

18.    Although the Debtor made these limited revisions to his filings, the Schedules still require "further amendments and disclosures." *See* Docket No. 133, Recitals; Docket No. 222, Recitals.  The U.S. Trustee raised this same issue at the hearing on May 14, 2024 (the "May 14 Hearing"), noting "[w]e've been requesting that [D]ebtor's counsel make the appropriate modifications to their schedules.  Those things were identified at the 341 [M]eeting."  *In re Giuliani*, No. 23-12055 (SHL) (Bankr. S.D.N.Y. May 14, 2024), May 14 Hearing Tr. at 62:24-63:1.  The U.S. Trustee informed the Court that the hope was for the Debtor to resolve the open issues with respect to the Schedules by the end of the week (*i.e.*, by May 17, 2024), but, as of the filing of this Motion, this issue remains unresolved, and no further filings related to the Schedules have been made.

### 2.    The Monthly Operating Reports

19.    On January 29, 2024, the Debtor filed a monthly operating report for the period from the Petition Date to December 31, 2023 [Docket No. 80] (the "December MOR").

20.    On February 23, 2024, the Debtor filed a monthly operating report for the period from January 1, 2024 to January 31, 2024 [Docket No. 127] (the "January MOR").  The difference between the Debtor's total income and total expenses for January was reported as *negative* $54,532.  Immediately following the Debtor's filing of the January MOR, Committee counsel reached out to the Debtor's counsel, identified the obvious deficiency that the January MOR failed to include supporting documentation for the American Express and Discover credit card payments, and requested the supporting documentation related thereto.

21.    Three days later, on February 26, 2024, the Debtor's counsel sent Committee counsel only the American Express credit card statements relating to the period covered by the

January MOR.[7]  The American Express credit card statements that the Committee received, however, included not only the Debtor's personal credit card statements but also Maria Ryan's American Express credit card statement and Giuliani Partners' American Express credit card statements.  By comparing the January MOR to the American Express credit card statements, it became clear that, in January, the Debtor paid thousands of dollars on account of Maria Ryan's credit card bill and Giuliani Partners' credit card bills and to cover the travel and lodging expenses of his close associates and employees of his business.  Although the Committee identified these unauthorized payments in communications with the Debtor's counsel and in pleadings before this Court, the Committee is not aware of the Debtor's taking any steps to facilitate the return of such amounts.  Moreover, the January MOR reveals nearly $28,000 in payments to the Debtor's now deceased ex-mother in law's nursing home.

22.    Despite the Debtor's counsel's assurances that this pattern of unauthorized payments would not continue, this pattern has persisted.  *See, e.g.*, February MOR[8] [Docket No. 199-2] at p. 19, 37 (payment of Giuliani Partners' credit card bills); March MOR[9] [Docket No. 203-1] at p. 19, [Docket No. 203-2] at p. 8 (payment of Giuliani Partners' credit card bills).  When asked by Committee counsel what action the Debtor would take to recover unauthorized postpetition payments made to or on behalf of non-Debtor individuals and entities, such as Maria Ryan and Giuliani Partners, the Debtor's counsel said that such payments had been made to

---

[7]    Despite repeated requests by the Committee since the filing of the January MOR, the Debtor did not send the Discover credit card statement until May 8, 2024, when the Debtor made his first and only production pursuant to the order granting the Committee's Bankruptcy Rule 2004 motion [Docket No. 164] (the "2004 Order").

[8]    The "February MOR" means the monthly operating report for the period from February 1, 2024 to February 29, 2024 [Docket No. 199].

[9]    The "March MOR" means the monthly operating report for the period from March 1, 2024 to March 31, 2024 [Docket No. 203].

reimburse expenses paid on the Debtor's behalf but has failed to provide support for what expenses

the Debtor was being reimbursed in this apparently unauthorized bartering system.[10]

23.     The February MOR, which was filed on May 2, 2024, the March MOR, which was

filed on May 6, 2024 (both well after the respective deadlines for each report) and the April MOR[11]

conform to the troubling trend in this case of the Debtor spending far more than he earns.   In

February, the difference between the Debtor's total income and total expenses was *negative*

$16,281, in March, the difference was *negative* $9,968 and, in April, the difference was *negative*

$20,601.  February MOR, Part 8(j); March MOR, Part 8(j); April MOR, Part 8(j).  Indeed, apart

from social security income, de minimis interest income (typically less than $1.00) and

withdrawals from his IRA account(s), the Debtor has never reported any income, wages or other

compensation on his monthly operating reports.[12]

24.     Finally, the Committee has serious doubts as to whether the information included

in these monthly operating reports is even accurate.  For example, attached to the February MOR

are two February 2023—not February 2024—bank statements, which appear to be the source for

at least one number in the February MOR form.  *See* February MOR [Docket No. 199-1] at p. 1-4

(February 2023 bank statement), 14-17 (February 2023 bank statement showing receipt of a social

security payment in the amount of $4,509.08); [Docket No. 199] at Part 1(b) (listing total receipts

---

[10]   Although this would mean that third parties are advancing the Debtor unsecured credit, the Debtor has not filed a
motion to obtain postpetition credit in this chapter 11 case.  Furthermore, it is incomprehensible why the Debtor
would ever have a need to reimburse his non-Debtor business for the travel expenses of that business's employees,
especially when that business purportedly is receiving all of the Debtor's income.

[11]   The "April MOR" means the monthly operating report for the period from April 1, 2024 to April 30, 2024 [Docket
No. 224].

[12]   The Committee recently became aware of the Debtor's efforts to launch a coffee brand, Rudy Coffee.  The
Committee requested information regarding this new venture, and the Debtor's counsel provided a copy of a
contract purportedly executed on April 23, 2024 pursuant to which any profit will be distributed to Giuliani
Communications, rather than the Debtor.  The Debtor's purported contract, dated April 23, 2024 with "Darron
Burke, aka Burke Brands" is attached to the Decl. in Support as Exhibit A.

of $4,509).  Upon request, the Debtor's counsel sent Committee counsel the February 2024 bank statements, but no amended monthly operating report for February has been filed.[13]  The clear errors do not stop there.

25.    In the December MOR, the "Cash balance end of month" is reported as $105,898. December MOR at p. 2.  But, in the January MOR, the "Cash balance beginning of month" is reported as $123,643.  January MOR at p. 2.  In the January MOR, the "Cash balance end of month" is reported as $69,121.  *Id.*  But, in the February MOR, the "Cash balance beginning of month" is reported as $74,138.  February MOR at p. 2.  In the February MOR, the "Cash balance end of month" is reported as $57,856.  *Id.*  But, in the March MOR, the "Cash balance beginning of month" is reported as $52,947.  March MOR at p. 2.  In the March MOR, the "Cash balance end of month" is reported as $41,979.  *Id.*  But, in the April MOR, the "Cash balance beginning of the month" is reported as $35,259.  April MOR at p. 2.  These errors are so egregious, particularly in light of the fact that all but one report has been filed late such that the Debtor had an extended period of time to close out his books for the applicable month and get these numbers right.  But, he did not, and his monthly operating reports, filed late and replete with errors and deficiencies, are worthless and raise questions of incompetence, at best, and fraud, at worst.

### 3.    The Committee's Budget Proposal

26.    After the Debtor provided the Committee with the American Express credit card statements as supporting documentation for his January MOR, the Committee gained insight into the Debtor's egregious spending habits.  In addition to the unauthorized payments described above, the Debtor's American Express credit card statements revealed at least 60 Amazon transactions,

---

[13]    The Debtor must file an amended February MOR that accurately portrays his financial information.  It is unacceptable to leave uncorrected filings that the Debtor knows to be false, and it is not the responsibility of creditors to do the Debtor's math for him.

charges for entertainment such as Netflix, Prime Video, Kindle, Audible, Paramount+ and Apple services and products and numerous Uber rides. As a result, in an attempt to curb the Debtor's exorbitant spending, the Committee's counsel sent correspondence to the Debtor's counsel on March 8, 2024 requesting that the Debtor agree to a reasonable budget.

27.    On March 11, 2024, counsel for both the Debtor and Committee had a call to discuss a potential budget for the Debtor, and, on April 8, 2024, Committee counsel sent a proposed budget to the Debtor's counsel. This budget proposal was met with no response, despite the Debtor's counsel's previous receptivity to working with Committee counsel on an agreed budget. When this issue was raised again, most recently at the May 14 Hearing, the Debtor's counsel noted that they had "not been able to, with the [D]ebtor's assistant, prepare a response to that at the moment." May 14 Hearing Tr. at 49:14-15.

28.    Furthermore, the supporting documentation appended to the February MOR and March MOR again disclosed a troubling quantity of Amazon and Apple transactions. On May 9, 2024, Committee counsel sent correspondence to the Debtor's counsel requesting itemized supporting detail regarding these purchases, which information is readily accessible on both websites and should have been easy to send quickly.[14] Oddly, at the May 14 Hearing, the Debtor's counsel announced that "[t]hose other issues, I believe, about the Amazon bill have been addressed." May 14 Hearing Tr. at 49:15-16. Following the hearing, Committee Counsel followed up with the Debtor's counsel because no such information had been provided and the issues remain outstanding. Two days later, the Debtor's counsel responded that they "spoke prematurely" but "hope to have the information shortly."[15] As of the date hereof, the Committee is still waiting.

---

[14]    *See* Decl. in Support, Exhibit B.

[15]    *See* Decl. in Support, Exhibit C.

### 4.    The Committee's Rule 2004 Discovery Efforts

29.    On March 7, 2024, the Committee filed a motion for the entry of an order authorizing discovery of the Debtor and third parties [Docket No. 140] (the "2004 Motion").  No one, including the Debtor, objected to the 2004 Motion, and on April 11, 2024, the Court entered the 2004 Order.

30.    Shortly thereafter, the Committee filed subpoenas and began working to serve those subpoenas on the parties identified in the 2004 Motion.  On April 25, 2024, after several unsuccessful attempts to serve a limited number of parties known to be close to, and interact frequently with, the Debtor, Committee counsel reached out to the Debtor's counsel seeking their cooperation to help facilitate service.  The Debtor's counsel never responded.

31.    And, in a move right out of his playbook from the Freeman Litigation, the Debtor and his wholly-owned businesses have failed to comply with the 2004 Order and his obligations to produce documents.  Specifically, the 2004 Order provides:  "[t]he Debtor and Debtor Related Entities [the Debtor's businesses] are directed to respond to the requests within twenty-one (21) calendar days of service and to complete document production no later than May 24, 2024."  2004 Order at 3.  On May 8, 2024, the Debtor made one production of documents, which primarily included the Debtor's bank and credit card statements and income tax returns for 2021 and 2022. The Debtor has made no other productions.  His businesses have made no productions.  As he has shown time and time again, the Debtor "has a troubling attitude vis-a-vis the law and the court system."  May 14 Hearing Tr. at 32:15.  He does not think the rules apply to him and views court orders as suggestions, and, consistent with that perspective, he has decided to largely ignore this Court's 2004 Order.

**5.    The Committee's Motion to Compel the Sale of the Debtor's Florida Condominium**

32.    On April 1, 2024, "[a]s an intermediary step to give the Debtor the opportunity to discharge his duties to creditors and act as a fiduciary before the Committee is required to take additional steps to protect the remaining value of the Debtor's estate, including filing a motion to appoint a chapter 11 trustee,"[16] the Committee filed the *Motion of the Official Committee of Unsecured Creditors of Rudolph W. Giuliani to Compel the Debtor to (I) Sell His Florida Condominium and (II) Obtain Homeowners Insurance for His Florida Condominium and New York City Apartment* [Docket No. 148] (the "Motion to Compel Sale").  By the Motion to Compel Sale, the Committee sought an order compelling the Debtor to take all reasonable steps to sell his Florida condominium and obtain homeowners insurance for his Florida and New York City homes. Alarmingly, the Debtor testified at the 341 Meeting that he had no homeowners insurance, which means he did not have insurance for the most valuable assets he purports to own.[17]

33.    On April 4, 2024, the Court held a hearing (the "April 4 Hearing") to consider the Motion to Compel Sale.  During the April 4 Hearing,

- The Debtor's counsel stated the Debtor's plan "will never be a hundred percent plan." *In re Giuliani*, No. 23-12055 (SHL) (Bankr. S.D.N.Y. May 14, 2024), April 4 Hearing Tr. at 51:23-24.

- The Court described the Motion to Compel as a "warning shot across the bow" and foreshadowed that "the debtor can sort of succeed in fending off this motion, only to be faced with far more draconian requests for relief by the Committee in the future."  April 4 Hearing Tr. at 57:9-11.

---

[16]    *Reply in Support of the Motion of the Official Committee of Unsecured Creditors of Rudolph W. Giuliani to Compel the Debtor to (I) Sell His Florida Condominium and (II) Obtain Homeowners Insurance for His Florida Condominium and New York City Apartment* [Docket No. 157] at p. 8, n.8.

[17]    341 Meeting Tr. at 144:1-4 ("Mr. Giuliani:  I don't -- I don't have homeowners insurance right now.  Ms. Schwartz:  You have no insurance on your apartment -- Mr. Giuliani:  Not right now.  Ms. Schwartz: -- in New York City?  Mr. Giuliani:  I couldn't afford it.  Right.  Ms. Schwartz:  Nothing?  Mr. Giuliani:  Right.  Ms. Schwartz:  What about the Florida property?  No insurance?  Mr. Giuliani:  Not that I can find.").

- The Court acknowledged the Committee's "legitimate question about what the monthly carrying cost is for the Florida condo because the numbers are sort of all over the place." April 4 Hearing Tr. at 22-24.

- The Court addressed the Debtor's delinquency with respect to filing monthly operating reports: "the good news is that, as to financial condition of the debtor, that is a fixable problem . . . . And it needs to continue to make significant progress with all deliberate speed . . . . [I]t's a solvable problem, and it needs to be solved promptly." April 4 Hearing Tr. at 58:3-9.

- The Court interpreted the Motion to Compel Sale as the Committee intended: "an intermediate step to give the debtor an opportunity to move its case forward, discharge its duties, before the Committee takes additional steps." April 4 Hearing Tr. at 58:19-21.

The Court took the Motion to Compel Sale under advisement. The Debtor decided to ignore the Court's guidance, doing very little to advance his chapter 11 case or discharge his fiduciary duties as a debtor in possession; instead, he waited nearly a month to file his next monthly operating report, which, at the time of the April 4 Hearing, was already two weeks late. It has become clear that the Debtor does not respond to intermediary steps, so the Committee is no longer taking intermediary steps.

**6.      General Lack of Progress in Chapter 11 Case**

34.      This chapter 11 case has been characterized by the Debtor's nonexistent efforts to progress toward a successful reorganization. The Debtor instead has pursued self-serving ends to the exclusion of nearly all steps he could take toward a resolution of this chapter 11 case that benefits his creditors. Indeed, this chapter 11 case has been pending for over five months, and the only actions the Debtor has taken include: (a) moving for relief from the automatic stay to (i) file post-trial motions to modify the Freeman Judgment and/or for a new trial in the Freeman Litigation and (ii) file a notice of appeal from the Freeman Judgment [Docket No. 25]; (b) filing five retention applications for each of (i) Camara & Sibley, LLP [Docket Nos. 40, 87], (ii) Aidala, Bertuna & Kamins, P.C. [Docket Nos. 37, 38, 77], (iii) Berger, Fischoff, Shumer, Wexler & Goodman, LLP

[Docket Nos. 90, 144], (iv) Kenneth Caruso Law LLC [Docket Nos. 169, 220] and (v) Sotheby's International Realty [Docket No. 214]; (c) moving for an extension of the Debtor's exclusive period to file a chapter 11 plan [Docket No. 142];[18] (d) agreeing to two stipulations extending the deadline for creditors to object to the dischargeability of their respective debts [Docket Nos. 133, 222]; (e) moving for relief from the automatic stay to pursue an appeal from the Freeman Judgment [Docket No. 195]; and (f) after months of resistance and delay, listing his New York City apartment for sale and filing a related application to retain a broker to sell his New York City apartment [Docket No. 214].

35.    To make matters worse, at the same time the Debtor is taking an extended vacation from his creditors in bankruptcy and no steps toward reorganization, he has continued the same egregious conduct that drove him to bankruptcy in the first place—namely, defaming the Freeman Plaintiffs.  This time, however, the Debtor's postpetition repetition of the statements already determined by order of the D.C. District Court to be defamatory has resulted in the Freeman Plaintiffs' filing proofs of administrative claims against the Debtor.  [Claim Nos. 8, 9].  The Committee could not agree more with the Court's statement at the May 14 Hearing, "I am disturbed about the status of this case.  The question is, as it always is in bankruptcy court, where do we go from here."  May 14 Hearing Tr. at 35:17-29.  At this point, there is only one right answer to the Court's question:  a trustee must be appointed.

### RELIEF REQUESTED

36.    By the Motion, the Committee seeks entry of the Proposed Order directing the immediate appointment of a chapter 11 trustee to take control of the Debtor's assets and financial

---

[18]    Although the Debtor and the Committee agreed to a sixty (60) day extension of the Debtor's exclusive plan filing period, no order granting this relief has been entered to date.

affairs, including those of his wholly-owned businesses.  Pursuant to Bankruptcy Code section 1104(a)(1), "cause," including, without limitation, dishonesty, incompetence and gross mismanagement of the estate, exists to require the appointment of a chapter 11 trustee.  In addition, the appointment of a chapter 11 trustee is in the interests of creditors and the estate, and pursuant to section 1104(a)(2), a trustee must be appointed.

## BASIS FOR RELIEF

A.    **Pursuant to Bankruptcy Code Section 1104(a)(1), "Cause" Exists to Require the Appointment of a Chapter 11 Trustee.**

37.    "Although there is a strong presumption that a debtor should remain in possession absent a showing of need for the appointment of a trustee, ***this presumption is not absolute***."  *In re Ashley River Consulting, LLC*, 2015 Bankr. LEXIS 1008, at *26 (Bankr. S.D.N.Y. Mar. 31, 2015) (emphasis added).  Upon a showing of "cause" under section 1104(a)(1), a bankruptcy court is required to appoint a chapter 11 trustee.  *See id.* at 28; *In re W.R. Grace & Co.*, 285 B.R. 148, 158 (Bankr. D. Del. 2002); *see also Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 295 B.R. 502, 507 (D.N.J. 2003) ("A court . . . must appoint a trustee if it finds 'cause' to do so, or if a trustee would further 'the interests of creditors, any equity security holders, and other interests of the estate.'").

38.    Bankruptcy Code section 1104(a)(1) provides:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—
>
>> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

17

11 U.S.C. § 1104(a)(1).  The list of wrongdoings constituting cause in section 1104(a)(1) is not exhaustive, and other factors warranting the appointment of a trustee under section 1104(a)(1) include, among others, inadequate record-keeping and reporting, inappropriate relations between a parent and its subsidiaries, conflicts of interest and breach of fiduciary duties.  *See In re Ashley River Consulting, LLC*, 2015 Bankr. LEXIS 1008, at *28-29.  In determining whether cause exists, a bankruptcy court can consider the debtor's prepetition and postpetition misconduct.

39.     Here, the facts compel the appointment of a trustee for cause, including (i) dishonesty, (ii) incompetence, (iii) gross mismanagement of the Debtor's affairs, (iv) inadequate record-keeping and reporting, (v) inappropriate relations between the Debtor and his wholly-owned businesses, (vi) conflicts of interest and (vii) breach of fiduciary duty.

### 1.     Since Day One, the Debtor's Bankruptcy Case Has Been Marred by His Dishonesty.

40.     Dishonesty constituting cause under Bankruptcy Code section 1104(a)(1) can come in many forms.  Omitting relevant financial data without justification in required financial disclosures, like schedules of assets and liabilities, constitutes dishonest conduct warranting the appointment of a chapter 11 trustee.  *See In re Deena Packaging Indus., Inc.*, 29 B.R. 705, 707-08 (Bankr. S.D.N.Y. 1983).  Moreover, even the *perception* of a debtor's conduct as dishonest is an independent ground for the appointment of a trustee.  *See In re Plaza de Retiro, Inc.*, 417 B.R. 632, 641 (Bankr. D.N.M. 2009).  Beginning on the Petition Date and continuing through the date hereof, the Debtor has filed admittedly deficient financial disclosures and, yet has made no real effort to correct such deficiencies, only taking incomplete action (if any) after repeated requests from the Committee and just before an impending court hearing.

41.     The Debtor has treated this bankruptcy case like a personal game of hide and seek: hiding potential sources of distribution for creditors, apparently leaving his own counsel in the

18

dark and forcing the Committee to repeatedly request from the Debtor and his counsel the same information for days, weeks and sometimes months. On December 21, 2023, with his petition [Docket No. 1], the Debtor filed *Schedule G: Executory Contracts and Unexpired Leases*. On this schedule, the Debtor checked the "No" box, indicating that he has no executory contracts and unexpired leases. Then, around February 13, 2024, media reports surfaced about the Debtor releasing a new book, which is currently available for pre-order.[19] On February 14, 2024, Committee counsel asked the Debtor's counsel whether the Debtor has a contract related to this book. Two days later, on February 16, the Debtor's counsel relayed a message from the Debtor that there is no contract for the book.[20] Given how unusual that would be, Committee counsel continued asking about the contract, and, two weeks later, the Debtor's counsel sent a partially executed contract. After additional requests for a fully executed version of the contract, the Debtor's counsel ultimately relayed that the Debtor did not have a copy of the fully executed contract.

42.    Moreover, in the Schedules generally, the Debtor engaged in dishonest conduct by assigning egregiously low values to his assets. For example, the Debtor values the following jewelry at a total of $30,000: "costume jewelry; diamond ring; three Yankee world series rings, two Bulova watches, five Shinola watches, one Tiffany & Co watch, one Seiko watch, one Frank Muller watch, one Graham watch, one Corum watch, one Rolex, two IWC watches, one Invicta watch, two Breitling watches, one Raymond Weil watch, one Baume & Mercier watch, and six unnamed watches." Schedule A/B, Part 3, Question 12 [Docket No. 70] at p. 4. Clearly, the

---

[19]    *See* Cindy Adams, *Rudy Giuliani's new book is taking aim at the 'Biden Crime Family'*, NEW YORK POST (Feb. 13, 2024, 7:19 PM), https://nypost.com/2024/02/13/opinion/rudy-giulianis-new-book-is-taking-aim-at-the-biden-crime-family/; *The Biden Crime Family: The Blueprint for Their Prosecution*, Amazon, https://www.amazon.com/Biden-Crime-Family-Blueprint-Prosecution-ebook/dp/B0CNQFXJMW (last visited May 23, 2024).

[20]    *See* Decl. in Support, Exhibit D.

aggregate value of the Debtor's jewelry materially exceeds that amount.  In fact, a single New York Yankees world series ring alone can be valued at over $29,000.[21]

43.    But the Debtor's dishonest conduct goes beyond inaccurate, incomplete and misleading reporting.  Around May 15, 2024, media reports surfaced about a new business venture for the Debtor, "Rudy Coffee," and a website, prominently featuring the Debtor, is now accepting orders.[22]  That same day, Committee counsel reached out to the Debtor's counsel for more information because no details about this business appear in any of the Debtor's required financial disclosures.  The Debtor's counsel responded two days later that they too saw the same reports and had asked the Debtor for information.  The information ultimately received by the Committee reveals (i) further dishonest conduct, as the Debtor is structuring the business deal in a way that funnels funds that would otherwise belong to his creditors to his wholly-owned business, and (ii) troubling conflicts of interest that demand the appointment of a chapter 11 trustee.  Both will be discussed in detail below.

44.    And, the Debtor's dishonesty is not limited to withholding information, he also testifies under penalty of perjury in conflicting ways, depending on what best suits his purposes.  For example, the Debtor's January MOR reveals nearly $28,000 in payments to his ex-mother in law's nursing home.  During the 341 Meeting, on February 7, 2024, the Debtor provided sworn testimony that such payments are made pursuant to his divorce settlement.

> Mr. Giuliani:  And I also pay for the nursing home for her [my ex-wife's] mom.
>
> Ms. Schwartz:  And her mom is -- her name is?

---

[21]    *See* Robert Edwards Auctions, 2009 New York Yankees World Series Ring, https://robertedwardauctions.com/archives/2014/Spring/1261/2009-new-york-yankees-world-series-ring-4829-grams-119-diamonds-with-provenance (last visited May 23, 2024).

[22]    *See Giuliani releases coffee ad after not guilty plea in Arizona*, CNN POLITICS, https://www.cnn.com/2024/05/22/politics/video/rudy-coffee-giuliani-ad-analysis-cnntm-digvid (last visited May 23, 2024); RUDY COFFEE, https://rudy.coffee/ (last visited May 23, 2024).

> Mr. Giuliani:  Joan.
>
> Ms. Schwartz:  Joan Stish?
>
> Mr. Giuliani:  Yes.
>
> Ms. Schwartz:  Okay.  And is that pursuant to the divorce settlement?
>
> Mr. Giuliani:  Yes.

*In re Giuliani*, No. 23-12055 (SHL) (Bankr. S.D.N.Y. Feb. 7, 2024), 341 Meeting Tr. (the "341 Meeting Transcript") at 23:2-10.  Two months later, without explanation, the Debtor provided sworn testimony about those same payments—"I took that obligation on and maybe the court would have ordered it."  *In re Giuliani*, No. 23-12055 (SHL) (Bankr. S.D.N.Y. Apr. 15, 2024), Dep. of R. Guiliani Tr. at 36:12-13.

45.    Additionally, during the 341 Meeting, the Debtor testified as to his membership in social clubs.  After the Debtor identified that he is a member of the Metropolitan Club and the Metropolitan Museum of Art, the U.S. Trustee trial attorney asked about the Debtor's membership in any other clubs, to which Mr. Giuliani stated, "[n]ot that I can recall."  341 Meeting Tr. at 92:10-12; 93:3-4, 8-10.  Then, just over two months later, the Debtor filed the April MOR, which included a check for $148.52 made out to the "Palm Beach Yacht Club" and a note "G3565," presumably, a membership number.  April MOR [Docket No. 224-1] at p. 13.  Regardless of whether Mr. Giuliani is actually a member of this club (and it appears he is), his behavior is being perceived by the Committee and his creditors as dishonest.  Because, while his creditors are told to sit on their hands, Mr. Giuliani opts to ignore his obligations as a debtor in possession and instead, kick back at the Palm Beach Yacht Club.

46.     Relatedly, and as will be discussed in further detail below, since the Debtor filed his January MOR and continuing for months thereafter, the Committee has been asking about the unauthorized payments made by the Debtor for Maria Ryan and his business and what the Debtor intends to do to secure the return of those funds.  After months of persistent inquiry, the Debtor's counsel replied that the unauthorized payments were "used to reimburse expenses paid on his behalf."[23]  Setting aside the fact that the Debtor had no authority to make such payments and making such payments clearly violates the Bankruptcy Code,[24] it is challenging to view that explanation as anything other than dishonest.  For example, the Debtor's January MOR shows that the Debtor made several unauthorized payments on behalf of his business Giuliani Partners, including making a $4,821.59 payment for the business's credit card.[25]  That payment included a January 13, 2024 charge for a flight from New York City to Boston for Maria Ryan.[26]  Clearly, this payment and the majority, if not all, of the other payments made by the Debtor are not reimbursement for expenses paid on the Debtor's behalf.

47.     Accordingly, the Debtor's dishonest conduct constitutes cause pursuant to Bankruptcy Code section 1104(a)(1), and the appointment of a chapter 11 trustee is required.

> **2.      The Debtor's Prepetition and Postpetition Conduct Has Revealed Incompetence, Gross Mismanagement of His Affairs and Inadequate Record-keeping and Reporting.**

48.     Since the Petition Date, with respect to his bankruptcy case, the Debtor has engaged in a course of conduct that can only be described as incompetence and gross mismanagement of

---

[23]   *See* Decl. in Support, Exhibit C.

[24]   This arrangement, if legitimate (which the Committee doubts), involves third parties advancing unsecured financing to the Debtor, and the Debtor has not filed a motion to obtain postpetition financing in this chapter 11 case.

[25]   *See* Decl. in Support, Exhibit E.

[26]   *See* Decl. in Support, Exhibit F.

his affairs, which conduct is amplified by the Debtor's wholly inadequate record-keeping and reporting.  Generally, where a debtor's financial disclosures raise significant questions, which the debtor does not resolve with further financial disclosures, a trustee must be appointed to cure the debtor's incompetence.  *See In re Denrose Diamond*, 49 B.R. 754, 759-60 (Bank. S.D.N.Y. 1985). Relatedly, a debtor's failure to maintain complete and accurate financial records or substantiate undocumented transactions, such that there appears to be confusion in the Debtor's accounting system, constitutes gross mismanagement for which a trustee must be appointed.  *See In re McCorhill Pub., Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987).  Moreover, reorganization "is a consensual process propelled by the free flow of information" and a "dearth of such information negates that process," and where there is no compelling excuse for failure to provide required financial disclosures, creditors should be protected through the appointment of a trustee.  *In re Denrose Diamond*, 49 B.R. at 759.  The free flow of information required of a debtor is the free flow of ***accurate*** information, as financial reporting with so many errors and inconsistencies that its value becomes questionable is grounds for the appointment of a trustee.  *See In re Plaza de Retiro, Inc.*, 417 B.R. at 642.

49.     As the Debtor has admitted, his schedules of assets and statement of financial affairs require "further amendments and disclosures."  *See* Docket No. 133, Recitals; Docket No. 222, Recitals.  Those amendments and disclosures have been required—but ignored—since February.  In fact, following the 341 Meeting, in early February, the Debtor was required to, among other things:

- File a declaration attesting the veracity of the Amended Schedules.  341 Meeting Tr. at 35:13-18.  As of the date hereof, he has not done so.

- Verify his ownership of shares of Uber.  341 Meeting Tr. at 74:9-13.  As of the date hereof, he has not done so.

- Amend the Schedules to reflect that he has a claim for unpaid fees against the Republican National Committee or the Trump Campaign, rather than Trump himself. 341 Meeting Tr. at 78:1-79:20. As of the date hereof, he has not done so.

- Amend *Schedule J: Your Expenses* to correctly identify the $10,934 expense included therein. 341 Meeting Tr. at 135:4-136:20. As of the date hereof, he has not done so.

- Amend *Schedule J: Your Expenses* to provide an accurate amount for expenses for entertainment, clubs, recreation, newspapers, magazines and books (currently listed at $0, which conflicts with the MORs). 341 Meeting Tr. at 140:18-21. As of the date hereof, he has not done so.

- Amend *Schedule J: Your Expenses* to include his charitable and religious donations (currently listed at $0). 341 Meeting Tr. 142:24-143:3. As of the date hereof, he has not done so.

- Provide the appraisal for his New York City apartment and Florida condominium to among others, the Committee. 341 Meeting Tr. at 147:18-148:8.[27] As of the date hereof, he has not done so.

- Amend *Schedule A/B: Property* to show the Debtor's registered trademarks. 341 Meeting Tr. at 152:11-153:15. As of the date hereof, he has not done so.

No explanation has been provided as to why the Debtor has been unable to file amended schedules and an amended statement of financial affairs for over three months. And his "unwillingness to comply with disclosure required of all Chapter 11 debtors demands rectification." *In re Denrose Diamond*, 49 B.R. at 758.

50.    Additionally, the Debtor's financial disclosures are consistently inaccurate, conflict with previous disclosures and generally lack supporting documentation, such that their value is questionable at best. The Debtor alleges he has limited assets to satisfy the extensive claims against him, and equity interests in various businesses compose a meaningful subset of his reported assets. The Debtor's *Schedule A/B: Property* lists three entities ("Giuliani Communications LLC,"

---

[27]    Following the 341 Meeting, the Debtor's counsel agreed to provide to the Committee all documents requested by the U.S. Trustee at the 341 Meeting.

"Giuliani & Company LLC" and "WorldCapital Payroll Corp") of which the Debtor allegedly owns 100 percent of the interests, while his *Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest* [Docket No. 81] (the "Rule 2015.3 Report") includes six entities ("Giuliani Partners, LLC," "Giuliani Group, LLC," "Giuliani & Company, LLC," "Giuliani Security & Safety, LLC," "World Capital Payroll Corp." and "Giuliani Communications, LLC) of which the Debtor allegedly owns 100 percent of the interests. And, unfortunately, the Debtor himself does not know what he owns. During his deposition, the Debtor testified under penalty of perjury:

> [With respect to Giuliani Partners,] I own it -- I'm not sure if I -- I own the overwhelming majority of it. I don't know if there are -- every one [*sic*] that was part of it has -- there may be some other smaller ownership interests. . . . I don't know what's left in it.
>
> . . .
>
> [With respect to Giuliani Security & Safety, LLC,] [t]hat is an entity I own. Again, it would be the same as Giuliani Partners. I think I may own all of it now but there may be some . . . people who have 3 or 4 percent.
>
> . . .
>
> [With respect to Giuliani Group, LLC,] [i]t is [an entity I own]. I am embarrassed to tell you I'm not sure I know what the heck it is.
>
> . . .
>
> [With respect to Giuliani & Company, LLC], I couldn't tell you for the life of me what – how it relates.

Dep. of R. Guiliani Tr. at 23:1-25; 27:2-5; 27:17-19; 32:1-2. The Debtor's reporting about, and limited knowledge of, his own assets reflect a level of incompetence and gross mismanagement that warrant the appointment of a chapter 11 trustee.

51.     Finally, as has been documented thoroughly by the Committee in filings with the Court, the Debtor's monthly operating reports support a finding of cause requiring the appointment of a chapter 11 trustee. *See Motion of the Official Committee of Unsecured Creditors of Rudolph W. Giuliani to Compel the Debtor to (I) File Delinquent Monthly Operating Reports and (II) File Timely Future Monthly Operating Reports* [Docket No. 197] (the "MOR Motion") at ¶¶ 26-30; *see generally Reply in Support of the Motion of the Official Committee of Unsecured Creditors of Rudolph W. Giuliani to Compel the Debtor to (I) File Delinquent Monthly Operating Reports and (II) File Timely Future Monthly Operating Reports* [Docket No. 216] (the "Reply ISO MOR Motion"). Other than one monthly operating report, which was still filed after his self-proclaimed filing deadline,[28] the Debtor has filed every monthly operating report after the filing deadline.

| Monthly Operating Report | Filing Deadline | Date Filed |
|---|---|---|
| December 2023 [Docket No. 80] | January 22, 2024 | January 29, 2024 |
| January 2024 [Docket No. 127] | February 21, 2024 | February 23, 2024 |
| February 2024 [Docket No. 199] | March 21, 2024 | May 2, 2024 |
| March 2024 [Docket No. 203] | April 22, 2024 | May 6, 2024 |

52.     In fact, the Debtor has a history of extending deadlines for himself and then missing those same self-extended deadlines. For example, at the April 4 Hearing, two weeks after the deadline for filing the February MOR, the Debtor's counsel told the Court, "[t]he February operating report, Your Honor, hasn't been filed yet. . . . Hopefully, we'll have that filed sometime

---

[28]     In a filing by the Debtor on May 7, 2024, the Debtor indicated that that "[t]he operating report for April should be filed prior to the return date of this motion [on May 14, 2024]." *Debtor's Response to the Motion of the Official Committee of Unsecured Creditors of Rudolph W. Giuliani to Compel the Debtor to (I) File Delinquent Monthly Operating Reports and (II) File Timely Future Monthly Operating Reports* [Docket No. 206] (the "MOR Response") at ¶ 10. However, the April MOR was actually filed on May 17, 2024. *See* April MOR [Docket No. 224].

towards the end of the next week."[29]  Instead of filing the February MOR that next week, the

Debtor, having gone dark on the Committee, filed the February MOR four weeks later.

53.    The December MOR and the January MOR include no supporting documentation.

*See* Docket Nos. 80, 127.  *See generally* December MOR; January MOR.  The February MOR

includes February *2023* bank statements as supporting documentation.  *See* February MOR

[Docket No. 199-1] at pp. 1-4 (February 2023 bank statement), 14-17 (February 2023 bank

statement showing receipt of a social security payment in the amount of $4,509.08); [Docket No.

199] at p. 2 (listing total receipts of $4,509).  Not one operating report's end of month cash balance

matches the beginning of month cash balance listed in the following month's operating report.  *See*

MORs at p. 2.  The Debtor's monthly operating reports reflect an astounding level of incompetence

and utter lack of respect for his obligations as a debtor in possession and as a beneficiary of the

bankruptcy process.

54.    Moreover, and equally egregious, the January MOR, the February MOR and the

March MOR show unauthorized payments, including payments made by the Debtor on behalf of

his business's employee, on behalf of his wholly-owned business and to his unretained

accountant[30]; yet, incredibly, he answers "No" to the questions: (1) "Were any payments made

outside the ordinary course of business without court approval?" and (2) "Were any payments

made to or on behalf of insiders?"  *See* January MOR at p. 8; February MOR at p. 8; March MOR

---

[29]    April 4 Hearing Tr. at 14:1-5.

[30]    When the Debtor finally filed the March MOR, two weeks after the deadline, the report showed a $12,000
payment to the Debtor's unretained accountant who is no longer willing to work with the Debtor.  *See* March
MOR at p. 19.  The Debtor and his counsel said nothing to the Committee and its counsel about the unauthorized
payment prior to filing the March MOR.  Upon reviewing the March MOR, Committee counsel immediately
reached out to the Debtor's counsel, who agreed that Mr. Giuliani had no authority to make that payment and
assured the Committee's counsel that the Debtor was working to get that payment returned.  It appears that, two
months after the unauthorized payment was made, the accountant did return the funds.  However, it is unclear
whether any action at all would have been taken but for the Committee's outreach.

at p. 8.  Finally, other than the December MOR, which covers an eight-day period, every monthly operating report shows total expenses exceeding total income for the applicable month.  *See* January MOR, Part 8(j); February MOR, Part 8(j); March MOR, Part 8(j); April MOR, Part 8(j). The Debtor's inability to file timely, complete and accurate monthly operating reports showcases his incompetence, gross mismanagement and inadequate reporting, which require the appointment of a chapter 11 trustee.

> **3.      The Temptation for Self-Dealing Has Proven to Be Too Much for the Debtor and Has Resulted in Incurable Conflicts of Interest and Inappropriate Relations with His Businesses.**

55.      A conflict of interest may constitute cause for the appointment of a trustee where a debtor has inappropriate dealings with an entity in which the debtor has an interest.  *See In re Sillerman*, 605 B.R. 631, 646 (Bankr. S.D.N.Y. 2019) (ordering the appointment of a trustee in the individual debtor's chapter 11 case after concluding, among other things, that there is "ample evidence of unauthorized transactions between the Debtor and non-debtor affiliated entities which evidences a conflict of interest"); *In re McCorhill Pub. Inc.*, 73 B.R. at 1017 (holding that conflicting interest in various related entities held by the debtor's directors warranted the appointment of a trustee).  Moreover, the temptation for self-dealing is heightened in an individual debtor's bankruptcy case, where the debtor's natural instinct is to protect his own self-interest.  *See In re Sillerman*, 605 B.R. at 647.  Unfortunately, that is precisely the situation that exists here, as the Debtor (i) directs all of his income-earning opportunities and compensation to his wholly-owned business in an attempt to put such assets outside of the reach of his creditors and (ii) uses his personal funds to pay his wholly-owned business's expenses.

56.      In a filing by the Debtor on March 28, 2024, the Debtor said that he "currently receives social security benefits and broadcasts a radio show and a podcast; these are his sole sources of income."  *See* Docket No. 155 at ¶ 3.  Then, in a filing by the Debtor on May 7, 2024,

he repeated the same statement that he "currently received [*sic*] social security benefits and broadcasts a radio show and podcast; these are his sole sources of income."  MOR Response at ¶ 5.  Despite these representations, the Debtor has never reported any compensation, wages or a salary in his monthly operating reports.  *See* December MOR at p. 9; January MOR at p. 9; February MOR at p. 9; March MOR at p. 9; April MOR at p. 9.

57.     Yet, beyond conflicting with representations in his other filings, the Debtor reporting that he has no wages, compensation or salary also conflicts with news reports that (i) the Debtor said he earned $15,000 a month, which he referred to as "peanuts," from his WABC radio show before his show was cancelled and he was suspended in May 2024 and (ii) the Debtor earns between $100,000 and $150,000 from Newsmax for his show America's Mayor Live.[31]

58.     At the May 14 Hearing, the Debtor's counsel committed to providing to the Committee with information concerning the Debtor's compensation.  *See* May 14 Hearing Tr. at 70:4-22.   In a letter dated May 22, 2024,[32] the Debtor's counsel provided the following information:

> [We] have been advised that there was no formal contract between the Debtor and WABC Radio, it was all done through a friendly handshake agreement between the parties.  The Debtor was compensated from WABC Radio at 50% of any revenue received from ads, which averaged approximately $14,000 per month which was paid to Giuliani Communications."

Perplexingly, there is no explanation as to why the monthly payments were made to Giuliani Communications, the Debtor's wholly-owned business, as opposed to the Debtor himself.

---

[31] *See, e.g.*, Priscilla DeGregory & Natalie O'Neill, *Rudy Giuliani yanked off the air for 'stolen election' rant on WABC radio show*, NEW YORK POST (May 10, 2024, 6:19 PM), https://nypost.com/2024/05/10/us-news/rudy-giuliani-suspended-from-wabc-radio-show-for-stolen-election-rant/.

[32] *See* Decl. in Support, Exhibit G.

29

The letter also provides:

> [T]he Debtor advised that the income received from his live stream comes mainly from Tunnel to Towers and averages approximately $16,346.18 per month, which is paid to Giuliani Communications.

Again, and equally perplexingly, there is no explanation as to why monthly payments are being made to Giuliani Communications as opposed to the Debtor himself, for the benefit of creditors.

59.    And, surprising exactly no one, the contract for the Debtor's Rudy Coffee venture, which contract the Debtor entered into postpetition on April 23, 2024, directs all payments ("80% of the net profit of each sale of Rudy Coffee") to Giuliani Communication's bank account, even though the contract appears to be signed by the Debtor in his individual capacity and refers to him in the contract as "Rudolph Giuliani, aka Giuliani Communications, LLC."[33]  The contract also obligates "Rudolph Giuliani" to promote "Rudy coffee."

60.    Despite more than tens of thousands of dollars coming into Giuliani Communications each month as a result of the Debtor's work, the letter states that "[t]he Debtor has not received any compensation from Giuliani Communications as the income is used for pay [*sic*] expenses of the company."  It appears the expenses of "the company" have mysteriously and significantly increased since 2023, as the Debtor reported just $66,672 of expenses for "Giuliani Communications LLC" in the Rule 2015.3 Report.  *See* Rule 2015.3 Report [Docket No. 81-1] at p. 3.  These facts suggest that Mr. Giuliani, a debtor in a chapter 11 case with more than $148 million of claims against him, is working for free to the detriment of his creditors, which in itself is problematic, and/or funneling funds that belong to his creditors to his business and using his business as a personal piggy bank, which is fraudulent.  Because the Debtor has failed to comply with the 2004 Order and produce the requested documents on behalf of his businesses, it is

---

[33]    *See* Decl. in Support, Exhibit A.

impossible to know with any precision the details of this arrangement.  However, surely, the former

mayor of New York City, a former United States Associate Attorney General and a former United

States Attorney for the Southern District of New York, can and should find a paying job that will

help fund distributions to his creditors instead of kickbacks to his cronies and a personal slush

fund.

61.    Additionally, the Debtor has shown himself incapable of operating his wholly-

owned businesses in a way that does not result in the diversion of his personal funds to the

businesses.  At the 341 Meeting, the Debtor explained:

> Mr. Giuliani:  Overview of all the expenses [on my schedules].
> Until now, I paid a lot of business expenses.  Always have because
> they're my businesses.  I pay them out of my personal account.  And
> I'm really not good about getting reimbursement for them because
> they were my businesses.  So for example -- . . . For example, a lot
> of the equipment that I use -- . . . I bought all those.  . . .  Yeah, I
> bought them personally.  And I --
>
> Ms. Schwartz:  And you could have actually bought them through
> Giuliani Communications --
>
> Mr. Giuliani:  I should have.  . . .  I probably should have.  Even to
> keep record of it, I should have.
>
> . . .
>
> Mr. Giuliani:  And I got used to that.  So I really am trying now to
> go back and to list it all because --
>
> Ms. Schwartz:  It's not so easy.
>
> Mr. Giuliani:  No, it's not.  I mean, I, but I am.  I am doing it.  But
> a lot of the – when we go through these expenses [on my schedules]
> and they seem, well what's that for and what's that for, about half
> of them are going to be for the business.  . . .  Maybe forty percent.
> . . . And some of the big ones.

341 Meeting Tr. at 137:25; 138:1-22; 139:6-19.

62.     As shown in the MORs, the Debtor continues to pay one of his business's credit card bills and attaches the business's credit card statements as supporting documentation. *See* February MOR [Docket No. 199-2]; March MOR [Docket No. 203-2].  The Committee has identified a number of unauthorized payments made by the Debtor on behalf of Giuliani Partners and his businesses' employees, including the below:

| January MOR | | | |
|---|---|---|---|
| Card | Amount | Unauthorized Payment | For the Benefit Of |
| AMEX Ending 5001 | $30.00 | JetBlue Airways "Additional Collection" Charge | Theodore Goodman |
| AMEX Ending 5001 | $30.00 | JetBlue Airways "Additional Collection" Charge | Theodore Goodman |
| AMEX Ending 5001 | $360.19 | JetBlue Airways Passenger Ticket | Theodore Goodman |
| AMEX Ending 5001 | $360.19 | JetBlue Airways Passenger Ticket | Maria Ryan |
| AMEX Ending 5002 | $359.99[34] | Mobile Payment | Giuliani Partners |
| AMEX Ending 5002 | $690.93 | Mobile Payment | Giuliani Partners |
| AMEX Ending 5002 | $617.22 | Mobile Payment | Giuliani Partners |
| AMEX Ending 5002 | $4,821.59 | Mobile Payment | Giuliani Partners |
| AMEX Ending 5002 | $369.92 | Mobile Payment | Giuliani Partners |
| AMEX Ending 5002 | $21.76 | Mobile Payment | Giuliani Partners |
| AMEX Ending 5002 | $166.76 | Mobile Payment | Giuliani Partners |
| AMEX Ending 2007 | $1,105.00 | Mobile Payment | Maria Ryan |
| AMEX Ending 2007 | $1,500.00 | Mobile Payment | Maria Ryan |
| AMEX Ending 2007 | $1,000.00 | Mobile Payment | Maria Ryan |

---

[34]   This payment was listed in the January MOR as being made on January 2, 2024; however, based on the Giuliani Partners American Express credit card statement (ending 5002), this payment was actually made on December 29, 2023.

| February MOR | | | |
|---|---|---|---|
| Card | Amount | Unauthorized Payment | For the Benefit Of |
| AMEX Ending 5002 | $321.08 | Mobile Payment | Giuliani Partners |
| AMEX Ending 5002 | $635.78 | Mobile Payment | Giuliani Partners |
| AMEX Ending 5002 | $465.24 | Mobile Payment | Giuliani Partners |
| AMEX Ending 5002 | $568.80 | Mobile Payment | Giuliani Partners |

| March MOR | | | |
|---|---|---|---|
| Card or Check | Amount | Unauthorized Payment | For the Benefit Of |
| AMEX Ending 5002 | $143.13 | Mobile Payment | Giuliani Partners |
| AMEX Ending 5002 | $1,310.19 | Mobile Payment | Giuliani Partners |

Given that the MORS are generally inaccurate and incomplete, the Committee has no reason to believe this is the entire universe of the Debtor's unauthorized payments for his businesses and their employees. The Committee's suspicion is likely confirmed by the April MOR, which reports a number of payments to "B&H Photo,"[35] a store for "photographers, musicians and creative professionals" with "leading-edge technology" that one might use for a live stream, radio show or podcast. *See* April MOR [Docket No. 224-1] at pp. 3-5.

63.     Moreover, the Debtor had a troubling response to questions regarding his intentions for seeking the return of such unauthorized payments. He has no intentions of doing so, with his counsel characterizing the payments as reimbursements for "expenses paid on his behalf." In addition to the explanation's being dishonest and clearly false, additional issues with the Debtor's

---

[35]   B&H Photo Video Audio, About Us, https://www.bhphotovideo.com/find/HelpCenter/AboutUs.jsp (last visited May 24, 2024).

response and approach to unauthorized spending, which themselves constitute cause for the appointment of a trustee, are discussed below.

64.    Regardless, it is crystal clear that the conflicts of interest presented in this bankruptcy case are overwhelming and the Debtor has shown no restraint when it comes to choosing between himself and his creditors.  Every time, he chooses himself and, in the process, has diverted and will continue to attempt to divert funds and opportunities for income away from his creditors and directly to his wholly-owned businesses and closest associates.  Therefore, cause exists that demands the appointment of a chapter 11 trustee.

### 4.    The Debtor Cannot be Bothered to Comply with His Fiduciary Duties as a Debtor in Possession.

65.    "The law is clear that if a debtor-in-possession neglects its fiduciary duties, the court should appoint a chapter 11 trustee."  *In re Sillerman*, 605 B.R. at 648.  Those fiduciary duties, include, among others, (i) the duty to protect and conserve estate property, (ii) a duty to refrain from acting in a manner that could damage the estate and (iii) a duty to refrain from acting in a manner that could hinder reorganization.  *See id.*  The Debtor has not only breached each of these fiduciary duties but, in certain cases, defiantly boasted about the same.

66.    *First*, the duty to preserve and conserve the estate includes, among other things, a duty to conduct impartial investigations and determine whether to pursue claims on behalf of the estate.  *See id.*  As set forth above, the Debtor is not willing to undertake any sort of investigation with respect to his unauthorized payments on behalf of his business and Maria Ryan; instead, the Debtor outright refuses to seek the return of any such amounts.  Additionally, observing this fiduciary duty means that the Debtor cannot dispense with assets outside of the ordinary course without court approval.  *See id.*  The Debtor, however, has not sought or obtained this Court's approval to pay Maria Ryan's credit card bill or his business's credit card bill.

67.     *Second*, the Debtor has taken a bat to his fiduciary duty to refrain from acting in a manner that could damage the estate.  Instead of even attempting to acknowledge the existence of this fiduciary duty, the Debtor has chosen to engage in value-destructive behavior that could lead to the incurrence of unnecessary administrative expense claims and make meaningful recoveries for his unsecured creditors an even more remote proposition.  This behavior is the same that led to the $148 million judgment against him and precipitated the need to file this bankruptcy case.  For reasons that defy all common sense and decency, following the Petition Date, the Debtor continued to make the same defamatory statements about the Freeman Plaintiffs.  *See Freeman, et al. v. Giuliani*, Adv. Pro. No. 24-01355-SHL [Docket No. 1].  And, such behavior has in fact led to additional administrative expense claims, as each of the Freeman Plaintiffs filed a proof of administrative expense claim based on the Debtor's continued bad behavior.  *See* Claim Nos. 8, 9.  Such behavior also led to the cancellation of the Debtor's radio show on WABC, his suspension from the station and a loss of the related compensation that he twice reported to this Court was his sole source of income other than his podcast and social security payments.  *See* Docket No. 155 at ¶ 3; MOR Response at ¶ 5.

68.     But the bad behavior does not stop there.  While the Debtor has taken every opportunity to announce his limited pool of assets available for distribution to creditors and to fund this case, he has taken no serious steps to rein in his own exorbitant spending or reduce the costs associated with his extravagant lifestyle.  As set forth above, in January, alone, the Debtor made credit card payments totaling $26,212.87 for expenses including: (i) at least 60 Amazon transactions; (ii) charges for entertainment such as Netflix, Prime Video, Kindle, Audible, Paramount+ and Apple services and products; (iii) numerous Uber rides; (iv) payments on account of Maria Ryan's credit card statement; and (v) travel and lodging expenses for his employees and

associates.[36]  Fast forward three months, and not much has changed.  In April, alone, the Debtor

paid $21,000 in fees for his New York City apartment, one of his two multi-million dollar homes.

Docket No. 224-1 at pp. 11, 15.  And, the Committee recently received a copy of one of the

Debtor's May 2024 bank statements, which shows the Debtor paid nearly $16,000 in fees for his

Florida condominium during the first half of the month.[37]  Instead of a being a responsible steward

of his assets, the Debtor has shown no discretion with respect to spending his limited resources

during the chapter 11 case.

69.    *Third*, all the troublesome behavior identified above—from acting in a manner that

could lead to the incurrence of unnecessary administrative expenses, to funneling his income to

his wholly-owned business, to unrestricted spending on himself, his businesses and his closest

associates—constitutes a clear violation of the Debtor's fiduciary duty to refrain from acting in a

manner that could hinder reorganization.  The Debtor should not be allowed to persist in his current

course of conduct.

70.    Accordingly, the Debtor's continued breaches of his fiduciary duties as a debtor in

possession constitute cause requiring the appointment of a trustee.

**B.    The Appointment of a Chapter 11 Trustee Is in the Interests of the Debtor's
Creditors and the Estate.**

71.    Bankruptcy Code section 1104(a)(2) offers another avenue for the appointment of

a chapter 11 trustee.  Section 1104(a)(2) provides:

> At any time after the commencement of the case but before
> confirmation of a plan, on request of a party in interest or the United
> States trustee, and after notice and a hearing, the court shall order
> the appointment of a trustee—
>
> . . .

---

[36]  *See* Decl. in Support, Exhibits E, F, H, I, J and K.

[37]  *See* Decl. in Support, Exhibit L.

36

> (2) if such appointment is in the interests of creditors, any
> equity security holders, and other interests of the estate,
> without regard to the number of holders of securities of the
> debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a)(2).  This section sets forth a flexible standard, and courts look to the practical

realities and necessities of the record to determine whether the appointment of a trustee is in the

best interest of a debtor's estate and creditors.  *See In re Sillerman*, 605 B.R. at 651-52.  Many of

the facts and considerations that determine whether "cause" exists under section 1104(a)(1) are

relevant to a section 1104(a)(2) determination.  *See id.* at 652; *In re Grasso*, 490 B.R. 500, 506

(Bankr. E.D. Pa. 2013); *In re Vascular Access Ctrs., L.P.*, 611 B.R. 742, 769 (Bankr. E.D. Pa.

2020).  Additionally, courts consider, among other factors, (i) the trustworthiness of the debtor,

(ii) the debtor's past and present performance and prospects for rehabilitation, (iii) the confidence

or lack thereof of creditors and (iv) the benefits derived from the appointment of a trustee as

compared to the costs.  *See, e.g.*, *In re Ashley River Consulting, LLC*, 2015 Bankr. LEXIS 1008,

at *28-29.

72.     Here, for all the reasons set forth in connection with the section 1104(a)(1) cause

analysis, as well as considerations regarding the Debtor's untrustworthiness, his past and present

performance and prospects for rehabilitation, the creditors' lack of confidence in the Debtor and

the benefits to be derived from the appointment of a trustee, a chapter 11 trustee must be appointed.

### 1.     The Debtor is Not Trustworthy.

73.     A debtor's prepetition misconduct that continues through to his bankruptcy case

warrants a finding that the debtor is not trustworthy.  *See In re Ashley River Consulting, LLC*, 2015

Bankr. LEXIS 1008, at *25.  Here, there is a clear and lengthy record of the Debtor's "willful" and

"malicious" conduct against the Freeman Plaintiffs and his egregious behavior in the Freeman

Litigation that led to sanctions and a jury award of $148 million judgment against the Debtor.[38]

The D.C. District Court described the Debtor's "willful shirking of his discovery obligations in

anticipation of and during this litigation, including the failure to preserve potentially relevant

evidence."[39]    And, the D.C. District Court concluded, "[t]he only reasonable explanation for

Giuliani's blatant disregard for satisfying his preservation obligations—despite fully

understanding them—is that he intentionally and willfully ignored them."[40]  It is deeply disturbing

that the Debtor acted in this manner at all, but it is staggering that the Debtor chose to continue

this "willful" and "malicious" conduct against the Freeman Plaintiffs after the Petition Date,

stopping (for now) only after the Freeman Plaintiffs commenced an adversary proceeding for

injunctive relief.  *Freeman, et al. v. Giuliani*, Adv. Pro. No. 24-01355-SHL [Docket No. 1];

*Freeman, et al. v. Giuliani*, Case No. 23-cv-03754 (BAH) (D.D.C. May 21, 2024) [Docket No. 14].

74.    As set forth above, throughout the bankruptcy case, the Debtor has made, at best,

half-baked financial disclosures and prioritized delay over progress in his chapter 11 case.  He files

delinquent, inaccurate and incomplete monthly operating reports.  He delayed for months the filing

of an application to retain a broker to sell his New York City apartment.[41]  He continues to resist

selling his Florida condominium, instead preferring to spend tens of thousands of dollars on

maintenance fees, despite his counsel's admission that the Debtor's bankruptcy case "will never

---

[38]    *Freeman et al. v. Giuliani*, No. 1:21-cv-03354-BAH [Docket No. 94, at 5].

[39]    *Id.* at 2.

[40]    *Id.* at 39-40.

[41]    *See* April 4 Hearing Tr. at 14:9-15 (Debtor's counsel explaining to the Court that his goal "is that we'll have that
[Sotheby's retention application] resolved and I will, hopefully have that filed, you know, sometime early next
week [the week of April 8].").  The Debtor filed the Sotheby's retention application on May 10, 2024.  The
Debtor's delay in filing this retention application is unexplainable and unjustifiable.  The retention of a broker is
a crucial step in furtherance of listing and selling the Debtor's New York City apartment and monetizing the
Debtor's limited self-reported assets for his creditors.

be a hundred percent plan."[42]  And the icing on the cake, without reason or any rationale, he directs

all income for *his* work to his business's bank account, in an attempt (that will not succeed) to keep

his income outside of the reach of his creditors.[43]  And, as to be expected based on his conduct in

the Freeman Litigation, he has not complied with his obligations under the 2004 Order.

75.    In this context, the Committee has no reason to trust the Debtor and his ability to

manage his own affairs and instead has every reason to believe that maximizing value for his

creditors and adhering to the rules governing the bankruptcy process do not matter to the Debtor.

### 2.    The Debtor's Past and Present Performance Lead to One Conclusion: There Can Be No Reorganization Without a Chapter 11 Trustee.

76.    The monthly operating reports reveal that the Debtor reports only one consistent

source of income:  social security payments, while squirreling away tens of thousands of dollars

each month in his wholly owned companies.  The Debtor was suspended from WABC and his

radio show terminated,[44] and this radio show was one of the only sources of income he has

identified (though he never disclosed any such income in any of his monthly operating reports).

Prior to the Petition Date, the Debtor was suspended from the practice of law, so he has no ability

to represent clients and bring in income as an attorney.  *See* Docket No. 37-1 at ¶ 8.  Additionally,

the Committee recently learned that the Debtor has structured other income opportunities in a way

to keep money out of his bankruptcy estate and direct money into his wholly-owned business's

bank account.[45]  The Debtor has shown zero ability to enhance the estate and an uncanny ability

to attempt to divert value from the estate and drain his limited resources.

---

[42]  *Id.* at 51:23-24.

[43]  *See* Decl. in Support, Exhibit G.

[44]  *See, e.g.*, Jocelyn Noveck, *WABC Radio suspends Rudy Giuliani for discussing discredited 2020 election claims*, ABC News (May 10, 2024, 7:14 PM), https://abcnews.go.com/US/wireStory/wabc-radio-suspends-rudy-giuliani-flouting-ban-discussing-110122602.

[45]  *See* Decl. in Support, Exhibit G.

77.     Moreover, he has made virtually no progress in his chapter 11 case, and every step forward in this case is a result of the Committee's and other creditors' decisions to act reasonably and agree to some form of relief.  That applies with respect to the Debtor's first attempt to modify the automatic stay, as well as the Debtor's request for an extension of his exclusive periods to file and solicit votes on a plan.  *See* Jan. 31, 2024 Hearing Tr. at 77:15-16 (the Court explaining that "given that agreement [among the Debtor, the Freeman Plaintiffs and the Committee], I agree it is appropriate to lift the stay"); April 4 Hearing Tr. at 23-25 (the Court describing the Committee's agreement to a sixty-day extension of the Debtor's exclusive periods as "an eminently reasonable position by the Committee").  Likewise, tasks that should be resolved in days have, without reason, taken months.  For example, the Committee worked for months with the Debtor's advisors to convince them that the application to retain a broker to sell the Debtor's New York City apartment should be filed.

78.     Accordingly, the Debtor's prepetition and postpetition performance present a doom and gloom outlook for rehabilitation should he remain as a debtor in possession.

**3.     Simply Put, the Creditors Have No Confidence in the Debtor.**

79.     In what should come as a surprise to no one, the Committee has no confidence in the Debtor and his ability to serve as a debtor in possession.  The Committee has repeatedly said as much in its filings and during hearings before the Court.  *See, e.g.*, MOR Motion at ¶ 28 ("It is no secret that the Committee believes the Debtor lacks credibility and the Committee has no confidence in him."); Reply ISO MOR Motion at ¶ 1 ("The Committee continues to lack confidence in the Debtor's ability to fulfill his obligations as a debtor in possession".).  Moreover,

40

the Committee has made every effort to provide the Debtor with an opportunity to prove otherwise.[46]  He has declined every invitation.

80.    Additionally, in light of the Debtor's consistent failure to provide timely, accurate and complete financial disclosures, the Committee is deeply concerned by the Debtor's inability to find a professional accountant willing to work for him.[47]

### 4.    The Benefits to Be Derived from the Appointment of a Trustee Far Exceed the Costs of Such Appointment.

81.    Whenever a chapter 11 trustee is appointed, there are financial and time-related costs associated with familiarizing the trustee with the record and the debtor's affairs.  *See In re Sillerman*, 605 B.R. at 655.  However, here, the benefits are clear and "far stronger."  *Id.*  By stepping into a debtor in possession's shoes and immediately taking charge of the estate, a trustee serves as an "impartial fiduciary capable of preserving estate assets and maximizing recovery for creditors."  *Id.*  "The benefit of such independent investigation and the related protection and safeguarding of estate assets that will be facilitated by the appointment of a trustee far outweigh the costs to the estate associate with such appointment."  *Id.*

82.    In addition, unlike the Debtor, an impartial fiduciary will take control of the Debtor's wholly owned companies and ensure funds that have been directed to such entities are properly allocated to the estate and likely would be capable of finding and retaining qualified professionals, like accountants, to assist in reorganization efforts.  Moreover, as an added benefit,

---

[46]    The Committee has tried to encourage the Debtor to act responsibly and take steps to advance his chapter 11 case by, for example, proposing a reasonable budget for the Debtor and filing pleadings seeking less draconian relief than the appointment of a chapter 11 trustee, such as a motion to compel the Debtor to sell his Florida condominium and a motion to compel the Debtor to comply with his obligations as a debtor in possession to file timely accurate and complete financial reporting.  *See generally* Motion to Compel Sale; MOR Motion.  The Committee's encouragement has been met with resistance and delay.

[47]    *See* MOR Response at ¶¶ 7-8 (explaining that "the Debtor originally had an accountant who was helping, however, he had a change of heart" and "[t]he Debtor advised that he has reached out to a number of accounting firms and CPA's [*sic*] seeking their help, however; [*sic*] no one seems interested in taking the assignment.")

the Committee intends to remain an active participant in the bankruptcy case following the appointment of a trustee, with its counsel continuing to work on the same pro bono fee arrangement and its specialized forensic financial advisor continuing to work on the same reduced rates.

83.      Accordingly, months into the Debtor's bankruptcy case, it has never been clearer that a reorganization requires the appointment of a chapter 11 trustee for the Debtor.  Such appointment is unquestionably in the interests of the Debtor's creditors and estate.

## **NOTICE**

84.      Notice of this Motion has been provided to: (i) the U.S. Trustee; (ii) bankruptcy counsel to the Debtor; and (iii) all parties requesting notice under Bankruptcy Rule 2002.  Due to the nature of the relief requested herein, the Committee submits that no other or further notice need be provided.

## **CONCLUSION**

**WHEREFORE**, the Committee respectfully requests that this Court (i) enter the Proposed

Order, substantially in the form attached hereto as **Exhibit A**, directing the immediate appointment

of a chapter 11 trustee for the Debtor and (ii) grant such other and further relief as this Court deems

just and proper.

Dated: May 28, 2024　　　　　　　　　　　　 */s/ Philip C. Dublin*
　　　New York, New York　　　　　**AKIN GUMP STRAUSS HAUER & FELD LLP**
　　　　　　　　　　　　　　　　　Ira S. Dizengoff
　　　　　　　　　　　　　　　　　Philip C. Dublin
　　　　　　　　　　　　　　　　　Abid Qureshi
　　　　　　　　　　　　　　　　　One Bryant Park
　　　　　　　　　　　　　　　　　New York, New York 10036
　　　　　　　　　　　　　　　　　Tel:　　(212) 872-1000
　　　　　　　　　　　　　　　　　Fax:　　(212) 872-1002
　　　　　　　　　　　　　　　　　Email:　idizengoff@akingump.com
　　　　　　　　　　　　　　　　　　　　　pdublin@akingump.com
　　　　　　　　　　　　　　　　　　　　　aqureshi@akingump.com

　　　　　　　　　　　　　　　　　- and -

　　　　　　　　　　　　　　　　　Rachel Biblo Block (admitted *pro hac vice*)
　　　　　　　　　　　　　　　　　2300 N. Field St., Suite 1800
　　　　　　　　　　　　　　　　　Dallas, Texas 75201
　　　　　　　　　　　　　　　　　Tel:　　(214) 969-2800
　　　　　　　　　　　　　　　　　Fax:　　(214) 969-4343
　　　　　　　　　　　　　　　　　Email:　rbibloblock@akingump.com

　　　　　　　　　　　　　　　　　*Counsel to the Official Committee of*
　　　　　　　　　　　　　　　　　*Unsecured Creditors of Rudolph W. Giuliani*

## Exhibit A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re:                                               :  **Chapter 11**
                                                     :
**RUDOLPH W. GIULIANI**                              :  **Case No. 23-12055 (SHL)**
**a/k/a RUDOLPH WILLIAM GIULIANI,**                  :
                                                     :
               **Debtor.**                           :
------------------------------------------------------------------x

## ORDER DIRECTING THE IMMEDIATE
## APPOINTMENT OF A TRUSTEE PURSUANT TO 11 U.S.C. § 1104

Upon the motion (the "Motion")[1] of the Committee for entry of an order appointing a

chapter 11 trustee for the Debtor's estate; all as set forth more fully in the Motion; and the Court

having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C.

§§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District

Court for the Southern District of New York entered February 1, 2012; and this Court having found

that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and that this Court may enter a

final order consistent with Article III of the United States Constitution; and this Court having found

that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408

and 1409; and due and proper notice of the Motion having been provided; and the relief requested

being in the best interests of the Debtor and his estate and creditors; and this Court having reviewed

the Motion and having heard the statements in support of the relief requested therein at a hearing

before this Court (the "Hearing"); and the Court having determined that the legal and factual bases

set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and

upon all of the proceedings had before the Court and after due deliberation and sufficient cause

appearing therefor, it is HEREBY ORDERED THAT:

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1.      The Motion is GRANTED as set forth herein.

2.      The U.S. Trustee, after consultation with the Committee, is directed to immediately appoint, subject to Court approval, one disinterested person as a chapter 11 trustee for the Debtor.

3.      Pursuant to Bankruptcy Code section 1121(d), the Debtor's exclusive periods during which to file a chapter 11 plan and solicit votes therefor are hereby terminated.

4.      The chapter 11 trustee shall (i) take control of the companies in which the Debtor holds a controlling ownership interest (the "Debtor-Owned Companies"); (ii) be appointed as the sole manager, member, director and officer, as applicable, of each of the Debtor-Owned Companies; and (iii) succeed to the powers of the current managers, members, directors, officers and any such other governing bodies of the Debtor-Owned Companies, including, without limitation, any positions held by the Debtor in any capacity, which powers and authority shall include, without limitation:  (a) managing and overseeing all day-to-day operations of the Debtor-Owned Companies, (b) managing all ongoing financial obligations of the Debtor-Owned Companies and (c) performing such other actions as may be necessary or required of the chapter 11 trustee in order to fulfill his or her obligations under the Bankruptcy Code and the Bankruptcy Rules.

5.      The Debtor and any other individual or entity in possession of the Debtor's records and property, including, without limitation, the employees of the Debtor-Owned Companies, shall (i) cooperate with the chapter 11 trustee in all respects, including, without limitation, in furtherance of paragraph 4 of this Order and (ii) immediately turn over to the chapter 11 trustee all records and property of the estate in their possession or control as directed by the chapter 11 trustee.

6.      This Order shall be immediately effective and enforceable upon its entry.

7.      This Court shall retain jurisdiction with respect to all matters arising from or related

to the interpretation or implementation of this Order.

Dated: _____, 2024
New York, New York

_____
THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE