# EXHIBIT A

**PRELIMINARY APPELLANT BRIEF
FOR USE IN BANKRUPTCY COURT (S.D.N.Y)
NOT IN D.C. CIRCUIT**

**KENNETH CARUSO LAW LLC**
New York, NY 10023
(646) 599-4790
ken.caruso@kennethcarusolaw.com

**LABKOWSKI LAW, P.A.**
250 95th Street, Unit #547233
Surfside, Florida 33154
(786) 461-1340
david@labkowskilaw.com

Of Counsel:
    Kenneth A. Caruso
    David Labkowski

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ............................................................................1

ISSUES PRESENTED FOR REVIEW ...................................................................1

STATEMENT OF THE CASE ................................................................................2

POINT I:    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UPON
            WHICH RELIEF CAN BE GRANTED..................................................4

    A.    Default Judgment: Legal Effects ...........................................................4

    B.    Standard of Review..................................................................................5

    C.    The Amended Complaint Does Not Adequately Allege
        Defendant's Actual Malice .....................................................................5

        1.    Defamation: Essential Elements .....................................................5

        2.    Actual Malice: Applicable Law ......................................................5

        3.    The District Court Failed To Apply The Clear-And-Convincing Standard ............6

        4.    The Evidence Does Not Clearly And Convincingly Establish Actual Malice.........7

            a.    Defendant Made A Rational Interpretation Of
                Ambiguous Information..................................................7

            b.    The Evidence On Which Plaintiffs Rely Does Not Establish Actual
                Malice ....................................................................8

        5.    IIED Claims Fail.............................................................13

    D.    The Amended Complaint Does Not Adequately Allege Liability
        On A Theory of Civil Conspiracy ........................................................13

        1.    Civil Conspiracy: Applicable Law................................................13

        2.    The Amended Complaint Does Not Adequately Allege
            A Coconspirator's Actual Malice .................................................14

            a.    First Example: The Trump-Raffensperger Phone Call ............14

            b.    Second Example: Unidentified Coconspirators......................15

**FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.**

   3.  Reversal Is Required ................................................................16

E.  The IIED Claim Is Duplicative Of The Defamation Claim ................17

F.  The Amended Complaint Does Not Adequately
Allege "Extreme And Outrageous Conduct" ...........................................19

POINT II:  THE JUDGMENT FOR COMPENSATORY DAMAGES
CANNOT STAND ..............................................................21

A.  The District Court Erred On The Issue Of Proximate Cause ................21

   1.  Proximate Cause: Effect Of Default Judgment.....................................21

   2.  Proximate Cause: Intervening Criminal Acts ......................................22

   3.  The Amended Complaint Does Not Adequately Allege Proximate Cause ...........22

   4.  The Evidence Of Proximate Cause Was Insufficient
To Sustain The Verdict..............................................................23

B.  The Amounts Of The Compensatory Damages Awards Are Excessive ...............24

C.  The Award Of Punitive Damages Falls With
The Judgment For Compensatory Damages.............................................24

POINT III:  AS A MATTER OF LAW, PLAINTIFFS CANNOT RECOVER
PUNITIVE DAMAGES ..........................................................25

A.  Applicable Law: The Dual Malice Requirement .................................25

B.  Common-Law Malice: Legal Requirements .......................................26

C.  The Amended Complaint Does Not Adequately Allege
Common-Law Malice ..............................................................26

D.  The Evidence Of Common-Law Malice Was Insufficient
To Sustain The Verdict..........................................................27

E.  The District Court Failed To Instruct The Jury On Common-Law Malice ...........27

POINT IV:  THE AMOUNT OF PUNITIVE DAMAGES IS EXCESSIVE...........................31

A.  As A Matter Of Common Law, The Amount Is Excessive ...................31

B.  As A Matter Of Constitutional Law, The Amount Is Excessive ...........31

ii

**FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.**

1.  The Court Should Reverse For Lack Of A Legitimate State Interest ....................32

2.  The Court Should Reverse On Examination Of The *Gore* Guideposts .................34

    a.  Degree Of Reprehensibility ....................................................................34

    b.  Disparity Between Actual Harm And Punitive Damages Award............34

    c.  Sanctions Authorized For Comparable Misconduct ...............................36

CONCLUSION.................................................................................................................37

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

Rudolph W. Giuliani ("Defendant") appeals from a Judgment and a subsequent Order of the United States District Court for the District of Columbia, Hon. Beryl A. Howell, United States District Judge. The Judgment awarded compensatory and punitive damages against Defendant, and in favor of Plaintiffs Ruby Freeman and Wandrea Moss ("Plaintiffs"), in the amount of approximately $146 million.

## JURISDICTIONAL STATEMENT

The district court had diversity-of-citizenship jurisdiction under 28 U.S.C. § 1332(a)(1); Plaintiffs are citizens of Georgia, and Defendant is a citizen of New York. This Court has jurisdiction under 28 U.S.C. § 1291; Defendant appeals from a final judgment and an order of the district court, which dispose of all parties' claims.

## ISSUES PRESENTED
## FOR REVIEW

I.    Does the Amended Complaint state a claim upon which relief can be granted? Specifically:

A.    Does the Amended Complaint adequately allege that Defendant published with "constitutional malice," also known as "actual malice?"

B.    Does the Amended Complaint adequately allege liability on a theory of civil conspiracy?

C.    In the alternative, does the Amended Complaint state a claim for intentional infliction of emotional distress ("IIED") where, as here, the Amended Complaint states a claim for a traditional tort, defamation, and the relief available for that traditional tort includes damages for emotional distress?

**FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.**

D.    In the further alternative, with respect to IIED, does the Amended Complaint adequately allege "extreme and outrageous conduct" by Defendant where, as here, Defendant engaged in pure speech relating to a matter of legitimate public interest?

II.    With respect to the award of compensatory damages:

A.    Does the Amended Complaint adequately allege proximate cause?

B.    In the alternative, did the evidence at trial provide a legally sufficient basis for a reasonable jury to find for Plaintiffs on the issue of proximate cause?

C.    In the further alternative, are the amounts of the compensatory damages awards excessive?

III.    With respect to the award of punitive damages, did Plaintiffs establish "common-law malice," as required for such an award?  Specifically:

A.    Does the Amended Complaint adequately allege common-law malice?

B.    In the alternative, did the evidence at trial provide a legally sufficient basis for a reasonable jury to find for Plaintiffs on the issue of common-law malice?

C.    In the further alternative, did the district court correctly instruct the jury on the issue of common-law malice?

IV.    With respect to the amount of the award of punitive damages:

A.    Is the amount excessive as a matter of common law?

B.    Is the amount "grossly excessive" as a matter of constitutional law under the Due Process Clause of the Fifth Amendment?

## STATEMENT OF THE CASE

During the Presidential election in 2020, Fulton County, Georgia, employed Plaintiffs to process absentee ballots at the State Farm Arena.  Security cameras videotaped their work.

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

Approximately a month after the election, "the Trump campaign published an excerpted clip from State Farm Arena security camera video[]" (the Video"). Amended Complaint ¶ 40. Defendant, later described by the district court as "head[]" of the "Trump legal team[,]" Dec. 14, 2023 a.m. trial transcript 144:2-3, viewed the Video. Defendant thereafter published a series of statements, in his own podcasts and in interviews on the podcasts of others, in which Defendant described and characterized what he saw. According to Plaintiffs' own summary, Defendant published, or caused to be published:

> statements that assert and/or imply that, among other things, (i) [Plaintiffs] engaged in a criminal conspiracy, along with others, to illegally exclude observers during the counting of ballots 'under false pretenses' so that they could engage in election fraud; (ii) [Plaintiffs] criminally and/or fraudulently introduced 'suitcases' of illegal ballots into the ballot-counting process; (iii) [Plaintiffs] fraudulently counted the same ballots multiple times; (iv) [Plaintiffs] were involved in surreptitiously passing around flash drives that were not supposed to be placed in Dominion voting machines; and (v) that [Plaintiffs] committed crimes and other fraud.

Amended Complaint ¶ 134.

Other persons republished Defendant's statements. For example, then-President Trump repeated some of those statements in a telephone call between the President and Georgia's Secretary of State. A recording and a transcript of that call later circulated widely in mainstream media.

Plaintiffs later commenced this action against Defendant. Each Plaintiff asserted a claim for defamation and a claim for IIED, seeking to hold Defendant liable as a principal and as a coconspirator. Plaintiffs sought compensatory and punitive damages.

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

The district court denied Defendant's motion to dismiss the Amended Complaint (the operative pleading). Defendant, however, later failed to satisfy his discovery obligations, which led the district court to enter a default judgment against Defendant on issues of liability.

The court then conducted a five-day trial on damages, after which the jury returned verdicts in Plaintiffs' favor. Specifically: The jury awarded Plaintiff Freeman $16,171,000 for defamation, and $20 million for IIED. The jury awarded Plaintiff Moss $16,998,000 for defamation, and $20 million for IIED. The jury also awarded punitive damages of $75 million.

The district court entered a final Judgment on the verdicts in the amount of approximately $146 million. The court later denied Defendant's post-trial motion for judgment as a matter of law or for a new trial. This appeal followed.

## POINT I

### THE AMENDED COMPLAINT
### FAILS TO STATE A CLAIM UPON
### WHICH RELIEF CAN BE GRANTED

The Amended Complaint asserts a claim for defamation and a claim for IIED, seeking to hold Defendant liable as a principal and as a coconspirator. For the following reasons, however, Plaintiffs' claims fail as a matter of law.

**A.    Default Judgment: Legal Effects**

A default judgment against a defendant has two legal effects pertinent here. First, the defendant admits the facts alleged in the complaint. Second, "however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law." 10A Wright & Miller, Federal Practice & Procedure ("Wright & Miller") § 2688.1 (2023).

Here, the district court entered a default judgment against Defendant. Accordingly, Defendant admits the facts alleged in the Amended Complaint. The Court, however, must

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

nevertheless decide whether those facts state a claim for defamation and/or IIED.  For the

reasons set forth below, the answer to that question—a question of law—is no.

## B.    Standard Of Review

This Court "has an obligation to make an independent examination of the whole record in

order to make sure that the judgment does not constitute a forbidden intrusion on the field of free

expression." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984) (cleaned

up).  When making that examination, the Court "will reexamine the evidentiary basis on which

th[e] conclusions [of the lower court] are founded[.]"  *Id.* at 509-10 (cleaned up).

## C.    The Amended Complaint Does Not
## Adequately Allege Defendant's Actual Malice

### 1.    Defamation: Essential Elements

To establish defamation, a plaintiff must allege four essential elements: "(1) that the

defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant

published the statement without privilege to a third party; (3) that the defendant's fault in

publishing the statement [here, constitutional/actual malice, defined below] amounted to at least

negligence; and (4) either that the statement was actionable as a matter of law irrespective of

special harm or that its publication caused the plaintiff special harm." *Oparaugo v. Watts*, 884

A.2d 63, 76 (D.C. 2005) (cleaned up).

Here, the Amended Complaint does not adequately allege the third of those elements—

that is, that Defendant published the statements at issue with constitutional/actual malice.

Defendant, by operation of the default judgment, admits, among other things, the falsity of his

publications.  He does not, however, admit the legal conclusion that he published with actual

malice.

### 2.    Actual Malice: Applicable Law

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

The existence of actual malice is a question of law for the court. *Harte-Hanks Communications, Inc v. Connaughton*, 491 U.S. 657, 685 (1989). "The actual malice standard [itself] is famously daunting." *Tah v. Global Witness Publishing, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021) (cleaned up). To establish actual malice, a plaintiff must prove that the defendant published a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). To establish reckless disregard, the plaintiff must prove that the defendant published the statement despite entertaining "serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). The plaintiff, furthermore, must establish actual malice by clear and convincing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

### 3.    The District Court Failed To Apply The Clear-And-Convincing Standard

The district court held that the Amended Complaint adequately alleged actual malice. In so holding, however, the district court erred, in that it failed to apply the correct standard of proof—clear and convincing evidence—a "standard significantly more onerous than the usual preponderance of the evidence standard." *Kahl v. Bureau of National Affairs, Inc.*, 856 F.3d 106, 116 (D.C. Cir. 2017); *see* ECF 31 at 20-22 (denying motion to dismiss without mentioning clear-and-convincing standard). That error alone warrants reversal, and remand so that the court can test the Amended Complaint against the applicable clear-and-convincing standard, not whatever lower standard the court tacitly applied. *Anderson*, 477 U.S. at 257 (remanding where lower court had not applied clear-and-convincing standard).[1]

---

[1] The Amended Complaint alleges that Plaintiffs are private figures, ¶ 164, but then also alleges that Defendant published with actual malice. ¶ 169. The district court assumed without deciding that Plaintiff Freeman "was a limited-purpose public figure[,]" ECF 31 at 20, and denied Defendant's motion to dismiss on the actual-malice issue.

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

4.      **The Evidence Does Not Clearly And
        Convincingly Establish Actual Malice**

If this Court chooses to decide the actual-malice issue in the first instance, the Court

should reverse the Judgment and dismiss this action. The evidence—that is, the facts alleged in

the Amended Complaint, and admitted by operation of the default judgment—does not

adequately allege actual malice.

a.      **Defendant Made A Rational
        Interpretation Of Ambiguous Information**

As a matter of law, a plaintiff cannot establish actual malice where a speaker/publisher

learns ambiguous information from a source, and adopts "one of a number of possible rational

interpretations" of that information. *Bose Corp.*, 466 U.S. at 512-13 (no actual malice where

author described in words his perceptions of music to which he listened); *see Masson v New

Yorker Magazine, Inc.*, 501 U.S. 496, 519 (1991) ("[t]he protection for rational interpretation

serves First Amendment principles by allowing an author the interpretive license that is

necessary when relying upon ambiguous sources[]"); *Moldea v. New York Times Co.*, 22 F.3d

310, 315-16 (D.C. Cir. 1994) ("some materials by their very nature require interpretation, and the

First Amendment affords latitude to those engaged in that task[]"); *Freedom Newspapers of

Texas v. Cantu*, 168 S.W.3d 847, 855-57 (Tex. 2005) (reporter watched political debate, during

which candidate made remarks about "bicultural and bilingual attributes[;]" reporter described

the remarks as "racial and ethnic[;]" held: "there is no factual dispute as to what" was actually

said, and reporter made "rational interpretation" of what was actually said).

Here, the Video served as Defendant's source of information. Defendant watched the

Video. He then described what he saw. Indeed, on many of the podcasts, he played the Video

for his audience, and he narrated, pointing out an empty table where election observers would sit,

pointing out a second table, noting election workers pulling containers out from under that

7

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

second table, and wheeling those containers to an area where votes would be tabulated or

counted, and noting that the few persons tabulating and counting were alone in the room.

It is indisputable that the first of these tables was in fact empty, that election workers in

fact pulled containers out from under the second table, and then in fact wheeled those containers

to an area where votes would be tabulated or counted.

Defendant then made a rational interpretation of the things he observed.  He narrated that

interpretation as his audience watched: "[L]et's watch the democrats steal the election!  And you

can see it. . . . Every once in a while, you look closely, you can see them doing this[.] . . . [J]ust

look at the tape." Amended Complaint ¶ ¶ 69.  "During that videotape, that we can all see right

in front of our eyes, we can see them stealing the votes.  We can see them[.]" *Id.* ¶ 71.  "I can

see the fraud, it's right in front of my eyes." *Id.* ¶ 72.  "They committed the crimes on video.

You can see them do it." *Id.* ¶ 90.

In sum, the visual information provided by the Video may have been ambiguous.  Other

observers may have interpreted—and indeed, did interpret—the visual information differently.

Plaintiffs, however, cannot clearly and convincingly establish actual malice where, as here,

Defendant adopted one of two or more possible rational interpretations of what he saw.

b.      **The Evidence On Which Plaintiffs
        Rely Does Not Establish Actual Malice**

The evidence on which Plaintiffs rely does not change the conclusion that Defendant

lacked actual malice.  Thus, according to the Amended Complaint:

On December 3, 2020, "Trump Campaign surrogates testified before the Georgia Senate.

. . . At the hearing, a lawyer assisting the Trump Campaign played snippets of the" Video,

provided information regarding voting fraud, and identified Plaintiffs as participants in the

misconduct.  Defendant then broadcasted the same information. ¶¶ 37-39.

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

This evidence, however, actually cuts against Plaintiffs. Defendant repeated information disclosed by a Campaign lawyer in official testimony, subject to penalties for perjury or false statement. These circumstances show an absence of Defendant's actual malice. *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1513-14 (D.C. Cir. 1996).

The next day, December 4, "the Voting Implementation Manager for the State of Georgia, Gabriel Sterling, refuted the false claims of election fraud[,]" ¶ 41, "shar[ing] a link to a fact-check published by Lead Stories, a fact-checking website[,]" which in turn "quotes Georgia election officials[.]" ¶ 42. Later that day, Sterling, on television, "again explained why the video did not show any fraud[.]" ¶ 44. Defendant thereafter continued to publish.

This evidence, however, does not show actual malice. On the contrary, Plaintiffs' position ignores at least three bedrock First Amendment principles: (1) "the law certainly does not insist that [publishers] shut up as soon as they are challenged[;]" *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994); (2) it does not "suffice for a plaintiff merely to proffer purportedly credible evidence that contradicts a publisher's story[;]" *Jankovic v. Intl. Crisis Group*, 822 F.3d 576, 590 (D.C. Cir. 2016) (cleaned up); and (3) "publishers need not accept 'denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'" *Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003) (quoting *Connaughton*, 491 U.S. 691 n.37).

Here, accordingly, Defendant had no obligation to accept Sterling's denials of misconduct. A fortiori, Defendant had no obligation to accept the denials of a biased source, such as Sterling. *Lohrenz*, 350 F.3d at 1285 (publisher "could reasonably infer that [source] had

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

not been objective in [reaching his] conclu[sions]"); *cf. Abel v. United States*, 469 U.S. 45, 51

(1984) (bias "tend[s] to make the facts to which [witness] testified less probable").

Here, Sterling was biased. By December 4, the State of Georgia, through its Governor

and its Secretary of State, had already "certified" the "election results[]" in favor of Biden. ¶ 35.

Sterling, an employee of the State of Georgia, had an obvious motive to make statements that

supported the prior institutional determination that election fraud had not occurred. Sterling

naturally supported his superiors—and kept his job.[2]

In any event, leaving bias aside, Sterling's statements actually support the conclusion that

Defendant made a rational interpretation of ambiguous information seen on the Video. Plaintiffs

contend that Defendant published with actual malice when he stated that people were told to

leave the State Farm Arena. Sterling, however, described this as "he said, she said[.]" Thus,

Sterling admitted, "yes, there was [sic] 82 minutes where there wasn't a person [i.e., a

Republican monitor] there." ¶ 44. Sterling added that "the officials there said, 'We didn't tell

anybody that they had to leave.' [But] [t]he people who left—the Republican monitor said, 'we

were told we had to leave.' And we have no audio from these videotapes to ascertain the

absolute truth. *That's what is he said[,] she said on that front.*" ¶ 44 (emphasis added).

A "he said, she said" dispute, by definition, presents facts that point, inconclusively, in at

least two directions. Plainly, a publisher's choice between two such factually supportable—

indeed, factually supported—versions of the "absolute truth" provides no evidence of actual

---

[2] For similar reasons, neither the Affidavit of the chief investigator of the Secretary of State, ¶¶ 47, the statements made at the Secretary of State's press conference, where Sterling repeated himself, ¶¶ 49-50, nor the statements made on Secure the Vote, "a website maintained by Secretary of State," ¶ 54, are probative of actual malice. The Secretary of State and his subordinates were biased, and motivated to uphold the earlier institutional decision that no election fraud had occurred.

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

malice.  *Cf. McFarlane*, 91 F.3d at 1513 (no actual malice where evidence gave publisher both reasons to be skeptical and reasons to believe).

Next, Plaintiffs contend that Defendant published with actual malice when he stated that election workers took "suitcases" containing ballots from under a table.  Sterling, however, actually confirmed that as a factual matter.  ¶ 44.

Sterling, to be sure, characterized the containers "as regular absentee carriers[,]" not "suitcases."  Under the First Amendment, however, such minor differences of characterization are "immaterial."  *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1300-01 (D.C. Cir. 1988) (defendant characterized law-school graduate as "lawyer" even though she was not member of bar).  In any event, the Video shows that the containers in question resemble suitcases that thousands of people wheel through airports every day.

Plaintiffs contend that Defendant published with actual malice when he stated that election workers had scanned "the same ballots multiple times[.]" ¶ 50.  The evidence, however, does not show actual malice.

Specifically, Plaintiffs rely on statements made by Sterling at a press conference, where a reporter asked Sterling, "Can you explain whether the machines can count a ballot three times?"  Tellingly, Sterling did not answer "no."  Rather, he answered, in substance, "yes, but."  Specifically, Sterling said that multiple counting can occur but would be detected after the fact: "Well, if it . . . counted five times, guess what[,] it would have shown up in the hand count."  ¶ 50.

This provides no evidence of actual malice.  On the contrary, it confirms that Defendant saw what was, or what could rationally be interpreted as, multiple scanning or counting.  *See*

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

Amended Complaint ¶ 66 (quoting Defendant, describing contents of Video: "there are times in which *it appears* that they were being counted more than one time[]") (emphasis added).

Sterling concluded: "[T]he problem we have is people don't understand this[.]" ¶ 44. That, however, is precisely the point. Sterling's conclusion provides no evidence of actual malice. On the contrary, it demonstrates that Sterling disputes Defendant's interpretation of what Defendant saw on the Video. "Misunderstandings" are not the stuff of which actual malice is made.

Plaintiffs next urge a finding of actual malice based on allegations that Defendant had a preconceived political mission. *See* ¶ 129 (alleging that Defendant "had decided in advance . . . to benefit his preferred candidate, Donald Trump[;]" ¶ 132 (alleging that Defendant "hoped that his preconceived narrative would . . . overturn[] the outcome of the presidential election.") This contention, however, runs headlong into precedent. "Evidence that the publishers . . . were on a mission . . . does not suffice to show actual malice." *Lohrenz*, 350 F.3d at 1284. "The fact that a commentary is one-sided and sets forth categorical accusations has no tendency to prove that the publisher believed it to be false." *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1307 (D.C. Cir. 1996) (cleaned up).

Finally, the district court denied Defendant's motion to dismiss, relying, in part, on a document, entitled Strategic Plan, which stated, "Ruby Freeman . . . now under arrest and providing evidence . . . on advanced coordinated effort to commit voter/election fraud [*need confirmation of arrest and evidence*]." ECF 31 at 21 (emphasis added); *see* Amended Complaint ¶ 63. In so holding, however, the court erred. A publisher's self-disclosure of a gap in his knowledge "tends to rebut a claim of actual malice, not to establish one." *McFarlane*, 74 F.3d at 1304.

12

**FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.**

In sum, the items of evidence on which Plaintiffs rely, viewed separately or cumulatively, *Jankovic*, 822 F.3d at 590, do not clearly and convincingly satisfy the daunting standard of actual malice.  This Court should therefore reverse.

**5.     IIED Claims Fail**

A claim for IIED, like a claim for defamation, requires a plaintiff to establish actual malice.  *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988).  As shown above, however, Plaintiffs fail to establish actual malice.  Therefore, Plaintiffs' IIED claims fail.

**D.     The Amended Complaint Does Not Adequately
Allege Liability On A Theory Of Civil Conspiracy**

**1.     Conspiracy: Applicable Law**

"Civil conspiracy is not an independent tort but only a means for establishing vicarious liability for an underlying tort."  *Nader v. Democratic Nat. Committee*, 567 F.3d 692, 697 (D.C. Cir. 2009) (cleaned up).  To establish civil conspiracy, a plaintiff must allege four essential elements: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the conspiracy; and (4) which overt act was done pursuant to an in furtherance of the common scheme."  *Ofisi v. BNP Paribas, S.A.*, 77 F.4th 667, 671 (D.C. Cir. 2023) (cleaned up).

Here, the Amended Complaint does not adequately allege the third of those elements.  To establish that element, the plaintiff must allege that a coconspirator committed the underlying tort, by performing an unlawful—that is, a tortious—overt act.  *Iron Vine Security, LLC v. Cygnacom Solutions, Inc.*, 274 A.3d 328, 346 n.48 (D.C. 2022) (requiring "an unlawful overt act i.e. tortious conduct") (cleaned up).  As stated in the classic treatise, "some act must be committed by one of the parties in pursuance of the agreement, which is itself a tort. . . It is only

13

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

where means are employed, or purposes are accomplished, which are themselves tortious, that

the conspirators who have not acted but have promoted the act will be held liable." Prosser,

Torts ("Prosser") § 46 at 324 (5th ed. 1984) (prior edition quoted with approval in *Halberstam v.*

*Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)); *Nader*, 567 F.3d at 697 ("civil conspiracy depends

on performance of some underlying tortious act[]") (cleaned up); *Halberstam*, 705 F.2d at 479

(requiring "an overt tortious act in furtherance of an agreement that causes injury").[3]

Here, Plaintiffs specify defamation as the underlying tort. Accordingly, Plaintiffs must

allege that a coconspirator committed defamation. The "conspiracy claim[,]" furthermore,

"incorporates . . . every substantive element" of defamation, *Nader*, 567 F.3d at 697, including

the element that the coconspirator had the requisite level of fault—here, actual malice. As

demonstrated below, however, the Amended Complaint does not adequately allege that a

coconspirator published with actual malice.

### 2.    The Amended Complaint Does Not Adequately Allege A Coconspirator's Actual Malice

Two examples illustrate this flaw in the Amended Complaint.

### a.    First Example: The Trump-Raffensperger Phone Call

Plaintiffs seek to hold Defendant liable for statements made by then-President Trump—

an alleged coconspirator—on a telephone call with Brad Raffensperger, the Georgia Secretary of

State. A recording and a transcript of that call later circulated widely in mainstream media.

Amended Complaint ¶¶ 85-86.

---

[3] This contrasts sharply with criminal-conspiracy law, under which (a) the essence of the crime is the agreement to commit an unlawful act, *Iannelli v. United States*, 420 U.S. 770, 777 & n.10 (1975); and (b) the overt act in furtherance of the conspiracy may be entirely lawful. *Yates v. United States*, 354 U.S. 298, 334 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978).

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

On that call, President Trump made statements concerning Plaintiff Freeman, which, the Court may assume for present purposes, were false. The evidence, however, does not establish that President Trump committed the requisite tortious act of defamation. Specifically, the evidence does not clearly and convincingly establish that President Trump spoke with actual malice.

First, the Amended Complaint does not even allege that President Trump spoke with actual malice, a failure that itself warrants reversal.

Second, the Amended Complaint alleges that Defendant served as President Trump's source of information, ¶ 77, and that President Trump merely "re-publish[ed]" statements "made to [President Trump] by Defendant[.]" 79. As shown above, however, Defendant lacked actual malice. It follows necessarily that President Trump lacked actual malice.

Third, the law allowed President Trump to publish information learned from a reliable source—such as his lawyer, Defendant, who owed his client a duty of honesty. Restatement (Third), Law Governing Lawyers § 16(3) and comment e (2000); *see* Dec. 14, 2023 a.m. trial transcript 144:2-3 (district court describing Defendant as "head[]" of "Trump legal team"). The Amended Complaint does not allege that President Trump knew that his lawyer provided knowingly false information, or knew his lawyer to be "untrustworthy." *Cannon v. Peck*, 36 F.4th 547, 571 (4th Cir. 2022).

In sum, the Amended Complaint does not adequately allege that the alleged coconspirator, President Trump, spoke to Raffensperger with actual malice. Accordingly, the alleged coconspirator did not perform an unlawful overt act (i.e. tortious conduct). Defendant therefore has no liability.

### b.        Second Example: Unidentified Coconspirators

**FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.**

The Amended Complaint alleged that Defendant conspired, "with other individuals," ¶ 189, but does not identify those individuals. Later, the district court entered a default judgment on liability, even though the default judgment did not identify the coconspirators. Later still, the court submitted the case to the jury on the theory that Defendant conspired with unidentified "members of the Trump 2020 presidential campaign[.]" Dec. 14, 2023 a.m. trial transcript at 143:22-144:6.

As demonstrated above, however, Defendant can have liability for the acts of coconspirators only if the coconspirators spoke with actual malice. "When there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice." *Dongguk University v. Yale University*, 734 F.3d 113, 123 (2d Cir. 2013). The state of mind required for actual malice must "be brought home to" the person who made the allegedly defamatory publication. *New York Times*, 376 U.S. at 287.

Here, Plaintiffs failed to identify particular Trump campaign members who published allegedly defamatory statements. Plaintiffs cannot possibly establish the states of mind of unidentified persons. *See Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 762 (4th Cir. 2023) (no evidence of actual malice where "record does not identify which staff members actually inserted the [defamatory] language into the scripts[]").

### 3.    Reversal Is Required

If the Court concludes that Plaintiffs failed to establish actual malice with respect to both Defendant and the coconspirators, then the Court should reverse and dismiss this action. If the Court concludes that Plaintiffs established actual malice with respect to Defendant or the

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

coconspirators, but not with respect to both Defendant and the coconspirators, then the Court

should reverse and remand for a new trial. The jury returned general verdicts awarding damages

for defamation and for IIED "by Mr. Giuliani and his co-conspirators[.]" ECF 135. "And, of

course, where a jury's general verdict may have rested upon grounds improper for First

Amendment reasons, a reviewing court will not pause to speculate whether the jury's verdict was

actually reached on other, permissible, grounds." *Founding Church of Scientology of*

*Washington D.C. v. United States*, 409 F.2d 1146, 1164 (D.C. Cir. 1969); *see Avins v. White*, 627

F.2d 637, 646 (3d Cir. 1980) (similar).

### E.   The IIED Claim Is Duplicative Of The Defamation Claim

Many states—perhaps all—recognize the tort of IIED. The D.C. Court of Appeals

recognizes it, having adopted the formulation promulgated in Restatement (Second), Torts (the

"Restatement") § 46 (1965). *See, e.g., Sere v. Group Hosp., Inc.*, 443 A.2d 33, 37 (D.C. 1982).

IIED, however, joined the common-law tort family relatively recently. Many states,

therefore, bar a claim for IIED where the facts of the case fit within a traditional tort, such as

defamation or battery, under which the plaintiff may recover damages for emotional distress.[4]

Courts in those states dismiss an IIED claim, describing it as "duplicative" of the

traditional tort;[5] or as "superfluous[.]"[6] Similarly, some courts describe IIED as a "gap-filler,"

---

[4] *See, e.g., Provencher v. CVS Pharmacy*, 145 F.3d 5, 12 (1st Cir. 1998) (N.H.; defamation); *Norris v. Bangor Pub. Co.*, 53 F. Supp. 2d 495, 508-08 (D. Me. 1999) (defamation); *Haubry v. Snow*, 31 P.3d 1186, 1194 (Wash App. 2001) (sexual harassment/discrimination); *Barker v. Huang*, 610 A.2d 1341, 1351 (Del. 1992) (defamation); *Fridovich v. Fridovich*, 598 So. 2d 65, 69-70 (Fla. 1992) (defamation).
[5] *Smith v. Penick*, 2021 WL 4047456, at *1-2 (S.D.W. Va. Aug. 6, 2021) (battery).
[6] *DeLaurentis v. City of New Haven*, 597 A.2d 807, 828 (Conn. 1991) (vexatious litigation); *Gallagher v. Philipps*, 563 F. Supp. 3d 1048, 1104 (S.D. Cal. 2021) (defamation; "surplusage").

**FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.**

which has no work to do where the traditional tort applies,[7] or as a tort of "last resort . . . to provide relief in those circumstances where traditional theories of recovery do not[.]"[8]

Such decisions find support in the Restatement, which contains two relevant sections: Section 46 states the elements of a claim for IIED; section 47 then clarifies and limits section 46.

Specifically, comment a to § 47 clarifies: "The rule stated in § 46 creates liability only where the actor intends to invade the interest in freedom from severe emotional distress." Accordingly, under section 47, "conduct which is tortious because intended to result in bodily injury to another[,]" for example, the traditional tort of battery, "or in the invasion of any other of his legally protected interests[,]" for example, the interest in reputation protected by the traditional tort of defamation, does not give rise to a claim for IIED.

As one court concluded: Section "47 recognizes that where an actor's conduct amounts to the commission of one of the traditional torts . . . for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage [IIED] will not lie. Recovery for emotional distress in those instances must be had under the appropriate traditional common law action." *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. App. 1993), *followed in Childers*, 367 S.W.3d at 581-82; *see Hoffman-LaRoche Inc.*, 144 S.W.3d at 447 (IIED "simply has no application when the actor intends to invade some other legally protected interest, even if emotional distress results.")

Here, applying the foregoing authorities, the Court should dismiss Plaintiffs' IIED claim (or hold that the district court erred in submitting the IIED claim to the jury). The facts of this case fit within the traditional tort of defamation, under which Plaintiffs can (and did) recover

---

[7] *Childers v. Geile*, 367 S.W.3d 576, 582 (Ky. 2012) (medical malpractice); *Hoffman-LaRoche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004) (sexual harassment).
[8] *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (New York; cleaned up).

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

damages for emotional distress.  The IIED claim is therefore duplicative or surplusage.  The tort

of defamation provides relief, with no gap for IIED to fill.

This Court, applying D.C. law, has already made a similar holding with respect to the tort

of false-light invasion of privacy.  *Moldea v. New York Times Co.*, 15 F.3d 1137, 1151 (D.C. Cir.

1994) ("Publicity that is actionable in a false light claim generally will be actionable in

defamation as well.  A plaintiff may only recover on one of the two theories based on a single

publication[.]")[9]  The Court should now extend that holding to publicity actionable as both IIED

and defamation.  Plaintiffs may recover on only one of those theories.

The D.C. Court of Appeals has not addressed the precise question presented here,

although at least one decision suggests that court's receptivity to the position urged by Defendant

here.  *See Salem Media Group, Inc. v. Awan*, 301 A.3d 633, 658 (D.C. 2023) (dismissing IIED

claim; noting, "even if proven, [the] aggravated and malicious conduct [at issue] can be fully

compensated through a defamation claim.")

Defendant's position, furthermore, finds support in Restatement § 47.  The D.C. Court of

Appeals adopted section 46 when that court recognized the tort of IIED.  That court, having

adopted section 46, should also adopt section 47.  The two sections "relate to the same thing[,]"

and therefore stand in pari materia.  *Harman v. United States*, 718 A.2d 114, 117 (D.C. 1998).

Under the circumstances, this Court should make the *Erie*-prediction that the D.C. Court

of Appeals would adopt the position urged here by Defendant.  Alternatively, this Court should

certify this question to the D.C. Court of Appeals under D.C. Code § 11-723.

**F.    The Amended Complaint Does Not Adequately
       Allege "Extreme And Outrageous Conduct"**

---

[9] The Court added that a plaintiff "is free to plead them in the alternative."  *Id*.  This case, however, has
proceeded beyond pleadings to entry of judgment.

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

On a claim for IIED, "a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant[], which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Salem*, 301 A.3d at 656 (cleaned up). This case, like most IIED cases, founders on the first of those elements, which presents a threshold question of law for the court. *Id.* at 657.

"Extreme and outrageous conduct is conduct[]"—conduct, not speech—"that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (cleaned up). "[O]utrageous speech[,]" however, "is protected by the Constitution," even though "outrageous conduct is not." *Tompkins v. Cyr*, 995 F. Supp. 664, 682 (N.D. Tex. 1998). Therefore, a court "must be especially attentive to the potential chilling effect where the claim is based on pure speech relating to a matter of legitimate public interest . . . . even if it is deeply upsetting to its subjects. . . . Calling pure speech about an issue of public concern 'extreme and outrageous' is clearly reserved for the rarest of cases." *Salem*, 301 A.3d at 657-58 (cleaned up).

This is not the rarest of cases. Defendant spoke regarding a matter of legitimate public interest—a Presidential election. Indeed, such speech "is the essence of self-government." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (cleaned up). It "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Id.*

This case, furthermore, exhibits none of the "hallmarks of extreme and outrageous conduct . . . identified previously, like abusing a position of authority over another . . . or callously disregarding another's known weakness," *Ortberg v. Goldman Sachs Group*, 64 A.3d 158, 164 (D.C. 2013), or "*numerous* unsolicited and unfriendly [home] visits[,]" *Homan v.*

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

*Goyal*, 711 A.2d 812, 819 (D.C. 1998), or "death threats[,]" *id.* at 817, or the exploitation of a

pre-existing relationship involving ill-will. *Snyder*, 562 U.S. at 455.

To be sure, in this case, third-persons who saw or read Defendant's statements—persons

accurately characterized by Plaintiffs as "strangers," Amended Complaint ¶ 15—engaged in

misconduct.  The Court may assume that such misconduct crossed the border into the realm of

the extreme and outrageous. *See, e.g.*, Amended Complaint ¶ 155 (alleging trespass/attempted

home invasion, to make "citizens' arrest"), ¶ 151-53 (harassing phone calls filled with

profanities, racial slurs and threat of lynching).  Defendant, however, has no liability for such

misconduct by third-persons where, as here, Plaintiffs do not allege that Defendant "coordinated"

with them. *Salem*, 301 A.3d at 656 (cleaned up).

**POINT II**

**THE JUDGMENT
FOR COMPENSATORY
DAMAGES CANNOT STAND**

The district court's Judgment awarded compensatory damages, in favor of Plaintiff

Freeman, for $16,171,000 for defamation, and $20 million for IIED, and in favor of Plaintiff

Moss, for $16,998,000 for defamation, and $20 million for IIED.  For the following reasons,

however, that Judgment cannot stand.

**A.     The District Court Erred On The Issue Of Proximate Cause**

**1.      Proximate Cause: Effect Of Default Judgment**

Proximate cause has two components, one factual ("cause-in-fact") and the other legal (a

"policy element [that] includes various liability limiting considerations"). *Lacy v. District of*

*Columbia*, 424 A.2d 317, 321 (D.C. 1980); *see United States v. Monzel*, 641 F.3d 528, 535-37

(D.C. Cir. 2011) (distinguishing between "mere *fact* of causation" and "singling out those [who]

are to be held *legally* responsible[]") (cleaned up; emphasis in original).

21

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

Here, by operation of the default judgment, Defendant admits cause-in-fact. "[H]owever, it remains for the court to consider whether the unchallenged facts constitute [proximate cause], since a party in default does not admit conclusions of law." Wright & Miller § 2688.1.

**2.       Proximate Cause: Intervening Criminal Acts**

In every tort case, the plaintiff must establish proximate cause as an essential element of her claim. Prosser § 41 at 263. "D.C. follows the black-letter tort law principle that an intervening force breaks the chain of proximate causation when that intervening force is sufficiently unforeseeable as to constitute a superseding cause." *Hundley v. District of Columbia*, 494 F.3d 1097, 1104 (D.C. Cir. 2007).

"Where the intervening act is criminal[,]" furthermore, "the defendant will be relieved of liability unless the plaintiff can make a heightened showing of foreseeability, *i.e.*, that the criminal act was so foreseeable that a duty arises to guard against it." *Freyberg v. DCO 2400 14th Street*, LLC, 304 A.3d 971, 977 (D.C. 2023) (cleaned up). The heightened-foreseeability rule "requires that the foreseeability of the risk be more precisely shown. . . . The bar for establishing foreseeability . . . is relatively high, because we want to limit the extent to which defendants become the insurers of others' safety from criminal acts, and we do not want to invite an absurd sprawl of liability whereby everyone is responsible for preventing all crimes at all times." *Id.* at 977-78 (cleaned up).

**3.       The Amended Complaint Does Not
           Adequately Allege Proximate Cause**

Here, as demonstrated below, the Amended Complaint does not adequately allege proximate cause.

The Amended Complaint repeatedly alleges acts, committed by third-persons, which intervened between Defendant's publications and Plaintiffs' injuries. The Amended Complaint

22

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

alleges, for example, that strangers trespassed at the home of Plaintiff Freeman, ¶¶141,145;

trespassed at the home of Plaintiff Moss's grandmother, "attempt[ing] to push into the house to

make a 'citizen's arrest[,]'" ¶155; and "bombarded" Plaintiff Moss and her son with telephone

calls and "online harassment[,]" making racial slurs and threatening a lynching; ¶¶151, 153.

Such acts, however, were criminal.  Applicable D.C. law, therefore, required Plaintiffs to

allege heightened foreseeability, "i.e., that the criminal act was so foreseeable that a duty arises

to guard against it." *Freyberg*, 304 A.3d at 977 (cleaned up).  The Amended Complaint,

however, makes no such allegations.

To be sure, the Amended Complaint alleges that Sterling, the Georgia Voting

Implementation Manager, stated, "Someone's going to get hurt, someone's going to get shot,

someone's going to get killed."  Amended Complaint ¶ 138.  That generic statement, however,

does not suffice.

"The crux of heightened foreseeability is a showing of the defendant's increased

awareness of the danger of a particular criminal act." *Freyberg*, 304 A.3d at 977 (cleaned up).

Liability requires a "reference to a precise location or class of persons." *Sigmund v. Starwood

Urban Retail VI, LLC*, 617 F.3d 512, 515 (D.C. Cir. 2010) (cleaned up).  Sterling's statement,

however, makes no reference to a particular criminal act, or to a precise location or class of

persons.  The Amended Complaint therefore stands bereft of allegations sufficient to satisfy the

heightened-foreseeability requirement.

**4.  The Evidence Of Proximate Cause Was Insufficient To Sustain The Verdict**

In the alternative, the Court should reverse because the evidence at trial provides "no

legally sufficient evidentiary basis for a reasonable jury to find for [Plaintiffs] on [the] issue[]" of

23

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

proximate cause.  *Milone v. Washington Metropolitan Area Transit Authority*, 91 F.3d 229, 231

(D.C. Cir. 1996) (cleaned up); *see* Fed. R. Civ. P. 50(a)(1)

As demonstrated above, this case involves intervening criminal acts.  Plaintiffs, therefore,

bore the burden of proving heightened foreseeability.  The trial record, however, contains no

evidence proving that issue.

To be sure, Plaintiffs, at trial, argued that Sterling's statement, quoted above, gave

Defendant a "warning."  Dec. 14, 2023, Trial Transcript 125:1-7.  Sterling's statement, however,

is insufficient to sustain the verdicts.  Again, Sterling made no reference to "a particular criminal

act[,]" *Freyberg*, 304 A.3d at 977 (cleaned up), or "to a precise location or class of persons."

*Sigmund*, 617 F.3d at 515 (cleaned up).  The Court should therefore "reject[] liability as a matter

of law[.]"  *Id.*; *see Hundley*, 494 F.3d at 1104-05 (reversing judgment entered on jury verdict);

*Board of Trustees of University of Dist. of Columbia v. DiSalvio*, 974 A.2d 868, 870-75 (D.C.

2009) (same).

**B.    The Amounts Of The Compensatory Damages Awards Are Excessive**

**NOTE TO BANKRUPTCY JUDGE:**

Research and drafting of this sub-Point are underway.  We intend and expect to

demonstrate that the amounts awarded—to Plaintiff Freeman, for $16,171,000 for defamation,

and $20 million for IIED, and to Plaintiff Moss, for $16,998,000 for defamation, and $20 million

for IIED—greatly exceed amounts awarded, and upheld on appeal, in prior, similar cases.

**C.    The Award Of Punitive Damages Falls With
       The Judgment For Compensatory Damages**

For the foregoing reasons, the Court should reverse the Judgment awarding compensatory

damages.  It follows that the Court should also reverse the Judgment awarding punitive damages.

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

*Ayala v. Washington*, 679 A.2d 1057, 1069-70 (D.C. 1996) (compensatory damages required

"before punitive damages will be considered.")

**POINT III**

**AS A MATTER OF LAW,
PLAINTIFFS CANNOT
RECOVER PUNITIVE DAMAGES**

The district court entered a default judgment against Defendant "on his liability for

[P]laintiffs['] . . . punitive damage claims[.]" ECF 95.  The court later entered its Judgment on

the jury verdict in the amount of $75 million for punitive damages.  ECF 135, 142.  In entering

those judgments, however, the court erred, for the following reasons.

**A.      Applicable Law: The Dual Malice Requirement**

"Something more than the mere commission of a tort is always required for punitive

damages."  Prosser § 2 at 9.  In an action for defamation and/or IIED, that "something more"

consists of two different kinds of malice—constitutional malice, also known as "actual malice,"

and common-law malice.  *See* Sack, Defamation ("Sack") § 5:5.1[A] at 5-90-92 (2024)

(identifying two kinds of malice).

Constitutional malice focuses on "the defendant's attitude toward the truth or falsity of

the content of [the defendant's] publication."  *Nader v. de Toledano*, 408 A.2d 31, 40 (D.C.

1979).  Common-law malice, by contrast, "focus[es] on the defendant's attitude toward the

plaintiff as the animus for defamatory publication[.]"  *Id.*; *see Prozeralik v. Capital Cities

Communications, Inc.*, 626 N.E.2d 34, 42 (N.Y. 1993) (common-law "malice focuses on the

defendant's mental state in relation to the plaintiff and the motive in publishing the falsity[.]")

To recover punitive damages, under D.C. law, a plaintiff must establish both kinds of

malice.  *See* 1 Standard Civil Jury Instructions For D.C. ("Standard Instructions") § 17.14 (2024)

(citing cases).   Here, however, as demonstrated in Point I(C) above, Plaintiffs have not

25

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

established constitutional malice. And, furthermore, as demonstrated below, Plaintiffs have not

established common-law malice.

**B.    Common-Law Malice: Legal Requirements**

In every tort case, a plaintiff seeking punitive damages must prove "that the [tortious] act

was accompanied by conduct and a state of mind evincing malice or its equivalent." *Jonathan*

*Woodner Co. v. Breeden*, 665 A.2d 929, 938 (D.C. 1995). This kind of malice—common-law

malice—requires proof that the defendant acted with "spite or ill will" or the like. *Nader*, 408

A.2d at 40 ("bad or corrupt motive, spite, ill will, general hostility, intention to injure, or

hatred[]"). This requirement applies to defamation; *id.*; *Columbia First Bank v. Ferguson*, 665

A.2d 650, 657-58 (D.C. 1995); and to IIED; *Pitt v. District of Columbia*, 491 F.3d 494, 508

(D.C. Cir. 2007) ("fraud, ill will, recklessness, wantonness, oppressiveness, wilful disregard of

the plaintiff's right, or other circumstances tending to aggravate the injury[]").

A plaintiff, finally, must prove common-law malice by clear and convincing evidence.

*Breeden*, 665 A.2d at 938.

**C.    The Amended Complaint Does Not
       Adequately Allege Common-Law Malice**

Here, as demonstrated below, the Amended Complaint does not adequately allege

common-law malice. This Court's review is *de novo*.

The Amended Complaint does not allege that Defendant spoke or acted with the requisite

animus—spite, ill will or the like—toward Plaintiffs. Rather, the Amended Complaint alleges

that Defendant published "because he had decided in advance to disseminate a false narrative . . .

that would continue to benefit his preferred candidate, Donald Trump[;]" ¶ 129; Defendant

"hoped that repeating his preconceived narrative would have the effect of overturning the

outcome of the presidential election." ¶ 132. The Amended Complaint also alleges that

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

Defendant published "because he believed [his storyline] to be personally advantageous" and "more profitable than reporting the truth[;]" ¶ 130; he published "in order to increase his profile and to profit[.]" *Id.* ¶ 131.

Such allegations do not even address—much less satisfy—the elements of common-law malice. Accordingly, the Amended Complaint does not adequately allege common-law malice. The district court therefore erred in entering judgment for punitive damages, and this Court should reverse.

**D.    The Evidence Of Common-Law Malice Was Insufficient To Sustain The Verdict**

In the alternative, the Court should reverse because the evidence at trial provides "no legally sufficient evidentiary basis for a reasonable jury to find for [Plaintiffs] on [the] issue[]" of common-law malice. *Milone*, 91 F.3d at 231.

The trial record contains no evidence that Defendant spoke or acted with the requisite animus—spite, or ill will, or the like—toward Plaintiffs. On the contrary, as Plaintiff Moss testified, Defendant "didn't know me from a hole in the wall." Dec. 12, 2023 p.m. Trial Transcript 49:21-22.

**E.    The District Court Failed To Instruct The Jury On Common-Law Malice**

In the further alternative, the Court should reverse and remand for a new trial. As demonstrated below, the district court failed to instruct the jury on common-law malice. This Court reviews for plain error under Fed. R. Civ. P. 51(d)(2).

"Plain error review requires (1) that there was an error, (2) that the error was clear or obvious, (3) that it affected the appellant's substantial rights, and (4) that it seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Coleman-Lee v. Government of the District of Columbia*, 788 F.3d 296, 299 (D.C. Cir. 2015) (cleaned up). The defendant has

27

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

the burden of persuasion on these requirements. *United States v. Robertson*, No. 22-2064, Slip

Op. at 44 (D.C. Cir. May 28, 2024).

Here, for the following reasons, Defendant has carried that burden.

*First*, the district court erred. "Deviation from a legal rule is 'error.'" *Olano v. United*

*States*, 507 U.S. 725, 732-33 (1993). Here, a legal rule requires a district court to give the jury

instructions, which, "viewed as a whole . . . fairly present the applicable legal principles and

standards." *Czekalski v. LaHood*, 589 F.3d 449-53 (D.C. Cir. 2009) (cleaned up). The district

court deviated from that legal rule, in that the court did not instruct the jury on either the

applicable substantive law of common-law malice (spite, ill-will, etc.) or the applicable standard

of proof (clear and convincing evidence).

*Second*, the error was clear or obvious, in that the applicable law is well-settled—so well-

settled that it appears in "standard" jury instructions, which were overlooked here. Standard

Instructions § 17.14. This Court, furthermore, has traced the common-law malice requirement to

the year 1851, at the latest. *Afro-American Pub. Co. v. Jaffe*, 366 F.2d 649, 661 (D.C. Cir. 1966)

(en banc) (punitive damages "depend[] on a determination" of common-law malice; where "that

standard was not followed . . . we are bound to remand[]"), *citing Day v. Woodworth*, 54 U.S.

363, 371 (1851). And the D.C. Court of Appeals adopted the clear-and-convincing standard

nearly 30 years ago. *Woodner*, 665 A.2d at 937.

*Third*, the error affected Defendant's substantial rights. On this issue, a court makes a

"'harmless error' inquiry—to determine whether the error was prejudicial." *Olano*, 507 U.S. at

734. The defendant must "demonstrate[] a reasonable probability of a different outcome."

*Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016).

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

Here, the record demonstrates such a reasonable probability. The jury received insufficient guidance on the issue of punitive damages. The jury, left to its own devices, could only speculate on the law that governed its decision, whereupon the jury returned a massive verdict.

Correct instructions, however, would have cabined the jury's deliberations, focusing it on the correct issue—Defendant's "attitude toward the plaintiff as the animus for" his speech, *Nader*, 408 A.2d at 40—an issue on which the trial record cut sharply against Plaintiffs, showing that Defendant did not even know Plaintiffs. Accordingly, if the jury had received and followed correct instructions—including a correct instruction on the heightened, clear-and-convincing standard of proof, a legal issue "with which we cannot expect jurors to be familiar[,]" *United States v. Alston*, 551 F.2d 315, 319 n.18 (D.C. Cir. 1976)—then the jury would have either rejected the claim for punitive damages, or returned a verdict in a much smaller amount. At the very least, on this record, Defendant has "demonstrate[] a reasonable probability of [such] a different outcome." *Molina-Martinez*, 578 U.S. at 200.

"Exacting appellate review ensures that an award of punitive damages is based on an application of law, rather than a decisionmaker's caprice." *State Farm Mutual Auto Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (cleaned up). "It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations[.]" *Anderson*, 477 U.S. at 254-55 (involving failure to apply clear-and-convincing evidentiary standard). Accordingly, this Court,[10] and many others,[11] have reversed for plain

---

[10] *See, e.g., United States v. Rawlings*, 73 F.3d 1145, 1148-49 (D.C. Cir. 1996); *Alston*, 551 F.2d at 320-21; *United States v. Wharton*, 433 F.2d 451, 456-61 (D.C. Cir. 1970); *Jackson v. United States*, 348 F.2d 772, 773-74 (D.C. Cir. 1965); *Byrd v. United States*, 342 F.2d 939, 94-42 (D.C. Cir. 1965).

[11] *See, e.g., Bearchild v. Cobban*, 947 F.3d 1130, 1139, 1145-49 (9th Cir. 2020); *Rasanen v. Doe*, 723 F.3d 325, 334-35 (2d Cir. 2013); *Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 13-14-15 (Fed. Cir. 2010) (applying Ninth Circuit law); *Septimus v. University of Houston*, 399 F.3d 601,

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

error where, as here, a district court failed to instruct, or incorrectly instructed, the jury on (a) an essential element of a claim or a crime, (b) the state of mind required for liability, and/or (c) the applicable standard of proof.[12]

    *Fourth*, the error here seriously affected the fairness, integrity, or public reputation of the judicial proceedings. The jury imposed punitive damages—a "quasi-criminal[]" remedy, which "operate[s] as [a] private fine[.]" *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001). The jury did so, however, without knowing—and therefore, necessarily, without applying—the law. Such a verdict, unmoored to the law, and therefore lawless, is unfair and rather obviously undermines the integrity of judicial proceedings. *See, e.g.*, *Rasanen*, 723 F.3d at 334-35 ("An error that deprives the jury of adequate legal guidance to reach a rational decision on a case's fundamental issue constitutes plain error[]") (cleaned up); *Hurley*, 174 F.3d at 124 ("The court's instructions failed to provide proper guidance for the jury on a fundamental question. Moreover, our failure to consider the error would result in a miscarriage of justice[]"); *Parker*, 386 F.3d at 1019 ("An error of this magnitude resulted in a miscarriage of justice and seriously affected the fairness of the judicial proceedings[]").

    Cases involving speech pose an additional threat to First Amendment values: "Punitive damages . . . are punishment of expression. . . . They are therefore a device peculiarly suited to use by judges and juries to avenge offending communications or to silence unpopular speakers." Sack § 10:3.5 at 10-16, *citing Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) (referring to

---

608-09 (5th Cir. 2005); *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1018-19 (11th Cir. 2004); *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 123-24 (3d Cir. 1999) (failure to instruct on substantive law of punitive damages); *United States v. Kline*, 922 F.2d 610, 612-13 (10th Cir. 1990); *United States v. Aitkin*, 755 F.2d 188, 193-94 (1st Cir. 1985) (failure to instruct on requisite state of mind).
[12] *MacEdward v. Northern Electric Co.*, 595 F.2d 105, 109-10 (2d Cir. 1979) (failure to instruct on substantive law and clear-and-convincing standard); *Ratay v. Lincoln Nat. Life Ins. Co.*, 378 F.2d 209, 211-12 (3d Cir. 1967) (failure to instruct on clear-and-convincing standard).

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

jurors' "discretion selectively to punish expressions of unpopular views.") "In a case such as this, a jury is unlikely to be neutral with respect to the content of the speech, posing a real danger of becoming an instrument for the suppression of vehement, caustic, and sometimes unpleasant expression." *Snyder*, 562 U.S. at 458 (cleaned up).

"It is a basic premise of our jury system that the court states the law to the jury and that the jury applies that law to the facts as the jury finds them. Unless we proceed on th[at] basis . . . the jury system makes little sense." *Delli Paoli v. United States*, 352 U.S. 232, 242 (1957). In this case, the district court did not proceed on that basis, and the system makes little sense. These circumstances seriously affect the public reputation of judicial proceedings.

## POINT IV

## THE AMOUNT OF PUNITIVE
## DAMAGES IS EXCESSIVE

In this case, the amount of the punitive damages award, $75 million, is excessive as a matter of common law, and grossly excessive as a matter of constitutional law.

### A.    As A Matter Of Common Law, The Amount Is Excessive

"[T]he purpose of punitive damages is to punish a tortfeasor and deter future conduct[.]" *Breeden*, 665 A.2d at 941. Therefore, "the amount of such damages should be enough to inflict punishment, while not so great as to exceed the boundaries of punishment and lead to bankruptcy." *Id. Cf.* 18 U.S.C. § 3553(a) (parsimony clause: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" subsection (a)(2)).

Here, indisputably, the amount of punitive damages was so great as to lead to bankruptcy: Defendant filed for bankruptcy within days of the verdict. The amount is therefore excessive.

### B.    As A Matter Of Constitutional Law, The Amount Is Excessive

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

The Due Process Clause protects a tortfeasor against an award of "grossly excessive" punitive damages. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 562 (1996). The "excessiveness inquiry begins with an identification of the state interests that a punitive damages award is designed to serve[,]" focusing "on the scope of [the state's] legitimate interests in punishing [the tortfeasor] and deterring [him] from future misconduct." *Id.* at 568.

Next, assuming a legitimate state interest, the reviewing court examines "[t]hree guideposts[] . . . [1] the degree of reprehensibility of the [tortfeasor's conduct]; [2] the disparity between that harm or potential harm suffered by [the plaintiff] and [the] punitive damages award; and [3] the difference between this remedy and the civil [or criminal] penalties authorized or imposed in comparable cases." *Id.* at 574-75, 583.

Here, treating the District of Columbia as a state,[13] and applying the Fifth Amendment rather than the Fourteenth,[14] the Court should reverse, for the reasons set forth below.

## 1.    The Court Should Reverse For Lack Of A Legitimate State Interest

As a rule, a state does not "have a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction." *State Farm*, 538 U.S. at 421. A state, furthermore, cannot award punitive damages "to punish a defendant for

---

[13] The Court should treat the District as a state for this purpose. This Court applies the *Erie* doctrine, although not statutorily required to do so. *Halberstam*, 705 F.2d at 479 n.10. Under that doctrine, this Court, "adjudicating a state-created [or a locally-created] right . . . is for that purpose, in effect, only another court of the State," *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 108 (1945), or here, only another court of the District. "Congress may exercise within the District all legislative powers that the legislature of a state might exercise within the State[.]" *Palmore v. United States*, 411 U.S. 389, 397 (1973) (cleaned up). Congress has exercised such powers in the D.C. Code, which established "strictly local courts . . . . expressly created . . . to exercise the powers of . . . a state government in all cases where legislation is possible." *Id.* at 407 (cleaned up).

[14] The Supreme Court's cases arose in state courts, bound by the Due Process Clause of the Fourteenth Amendment, which does not bind the District. The Court's decisions, however, apply under the Due Process Clause of the Fifth Amendment, which does apply to the District. *See Timbs v. Indiana*, 586 U.S. 145, 151 (2019) ("there is no daylight between the federal and state conduct . . . prohibit[ed] or require[d]").

32

**FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.**

injury that [he] inflicts on nonparties." *Philip Morris USA v. Williams*, 549 U.S. 346, 353 (2007).

The punitive damages award here runs afoul of both of those rules:

First, the district court did nothing to avoid the imposition of punitive damages for "acts committed outside of the" District of Columbia. *State Farm*, 538 U.S. at 421 (2003); *see, e.g., Spaulding v. Tate*, 2012 U.S. Dist. LEXIS 125669, *17-18 (E.D. Ky. Sept 5, 2012) (Kentucky cannot impose punitive damages for acts committed in Tennessee); *In Re MTBE Prod. Liab. Lit.*, 2009 U.S. Dist. LEXIS 96469 * 13 (S.D.N.Y. Oct. 19, 2009); *Fowler v. State Farm Fire & Cas. Co.*, 2008 U.S. Dist. LEXIS 63312 *17 (S.D. Miss. July 25, 2008); *Republic Services, Inc. v. Liberty Mut. Ins. Co.*, 2006 U.S. Dist. LEXIS *10 (E.D. Ky. Dec. 1, 2006); *see also Clark v. Chrysler Corp.*, 436 F.3d 594, 609-10 (6th Cir. 2006).

Here, Plaintiffs did not prove that Defendant acted within the District of Columbia when he made the allegedly actionable statements. The district court, furthermore, did not separate conduct within the District from conduct outside the District. The jury, however, had before it substantial, inflammatory evidence of acts committed in Georgia—for example, the attempted invasion of the home of Plaintiff Moss's grandmother. The conclusion is inescapable: The jury punished Defendant for acts committed outside the District.

Second, the district court did nothing to avoid the imposition of punitive damages for injury that was, or may have been, inflicted on nonparties. *Philip Morris*, 549 U.S. at 353. The jury had before it inflammatory evidence of injury to Plaintiff Moss's son and grandmother. The district court, however, did not instruct the jury that it could not punish Defendant for any injuries to those non-parties. The record reveals an unacceptably high risk that the jury did precisely that, at least in part.

33

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

2.    **The Court Should Reverse On
        Examination Of The *Gore* Guideposts**

a.        **Degree Of Reprehensibility**

Here, the first, and "most important[,]" *Gore* guidepost, the degree of reprehensibility of
the defendant's conduct, points toward reversal.  *State Farm*, 538 U.S. at 419 ("most
important").  Defendant's conduct—as distinct from the conduct of the strangers who heard or
read Defendant's publications—was not at all reprehensible.  Defendant engaged in pure speech,
concerning an important matter of politics and government—a Presidential election.  Such
speech—an integral part of our centuries-old tradition—is simply not reprehensible for purposes
of the *Gore* punitive-damages calculus.  Such speech, even if tortious, does not rise to the high
degree of reprehensibility required to sustain the massive punitive damages award in this case.

To be sure, Defendant's listeners and readers engaged in reprehensible conduct.  The Due
Process Clause, however, does not permit the district court to impose punitive damages against
Defendant for the acts of others—any more than it would permit the court to imprison Defendant
for crimes committed by others, absent proof of conspiracy or aiding and abetting, which does
not exist here.

Plaintiffs, at trial, emphasized the acts of others, referring repeatedly to those acts, such
as the attempted home invasion, harassing phone calls filled with profanities and sexual and
racial slurs, and more.  This case therefore presents a high likelihood—an unacceptably high
likelihood, Defendant submits—that the jury, through its massive award, sought to, and did,
punish Defendant for the conduct of others.

b.        **Disparity Between Actual Harm
            And Punitive Damages Award**

This guideline requires a court to examine the ratio between the amount of a plaintiff's
actual damages and the amount of a punitive damages award.  "[F]ew awards exceeding a single-

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

digit ratio between punitive and compensatory damages . . . will satisfy due process." *State Farm*, 538 U.S. at 425. Indeed, "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* A high compensatory award, however, may warrant a lower ratio. *Id.*

Here, the ratio between the amount of punitive damages and the amount of each category of compensatory damages hovers around 4:1. The high compensatory awards, however, ranging from $16.171 million and $20 million, make even a 4:1 ratio too high. *Id.* ("It should be presumed a plaintiff has been made whole for [her] injuries by compensatory damages[]").

The district court, moreover, erred in that it gave the jury imbalanced, incomplete—and therefore erroneous—instructions on this issue. The court instructed the jury:

> Although you should use your discretion to choose an appropriate amount of punitive damages, the law still requires that the amount be reasonable in proportion to the amount of compensatory damages that a plaintiff has suffered. Punitive damages that are more than ten times compensatory damages are almost never permissible. Usually, a permissible punitive damages award will not be more than four times compensatory damages.

ECF 137 at 10.

These instructions, however, contain two material errors:

First, these instructions, read as a whole, effectively told the jury to return a verdict at a 4:1 ratio, which the jury duly did. *See United States v. Rhone*, 864 F.2d 832, 837 (D.C. Cir. 1989) ("The jury is likely to discern hints, a point of view, a suggested direction, even if none is intended and quite without regard to the judge's efforts to modulate and minimize [her] role.")

Second, the instructions failed to provide balance. The instructions should have cautioned the jury that a high compensatory award—which the jury here certainly made—may warrant a lower ratio. *State Farm*, 538 U.S. at 425.

35

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

### c.   Sanctions Authorized For Comparable Misconduct

Under this guideline, a court "[c]ompare[s] the punitive damages award [to] the civil or criminal penalties that could be imposed for comparable misconduct[.]" *Gore*, 517 U.S. at 583. This guideline requires a court to "accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.*

Here, examination of this guideline shows—overwhelmingly—that the $75 million award is grossly excessive.

Under the D.C. Code, the maximum fine authorized in *any* criminal case is $250,000— and then, only "if the offense resulted in death." D.C. Code § 22-3571.01(b)(12). Here, the jury awarded 300 times that amount—even though, of course, Defendant did not cause death.

But it gets worse: D.C. Code §§ 22-3132(8)(A) and 3133 "make[] it a crime "to engage in a course of conduct . . . that one knows or should know would reasonably cause another to suffer emotional distress." *Mashaud v. Boone*, 295 A.3d 1139, 1143 (D.C. 2023). The maximum fine authorized for that offense, when the criminal conduct has caused "financial injury[,]" is $12,500. *See* D.C. Code §§ 22-3134(b)(4) and 22-3571.01(b)(6). Here, the jury awarded 6,000 times that amount.

Finally, the Court should consider the legislative judgment made by the State of Georgia—Plaintiffs' domicile. Georgia Code § 51-12-5.1(g) caps an award of punitive damages at $250,000 (subject to an exception, for a case of "specific intent to cause harm," § 51-12-5.1(f), which, on the record of this case, would not apply). Here, Plaintiffs forum-shopped their way into an award 300 times their home-state statutory cap.

FILED IN BANKRUPTCY COURT (SDNY); NOT DC CIR.

## CONCLUSION

For the foregoing reasons, the Court should reverse the Judgment and either dismiss this

action or remand for a new trial.

Dated:   June 10, 2024
         New York, NY

**KENNETH CARUSO LAW LLC**                          **LABKOWSKI LAW, P.A.**

By:  /s/ Kenneth A. Caruso                          By:  /s/ David Labkowski
Kenneth A. Caruso                                   David Labkowski
D.C. Circuit Bar # 65274                            D.C. Circuit Bar #65285
15 W. 72nd Street                                   250 95th Street, Unit #547233
New York, NY 10023                                  Surfside, Florida 33154
(646) 599-4790                                      (786) 461-1340
ken.caruso@kennethcarusolaw.com                     david@labkowskilaw.com

37