1

<pre>
 1

 2   UNITED STATES BANKRUPTCY COURT

 3   SOUTHERN DISTRICT OF NEW YORK

 4   - - - - - - - - - - - - - - - - - - - -x

 5   In the Matter of:

 6   RUDOLPH W. GIULIANI,                      Lead Case No.

 7           Debtor.                           23-12055-shl

 8   - - - - - - - - - - - - - - - - - - - -x

 9   RUBY FREEMAN, ET AL,

10           Plaintiff,

11   v.

12   RUDOLPH W. GIULIANI,                      Adv. Proc. No.

13           Defendant.                        24-01320-shl

14   - - - - - - - - - - - - - - - - - - - -x

15               United States Bankruptcy Court

16               300 Quarropas Street

17               White Plains, New York

18

19               June 17, 2024

20               12:07 PM

21   B E F O R E:

22   HON. SEAN H. LANE

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  ART
</pre>

2

1

2  Case Management Status Conference

3

4  Doc. #233 Motion of the Official Committee of Unsecured

5  Creditors of Rudolph W. Giuliani for Entry of an Order

6  Directing the Immediate Appointment of a Trustee

7

8  Doc. #197 Motion of the Official Committee of Unsecured

9  creditors of Rudolph W. Giuliani to Compel the Debtor to (I)

10  File Delinquent Monthly Operating Reports and (II) File Timely

11  Future Monthly Operating Reports

12

13  Discovery Conference Re: Doc. #164 Order Signed on 4/11/24,

14  Granting Motion of the Official Committee of Unsecured

15  Creditors for the Entry of an Order Pursuant to Bankruptcy Code

16  Section 105 and Federal Rule of Bankruptcy Procedure 2004

17  Authorizing Discovery of the Debtor and Third Parties

18

19  Adversary proceeding: 24-01320-shl Freeman et al v. Giuliani

20  Pre-trial Conference

21

22  Adversary proceeding: 24-01320-shl Freeman et al v. Giuliani

23  Doc. #5 Scheduling Order

24

25

3

Transcribed by:  Michael Drake

eScribers, LLC

7227 North 16th Street, Suite #207

Phoenix, AZ 85020

(800) 257-0885

operations@escribers.net

4

1

2  A P P E A R A N C E S:

3  BERGER, FISCHOFF, SHUMER, WEXLER & GOODMAN, LLP

4       Attorneys for Debtor

5       6901 Jericho Turnpike

6       Suite 230

7       Syosset, NY 11791

8

9  BY:   HEATH S. BERGER, ESQ.

10      GARY C. FISCHOFF, ESQ.

11

12

13  KENNETH CARUSO LAW LLC

14      Attorneys for Debtor

15      15 West 72nd Street

16      New York, NY 10023

17

18  BY:   KENNETH A. CARUSO, ESQ.

19

20

21

22

23

24

25

5

```
 1
 2   LABKOWSKI LAW, P.A.
 3        Attorneys for Debtor
 4        250 95th Street
 5        Unit #547233
 6        Surfside, FL 33154
 7
 8   BY:   DAVID LABKOWSKI, ESQ.
 9
10
11   WILLKIE FARR & GALLAGHER LLP
12        Attorneys for Freeman plaintiffs
13        787 Seventh Avenue
14        New York, NY 10019
15
16   BY:   RACHEL C. STRICKLAND, ESQ.
17        JAMES H. BURBAGE, ESQ.
18        ALISON AMBEAULT, ESQ.
19        MARINE LOISON, ESQ.
20
21
22
23
24
25
```

6

WILLKIE FARR & GALLAGHER LLP

 Attorneys for Ruby Freeman and Wandrea ArShaye Moss

 1875 K street, NW

 Washington, DC 20006


BY:   MAGGIE MACCURDY, ESQ.



AKIN GUMP STRAUSS HAUER & FELD LLP

 Attorneys for Official Committee of Unsecured Creditors

 One Bryant Park

 New York, NY 10036


BY:   AMELIA DANOVITCH, ESQ.

 ABID QURESHI, ESQ.

 RACHEL BIBLIO BLOCK, ESQ.

 DAVID F. HILL, IV, ESQ.

 PHILIP C. DUBLIN, ESQ.

 SHANT EULMESSEKIAN, ESQ.

 DAVID HILL, ESQ.

7

1

2    AKIN GUMP STRAUSS HAUER & FELD LLP

3        Attorneys for Official Committee of Unsecured Creditors

4        2300 North Field Street

5        Suite 1800

6        Dallas, TX 75201

7

8    BY:   SAM BAHAM, ESQ.

9

10

11

12   DAVIDOFF HUTCHER & CINTRON LLP

13        Attorneys for Davidoff Hutcher & Cintron LLP

14        605 Third Avenue

15        New York, NY 10158

16

17   BY:   JAMES B. GLUCKSMAN, ESQ.

18        ROBERT L. RATTET, ESQ.

19

20

21

22

23

24

25

8

```
 1
 2    WHITE AND WILLIAMS LLP
 3          600 North King Street
 4          Wilmington, DE 19801
 5
 6    BY:   MICHAEL INGRASSIA, ESQ.
 7
 8
 9    WINSTON & STRAWN
10          Attorneys for Interested Party
11          200 Park Avenue
12          New York, NY 10666
13
14    BY:   KENNETH L. PERKINS, ESQ.
15
16
17    BUCHALTER, A PROFESSIONAL CORPORATION
18          Attorneys for US Dominion, Inc.
19          1000 Wilshire Boulevard
20          Suite 1500
21          Los Angeles, CA 90017
22
23    BY:   JOEL G. SAMUELS, ESQ.
24
25
```

9

UNITED STATES DEPARTMENT OF JUSTICE

     Office of the United States Trustee

     One Bowling Green

     New York, NY 10004


BY:   ANDREA B. SCHWARTZ, ESQ.


NEW YORK STATE ATTORNEY GENERAL

     Attorneys for New York State Department of Taxation

     28 Liberty Street

     New York, NY 10005


BY:   ENID N. STUART, ESQ.



LOCKE LORD

     Attorneys for Locke Lord

     200 Vesey

     New York, NY 10281


BY:   STEPHANIE WICKOUSKI, ESQ.

**RUDOLPH W. GIULIANI**

10

1                P R O C E E D I N G S

2           THE COURT:  Good afternoon.  Let me first thank the

3     parties for their patience in waiting as we went through the

4     morning calendar which was proof, once again, that I never

5     quite know how long that's going to take.  And so -- but I

6     recognize you all have other things to do with your lives.  So

7     thank you for your patience.

8           And so as everyone knows, we're here for the Rudolph

9     Giuliani case.  And so we'll get appearances.  And before I do

10    that, I just note that obviously we're hybrid.  There's folks

11    who are here in the courtroom.  I appreciate you being here in

12    the courtroom.  As one of the hearings this morning

13    demonstrated when I had to raise my voice to pierce through the

14    technological divide of me being here and people being on Zoom,

15    it's much easier to have arguments in person.  And so thank you

16    very much for being here.

17          And so to the extent that anyone has any issues

18    hearing anyone, let me know.  And for anybody who's on Zoom,

19    make sure that your microphone is muted unless you're speaking.

20          And the last bit of practical advice is, as I think

21    you all know, there are microphones here, the traditional

22    looking microphones that handle amplification in the courtroom.

23    And then for purposes of Zoom, there are these lovely little

24    square things.  So just try to make sure you're near both when

25    you talk so that everybody can hear you not only here but on

**RUDOLPH W. GIULIANI**

11

1  Zoom as well.

2           So with that, we'll proceed to appearances.  And so

3  first, on behalf of the debtor.

4           UNIDENTIFIED SPEAKER:  Judge, if I could just

5  interrupt.  We don't have a Zoom -- here's or on the --

6           THE COURT:  Yeah.  So I would just say you can use

7  that one.

8           UNIDENTIFIED SPEAKER:  Okay.

9           THE COURT:  And they are fairly sensitive, so I think

10 that one should cover everybody.

11          And I guess the last thing in connection with that,

12 I'm happy to hear people wherever they want to argue.  If you

13 want to do it from the table, you want to do it from the

14 podium.  And again, if anybody has any trouble hearing, the

15 people on Zoom can just wave their hands.  And that'll catch

16 everyone's attention.  And we'll make sure to remedy any

17 problems we might have.

18          So with that, on behalf of the debtor?

19          MR. BERGER:  Sure.  Good afternoon, Your Honor.  Heath

20 Berger, Berger, Fischoff, Shumer, Wexler & Goodman, attorney

21 for the debtor.  I also have my partner, Gary Fischoff, on my

22 left.  And on my right is Ken Caruso.

23          THE COURT:  All right.  Good morning -- well, good

24 afternoon to you all.

25          And on behalf of the Official Committee of Unsecured

**RUDOLPH W. GIULIANI**

12

1   Creditors?

2        MS. BLOCK:  Good afternoon, Your Honor.  Rachel Biblo

3   Block with Akin Gump Strauss Hauer & Feld on behalf of the

4   official committee.  And I'm joined by my colleagues Phil

5   Dublin, Abid Quresh, Amelia Danovitch, and David Hill.

6        THE COURT:  All right.  Good afternoon to you all.

7        And on behalf of the parties that we have been

8   referring to as the Freeman plaintiffs?

9        MS. STRICKLAND:  Good afternoon, Your Honor.  Rachel

10  Strickland, Willkie Farr & Gallagher.  I'm joined by Jim

11  Burbage and Aaron Nathan.

12       THE COURT:  All right.  Good afternoon.

13       And let me find out, anyone else who's here in the

14  courtroom who wishes to make an appearance?  You can wander

15  over to a microphone.  All right.  See no one else who needs to

16  make an appearance?

17       I do see the United States trustee's office on the

18  Zoom.  So let me get that appearance.

19       MS. SCHWARTZ:  Thank you, Your Honor.  Andrea Schwartz

20  for the United States Trustee.  And I'll do my best so that you

21  don't have to yell at me because I'm on Zoom.

22       THE COURT:  That's fine.  Life's not an exact science.

23  We all know -- that's fine.  I'm sure we'll make it work.

24  And --

25       MS. SCHWARTZ:  Well, I very much appreciate Your Honor

13

1   letting me appear by Zoom.  I'm still struggling with that

2   stress fracture in my foot.  Otherwise, I would be there too.

3           THE COURT:  I appreciate that now more than ever as my

4   wife broke her shoulder about ten days ago.  So more

5   information than you want.

6           So I also see the debtor, Mr. Giuliani, on the Zoom.

7   He doesn't have to make an appearance.  But I wanted to let you

8   know that I could see you.  And it's I'm assuming that means

9   you can see everybody in the courtroom as well.

10          THE DEBTOR:  I can, Your Honor.  Thank you.

11          THE COURT:  All right.  You're welcome.

12          Anyone else who's on Zoom who needs to make an

13  appearance?

14          MR. GLUCKSMAN:  James B. Glucksman, observing the

15  hearing for Davidoff Hutcher & Cintron, a creditor.

16          THE COURT:  All right.  Good afternoon.  Anyone else?

17          All right.  So with that, I do have a copy of the

18  agenda that was filed for today's hearing at docket 258.  It

19  may be the only thing that the parties agree upon, but it lays

20  a proposed order for proceeding, starting with the motion to

21  appoint a trustee and then segueing later to a motion to compel

22  monthly operating reports and then to a discovery conference.

23          So I'm assuming that that's something that parties

24  embrace in terms of the order of proceedings.  That seems to be

25  sensible.  And so, but before we get to the motion, any

**RUDOLPH W. GIULIANI**

14

1  motions, we're also here for a case status conference.

2  Obviously, we'll be talking about the status conference of the

3  case in connection with the first motion.  But if there's

4  anything that's particularly noteworthy or appropriate to

5  address before we get into the motion, I'll be happy to hear

6  it.  So anything from debtor's counsel on that front?

7         MR. BERGER:  Not at this point, Your Honor.  I have a

8  feeling as we go through the motions, there may be some things

9  we want to interject onto it.  But I think at this point, the

10  motion probably makes the most sense to proceed forward.  And

11  then we could start -- backtrack to some status.

12         THE COURT:  I think that that's right.  So thank you

13  very much for that.

14         MS. SCHWARTZ:  Your Honor?

15         THE COURT:  Yes.

16         MS. SCHWARTZ:  This is Andrea Schwartz for the U.S.

17  Trustee.

18         We have something that we would want to bring up at

19  the case conference, but we're happy to do that in between the

20  motion for the trustee and the discovery conference, if that

21  would work for Your Honor.

22         THE COURT:  That would.  I think that's an appropriate

23  way to handle that.  So thank you very much for the suggestion

24  on that score.

25         All right.  So with that, it is the motion filed by

1   the official committee.  And keeping with traditional practice,

2   I'll hear from them first.

3          MS. BLOCK:  Good afternoon, Your Honor.  Rachel Biblo

4   Block With Akin Gump Strauss Hauer & Feld on behalf of the

5   official committee of unsecured creditors.

6          Before I get started, can we share the screen?

7          THE COURT:  Yes.  There is a PowerPoint.  And the

8   screen is going to be shared so that folks who are on Zoom can

9   also see it.  And I assume the copy of the PowerPoint has been

10  shared with all parties so that everybody has it.  No.  Is that

11  yes or no?  I wanted to make sure everybody has a copy.

12         And so what I'm going to do just for one second before

13  we start, it's not n evidentiary hearing in the sense of

14  anybody Is being put on the stand.  And so nobody's going to be

15  examined.  And so under those circumstances, there isn't quite

16  the same concerns about PowerPoints.  But certainly, if

17  debtor's counsel and all other interested parties want to take

18  a look at the PowerPoint briefly before we start to say you

19  haven't seen it before, that, that makes sense.  I'll give you

20  a minute or two to do that.  That would be helpful.

21         MS. SCHWARTZ:  Thank you, Your Honor.

22         UNIDENTIFIED SPEAKER:  We have not seen it before.

23         THE COURT:  All right.

24         MS. SCHWARTZ:  If someone could just email me a copy

25  of it so I can look at it while they're making their

1  presentation, that would be very helpful.

2          THE COURT:  All right.  So  we're going to get that

3  done.  So sorry.  I should have mentioned this while we were at

4  break if I had thought about it.  But that's fine.  We'll just

5  take a minute or two.  I'm assuming that's happening as we as

6  we sit here.  So let's give a minute.  Everybody can flip

7  through.  And then we'll pick up with the argument in a minute.

8          And I will just inject what you all know to be the

9  case.  I consider this as argument.  It's not evidence.  It's a

10  demonstrative.  So it's only as good or as not good for lack of

11  a legal term as whatever supports it.  And you can obviously

12  feel free to address whatever points as you respond, but that's

13  how I consider it.

14          MR. FISCHOFF:  I understand.  And clearly it's not

15  evident.  But I am a little bit unnerved by the fact that the

16  first time I received it was just now, not an hour before when

17  I was waiting in the hallway and not previously at all.  And I

18  object to the Court even reviewing or having them use it as

19  something to aid them in their argument.  They could have sent

20  it to me in advance.  I could have reviewed it.  I don't know

21  what's in it.  I don't know if there's new stuff in here, if

22  there's items that were already included in the motion.

23          THE COURT:  So --

24          MR. FISCHOFF:  It's totally uncalled for, unnecessary.

25  And I ask the Court to just not allow them to use it at all.

17

1          THE COURT:  Well, here's --

2          MR. FISCHOFF:  It could have been given an hour --

3          THE COURT:  Here's what I'm going to do.  If there's

4    anything new and that wasn't included in the papers, you can

5    certainly make an objection and respond.

6          The challenge for these kinds of motions is oftentimes

7    it is writ large the bankruptcy saying we're litigating in real

8    time, that people say, Judge, there's this issue and we

9    addressed it last week.  And so there's always a concern about

10   a shifting narrative over time.  And so I don't want to be in

11   the business of precluding anybody from essentially saying what

12   they want to say based on where they are.

13         But to the extent anyone thinks there's unfair

14   surprise, you should identify it and tell me that.  And that's

15   fine.  And I understand that point of view.

16         My sense in looking at it is that it repeats in sort

17   of summary PowerPoint form of what's in the papers,

18   particularly the reply.  And so it's essentially just a way to

19   walk through a presentation.  But to the extent it's more than

20   that, certainly you have a right to make that argument.  And

21   again, I'm only considering it as argument.  If it's not in the

22   motion or the reply for purposes of today, I will have sort of

23   a separate filter and category for things that are not in the

24   motion, the opposition, and the reply.  And that will -- that

25   sort of applies to both sides or all sides in the sense that

1  these motions often do have parties come in saying, well,

2  Judge, things have changed since papers were filed and now the

3  facts are X, Y and Z.  So how I can consider that -- I should

4  consider some of that in the sense that what we're talking

5  about is progress in the case.  That's certainly a -- to dumb

6  it down to layperson's terms, that's a lot of what the motion

7  is about is whether there's been progress.  So  --

8         MR. FISCHOFF:  I just have two brief things to say on

9  that.  This is twenty-nine pages long.  There's no way I can

10 know sitting here today if everything in here was previously

11 presented in the earliest papers or not.

12        THE COURT:  Well, so --

13        MR. FISCHOFF:  And 2 --

14        THE COURT:  So here's what I'll say on that, is I'm

15 only going to consider what's in the papers and what's argued

16 here today.  So if there's something in here that doesn't fall

17 into either category, I'm not going to go looking for, as My

18 Cousin Vinny says, the case cracker in in some text that wasn't

19 discussed.  I'm not a fan of that.  And for evidentiary

20 hearings, for example, people give me a stack of something.

21 I'll say you should identify chapter and verse of this that's

22 relevant because we're not going to have somehow on appeal some

23 other issue that nobody talked about be what's dispositive.  So

24 that same rule applies here.  So I intend to use this as a

25 summary.

**RUDOLPH W. GIULIANI**

19

1        The other thing I'm saying, I'm always happy to if

2   people want to have PowerPoints to aid in their presentation,

3   that said, I will ask questions and it almost inevitably

4   necessitates people jumping around a bit.  So I apologize in

5   advance for that.

6        MR. FISCHOFF:  And one other just minor point.  The

7   cover of this presentation labels it as attorney advertising.

8   Just thought I'd point that out to the Court, that the people

9   prepared it consider it advertising.

10        THE COURT:  Well, happily I'm free of the burdens of

11   such concerns as my clients just appear on a regular basis,

12   regardless of any advertising that we conduct.  So I'll -- I'm

13   putting an X through that --

14        MS. BLOCK:  Yes.

15        THE COURT:  -- because it's irrelevant and it's a

16   perfect example of something I'm not going to consider.  But

17   again, my thought is the idea is here.  There's no surprise.

18   I'm not going to rely on anything that that people have heard

19   for the first time and haven't had a chance to respond to.  So

20   that applies for anything that people argue and anything that's

21   in a PowerPoint.

22        So that's a -- that's a fair point.  And I will also

23   make sure to take a break before we're concluded.  That way, if

24   there's anything that that people need a chance to sort of take

25   a look at to identify, we'll make sure we get it done in the

**RUDOLPH W. GIULIANI**

20

1   way that's appropriate and fair.

2        MS. BLOCK:  Thank you, Your Honor.

3        THE COURT:  All right.  With that, I'll turn it over

4   to the trustee.

5        MS. SCHWARTZ:  Your Honor?

6        THE COURT:  I'm sorry.  Yeah.

7        MS. SCHWARTZ:  I still don't have a copy of it.

8        MS. BLOCK:  Apologies.  It's in my outbox.

9        THE COURT:  All right.  Yeah, people may be used to

10  the Wi-Fi at Bowling Green, which is fairly robust.  It's more

11  of a new thing up here in White Plains.  So if you let me know

12  when that's no longer in your outbox, and I think we can --

13       MS. BLOCK:  I will, Your Honor.

14       MS. SCHWARTZ:  Your Honor, FYI, you know, the U.S.

15  Trustee's Office doesn't have access to that Wi-Fi at Bowling

16  Green.

17       THE COURT:  Well, as you can see, sometimes we don't

18  either.

19       MS. SCHWARTZ:  I know.  The only suggestion I would

20  make for someone in the courtroom is to have someone at your

21  office just email it to me.  This way you don't have to deal

22  with the Wi-Fi situation that we could get going.

23       THE COURT:  Yeah.  That's not a -- that's a good

24  circuitous but no productive belt and suspenders way to deal

25  with this.  So all right.  Yeah.  No.  And in fact, it's -- the

**RUDOLPH W. GIULIANI**

21

1   Wi-Fi can be a bit a bit of an issue.  Zoom is handled

2   separately.  We don't rely on the Wi-Fi for Zoom.

3          So all right.  So, well, here's what I'm going to do.

4   I'm going to ask you to send it.  Have somebody in your office

5   send it.  Have a friend send it, whatever's necessary.  And one

6   of those will go through.  And again, I will make sure to take

7   a break at some point just to make sure everybody's had a

8   chance to get it, to look at it, and to respond to anything.

9          But I think since your intention no doubt is to walk

10  through --

11         MS. SCHWARTZ:  I have it now, Judge.

12         THE COURT:  Okay.  Fantastic.  All right, so with

13  that, proceed, counsel.

14         MS. BLOCK:  All right.  Thank you, Your Honor.

15         On May 28th, the committee filed its motion for entry

16  of an order directing the immediate appointment of a trustee

17  pursuant to 11 U.S.C. Section 1104.  The motion is at docket

18  number 233.  The filing of this motion was preceded by a host

19  of steps that the committee took to avoid being where we are

20  today.

21         We asked the debtor to agree to a date by when he and

22  his businesses would complete document production pursuant to

23  this Court's bankruptcy Rule 2004 order.  He agreed to May

24  24th, and then provided an initial production of just fifteen

25  documents, totaling less than 500 pages and nothing more.  His

1  wholly owned businesses did not produce a single document.  We

2  asked the debtor to file timely, complete, and accurate monthly

3  operating reports.  He continues to file reports that are so

4  full of errors as to be of, at best, questionable value.

5         We asked the debtor for information about his Amazon

6  and Apple purchases, sometimes more than sixty transactions in

7  a single month.  His counsel told the Court such information

8  was already provided but later backtracked and said he spoke

9  prematurely.  The committee is still waiting.

10        We asked the debtor to agree to a reasonable budget.

11  He declined to engage, never meaningfully responding.

12        We asked the debtor for information about his

13  compensation, to which he cites in his own pleadings.  His

14  counsel sent a letter saying that all compensation is being

15  funneled to his nondebtor business, at one point during the

16  bankruptcy case more than 30,000 dollars each month.  He gets

17  no salary from that business.  And instead his salary is used

18  to pay that business expenses, which were less than 70,000

19  dollars in 2023.

20        THE COURT:  So counsel, let me interject to ask you a

21  question and sort of make a comment that might be helpful going

22  forward.  Again, these sort of motions are sort of on a time

23  continuum, right, things you may complain of and you may get

24  some responses but not get other responses.  So it would be

25  helpful for me as you go through to identify the state of --

**RUDOLPH W. GIULIANI**

23

1   the current state of play, right?  I know there was a letter

2   about that, and I know the reply is a fairly recent and vintage

3   timewise.  But so when you say his wholly owned businesses not

4   produced a single document, I just want to make sure if you're

5   talking about at the time you filed a motion or currently or

6   both.

7          MS. BLOCK:  Both, Your Honor.

8          THE COURT:  All right.  Thank you.

9          MS. BLOCK:  We asked the debtor to sell his Florida

10  condo and comply with his fiduciary duties to creditors.  He

11  refused and instead argued that he should be applauded for

12  using exempt assets in furtherance of his own self-interest and

13  his mistaken belief that he can keep ownership of the Florida

14  condo when the bankruptcy case concludes.

15         THE COURT:  All right.  Again, I apologize for hopping

16  around, but just to make sure I think about these things.

17  There is a motion that was filed.  That motion is pending.

18  It's sub judice.  And so what's your view about how that motion

19  relates to this motion, is do you view as one being more

20  appropriate?  If I grant this motion, does that motion cease to

21  be an issue?  If I grant that motion, does this motion -- does

22  it change the status on this motion?  If I deny that motion,

23  where does it leave the committee?  I'm just interested in how

24  you view things holistically speaking.

25         MS. BLOCK:  We think this motion is paramount.  This

24

1  one is the most important because if a trustee comes in,

2  they'll look at this asset, it's not exempt, and they'll sell

3  it.  They'll use their business judgment.  If that motion were

4  to be granted, we still think a trustee is appointed for all

5  the reasons we've set forth in our papers.  So key is this

6  motion.  And we think this condo needs to be sold.

7        THE COURT:  All right.  Thank you.

8        MS. BLOCK:  Thank you.  We asked the debtor to

9  facilitate the return of unauthorized payments to his

10 businesses, their employees, and his reported girlfriend.  He

11 refused and concocted a story that he was reimbursing them for

12 expenses paid on his behalf, expenses like his business's

13 employees' plane tickets.  But then he pivoted and said it's

14 okay that he made unauthorized payments because he reimbursed

15 the estate with exempt funds used to pay expenses that align

16 completely with his own self-interest.

17        So, Your Honor, unfortunately, the debtor has made

18 today an inevitability.  And the committee is here requesting

19 the immediate appointment of a Chapter 11 trustee.

20        THE COURT:  All right.  Let me ask you about the

21 payment of various individuals on the question of verification.

22 What do you know or not know based on what's been shared and

23 not shared as to the source of funds?  There's a fight about

24 what would be appropriate and what would not be appropriate,

25 depending on what funds are used or not used.  But what does

**RUDOLPH W. GIULIANI**

25

1    the committee know or what information does it lack to be able

2    to categorically understand where the funds came from and the

3    flow of things, particularly as to the payment of the

4    individuals associated with his entities?

5         MS. BLOCK:  Your Honor, we don't really have any

6    records from the businesses.  We just have the credit card

7    statements that are attached to the monthly operating reports.

8    And they don't tick and tie.  They don't show exactly where the

9    funds are coming from.  They just show that the debtor reports

10   paying the businesses and their employees' credit cards during

11   various months throughout the cases.

12        THE COURT:  All right.  So essentially you just have

13   the out.  You have where the money is going, that is from the

14   debtor based on the credit card to these individuals.  You

15   don't know the in as to where that funds are.  So I'm assuming

16   that means it's not reflected in your view in the monthly

17   operating report in a way that can be identified?

18        MS. BLOCK:  That's right, Your Honor.  There is one

19   IRA withdrawal or payment in the December report.  But money is

20   fungible, so it's hard to know what's going where and what's

21   paying what.

22        THE COURT:  All right.  And what was the size of that?

23        MS. BLOCK:  100,000 dollars.

24        THE COURT:  All right.  And what ballpark is the

25   aggregate amount of the payment to these individuals or for

1   other expenses that have been identified in the committee's

2   view as coming from exempt assets?  In other words, that I

3   understand is the exempt asset.  Right?  And what's your

4   understanding is the universe of things, or do you not know?

5          MS. BLOCK:  You know, Your Honor, we don't know.  And

6   that's in particular because of the way his earnings are being

7   funneled to the wholly owned business.  So it's unclear how

8   much of that estate asset is going to pay the business's

9   expenses because we don't know the in there.  We do know that

10  he's reported paying tens of thousands of dollars for his

11  business and Ms. Ryan in his monthly operating reports, but

12  that's not the whole universe.

13         THE COURT:  All right.

14         MS. BLOCK:  Your Honor, Bankruptcy Code Section

15  1104(a) provides two separate paths for the appointment of a

16  trustee:  first, a finding of cause under Section 1104(a)(1),

17  and second, a finding that the appointment of a trustee is in

18  the interest of the debtor's estate and creditors under Section

19  1104(a)(2).  An analysis of the facts and standard

20  circumstances here, as applied to each standard, leads to the

21  same place.  A Chapter 11 trustee must be appointed.

22         Your Honor, I plan to address both standards and will

23  start with Section 1104(a)(1).  Upon a showing of cause under

24  1104(a)(1), a Bankruptcy Court is required to appoint a Chapter

25  eleven Trustee.  The list of wrongdoings constituting cause

**RUDOLPH W. GIULIANI**

27

1  fell on the section is not exhaustive.  And in determining

2  whether cause exists, a Bankruptcy Court can consider a

3  debtor's pre-petition and post-petition conduct.

4         Here, the facts compel the appointment of a Trustee

5  for cause, including dishonesty, incompetence, gross

6  mismanagement of the debtor's affairs, inadequate record-

7  keeping and reporting, inappropriate relations between the

8  debtor and his wholly owned businesses, conflicts of interest,

9  and breaches of fiduciary duty.  I will take each in turn.

10         Dishonesty constituting cause under Section 1104(a)(1)

11  can come in many forms.  And particularly applicable here,

12  cause is found where a debtor omits financial data without

13  justification and required financial disclosures.  The debtor

14  has treated this bankruptcy case like a personal game of

15  hide-and-seek.  He files inaccurate and incomplete financial

16  disclosures.  The committee learns that information the debtor

17  failed to report and request such information.  Debtor denies

18  the information, ignores the committee's request, or otherwise

19  does not provide the time -- provide timely the information.

20  The committee continues asking questions.  And the debtor

21  concedes he's been found and provides some information which

22  just leads to more questions.  And this game for the debtor

23  started on day 1.

24         In a schedule G filed with the petition, the debtor

25  listed no contracts.  The committee learned from press

1   reporting and social media that the debtor was releasing an

2   upcoming book.  The committee asked whether the debtor had a

3   contract for this book.  The debtor denied having a contract.

4   The committee continued asking questions.  The debtor finally

5   provided a partially executed contract for the book.  He

6   allegedly does not have a fully executed version in his

7   records.

8        And the committee was forced to participate in a

9   similar game with respect to the debtor's latest business

10  venture, Rudy Coffee.  The debtors own counsel, and the

11  committee learned of Rudy Coffee from press reporting and

12  social media which led for the committee to ask questions and

13  specifically about the compensation arrangement.  Ultimately,

14  the committee received a copy of a contract dated April of this

15  year signed by the debtor not as an authorized signatory of any

16  company.  He just signed it with his name and no specific

17  designation.  And it showed all money being routed to Giuliani

18  Communications, not the debtor.

19        This seems to be a common theme for the debtor.  He

20  does the work, and his company gets all of his earnings, which

21  means that money, an estate asset, is not coming into the

22  estate.

23        THE COURT:  So let me ask you for -- and this is a

24  recurring theme in your papers for your sort of say best case

25  authority in terms of looking at a debtor's company where a

1    debtor uses that company to funnel -- or essentially to do

2    business.  I don't even -- I'm not trying to use a pejorative

3    adjective, but just if essentially that's how the debtor

4    decides to conduct business, that is then squarely in the

5    crosshairs for the transparency obligations of the Bankruptcy

6    Code.  Do you have anything in particular, case authority or --

7    whether it's code sections or cases that you think are helpful?

8    I think you cited some things in connection with -- I'm trying

9    to remember the context.  But it was -- it was a bit off to the

10   side in terms of authority.  So I was just trying to ask if you

11   had -- what you would urge me to consider in context of this

12   question.

13       MS. BLOCK:  Yeah.  I think In re Sillerman (ph.)

14   provides good case authority that debtor was an individual

15   debtor that also owned interest in many different companies and

16   was using those companies and moving assets and using a joint

17   account with his wife to do the same thing.  We also have

18   Nacore Hill Publishing, Inc. (ph.)  And that case involved a

19   company where the company debtor paid for its affiliates'

20   office spaces and various other affiliates' expenses without

21   any authority.

22       THE COURT:  All right.  So let me ask, because I

23   haven't gotten a chance to read these cases although I will, is

24   what the court says -- is there any particular takeaway or line

25   in terms of how the court considers those questions, the issues

**RUDOLPH W. GIULIANI**

30

1   you've just identified?

2           MS. BLOCK:  They look at a lot about conflicts of

3   interest and how debtors are using affiliates in a way that

4   benefit that particular debtor and keeping assets outside of

5   the estate.  They talk particularly about the debtor's

6   unwillingness to pursue claims against those affiliates, given

7   his own self-interest and interest in those affiliates.  So a

8   lot of common themes that we have here.

9           THE COURT:  All right.  Thank you.

10          Well, actually back up for one second.  And I think

11  that is how it's identified in your papers in terms of conflict

12  of interest.  So thank you for the harmonic.

13          I guess my question is, are there cases that just talk

14  about it that you're aware of that talk about it in the context

15  of transparency writ large, meaning that when you file for

16  bankruptcy, you get certain benefits, you take on certain

17  obligations, the primary obligations the financial

18  transparency?  And in terms of if you choose to organize your

19  business affairs a particular way, then essentially you take on

20  that obligation as to transparency as to those businesses.

21          So I'm not -- and that's the thing.  I'm not sure I

22  necessarily saw parties directly talking about case law in that

23  area.  And it may be because it's harder to find.  But I

24  appreciate your guidance and wisdom on that.

25          MS. BLOCK:  Yeah.  I think also In re Sillerman is

**RUDOLPH W. GIULIANI**

31

1  helpful.  There are some issues with respect to the 2015.3

2  reports and the monthly operating reports being deficient, not

3  identifying interest in affiliates.  So again, there are common

4  themes.  Facts are a little bit different, but again, common

5  themes.

6          THE COURT:  All right.  Thank you.

7          MS. BLOCK:  Another common theme for the debtor is

8  filing inaccurate and misleading financial disclosures and,

9  with full knowledge of the inaccuracies and misleading

10  information, doing nothing to update it.  For example, the

11  debtor ignores the instructions for schedule AB which requires

12  that he separately list individual items worth more than 500

13  dollars and instead lumps his jewelry together and assigns a

14  total value of just 30,000 dollars for a long list of pieces,

15  including, among others, three Yankee World Series rings, a

16  Rolex, six unnamed watches, and a Tiffany watch.

17          Moreover, even the perception of a debtor's conduct is

18  dishonest is an independent ground for the appointment of a

19  trustee.  And the committee has made no secret of its view that

20  it perceives the debtor's conduct throughout this bankruptcy

21  case as dishonest.

22          First, the debtor has provided conflicting testimony

23  regarding a court-ordered requirement, or lack thereof, to pay

24  certain expenses for his former mother-in-law.  At the 341

25  meeting, a court ordered him to make such payments.  Later

**RUDOLPH W. GIULIANI**

32

1    during his deposition, he took that obligation on and maybe the

2    court would have ordered it.  As is --

3            THE COURT:  So as to that, I understand the point in

4    your papers is as to disclosure primarily.  Is there any point

5    as to substance or the appropriateness of that payment?  I

6    didn't see it.  I thought it was in connection with the

7    disclosure point.

8            MS. BLOCK:  That's exactly right, Your Honor.

9            THE COURT:  All right.

10           MS. BLOCK:  Second, at the 341 meeting, the debtor

11   provided testimony about his membership in social clubs and did

12   not identify the Palm Beach Yacht Club.  But months later, a

13   check to the Palm Beach Yacht Club appeared on his April

14   operating report.  Again, Your Honor, this is not an argument

15   about the merit of the payment or whether it was authorized or

16   not.  It's another example of the debtor providing sworn

17   testimony that conflicts with his filings made under penalty of

18   perjury.  An honest debtor would have updated his schedules.

19   This debtor did not.

20           Third, the debtor claims that thousands of dollars of

21   payments made on behalf -- made by him on account of Maria

22   Ryan's credit card bill and Giuliani Partners credit card bill

23   are merely reimbursements of expenses paid on his behalf.  But

24   it's almost impossible to view that explanation for repeated

25   unauthorized payments as anything other than dishonest.  Why

**RUDOLPH W. GIULIANI**

33

1    would the debtor ever be responsible for reimbursing his

2    businesses for the cost of plane tickets for his businesses'

3    employees?

4           THE COURT:  So let me ask you a specific question

5    about this.  I understood that the focus of the financial sort

6    of untying the Gordian knot was between the debtor and Giuliani

7    Communications as the primary entity and that the understanding

8    the committee had based on what the debtor had said is that all

9    the money gets -- for these businesses gets funneled through

10   Giuliani Communications and that the excess goes to Mr.

11   Giuliani if there -- if there is money that is excess.

12          So a couple of follow-up questions.  I see we're

13   talking about Giuliani Partners here.  And I'm wondering what

14   your understanding is as to that particular entity.  Just given

15   that, I think most of the conversation has been about Giuliani

16   Communications.

17          MS. BLOCK:  Yeah.  Your Honor, in his deposition, he

18   described that one as essentially dormant.  But then he

19   attaches credit card statements from Giuliani Partners as

20   supporting documentation for his monthly operating reports.  So

21   it seems there's some spending going on some level of business

22   activity, but we don't have any further visibility into what's

23   actually happening at that entity.

24          THE COURT:  All right.  Had it been identified to the

25   committee or other parties-in-interest as a business entity

1  through which the debtor was continuing to do business or --

2  again, my very loose understanding based on sort of looking at

3  the tip of the iceberg above the waterline is that we were

4  talking about Giuliani Communications as opposed to some other

5  entity.  But again, I know you all are much more in the weeds.

6  So did you have -- was this the first instance in which

7  Giuliani Partners was identified, or was it identified earlier

8  but in some other way?

9       MS. BLOCK:  Your Honor, Giuliani Partners was the only

10  entity we knew about until we got that May compensation letter

11  and the Rudy Coffee contract that listed Giuliani

12  Communications.  We had thought that business was going through

13  Giuliani Partners because those were the monthly operating

14  reports supporting documentation.  So we only learned about the

15  compensation arrangement with everything going to Giuliani

16  Communications pursuant to that, I believe, May letter.

17       THE COURT:  All right.  Thank you very much.  And so

18  from what I understand, the committee's position is when you're

19  talking about these expenses, the theory -- and I'm going to

20  state what I think I understand your position being, and you're

21  going to straighten me out if I have it incorrect.  Is it that

22  if the income and the businesses are being run through, say,

23  Giuliani Communications as pursuant to the May letter and all

24  the income goes there, do I understand the committee's position

25  correctly to be that if expenses are being paid, that they

1    should come out of Giuliani Communications because that's where

2    the income is coming as opposed to it coming from the debtor

3    directly?

4            MS. BLOCK:  That's right.  But we think by using the

5    income, it actually is coming directly from the debtor because

6    he should be getting a salary or earnings.  Those are property

7    of the estate.  And so he can't use that income, those

8    earnings, 1115 saying those are post-petition earnings to fund

9    a nondebtor wholly owned affiliate's expenses.

10           THE COURT:  All right.  But I guess as a theoretical

11   matter, isn't it possible that if the business is set up where

12   the money does go there to some entity, Corporation, A that if

13   the income goes there, the expenses come out of there and then

14   the principal is paid whatever is profit or whatever or salary

15   or whatever it is but that you can do it that way but that the

16   income and the expenses are dealt with at the entity level as

17   opposed to the individual short of making a capital

18   contribution is sort of separate and apart from that  I just

19   want to sort of understand the theory here.

20           MS. BLOCK:  Yeah.  There's sort of those two separate

21   theories that he shouldn't directly from his estate be paying

22   expensive.  And then the theory that if he's actually an

23   employee of Giuliani Communications, his salary, his income,

24   the work he gets, his earnings shouldn't be used to pay that

25   business expenses.

**RUDOLPH W. GIULIANI**

36

1        THE COURT:  All right.

2        MS. BLOCK:  Your Honor, simply the debtor's

3   dishonesty, along with the creditors perception that the debtor

4   is dishonest, constitute cause requiring the appointment of a

5   trustee.

6        THE COURT:  So before we get off this particular

7   point, I think you're getting ready to segue to another point,

8   what, if anything, do you want me to take -- as I see it's in

9   in in your papers and repeated again the slides talking about

10  how you can consider post-petition conduct but also pre-

11  petition conduct.  What, if anything, do you want me to take

12  from the history and before the filing on this -- as to your

13  motion?  And maybe the answer is nothing.  Maybe the answer is

14  a lot.  I don't know.  And I want to make sure I understand.

15       MS. BLOCK:  Your Honor, I think it comes back to the

16  Freeman litigation and how we dealt dishonestly in the

17  litigation there with respect to his discovery obligations and

18  complying with court orders.  And so the dishonest conduct has

19  bled into here with his not complying with court orders, not

20  honestly fulfilling his duties as a debtor-in-possession.

21       THE COURT:  All right.

22       MS. STRICKLAND:  Next up is incompetence, gross

23  mismanagement, and inadequate record-keeping and reporting

24  constituting cause requiring an appointment of a trustee.

25       Since the petition date, the debtor has engaged in a

37

1  course of conduct that can only be described as incompetence

2  and gross mismanagement of affairs which conduct is amplified

3  by his wholly inadequate record-keeping and reporting.

4          Throughout the case, we have discussed that the

5  reorganization process depends upon the free flow of accurate

6  information from the debtor.  But where debtor's financial

7  disclosures raised significant questions or debtor fails to

8  maintain complete and accurate financial records, such

9  constitutes gross mismanagement for which a trustee must be

10 appointed.  And that is precisely with what we're dealing with

11 here.

12         In two separate stipulations, the debtor has admitted

13 that his schedules of assets and liabilities and statement of

14 financial affairs require further amendments and disclosures.

15 The first of the two stipulations was filed on March 5th.  Yet

16 more than three months later, debtor has not filed any further

17 amendments to his schedules or statement.

18         Similarly, at the 341 meeting back on February 7th,

19 the debtor agreed to make a number of amendments to his

20 schedules and statement.  Without explanation, we are still

21 waiting for those amendments four months later.

22         Moreover, the debtor's filings in this case are

23 consistently inaccurate, conflict with previous disclosures,

24 and generally lack supporting documentation.

25         THE COURT:  Have you in the capacity as a committee

**RUDOLPH W. GIULIANI**

38

1  been given any visibility into what further amendments are

2  discussed at those two points in the docket that you identify?

3        MS. BLOCK:  So we have a list of amendments that we

4  include in our paper with respect to things he agreed to do

5  after the 341 meeting, but we haven't been privy to any

6  discussions of the status of where that stands.

7        THE COURT:  All right.  So safe to assume that you

8  know what you've been told as to amendments that may occur, but

9  you don't know if they're the whole universe of amendments as

10 are referenced in these pleadings?

11       MS. BLOCK:  That's right, Your Honor.

12       Given the debtors limited self-reported assets as

13 compared to his liabilities, it's particularly important that a

14 schedule of assets is correct.  But it's not.  In schedule AB,

15 he lists three entities that he owns one hundred percent of:

16 Giuliani Communications, LLC.  Giuliani & Company, LLC and

17 World Capital Payroll Corp.  Contrast that with his bankruptcy

18 Rule 2015.3 report, he adds three more entities that he lists

19 as owning a hundred percent of which are not listed in his

20 schedule.

21       The debtor's lack of knowledge concerning his own

22 assets is highlighted by his deposition testimony where he

23 displayed very little knowledge about the entities he reports

24 to own a hundred percent of, saying I'm embarrassed to tell

25 you, I'm not sure I know what the heck it is, in reference to

**RUDOLPH W. GIULIANI**

39

1    Giuliani Group, LLC.  With respect to Giuliani & Company, LLC,

2    he said I couldn't tell you for the life of me how it relates.

3    Your Honor, his limited knowledge of his own assets is

4    concerning.

5           Additionally, on numerous occasions, in pleadings and

6    at hearings, the committee has expressed concerns about the

7    debtor's monthly operating reports.  Other than one monthly

8    operating report, which was still filed after a self-proclaimed

9    filing deadline, debtor has filed every monthly operating

10   report after the filing deadline.  One would think that the

11   debtor would use that extra time to get the numbers right, but

12   one would be wrong as every monthly operating report has

13   inexplicable errors and omissions.  The December and January

14   operating reports include no supporting documentation.  The

15   February operating report includes February 2023 bank

16   statements as supporting documentation.  Not one operating

17   report's end-of-month cash balance matches the beginning of

18   month cash balance listed in the following month's operating

19   report.

20          The debtor's monthly operating reports reflect

21   incompetence and a lack of respect for its obligations as a

22   debtor-in-possession and a beneficiary of the bankruptcy

23   process.  Moreover and equally egregious, and is flagged

24   throughout this presentation, the monthly operating reports for

25   January, February, and March show obvious unauthorized

1    payments.  Yet incredibly he answers no to the questions were

2    any payments made outside the ordinary course of business

3    without court approval, and were any payments made to or on

4    behalf of insiders.

5          Finally, other than the December operating report

6    which covers an eight-day period and includes 100,000

7    withdrawal from the debtor's IRA every month, the operating

8    report shows a total expenses exceed total income for the

9    applicable month.  Simply the debtor's continued failure to

10   amend his schedules and statements to accurately reflect his

11   assets and liabilities, his inability to file timely, complete,

12   and accurate monthly operating reports, his regular

13   unauthorized payments for the benefit of nondebtor insiders,

14   and the fact that his expenses are reported as exceeding total

15   income for every month except December showcase his

16   incompetence, gross mismanagement, and inadequate reporting

17   which require the appointment of a Chapter 11 Trustee.

18          Next, Your Honor, the temptation for self-dealing has

19   proven to be too much for the debtor and has led to incurable

20   conflicts of interest and inappropriate dealings with his

21   wholly owned businesses which required the appointment of a

22   trustee.  Generally, this temptation for self-dealing is

23   heightened in an individual debtor's bankruptcy case where the

24   debtor's natural instinct is to protect his own self-interest.

25   And such a scenario demands full transparency.

41

1        Moreover, a conflict of interest constituting cause

2  occurs where debtor has inappropriate dealings with an entity

3  in which the debtor owns an interest.  That is precisely here

4  what we have as a debtor directs all of his income earning

5  opportunities and compensation to his Nondebtor wholly owned

6  business and uses his earnings to pay his wholly owned

7  businesses' expenses.

8        In filings by the debtor on March 28th and then again

9  on May 7th, he said that he currently receives Social Security

10  benefits and broadcasts a radio show and podcast which are his

11  sole sources of income.  However, the debtor has never reported

12  any compensation, wages, or salary in his monthly operating

13  reports.  The debtor's failure to so report conflicts with news

14  reports that the debtor said he earned 15,000 dollars a month,

15  which he referred to as peanuts, from his WABC show before it

16  was canceled in May.  And the debtor earns 100,000 -- between

17  100,000 and 150,000 from Newsmax for a show America's Mayor

18  Live.

19        And following questions from the committee and with

20  Your Honor's assistance, the debtor's counsel at the May 14th

21  hearing agreed to provide the committee information about the

22  debtors compensation.  On May 22nd, the committee received a

23  letter from the debtor's counsel with information that was

24  disturbing with respect to the debtor's now canceled WABC radio

25  show, there was no formal contract governing the relationship,

1    but the debtor earned approximately 14,000 dollars per month.

2    However, that amount was paid to Giuliani Communications.  The

3    debtor's counsel did not provide an explanation as to why the

4    monthly payments were made to that business and not the debtor.

5    And the same arrangement is in place with respect to debtor's

6    live stream, where the income comes primarily from tunnels to

7    tower, tunnel to towers, averages over 16,000 dollars per

8    month, and again is paid to Giuliani Communications.

9          And then the letter talks about Rudy Coffee.  And by

10   this point, it's obvious where we're all going.  The letter

11   purports to have entered into a post-petition contract

12   requiring Rudolph Giuliani to promote Rudy Coffee, but all

13   payments are going directly to Giuliani Communications.

14         What this letter tells us is that despite more than

15   tens of thousands of dollars coming into Giuliani

16   Communications each month as a result of the debtor's work, he

17   has allegedly not received any compensation from Giuliani

18   Communications because the income is used to pay expenses of

19   that company, and that's how he's always done it.  That

20   explanation is generally hard to believe but also does not

21   align with the only reporting that the debtor has provided on

22   Giuliani Communications, one Bankruptcy Rule 2015.3 report

23   showing less than 70,000 dollars of expenses for Giuliani

24   Communications in all of 2023.

25         So the debtor says he's working for free and all of

1    his income, an estate asset, is being directed to his business,

2    a nondebtor insider instead of his creditors.  And since he

3    refuses to comply with the Rule 2004 order, we have no records

4    for Giuliani Communications or any of his other wholly owned

5    businesses.  The debtor's arrangement of siphoning his income

6    to businesses attempting to put such funds outside the reach of

7    creditors cannot continue.

8         In addition to directing all of his income to his

9    business, the debtor has shown himself incapable of operating

10   his business in a way that does not divert his personal funds

11   to his business.  Just listen to the debtor's own words at the

12   341 meeting.  Overview of all the expenses.  "Until now, I paid

13   a lot of business expenses, always have because they're my

14   businesses.  I pay them out of my personal account.  And I'm

15   really not good about getting reimbursement for them because

16   they were my businesses."  And despite the debtor's sworn

17   testimony that he is not now -- that this is not how he

18   operates now, his monthly operating reports say otherwise.

19        Throughout the bankruptcy case, the debtor continues

20   to pay Giuliani Partners credit card bills and attaches the

21   business's credit card statements as supporting documentation.

22   Moreover, given that the monthly operating reports are

23   generally inaccurate and incomplete, the committee has no

24   reason to believe that he has not made other unauthorized

25   payments for his businesses and their employees.  The debtor's

**RUDOLPH W. GIULIANI**

44

1    April operating report shows a number of payments to B&H Photo,

2    a store for photographers, musicians and creative professionals

3    with leading edge technology that one might use for say, a live

4    stream, radio show, or podcast.

5          It's crystal clear that the conflicts of interest

6    presented in this bankruptcy case are overwhelming the debtor.

7    And he has shown no restraint when it comes to choosing between

8    his own self-interest and that of his creditors.  He chooses

9    himself every time and diverts and will continue to divert

10   funds and opportunities for income away from his creditors and

11   directly to his wholly owned businesses and close associates.

12         Your Honor, next is the debtor's failure to satisfy

13   his fiduciary duties as a debtor-in-possession.  We focus on

14   three specific fiduciary duties the debtor has failed to

15   observe:  the duty to protect and conserve estate property, the

16   duty to refrain from acting in a manner that could damage the

17   estate, and the duty to refrain from acting in a manner that

18   could hinder reorganization.

19         First, the duty to protect and conserve estate assets,

20   which includes a duty to conduct impartial investigations and

21   determine whether to pursue claims on behalf of the estate.  As

22   previously discussed, the debtor is not willing to undertake

23   any sort of investigation or take any action at all with

24   respect to the unauthorized payments on behalf of his business

25   and Maria Ryan.

45

1          Moreover, observance of this fiduciary duty also means

2     that the debtor cannot dispense with assets outside of the

3     ordinary course without approval.  Yet the debtor is not sought

4     or obtained any approval from this Court to pay Maria Ryan's

5     credit card bill or the credit card bills of his business.

6          Second, the fiduciary duty to refrain from acting in a

7     manner that could damage the estate, a duty to which a debtor

8     is taken aback.  Debtor has chosen time and time again to

9     engage in value-destructive behavior that could lead to the

10    occurrence of additional and unnecessary administrative

11    expenses and make meaningful recoveries for unsecured creditors

12    an even more remote possibility.  The specific behavior the

13    debtor can't seem to help but engage in is the same that led to

14    the 148-million-dollar judgment against him and led to the

15    debtor commencing this case.

16         For reasons that are impossible to understand,

17    following the petition date, the debtor continued to make the

18    same defamatory statements about the Freeman plaintiffs, the --

19         THE COURT:  So let me ask you about that.  Obviously,

20    that issue came in front of me.  There was an adversary

21    proceeding.  There was a motion.  Ultimately, there was a

22    stipulation.  Of course, the appointment of a trustee doesn't

23    necessarily prevent that kind of conduct.  So what is it I'm

24    supposed to take from that instance, right, in terms of your

25    current motion?  Like, how am I supposed to consider it?

**RUDOLPH W. GIULIANI**

46

1    Because it's -- unlike the conserving estate property, the

2    notion is, well, the trustee is going to come in and marshal

3    assets and do things of that sort.  This seems to be a little

4    different in kind.  So what is the case law or what do the

5    facts here tell me about this issue about refraining in a way

6    in a manner that could damage the estate?

7         MS. BLOCK:  If a trustee comes in, he could take over

8    the management of the wholly owned businesses and remove that

9    platform to make these statements that reach thousands and

10   thousands of people which would go to some of the unnecessary

11   administrative expenses.  But you're right, Your Honor.  The

12   trustee can't stop the debtor from tweeting.

13        THE COURT:  But I to understand that this point --

14   well, I'm assuming, but again, you can straighten me out if

15   I've got this wrong, that for purposes of the committee's

16   argument, the fact that a trustee can't prevent the conduct

17   that you identify in this second prong of fiduciary duty

18   doesn't mean it isn't relevant.  It's still relevant because

19   it's relevant for considering the breaches of fiduciary duty

20   because it's a breach.

21        MS. BLOCK:  It's a breach.  And it also goes, I would

22   say, to gross mismanagement.

23        THE COURT:  All right.

24        MS. BLOCK:  Thank you, Your Honor.

25        The consequences of his reckless and cruel behavior

1   are borne by his unsecured creditors letters.  The debtor's

2   WABC radio show, one of his only reported sources of income,

3   was canceled.  Estate resources were expended getting the

4   debtor to stop talking.  There was an emergency adversary

5   proceeding.  And ultimately an injunction entered.  And the

6   Freeman plaintiffs did in fact file administrative expense

7   claims.

8          But the behavior doesn't stop there.  Debtor has taken

9   no serious steps to rein in his own spending or reduce the

10  costs associated with his lifestyle.  His January operating

11  report, to the extent it is even accurate, includes credit card

12  payments over 26,000 dollars, including an account of at least

13  sixty Amazon transactions.  Fast-forward three months and not

14  much has changed.  In April, the debtor reports paying 21,000

15  dollars in fees for his New York City apartment.  And the

16  committee received a partial copy -- a copy of a partial May

17  2024 bank statement, which shows the debtor paid nearly 16,000

18  dollars in fees for his Florida condo, a nonexempt asset that

19  he refuses to sell.

20         THE COURT:  So I know we heard argument on the motion

21  a while back.  I took it under advisement.  But remind me of

22  the following.  I remember the argument being in that

23  particular instance with the Florida condo being -- the

24  debtor's argument was that he needed a place to live and that

25  that's where he was going to live.  I don't remember, and I

48

1   wanted to confirm in the context of that argument, that there

2   wasn't any argument about asset being in fact exempt.  I think

3   the committee had said it's not exempt or -- again, I forget

4   which party said it.  But am I remembering that correctly that

5   there is no argument made that it was an exempt asset?

6           MS. BLOCK:  You're right.  I think there's no argument

7   made that it is a nonexempt asset.  But there has been

8   discussion that the debtor wants to live there after the

9   bankruptcy case.

10          THE COURT:  Right.  Yep.  That's how I remember the

11  state of play.  All right.  Thank you.

12          MS. BLOCK:  Simply, the debtor is not a responsible

13  steward of his assets.

14          Third, the debtor is undoubtedly violated, his

15  fiduciary duty to refrain from acting in a manner that could

16  hinder a reorganization by, among other things, acting in a

17  manner that could lead to the incurrence of unnecessary

18  administrative expenses, funneling income to his wholly owned

19  businesses, unrestricted spending for his own benefit for his

20  businesses and his closest associates, and refusing to sell the

21  Florida condo, instead paying tens of thousands of dollars to

22  maintain it.

23          Simply through the continued bad behavior, the debtor

24  can no longer keep the privilege of being a debtor-in-

25  possession.  And his breaches of fiduciary duties that all

**RUDOLPH W. GIULIANI**

49

1   debtors-in-possession must observe constitutes cause requiring

2   appointment.

3        Your Honor, that covers the debtor's dishonesty,

4   incompetence, gross mismanagement, inadequate record keeping

5   and reporting, inappropriate relations with his businesses,

6   conflicts of interest, and breaches of fiduciary duty, each of

7   which constitutes cause requiring the appointment of a trustee.

8        THE COURT:  But so for purposes of the other argument,

9   I know that you have about being in the best interest of

10  creditors and the estate, there's obviously a certain amount of

11  repetition here in terms of the facts fitting into the test in

12  a different way.  So I think I understand where you're coming

13  from for that.  So I think we can probably dispense with going

14  through that.

15       What I would say for that, is there any particular

16  point that you think is important for me to understand from the

17  committee's point of view that merits discussion?

18       MS. BLOCK:  One point that we hit that I think should

19  be highlighted is with respect to the debtor's pre-petition

20  misconduct that's continuing during the bankruptcy case, and

21  that's the willful shirking of his discovery obligations.  His

22  businesses have not produced one document and he produced just

23  fifteen documents totaling 500 pages.  And that's in line with

24  his behavior in the Freeman litigation and the shirking of

25  discovery obligations there.

1      THE COURT:  And that's the second of the of the

2  1104(a)(2), the past and present performance.  Is that right?

3      MS. BLOCK:  That actually went to the creditor

4  distrustworthy (sic).

5      THE COURT:  All right.  I guess the fact is what it

6  is.  And --

7      MS. BLOCK:  Yes.

8      THE COURT:  And beauty's in the eye of the beholder as

9  to exactly where it might fit.  All right.

10      MS. BLOCK:  Your Honor, if I just may have a second to

11  make sure I don't have any other highlights to hit that would

12  be different.

13      THE COURT:  Sure.

14      MS. BLOCK:  The one other point I'd like to note is

15  with respect to past and present performance.  And it's just

16  highlighting again that he's made virtually no progress in the

17  Chapter 11 case.  And any progress has come as a result of the

18  committee and other parties acting reasonably and agreeing to

19  relief.

20      THE COURT:  All right.  So I think that would get us

21  to all the way to page 25 of 29 where you address the debtor's

22  opposition.  I'll give you the option, the old game show

23  password, to pass or play, whether you want to do that now or

24  whether you want me to hear from the debtor first and then

25  respond.  It's up to you.

51

1          MS. BLOCK:  Your Honor, can I proceed now?

2          THE COURT:  All right.

3          MS. BLOCK:  Thank you.

4          Your Honor, the debtor filed his opposition on June

5   13th at docket number 256.  As set forth in the committee's

6   reply, we were shocked by what we read.  The opposition is

7   replete with statements against interest and facts that

8   actually support granting the motion.  Among them, the debtor

9   talks about Giuliani Communications as his alter ego.  The

10  letter admits to struggling with the administrative aspects of

11  Chapter 11.  Debtor admits to administrative deficiencies and

12  concedes his need to improve adherence to the administrative

13  guidelines.  The debtor describes how he funnels his income to

14  his nondebtor wholly owned company and uses that income to pay

15  that company's expenses.  The debtor concedes his compliance

16  with the operating guidelines is not up to par.  And the debtor

17  asks us to be rewarded for him -- the debtor asked to be

18  rewarded for reporting fewer unauthorized payments in March

19  than he did in January.

20          It's hard to know exactly what to make of the

21  opposition, and it covers a range of topics, some relevant,

22  some not.  But I will address these in turn.

23          First, the debtor focuses on fraud, an 1104(a)(1)

24  cause that the committee does not allege in the motion.

25          Second, the debtor tells a false and misleading

1   narrative that I'd frame as a work of fiction whereby he

2   completely omits his and his businesses' failure to comply with

3   this court's bankruptcy Rule 2004 order and says he has always

4   been fully transparent and open about his finances.  Again,

5   Your Honor, he produced just fifteen documents that total less

6   than 500 pages in response to the committee's subpoena.  The

7   businesses, well, they've produced nothing.

8        Third, he identifies another conflict of interest,

9   using his income, an estate asset, to pay the salary of the

10  debtor's reported girlfriend's daughter.

11        Fourth, he asked his court to applaud his use of

12  exempt funds for his personal benefit for things like upkeep on

13  his nonexempt Florida condo the committee has asked him to sell

14  for months.

15        Fifth, he continues to obsess on an appeal of the

16  Freeman judgment, attaching a preliminary appellate brief to

17  his opposition which is irrelevant to the issue of whether a

18  trustee should be appointed.  The debtor has completely lost

19  sight of how to make his bankruptcy case successful and to get

20  progress and continues to ignore the court-related guidance

21  that lifting the automatic stay to pursue an appeal at this

22  time is an impediment to progress in the bankruptcy case.  We

23  just went through this exercise.  The debtor lost.  His stay

24  relief motion was denied.  We don't understand why he continues

25  to bring it up.

**RUDOLPH W. GIULIANI**

53

1          Sixth, the debtor is not entitled to an evidentiary

2     hearing.  He has failed to identify any material issues of

3     disputed fact.  And the debtor has not disputed any of the core

4     facts.  It's an attempt to delay the inevitable.

5          Seventh, the letter refers to Giuliani Communications

6     as its alter ego.  This opens the door for reverse veil

7     piercing whereby his creditors could seek to recover from his

8     business.  And his description of how his salary is used to pay

9     that business expenses just supports a finding of gross

10    mismanagement, inappropriate relations with Giuliani

11    Communications and breaches of fiduciary duty.

12         Eighth, the debtor ignored the obvious and substantial

13    benefits that would flow from the appointment of a trustee,

14    including among them the fact that the trustee can take control

15    of debtor's books and records, economic and governance rights

16    of the debtor's wholly owned companies, the sale of the debtors

17    New York apartment and Florida condominium, and monetize the

18    debtor's other nonexempt assets, while also pursuing the

19    recipients and are beneficiaries of the debtor's unauthorized

20    payments and facilitating the return of estate assets that have

21    been improperly diverted.  Simply, the debtor's opposition is

22    not persuasive.

23         Finally, Your Honor, we've made it to the proposed

24    order section.  We are requesting the immediate appointment of

25    a trustee.  Given the fact of this case -- we think it's

**RUDOLPH W. GIULIANI**

54

1    important that a trustee is appointed sooner rather than later.

2    And the United States Trustee Program Manual supports that

3    request.

4           In connection with the appointment, we are asking the

5    United States Trustee to fulfill the requirements set forth in

6    Section 1104(d) and consult with the committee before such

7    appointment.  The order does not prescribe with whom the U.S.

8    Trustee can and cannot consult in any way that's contrary to

9    the Bankruptcy Code.  It merely confirms our right as the

10   official committee to be consulted.  And again, this is

11   supported by the United States Trustee Program manual.

12          Upon appointment of a trustee, the debtor's

13   exclusivity period should be terminated.  He's admitted in the

14   opposition that he is in no position to file a plan, and for

15   all the reasons that a trustee should be appointed, and

16   specifically due to lack of progress --

17          THE COURT:  Well, wouldn't that be a -- you'd

18   hamstring the trustee, right?  I mean, it's one thing to

19   appoint at the request to appoint a Chapter 7 Trustee where

20   liquidation is the goal.  But even if liquidation -- maybe this

21   is a liquidating 11.  Even then, doesn't the timing and the way

22   things are done matter whether it's a sale person to a plan,

23   tax advantages, all those kinds of things?  So wouldn't it be

24   really infringing on the trustee, any trustee who would be

25   appointed in terms of their ability to exercise appropriate

**RUDOLPH W. GIULIANI**

1   judgment?

2          MS. BLOCK:  In terms of proposing a plan?

3          THE COURT:  Well, in terms of the Court may reduce or

4   increase 120-day period for exclusive period.  And just again,

5   anything that says here's the substance of where the case is

6   and what should happen, that would seem to be saying, well, not

7   only is the motion granted, but there should be additional

8   relief as to the case baked in that handcuffs any Chapter 11

9   trustee.  And maybe the trustee ends up there.  Maybe the

10  trustee doesn't end up there.  And sometimes it's hard to know

11  if -- my years on the bench have proven anything, it's that

12  it's very hard to predict the future in cases.  So I guess

13  that's my point, but I want to make sure I understand your

14  position on that.

15         MS. BLOCK:  The position is that we're just needing to

16  terminate the debtor's exclusivity periods.  We're fine with

17  the Trustee having some.  And we would plan on working

18  cooperatively with the trustee and providing all the

19  information that could be beneficial for a trustee to propose a

20  plan.

21         THE COURT:  All right.

22         MS. BLOCK:  Your Honor, the next point is an important

23  one.  The debtor stated under penalty of perjury that he's a

24  hundred percent owner of six companies.  His interest in those

25  companies are property of the estate set forth in Section --

1   Bankruptcy Code Section 541(a).  Bankruptcy Code Section 1108

2   authorizes the trustee to operate the debtor's business.  The

3   case law explains the Chapter 11 trustee stands in the shoes of

4   a debtor and possesses the economic and governance rights to

5   participate in the management of a debtor's wholly owned

6   company that the debtor enjoyed before the --

7          THE COURT:  But doesn't that happen automatically?

8   The concern courts often have in orders is the more you specify

9   things that people say, well that actually is included, well,

10  but then add it, is then you have problems of arguments about

11  exclusion.  Well, Judge, if you identified the following five

12  things in this order, but you didn't identify things 6, 7, and

13  8, they aren't included.  And so that's why you'll see a lot of

14  judges say to the extent applicable law that it is what it is,

15  what it is.  So that's -- in the context of this case, whatever

16  the unique set of facts, that's sort of a traditional kind of

17  concern about dictating in the order exactly what the order

18  means.  It means whatever the law tells us it would mean if a

19  trustee is appointed.

20         MS. BLOCK:  Your Honor, we completely agree.  That

21  should happen automatically.  But we're worried that if the

22  order isn't crystal clear, the parties won't abide by it.

23         Additionally, the United States Trustee took the

24  position that that was not appropriate relief that instead, it

25  would be -- it would infringe on the trustee's independent

1    judgment.  So we think it needs to be clear for all parties

2    that that's exactly what happened.

3         THE COURT:  Well, I'm guessing -- and the U.S.

4    Trustee's Office at the end of this can sort of chime in -- is

5    that they might say a Trustee might say as to that entity, we

6    don't have any interest, we're just going to leave it alone

7    because it doesn't -- we found it didn't really have economic

8    substance that is worth attending to for purposes of this case.

9    So I'm guessing that their -- the U.S. Trustee's Office view

10   sort of reflects that exercise of independent judgment, that

11   it's just not worth fighting about certain things or the

12   trustee spending the time and money to assert control over

13   things that they think -- he or she thinks don't ultimately

14   help with the case.

15        MS. BLOCK:  And we would definitely agree with that

16   business judgment.  If we have a shell entity with nothing in

17   there, there's no point in furthering that.  But we just want

18   to be crystal clear, given what a key component of our argument

19   is, that he's using his businesses inappropriately and

20   weaponizing them in this case, that the trustee would take

21   control of those business, governance rights and management.

22        THE COURT:  Well, if a trustee were appointed, I would

23   expect in this case, as in any case, that the trustee would

24   look at the motion papers that led to a trustee appointment as

25   well as the oral argument and be well versed.  And my

58

1    experience is that's what folks do.

2           MS. BLOCK:  Thank you, Your Honor.

3           Finally, we are requesting that any individual or

4    entity in possession of the debtors records or property

5    cooperate with the trustee and turn over such records and

6    property of the estate to the trustee.  This provision should

7    not be controversial and find support in Bankruptcy Code

8    Section 542.  No party has identified any case law to the

9    contrary.  And there's no reason for nondebtors to hold on to

10   estate property and records once the Court -- once a trustee is

11   appointed.

12          THE COURT:  All right.

13          MS. BLOCK:  With that.  Your Honor, we have reached

14   the end of the committee's presentation.  And we respectfully

15   request that the motion be granted.

16          THE COURT:  All right.  Thank you very much.

17          MS. STRICKLAND:  Your Honor, do you wan to hear from

18   the whole side first?

19          THE COURT:  I would think -- I don't know if you had a

20   chance to talk about it.  I would think it probably makes sense

21   to hear from the Freeman plaintiffs before we hear from the

22   debtor.

23          All right.  So let's do that.  That way debtor's

24   counsel can respond to everything.  I'm guessing that it

25   probably makes sense to hear not only from the Freeman

1  planners, but from the U.S. Trustee's Office and then debtor's

2  counsel can bat clean-up in terms of responding to whatever

3  arguments have been.

4          MR. FISCHOFF:  Sure.

5          THE COURT:  All right.  Thank you.

6          THE COURT:  Counsel?

7          MS. STRICKLAND:  For the record, Your Honor, Rachel

8  Strickland, Willkie Farr& Gallagher on behalf of the Freeman

9  plaintiffs.

10          When someone shows you who they are, believe them.

11  And I won't repeat how Mr. Giuliani has shown himself to be

12  dishonest, incompetent, and someone who has grossly mismanaged

13  his estate.

14          Your Honor has nonetheless given him a lot of grace.

15  And like a debtor should, you enabled him to appear before you

16  with a clean slate.  But look at how he has flouted you and the

17  law post-petition.  He's not a doddering eighty-year-old.  He

18  is a shrewd and manipulative man.  His reports are false,

19  inconsistent, and late.  His deadlines are ignored.  He's

20  funneling money to a nondebtor LLC, referred to by his counsel

21  as his alter ego.

22          But per the debtor's reply at docket 256, his

23  bookkeeper is ill, his accountant has quit, and no one else

24  will work for him.  That is not an excuse.  Those are huge red

25  flags that warrant that adult supervision that 1104 provides.

1   And once again, Giuliani's pleading makes clear that the whole

2   case is about the Freeman plaintiffs.

3         And I have to say, I don't really get it.  If all of

4   his money is outside of the estate and nothing to do with the

5   case and he wants to litigate, all he had to do was not file to

6   begin with unless, of course, it was a pure litigation tactic

7   to be used against the Freeman plaintiffs.

8         And then in an advocacy piece filed with a lot of

9   chutzpah, Giuliani agrees throughout -- attaches this whole

10  draft and argues that all of the statements he made about the

11  Freemans were without malice.  Well, they should tell that to

12  the fourteen-year-old son of my client who received racist

13  death threats, the grandmother who was harassed, and my clients

14  who the FBI said should move for their own safety.

15        This pleading is an insult, and it's worse.  The

16  pleading says that this is all Pre-petition conduct.  It's not.

17  The last time I was here, I repeated the almost daily things

18  that Giuliani was saying on podcasts and elsewhere.  And you

19  admonished him twice.  And his counsel said that they would

20  relay the message that Your Honor said to just close his mouth.

21        And our administrative claims are mounting.  We have

22  filed them, and they are growing.  So we thought the resolution

23  was going to be an injunction that he would agree to.  We

24  entered into a stipulation.  Giuliani agreed he would stop

25  defaming my clients and abide by the injunction.  We got an

1   order of the District Court.  This was late May.

2        So this morning I printed a recent tweet from the

3   mayor, which is dated June 3rd, 2024.  He has 1.7 million

4   followers, but I'm sure other people read it as well.  May I

5   approach?

6        THE COURT:  Yes.  Please provide a copy to everyone

7   else.

8        MS. STRICKLAND:  So if you look at the tweet, I think

9   this is X now, but I think they're still calling it tweets --

10  if you look at the second part of the sentence, he's talking

11  about a video of ballots being run through counting machines

12  two and three times.  This is the specific allegation that he

13  has made over and over and over again which is false about my

14  client.  And then he follows up with the cherry on top I refuse

15  to be silenced.

16       Well, I don't really know what's happening here if

17  he's agreeing to the injunction and has acknowledged that he

18  has a legal obligation to be silent and no longer defame our

19  clients if he's putting this out after the District court

20  enters the order.  So he just won't follow the law.

21       The creditors are unanimous.  We all need this relief.

22  We don't need any further evidence.  Your Honor can observe all

23  of the hard facts before you.  A trustee is warranted, and we

24  need it immediately.  Thank you, Your Honor.

25       THE COURT:  Thank you.

1        All right.  Let me hear from the United States

2   Trustee's office, and I'll hear from debtor's counsel.

3        MS. SCHWARTZ:  Thank you, Your Honor.  Andrea Schwartz

4   for the United States Trustee.

5        As stated in our papers, Your Honor, we're not taking

6   a position on the committee's motion for the appointment of a

7   Chapter 11 trustee.  Our issues concern the paragraphs in the

8   proposed form of order.  And we'll address them since they have

9   been addressed by the committee and the Court is hearing

10  argument on that.

11       I think Your Honor got it right.  And certainly I know

12  this from appearing before this Court many times.  It is what

13  it is, is what it is.  And the statute provides exactly what

14  the duties and obligations are of the United States Trustee

15  with respect to the appointment of a Chapter 11 trustee.  And

16  the United States Trustee takes that responsibility very

17  seriously and acts expeditiously.

18       In paragraph 2 where the debtors are asking for the

19  immediate appointment of a Chapter 11 trustee, the United

20  States Trustee is of the view there's no need for the word

21  immediate.  We take that responsibility very seriously, and we

22  will act expeditiously.

23       Further, the notation in that paragraph after

24  consultation with the committee, it's correct.  Of course the

25  U.S. Trustee consults with all parties-in-interest, not just

**RUDOLPH W. GIULIANI**

63

1  the committee.  We will reach out to all parties-in-interest in

2  the case, as we do in every single case.  And there's no need

3  for that language to be there because it does give the

4  impression that somehow the opinion of the committee or the

5  recommendation of the committee is somehow more important than

6  other parties-in-interest.  The U.S. Trustee will, as the

7  statute requires and is his statutory obligation, consult with

8  all parties-in-interest if, in fact, the Court decides it will

9  appoint a trustee.

10        With respect to paragraph 4 that talks about taking

11  control of the companies, Your Honor, I think you hit it right.

12  Again, when you were making comments with respect to the

13  committee's presentation, the Chapter 11 trustee needs some

14  time to be able to determine whether or not taking control of

15  any of these entities has any value to the estate, whether or

16  not he can take control.  He has to look at the operating

17  agreements.  Just because a trustee gets appointed and steps

18  into the shoes of the debtor and becomes the one hundred

19  percent owner does not necessarily mean he becomes the managing

20  member.

21        And if one looks at any of the cases that the

22  committee cited, each of those cases were decided on state law.

23  And none of the appointment orders in those cases included at

24  the time of appointment that the trustee should take control of

25  the nondebtor companies.  Certainly, if there are benefits to

1    managing those and there are assets there, that is going to be

2    part of the U.S. Trustee's appointment, subject to the Court's

3    approval, of the Chapter 11 trustees' business judgment.

4    Clearly --

5         THE COURT:  So is one way to address this to have the

6    order just identify things that the  Trustee can look at and

7    sort of including but not limited way?

8         MS. SCHWARTZ:  Well, Your Honor, if Your Honor feels

9    that it's important to do it, that's okay.  But we don't think

10   it's even necessary.  All the -- it's --

11        THE COURT:  I see your point.  And again, another way

12   to sort of address this is the fact that I always understand

13   that if there's an appointment of a Chapter 11 Trustee in

14   cases, they also -- they always make a point of looking at the

15   history of their appointments so they understand --

16        MS. SCHWARTZ:  Right.

17        THE COURT:  -- why they've been here.  And I guess

18   your point is that -- and it's not necessarily a bad idea in

19   this case, but it may be a burdensome precedent because it may

20   encourage parties in any case where trustee is appointed to

21   identify what things should be on that list and what things

22   should be --

23        MS. SCHWARTZ:  Judge, that is --

24        THE COURT:  -- on that list and what things shouldn't.

25        MS. SCHWARTZ:  That is a hundred percent correct.  And

1   I will tell you, Judge, even the cases cited here, they're not

2   on all fours with this case at all.  So what we would really

3   not want is another order getting entered where then anyone

4   that's seeking the appointment of trustee starts laying out

5   what the trustee has to do.  It's a statutory duty.  And in

6   these cases, by the way -- one of the cases that was cited was

7   In re Kwok (phonetic), which is in our district, that was a

8   motion by the Trustee made a month and a half after his

9   appointment when he determined that he wanted to take control

10  of that wholly owned company.  That was not part of the -- that

11  was not part of the appointment order.  And I think we run into

12  a lot of problems, Judge.  And I would I would implore the

13  Court not to do that because then that just becomes more going

14  back over other cases and notwithstanding -- even if the Court

15  were to say this is not supposed to be a precedential value, my

16  experience is that there will be some case where someone will

17  raise it for precedential value.

18          THE COURT:  I can take judicial notice of the fact

19  that orders are often cited to judges here and in other

20  districts.  I'm not saying that that proves to be particularly

21  persuasive necessarily, but I understand your point.

22          MS. SCHWARTZ:  Okay.  Your Honor, also, with respect

23  to paragraph 5, that's another thing that the committee wants

24  to impose on the trustee before the Trustee even gets his sea

25  legs, if you will, before he even get to handle of everything

1   that's going on in the case.  The notion that the Trustee has

2   to immediately take possession of all books and records of

3   nondebtor entities, again, it goes right against the trustee's

4   business judgment.  As Your Honor said earlier, it may be.  It

5   may be --

6           THE COURT:  Well, that one I -- I haven't appointed a

7   trustee yet.  But certainly in the case in front of me, central

8   to the argument is the fact that -- and indeed admitted by the

9   debtor, regardless of what the outcome is, that essentially the

10  records are a mess.  And so I'm often concerned about having

11  these conversations to the extent that denial of request for

12  language is, is construed as in any way encouragement or a

13  blessing of the status quo.  So I think I will just move on

14  without --

15          MS. SCHWARTZ:  Oh, absolutely.

16          THE COURT:  -- because I can certainly -- of all the

17  things that are identified here, I can -- this one is eminently

18  understandable, the record that I have in front of me.  But

19  beyond that, I think I will say nothing.  And we can move on to

20  any other comments that you have.  That's probably the high

21  watermark of where to leave that.

22          MS. SCHWARTZ:  Well, I just want to say one other

23  thing, Your Honor, which I didn't say earlier with respect to

24  this taking control of the entities and taking control of all

25  the books and records.  Your Honor may be aware that the

**RUDOLPH W. GIULIANI**

67

1    Corporate Transparency Act was effected January 1, 2024.  And I

2    think many owners of companies and so forth are still getting

3    their arms around that.  And that's why we mentioned in our

4    papers that it was imperative that the that the Chapter 11

5    trustee have all opportunity to examine these nondebtor

6    companies before taking on responsibility to the extent there's

7    no value or no benefit to the estate.

8             THE COURT:  No, I got it.  I got it.  Anything else,

9    Ms. Schwartz?

10            MS. SCHWARTZ:  No, Your Honor, thank you.  Just so

11   when I want to raise things at the case management conference.

12            THE COURT:  Yes.  Please remind me if --

13            MS. SCHWARTZ:  Thank you, Your Honor.

14            THE COURT:  -- I drop the ball on that.

15            THE COURT:  Thank you.  All right.

16            I think I've canvased all parties who wish to be heard

17   on this other than the debtor.  All right.  With that, let me

18   hear from debtor's counsel.

19            MR. FISCHOFF:  Good afternoon, Your Honor.  Gary

20   Fischoff for the debtor.

21            So there's been a lot said this morning or this

22   afternoon about the debtor in connection with this motion.  And

23   I think there were perhaps three categories.  There was the

24   issue of the debtor who's an individual operating through an

25   LLC.  There was the issue of the debtor's reporting.  And then

68

1    maybe there was a catchall of everything else.  So first I'm

2    going to try to address stuff generally then maybe get more

3    specific.

4            The Bankruptcy Code says that the Court shall appoint

5    an operating trustee in the event it finds cause or if it's in

6    the best interest of creditors.  Cause is not a defined term.

7    It's used throughout the Bankruptcy Code for various matters.

8    And it's really a finding of fact by the Court based on the

9    view of the entirety of the circumstances.

10           Now, a lot -- and also the part 2 is for the best

11   interests of creditors.  I think as will be demonstrated, the

12   appointment of a trustee is not in the best interests of

13   creditors.  In fact, it's harmful to the interests of

14   creditors.

15           But let me first go to what's -- lot been said that

16   the debtor has entities or an entity basically that he

17   operates.  The debtor generates personal services income

18   besides the Social Security which we don't talk about.  The

19   personal services income is generated by him doing podcasts or

20   radio shows where he is the show.  He is the producer of the

21   content.  He is the one that attracts the audience.  And it's

22   his services that bring in the income.  The fact that he does

23   it through an LLC or a corporation is nothing unusual, nothing

24   dishonest, and not an effort --

25           THE COURT:  I don't think anybody is quibbling with

1   that notion.  I think what they're -- what the argument --

2              MR. FISCHOFF:  That's not what I heard.

3              THE COURT:  -- I've heard is that if you do that, then

4   you have to provide information because it can't be on a trust

5   me basis.  And so for example, a specific instance here is that

6   he provides the services, but he is also then individually

7   paying the expenses that are not being run through those

8   entities when those entities are getting the income.  And

9   that's putting aside the fact that there appears not any

10  dispute that those entities haven't -- there's no documentation

11  and transparency into how those entities run the numbers.

12             MR. FISCHOFF:  So bad habits die slowly.  All of the

13  credit cards he had at the commencement of the case have been

14  canceled, which they should have been.  Unfortunately, he was

15  still engaged in some of that pre-petition activity where he'd

16  pay an expense.  You know, that was business expense.

17             THE COURT:  I understand that.  And while this case

18  has some very interesting circumstances about it, this is a

19  traditional bankruptcy problem, right?  So I've certainly seen

20  plenty of cases, the Seinfeld Bagel King.  Helmer Toro was in

21  this court probably a decade ago.  He had a lot of different

22  businesses.  And sometimes they charged -- one business would

23  charge another business rent to 5,000 dollars month.  Sometimes

24  the rent would be zero.  But they were separate entities that

25  had separate creditors.  And so we all have the experience of

 1  giving people a certain amount of time to turn the aircraft

 2  carrier and figure out that bankruptcy requires something

 3  different perhaps than what they're used to doing.  But we've

 4  been here too long to be having that discussion.

 5        MR. FISCHOFF:  Well, I understand that it's taken some

 6  time.  But what's important is the debtor has been paying these

 7  expenses not with creditors' money, with his own money.

 8        THE COURT:  But how do I -- how do I know that?  How

 9  does anybody know that if there's no transparency into the

10  record?  So is there a record of Giuliani Communications that

11  you can show me that says here's how all the money is flowing,

12  here's where the money came from, here's where it went?

13        MR. FISCHOFF:  No, not yet.  But there is a record --

14        THE COURT:  But not yet.  That's an unfortunate

15  statement for you to have to make at a hearing --

16        MR. FISCHOFF:  Well, Judge --

17        THE COURT:  -- this late in the case.

18        MR. FISCHOFF:  -- there is record of the 206,000 of

19  exempt funds going into his personal account.  And with those

20  exempt funds, he's paid the maintenance on the New York

21  apartment, which is up for sale, and preserved the equity for

22  the creditors.

23        THE COURT:  But I'm not even sure that I know that.  I

24  know the -- without knowing anything -- the more complete

25  financial picture, all I know is that money was put in from

1   exempt assets and that various things were paid.  But I don't

2   know if anything about Giuliani Communications -- without that

3   kind of information, nobody can say anything with any

4   confidence.

5           MR. FISCHOFF:  Okay.  I think we can say with

6   confidence, and no one's disputing the fact that he brought

7   206,000 of exempt funds into the DIP account and paid expenses

8   of the estate with that personal money and preserved equity in

9   the two homes by paying their taxes and common charges.  So on

10  the one hand, they complain that he's paying those.  But on the

11  other hand, they're not disputing that it came from his

12  personal money.

13          THE COURT:  But --

14          MR. FISCHOFF:  As far as Giuliani --

15          THE COURT:  But again, if we don't know what the

16  income, potential income would be or what amount the debtor was

17  entitled to or could take -- reasonably take from the entities,

18  we don't know how these things compare, right?

19          MR. FISCHOFF:  Yes.  I agree.  And unfortunately --

20  well, it's taking the debtor some time.  I think the debtor is

21  improving his reporting.  And it doesn't indicate an intent --

22  an intent for deception or dishonesty.  It's just slow to adapt

23  which I understand.  It's been several months.  But on the

24  other hand, the debtor --

25          THE COURT:  Of course, the test is not necessarily

**RUDOLPH W. GIULIANI**

72

1   focused solely on bad intent, right?  So if there's gross

2   mismanagement, there can be plenty of things that are -- don't

3   involve bad intent but are a reflection of the facts on the

4   ground to say this -- these are the obligations.  They're not

5   happening.  And therefore, they satisfy one or more of the

6   tests that are identified.

7        So while the motion and various creditors have come

8   forward and said, Judge, we think there's plenty here for you

9   to find intent, but the -- but the statute doesn't necessarily

10  even require me --

11       MR. FISCHOFF:  Okay, but it does --

12       THE COURT:  -- to find bad intent --

13       MR. FISCHOFF:  It does require best interest of the

14  creditors.  And in this particular case, the appointment of a

15  Trustee is not in the best interest of creditors because, 1,

16  it's going to add -- I mean, the assets in this case are

17  limited to two categories:  the assets he owned on the filing

18  date and whatever their value is upon liquidation and by the

19  way, the equity that's apparently being preserved by him using

20  exempt assets to pay those associated expenses.  But the other

21  asset in this case 00 and everyone's talking about let's take

22  control and operate as business, his business is an eighty-

23  year-old man doing personal services.  If he decides to retire

24  next week, all we have are those limited physical assets.

25  So -- and --

73

1            THE COURT:  Well, but --

2            MR. FISCHOFF:  And the liquidation -- Judge, everyone

3    talked for a long time.  Man, I just finished my thought?

4            THE COURT:  Yes, but I interrupted various people

5    along the way.  That's the way I guarantee --

6            MR. FISCHOFF:  Okay.

7            THE COURT:  -- that I -- if I have a question to ask

8    you that I ask you and then you give me --

9            MR. FISCHOFF:  Okay, go ahead.

10           THE COURT:  -- you can give a chance to --

11           MR. FISCHOFF:  I'm sorry.

12           THE COURT:  -- share your wisdom.  The issue that

13   always comes up when somebody else asserts the interest of the

14   creditors who isn't the creditors is that people say, well,

15   we've got what represented parties here who are sophisticated

16   and are fully capable of deciding what they'd like to do.  So

17   what's your response to that?

18           MR. FISCHOFF:  Well, I understand the motivation of

19   the Freeman creditors.  Obviously, they have a judgment and

20   they want that judgment to remain in place.  And I know I'm

21   going to say something that I've said before.  Nobody really

22   likes to hear it.  But there's 150 million reasons why the

23   Freeman case should be appealed.  How can a creditor --

24           THE COURT:  But see --

25           MR. FISCHOFF:  How can a creditors' committee not be

**RUDOLPH W. GIULIANI**

74

1   interested in having that overturned?  We do have an arguable

2   basis.  I mean, we have a draft brief that shows this is not

3   pie in the sky.  It's --

4          THE COURT:  But I don't have a motion to reconsider my

5   prior denial of the order.

6          MR. FISCHOFF:  No, you don't.

7          THE COURT:  And I will say that in the conversation

8   back and forth, I denied the motion, making it very clear that

9   the reason for the denial, among other things, was my concern

10  that the debtor viewed the case as solely about an appeal of

11  that litigation.  And that progress had been exceedingly slow

12  is one way of putting it.  You can take a more aggressive tact

13  on that.  And that granting a further request in a case that

14  stayed would reinforce that message.

15         And so for example, we bump into other things that

16  have happened in this case, for example, the idea of selling

17  the Florida premises, which is a motion that's sub judice.  I

18  took it under advisement.  It's not exempt property.  The

19  argument has been made that the debtor doesn't need to live

20  there as opposed to somewhere else, given the value of that

21  property.  And there's been -- all quiet on that.  So no one

22  has sort of taken any hints or any action to deal with that.

23         And there hasn't been progress on a whole host of

24  other things.  In fact, I'm not sure there's been any

25  significant progress since the time we heard that motion to

75

1   lift stay --

2          MR. FISCHOFF:  Well --

3          THE COURT:  -- and now.

4          MR. FISCHOFF:  The property in New York has been

5   formally listed.  The broker -- the order has been entered

6   authorizing the retention of Sotheby's to market that property.

7   So that's underway.  And the debtor is generating income from

8   his personal services.  I recently the other day received a

9   contract, a new contract he received for a five-day-a-week

10  daily internet show or radio show.  I'm not sure.  I emailed it

11  to creditors this morning.  I received it on Father's Day.  And

12  that's going to generate approximately an additional 180,000

13  dollars income.

14         So the debtor is working and trying to obtain

15  additional employment.  And I think it's slow.  It's not like

16  this is a business that's generating operating revenues and

17  there are claims objections and other administrative aspects.

18  This is really an individual with a huge creditor claim that I

19  know it's not the singular focus, but out of 150 million and

20  change in creditors, that's ninety-nine percent of it.  So it

21  needs to be addressed.  And we will consider renewing that

22  motion or refiling it.  Regardless of what happens today, it

23  needs to be addressed.

24         But I think overall, I'm not going to say -- look, the

25  debtor has an obligation to comply with the administrative

1  obligations for the benefit of being in the Bankruptcy Court.

2  There's no question about it.  And the debtor is making every

3  effort to do that.  But I don't think that on balance requires

4  that an operating trustee to be appointed, to do what?  To get

5  the bookkeeper for his business who I understand was out sick

6  or something to comply faster to turn over the records, which I

7  understand he's talking to the creditors committee about?  Is

8  it going to make the debtor work harder?

9          THE COURT:  Well, this is why I asked questions and

10 jump in, because there's a lot to unpack in what you've said

11 over the last few minutes.

12         MR. FISCHOFF:  Okay.

13         THE COURT:  So the debtor has not shown any ability to

14 have a bookkeeper or an accountant work on his behalf.

15         MR. FISCHOFF:  For him individually, correct.

16         THE COURT:  Right.  And he is an individual debtor.

17         MR. FISCHOFF:  Correct.

18         THE COURT:  Certainly I would expect that situation to

19 not be true if a Trustee were appointed.  I do think that the

20 failure to retain a bookkeeper, an accountant is a troubling

21 fact.  What I would take from that beyond it being troubling,

22 I'm not sure.  But it is exceedingly rare for such an event,

23 that kind of a problem to exist in a case.  The usual instance

24 is where someone says they're not going to be paid.  But short

25 of that, this is a normal thing to have happen.

**RUDOLPH W. GIULIANI**

77

1        But let me also back up to an earlier comment you made

2   about administrative expenses.  And I'm trying to identify for

3   you the things I'm concerned about so that you can respond to

4   them.

5        MR. FISCHOFF:  Okay.

6        THE COURT:  As for administrative expenses, it's

7   pointed out by the Freeman plaintiffs that some of the work

8   that the debtor does is leading to statements which, from the

9   Freeman plaintiffs' point of view, are is going to lead to

10   additional liabilities.  And it's also -- and they made a claim

11   for administrative expenses.  And we have that.  So you could

12   view that in terms of an argument by various parties whether

13   you talk about bad faith, good faith, whether you talk about

14   just garden variety administrative expenses and increasing

15   liabilities.

16        So I'm not sure that a trustee would necessarily fix

17   all of that, but it certainly couldn't hurt, given that we've

18   had very recently a conversation about this issue and at least

19   from what I have been shown today, that conversation seems to

20   not have resulted in progress.

21        MR. FISCHOFF:  Well, I just saw this also I guess the

22   same time the Court saw it.  And I don't see any reference to

23   the Freeman -- I mean, the injunction --

24        THE COURT:  Counsel, let's not be clever.  I think it

25   would be impossible for anybody who's familiar with that issue

**RUDOLPH W. GIULIANI**

78

1  to not connect this with that litigation.  It seems that that

2  doesn't seem plausible to me.  So you may not have much that

3  you can say about that, and maybe we leave it at that.  But

4  again, to identify --

5           MR. FISCHOFF:  I'll leave it at that.

6           THE COURT:  To identify the arguments that have been

7  made and how I'm viewing them, the other -- that's a reason you

8  could consider it in the context of intent, but you could also

9  consider it in the context of very Machiavellian liabilities

10  being created during the course of the case.  So --

11           MR. FISCHOFF:  Well, a trustee may not change that.  I

12  don't know, Judge.

13           THE COURT:  That's a fair point.  That's a fair point.

14           MR. FISCHOFF:  I don't know.  But look, they went

15  through a lot of specifics.  I don't think I need to go through

16  each one.  I can tell you the credit cards that were causing a

17  problem have been canceled.  The debtor will -- I mean, if the

18  Court says we want reporting, we'll get reporting on the

19  entity.  I believe the entity that generates the income is

20  Giuliani Communications.  I'm not sure.  I mean, he had some

21  left over entities from when his life was more complicated with

22  more businesses.  But we will endeavor to get the committee,

23  U.S. Trustee a report of the income and expenses for the

24  business.  I've been advised that so far, at least up until

25  recently, the income did not exceed the expenses and therefore

1    there was no dividend to the individual.  Now, with a new

2    contract and so forth, that may change, but I'm not in a

3    position to say.

4          As a matter of fact, judge, so far today, we haven't

5    really had any evidence before the Court.  We've had a nice --

6          THE COURT:  Well, these are --

7          MR. FISCHOFF:  -- presentation that I saw for the

8    first time when it was handed to me.  We had papers submitted.

9    But I would submit that for the Court to appoint a trustee

10   under -- in a contested matter such as this, the Court should

11   conduct an evidentiary hearing so that --

12         THE COURT:  So let me ask you about that.  But let me

13   back up.  What I'm seeing cited in here are things in the

14   context of this case.  So I'm seeing pleadings of which I can

15   take judicial notice.  And I'm seeing sworn testimony that was

16   done in the context of examinations, for example, an

17   examination February 7th.  And I'm seeing, again, docket 133,

18   222 about further disclosures, 341 meeting, and a check.  It's

19   discussed in the opposition.  I mean, I'm not seeing things

20   that that are not rooted to and anchored in this case.  And it

21   would seem that I'm having trouble identifying in my quick flip

22   through the papers things that of which I couldn't take

23   judicial notice because they're not -- I mean, the only thing

24   from the internet is this.  And I don't need to take -- I'm not

25   taking anything for the truth or falsity of the matter

1  asserted.  I understand this to be, Judge, this is out there,

2  and it says what it says, and we have an argument about it.

3  But, I mean, everything else seems to be anchored to this case.

4      So what is it that we need an evidentiary hearing for?

5  What is it that's not appropriate for me to consider?

6      MR. FISCHOFF:  Well, judge, the 341 meeting testimony,

7  in one instance, he's questioned about the payment he makes to

8  his ex-wife's -- o his ex-mother-in-law.  And he says I don't

9  know if it's court ordered or I don't know if I -- if it

10 wasn't, I would have done it any way.  I mean, that's 341

11 meaning testimony.  But what does that do?  Or he says I don't

12 know --

13     THE COURT:  Think that was used in the context of

14 disclosure.  So that's why I asked that question, that it's --

15 that argument is not made in the context of saying that's an

16 inappropriate payment.  It was used in the context of, Judge,

17 if you look at the schedules, that's not there.  If you look at

18 the disclosures about ongoing costs, that's not known.

19     MR. FISCHOFF:  No.  But his payments under his

20 matrimonial order were disclosed.

21     THE COURT:  All right.

22     MR. FISCHOFF:  And he disclosed it is 341 meeting.  We

23 ultimately obtained with some difficulty the divorce papers and

24 sent it to the committee.  So they had to -- they see it was

25 court-ordered.

1           THE COURT:  Frankly, I don't consider the payments for

2      Mr. Giuliani's mother-in-law to be the thing that is going to

3      decide this case.  We have plenty of other issues.

4           MR. FISCHOFF:  But --

5           THE COURT:  And so I will just say it's cited as a

6      question about transparency into finances.  I took it in that

7      context.  You have some responses.  That's fine.

8           But again, what I'm -- a lot more of what I'm hearing

9      is things about, say, Giuliani Communications.  And I suppose

10     the only thing in which I don't have in evidence is I have a

11     representation, but it's not refuted in the reply that there

12     have been no documents produced from Giuliani Communications or

13     the other entities.

14          MR. FISCHOFF:  I understand that the creditors'

15     committee is in touch with the part time bookkeeper for

16     Giuliani Communications, and they're discussing it.  I don't --

17     I can't say more than that, but I understand that.

18          But, Judge, again, I still think that there isn't

19     sufficient evidence.  There are statements.  There is legal

20     argument.  There are copies of documents that haven't been

21     admitted into evidence.  So --

22          THE COURT:  Well, if you have specific evidentiary

23     objections, you should make them.  And I'll deal with them.  I

24     understand the argument from your point of view that I don't

25     have sufficient evidence.  The folks on the other side, I

1  think, disagree with that.  But if there's specific evidentiary

2  objections, I need to hear them.  I'm not going to get into an

3  umbrella, well, the evidence is a little wonky, Judge, and that

4  prevents you from considering the merits of the motion.  So if

5  there's specific, again, objections, I didn't see any in the --

6  in the reply.  I saw the statement saying that you were

7  requesting an evidentiary hearing.  And my question to the

8  hearing is going to be what is it that we need evidence on.  An

9  evidentiary hearing puts people on the stand.

10         And so is there a request to put your client on the

11  stand, to put other clients on the stand?  I mean, that that's

12  what -- that's what evidence looks like.

13         MR. FISCHOFF:  Yes.

14         THE COURT:  People receive for summary judgment

15  documents all the time.  And so that's what I have here.  I

16  have the traditional stack that judges receive.

17         MR. FISCHOFF:  Yeah.

18         THE COURT:  And so if there's specific evidentiary

19  objections, I'm happy to hear them and decide them, take

20  them -- either decide them now or take them under advisement.

21  But I need something more than we should have an evidentiary

22  hearing as a general statement.

23         MR. FISCHOFF:  Well, I think perhaps the debtor needs

24  to take the stand in connection with this matter.  I mean --

25         THE COURT:  But for what purpose?  You control the

83

1  debtor.  He could have supplied a declaration in response to

2  all this.  I don't have that.

3          MR. FISCHOFF:  Right.

4          THE COURT:  So again, the idea is that there's been

5  something that's provided where you say I don't have a chance

6  to respond to that.  The debtor is your client.  I mean, I

7  understand this is a challenging case.  But this is the way it

8  goes.  There's a motion made.  And then you have a chance to

9  respond.  And that's how it works, just like a motion for

10  summary judgment, a motion to dismiss, whatever it is.  And if

11  there's specific objections to evidence that the other side,

12  that is the committee, the Freeman plaintiffs. have referenced,

13  then that's -- I'll hear that.  But I need, again, something

14  more specific as to what it is that I need to decide as an

15  evidentiary matter that's an open question.

16          MR. FISCHOFF:  One minute, Your Honor.

17          So, judge, I have nothing further to say.  Mr. Caruso,

18  who's here, I guess would just like to speak for a moment, if

19  he may.  He was the prospective attorney whose retention was

20  not authorized because the appeal wasn't authorized at that

21  time to go forward.  But since it was brought up, I think he

22  would just like to make a brief statement.

23          THE COURT:  Well, I'm not here to reargue the motion

24  to lift stay.

25          MR. FISCHOFF:  I don't think that's what he's going

84

1   to --

2           THE COURT:  No, no.  wait a minute.  I haven't given

3   you leave to speak.

4           MR. FISCHOFF:  Sorry.

5           THE COURT:  So you need -- again, just like the

6   evidentiary point, you need to be a little more specific and

7   give me a little more to work with than he wants to speak about

8   the appeal, because they haven't raised the status of the

9   appeal as relevant to what they're requesting.  And to the

10  extent that I denied the request to lift the stay to take

11  further steps on the appeal, I certainly wouldn't hold that

12  against you in the context of this motion because that was my

13  decision.  So I'm trying to -- I'm struggling with

14  understanding --

15          MR. FISCHOFF:  So --

16          THE COURT:  -- how a conversation about this is

17  relevant.

18          MR. FISCHOFF:  Well, so, Judge, it's not going to be

19  about the appeal.  May Mr. Caruso say specifically what he

20  wants to address?  And the Court can say yes or no.

21          THE COURT:  Well, I'm going to give you a chance to

22  chat.

23          MR. FISCHOFF:  Okay.

24          THE COURT:  And you can --

25          MR. FISCHOFF:  Okay.

**RUDOLPH W. GIULIANI**

1        THE COURT:  And explain it to me after you chat.

2     (Counsel confer)

3        MR. FISCHOFF:  Okay.  So the brief that -- the draft

4  brief that was next to the debtor's papers, there was a comment

5  from the Freeman plaintiffs' counsel that it was an insult, and

6  he just wants to address that it's not an insult.  He didn't

7  intend to insult the Court.

8        THE COURT:  I'll take it in that vein, but I don't

9  know that that's relevant to what I have to decide.  So I'm not

10  going to take -- it's several steps attenuated from what my

11  inquiry is.  So the proposed draft of papers to file an appeal

12  and the response to that proposed draft is pretty far afield

13  from what I have to decide.  So I'm not -- I'm not going to

14  take that comment about offense taken or his spirited defense

15  of his honor as something that I need to decide.

16        I'm always mindful in cases that there are times when

17  people sometimes need to speak to defend their honor.  But it

18  is also my job in those circumstances if that's not what I need

19  to decide to tell people there's no need to defend your honor

20  in this context because it's not the thing I'm deciding and I'm

21  not going there.  So I can tell you that.

22        And if there's something else you want to address,

23  you'll let me know.  But that's not something I need to delve

24  into at this time.

25        MR. FISCHOFF:  Nothing further on Mr. Caruso.  Thank

1    you.

2              THE COURT:  All right.

3              MR. FISCHOFF:  Just one moment.

4              THE COURT:  Sure.  Take your time.

5              In fact, here's what I'd like to do.  I'd like to take

6    a short break to make sure that everybody has had enough time

7    to look at the PowerPoint.  If anybody has any questions or

8    concerns, I think it -- the comments that were made I think

9    fairly track the pleadings that were made and are essentially

10   just a demonstrative.  Again, I'm only considering it for

11   purposes of whatever I have in the record both in terms of

12   arguments that have been made and evidence that's been cited

13   to.  But this way you'll get a chance to canvas your team about

14   anything else you want to address.  It'll also give the

15   committee and the Freeman plaintiffs a minute to gather

16   thoughts about if there's anything you want to say in response.

17   Seems to be about the right time to do this.

18             My thought would be, rather than take a break for

19   lunch to just take five or ten minutes here and then come back

20   and wrap it up unless you all have desire to tour the offerings

21   of the wonderful City of White Plains.

22             Sol let's take a ten-minute break.  And I will come

23   back out in ten minutes.

24             MR. FISCHOFF:  Thank you.

25         (Recess from 2:01 p.m., until 2:17 p.m.)

87

1          THE COURT:  Thank you.  Please be seated.  Good

2    afternoon.

3          So we took a break as I wanted to make sure everybody

4    had enough time to address any issues about the PowerPoint,

5    which, again, I'm only considering in the context of the

6    arguments and the facts that have been presented in the motion

7    and the reply and the opposition.  So if it's not in there, I'm

8    not considering it in here.  And also to make sure that parties

9    had a chance to go through their notes and think about anything

10   else they want to say.  I realize I ask a lot of questions and

11   I do damage to people's otherwise beautiful presentations.  So

12   I'm happy to always give folks a chance to take a look at their

13   notes.

14         So with that, I'll turn it over to debtor's counsel

15   for any issues you wanted to raise on anything frankly.

16         MR. FISCHOFF:  One other minor point I wanted to bring

17   up, and I did forget.  This morning I received an email.  And

18   the debtor has been making efforts to get an accounting

19   professional on his team.  And I did receive an email this

20   morning of somebody who was interested and had experience in

21   doing bankruptcy reporting and joining the debtor's team to

22   provide that information.  I mean, I don't have more other than

23   the email, but at least somebody knows the situation and is

24   willing to become involved which is more than we had last week.

25         THE COURT:  All right.  I appreciate the update.  And

1    obviously keep interested parties in the loop on that.

2            So let me just make sure I've sort of addressed any

3    issues.   Is there any issue with me considering -- the

4    PowerPoint presentation, again, it was -- counsel walked

5    through it in argument.  So but again, I told you the basis on

6    which I'll consider it.  But I wanted to make sure, given the

7    timing of it, that there was nothing in particular you wanted

8    to point for -- that you were concerned about.  So Mr.

9    Fischoff, anything you wanted to address on that score?

10           MR. FISCHOFF:  Well, look, it was a surprise.  and I'm

11   not consenting to it.  I understand the Court is not taking it

12   as evidence.  But I think absent having been provided to me in

13   advance I could compare it to the papers that were previously

14   filed, I have a standing objection to it even being considered

15   by the Court.

16           THE COURT:  All right.  Is there anything in

17   particular that you wanted to identify?  Again, my view is that

18   it follows the motion papers that exist.  And there's -- I

19   don't think there was anything that counsel raised in her

20   presentation that was problematic in the context of arguing the

21   motion.

22           MR. FISCHOFF:  I can't say.  It's twenty-nine pages.

23   Their papers were -- their reply papers, along with thirty-two.

24   So I haven't been able to do a --

25           THE COURT:  No, that's fine.

1      MR. FISCHOFF:  -- side-by-side comparison.  So I don't

2   know.

3      THE COURT:  Okay.  All right.  That that's fine.

4   Again, I'm going to consider it as an aid to the argument we

5   just had, meaning that she walked through it as she went

6   through a presentation.  But it's not evidence per se.  And so

7   I think I've made that pretty clear.  So I'll -- I've permitted

8   it for that use and that use only.

9      So as to any other points.  The debtor wanted to

10  address on the record for purposes of arguing the motion.  Mr.

11  Fischoff, anything else that you wanted to address given the

12  break and a chance to gather your thoughts?

13     MR. FISCHOFF:  No, that's it, Your Honor.

14     THE COURT:  All right.  Thank you very much.

15     All right.  So with that said, I will loop back to the

16  committee that started us off to see if there's anything else

17  the committee wanted to address.  I know that you had already

18  addressed sort of your response sort of in advance.  So you --

19  so I have all that.  And so there's no need to repeat anything.

20  But I certainly want to give you a chance if there's of a newer

21  vintage that you wanted to add.

22     MS. BLOCK:  Your Honor, I do have a few points, but

23  Ms. Strickland would like to go first.

24     THE COURT:  That's fine.

25     MS. STRICKLAND:  Your Honor, this is just as very

**RUDOLPH W. GIULIANI**

90

1   brief --

2           THE COURT:  I will say, I will try to come up with a

3   name for these things because -- that's as good as any as we

4   pass it back and forth.  All right.

5           MS. STRICKLAND:  For the record, Rachel Strickland,

6   Willkie Farr & Gallagher.

7           I just wanted to note one thing that Mr. Bischoff

8   mentioned in the update to the case of how things were going

9   better.  And he referenced a contract that he emailed us this

10  morning that is 180,000-dollar speaking engagement.  So we did

11  receive this contract actually right after we walked into the

12  courthouse.  And it really underscores exactly what the problem

13  is.  The contract is between a company and Rudy Giuliani,

14  comma, Giuliani Communications, LLC.  That's who the contract

15  is.  Giuliani is obviously going to be the person speaking.

16  He's going to anchor some shows for them.  It's 180,000

17  dollars.

18          Then you go to the signature pages.  And the signature

19  pages have company that's hiring them.  And then there are a

20  couple of signatures.  Mr. Giuliani signs under Giuliani

21  Communications, LLC.  And inexplicably Maria Ryan signs it as a

22  contractor.  I don't really know what's going on there.  And

23  that's it.  So once again, it was cited as we've got income

24  coming in.  But when you look at all of the reports, we don't

25  have anything coming in.  There's zero dollars coming into the

**RUDOLPH W. GIULIANI**

1   estate.  And it seems that whenever Mr. Giuliani has a business

2   opportunity, he shoves it into one of these shells and keeps

3   going.  So the progress that was touted is more of the same.

4            And again, this is the contract that they emailed us

5   this morning.  So I think it underscores the problem.

6            THE COURT:  All right.  Thank you very much.

7            And on behalf of the committee?

8            MS. BLOCK:  Your Honor, for the record, Rachel Block,

9   Akin Gump Strauss Hauer & Feld.

10           Building off that, the debtor's counsel said that

11  progress had already been made by generating income.  Where is

12  it?  Nothing has ever been reported to us in the monthly MORs

13  or otherwise.

14           Additionally, the debtor's counsel talks about

15  significant -- about 150 million dollars of claims against the

16  debtor.  He's ignoring significant unliquidated claims and

17  other creditors' claims in favor of his singular focus on the

18  Freeman plaintiffs.

19           Your Honor, we completely agree.  We don't need an

20  evidentiary hearing.  Nothing is disputed, and it's all on the

21  record.  We have pleadings, MORs, and filings related to this

22  motion.

23           And finally, the debtor's counsel said something about

24  we'll give you more reporting.  We've given the debtor plenty

25  of time to provide that reporting.  We've asked them to comply

1   with financial disclosures.  We asked them to comply with the

2   Rule 2004 order.  He's provided none of that reporting, not for

3   him and not for his business.  Thank you.

4          THE COURT:  All right.  Thank you.  Anything else from

5   the U.S. Trustee's office before I hear from the debtor?

6          MS. SCHWARTZ:  No, Your Honor.  Thank you.

7          THE COURT:  All right.  Thank you.

8          Mr. Fischoff, any parting words?

9          MR. FISCHOFF:  Well, again, here we have the debtor

10  who generates personal services income operating just like any

11  other lawyer, accountant, doctor through an LLC and being

12  criticized.  I understand the reporting issue, but that wasn't

13  what the Freeman plaintiffs are complaining about.  They're

14  complaining about hey, he's generating income and it's going to

15  his business.  And by the way, Maria Ryan, I understand, is an

16  officer of Giuliani Communications.

17         THE COURT:  Okay.  So I took the point of the

18  committee just now on this to be -- and Ms. Strickland as well

19  to be that this is presented as this is going to be additional

20  income to the case.  And I think what I'm hearing is, Judge, we

21  have a number of relationships like this, and it's never

22  resulted in income that we've seen in the case because it's

23  gone through Giuliani Communications.  And once all -- whatever

24  payments are being made are made, the debtor has gotten

25  nothing.

93

1        So I think what they're saying is that it doesn't

2  necessarily evidence progress.  It evidences activity but not

3  value that is demonstrable in the case.  And that's -- and I

4  think that's what I understand Ms. Strickland's sort of

5  exploded view of the signature block to reflect that concern.

6        So is there anything you want to address on that

7  front?

8        MR. FISCHOFF:  Well, I didn't understand that to be

9  the case.  And I understand up until recently the income coming

10  into the business with its expenses, including a few employees,

11  hadn't resulted in a dividend to the debtor.  That may have

12  changed in -- that may have changed in May.  I understand where

13  I see a report later today perhaps, and we can file it.

14        But the point is, whatever,  I understood it to be

15  different, complaining that, again, he's operating through an

16  entity which, again, I say is perfectly normal and appropriate.

17  And nothing further.  Thank you.

18        THE COURT:  All right.  And so I think -- but let me

19  ask you again.  I'm just trying to do the math which

20  occasionally we need to do here in this courthouse.  So if, as

21  I understand it, the payments in connection with other

22  contracts with -- where the money has gone through Giuliani

23  Communications, I think one of them reflected -- I think it was

24  14,000 dollars and another 10,000 dollars a month.  And so if

25  you take 180- and divide by twelve, you end up with 15,000

**RUDOLPH W. GIULIANI**

94

1   dollars a month.  And I think --

2          MR. FISCHOFF:  And when it begins --

3          THE COURT:  Yeah.  So I think that the concern is that

4   it's a similar kind of -- it looks like a similar kind of

5   contract.  And if the debtor hasn't realized any profits from

6   that or any income that is -- that can be used in this case,

7   why would this one be any different?  And because it's also

8   done through Giuliani Communications and also has other folks

9   involved in it.  So you may have an answer to that.  You may

10  not.  This isn't something that was in the in the papers.  But

11  I think it was a response to something you raised.  And I think

12  what they're telling me is, Judge, you can't really take very

13  much -- So for example, the live stream Tunnels to Towers was

14  16,000 dollars a month.  And the WABC radio is 14,000 dollars a

15  month.  This, I think, comes out to 15,000 dollars a month.

16  And so I think they're drawing comparisons between what

17  happened there and what might happen here.  And so that's how I

18  understand it.  So I don't know if you have anything in

19  particular to -- I'm trying to put as much of a fine point on

20  it so I can get whatever comments you have.

21         MR. FISCHOFF:  I'm answering.  So, Judge, there's a

22  point where business expenses are paid and excess income would

23  be in common and perhaps income to the individual.  And my

24  understanding is in the past, the gross revenue had not

25  exceeded the expenses.  But as I said, my understanding is that

1   point may have passed recently.  And if there's new additional

2   income, then that should in theory enure to the benefit of the

3   individual debtor's estate.  I don't have the numbers in front

4   of me, so I'm just giving you a theoretical answer.  But I'm

5   not to state otherwise.

6          THE COURT:  All right.  Thank you very much.  Anything

7   else, Mr. Fischoff?

8          MR. FISCHOFF:  No, Your Honor.

9          THE COURT:  All right.  Thank you.

10          So I realize that it's now a little after 2:30 and we

11   just finished item 1 on the contested matters agenda.  We also

12   have the motion to compel monthly operating reports and a

13   discovery conference.

14          So the motion to compel monthly operating reports is

15   the official committee's motion.  We certainly have covered a

16   lot of the same ground.  And I know we've been talking about

17   these issues at a variety of hearings.  I actually have a list

18   of various things we've discussed at various hearings in

19   connection with disclosure and monthly operating reports.  So I

20   think I have a very good handle on it.

21          But let me ask the committee whose motion it is to

22   sort of sum up sort of where we are and it and what is it today

23   problem  and what is not.

24          MS. BLOCK:  Your Honor, for the record, Rachel Biblo

25   Block, Akin Gump Strauss Hauer &  Feld on behalf of the

1   Official Committee of Unsecured Creditors.

2          Your Honor, we don't view this particular motion as a

3   today problem.  As you said, we've discussed it at length in

4   our motion to appoint a trustee and at previous hearing.  So we

5   don't think there's anything further to discuss right now.

6          THE COURT:  All right.  So with that, I'll sort of cut

7   to the chase and turn to Mr. Fischoff.  I would expect, in

8   light of that statement, that you probably don't have anything

9   you want to comment on, but I don't want to -- I want to give

10  you an opportunity.

11         MR. BERGER:  Thank you, Your Honor.  Heath Berger for

12  the debtor.

13         THE COURT:  Mr. Berger?

14         MR. BERGER:  Your Honor, no.  We don't really have

15  much to say.  We filed the April reports.  I did get a text

16  that the May report should be done in the next day or so.  I

17  just want to make sure I review it before we upload it.  So

18  hopefully that will be done.  And like Mr. Fischoff said,

19  hopefully we could actually have a professional come in for the

20  next month's operating reports which should hopefully keep

21  everything within acceptable to the U.S. Trustee and to the

22  creditors' committee.  But the reports at least have been

23  filed, Your Honor.  And the June -- the May report will be

24  filed also.

25         THE COURT:  All right.  Thank you very much.

1          And so let me ask you if anybody has -- anyone else

2     has a comment on this particular motion.  If not, I think now

3     would be a good time to hear from Ms. Schwartz as to the issue

4     she wanted to raise.  And then we can turn to the 2004 thing

5     that's on -- listed as a Discovery conference.

6          So anybody else on the motion to compel monthly

7     operating reports?  All right.  Hearing no response, we'll turn

8     to Ms. Schwartz with the issue you wanted to raise.

9          MS. SCHWARTZ:  Thank you, Your Honor.  I won't take up

10    much of the Court's time.  I just wanted to bring to the

11    Court's attention that we're very concerned about professionals

12    representing Mr. Giuliani in other legal matters post-petition

13    for which there hasn't even been a retention application filed.

14         Specifically, Your Honor, in the Georgia criminal

15    election racketeering case that's pending in Fulton County,

16    Georgia, there's an attorney named Allyn Stockton who's been

17    making appearances on behalf of Mr. Giuliani post-bankruptcy.

18         In addition, there's another case that's pending in

19    the District of New Hampshire that Mr. Giuliani commenced

20    against President Joe Biden.  And he's got two lawyers.  And

21    that one's pending in the U.S. District Court in the District

22    of New Hampshire.  And he's got two lawyers there, Mr. Louis

23    Diamond and Mr. William O'Brien, who have made appearances on

24    his behalf.  And we haven't had any retention applications.

25         The Court should know that I have made many, many

**RUDOLPH W. GIULIANI**

98

1    phone calls to debtor's counsel regarding these retentions, and

2    we still don't have an order entered for the Aidala law firm,

3    which has been on the docket for several months.  I was given a

4    proposed order last week with respect to it, and that seems to

5    say that the debtor is seeking to have Mr. Aidala's firm

6    represent him also in the Georgia election case that's pending

7    down in Fulton County.

8            So we wanted to raise it and bring it to the Court's

9    attention that there appears to be -- there appear to be

10   attorneys that are representing the debtor post-bankruptcy not

11   in compliance with 327 or 2014.  And we're actually close to

12   filing a motion to dismiss or convert the case because all of

13   these things that are going on here are extremely problematic.

14   And I wanted to bring that to the Court's attention.

15           THE COURT:  All right.  Thank you very much.

16           So let me ask Mr. Berger or Mr. Fischoff whether

17   anyone wants to comment on this from the debtor's perspective.

18           MR. BERGER:  Sure, Your Honor.  Heath Berger, Berger

19   Fischoff Shumer.

20           I know that the attorneys in the New Hampshire case

21   and the Joe Biden case, we've been back and forth.  They

22   finally last week sent me some documents.  I think they're

23   working actually on a contingency basis.  So I finally got all

24   the paperwork that was signed obviously pre-petition so I could

25   bring on those motions to do.

**RUDOLPH W. GIULIANI**

99

1          As far as Allyn Stockton, I think he's been

2   appearing -- Judge, will reach out to them again to get the

3   retention on that.  And obviously there is going to get to a

4   point where Mr. Giuliani is looking for an attorney, obviously,

5   to represent him in the current case that was just filed, the

6   criminal charges.  And we're waiting to find out who he's been

7   speaking to.  And we'll deal with that also.

8          THE COURT:  All right.

9          MS. SCHWARTZ:  Judge, may I just be heard on that for

10  one second?

11         THE COURT:  Yeah.

12         MS. SCHWARTZ:  And that is that answer, Your Honor, is

13  the same answer that we've received for months in this case.

14  So I think it's important to bring it to the Court's attention,

15  especially in light of the pending motion that you've got that

16  was filed by the committee to give the Court the biggest and

17  most full picture of what's going on in this case.

18         THE COURT:  All right.  Thank you very much.  Duly

19  noted.

20         Anyone else wish to be heard on that particular issue

21  before we segue to the discovery conference?  That's the last

22  item on the agenda.  All right.

23         So let's do that.  So we're now on page 3 of the

24  agenda under the gigantic heading discovery conference.  And it

25  relates to the motion -- the official committee as authorizing

100

1    discovery of the debtor and third parties at docket number 164.

2            And so let me ask the committee to tee it up, and

3    we'll see where we go from there.

4            MR. HILL:  Good afternoon, Your Honor.  David Hill,

5    Akin Gump Strauss Hauer & Feld, on behalf of the Official

6    Committee of Unsecured Creditors.

7            Your Honor, yes, we requested the discovery conference

8    today last week with your chambers which we appreciate they

9    approved.

10           As respect to I'm going to call it three entities, one

11   is the debtor himself, two is the debtor's wholly owned

12   entities, and three is Ms. Maria Ryan, I'm not sure if Ms. Ryan

13   is on the phone.  She was on the scheduling email.  I was given

14   indication she may be, but I just want to make sure she's

15   present, on the line.

16           THE COURT:  All right.  Let me ask if Ms. Ryan is

17   present on the line.  All right.  I'm not hearing any response.

18   So I think we can assume that she is not.

19           MR. HILL:  Okay.  Thank you, Your Honor.

20           I think a lot of the ground we've covered today is

21   going to be a little bit retried here, but I wanted to give a

22   little context.

23           THE COURT:  And let me -- sorry to interrupt you.  Let

24   me back up for a second.  I'll let the parties know that at one

25   point, Ms. Ryan called chambers directly to talk about the

**RUDOLPH W. GIULIANI**

1   case.  As is the case, the instance when that happens, she was

2   given the following direction, which is anything that she

3   wanted to share, she needed to file on the docket.  She could

4   send it to our chambers and we would file it.  She could file

5   it.  Obviously, we don't engage in ex parte communication.  And

6   in fact, my law clerk identified who had called and why.  And

7   essentially the very large picture that Mr. Ryan wanted to

8   communicate about the Giuliani case.

9        And so I didn't listen to the email -- or the voice

10  mail, other than, I think the first seven seconds because,

11  again, I am not engaging in ex parte communication.  Anybody is

12  free to submit whatever they want in the context of the case.

13  Always happy to receive it.  But it's important for purposes of

14  transparency, which has been a watchword for today, that

15  everybody knows who's talking to who when it comes to the

16  Court.

17       So sorry to interrupt you, counsel.  I'm glad you

18  mentioned that though.  I wanted to get that on the record, and

19  I had forgotten.  Please proceed.

20       MR. HILL:  Thank you, Your Honor.

21       I think given that Ms. Ryan is not on the line, it

22  makes more sense to proceed with the debtor and the debtor

23  entities first.  And then we can handle that at the tail end.

24  Thank you.

25       So I want to give a little context to the discovery

**RUDOLPH W. GIULIANI**

102

1    here, because I think it's important for the conference.  On

2    March 6th, we first reached out to the debtor with our proposed

3    2004 order and proposed discovery.  And we had our first

4    conversation on March 14th.  We identified for the debtor

5    priority discovery items on March 22nd.  We then proceeded to

6    file our rule 2004 order, which the Court entered on April

7    11th.  And that, Your Honor, is at docket Number 164.

8            Your Honor, I'd like to point to one specific

9    paragraph of docket entry 164, which is paragraph 3,

10   specifically the last sentence.  The debtor and debtor-related

11   entities are directed to respond to the requests within twenty-

12   one days -- calendar days of service and a complete production

13   no later than May 24th, 2024.

14           I've heard the debtor's counsel today represent

15   several times to the extent we want information and reporting,

16   we'll get it.  Your Honor, it's been crystal clear for over

17   three months that we want that information.  In fact, we sent

18   discovery requests.  We filed a discovery motion.  We then

19   served discovery requests on the debtor and his entities.

20           As my colleague reported earlier, to date we have

21   received from the debtor pursuant to a rule 2004 requests

22   fifteen documents in two FedEx productions on May 6th and May

23   8th.  We have not received anything further in the past month

24   pursuant to our rule 2004 request nor, and this is particularly

25   crucial for the issues we have raised today, anything from the

**RUDOLPH W. GIULIANI**

103

1   debtor related entities, particularly Giuliani Communications

2   and Giuliani Partners.  It's difficult to say particularly

3   because we received nothing from any of them.

4          They've said repeatedly today that we should ask for

5   information.  One company is operating, one isn't.  The easiest

6   way to do this -- to show this to the committee, Your Honor, is

7   to produce the documents that were requested pursuant to the

8   2004 request and to have produced them timely.  They did

9   neither of those things.  We've never received formal responses

10  and objections.  We don't know exactly what they have.  We

11  don't know exactly what they've been told.  We've repeatedly

12  emphasized to the debtor and his counsel that we expected

13  compliance with the Court's deadline.  Not that such

14  reiteration should have been necessary, but to avoid any

15  implication that we were not asking for this information, we

16  did so.

17         The short of it is after we got the -- we failed to

18  get responses, we sent a email to the debtor's counsel on June

19  6th requesting confirmation that he would comply immediately

20  with the production.  We received no response.

21         On June 10th, we emailed chambers requesting a -- this

22  particular conference.  We received no response.

23         And on June 10 the debtor -- the same day the debtor

24  filed his objection to the motion.  And I think it bears worth

25  quoting.  On page -- excuse me, paragraph 16, "While the debtor

**RUDOLPH W. GIULIANI**

1    may be struggling with some of the administrative aspects, he

2    has always been fully transparent and open about his finances."

3            Your Honor, that is simply not true.  And I think the

4    fact that we are here today on a discovery conference with

5    respect to productions from Giuliani Communications and the

6    debtor himself and all of the other debtor entities belies

7    that.

8            I know that debtor's counsel today has attempted to

9    I'm going to say pass the buck to the part time bookkeeper of

10   Giuliani Communications.  One, Your Honor, Giuliani

11   Communications is the debtor's wholly owned entity.  And the

12   debtor's counsel today is reiterated that he is doing

13   predominantly all of his business, if not entirely his

14   business, through this entity.  The fact that none of this

15   documentation is produced, that we've not R&Os and other issues

16   is obviously very troubling for the committee and I think bears

17   on the relief request of the motion.  I'm not here to reargue

18   that.

19           The point, Your Honor, is we have not received this

20   information and received no communication to the debtor as to

21   why he has failed to comply with this Court's orders and his

22   production requirements for both him and his wholly owned

23   entities.

24           THE COURT:  All right.  I got it.  So is there

25   anything you wanted to get into with Ms. Ryan in terms of

1   status?  I have no idea whether Mr. Berger or Mr. Fischoff

2   would address that or not.  O you think it's best with since

3   she's not here to hold off on that?  I'll leave it to your

4   considered judgment, counsel.

5           MR. HILL:  Your Honor, I'm happy to address Maria Ryan

6   right now.  Actually, one issue that was raised just a few

7   moments ago by I believe Mr. Fischoff was that Maria Ryan is

8   apparently an officer of Giuliani Communications.  Her email

9   address is actually at Giuliani Partners.  The email address we

10  had used to communicate with her both on June 5th and 7th, she

11  had not responded until about 7 a.m. this morning whereupon she

12  denied that she had ever been served.  Your Honor, we have an

13  affidavit of service from the process server that she was, in

14  fact, served on May 14th at the debtor's apartment.  She was

15  conclusively identified by photographs and in fact prior

16  photographs taken the prior day of a livestream that she had

17  done with the debtor.

18          But I don't know if -- I presume the debtors do not

19  represent -- or excuse me, Mr. Berger and Mr. Fischoff don't

20  represent Ms. Ryan.  If that is the case, they can certainly

21  correct me.  But with respect to her, all we've received from

22  her is a denial that she was served.  We believe that she was.

23  The Court's requirements obviously require a reach out to her

24  in order to resolve any disputes.  And when we didn't hear back

25  from her, we asked for the discovery conference.

1            THE COURT:  All right.

2            MR. HILL:  So that that's where we are with Ms. Ryan.

3            THE COURT:  Got it.  All right.  so Mr. Berger and Mr.

4    Fischoff, your thoughts and -- as to Ms. Ryan, it would be

5    helpful to know what you're understanding is in terms of what

6    official role she plays or doesn't play.

7            MR. BERGER:  Thank you, Your Honor.  Heath Berger,

8    Berger Fischoff Shumer.

9            If I could take two steps back, Your Honor.  There was

10   a first tranche of discovery requests which we did provide to

11   the committee.  They also did informal 2004 examination of the

12   debtor which lasted a couple of hours.  They asked us to

13   produce the debtor, and we did it.  They've also said they want

14   to do a more formal one.  We said let us know what dates were.

15           My understanding, Your Honor, was that the official

16   committee was provided with information from the accountant of

17   the companies, Mr. Ricci (ph.).  I understand that he sent

18   documents.  I haven't seen them, Judge.  But I understand he

19   was subpoenaed, and he responded with financials and stuff

20   to --

21           THE COURT:  But we just had an argument where I was

22   told that there had been nothing produced by the company.  So

23   I'm having trouble squaring this with what I -- my

24   understanding was leaving earlier.  And frankly, it surprised

25   me to hear that you wouldn't have a copy of that.  These are

**RUDOLPH W. GIULIANI**

107

his wholly -- these are his entities, right?  We've just talked
about how he's -- and we're going to talk about that a little
bit more in a minute.  But I'm struggling understanding then
what the state of play is.

MR. BERGER:  Judge, I was advised by -- that he sent
the information in regard -- in regard to the subpoena and to
respond to it.  I do also understand that Mr. Medrano, who is
the bookkeeper, I think, reached out to the creditors'
committee, also indicating that he was working on providing the
information.

THE COURT:  Well, I only want to hear about responses.

MR. BERGER:  Sure.

THE COURT:  People can reach out to each other all the
livelong day.  And I -- that means -- can mean a lot of things.

So I want to know what was produced.  And was it Mr.
Giuliani's information?  Again, I think it had been represented
to me that there was nothing from Giuliani Communications
that's been produced.  Am I missing something on that?

MR. BERGER:  Again, I'm going to ask the creditors'
committee if they received information from Mr. Ricci.

MR. HILL:  Your Honor, we in addition to serving the
debtor and the debtor-related entities also subpoenaed Mr.
Ricci directly.  And we subpoenaed Mr. Medrano as an identified
individual.  We have not yet received any production from Mr.
Medrano.  I'm frankly at a loss.  We served separate subpoenas

**RUDOLPH W. GIULIANI**

108

1   and requests on the debtor.  The debtor's engaged with us

2   initially, made two very small production and didn't -- and

3   have not  -- so to be clear, Giuliani Communications nor any of

4   the entities have produced documents.  Mr. Ricci did make a

5   production of certain financial information but not the recent

6   information and not the information we're asking for today, the

7   more recent productions.

8        THE COURT:  All right.  Well, what did he -- what did

9   he give?  Was he duplicative of things that were already

10  produced?  Was it individual -- I'm just trying to get a handle

11  on things.

12       MR. HILL:  Your Honor, Mr. Ricci was not represented

13  by counsel.  He just gave us a tranche of documents which we

14  reviewed which were financial information for the debtor in his

15  personal capacity.  And I'm a little bit perplexed that the

16  debtor is representing today that that solves the problem, that

17  we haven't gotten responses, objections, or materials from

18  communications.

19       THE COURT:  So am I correct in understanding your

20  comment to translate to the following statement, which is that

21  while you've gotten some information from various people, you

22  haven't gotten any documents from anybody for Giuliani

23  Communications and Giuliani Partners?

24       MR. HILL:  I can't say that we don't have any

25  documents for Giuliani Communications and Giuliani Partners.

1    What I can say, and I think this is reflective of today's

2    bigger issue, is that we have an incomplete collection of

3    documents from Giuliani Communications and Giuliani Partners.

4           THE COURT:  Right.  Well, I need to get a handle on

5    that for purposes of figuring out what to do with discovery.

6    And  recognize -- I mean, the problem also becomes if the

7    People who are supposed to respond don't respond.  It also

8    raises the question of what you can rely upon or not rely upon

9    for purposes of somebody saying I am an authorized

10   representative of X, and I am providing you with this as

11   opposed to being subpoenaed in their individual capacity.  And

12   whether people adopt or don't adopt those responses, it gets to

13   be a mess.  And that also puts aside the whole notion that's

14   well established that a party that has possession, custody, or

15   control of documents is supposed to produce the documents.

16          And from what I'm hearing about the entities, the

17   debtor has possession, custody, or control of the documents.

18   So the debtor should be producing anything that has to do with

19   his entities because there's doesn't seem to be theory under

20   which he doesn't have control over that so he can direct people

21   who are working for those entities for him, as he said in his

22   papers, in numerous points, to respond.

23          So I understand why the committee sent things to

24   people in their individual capacity.  Necessity is the mother

25   of invention.  But it's not the -- it doesn't work that -- it's

110

1    not supposed to have to work that way.

2            So let me turn back to the debtor on this because,

3    again, Mr. Giuliani holds the keys.  So what can you tell me?

4            MR. BERGER:  That's correct, Your Honor.  And I know

5    the debtor is working on trying to get all the documents that

6    he can.  We've spoken to him.  He understands his

7    responsibility.  Obviously, he's being pulled in a number of

8    different directions with a number of different actions that

9    are going.  And unfortunately, one thing sometimes takes

10   priority over another.  And I apologize to the Court because

11   this should be one of the most important things right now.  And

12   we will do a yeoman's job, Your Honor, to get whatever we can

13   to provide as quickly as possible to the creditors' committee

14   in regard to the information.  And hopefully between Mr.

15   Medrano and what Mr. Ricci provided, that should at least come

16   to a somewhat of a real picture.

17           THE COURT:  If Mr. Ricci responded to his subpoena in

18   his individual capacity --

19           MR. BERGER:  Correct.

20           THE COURT:  -- I'm not sure what -- it's like standing

21   on quicksand.  I'm not sure what anybody can do with that kind

22   of information because it's -- somebody could easily say not

23   authorized to do it, there's no chain of custody,  mean, it's

24   not a business record.  I mean, there's all sorts of -- we were

25   talking about evidence before.  There's all sorts of potential

1   pitfalls.  So while I'm not saying it doesn't count, it's

2   awfully close to saying it doesn't count if he's responding in

3   his individual capacity which it sounds like, am I right,

4   counsel, that was what his response was?

5         MR. HILL:  Yes, Your Honor.  It was produced by him

6   directly without the --

7         THE COURT:  Yes.

8         MR. HILL:  -- as I think the counsel's made clear,

9   without their involvement.  Perhaps they didn't even provide it

10  to him.

11        THE COURT:  All right.  So I don't think I can take a

12  whole lot from that production.  And again, given the whole

13  rules about possession, custody, and control, there's a reason

14  we rarely, if ever, get to that kind of a question because it

15  should be necessary.  So --

16        MR. BERGER:  Understood, Your Honor.

17        THE COURT:  All right.  So let me ask the committee.

18  Anything else that we should chat about in connection with the

19  discovery conference?  I'm not sure we made a huge amount of

20  progress, but we've at least tried to identify and cabin off

21  the issues.

22        MR. HILL:  Your Honor, I think the next step would

23  be -- I know that they said they'd make a yeoman's job.  Again,

24  the production deadline was May 24th.  I think it would be

25  beneficial to have the Court establish a date certain by which

1  they would complete their production, and if they don't, we

2  would then be able to move for the next step of motion to

3  compel or sanctions without having to have another conference

4  with the Court.

5         THE COURT:  Yeah.  That's fine.  We'll get a date, and

6  we'll use that as the control date.  Of course, it's always

7  awkward in the sense that the Court entered an order.  And so I

8  know that the drill for discovery as well and then its order to

9  compel and for sanctions and whatever.  We already have an

10 order.  So at a certain point, failure to comply with orders

11 will mean that my tone takes a decided -- it takes on a decided

12 edge, which I at this point have tried to avoid using because I

13 don't know necessarily that it helps for certain things.  But

14 people don't obey court orders, it's a profound problem.  And I

15 will not be kind on that score.  And the record in this case

16 suggests that I should be exceedingly concerned about the

17 failure to comply with court orders.

18         So anything else, counsel?

19         MR. HILL:  Yes, Your Honor.  Last part is with respect

20 to Ms. Ryan, I think we fulfilled the two steps required under

21 the Court's requirements of, A, scheduling the conference and

22 B, or -- rather A, reaching out to her, B, scheduling the

23 conference.  I think C, the next step is a motion.

24         THE COURT:  Well, but again, we have the same issue.

25 I understand she's an employee or an officer of these entities.

1   And if you get things in her personal capacity, you're on the

2   same unsure footing as if you get it from Mr. Ricci.  Again,

3   maybe there's some case law out there that suggests that I'm

4   reading things too narrowly.  But the whole point is you want

5   it from the entities.  You want somebody to say this is

6   produced on behalf of Giuliani Communications.  And so you

7   don't want to have impediments to being able to make that

8   statement in court.

9        So I'm not disagreeing with you that she's received a

10  request.  It sounds like you represent she has not complied.

11  She's not here.  She had notice of this.  At the same time, my

12  goal is to try to meaningfully reach a level of finality on

13  discovery so that you don't end up having a whack-a-mole

14  problem, you solve one problem and something else pops up.

15       So I would say we'll use the same date in connection

16  with that.  But again.  There's a court order.  I understand.

17  It's been represented that she is an officer of these entities

18  that are the debtor's entities.  And so I've been provided with

19  no explanation or statement that if the debtor says to her to

20  respond, that she wouldn't respond.  And so that's highly

21  problematic.

22            MR. HILL:  Thank you, Your Honor.  That's it for me.

23            THE COURT:  Thank you.

24       Anything else?  As to the discovery conference?

25       All right.  So I think the next thing we need to do is

**RUDOLPH W. GIULIANI**

114

1   set a date.  I have a list of dates here that I've covered over

2   with other papers but I seem to have located.  So I'm assuming

3   that thirty days makes a lot of sense here.  I know that we

4   have a -- we have a hearing on July 10th on another substantive

5   motion in the adversary proceeding.  I suppose we could use

6   that as a date.

7        I'll be guided by what you all think is an efficient

8   use of your time.  I know this morning you had to hang around

9   for a while, so I'm always anxious to try to avoid people

10  having to spend too much time waiting in the wings.  So does

11  anybody have a suggestion what they'd like to do?

12       MR. BERGER:  I mean, we have to be here anyway on the

13  10th, Your Honor.  So it just as an efficient use of funds and

14  assets, why don't we -- does that work for you guys?

15       Mr. QURESHI:  Well, Your Honor, for the record, Abid

16  Qureshi, Akin Gump, on behalf of the committee.

17       Just to clarify, is the date Your Honor is inquiring

18  about now deadline by which they must produce or would this be

19  a whole --

20       THE COURT:  Well, there's already a deadline.

21       MR. QURESHI:  Okay.  So this is a whole day for the

22  motion to compel?

23       THE COURT:  So this would be to the extent you wanted

24  to take further steps.

25       MR. QURESHI:  Yes.

1              THE COURT:  The other thing we could do is treat it as

2    a status conference.  I understand you're not trying -- you're

3    trying to be efficient.  And so I certainly will not hold it

4    against you if you decide to hold off and say, Judge, we're

5    going have one more status conference.  You might decide you

6    want to file a motion.  You might be trying to get to the

7    bottom of people responding their official capacities as

8    employees or corporate officers versus in their individual

9    capacities.  There are a lot of ways to look at this.

10             MR. QURESHI:  Sure.

11             THE COURT:  So we I'm also happy to give you a date.

12   And if you decide you want to file something to be heard in

13   that date, you can do it.  If you decide to just treat it as a

14   status, we can do that.  So your option depending on how things

15   go.

16             MR. QURESHI:  Appreciate that flexibility, Your Honor.

17   We would like to use July 10th to have the motion to compel

18   heard.  And we'll file in advance of that.  Obviously, to the

19   extent that becomes unnecessary, then we can use it as a status

20   conference.  But we don't have the luxury of time, given how

21   far beyond the deadlines we already are.  So we'd certainly

22   like to have that date available to tee up the motion to

23   compel.

24             THE COURT:  All right.  And it sounds like Mr. Berger

25   is thinking that this is where we're going to end up in July

**RUDOLPH W. GIULIANI**

116

1    10th.  And so I'm fine with July 10th.  It does mean -- today's

2    the 17th.  I think you have enough time.  But to the extent you

3    need to put things on appropriate notice, that means it does

4    put the burden on you to act properly.  But if -- I'm happy to

5    give the 10th.  And if for some reason your views change,

6    you'll talk to each other and you reach out to chambers.  I'll

7    accommodate.  Again, the lawyers know the ins and outs of the

8    case better than I do, so I'm just trying to be efficient.

9              MR. QURESHI:  Fair enough, Your Honor.  And also just

10   to be clear so there are no surprises, as things presently

11   stand, in addition to a motion to compel, I would imagine we

12   may be seeking sanctions as well.  But we'll --

13             THE COURT:  yeah.

14             MR. QURESHI:  We'll see what happens.

15             THE COURT:  I'm not surprised to hear that.  And I

16   know also the U.S. Trustee's Office has its own set of issues.

17   And so anybody who wants to file something on the 10th can file

18   something to be heard on the 10th.

19             I think since we have enough challenges in this case,

20   I'm always conscious of the fact that shortening time raises

21   potential procedural objections.  So I'm trying to avoid that

22   where necessary.  So if you need to tweak dates, you, again

23   should think about that because, again, I'd like to decide

24   things on the merits rather than get bogged down in the morass

25   of procedural issues which is why I identified this whole issue

1   about people responding to subpoenas in their individual

2   capacity to provide documents of a corporation.  So --

3         MR. QURESHI:  Your Honor, we'll confer with the

4   debtor.  Hopefully we can agree upon dates for briefing and

5   proceed consensually with respect to that.

6         THE COURT:  That's fine.  And you can just --

7   whatever's the most efficient way to memorialize that.  A short

8   letter would be fine.

9         MR. QURESHI:  Great.

10        MR. BERGER:  Thank you, Your Honor.

11        MR. QURESHI:  Thank you, Your Honor.

12        THE COURT:  all right.  And remind me what time we're

13   on for the 10th.

14        MR. BERGER:  11 I think.

15        THE COURT:  It's 11 a.m.  So another thing is you sat

16   through a 10 o'clock calendar.  I never know how long those are

17   going to last.  And in fact, I canceled a few things and

18   adjourned things on Friday because I was afraid it would run

19   long, and it ran long anyway.  So to the extent that would be

20   helpful, I can look at my calendar to see whether I can put you

21   on a 2 o'clock as the only customer on that day, if that's

22   helpful for you all.  So let me know.  Again, I'm just trying

23   to be mindful of people's time.

24        MR. QURESHI:  That's certainly fine for us, Your

25   Honor.

1          MR. BERGER:  Yeah.  Fine for us, Your Honor.

2          THE COURT:  So I'm told we have a currently have a

3   lengthy 10 a.m. calendar.  And the things have -- the wheel has

4   a sense of humor.  So if you have a strong feeling one way or

5   the other, communicate it to chambers.  If you don't, then I'll

6   just exercise whatever judgment in terms of setting the time.

7   We'll let you know promptly if we move it to 2  o'clock.

8          MR. QURESHI:  Happy to defer to Your Honor.

9          MR. DUBLIN:  Whenever the Court works.

10          THE COURT:  Okay.  All right.  All right.  And one

11   thing I don't want to forget to ask is I think people have been

12   ordering transcripts of these hearings.  So I would assume that

13   that's going to be the case here as well.  And so when that is

14   ready to hit the docket, you can -- when you have it, just send

15   it along.  That's always helpful to have.

16          And with that, let me ask the debtor if there's

17   anything else to address here today.

18          MR. BERGER:  Nothing else, Your Honor.  Thank you very

19   much.

20          THE COURT:  All right.  Thank you very much.

21          On behalf of the committee, anything else?

22          MS. BLOCK:  Nothing else, Your Honor.

23          THE COURT:  All right.  Thank you.

24          On behalf of the Freeman plaintiffs?

25          MS. STRICKLAND:  Nothing, Your Honor.

**RUDOLPH W. GIULIANI**

119

1          THE COURT:  All right.  On behalf of the U.S.

2   Trustee's Office?

3          MS. SCHWARTZ:  No, Your Honor.

4          THE COURT:  All right.  All right.  So with that, I

5   thank you all very much for the arguments today.  Again, I

6   appreciate the back-and-forth dialog about the issues in the

7   case.  And again, there are reasons to be very concerned here.

8   I'm not going to beat a dead horse.  If there's ever anything

9   the Court can do aside from deciding motions in front of me

10  you'll let me know.  Again, I'm never going to have a handle on

11  that the way you all have as to whether that would be

12  productive in any way, shape, or form, but I just think it's

13  appropriate to offer.

14          And with that, I wish you all a very good day.  And

15  see you all July 10th.  And stay cool this week.  Thanks so

16  much.

17          (Whereupon these proceedings were concluded at 3:02 PM)

18

19

20

21

22

23

24

25

120

1

2               C E R T I F I C A T I O N

3

4   I, Michael Drake, certify that the foregoing transcript is a

5   true and accurate record of the proceedings.

6

7

8

9   _____

10  Michael Drake (CER-513, CET-513)

11  AAERT Certified Electronic Transcriber

12

13  eScribers

14  7227 North 16th Street, Suite #207

15  Phoenix, AZ 85020

16

17  Date:  June 18, 2024

18

19

20

21

22

23

24

25

**#**

**#547233 (1)**
5:5

**A**

**Aaron (1)**
12:11
**AB (2)**
31:11;38:14
**aback (1)**
45:8
**ABID (3)**
6:17;12:5;114:15
**abide (2)**
56:22;60:25
**ability (2)**
54:25;76:13
**able (5)**
25:1;63:14;88:24;
112:2;113:7
**above (1)**
34:3
**absent (1)**
88:12
**absolutely (1)**
66:15
**acceptable (1)**
96:21
**access (1)**
20:15
**accommodate (1)**
116:7
**account (6)**
29:17;32:21;43:14;
47:12;70:19;71:7
**accountant (5)**
59:23;76:14,20;
92:11;106:16
**accounting (1)**
87:18
**accurate (5)**
22:2;37:5,8;40:12;
47:11
**accurately (1)**
40:10
**acknowledged (1)**
61:17
**act (3)**
62:22;67:1;116:4
**acting (6)**
44:16,17;45:6;
48:15,16;50:18
**action (2)**
44:23;74:22
**actions (1)**
110:8
**activity (3)**
33:22;69:15;93:2
**acts (1)**
62:17

**actually (14)**
30:10;33:23;35:5,
22;50:3;51:8;56:9;
90:11;95:17;96:19;
98:11,23;105:6,9
**adapt (1)**
71:22
**add (3)**
56:10;72:16;89:21
**addition (4)**
43:8;97:18;107:21;
116:11
**additional (3)**
45:10;55:7;75:12,
15;77:10;92:19;95:1
**Additionally (3)**
39:5;56:23;91:14
**address (24)**
14:5;16:12;26:22;
50:21;51:22;62:8;
64:5,12;68:2;84:20;
85:6,22;86:14;87:4;
88:9;89:10,11,17;
93:6;105:2,5,9,9;
118:17
**addressed (6)**
17:9;62:9;75:21,23;
88:2;89:18
**adds (1)**
38:18
**adherence (1)**
51:12
**adjective (1)**
29:3
**adjourned (1)**
117:18
**administrative (15)**
45:10;46:11;47:6;
48:18;51:10,11,12;
60:21;75:17,25;77:2,
6,11,14;104:1
**admits (2)**
51:10,11
**admitted (4)**
37:12;54:13;66:8;
81:21
**admonished (1)**
60:19
**adopt (2)**
109:12,12
**adult (1)**
59:25
**advance (5)**
16:20;19:5;88:13;
89:18;115:18
**advantages (1)**
54:23
**adversary (3)**
45:20;47:4;114:5
**advertising (3)**
19:7,9,12
**advice (1)**
10:20

**advised (2)**
78:24;107:5
**advisement (3)**
47:21;74:18;82:20
**advocacy (1)**
60:8
**affairs (4)**
27:6;30:19;37:2,14
**affidavit (1)**
105:13
**affiliates (4)**
30:3,6,7;31:3
**affiliates' (2)**
29:19,20
**affiliate's (1)**
35:9
**afield (1)**
85:12
**afraid (1)**
117:18
**afternoon (13)**
10:2;11:19,24;12:2,
6,9,12;13:16;15:3;
67:19,22;87:2;100:4
**again (65)**
10:4;11:14;17:21;
19:17;21:6;22:22;
23:15;31:3,4;32:14;
34:2,5;36:9;41:8;
42:8;45:8;46:14;48:3;
50:16;52:4;54:10;
55:4;60:1;61:13;
63:12;64:11;66:3;
71:15;78:4;79:17;
81:8,18;82:5;83:4,13;
84:5;86:10;87:5;88:4,
5,17;89:4;90:23;91:4;
92:9;93:15,16,19;
99:2;101:11;107:16,
19;110:3;111:12,23;
112:24;113:2,16;
116:7,22,23;117:22;
119:5,7,10
**against (9)**
30:6;45:14;51:7;
60:7;66:3;84:12;
91:15;97:20;115:4
**agenda (4)**
13:18;95:11;99:22,
24
**aggregate (1)**
25:25
**aggressive (1)**
74:12
**ago (3)**
13:4;69:21;105:7
**agree (9)**
13:19;21:21;22:10;
56:20;57:15;60:23;
71:19;91:19;117:4
**agreed (5)**
21:23;37:19;38:4;
41:21;60:24

**agreeing (2)**
50:18;61:17
**agreements (1)**
63:17
**agrees (1)**
60:9
**ahead (1)**
73:9
**aid (3)**
16:19;19:2;89:4
**Aidala (1)**
98:2
**Aidala's (1)**
98:5
**aircraft (1)**
70:1
**AKIN (8)**
6:11;7:2;12:3;15:4;
91:9;95:25;100:5;
114:16
**align (2)**
24:15;42:21
**ALISON (1)**
5:18
**allegation (1)**
61:12
**allege (1)**
51:24
**allegedly (2)**
28:6;42:17
**allow (1)**
16:25
**Allyn (2)**
97:16;99:1
**almost (3)**
19:3;32:24;60:17
**alone (1)**
57:6
**along (4)**
36:3;73:5;88:23;
118:15
**alter (3)**
51:9;53:6;59:21
**although (1)**
29:23
**always (16)**
17:9;19:1;42:19;
43:13;52:3;64:12,14;
73:13;85:16;87:12;
101:13;104:2;112:6;
114:9;116:20;118:15
**Amazon (2)**
22:5;47:13
**AMBEAULT (1)**
5:18
**AMELIA (2)**
6:16;12:5
**amend (1)**
40:10
**amendments (8)**
37:14,17,19,21;
38:1,3,8,9
**America's (1)**

**41:17**
**among (5)**
31:15;48:16;51:8;
53:14;74:9
**amount (6)**
25:25;42:2;49:10;
70:1;71:16;111:19
**amplification (1)**
10:22
**amplified (1)**
37:2
**analysis (1)**
26:19
**anchor (1)**
90:16
**anchored (3)**
79:20;80:3
**ANDREA (4)**
9:7;12:19;14:16;
62:3
**Angeles (1)**
8:21
**anxious (1)**
114:9
**apart (1)**
35:18
**apartment (4)**
47:15;53:17;70:21;
105:14
**Apologies (1)**
20:8
**apologize (3)**
19:4;23:15;110:10
**apparently (2)**
72:19;105:8
**appeal (10)**
18:22;52:15,21;
74:10;83:20;84:8,9,
11,19;85:11
**appealed (1)**
73:23
**appear (4)**
13:1;19:11;59:15;
98:9
**appearance (5)**
12:14,16,18;13:7,
13
**appearances (2)**
10:9;11:2;97:17,23
**appeared (1)**
32:13
**appearing (2)**
62:12;99:2
**appears (2)**
69:9;98:9
**appellate (1)**
52:16
**applaud (1)**
52:11
**applauded (1)**
23:11
**Apple (1)**
22:6

23-12055-shl    Doc 293    Filed 07/12/24    Entered 07/15/24 09:24:56    Main Document
In the Matter of Rudolph Giuliani
Pg 122 of 142

June 17, 2024

**applicable (3)**
27:11;40:9;56:14
**application (1)**
97:13
**applications (1)**
97:24
**applied (1)**
26:20
**applies (3)**
17:25;18:24;19:20
**appoint (8)**
13:21;26:24;54:19,
19;63:9;68:4;79:9;
96:4
**appointed (15)**
24:4;26:21;37:10;
52:18;54:1,15,25;
56:19;57:22;58:11;
63:17;64:20;66:6;
76:4,19
**appointment (31)**
21:16;24:19;26:15,
17;27:4;31:18;36:4,
24;40:17,21;45:22;
49:2,7;53:13,24;54:4,
7,12;57:24;62:6,15,
19;63:23,24;64:2,13;
65:4,9,11;68:12;
72:14
**appointments (1)**
64:15
**appreciate (8)**
10:11;12:25;13:3;
30:24;87:25;100:8;
115:16;119:6
**approach (1)**
61:5
**appropriate (12)**
14:4,22;20:1;23:20;
24:24,24;54:25;
56:24;80:5;93:16;
116:3;119:13
**appropriateness (1)**
32:5
**approval (4)**
40:3;45:3,4;64:3
**approved (1)**
100:9
**approximately (2)**
42:1;75:12
**April (6)**
28:14;32:13;44:1;
47:14;96:15;102:6
**area (1)**
30:23
**arguable (1)**
74:1
**argue (2)**
11:12;19:20
**argued (2)**
18:15;23:11
**argues (1)**
60:10

**arguing (2)**
88:20;89:10
**argument (29)**
16:7,9,19;17:20,21;
32:14;46:16;47:20,
22,24;48:1,2,5,6;49:8;
57:18,25;62:10;66:8;
69:1;74:19;77:12;
80:2,15;81:20,24;
88:5;89:4;106:21
**arguments (7)**
10:15;56:10;59:3;
78:6;86:12;87:6;
119:5
**arms (1)**
67:3
**around (4)**
19:4;23:16;67:3;
114:8
**arrangement (4)**
28:13;34:15;42:5;
43:5
**ArShaye (1)**
6:4
**aside (3)**
69:9;109:13;119:9
**aspects (3)**
51:10;75:17;104:1
**assert (1)**
57:12
**asserted (1)**
80:1
**asserts (1)**
73:13
**asset (11)**
24:2;26:3,8;28:21;
43:1;47:18;48:2,5,7;
52:9;72:21
**assets (23)**
23:12;26:2;29:16;
30:4;37:13;38:12,14,
22;39:3;40:11;44:19;
45:2;46:3;48:13;
53:18,20;64:1;71:1;
72:16,17,20,24;
114:14
**assigns (1)**
31:13
**assistance (1)**
41:20
**associated (3)**
25:4;47:10;72:20
**associates (2)**
44:11;48:20
**assume (4)**
15:9;38:7;100:18;
118:12
**assuming (6)**
13:8,23;16:5;25:15;
46:14;114:2
**attached (1)**
25:7
**attaches (3)**

33:19;43:20;60:9
**attaching (1)**
52:16
**attempt (1)**
53:4
**attempted (1)**
104:8
**attempting (1)**
43:6
**attending (1)**
57:8
**attention (5)**
11:16;97:11;98:9,
14;99:14
**attenuated (1)**
85:10
**ATTORNEY (6)**
9:9;11:20;19:7;
83:19;97:16;99:4
**Attorneys (12)**
5:3,12;6:4,12;7:3,
13;8:10,18;9:10,18;
98:10,20
**attracts (1)**
68:21
**audience (1)**
68:21
**authority (5)**
28:25;29:6,10,14,
21
**authorized (6)**
28:15;32:15;83:20,
20;109:9;110:23
**authorizes (1)**
56:2
**authorizing (2)**
75:6;99:25
**automatic (1)**
52:21
**automatically (2)**
56:7,21
**available (1)**
115:22
**Avenue (3)**
5:13;7:14;8:11
**averages (1)**
42:7
**avoid (5)**
21:19;103:14;
112:12;114:9;116:21
**aware (2)**
30:14;66:25
**away (1)**
44:10
**awfully (1)**
111:2
**awkward (1)**
112:7

**B**

**B&H (1)**
44:1

**back (17)**
30:10;36:15;37:18;
47:21;65:14;74:8;
77:1;79:13;86:19,23;
89:15;90:4;98:21;
100:24;105:24;106:9;
110:2
**back-and-forth (1)**
119:6
**backtrack (1)**
14:11
**backtracked (1)**
22:8
**bad (7)**
48:23;64:18;69:12;
72:1,3,12;77:13
**Bagel (1)**
69:20
**BAHAM (1)**
7:8
**baked (1)**
55:8
**balance (3)**
39:17,18;76:3
**ball (1)**
67:14
**ballots (1)**
61:11
**ballpark (1)**
25:24
**bank (2)**
39:15;47:17
**bankruptcy (32)**
17:7;21:23;22:16;
23:14;26:14,24;27:2,
14;29:5;30:16;31:20;
38:17;39:22;40:23;
42:22;43:19;44:6;
48:9;49:20;52:3,19,
22;54:9;56:1,1;58:7;
68:4,7;69:19;70:2;
76:1;87:21
**based (6)**
17:12;24:22;25:14;
33:8;34:2;68:8
**basically (1)**
68:16
**basis (5)**
19:11;69:5;74:2;
88:5;98:23
**bat (1)**
59:2
**Beach (2)**
32:12,13
**bears (2)**
103:24;104:16
**beat (1)**
119:8
**beautiful (1)**
87:11
**beauty's (1)**
50:8
**become (1)**

87:24
**becomes (5)**
63:18;19;65:13;
109:6;115:19
**begin (1)**
60:6
**beginning (1)**
39:17
**begins (1)**
94:2
**behalf (24)**
11:3,18,25;12:3,7;
15:4;24:12;32:21,23;
40:4;44:21,24;59:8;
76:14;91:7;95:25;
97:17,24;100:5;
113:6;114:16;118:21,
24;119:1
**behavior (6)**
45:9,12;46:25;47:8;
48:23;49:24
**beholder (1)**
50:8
**belief (1)**
23:13
**belies (1)**
104:6
**belt (1)**
20:24
**bench (1)**
55:11
**beneficial (2)**
55:19;111:25
**beneficiaries (1)**
53:19
**beneficiary (1)**
39:22
**benefit (7)**
30:4;40:13;48:19;
52:12;67:7;76:1;95:2
**benefits (4)**
30:16;41:10;53:13;
63:25
**BERGER (30)**
11:19,20,20;14:7;
96:11,11,13,14;98:16,
18,18,18;105:1,19;
106:3,7,7,8;107:5,12,
19;110:4,19;111:16;
114:12;115:24;
117:10,14;118:1,18
**besides (1)**
68:18
**best (10)**
12:20;22:4;28:24;
49:9;68:6,10,12;
72:13,15;105:2
**better (2)**
90:9;116:8
**beyond (3)**
66:19;76:21;115:21
**BIBLIO (1)**
6:18

23-12055-shl    Doc 293    Filed 07/12/24    Entered 07/15/24 09:24:56    Main Document
In the Matter of Rudolph Giuliani
Pg 123 of 142

June 17, 2024

**Biblo (3)**
12:2;15:3;95:24
**Biden (2)**
97:20;98:21
**bigger (1)**
109:2
**biggest (1)**
99:16
**bill (3)**
32:22,22;45:5
**bills (2)**
43:20;45:5
**Bischoff (1)**
90:7
**bit (10)**
10:20;16:15;19:4;
21:1,1;29:9;31:4;
100:21;107:3;108:15
**bled (1)**
36:19
**blessing (1)**
66:13
**BLOCK (59)**
6:18;12:2,3;15:3,4;
19:14;20:2,8,13;
21:14;23:7,9,25;24:8;
25:5,18,23;26:5,14;
29:13;30:2,25;31:7;
32:8,10;33:17;34:9;
35:4,20;36:2,15;38:3,
11;46:7,21,24;48:6,
12;49:18;50:3,7,10,
14;51:1,3;55:2,15,22;
56:20;57:15;58:2,13;
89:22;91:8,8;93:5;
95:24,25;118:22
**bogged (1)**
116:24
**book (3)**
28:2,3,5
**bookkeeper (7)**
59:23;76:5,14,20;
81:15;104:9;107:8
**books (3)**
53:15;66:2,25
**borne (1)**
47:1
**both (8)**
10:24;17:25;23:6,7;
26:22;86:11;104:22;
105:10
**bottom (1)**
115:7
**Boulevard (1)**
8:19
**Bowling (3)**
9:4;20:10,15
**breach (2)**
46:20,21
**breaches (5)**
27:9;46:19;48:25;
49:6;53:11
**break (8)**

16:4;19:23;21:7;
86:6,18,22;87:3;
89:12
**brief (7)**
18:8;52:16;74:2;
83:22;85:3,4;90:1
**briefing (1)**
117:4
**briefly (1)**
15:18
**bring (9)**
14:18;52:25;68:22;
87:16;97:10;98:8,14,
25;99:14
**broadcasts (1)**
41:10
**broke (1)**
13:4
**broker (1)**
75:5
**brought (2)**
71:6;83:21
**Bryant (1)**
6:13
**BUCHALTER (1)**
8:17
**buck (1)**
104:9
**budget (1)**
22:10
**Building (1)**
91:10
**bump (1)**
74:15
**BURBAGE (2)**
5:17;12:11
**burden (1)**
116:4
**burdens (1)**
19:10
**burdensome (1)**
64:19
**business (50)**
17:11;22:15,17,18;
24:3;26:7,11;28:9;
29:2,4;30:19;33:21,
25;34:1,12;35:11,25;
40:2;41:6;42:4;43:1,
9,10,11,13;44:24;
45:5;53:8,9;56:2;
57:16,21;64:3;66:4;
69:16,22,23;72:22,22;
75:16;76:5;78:24;
91:1;92:3,15;93:10;
94:22;104:13,14;
110:24
**businesses (27)**
21:22;22:1;23:3;
24:10;25:6,10;27:8;
30:20;33:2,9;34:22;
40:21;43:5,6,14,16,
25;44:11;46:8;48:19,
20;49:5,22;52:7;

57:19;69:22;78:22
**businesses' (3)**
33:2;41:7;52:2
**business's (3)**
24:12;26:8;43:21

---

# C

**CA (1)**
8:21
**cabin (1)**
111:20
**calendar (5)**
10:4;102:12;
117:16,20;118:3
**call (1)**
100:10
**called (2)**
100:25;101:6
**calling (1)**
61:9
**calls (1)**
98:1
**came (4)**
25:2;45:20;70:12;
71:11
**can (82)**
10:25;11:6,15;
12:14;13:9,10;15:6,8,
25;16:6,11;17:4;18:3,
9;20:12,17;21:1;
23:13;25:17;27:2,11;
35:15;36:10;37:1;
46:14;48:24;49:13;
51:1;53:14;54:8;57:4;
58:24;59:2;61:22;
63:16;64:6;65:18;
66:16,17,19;70:11;
71:3,5;72:2;73:10,23,
25;74:12;77:3;78:3,
16;79:14;84:20;24;
85:21;93:13;94:6,20;
97:4;100:18;101:23;
105:20;107:13,14;
109:1,8,20;110:3,6,
12,21;111:11;115:13,
14,19;116:17;117:4,6,
20,20;118:14;119:9
**canceled (6)**
41:16,24;47:3;
69:14;78:17;117:17
**canvas (1)**
86:13
**canvassed (1)**
67:16
**capable (1)**
73:16
**capacities (2)**
115:7,9
**capacity (8)**
37:25;108:15;
109:11,24;110:18;
111:3;113:1;117:2

**capital (2)**
35:17;38:17
**card (10)**
25:6,14;32:22,22;
33:19;43:20,21;45:5,
5;47:11
**cards (3)**
25:10;69:13;78:16
**carrier (1)**
70:2
**Caruso (4)**
11:22;83:17;84:19;
85:25
**case (93)**
10:9;14:1,3,19;
16:9;18:5,18;22:16;
23:14;27:14;28:24;
29:6,14,18;30:22;
31:21;37:4,22;40:23;
43:19;44:6;45:15;
46:4;48:9;49:20;
50:17;52:19,22;
53:25;55:5,8;56:3,15;
57:8,14,20,23,23;
58:8;60:2,5;63:2,2;
64:19,20;65:2,16;
66:1,7;67:11;69:13,
17;70:17;72:14,16,
21;73:23;74:10,13,
16;76:23;78:10;
79:14,20;80:3;81:3;
83:7;90:8;92:20,22;
93:3,9;94:6;97:15,18;
98:6,12,20,21;99:5,
13,17;101:1,1,8,12;
105:20;112:15;113:3;
116:8,19;118:13;
119:7
**cases (15)**
25:11;29:7,23;
30:13;55:12;63:21,
22,23;64:14;65:1,6,6,
14;69:20;85:16
**cash (2)**
39:17,18
**catch (1)**
11:15
**catchall (1)**
68:1
**categorically (1)**
25:2
**categories (2)**
67:23;72:17
**category (2)**
17:23;18:17
**cause (15)**
26:16,23,25;27:2,5,
10,12;36:4,24;41:1;
49:1,7;51:24;68:5,6
**causing (1)**
78:16
**cease (1)**
23:20

**central (1)**
66:7
**certain (10)**
30:16,16;31:24;
49:10;57:11;70:1;
108:5;111:25;112:10,
13
**certainly (18)**
15:16;17:5,20;18:5;
62:11;63:25;66:7,16;
69:19;76:18;77:17;
84:11;89:20;95:15;
105:20;115:3,21;
117:24
**chain (1)**
110:23
**challenge (1)**
17:6
**challenges (1)**
116:19
**challenging (1)**
83:7
**chambers (6)**
100:8,25;101:4;
103:21;116:6;118:5
**chance (14)**
19:19,24;21:8;
29:23;58:20;73:10;
83:5,8;84:21;86:13;
87:9,12;89:12,20
**change (5)**
23:22;75:20;78:11;
79:2;116:5
**changed (4)**
18:2;47:14;93:12,
12
**chapter (17)**
18:21;24:19;26:21,
24;40:17;50:17;
51:11;54:19;55:8;
56:3;62:7,15,19;
63:13;64:3,13;67:4
**charge (1)**
69:23
**charged (1)**
69:22
**charges (2)**
71:9;99:6
**chase (1)**
96:7
**chat (3)**
84:22;85:1;111:18
**check (2)**
32:13;79:18
**cherry (1)**
61:14
**chime (1)**
57:4
**choose (1)**
30:18
**chooses (1)**
44:8
**choosing (1)**

44:7
**chosen (1)**
45:8
**chutzpah (1)**
60:9
**CINTRON (3)**
7:12,13;13:15
**circuitous (1)**
20:24
**circumstances (5)**
15:15;26:20;68:9;
69:18;85:18
**cited (9)**
29:8;63:22;65:1,6,
19;79:13;81:5;86:12;
90:23
**cites (1)**
22:13
**City (2)**
47:15;86:21
**claim (2)**
75:18;77:10
**claims (9)**
30:6;32:20;44:21;
47:7;60:21;75:17;
91:15,16,17
**clarify (1)**
114:17
**clean (1)**
59:16
**clean-up (1)**
59:2
**clear (11)**
44:5;56:22;57:1,18;
60:1;74:8;89:7;
102:16;108:3;111:8;
116:10
**clearly (2)**
16:14;64:4
**clerk (1)**
101:6
**clever (1)**
77:24
**client (4)**
60:12;61:14;82:10;
83:6
**clients (5)**
19:11;60:13,25;
61:19;82:11
**close (4)**
44:11;60:20;98:11;
111:2
**closest (1)**
48:20
**Club (2)**
32:12,13
**clubs (1)**
32:11
**Code (9)**
26:14;29:6,7;54:9;
56:1,1;58:7;68:4,7
**Coffee (5)**
28:10,11;34:11;

42:9,12
**colleague (1)**
102:20
**colleagues (1)**
12:4
**collection (1)**
109:2
**coming (12)**
25:9;26:2;28:21;
35:2,2,5;42:15;49:12;
90:24,25,25;93:9
**comma (1)**
90:14
**commenced (1)**
97:19
**commencement (1)**
69:13
**commencing (1)**
45:15
**comment (8)**
22:21;77:1;85:4,14;
96:9;97:2;98:17;
108:20
**comments (4)**
63:12;66:20;86:8;
94:20
**Committee (73)**
6:12;7:3;11:25;
12:4;15:1,5;21:15,19;
22:9;23:23;24:18;
25:1;27:16,20,25;
28:2,4,8,11,12,14;
31:19;33:8,25;37:25;
39:6;41:19,21,22;
43:23;47:16;48:3;
50:18;51:24;52:13;
54:6,10;62:9,24;63:1,
4,5,22;65:23;73:25;
76:7;78:22;80:24;
81:15;83:12;86:15;
89:16,17;91:7;92:18;
95:21;96:1,22;99:16,
25;100:2,6;103:6;
104:16;106:11,16;
107:9,20;109:23;
110:13;111:17;
114:16;118:21
**committee's (12)**
26:1;27:18;34:18,
24;46:15;49:17;51:5;
52:6;58:14;62:6;
63:13;95:15
**common (7)**
28:19;30:8;31:3,4,
7;71:9;94:23
**communicate (3)**
101:8;105:10;118:5
**communication (3)**
101:5,11;104:20
**Communications (46)**
28:18;33:7,10,16;
34:4,12,16,23;35:1,
23;38:16;42:2,8,13,

16,18,22,24;43:4;
51:9;53:5,11;70:10;
71:2;78:20;81:9,12,
16;90:14,21;92:16,
23;93:23;94:8;103:1;
104:5,10,11;105:8;
107:17;108:3,18,23,
25;109:3;113:6
**companies (10)**
29:15,16;53:16;
55:24,25;63:11,25;
67:2,6;106:17
**company (16)**
28:16,20,25;29:1,
19,19;38:16;39:1;
42:19;51:14;56:6;
65:10;90:13,19;
103:5;106:22
**company's (1)**
51:15
**compare (2)**
71:18;88:13
**compared (1)**
38:13
**comparison (1)**
89:1
**comparisons (1)**
94:16
**compel (11)**
13:21;27:4;95:12,
14;97:6;112:3,9;
114:22;115:17,23;
116:11
**compensation (9)**
22:13,14;28:13;
34:10,15;41:5,12,22;
42:17
**complain (2)**
22:23;71:10
**complaining (3)**
92:13,14;93:15
**complete (7)**
21:22;22:2;37:8;
40:11;70:24;102:12;
112:1
**completely (5)**
24:16;52:2,18;
56:20;91:19
**compliance (3)**
51:15;98:11;103:13
**complicated (1)**
78:21
**complied (1)**
113:10
**comply (11)**
23:10;43:3;52:2;
75:25;76:6;91:25;
92:1;103:19;104:21;
112:10,17
**complying (2)**
36:18,19
**component (1)**
57:18

concedes (3)
27:21;51:12,15
**concern (7)**
17:9;56:8,17;62:7;
74:9;93:5;94:3
**concerned (6)**
66:10;77:3;88:8;
97:11;112:16;119:7
**concerning (2)**
38:21;39:4
**concerns (4)**
15:16;19:11;39:6;
86:8
**concluded (2)**
19:23;119:17
**concludes (1)**
23:14
**conclusively (1)**
105:15
**concocted (1)**
24:11
**condo (7)**
23:10,14;24:6;
47:18,23;48:21;52:13
**condominium (1)**
53:17
**conduct (15)**
19:12;27:3;29:4;
31:17,20;36:10,11,18;
37:1,2;44:20;45:23;
46:16;60:16;79:11
**confer (2)**
85:2;117:3
**conference (23)**
13:22;14:1,2,19,20;
67:11;95:13;97:5;
99:21,24;100:7;
102:1;103:22;104:4;
105:25;111:19;112:3,
21,23;113:24;115:2,5,
20
**confidence (2)**
71:4,6
**confirm (1)**
48:1
**confirmation (1)**
103:19
**confirms (1)**
54:9
**conflict (4)**
30:11;37:23;41:1;
52:8
**conflicting (1)**
31:22
**conflicts (7)**
27:8;30:2;32:17;
40:20;41:13;44:5;
49:6
**connect (1)**
78:1
**connection (11)**
11:11;14:3;29:8;
32:6;54:4;67:22;

82:24;93:21;95:19;
111:18;113:15
**conscious (1)**
116:20
**consensually (1)**
117:5
**consenting (1)**
88:11
**consequences (1)**
46:25
**conserve (2)**
44:15,19
**conserving (1)**
46:1
**consider (18)**
16:9,13;18:3,4,15;
19:9,16;27:2;29:11;
36:10;45:25;75:21;
78:8,9;80:5;81:1;
88:6;89:4
**considered (2)**
88:14;105:4
**considering (7)**
17:21;46:19;82:4;
86:10;87:5,8;88:3
**considers (1)**
29:25
**consistently (1)**
37:23
**constitute (1)**
36:4
**constitutes (3)**
37:9;49:1,7
**constituting (4)**
26:25;27:10;36:24;
41:1
**construed (1)**
66:12
**consult (3)**
54:6,8;63:7
**consultation (1)**
62:24
**consulted (1)**
54:10
**consults (1)**
62:25
**content (1)**
68:21
**contested (2)**
79:10;95:11
**context (20)**
29:9,11;30:14;48:1;
56:15;78:8,9;79:14,
16;80:13,15,16;81:7;
84:12;85:20;87:5;
88:20;100:22;101:12,
25
**contingency (1)**
98:23
**continue (2)**
43:7;44:9
**continued (4)**
28:4;40:9;45:17;

23-12055-shl   Doc 293   Filed 07/12/24   Entered 07/15/24 09:24:56   Main Document
In the Matter of Rudolph Giuliani
Pg 125 of 142

June 17, 2024

48:23
**continues (6)**
22:3;27:20;43:19;
52:15,20,24
**continuing (2)**
34:1;49:20
**continuum (1)**
22:23
**contract (16)**
28:3,3,5,14;34:11;
41:25;42:11;75:9,9;
79:2;90:9,11,13,14;
91:4;94:5
**contractor (1)**
90:22
**contracts (2)**
27:25;93:22
**contrary (2)**
54:8;58:9
**Contrast (1)**
38:17
**contribution (1)**
35:18
**control (17)**
53:14;57:12,21;
63:11,14,16,24;65:9;
66:24,24;72:22;
82:25;109:15,17,20;
111:13;112:6
**controversial (1)**
58:7
**conversation (6)**
33:15;74:7;77:18,
19;84:16;102:4
**conversations (1)**
66:11
**convert (1)**
98:12
**cool (1)**
119:15
**cooperate (1)**
58:5
**cooperatively (1)**
55:18
**copies (1)**
81:20
**copy (10)**
13:17;15:9,11,24;
20:7;28:14;47:16,16;
61:6;106:25
**core (1)**
53:3
**Corp (1)**
38:17
**Corporate (2)**
67:1;115:8
**CORPORATION (4)**
8:17;35:12;68:23;
117:2
**correctly (2)**
34:25;48:4
**cost (1)**
33:2

**costs (2)**
47:10;80:18
**counsel (37)**
14:6;15:17;21:13;
22:7,14,20;28:10;
41:20,23;42:3;58:24;
59:2,6,20;60:19;62:2;
67:18;77:24;85:2,5;
87:14;88:4,19;91:10,
14,23;98:1;101:17;
102:14;103:12,18;
104:8,12;105:4;
108:13;111:4;112:18
**counsel's (1)**
111:8
**count (2)**
111:1,2
**counting (1)**
61:11
**County (2)**
97:15;98:7
**couple (3)**
33:12;90:20;106:12
**course (9)**
37:1;40:2;45:3,22;
60:6;62:24;71:25;
78:10;112:6
**COURT (249)**
10:2;11:6,9,23;
12:6,12,22;13:3,11,
16;14:12,15,22;15:7,
23;16:2,18,23,25;
17:1,3;18:12,14;19:8,
10,15;20:3,6,9,17,23;
21:12;22:7,20;23:8,
15;24:7,20;25:12,22,
24;26:13,24;27:2;
28:23;29:22,24,25;
30:9;31:6,25;32:2,3,
9;33:4,24;34:17;
35:10;36:1,6,18,19,
21;37:25;38:7;40:3;
45:4,19;46:13,23;
47:20;48:10;49:8;
50:1,5,8,13,20;51:2;
52:11;54:17;55:3,3,
21;56:7;57:3,22;
58:10,12,16,19;59:5,
6;61:1,6,19,22;62:9,
12;63:8;64:5,11,17,
24;65:13,14,18;66:6,
16;67:8,12,14,15;
68:4,8,25;69:3,17,21;
70:8,14,17,23;71:13,
15,25;72:12;73:1,4,7,
10,12,24;74:4,7;75:3;
76:1,9,13,16,18;77:6,
22,24;78:6,13,18;
79:5,6,9,10,12;80:9,
13,21;81:1,5,22;
82:14,18,25;83:4,23;
84:2,5,16,20,21,24;
85:1,7,8;86:2,4;87:1,

25;88:11,15,16,25;
89:3,14,24;90:2;91:6;
92:4,7,17;93:18;94:3;
95:6,9;96:6,13,25;
97:21,25;98:15;99:8,
11,16,18;100:16,23;
101:16;102:6;104:24;
106:1,3,21;107:11,13;
108:8,19;109:4;
110:10,17,20;111:7,
11,17,25;112:4,5,7,
14,17,24;113:8,16,23;
114:20,23;115:1,11,
24;116:13,15;117:6,
12,15;118:2,9,10,20,
23;119:1,4,9
**courthouse (1)**
90:12;93:20
**court-ordered (2)**
31:23;80:25
**court-related (1)**
52:20
**courtroom (6)**
10:11,12,22;12:14;
13:9;20:20
**courts (1)**
56:8
**Court's (12)**
21:23;52:3;64:2;
97:10,11;98:8,14;
99:14;103:13;104:21;
105:23;112:21
**Cousin (1)**
18:18
**cover (2)**
11:10;19:7
**covered (3)**
95:15;100:20;114:1
**covers (3)**
40:6;49:3;51:21
**cracker (1)**
18:18
**created (1)**
78:10
**creative (1)**
44:2
**credit (13)**
25:6,10,14;32:22,
22;33:19;43:20,21;
45:5,5;47:11;69:13;
78:16
**creditor (4)**
13:15;50:3;73:23;
75:18
**Creditors (33)**
6:12;7:3;12:1;15:5;
23:10;26:18;36:3;
43:2,7;44:8,10;45:11;
47:1;49:10;53:7;
61:21;68:6,11,13,14;
69:25;70:22;72:7,14,
15;73:14,14,19;75:11,
20;76:7;96:1;100:6

**creditors' (8)**
70:7;73:25;81:14;
91:17;96:22;107:8,
19;110:13
**criminal (2)**
97:14;99:6
**criticized (1)**
92:12
**crosshairs (1)**
29:5
**crucial (1)**
102:25
**cruel (1)**
46:25
**crystal (4)**
44:5;56:22;57:18;
102:16
**current (3)**
23:1;45:25;99:5
**currently (3)**
23:5;41:9;118:2
**custody (4)**
109:14,17;110:23;
111:13
**customer (1)**
117:21
**cut (1)**
96:6

## D

**daily (2)**
60:17;75:10
**Dallas (1)**
7:6
**damage (4)**
44:16;45:7;46:6;
87:11
**DANOVITCH (2)**
6:16;12:5
**data (1)**
27:12
**date (15)**
21:21;36:25;45:17;
72:18;102:20;111:25;
112:5,6;113:15;
114:1,6,17;115:11,13,
22
**dated (2)**
28:14;61:3
**dates (4)**
106:14;114:1;
116:22;117:4
**daughter (1)**
52:10
**DAVID (5)**
5:8;6:19,22;12:5;
100:4
**DAVIDOFF (3)**
7:12,13;13:15
**day (10)**
27:23;75:8,11;
96:16;103:23;105:16;

107:14;114:21;
117:21;119:14
**days (4)**
13:4;102:12,12;
114:3
**DC (1)**
6:6
**DE (1)**
8:4
**dead (1)**
119:8
**deadline (6)**
39:9,10;103:13;
111:24;114:18,20
**deadlines (2)**
59:19;115:21
**deal (5)**
20:21,24;74:22;
81:23;99:7
**dealing (1)**
37:10
**dealings (2)**
40:20;41:2
**dealt (2)**
35:16;36:16
**death (1)**
60:13
**Debtor (183)**
5:3;11:3,18,21;
13:6,10;21:21;22:2,5,
10,12;23:9;24:8,17;
25:9,14;27:8,12,13,
16,17,20,22,24;28:1,
2,3,4,15,18,19;29:1,3,
14,15,19;30:4;31:7,
11,22;32:10,16,18,19,
20;33:1,6,8;34:1;
35:2,5;36:3,25;37:6,7,
12,16,19;39:9,11;
40:19;41:2,3,4,8,11,
14,16;42:1,4,21,25;
43:9,19;44:6,14,22;
45:2,3,7,8,13,15,17;
46:12;47:4,8,14,17;
48:8,12,14,23;50:24;
51:4,8,11,13,15,16,17,
23,25;52:18,23;53:1,
3,12;55:23;56:4,6;
58:22;59:15;63:18;
66:9;67:17,20,22,24;
68:16,17;70:6;71:16,
20,20,24;74:10,19;
75:7,14,25;76:2,8,13,
16;77:8;78:17;82:23;
83:1,6;87:18;89:9;
91:16,24;92:5,9,24;
93:11;94:5;96:12;
98:5,10;100:1,11;
101:22,22;102:2,4,10,
19,21;103:1,12,23,23,
25;104:6,6,20;
105:17;106:12,13;
107:22;108:1,14,16;

23-12055-shl    Doc 293    Filed 07/12/24    Entered 07/15/24 09:24:56    Main Document
In the Matter of Rudolph Giuliani
Pg 126 of 142

June 17, 2024

109:17,18;110:2,5;
113:19;117:4;118:16
**debtor-in- (1)**
48:24
**debtor-in-possession (3)**
36:20;39:22;44:13
**debtor-related (2)**
102:10;107:22
**debtors (8)**
28:10;30:3;38:12;
41:22;53:16;58:4;
62:18;105:18
**debtor's (71)**
14:6;15:17;26:18;
27:3,6;28:9,25;30:5;
31:17,20;36:2;37:6,
22;38:21;39:7,20;
40:7,9,23,24;41:13,
20,23,24;42:3,5,16;
43:5,11,16,25;44:12;
47:1,24;49:3,19;
50:21;52:10;53:15,
16,18,19,21;54:12;
55:16;56:2,5;58:23;
59:1,22;62:2;67:18,
25;85:4;87:14,21;
91:10,14,23;95:3;
98:1,17;100:11;
102:14;103:18;104:8,
11,12;105:14;108:1;
113:18
**debtors-in-possession (1)**
49:1
**decade (1)**
69:21
**December (4)**
25:19;39:13;40:5,
15
**deception (1)**
71:22
**decide (13)**
81:3;82:19,20;
83:14;85:9,13,15,19;
115:4,5,12,13;116:23
**decided (3)**
63:22;112:11,11
**decides (3)**
29:4;63:8;72:23
**deciding (3)**
73:16;85:20;119:9
**decision (1)**
84:13
**declaration (1)**
83:1
**declined (1)**
22:11
**defamatory (1)**
45:18
**defame (1)**
61:18
**defaming (1)**
60:25
**defend (2)**

85:17,19
**defense (1)**
85:14
**defer (1)**
118:8
**deficiencies (1)**
51:11
**deficient (1)**
31:2
**defined (1)**
68:6
**definitely (1)**
57:15
**delay (1)**
53:4
**delve (1)**
85:23
**demands (1)**
40:25
**demonstrable (1)**
93:3
**demonstrated (2)**
10:13;68:11
**demonstrative (2)**
16:10;86:10
**denial (4)**
66:11;74:5,9;
105:22
**denied (5)**
28:3;52:24;74:8;
84:10;105:12
**denies (1)**
27:17
**deny (1)**
23:22
**DEPARTMENT (2)**
9:2,10
**depending (2)**
24:25;115:14
**depends (1)**
37:5
**deposition (3)**
32:1;33:17;38:22
**described (2)**
33:18;37:1
**describes (1)**
51:13
**description (1)**
53:8
**designation (1)**
28:17
**desire (1)**
86:20
**despite (2)**
42:14;43:16
**determine (2)**
44:21;63:14
**determined (1)**
65:9
**determining (1)**
27:1
**dialog (1)**
119:6

**Diamond (1)**
97:23
**dictating (1)**
56:17
**die (1)**
69:12
**different (11)**
29:15;31:4;46:4;
49:12;50:12;69:21;
70:3;93:15;94:7;
110:8,8
**difficult (1)**
103:2
**difficulty (1)**
80:23
**DIP (1)**
71:7
**direct (1)**
109:20
**directed (2)**
43:1;102:11
**directing (2)**
21:16;43:8
**direction (1)**
101:2
**directions (1)**
110:8
**directly (9)**
30:22;35:3,5,21;
42:13;44:11;100:25;
107:23;111:6
**directs (1)**
41:4
**disagree (1)**
82:1
**disagreeing (1)**
113:9
**disclosed (2)**
80:20,22
**disclosure (4)**
32:4,7;80:14;95:19
**disclosures (9)**
27:13,16;31:8;37:7,
14,23;79:18;80:18;
92:1
**discovery (25)**
13:22;14:20;36:17;
49:21,25;95:13;97:5;
99:21,24;100:1,7;
101:25;102:3,5,18,18,
19;104:4;105:25;
106:10;109:5;111:19;
112:8;113:13,24
**discuss (1)**
96:5
**discussed (7)**
18:19;37:4;38:2;
44:22;79:19;95:18;
96:3
**discussing (1)**
81:16
**discussion (3)**
48:8;49:17;70:4

**discussions (1)**
38:6
**dishonest (7)**
31:18,21;32:25;
36:4,18;59:12;68:24
**dishonestly (1)**
36:16
**dishonesty (5)**
27:5,10;36:3;49:3;
71:22
**dismiss (2)**
83:10;98:12
**dispense (2)**
45:2;49:13
**displayed (1)**
38:23
**dispositive (1)**
18:23
**dispute (1)**
69:10
**disputed (3)**
53:3,3;91:20
**disputes (1)**
105:24
**disputing (2)**
71:6,11
**District (6)**
61:1,19;65:7;97:19,
21,21
**districts (1)**
65:20
**distrustworthy (1)**
50:4
**disturbing (1)**
41:24
**divert (2)**
43:10;44:9
**diverted (1)**
53:21
**diverts (1)**
44:9
**divide (2)**
10:14;93:25
**dividend (2)**
79:1;93:11
**divorce (1)**
80:23
**docket (12)**
13:18;21:17;38:2;
51:5;59:22;79:17;
98:3;100:1;101:3;
102:7,9;118:14
**doctor (1)**
92:11
**document (4)**
21:22;22:1;23:4;
49:22
**documentation (8)**
33:20;34:14;37:24;
39:14,16;43:21;
69:10;104:15
**documents (20)**
21:25;49:23;52:5;

81:12,20;82:15;
98:22;102:22;103:7;
106:18;108:4,13,22,
25;109:3,15,15,17;
110:5;117:2
**doddering (1)**
59:17
**dollars (27)**
22:16,19;25:23;
26:10;31:13,14;
32:20;41:14;42:1,7,
15,23;47:12,15,18;
48:21;69:23;75:13;
90:17,25;91:15;
93:24,24;94:1,14,14,
15
**Dominion (1)**
8:18
**done (10)**
16:3;19:25;42:19;
54:22;79:16;80:10;
94:8;96:16,18;105:17
**door (1)**
53:6
**dormant (1)**
33:18
**doubt (1)**
21:9
**down (3)**
18:6;98:7;116:24
**draft (5)**
60:10;74:2;85:3,11,
12
**drawing (1)**
94:16
**drill (1)**
112:8
**drop (1)**
67:14
**DUBLIN (3)**
6:20;12:5;118:9
**due (1)**
54:16
**Duly (1)**
99:18
**dumb (1)**
18:5
**duplicative (1)**
108:9
**during (5)**
22:15;25:10;32:1;
49:20;78:10
**duties (6)**
23:10;36:20;44:13,
14;48:25;62:14
**duty (15)**
27:9;44:15,16,17,
19,20;45:1,6,7;46:17,
19;48:15;49:6;53:11;
65:5

**E**

**earlier (6)**
34:7;66:4,23;77:1;
102:20;106:24
**earliest (1)**
18:11
**earned (2)**
41:14;42:1
**earning (1)**
41:4
**earnings (7)**
26:6;28:20;35:6,8,
8,24;41:6
**earns (1)**
41:16
**easier (1)**
10:15
**easiest (1)**
103:5
**easily (1)**
110:22
**economic (3)**
53:15;56:4;57:7
**edge (2)**
44:3;112:12
**effected (1)**
67:1
**efficient (5)**
114:7,13;115:3;
116:8;117:7
**effort (2)**
68:24;76:3
**efforts (1)**
87:18
**ego (3)**
51:9;53:6;59:21
**egregious (1)**
39:23
**eight-day (1)**
40:6
**Eighth (1)**
53:12
**eighty- (1)**
72:22
**eighty-year-old (1)**
59:17
**either (3)**
18:17;20:18;82:20
**election (2)**
97:15;98:6
**eleven (1)**
26:25
**else (29)**
12:13,15;13:12,16;
59:23;61:7;67:8;68:1;
73:13;74:20;80:3;
85:22;86:14;87:10;
89:11,16;92:4;95:7;
97:1,6;99:20;111:18;
112:18;113:14,24;
118:17,18,21,22
**elsewhere (1)**
60:18
**email (10)**

15:24;20:21;87:17,
19,23;100:13;101:9;
103:18;105:8,9
**emailed (4)**
75:10;90:9;91:4;
103:21
**embarrassed (1)**
38:24
**embrace (1)**
13:24
**emergency (1)**
47:4
**eminently (1)**
66:17
**emphasized (1)**
103:12
**employee (2)**
35:23;112:25
**employees (5)**
24:10;33:3;43:25;
93:10;115:8
**employees' (2)**
24:13;25:10
**employment (1)**
75:15
**enabled (1)**
59:15
**encourage (1)**
64:20
**encouragement (1)**
66:12
**end (7)**
55:10;57:4;58:14;
93:25;101:23;113:13;
115:25
**endeavor (1)**
78:22
**end-of-month (1)**
39:17
**ends (1)**
55:9
**engage (4)**
22:11;45:9,13;
101:5
**engaged (3)**
36:25;69:15;108:1
**engagement (1)**
90:10
**engaging (1)**
101:11
**ENID (1)**
9:14
**enjoyed (1)**
56:6
**enough (5)**
86:6;87:4;116:2,9,
19
**entered (8)**
42:11;47:5;60:24;
65:3;75:5;98:2;102:6;
112:7
**enters (1)**
61:20

**entirely (1)**
104:13
**entirety (1)**
68:9
**entities (34)**
25:4;38:15,18,23;
63:15;66:3,24;68:16;
69:8,8,10,11,24;
71:17;78:21;81:13;
100:10,12;101:23;
102:11,19;103:1;
104:6,23;107:1,22;
108:4;109:16,19,21;
112:25;113:5,17,18
**entitled (2)**
53:1;71:17
**entity (18)**
33:7,14,23,25;34:5,
10;35:12,16;41:2;
57:5,16;58:4;68:16;
78:19,19;93:16;
104:11,14
**entry (2)**
21:15;102:9
**enure (1)**
95:2
**equally (1)**
39:23
**equity (3)**
70:21;71:8;72:19
**errors (2)**
22:4;39:13
**especially (1)**
99:15
**ESQ (22)**
5:8,16,17,18,19;6:8,
16,17,18,19,20,21,22;
7:8,17,18;8:6,14,23;
9:7,14,22
**essentially (10)**
17:11,18;25:12;
29:1,3;30:19;33:18;
66:9;86:9;101:7
**establish (1)**
111:25
**established (1)**
109:14
**estate (30)**
24:15;26:8,18;
28:21,22;30:5;35:7,
21;43:1;44:15,17,19,
21;45:7;46:1,6;47:3;
49:10;52:9;53:20;
55:25;58:6,10;59:13;
60:4;63:15;67:7;71:8;
91:1;95:3
**EULMESSEKIAN (1)**
6:21
**even (17)**
16:18;29:2;31:17;
45:12;47:11;54:20,
21;64:10;65:1,14,24,
25;70:23;72:10;

88:14;97:13;111:9
**event (2)**
68:5;76:22
**everybody (9)**
10:25;11:10;13:9;
15:10,11;16:6;86:6;
87:3;101:15
**everybody's (1)**
21:7
**everyone (3)**
10:8;61:6;73:2
**everyone's (2)**
11:16;72:21
**evidence (16)**
16:9;61:22;79:5;
81:10,19,21,25;82:3,
8,12;83:11;86:12;
88:12;89:6;93:2;
110:25
**evidences (1)**
93:2
**evident (1)**
16:15
**evidentiary (14)**
15:13;18:19;53:1;
79:11;80:4;81:22;
82:1,7,9,18,21;83:15;
84:6;91:20
**ex (2)**
101:5,11
**exact (1)**
12:22
**exactly (10)**
25:8;32:8;50:9;
51:20;56:17;57:2;
62:13;90:12;103:10,
11
**examination (2)**
79:17;106:11
**examinations (1)**
79:16
**examine (1)**
67:5
**examined (1)**
15:15
**example (9)**
18:20;19:16;31:10;
32:16;69:5;74:15,16;
79:16;94:13
**exceed (2)**
40:8;78:25
**exceeded (1)**
94:25
**exceeding (1)**
40:14
**exceedingly (3)**
74:11;76:22;112:16
**except (1)**
40:15
**excess (3)**
33:10,11;94:22
**exclusion (1)**
56:11

**exclusive (1)**
55:4
**exclusivity (2)**
54:13;55:16
**excuse (3)**
59:24;103:25;
105:19
**executed (2)**
28:5,6
**exempt (15)**
23:12;24:2,15;26:2,
3;48:2,3,5;52:12;
70:19,20;71:1,7;
72:20;74:18
**exercise (4)**
52:23;54:25;57:10;
118:6
**exhaustive (1)**
27:1
**exist (2)**
76:23;88:18
**exists (1)**
27:2
**ex-mother-in-law (1)**
80:8
**expect (3)**
57:23;76:18;96:7
**expected (1)**
103:12
**expeditiously (2)**
62:17,22
**expended (1)**
47:3
**expense (3)**
47:6;69:16,16
**expenses (40)**
22:18;24:12,12,15;
26:1,9;29:20;31:24;
32:23;34:19,25;35:9,
13,16,25;40:8,14,
41:7;42:18,23;43:12,
13;45:11;46:11;
48:18;51:15;53:9;
69:7;70:7;71:7;72:20;
77:2,6,11,14;78:23,
25;93:10;94:22,25
**expensive (1)**
35:22
**experience (4)**
58:1;65:16;69:25;
87:20
**explain (1)**
85:1
**explains (1)**
56:3
**explanation (5)**
32:24;37:20;42:3,
20;113:19
**exploded (1)**
93:5
**expressed (1)**
39:6
**extent (13)**

23-12055-shl    Doc 293    Filed 07/12/24    Entered 07/15/24 09:24:56    Main Document
In the Matter of Rudolph Giuliani
Pg 128 of 142

June 17, 2024

10:17;17:13,19;
47:11;56:14;66:11;
67:6;84:10;102:15;
114:23;115:19;116:2;
117:19
**extra (1)**
39:11
**extremely (1)**
98:13
**ex-wife's (1)**
80:8
**eye (1)**
50:8

# F

**facilitate (1)**
24:9
**facilitating (1)**
53:20
**fact (31)**
16:15;20:25;40:14;
46:16;47:6;48:2;50:5;
53:3,14,25;63:8;
64:12;65:18;66:8;
68:8,13,22;69:9;71:6;
74:24;76:21;79:4;
86:5;101:6;102:17;
104:4,14;105:14,15;
116:20;117:17
**facts (10)**
18:3;26:19;27:4;
31:4;46:5;49:11;51:7;
53:4;56:16;61:23;
72:3;87:6
**failed (5)**
27:17;44:14;53:2;
103:17;104:21
**fails (1)**
37:7
**failure (7)**
40:9;41:13;44:12;
52:2;76:20;112:10,17
**fair (5)**
19:22;20:1;78:13,
13;116:9
**fairly (4)**
11:9;20:10;23:2;
86:9
**faith (2)**
77:13,13
**fall (1)**
18:16
**false (3)**
51:25;59:18;61:13
**falsity (1)**
79:25
**familiar (1)**
77:25
**fan (1)**
18:19
**Fantastic (1)**
21:12

**far (6)**
71:14;78:24;79:4;
85:12;99:1;115:21
**FARR (4)**
5:11;6:3;12:10;
90:6
**Farr& (1)**
59:8
**faster (1)**
76:6
**Fast-forward (1)**
47:13
**Father's (1)**
75:11
**favor (1)**
91:17
**FBI (1)**
60:14
**February (5)**
37:18;39:15,15,25;
79:17
**FedEx (1)**
102:22
**feel (1)**
16:12
**feeling (2)**
14:8;118:4
**feels (1)**
64:8
**fees (2)**
47:15,18
**FELD (7)**
6:11;7:2;12:3;15:4;
91:9;95:25;100:5
**fell (1)**
27:1
**few (5)**
76:11;89:22;93:10;
105:6;117:17
**fewer (1)**
51:18
**fiction (1)**
52:1
**fiduciary (12)**
23:10;27:9;44:13,
14;45:1,6;46:17,19;
48:15,25;49:6;53:11
**Field (1)**
7:4
**fifteen (4)**
21:24;49:23;52:5;
102:22
**Fifth (1)**
52:15
**fight (1)**
24:23
**fighting (1)**
57:11
**figure (1)**
70:2
**figuring (1)**
109:5
**file (18)**

22:2,3;30:15;40:11;
47:6;54:14;60:5;
85:11;93:13;101:3,4,
4;102:6;115:6,12,18;
116:17,17
**filed (23)**
13:18;14:25;18:2;
21:15;23:5,17;27:24;
37:15,16;39:8,9;51:4;
60:8,22;88:14;96:15,
23,24;97:13;99:5,16;
102:18;103:24
**files (1)**
27:15
**filing (7)**
21:18;31:8;36:12;
39:9,10;72:17;98:12
**filings (4)**
32:17;37:22;41:8;
91:21
**filter (1)**
17:23
**finality (1)**
113:12
**finally (7)**
28:4;40:5;53:23;
58:3;91:23;98:22,23
**finances (3)**
52:4;81:6;104:2
**financial (13)**
27:12,13,15;30:17;
31:8;33:5;37:6,8,14;
70:25;92:1;108:5,14
**financials (1)**
106:19
**find (6)**
12:13;30:23;58:7;
72:9,12;99:6
**finding (4)**
26:16,17;53:9;68:8
**finds (1)**
68:5
**fine (16)**
12:22,23;16:4;
17:15;55:16;81:7;
88:25;89:3,24;94:19;
112:5;116:1;117:6,8,
24;118:1
**finished (2)**
73:3;95:11
**firm (2)**
98:2,5
**first (23)**
10:2;11:3;14:3;
15:2;16:16;19:19;
26:16;31:22;34:6;
37:15;44:19;50:24;
51:23;58:18;68:1,15;
79:8;89:23;101:10,
23;102:2,3;106:10
**Fischoff (83)**
11:20,21;16:14,24;
17:2;18:8,13;19:6;

59:4;67:19,20;69:2,
12;70:5,13,16,18;
71:5,14,19;72:11,13;
73:2,6,9,11,18,25;
74:6;75:2,4;76:12,15,
17;77:5,21;78:5,11,
14;79:7;80:6,19,22;
81:4,14;82:13,17,23;
83:3,16,25;84:4,15,
18,23,25;85:3,25;
86:3,24;87:16;88:9,
10,22;89:1,11,13;
92:8;9;93:8;94:2,21;
95:7,8;96:7,18;98:16,
19;105:1,7,19;106:4,8
**fit (1)**
50:9
**fitting (1)**
49:11
**five (2)**
56:11;86:19
**five-day-a-week (1)**
75:9
**fix (1)**
77:16
**FL (1)**
5:6
**flagged (1)**
39:23
**flags (1)**
59:25
**flexibility (1)**
115:16
**flip (2)**
16:6;79:21
**Florida (8)**
23:9,13;47:18,23;
48:21;52:13;53:17;
74:17
**flouted (1)**
59:16
**flow (3)**
25:3;37:5;53:13
**flowing (1)**
70:11
**focus (4)**
33:5;44:13;75:19;
91:17
**focused (1)**
72:1
**focuses (1)**
51:23
**folks (6)**
10:10;15:8;58:1;
81:25;87:12;94:8
**follow (1)**
61:20
**followers (1)**
61:4
**following (7)**
39:18;41:19;45:17;
47:22;56:11;101:2;
108:20

**follows (2)**
61:14;88:18
**follow-up (1)**
33:12
**foot (1)**
13:2
**footing (1)**
113:2
**forced (1)**
28:8
**forget (3)**
48:3;87:17;118:11
**forgotten (1)**
101:19
**form (3)**
17:17;62:8;119:12
**formal (3)**
41:25;103:9;106:14
**formally (1)**
75:5
**former (1)**
31:24
**forms (1)**
27:11
**forth (9)**
24:5;51:5;54:5;
55:25;67:2;74:8;79:2;
90:4;98:21
**forward (4)**
14:10;22:22;72:8;
83:21
**found (3)**
27:12,21;57:7
**four (1)**
37:21
**fours (1)**
65:2
**fourteen-year-old (1)**
60:12
**Fourth (1)**
52:11
**fracture (1)**
13:2
**frame (1)**
52:1
**Frankly (4)**
81:1;87:15;106:24;
107:25
**fraud (1)**
51:23
**free (5)**
16:12;19:10;37:5;
42:25;101:12
**Freeman (24)**
5:12;6:4;12:8;
36:16;45:18;47:6;
49:24;52:16;58:21,
25;59:8;60:2,7;73:19,
23;77:7,9,23;83:12;
85:5;86:15;91:18;
92:13;118:24
**Freemans (1)**
60:11

**Friday (1)**
117:18
**friend (1)**
21:5
**front (7)**
14:6;45:20;66:7,18;
93:7;95:3;119:9
**fulfill (1)**
54:5
**fulfilled (1)**
112:20
**fulfilling (1)**
36:20
**full (4)**
22:4;31:9;40:25;
99:17
**fully (4)**
28:6;52:4;73:16;
104:2
**Fulton (2)**
97:15;98:7
**fund (1)**
35:8
**funds (14)**
24:15,23,25;25:2,9,
15;43:6,10;44:10;
52:12;70:19,20;71:7;
114:13
**fungible (1)**
25:20
**funnel (1)**
29:1
**funneled (3)**
22:15;26:7;33:9
**funneling (2)**
48:18;59:20
**funnels (1)**
51:13
**further (15)**
33:22;37:14,16;
38:1;61:22;62:23;
74:13;79:18;83:17;
84:11;85:25;93:17;
96:5;102:23;114:24
**furtherance (1)**
23:12
**furthering (1)**
57:17
**future (1)**
55:12
**FYI (1)**
20:14

**G**

**GALLAGHER (5)**
5:11;6:3;12:10;
59:8;90:6
**game (4)**
27:14,22;28:9;
50:22
**garden (1)**
77:14

**Gary (2)**
11:21;67:19
**gather (2)**
86:15;89:12
**gave (1)**
108:13
**GENERAL (2)**
9:9;82:22
**generally (5)**
37:24;40:22;42:20;
43:23;68:2
**generate (1)**
75:12
**generated (1)**
68:19
**generates (3)**
68:17;78:19;92:10
**generating (4)**
75:7,16;91:11;
92:14
**Georgia (3)**
97:14,16;98:6
**gets (8)**
22:16;28:20;33:9,9;
35:24;63:17;65:24;
109:12
**gigantic (1)**
99:24
**girlfriend (1)**
24:10
**girlfriend's (1)**
52:10
**Giuliani (79)**
10:9;13:6;28:17;
32:22;33:6,10,11,13,
15,19;34:4,7,9,11,13,
15,23;35:1,23;38:16,
16;39:1,1;42:2,8,12,
13,15,17,22,23;43:4,
20;51:9;53:5,10;
59:11;60:9,18,24;
70:10;71:2,14;78:20;
81:9,12,16;90:13,14,
15,20,20;91:1;92:16,
23;93:22;94:8;97:12,
17,19;99:4;101:8;
103:1,2;104:5,10,10;
105:8,9;107:17;
108:3,22,23,25,25;
109:3,3;110:3;113:6
**Giuliani's (3)**
60:1;81:2;107:16
**given (21)**
17:2;30:6;33:14;
38:1,12;43:22;53:25;
57:18;59:14;74:20;
77:17;84:2;88:6;
89:11;91:24;98:3;
100:13;101:2,21;
111:12;115:20
**giving (2)**
70:1;95:4
**glad (1)**

101:17
**GLUCKSMAN (3)**
7:17;13:14,14
**goal (2)**
54:20;113:12
**goes (6)**
33:10;34:24;35:13;
46:21;66:3;83:8
**Good (23)**
10:2;11:19,23,23;
12:2,6,9,12;13:16;
15:3;16:10,10;20:23;
29:14;43:15;67:19;
77:13;87:1;90:3;
95:20;97:3;100:4;
119:14
**Goodman (1)**
11:20
**Gordian (1)**
33:6
**governance (3)**
53:15;56:4;57:21
**governing (1)**
41:25
**grace (1)**
59:14
**grandmother (1)**
60:13
**grant (2)**
23:20,21
**granted (3)**
24:4;55:7;58:15
**granting (2)**
51:8;74:13
**Great (1)**
117:9
**Green (3)**
9:4;20:10,16
**gross (10)**
27:5;36:22;37:2,9;
40:16;46:22;49:4;
53:9;72:1;94:24
**grossly (1)**
59:12
**ground (4)**
31:18;72:4;95:16;
100:20
**Group (1)**
39:1
**growing (1)**
60:22
**guarantee (1)**
73:5
**guess (8)**
11:11;30:13;35:10;
50:5;55:12;64:17;
77:21;83:18
**guessing (3)**
57:3,9;58:24
**guidance (2)**
30:24;52:20
**guided (1)**
114:7

**guidelines (2)**
51:13,16
**GUMP (8)**
6:11;7:2;12:3;15:4;
91:9;95:25;100:5;
114:16
**guys (1)**
114:14

**H**

**habits (1)**
69:12
**half (1)**
65:8
**hallway (1)**
16:17
**Hampshire (3)**
97:19,22;98:20
**hamstring (1)**
54:18
**hand (3)**
71:10,11,24
**handcuffs (1)**
55:8
**handed (1)**
79:8
**handle (8)**
10:22;14:23;65:25;
95:20;101:23;108:10;
109:4;119:10
**handled (1)**
21:1
**hands (1)**
11:15
**hang (1)**
114:8
**happen (5)**
55:6;56:7,21;76:25;
94:17
**happened (3)**
57:2;74:16;94:17
**happening (4)**
16:5;33:23;61:16;
72:5
**happens (3)**
75:22;101:1;116:14
**happily (1)**
19:10
**happy (11)**
11:12;14:5,19;19:1;
82:19;87:12;101:13;
105:5;115:11;116:4;
118:8
**harassed (1)**
60:13
**hard (6)**
25:20;42:20;51:20;
55:10,12;61:23
**harder (2)**
30:23;76:8
**harmful (1)**
68:13

**harmonic (1)**
30:12
**HAUER (7)**
6:11;7:2;12:3;15:4;
91:9;95:25;100:5
**heading (1)**
99:24
**hear (22)**
10:25;11:12;14:5;
15:2;50:24;58:17,21,
21,25;62:1,2;67:18;
73:22;82:2,19;83:13;
92:5;97:3;105:24;
106:25;107:11;
116:15
**heard (12)**
19:18;47:20;67:16;
69:2,3;74:25;99:9,20;
102:14;115:12,18;
116:18
**hearing (23)**
10:18;11:14;13:15,
18;15:13;41:21;53:2;
62:9;70:15;79:11;
80:4;81:8;82:7,8,9,
22;91:20;92:20;96:4;
97:7;100:17;109:16;
114:4
**hearings (6)**
10:12;18:20;39:6;
95:17,18;118:12
**Heath (4)**
11:19;96:11;98:18;
106:7
**heck (1)**
38:25
**heightened (1)**
40:23
**Helmer (1)**
69:20
**help (2)**
45:13;57:14
**helpful (10)**
15:20;16:1;22:21,
25;29:7;31:1;106:5;
117:20,22;118:15
**helps (1)**
112:13
**here's (10)**
11:5;17:1,3;18:14;
21:3;55:5;70:11,12,
12;86:5
**hey (1)**
92:14
**hide-and-seek (1)**
27:15
**high (1)**
66:20
**highlighted (2)**
38:22;49:19
**highlighting (1)**
50:16
**highlights (1)**

50:11
**highly (1)**
    113:20
**HILL (18)**
    6:19,22;12:5;29:18;
    100:4,4,19;101:20;
    105:5;106:2;107:21;
    108:12,24;111:5,8,22;
    112:19;113:22
**himself (5)**
    43:9;44:9;59:11;
    100:11;104:6
**hinder (2)**
    44:18;48:16
**hints (1)**
    74:22
**hiring (1)**
    90:19
**history (2)**
    36:12;64:15
**hit (4)**
    49:18;50:11;63:11;
    118:14
**hold (5)**
    58:9;84:11;105:3;
    115:3,4
**holds (1)**
    110:3
**holistically (1)**
    23:24
**homes (1)**
    71:9
**honest (1)**
    32:18
**honestly (1)**
    36:20
**Honor (124)**
    11:19;12:2,9,19,25;
    13:10;14:7,14,21;
    15:3,21;20:2,5,13,14;
    21:14;23:7;24:17;
    25:5,18;26:5,14,22;
    32:8,14;33:17;34:9;
    36:2,15;38:11;39:3;
    40:18;44:12;46:11,
    24;49:3;50:10;51:1,4;
    52:5;53:23;55:22;
    56:20;58:2,13,17;
    59:7,14;60:20;61:22,
    24;62:3,5,11;63:11;
    64:8,8;65:22;66:4,23,
    25;67:10,13,19;
    83:16;85:15,17,19;
    89:13,22,25;91:8,19;
    92:6;95:8,24;96:2,11,
    14,23;97:9,14;98:18;
    99:12;100:4,7,19;
    101:20;102:7,8,16;
    103:6;104:3,10,19;
    105:5,12;106:7,9,15;
    107:21;108:12;110:4,
    12;111:5,16,22;
    112:19;113:22;

114:13,15,17;115:16;
116:9;117:3,10,11,25;
118:1,8,18,22,25;
119:3
**Honor's (1)**
    41:20
**hopefully (5)**
    96:18,19,20;
    110:14;117:4
**hopping (1)**
    23:15
**horse (1)**
    119:8
**host (2)**
    21:18;74:23
**hour (2)**
    16:16;17:2
**hours (1)**
    106:12
**huge (3)**
    59:24;75:18;111:19
**humor (1)**
    118:4
**hundred (6)**
    38:15,19,24;55:24;
    63:18;64:25
**hurt (1)**
    77:17
**HUTCHER (3)**
    7:12,13;13:15
**hybrid (1)**
    10:10

# I

**iceberg (1)**
    34:3
**idea (5)**
    19:17;64:18;74:16;
    83:4;105:1
**identified (16)**
    25:17;26:1;30:1,11;
    33:24;34:7,7;56:11;
    58:8;66:17;72:6;
    101:6;102:4;105:15;
    107:23;116:25
**identifies (1)**
    52:8
**identify (16)**
    17:14;18:21;19:25;
    22:25;32:12;38:2;
    46:17;53:2;56:12;
    64:6,21;77:2;78:4,6;
    88:17;111:20
**identifying (2)**
    31:3;79:21
**ignore (1)**
    52:20
**ignored (2)**
    53:12;59:19
**ignores (2)**
    27:18;31:11
**ignoring (1)**

91:16
**ill (1)**
    59:23
**imagine (1)**
    116:11
**immediate (5)**
    21:16;24:19;53:24;
    62:19,21
**immediately (3)**
    61:24;66:2;103:19
**impartial (1)**
    44:20
**impediment (1)**
    52:22
**impediments (1)**
    113:7
**imperative (1)**
    67:4
**implication (1)**
    103:15
**implore (1)**
    65:12
**important (12)**
    24:1;38:13;49:16;
    54:1;55:22;63:5;64:9;
    70:6;99:14;101:13;
    102:1;110:11
**impose (1)**
    65:24
**impossible (3)**
    32:24;45:16;77:25
**impression (1)**
    63:4
**improperly (1)**
    53:21
**improve (1)**
    51:12
**improving (1)**
    71:21
**inability (1)**
    40:11
**inaccuracies (1)**
    31:9
**inaccurate (4)**
    27:15;31:8;37:23;
    43:23
**inadequate (5)**
    27:6;36:23;37:3;
    40:16;49:4
**inappropriate (6)**
    27:7;40:20;41:2;
    49:5;53:10;80:16
**inappropriately (1)**
    57:19
**Inc (2)**
    8:18;29:18
**incapable (1)**
    43:9
**include (2)**
    38:4;39:14
**included (5)**
    16:22;17:4;56:9,13;
    63:23

**includes (4)**
    39:15;40:6;44:20;
    47:11
**including (6)**
    27:5;31:15;47:12;
    53:14;64:7;93:10
**income (45)**
    34:22,24;35:2,5,7,
    13,16,23;40:8,15;
    41:4,11;42:6,18;43:1,
    5,8;44:10;47:2;48:18;
    51:13,14;52:9;68:17,
    19,22;69:8;71:16,16;
    75:7,13;78:19,23,25;
    90:23;91:11;92:10,
    14,20,22;93:9;94:6,
    22,23;95:2
**incompetence (6)**
    27:5;36:22;37:1;
    39:21;40:16;49:4
**incompetent (1)**
    59:12
**incomplete (3)**
    27:15;43:23;109:2
**inconsistent (1)**
    59:19
**incorrect (1)**
    34:21
**increase (1)**
    55:4
**increasing (1)**
    77:14
**incredibly (1)**
    40:1
**incurable (1)**
    40:19
**incurrence (1)**
    48:17
**indeed (1)**
    66:8
**independent (3)**
    31:18;56:25;57:10
**indicate (1)**
    71:21
**indicating (1)**
    107:9
**indication (1)**
    100:14
**individual (19)**
    29:14;31:12;35:17;
    40:23;58:3;67:24;
    75:18;76:16;79:1;
    94:23;95:3;107:24;
    108:10;109:11,24;
    110:18;111:3;115:8;
    117:1
**individually (2)**
    69:6;76:15
**individuals (4)**
    24:21;25:4,14,25
**inevitability (1)**
    24:18
**inevitable (1)**

53:4
**inevitably (1)**
    19:3
**inexplicable (1)**
    39:13
**inexplicably (1)**
    90:21
**informal (1)**
    106:11
**information (35)**
    13:5;22:5,7,12;
    25:1;27:16,17,18,19,
    21;31:10;37:6;41:21,
    23;55:19;69:4;71:3;
    87:22;102:15,17;
    103:5,15;104:20;
    106:16;107:6,10,16,
    20;108:5,6,6,14,21;
    110:14,22
**infringe (1)**
    56:25
**infringing (1)**
    54:24
**INGRASSIA (1)**
    8:6
**initial (1)**
    21:24
**initially (1)**
    108:2
**inject (1)**
    16:8
**injunction (5)**
    47:5;60:23,25;
    61:17;77:23
**inquiring (1)**
    114:17
**inquiry (1)**
    85:11
**ins (1)**
    116:7
**insider (1)**
    43:2
**insiders (2)**
    40:4,13
**instance (7)**
    34:6;45:24;47:23;
    69:5;76:23;80:7;
    101:1
**instead (6)**
    22:17;23:11;31:13;
    43:2;48:21;56:24
**instinct (1)**
    40:24
**instructions (1)**
    31:11
**insult (4)**
    60:15;85:5,6,7
**intend (1)**
    18:24;85:7
**intent (7)**
    71:21,22;72:1,3,9,
    12;78:8
**intention (1)**

23-12055-shl    Doc 293    Filed 07/12/24    Entered 07/15/24 09:24:56    Main Document
In the Matter of Rudolph Giuliani
Pg 131 of 142

June 17, 2024

21:9

**interest (21)**
26:18;27:8;29:15;
30:3,7,12;31:3;40:20;
41:1,3;44:5;49:6,9;
51:7;52:8;55:24;57:6;
68:6;72:13,15;73:13

**Interested (6)**
8:10;15:17;23:23;
74:1;87:20;88:1

**interesting (1)**
69:18

**interests (3)**
68:11,12,13

**interject (2)**
14:9;22:20

**internet (2)**
75:10;79:24

**interrupt (3)**
11:5;100:23;101:17

**interrupted (1)**
73:4

**into (26)**
14:5;18:17;28:21;
33:22;36:19;38:1;
42:11,15;49:11;
60:24;63:18;65:11;
69:11;70:9,19;71:7;
74:15;81:6,21;82:2;
85:24;90:11,25;91:2;
93:10;104:25

**invention (1)**
109:25

**investigation (1)**
44:23

**investigations (1)**
44:20

**involve (1)**
72:3

**involved (3)**
29:18;87:24;94:9

**involvement (1)**
111:9

**IRA (2)**
25:19;40:7

**irrelevant (2)**
19:15;52:17

**issue (21)**
17:8;18:23;21:1;
23:21;45:20;46:5;
52:17;67:24,25;
73:12;77:18,25;88:3;
92:12;97:3,8;99:20;
105:6;109:2;112:24;
116:25

**issues (16)**
10:17;29:25;31:1;
53:2;62:7;81:3;87:4,
15;88:3;95:17;
102:25;104:15;
111:21;116:16,25;
119:6

**item (2)**

95:11;99:22

**items (3)**
16:22;31:12;102:5

**IV (1)**
6:19

---

## J

**JAMES (3)**
5:17;7:17;13:14

**January (5)**
39:13,25;47:10;
51:19;67:1

**jewelry (1)**
31:13

**Jim (1)**
12:10

**job (3)**
85:18;110:12;
111:23

**Joe (2)**
97:20;98:21

**JOEL (1)**
8:23

**joined (2)**
12:4,10

**joining (1)**
87:21

**joint (1)**
29:16

**Judge (28)**
11:4;17:8;18:2;
21:11;56:11;64:23;
65:1,12;70:16;72:8;
73:2;78:12;79:4;80:1,
6,16;81:18;82:3;
83:17;84:18;92:20;
94:12,21;99:2,9;
106:18;107:5;115:4

**judges (3)**
56:14;65:19;82:16

**judgment (15)**
24:3;45:14;52:16;
55:1;57:1,10,16;64:3;
66:4;73:19,20;82:14;
83:10;105:4;118:6

**judice (2)**
23:18;74:17

**judicial (3)**
65:18;79:15,23

**July (5)**
114:4;115:17,25;
116:1;119:15

**jump (1)**
76:10

**jumping (1)**
19:4

**June (7)**
51:4;61:3;96:23;
103:18,21,23;105:10

**JUSTICE (1)**
9:2

**justification (1)**

27:13

---

## K

**keep (4)**
23:13;48:24;88:1;
96:20

**keeping (4)**
15:1;27:7;30:4;
49:4

**keeps (1)**
91:2

**Ken (1)**
11:22

**KENNETH (1)**
8:14

**key (2)**
24:5;57:18

**keys (1)**
110:3

**kind (10)**
45:23;46:4;56:16;
71:3;76:23;94:4,4;
110:21;111:14;
112:15

**kinds (2)**
17:6;54:23

**King (2)**
8:3;69:20

**knew (1)**
34:10

**knot (1)**
33:6

**knowing (1)**
70:24

**knowledge (4)**
31:9;38:21,23;39:3

**known (1)**
80:18

**knows (3)**
10:8;87:23;101:15

**Kwok (1)**
65:7

---

## L

**labels (1)**
19:7

**LABKOWSKI (2)**
5:2,8

**lack (7)**
16:10;25:1;31:23;
37:24;38:21;39:21;
54:16

**language (2)**
63:3;66:12

**large (3)**
17:7;30:15;101:7

**last (13)**
10:20;11:11;17:9;
60:17;76:11;87:24;
98:4,22;99:21;100:8;
102:10;112:19;

117:17

**lasted (1)**
106:12

**late (3)**
59:19;61:1;70:17

**later (9)**
13:21;22:8;31:25;
32:12;37:16,21;54:1;
93:13;102:13

**latest (1)**
28:9

**LAW (13)**
5:2;30:22;46:4;
56:3,14,18;58:8;
59:17;61:20;63:22;
98:2;101:6;113:3

**lawyer (1)**
92:11

**lawyers (3)**
97:20,22;116:7

**laying (1)**
65:4

**layperson's (1)**
18:6

**lays (1)**
13:19

**lead (3)**
45:9;48:17;77:9

**leading (2)**
44:3;77:8

**leads (2)**
26:20;27:22

**learned (3)**
27:25;28:11;34:14

**learns (1)**
27:16

**least (7)**
47:12;77:18;78:24;
87:23;96:22;110:15;
111:20

**leave (7)**
23:23;57:6;66:21;
78:3,5;84:3;105:3

**leaving (1)**
106:24

**led (5)**
28:12;40:19;45:13,
14;57:24

**left (2)**
11:22;78:21

**legal (4)**
16:11;61:18;81:19;
97:12

**legs (1)**
65:25

**length (1)**
96:3

**lengthy (1)**
118:3

**less (4)**
21:25;22:18;42:23;
52:5

**letter (12)**

22:14;23:1;34:10,
16,23;41:23;42:9,10,
14;51:10;53:5;117:8

**letters (1)**
47:1

**letting (1)**
13:1

**level (3)**
33:21;35:16;113:12

**liabilities (6)**
37:13;38:13;40:11;
77:10,15;78:9

**Liberty (1)**
9:11

**life (2)**
39:2;78:21

**Life's (1)**
12:22

**lifestyle (1)**
47:10

**lift (3)**
75:1;83:24;84:10

**lifting (1)**
52:21

**light (2)**
96:8;99:15

**likes (1)**
73:22

**limited (5)**
38:12;39:3;64:7;
72:17,24

**line (5)**
29:24;49:23;
100:15,17;101:21

**liquidating (1)**
54:21

**liquidation (4)**
54:20,20;72:18;
73:2

**list (8)**
26:25;31:12,14;
38:3;64:21,24;95:17;
114:1

**listed (6)**
27:25;34:11;38:19;
39:18;75:5;97:5

**listen (2)**
43:11;101:9

**lists (2)**
38:15,18

**litigate (1)**
60:5

**litigating (1)**
17:7

**litigation (6)**
36:16,17;49:24;
60:6;74:11;78:1

**little (14)**
10:23;16:15;31:4;
38:23;46:3;82:3;84:6,
7;95:10;100:21,22;
101:25;107:2;108:15

**Live (8)**

23-12055-shl    Doc 293    Filed 07/12/24    Entered 07/15/24 09:24:56    Main Document
In the Matter of Rudolph Giuliani
Pg 132 of 142

June 17, 2024

41:18;42:6;44:3;
47:24,25;48:8;74:19;
94:13
**livelong (1)**
107:14
**lives (1)**
10:6
**livestream (1)**
105:16
**LLC (10)**
38:16,16;39:1,1;
59:20;67:25;68:23;
90:14,21;92:11
**LLP (7)**
5:11;6:3,11;7:2,12,
13;8:2
**located (1)**
114:2
**LOCKE (2)**
9:17,18
**LOISON (1)**
5:19
**long (8)**
10:5;18:9;31:14;
70:4;73:3;117:16,19,
19
**longer (3)**
20:12;48:24;61:18
**look (22)**
15:18,25;19:25;
21:8;24:2;30:2;57:24;
59:16;61:8,10;63:16;
64:6;75:24;78:14;
80:17,17;86:7;87:12;
88:10;90:24;115:9;
117:20
**looking (7)**
10:22;17:16;18:17;
28:25;34:2;64:14;
99:4
**looks (3)**
63:21;82:12;94:4
**loop (2)**
88:1;89:15
**loose (1)**
34:2
**LORD (2)**
9:17,18
**Los (1)**
8:21
**loss (1)**
107:25
**lost (2)**
52:18,23
**lot (23)**
18:6;30:2,8;36:14;
43:13;56:13;59:14;
60:8;65:12;67:21;
68:10,15;69:21;
76:10;78:15;81:8;
87:10;95:16;100:20;
107:14;111:12;114:3;
115:9

**Louis (1)**
97:22
**lovely (1)**
10:23
**lumps (1)**
31:13
**lunch (1)**
86:19
**luxury (1)**
115:20

## M

**MACCURDY (1)**
6:8
**Machiavellian (1)**
78:9
**machines (1)**
61:11
**MAGGIE (1)**
6:8
**mail (1)**
101:10
**maintain (2)**
37:8;48:22
**maintenance (1)**
70:20
**makes (8)**
14:10;15:19;58:20,
25;60:1;80:7;101:22;
114:3
**making (7)**
15:25;35:17;63:12;
74:8;76:2;87:18;
97:17
**malice (1)**
60:11
**man (3)**
59:18;72:23;73:3
**management (4)**
46:8;56:5;57:21;
67:11
**managing (2)**
63:19;64:1
**manipulative (1)**
59:18
**manner (6)**
44:16,17;45:7;46:6;
48:15,17
**Manual (2)**
54:2,11
**many (6)**
27:11;29:15;62:12;
67:2;97:25,25
**March (7)**
37:15;39:25;41:8;
51:18;102:2,4,5
**Maria (8)**
32:21;44:25;45:4;
90:21;92:15;100:12;
105:5,7
**MARINE (1)**
5:19

**market (1)**
75:6
**marshal (1)**
46:2
**matches (1)**
39:17
**material (1)**
53:2
**materials (1)**
108:17
**math (1)**
93:19
**matrimonial (1)**
80:20
**matter (7)**
35:11;54:22;79:4,
10,25;82:24;83:15
**matters (3)**
68:7;95:11;97:12
**may (48)**
13:19;14:8;20:9;
21:15,23;22:23,23;
30:23;34:10,16,23;
38:8;41:9,16,20,22;
47:16;50:10;55:3;
61:1,4;64:19,19;66:4,
5,25;78:2,11;79:2;
83:19;84:19;93:11,
12,12;94:9,9;95:1;
96:16,23;99:9;
100:14;102:13,22,22;
104:1;105:14;111:24;
116:12
**maybe (10)**
32:1;36:13,13;
54:20;55:9,9;68:1,2;
78:3;113:3
**Mayor (2)**
41:17;61:3
**mean (24)**
46:18;54:18;56:18;
63:19;72:16;74:2;
77:23;78:17,20;
79:19,23;80:3,10;
82:11,24;83:6;87:22;
107:14;109:6;110:23,
24;112:11;114:12;
116:1
**meaning (3)**
30:15;80:11;89:5
**meaningful (1)**
45:11
**meaningfully (2)**
22:11;113:12
**means (8)**
13:8;25:16;28:21;
45:1;56:18,18;
107:14;116:3
**media (2)**
28:1,12
**Medrano (4)**
107:7,23,25;110:15
**meeting (8)**

31:25;32:10;37:18;
38:5;43:12;79:18;
80:6,22
**member (1)**
63:20
**membership (1)**
32:11
**memorialize (1)**
117:7
**mentioned (4)**
16:3;67:3;90:8;
101:18
**merely (2)**
32:23;54:9
**merit (1)**
32:15
**merits (3)**
49:17;82:4;116:24
**mess (2)**
66:10;109:13
**message (2)**
60:20;74:14
**MICHAEL (1)**
8:6
**microphone (2)**
10:19;12:15
**microphones (2)**
10:21,22
**might (9)**
11:17;22:21;44:3;
50:9;57:5,5;94:17;
115:5,6
**million (4)**
61:3;73:22;75:19;
91:15
**mindful (2)**
85:16;117:23
**minor (2)**
19:6;87:16
**minute (8)**
15:20;16:5,6,7;
83:16;84:2;86:15;
107:3
**minutes (3)**
76:11;86:19,23
**misconduct (1)**
49:20
**misleading (3)**
31:8,9;51:25
**mismanaged (1)**
59:12
**mismanagement (9)**
27:6;36:23;37:2,9;
40:16;46:22;49:4;
53:10;72:2
**missing (1)**
107:18
**mistaken (1)**
23:13
**moment (2)**
83:18;86:3
**moments (1)**
105:7

**monetize (1)**
53:17
**money (18)**
25:13,19;28:17,21;
33:9,11;35:12;57:12;
59:20;60:4;70:7,7,11,
12,25;71:8,12;93:22
**month (18)**
22:7,16;39:18;40:7,
9,15;41:14;42:1,8,16;
65:8;69:23;93:24;
94:1,14,15,15;102:23
**monthly (24)**
13:22;22:2;25:7,16,
26:11;31:2;33:20;
34:13;39:7,7,9,12,20,
24;40:12;41:12;42:4;
43:18,22;91:12;
95:12,14,19;97:6
**months (10)**
25:11;32:12;37:16,
21;47:13;52:14;
71:23;98:3;99:13;
102:17
**month's (2)**
39:18;96:20
**morass (1)**
116:24
**more (39)**
13:3,4;17:19;20:10;
21:25;22:6,16;23:19;
27:22;31:12;34:5;
37:16;38:18;42:14;
45:12;56:8;63:5;
65:13;68:2;70:24;
72:5;74:12;78:21,22;
81:8,17;82:21;83:14;
84:6,7;87:22,24;91:3,
24;101:22;106:14;
107:3;108:7;115:5
**Moreover (6)**
31:17;37:22;39:23;
41:1;43:22;45:1
**morning (12)**
10:4,12;11:23;61:2;
67:21;75:11;87:17,
20;90:10;91:5;
105:11;114:8
**MORs (2)**
91:12,21
**Moss (1)**
6:4
**most (6)**
14:10;24:1;33:15;
99:17;110:11;117:7
**mother (1)**
109:24
**mother-in-law (2)**
31:24;81:2
**motion (81)**
13:20,21,25;14:3,5,
10,20,25;16:22;17:22,
24;18:6;21:15,17,18;

23-12055-shl    Doc 293    Filed 07/12/24    Entered 07/15/24 09:24:56    Main Document
In the Matter of Rudolph Giuliani
Pg 133 of 142

June 17, 2024

23:5,17,17,18,19,20,
20,21,21,22,22,25;
24:3,6;36:13;45:21,
25;47:20;51:8,24;
52:24;55:7;57:24;
58:15;62:6;65:8;
67:22;72:7;74:4,8,17,
25;75:22;82:4;83:8,9,
10,23;84:12;87:6;
88:18,21;89:10;
91:22;95:12,14,15,21;
96:2,4;97:2,6;98:12;
99:15,25;102:18;
103:24;104:17;112:2,
23;114:5,22;115:6,17,
22;116:11

**motions (7)**
14:1,8;17:6;18:1;
22:22;98:25;119:9

**motivation (1)**
73:18

**mounting (1)**
60:21

**mouth (1)**
60:20

**move (3)**
60:14;66:13,19;
112:2;118:7

**moving (1)**
29:16

**much (27)**
10:15,16;12:25;
14:13,23;26:8;34:5,
17;40:19;47:14;
58:16;78:2;89:14;
91:6;94:13,19;95:6;
96:15,25;97:10;
98:15;99:18;114:10;
118:19,20;119:5,16

**musicians (1)**
44:2

**must (4)**
26:21;37:9;49:1;
114:18

**muted (1)**
10:19

## N

**Nacore (1)**
29:18

**name (2)**
28:16;90:3

**named (1)**
97:16

**narrative (2)**
17:10;52:1

**narrowly (1)**
113:4

**Nathan (1)**
12:11

**natural (1)**
40:24

**near (1)**
10:24

**nearly (1)**
47:17

**necessarily (10)**
30:22;45:23;63:19;
64:18;65:21;71:25;
72:9;77:16;93:2;
112:13

**necessary (5)**
21:5;64:10;103:14;
111:15;116:22

**necessitates (1)**
19:4

**Necessity (1)**
109:24

**need (30)**
19:24;51:12;61:21,
22,24;62:20;63:2;
74:19;78:15;79:24;
80:4;82:2,8,21;83:13,
14;84:5,6;85:15,17,
18,19,23;89:19;
91:19;93:20;109:4;
113:25;116:3,22

**needed (2)**
47:24;101:3

**needing (1)**
55:15

**needs (8)**
12:15;13:12;24:6;
57:1;63:13;75:21,23;
82:23

**neither (1)**
103:9

**New (22)**
5:14;6:14;7:15;
8:12;9:5,9,10,12,20;
16:21;17:4;20:11;
47:15;53:17;70:20;
75:4,9;79:1;95:1;
97:19,22;98:20

**newer (1)**
89:20

**news (1)**
41:13

**Newsmax (1)**
41:17

**Next (12)**
36:22;40:18;44:12;
55:22;72:24;85:4;
96:16,20;111:22;
112:2,23;113:25

**nice (1)**
79:5

**ninety-nine (1)**
75:20

**nobody (3)**
18:23;71:3;73:21

**nobody's (1)**
15:14

**nondebtor (10)**
22:15;35:9;40:13;

41:5;43:2;51:14;
59:20;63:25;66:3;
67:5

**nondebtors (1)**
58:9

**none (3)**
63:23;92:2;104:14

**nonetheless (1)**
59:14

**nonexempt (4)**
47:18;48:7;52:13;
53:18

**nor (2)**
102:24;108:3

**normal (2)**
76:25;93:16

**North (2)**
7:4;8:3

**notation (1)**
62:23

**note (3)**
10:10;50:14;90:7

**noted (1)**
99:19

**notes (2)**
87:9,13

**noteworthy (1)**
14:4

**notice (5)**
65:18;79:15,23;
113:11;116:3

**notion (4)**
46:2;66:1;69:1;
109:13

**notwithstanding (1)**
65:14

**number (9)**
21:18;37:19;44:1;
51:5;92:21;100:1;
102:7;110:7,8

**numbers (3)**
39:11;69:11;95:3

**numerous (2)**
39:5;109:22

**NW (1)**
6:5

**NY (7)**
5:14;6:14;7:15;
8:12;9:5,12,20

## O

**obey (1)**
112:14

**object (1)**
16:18

**objection (3)**
17:5;88:14;103:24

**objections (9)**
75:17;81:23;82:2,5,
19;83:11;103:10;
108:17;116:21

**obligation (5)**

30:20;32:1;61:18;
63:7;75:25

**obligations (10)**
29:5;30:17,17;
36:17;39:21;49:21,
25;62:14;72:4;76:1

**O'Brien (1)**
97:23

**observance (1)**
45:1

**observe (3)**
44:15;49:1;61:22

**observing (1)**
13:14

**obsess (1)**
52:15

**obtain (1)**
75:14

**obtained (2)**
45:4;80:23

**obvious (3)**
39:25;42:10;53:12

**obviously (16)**
10:10;14:2;16:11;
45:19;49:10;73:19;
88:1;90:15;98:24;
99:3,4;101:5;104:16;
105:23;110:7;115:18

**occasionally (1)**
93:20

**occasions (1)**
39:5

**occur (1)**
38:8

**occurrence (1)**
45:10

**occurs (1)**
41:2

**o'clock (3)**
117:16,21;118:7

**off (7)**
29:9;36:6;89:16;
91:10;105:3;111:20;
115:4

**offense (1)**
85:14

**offer (1)**
119:13

**offerings (1)**
86:20

**Office (13)**
9:3;12:17;20:15,21;
21:4;29:20;57:4,9;
59:1;62:2;92:5;
116:16;119:2

**officer (4)**
92:16;105:8;
112:25;113:17

**officers (1)**
115:8

**Official (14)**
6:12;7:3;11:25;
12:4;15:1,5;54:10;

95:15;96:1;99:25;
100:5;106:6,15;115:7

**often (4)**
18:1;56:8;65:19;
66:10

**oftentimes (1)**
17:6

**old (1)**
50:22

**omissions (1)**
39:13

**omits (2)**
27:12;52:2

**once (6)**
10:4;58:10,10;60:1;
90:23;92:23

**One (67)**
6:13;9:4;10:12;
11:7,10;12:15;15:12;
19:6;21:5;22:15;
23:19;24:1;25:18;
30:10;33:18;38:15;
39:7,10,12,16;42:22;
44:3;47:2;49:18,22;
50:14;54:18;55:23;
59:23;63:18,21;64:5;
65:6;66:6,17,22;
68:21;69:22;71:10;
72:5;74:12,21;78:16;
80:7;83:16;86:3;
87:16;90:7;91:2;
93:23;94:7;99:10;
100:10,24;102:8,12;
103:5,5;104:10;
105:6;106:14;110:9,
11;113:14;115:5;
118:4,10

**one's (2)**
71:6;97:21

**ongoing (1)**
80:18

**only (20)**
10:25;13:19;16:10;
17:21;18:15;20:19;
34:9,14;37:1;42:21;
47:2;55:7;58:25;
79:23;81:10;86:10;
87:5;89:8;107:11;
117:21

**onto (1)**
14:9

**open (3)**
52:4;83:15;104:2

**opens (1)**
53:6

**operate (2)**
56:2;72:22

**operates (2)**
43:18;68:17

**operating (42)**
13:22;22:3;25:7,17;
26:11;31:2;32:14;
33:20;34:13;39:7,8,9,

23-12055-shl    Doc 293    Filed 07/12/24    Entered 07/15/24 09:24:56    Main Document
In the Matter of Rudolph Giuliani
Pg 134 of 142

June 17, 2024

12,14,15,16,18,20,24;
40:5,7,12;41:12;43:9,
18,22;44:1;47:10;
51:16;63:16;67:24;
68:5;75:16;76:4;
92:10;93:15;95:12,
14,19;96:20;97:7;
103:5
**opinion (1)**
63:4
**opportunities (2)**
41:5;44:10
**opportunity (3)**
67:5;91:2;96:10
**opposed (5)**
34:4;35:2,17;74:20;
109:11
**opposition (10)**
17:24;50:22;51:4,6,
21;52:17;53:21;
54:14;79:19;87:7
**option (2)**
50:22;115:14
**oral (1)**
57:25
**order (31)**
13:20,24;21:16,23;
43:3;52:3;53:24;54:7;
56:12,17,17,22;61:1,
20;62:8;64:6;65:3,11;
74:5;75:5;80:20;92:2;
98:2,4;102:3,6;
105:24;112:7,8,10;
113:16
**ordered (3)**
31:25;32:2;80:9
**ordering (1)**
118:12
**orders (9)**
36:18,19;56:8;
63:23;65:19;104:21;
112:10,14,17
**ordinary (2)**
40:2;45:3
**organize (1)**
30:18
**others (1)**
31:15
**Otherwise (6)**
13:2;27:18;43:18;
87:11;91:13;95:5
**out (28)**
12:13;19:8;25:13;
34:21;35:1,13;43:14;
46:14;61:19;63:1;
65:4;70:2;75:19;76:5;
77:7;80:1;86:23;
94:15;99:2,6;102:2;
105:23;107:8,13;
109:5;112:22;113:3;
116:6
**outbox (2)**
20:8,12

**outcome (1)**
66:9
**outs (1)**
116:7
**outside (5)**
30:4;40:2;43:6;
45:2;60:4
**over (20)**
12:15;17:10;20:3;
42:7;46:7;47:12;
57:12;58:5;61:13,13,
13;65:14;76:6,11;
78:21;87:14;102:16;
109:20;110:10;114:1
**overall (1)**
75:24
**overturned (1)**
74:1
**Overview (1)**
43:12
**overwhelming (1)**
44:6
**own (16)**
22:13;23:12;24:16;
28:10;30:7;38:21,24;
39:3;40:24;43:11;
44:8;47:9;48:19;
60:14;70:7;116:16
**owned (21)**
22:1;23:3;26:7;
27:8;29:15;35:9;
40:21;41:5,6;43:4;
44:11;46:8;48:18;
51:14;53:16;56:5;
65:10;72:17;100:11;
104:11,22
**owner (2)**
55:24;63:19
**owners (1)**
67:2
**ownership (1)**
23:13
**owning (1)**
38:19
**owns (2)**
38:15;41:3

**P**

**PA (1)**
5:2
**page (3)**
50:21;99:23;103:25
**pages (7)**
18:9;21:25;49:23;
52:6;88:22;90:18,19
**paid (14)**
24:12;29:19;32:23;
34:25;35:14;42:2,8;
43:12;47:17;70:20;
71:1,7;76:24;94:22
**Palm (2)**
32:12,13

**paper (1)**
38:4
**papers (25)**
17:4,17;18:2,11,15;
24:5;28:24;30:11;
32:4;36:9;57:24;62:5;
67:4;79:8,22;80:23;
85:4,11;88:13,18,23,
23;94:10;109:22;
114:2
**paperwork (1)**
98:24
**par (1)**
51:16
**paragraph (7)**
62:18,23;63:10;
65:23;102:9,9;103:25
**paragraphs (1)**
62:7
**paramount (1)**
23:25
**Park (2)**
6:13;8:11
**part (8)**
61:10;64:2;65:10,
11;68:10;81:15;
104:9;112:19
**parte (2)**
101:5,11
**partial (2)**
47:16,16
**partially (1)**
28:5
**participate (2)**
28:8;56:5
**particular (17)**
26:6;29:6,24;30:4,
19;33:14;36:6;47:23;
49:15;72:14;88:7,17;
94:19;96:2;97:2;
99:20;103:22
**particularly (10)**
14:4;17:18;25:3;
27:11;30:5;38:13;
65:20;102:24;103:1,2
**parties (19)**
10:3;12:7;13:19,23;
15:10,17;18:1;30:22;
50:18;56:22;57:1;
64:20;67:16;73:15;
77:12;87:8;88:1;
100:1,24
**parties-in-interest (5)**
33:25;62:25;63:1,6,
8
**parting (1)**
92:8
**partner (1)**
11:21
**Partners (12)**
32:22;33:13,19;
34:7,9,13;43:20;
103:2;105:9;108:23,

25;109:3
**Party (4)**
8:10;48:4;58:8;
109:14
**pass (3)**
50:23;90:4;104:9
**passed (1)**
95:1
**password (1)**
50:23
**past (4)**
50:2,15;94:24;
102:23
**paths (1)**
26:15
**patience (2)**
10:3,7
**pay (5)**
22:18;24:15;26:8;
31:23;35:24;41:6;
42:18;43:14,20;45:4;
51:14;52:9;53:8;
69:16;72:20
**paying (10)**
25:10,21;26:10;
35:21;47:14;48:21;
69:7;70:6;71:9,10
**payment (8)**
24:21;25:3,19,25;
32:5,15;80:7,16
**payments (21)**
24:9,14;31:25;
32:21,25;40:1,2,3,13;
42:4,13;43:25;44:1,
24;47:12;51:18;
53:20;80:19;81:1;
92:24;93:21
**Payroll (1)**
38:17
**peanuts (1)**
41:15
**pejorative (1)**
29:2
**penalty (2)**
32:17;55:23
**pending (6)**
23:17;97:15,18,21;
98:6;99:15
**people (33)**
10:14;11:12,15;
17:8;18:20;19:2,4,8,
18,20,24;20:9;46:10;
56:9;61:4;70:1;73:4,
14;82:9,14;85:17,19;
107:13;108:21;109:7,
12,20,24;112:14;
114:9;115:7;117:1;
118:11
**people's (2)**
87:11;117:23
**per (4)**
42:1,7;59:22;89:6
**perceives (1)**

25;109:3
**percent (7)**
38:15,19,24;55:24;
63:19;64:25;75:20
**perception (2)**
31:17;36:3
**perfect (1)**
19:16
**perfectly (1)**
93:16
**performance (2)**
50:2,15
**perhaps (6)**
67:23;70:3;82:23;
93:13;94:23;111:9
**period (4)**
40:6;54:13;55:4,4
**periods (1)**
55:16
**perjury (2)**
32:18;55:23
**PERKINS (1)**
8:14
**permitted (1)**
89:7
**perplexed (1)**
108:15
**person (3)**
10:15;54:22;90:15
**personal (14)**
27:14;43:10,14;
52:12;68:17,19;
70:19;71:8,12;72:23;
75:8;92:10;108:15;
113:1
**perspective (1)**
98:17
**persuasive (2)**
53:22;65:21
**petition (4)**
27:24;36:11,25;
45:17
**ph (3)**
29:13,18;106:17
**Phil (1)**
12:4
**PHILIP (1)**
6:20
**phone (2)**
98:1;100:13
**phonetic (1)**
65:7
**Photo (1)**
44:1
**photographers (1)**
44:2
**photographs (2)**
105:15,16
**physical (1)**
72:24
**pick (1)**
16:7
**picture (4)**

70:25;99:17;101:7;
110:16
**pie (1)**
74:3
**piece (1)**
60:8
**pieces (1)**
31:14
**pierce (1)**
10:13
**piercing (1)**
53:7
**pitfalls (1)**
111:1
**pivoted (1)**
24:13
**place (4)**
26:21;42:5;47:24;
73:20
**Plains (2)**
20:11;86:21
**plaintiffs (14)**
5:12;12:8;45:18;
47:6;58:21;59:9;60:2,
7;77:7;83:12;86:15;
91:18;92:13;118:24
**plaintiffs' (2)**
77:9;85:5
**plan (6)**
26:22;54:14,22;
55:2,17,20
**plane (2)**
24:13;33:2
**planners (1)**
59:1
**platform (1)**
46:9
**plausible (1)**
78:2
**play (5)**
23:1;48:11;50:23;
106:6;107:4
**plays (1)**
106:6
**pleading (3)**
60:1,15,16
**pleadings (6)**
22:13;38:10;39:5;
79:14;86:9;91:21
**Please (4)**
61:6;67:12;87:1;
101:19
**plenty (5)**
69:20;72:2,8;81:3;
91:24
**pm (3)**
86:25,25;119:17
**podcast (2)**
41:10;44:4
**podcasts (2)**
60:18;68:19
**podium (1)**
11:14

**point (45)**
14:7,9;17:15;19:6,
8,22;21:7;22:15;32:3,
4,7;36:7,7;42:10;
46:13;49:16,17,18;
50:14;55:13,22;
57:17;64:11,14,18;
65:21;77:9;78:13,13;
81:24;84:6;87:16;
88:8;92:17;93:14;
94:19,22;95:1;99:4;
100:25;102:8;104:19;
112:10,12;113:4
**pointed (1)**
77:7
**points (5)**
16:12;38:2;89:9,22;
109:22
**pops (1)**
113:14
**position (9)**
34:18,20,24;54:14;
55:14,15;56:24;62:6;
79:3
**possesses (1)**
56:4
**possession (6)**
48:25;58:4;66:2;
109:14,17;111:13
**possibility (1)**
45:12
**possible (2)**
35:11;110:13
**post-bankruptcy (2)**
97:17;98:10
**post-petition (6)**
27:3;35:8;36:10;
42:11;59:17;97:12
**potential (3)**
71:16;110:25;
116:21
**PowerPoint (8)**
15:7,9,18;17:17;
19:21;86:7;87:4;88:4
**PowerPoints (2)**
15:16;19:2
**practical (1)**
10:20
**practice (1)**
15:1
**pre- (1)**
36:10
**preceded (1)**
21:18
**precedent (1)**
64:19
**precedential (2)**
65:15,17
**precisely (2)**
37:10;41:3
**precluding (1)**
17:11
**predict (1)**

55:12
**predominantly (1)**
104:13
**preliminary (1)**
52:16
**prematurely (1)**
22:9
**premises (1)**
74:17
**prepared (1)**
19:9
**pre-petition (5)**
27:3;49:19;60:16;
69:15;98:24
**prescribe (1)**
54:7
**present (4)**
50:2,15;100:15,17
**presentation (11)**
16:1;17:19;19:2,7;
39:24;58:14;63:13;
79:7;88:4,20;89:6
**presentations (1)**
87:11
**presented (4)**
18:11;44:6;87:6;
92:19
**presently (1)**
116:10
**preserved (3)**
70:21;71:8;72:19
**President (1)**
97:20
**press (2)**
27:25;28:11
**presume (1)**
105:18
**pretty (2)**
85:12;89:7
**prevent (2)**
45:23;46:16
**prevents (1)**
82:4
**previous (2)**
37:23;96:4
**previously (4)**
16:17;18:10;44:22;
88:13
**primarily (2)**
32:4;42:6
**primary (2)**
30:17;33:7
**principal (1)**
35:14
**printed (1)**
61:2
**prior (3)**
74:5;105:15,16
**priority (2)**
102:5;110:10
**privilege (1)**
48:24
**privy (1)**

38:5
**probably (7)**
14:10;49:13;58:20,
25;66:20;69:21;96:8
**problem (12)**
69:19;76:23;78:17;
90:12;91:5;95:23;
96:3;108:16;109:6;
112:14;113:14,14
**problematic (3)**
88:20;98:13;113:21
**problems (3)**
11:17;56:10;65:12
**procedural (2)**
116:21,25
**proceed (7)**
11:2;14:10;21:13;
51:1;101:19,22;117:5
**proceeded (1)**
102:5
**proceeding (4)**
13:20;45:21;47:5;
114:5
**proceedings (2)**
13:24;119:17
**process (3)**
37:5;39:23;105:13
**produce (5)**
22:1;103:7;106:13;
109:15;114:18
**produced (15)**
23:4;49:22,22;52:5,
7;81:12;103:8;
104:15;106:22;
107:15,18;108:4,10;
111:5;113:6
**producer (1)**
68:20
**producing (1)**
109:18
**production (11)**
21:22,24;102:12;
103:20;104:22;
107:24;108:2,5;
111:12,24;112:1
**productions (3)**
102:22;104:5;108:7
**productive (2)**
20:24;119:12
**PROFESSIONAL (3)**
8:17;87:19;96:19
**professionals (2)**
44:2;97:11
**profit (1)**
35:14
**profits (1)**
94:5
**profound (1)**
112:14
**Program (2)**
54:2,11
**progress (15)**
18:5,7;50:16,17;

52:20,22;54:16;
74:11,23,25;77:20;
91:3,11;93:2;111:20
**promote (1)**
42:12
**promptly (1)**
118:7
**prong (1)**
46:17
**proof (1)**
10:4
**properly (1)**
116:4
**property (11)**
35:6;44:15;46:1;
55:25;58:4,6,10;
74:18,21;75:4,6
**propose (1)**
55:19
**proposed (8)**
13:20;53:23;62:8;
85:11,12;98:4;102:2,
3
**proposing (1)**
55:2
**prospective (1)**
83:19
**protect (3)**
40:24;44:15,19
**proven (2)**
40:19;55:11
**proves (1)**
65:20
**provide (12)**
27:19,19;41:21;
42:3;61:6;69:4;87:22;
91:25;106:10;110:13;
111:9;117:2
**provided (12)**
21:24;22:8;28:5;
31:22;32:11;42:21;
83:5;88:12;92:2;
106:16;110:15;
113:18
**provides (6)**
26:15;27:21;29:14;
59:25;62:13;69:6
**providing (4)**
32:16;55:18;107:9;
109:10
**provision (1)**
58:6
**Publishing (1)**
29:18
**pulled (1)**
110:7
**purchases (1)**
22:6
**pure (1)**
60:6
**purports (1)**
42:11
**purpose (1)**

82:25
**purposes (10)**
10:23;17:22;46:15;
49:8;57:8;86:11;
89:10;101:13;109:5,9
**pursuant (7)**
21:17,22;34:16,23;
102:21,24;103:7
**pursue (3)**
30:6;44:21;52:21
**pursuing (1)**
53:18
**put (9)**
15:14;43:6;70:25;
82:10,11;94:19;
116:3,4;117:20
**puts (2)**
82:9;109:13
**putting (4)**
19:13;61:19;69:9;
74:12

## Q

**questionable (1)**
22:4
**quibbling (1)**
68:25
**quick (1)**
79:21
**quickly (1)**
110:13
**quicksand (1)**
110:21
**quiet (1)**
74:21
**quit (1)**
59:23
**quite (2)**
10:5;15:15
**quo (1)**
66:13
**quoting (1)**
103:25
**Quresh (1)**
12:5
**QURESHI (14)**
6:17;114:15,16,21,
25;115:10,16;116:9,
14;117:3,9,11,24;
118:8

## R

**R&Os (1)**
104:15
**RACHEL (9)**
5:16;6:18;12:2,9;
15:3;59:7;90:5;91:8;
95:24
**racist (1)**
60:12
**racketeering (1)**

97:15
**radio (7)**
41:10,24;44:4;47:2;
68:20;75:10;94:14
**raise (7)**
10:13;65:17;67:11;
87:15;97:4,8;98:8
**raised (6)**
37:7;84:8;88:19;
94:11;102:25;105:6
**raises (2)**
109:8;116:20
**ran (1)**
117:19
**range (1)**
51:21
**rare (1)**
76:22
**rarely (1)**
111:14
**rather (4)**
54:1;86:18;112:22;
116:24
**RATTET (1)**
7:18
**re (3)**
29:13;30:25;65:7
**reach (8)**
43:6;46:9;63:1;
99:2;105:23;107:13;
113:12;116:6
**reached (3)**
58:13;102:2;107:8
**reaching (1)**
112:22
**read (3)**
29:23;51:6;61:4
**reading (1)**
113:4
**ready (2)**
36:7;118:14
**real (2)**
17:7;110:16
**realize (2)**
87:10;95:10
**realized (1)**
94:5
**really (15)**
25:5;43:15;54:24;
57:7;60:3;61:16;65:2;
68:8;73:21;75:18;
79:5;90:12,22;94:12;
96:14
**reargue (2)**
83:23;104:17
**reason (6)**
43:24;58:9;74:9;
78:7;111:13;116:5
**reasonable (1)**
22:10
**reasonably (2)**
50:18;71:17
**reasons (5)**

24:5;45:16;54:15;
73:22;119:7
**receive (5)**
82:14,16;87:19;
90:11;101:13
**received (23)**
16:16;28:14;41:22;
42:17;47:16;60:12;
75:8,9,11;87:17;
99:13;102:21,23;
103:3,9,20,22;104:19,
20;105:21;107:20,24;
113:9
**receives (1)**
41:9
**recent (4)**
23:2;61:2;108:5,7
**recently (5)**
75:8;77:18;78:25;
93:9;95:1
**Recess (1)**
86:25
**recipients (1)**
53:19
**reckless (1)**
46:25
**recognize (2)**
10:6;109:6
**recommendation (1)**
63:5
**reconsider (1)**
74:4
**record (17)**
49:4;59:7;66:18;
70:10,10,13,18;86:11;
89:10;90:5;91:8,21;
95:24;101:18;110:24;
112:15;114:15
**record- (1)**
27:6
**record-keeping (2)**
36:23;37:3
**records (12)**
25:6;28:7;37:8;
43:3;53:15;58:4,5,10;
66:2,10,25;76:6
**recover (1)**
53:7
**recoveries (1)**
45:11
**recurring (1)**
28:24
**red (1)**
59:24
**reduce (2)**
47:9;55:3
**reference (2)**
38:25;77:22
**referenced (3)**
38:10;83:12;90:9
**referred (2)**
41:15;59:20
**referring (1)**

12:8
**refers (1)**
53:5
**refiling (1)**
75:22
**reflect (3)**
39:20;40:10;93:5
**reflected (2)**
25:16;93:23
**reflection (1)**
72:3
**reflective (1)**
109:1
**reflects (1)**
57:10
**refrain (4)**
44:16,17;45:6;
48:15
**refraining (1)**
46:5
**refuse (1)**
61:14
**refused (2)**
23:11;24:11
**refuses (2)**
43:3;47:19
**refusing (1)**
48:20
**refuted (1)**
81:11
**regard (3)**
107:6,6;110:14
**regarding (2)**
31:23;98:1
**regardless (3)**
19:12;66:9;75:22
**regular (2)**
19:11;40:12
**reimbursed (1)**
24:14
**reimbursement (1)**
43:15
**reimbursements (1)**
32:23
**reimbursing (2)**
24:11;33:1
**rein (1)**
47:9
**reinforce (1)**
74:14
**reiterated (1)**
104:12
**reiteration (1)**
103:14
**related (2)**
91:21;103:1
**relates (3)**
23:19;39:2;99:25
**relations (3)**
27:7;49:5;53:10
**relationship (1)**
41:25
**relationships (1)**

92:21
**relay (1)**
60:20
**releasing (1)**
28:1
**relevant (8)**
18:22;46:18,18,19;
51:21;84:9,17;85:9
**relief (6)**
50:19;52:24;55:8;
56:24;61:21;104:17
**rely (4)**
19:18;21:2;109:8,8
**remain (1)**
73:20
**remedy (1)**
11:16
**remember (4)**
29:9;47:22,25;
48:10
**remembering (1)**
48:4
**remind (3)**
47:21;67:12;117:12
**remote (1)**
45:12
**remove (1)**
46:8
**renewing (1)**
75:21
**rent (2)**
69:23,24
**reorganization (3)**
37:5;44:18;48:16
**repeat (2)**
59:11;89:19
**repeated (3)**
32:24;36:9;60:17
**repeatedly (2)**
103:4,11
**repeats (1)**
17:16
**repetition (1)**
49:11
**replete (1)**
51:7
**reply (10)**
17:18,22,24;23:2;
51:6;59:22;81:11;
82:6;87:7;88:23
**report (20)**
25:17,19;27:17;
32:14;38:18;39:8,10,
12,15,19;40:5,8;
41:13;42:22;44:1;
47:11;78:23;93:13;
96:16,23
**reported (8)**
24:10;26:10;40:14;
41:11;47:2;52:10;
91:12;102:20
**reporting (19)**
27:7;28:1,11;36:23;

23-12055-shl   Doc 293   Filed 07/12/24   Entered 07/15/24 09:24:56   Main Document
In the Matter of Rudolph Giuliani
Pg 137 of 142

June 17, 2024

37:3;40:16;42:21;
49:5;51:18;67:25;
71:21;78:18,18;
87:21;91:24,25;92:2,
12;102:15
**reports (30)**
13:22;22:3,3;25:7,
9;26:11;31:2,2,33:20;
34:14;38:23;39:7,14,
20,24;40:12;41:13,
14;43:18,22;47:14;
59:18;90:24;95:12,
14,19;96:15,20,22;
97:7
**report's (1)**
39:17
**represent (6)**
98:6;99:5;102:14;
105:19,20;113:10
**representation (1)**
81:11
**representative (1)**
109:10
**represented (4)**
73:15;107:16;
108:12;113:17
**representing (3)**
97:12;98:10;108:16
**request (13)**
27:17,18;54:3,19;
58:15;66:11;74:13;
82:10;84:10;102:24;
103:8;104:17;113:10
**requested (2)**
100:7;103:7
**requesting (7)**
24:18;53:24;58:3;
82:7;84:9;103:19,21
**requests (6)**
102:11,18,19,21;
106:10;108:1
**require (5)**
37:14;40:17;72:10,
13;105:23
**required (4)**
26:24;27:13;40:21;
112:20
**requirement (1)**
31:23
**requirements (4)**
54:5;104:22;
105:23;112:21
**requires (4)**
31:11;63:7;70:2;
76:3
**requiring (5)**
36:4,24;42:12;49:1,
7
**resolution (1)**
60:22
**resolve (1)**
105:24
**resources (1)**

47:3
**respect (22)**
28:9;31:1;36:17;
38:4;39:1,21;41:24;
42:5;44:24;49:19;
50:15;62:15;63:10,
12;65:22;66:23;98:4;
100:10;104:5;105:21;
112:19;117:5
**respectfully (1)**
58:14
**respond (16)**
16:12;17:5;19:19;
21:8;50:25;58:24;
77:3;83:6,9;102:11;
107:7;109:7,7,22;
113:20,20
**responded (3)**
105:11;106:19;
110:17
**responding (5)**
22:11;59:2;111:2;
115:7;117:1
**response (12)**
52:6;73:17;83:1;
85:12;86:16;89:18;
94:11;97:7;100:17;
103:20,22;111:4
**responses (8)**
22:24,24;81:7;
103:9,18;107:11;
108:17;109:12
**responsibility (4)**
62:16,21;67:6;
110:7
**responsible (2)**
33:1;48:12
**restraint (1)**
44:7
**result (2)**
42:16;50:17
**resulted (3)**
77:20;92:22;93:11
**retain (1)**
76:20
**retention (5)**
75:6;83:19;97:13,
24;99:3
**retentions (1)**
98:1
**retire (1)**
72:23
**retried (1)**
100:21
**return (2)**
24:9;53:20
**revenue (1)**
94:24
**revenues (1)**
75:16
**reverse (1)**
53:6
**review (1)**

96:17
**reviewed (2)**
16:20;108:14
**reviewing (1)**
16:18
**rewarded (2)**
51:17,18
**Ricci (8)**
106:17;107:20,23;
108:4,12;110:15,17;
113:2
**right (122)**
11:22,23;12:6,12,
15;13:11,16,17;14:12,
25;15:23;16:2;17:20;
20:3,9,25;21:3,12,14;
22:23;23:1,8,15;24:7,
20;25:12,18,22,24;
26:3,13;29:22;30:9;
31:6;32:8,9;33:24;
34:17;35:4,10;36:1,
21;38:7,11;39:11;
45:24;46:11,23;48:6,
10,11;50:2,5,9,20;
51:2;54:9,18;55:21;
58:12,16,23;59:5;
62:1,11;63:11;64:16;
66:3;67:15,17;69:19;
71:18;72:1;76:16;
80:21;83:3;86:2,17;
87:25;88:16;89:3,14,
15;90:4,11;91:6;92:4,
7;93:18;95:6,9;96:5,
6,25;97:7;98:15;99:8,
18,22;100:16,17;
104:24;105:6;106:1,
3;107:1;108:8;109:4;
110:11;111:3,11,17;
113:25;115:24;
117:12;118:10,10,20,
23;119:1,4,4
**rights (3)**
53:15;56:4;57:21
**rings (1)**
31:15
**ROBERT (1)**
7:18
**robust (1)**
20:10
**role (1)**
106:6
**Rolex (1)**
31:16
**rooted (1)**
79:20
**routed (1)**
28:17
**Ruby (1)**
6:4
**Rudolph (2)**
10:8;42:12
**Rudy (6)**
28:10,11;34:11;

42:9,12;90:13
**rule (10)**
18:24;21:23;38:18;
42:22;43:3;52:3;92:2;
102:6,21,24
**rules (1)**
111:13
**run (6)**
34:22;61:11;65:11;
69:7,11;117:18
**Ryan (17)**
26:11;44:25;90:21;
92:15;100:12,12,16,
25;101:7,21;104:25;
105:5,7,20;106:2,4;
112:20
**Ryan's (2)**
32:22;45:4

## S

**safe (1)**
38:7
**safety (1)**
60:14
**salary (8)**
22:17,17;35:6,14,
23;41:12;52:9;53:8
**sale (3)**
53:16;54:22;70:21
**SAM (1)**
7:8
**same (16)**
15:16;18:24;26:21;
29:17;42:5;45:13,18;
77:22;91:3;95:16;
99:13;103:23;112:24;
113:2,11,15
**SAMUELS (1)**
8:23
**sanctions (2)**
112:3,9;116:12
**sat (1)**
117:15
**satisfy (2)**
44:12;72:5
**saw (5)**
30:22;77:21,22;
79:7;82:6
**saying (16)**
17:7,11;18:1;19:1;
22:14;35:8;38:24;
55:6;60:18;65:20;
80:15;82:6;93:1;
109:9;111:1,2
**scenario (1)**
40:25
**schedule (5)**
27:24;31:11;38:14,
14,20
**schedules (6)**
32:18;37:13,17,20;
40:10;80:17

**scheduling (3)**
100:13;112:21,22
**SCHWARTZ (3)**
9:7;12:19,19,25;
14:14,16,16;15:21,24;
20:5,7,14,19;21:11;
62:3,3;64:8,16,23,25;
65:22;66:15,22;67:9,
10,13;92:6;97:3,8,9;
99:9,12;119:3
**science (1)**
12:22
**score (3)**
14:24;88:9;112:15
**screen (2)**
15:6,8
**se (1)**
89:6
**sea (1)**
65:24
**seated (1)**
87:1
**second (12)**
15:12;26:17;30:10;
32:10;45:6;46:17;
50:1,10;51:25;61:10;
99:10;100:24
**seconds (1)**
101:10
**secret (1)**
31:19
**Section (13)**
21:17;26:14,16,18,
23;27:1,10;53:24;
54:6;55:25;56:1,1;
58:8
**sections (1)**
29:7
**Security (2)**
41:9;68:18
**seeing (5)**
79:13,14,15,17,19
**seek (1)**
53:7
**seeking (3)**
65:4;98:5;116:12
**seem (6)**
45:13;55:6;78:2;
79:21;109:19;114:2
**seems (10)**
13:24;28:19;33:21;
46:3;77:19;78:1;80:3;
86:17;91:1;98:4
**segue (2)**
36:7;99:21
**segueing (1)**
13:21
**Seinfeld (1)**
69:20
**self-dealing (2)**
40:18,22
**self-interest (5)**
23:12;24:16;30:7;

40:24;44:8
**self-proclaimed (1)**
39:8
**self-reported (1)**
38:12
**sell (5)**
23:9;24:2;47:19;
48:20;52:13
**selling (1)**
74:16
**send (5)**
21:4,5,5;101:4;
118:14
**sense (12)**
14:10;15:13,19;
17:16,25;18:4;58:20,
25;101:22;112:7;
114:3;118:4
**sensible (1)**
13:25
**sensitive (1)**
11:9
**sent (9)**
16:19;22:14;80:24;
98:22;102:17;103:18;
106:17;107:5;109:23
**sentence (2)**
61:10;102:10
**separate (8)**
17:23;26:15;35:18,
20;37:12;69:24,25;
107:25
**separately (2)**
21:2;31:12
**Series (1)**
31:15
**serious (1)**
47:9
**seriously (2)**
62:17,21
**served (5)**
102:19;105:12,14,
22;107:25
**server (1)**
105:13
**service (2)**
102:12;105:13
**services (7)**
68:17,19,22;69:6;
72:23;75:8;92:10
**serving (1)**
107:21
**set (8)**
24:5;35:11;51:5;
54:5;55:25;56:16;
114:1;116:16
**setting (1)**
118:6
**seven (1)**
101:10
**Seventh (2)**
5:13;53:5
**several (4)**

71:23;85:10;98:3;
102:15
**shall (1)**
68:4
**SHANT (1)**
6:21
**shape (1)**
119:12
**share (3)**
15:6;73:12;101:3
**shared (4)**
15:8,10;24:22,23
**shell (1)**
57:16
**shells (1)**
91:2
**shifting (1)**
17:10
**shirking (2)**
49:21,24
**shocked (1)**
51:6
**shoes (2)**
56:3;63:18
**short (5)**
35:17;76:24;86:6;
103:17;117:7
**shortening (1)**
116:20
**shoulder (1)**
13:4
**shoves (1)**
91:2
**show (15)**
25:8,9;39:25;41:10,
15,17,25;44:4;47:2;
50:22;68:20;70:11;
75:10,10;103:6
**showcase (1)**
40:15
**showed (1)**
28:17
**showing (2)**
26:23;42:23
**shown (5)**
43:9;44:7;59:11;
76:13;77:19
**shows (7)**
40:8;44:1;47:17;
59:10;68:20;74:2;
90:16
**shrewd (1)**
59:18
**Shumer (3)**
11:20;98:19;106:8
**sic (1)**
50:4
**sick (1)**
76:5
**side (4)**
29:10;58:18;81:25;
83:11
**side-by-side (1)**

89:1
**sides (2)**
17:25,25
**sight (1)**
52:19
**signatory (1)**
28:15
**signature (3)**
90:18,18;93:5
**signatures (1)**
90:20
**signed (3)**
28:15,16;98:24
**significant (4)**
37:7;74:25;91:15,
16
**signs (2)**
90:20,21
**silenced (1)**
61:15
**silent (1)**
61:18
**Sillerman (2)**
29:13;30:25
**similar (3)**
28:9;94:4,4
**Similarly (1)**
37:18
**simply (6)**
36:2;40:9;48:12,23;
53:21;104:3
**single (4)**
22:1,7;23:4;63:2
**singular (2)**
75:19;91:17
**siphoning (1)**
43:5
**sit (1)**
16:6
**sitting (1)**
18:10
**situation (3)**
20:22;76:18;87:23
**six (2)**
31:16;55:24
**Sixth (1)**
53:1
**sixty (2)**
22:6;47:13
**size (1)**
25:22
**sky (1)**
74:3
**slate (1)**
59:16
**slides (1)**
36:9
**slow (3)**
71:22;74:11;75:15
**slowly (1)**
69:12
**small (1)**
108:2

**social (5)**
28:1,12;32:11;41:9;
68:18
**Sol (1)**
86:22
**sold (1)**
24:6
**sole (1)**
41:11
**solely (2)**
72:1;74:10
**solve (1)**
113:14
**solves (1)**
108:16
**somebody (7)**
21:4;73:13;87:20,
23;109:9;110:22;
113:5
**somehow (3)**
18:22;63:4,5
**someone (7)**
15:24;20:20,20;
59:10,12;65:16;76:24
**sometimes (7)**
20:17;22:6;55:10;
69:22,23;85:17;110:9
**somewhat (1)**
110:16
**somewhere (1)**
74:20
**son (1)**
60:12
**sooner (1)**
54:1
**sophisticated (1)**
73:15
**sorry (6)**
16:3;20:6;73:11;
84:4;100:23;101:17
**sort (28)**
17:16,22,25;19:24;
22:21,22,22;28:24;
33:5;34:2;35:18,19,
20;44:23;46:3;56:16;
57:4,10;64:7,12;
74:22;88:2;89:18,18;
93:4;95:22,22;96:6
**sorts (2)**
110:24,25
**Sotheby's (1)**
75:6
**sought (1)**
45:3
**sounds (3)**
111:3;113:10;
115:24
**source (1)**
24:23
**sources (2)**
41:11;47:2
**spaces (1)**
29:20

**speak (4)**
83:18;84:3,7;85:17
**SPEAKER (3)**
11:4,8;15:22
**speaking (5)**
10:19;23:24;90:10,
15;99:7
**specific (15)**
28:16;33:4;44:14;
45:12;61:12;68:3;
69:5;81:22;82:1,5,18;
83:11,14;84:6;102:8
**specifically (5)**
28:13;54:16;84:19;
97:14;102:10
**specifics (1)**
78:15
**specify (1)**
56:8
**spend (1)**
114:10
**spending (4)**
33:21;47:9;48:19;
57:12
**spirited (1)**
85:14
**spoke (1)**
22:8
**spoken (1)**
110:6
**square (1)**
10:24
**squarely (1)**
29:4
**squaring (1)**
106:23
**stack (2)**
18:20;82:16
**stand (6)**
15:14;82:9,11,11,
24;116:11
**standard (2)**
26:19,20
**standards (1)**
26:22
**standing (2)**
88:14;110:20
**stands (2)**
38:6;56:3
**start (4)**
14:11;15:13,18;
26:23
**started (3)**
15:6;27:23;89:16
**starting (1)**
13:20
**starts (1)**
65:4
**STATE (9)**
9:9,10;22:25;23:1;
34:20;48:11;63:22;
95:5;107:4
**stated (2)**

23-12055-shl    Doc 293    Filed 07/12/24    Entered 07/15/24 09:24:56    Main Document
In the Matter of Rudolph Giuliani
Pg 139 of 142

June 17, 2024

55:23;62:5
**statement (12)**
37:13,17,20;47:17;
70:15;82:6,22;83:22;
96:8;108:20;113:8,19
**statements (11)**
25:7;33:19;39:16;
40:10;43:21;45:18;
46:9;51:7;60:10;77:8;
81:19
**STATES (13)**
9:2,3;12:17,20;
54:2,5,11;56:23;62:1,
4,14,16,20
**status (12)**
14:1,2,11;23:22;
38:6;66:13;84:8;
105:1;115:2,5,14,19
**statute (3)**
62:13;63:7;72:9
**statutory (2)**
63:7;65:5
**stay (6)**
52:21,23;75:1;
83:24;84:10;119:15
**stayed (1)**
74:14
**step (3)**
111:22;112:2,23
**STEPHANIE (1)**
9:22
**steps (8)**
21:19;47:9;63:17;
84:11;85:10;106:9;
112:20;114:24
**steward (1)**
48:13
**still (12)**
13:1;20:7;22:9;
24:4;37:20;39:8;
46:18;61:9;67:2;
69:15;81:18;98:2
**stipulation (2)**
45:22;60:24
**stipulations (2)**
37:12,15
**Stockton (2)**
97:16;99:1
**stop (2)**
46:12;47:4,8;60:24
**store (1)**
44:2
**story (1)**
24:11
**straighten (2)**
34:21;46:14
**STRAUSS (7)**
6:11;7:2;12:3;15:4;
91:9;95:25;100:5
**STRAWN (1)**
8:9
**stream (3)**
42:6;44:4;94:13

**Street (5)**
5:4;6:5;7:4;8:3;
9:11
**stress (1)**
13:2
**STRICKLAND (14)**
5:16;12:9,10;36:22;
58:17;59:7,8;61:8;
89:23,25;90:5,5;
92:18;118:25
**Strickland's (1)**
93:4
**strong (1)**
118:4
**struggling (5)**
13:1;51:10;84:13;
104:1;107:3
**STUART (1)**
9:14
**stuff (3)**
16:21;68:2;106:19
**sub (2)**
23:18;74:17
**subject (1)**
64:2
**submit (2)**
79:9;101:12
**submitted (1)**
79:8
**subpoena (3)**
52:6;107:6;110:17
**subpoenaed (4)**
106:19;107:22,23;
109:11
**subpoenas (2)**
107:25;117:1
**substance (3)**
32:5;55:5;57:8
**substantial (1)**
53:12
**substantive (1)**
114:4
**successful (1)**
52:19
**sufficient (2)**
81:19,25
**suggestion (3)**
14:23;20:19;114:11
**suggests (2)**
112:16;113:3
**Suite (2)**
7:5;8:20
**sum (1)**
95:22
**summary (4)**
17:17;18:25;82:14;
83:10
**supervision (1)**
59:25
**supplied (1)**
83:1
**support (2)**
51:8;58:7

**supported (1)**
54:11
**supporting (6)**
33:20;34:14;37:24;
39:14,16;43:21
**supports (3)**
16:11;53:9;54:2
**suppose (2)**
81:9;114:5
**supposed (6)**
45:24,25;65:15;
109:7,15;110:1
**sure (41)**
10:19,24;11:16,19;
12:23;15:11;19:23,
25;21:6,7;23:4,16;
30:21;36:14;38:25;
50:11,13;55:13;59:4;
61:4;70:23;74:24;
75:10;76:22;77:16;
78:20;86:4,6;87:3,8;
88:2,6;96:17;98:18;
100:12,14;107:12;
110:20,21;111:19;
115:10
**Surfside (1)**
5:6
**surprise (3)**
17:14;19:17;88:10
**surprised (2)**
106:24;116:15
**surprises (1)**
116:10
**suspenders (1)**
20:24
**sworn (3)**
32:16;43:16;79:15

**T**

**table (1)**
11:13
**tact (1)**
74:12
**tactic (1)**
60:6
**tail (1)**
101:23
**takeaway (1)**
29:24
**talk (11)**
10:25;30:5,13,14;
58:20;68:18;77:13,
13;100:25;107:2;
116:6
**talked (3)**
18:23;73:3;107:1
**talking (15)**
14:2;18:4;23:5;
30:22;33:13;34:4,19;
36:9;47:4;61:10;
72:21;76:7;95:16;
101:15;110:25

**talks (4)**
42:9;51:9;63:10;
91:14
**tax (1)**
54:23
**Taxation (1)**
9:10
**taxes (1)**
71:9
**team (3)**
86:13;87:19,21
**technological (1)**
10:14
**technology (1)**
44:3
**tee (2)**
100:2;115:22
**telling (1)**
94:12
**tells (3)**
42:14;51:25;56:18
**temptation (2)**
40:18,22
**ten (3)**
13:4;86:19,23
**ten-minute (1)**
86:22
**tens (3)**
26:10;42:15;48:21
**term (2)**
16:11;68:6
**terminate (1)**
55:16
**terminated (1)**
54:13
**terms (18)**
13:24;18:6;28:25;
29:10,25;30:11,18;
45:24;49:11;54:25;
55:2,3;59:2;77:12;
86:11;104:25;106:5;
118:6
**test (2)**
49:11;71:25
**testimony (8)**
31:22;32:11,17;
38:22;43:17;79:15;
80:6,11
**tests (1)**
72:6
**Thanks (1)**
119:15
**that'll (1)**
11:15
**theme (3)**
28:19,24;31:7
**themes (3)**
30:8;31:4,5
**theoretical (2)**
35:10;95:4
**theories (1)**
35:21
**theory (5)**

34:19;35:19,22;
95:2;109:19
**therefore (2)**
72:5;78:25
**thereof (1)**
31:23
**thinking (1)**
115:25
**Third (5)**
7:14;32:20;48:14;
52:8;100:1
**thirty (1)**
114:3
**thirty-two (1)**
88:23
**though (1)**
101:18
**thought (8)**
16:4;19:8,17;32:6;
34:12;60:22;73:3;
86:18
**thoughts (3)**
86:16;89:12;106:4
**thousands (6)**
26:10;32:20;42:15;
46:9;10;48:21
**threats (1)**
60:13
**three (11)**
31:15;37:16;38:15,
18;44:14;47:13;
61:12;67:23;100:10,
12;102:17
**throughout (7)**
25:11;31:20;37:4;
39:24;43:19;60:9;
68:7
**tick (1)**
25:8
**tickets (2)**
24:13;33:2
**tie (1)**
25:8
**Tiffany (1)**
31:16
**timely (4)**
22:2;27:19;40:11;
103:8
**times (4)**
61:12;62:12;85:16;
102:15
**timewise (1)**
23:3
**timing (2)**
54:21;88:7
**tip (1)**
34:3
**today (24)**
17:22;18:10,16;
21:20;24:18;75:22;
77:19;79:4;93:13;
95:22;96:3;100:8,20;
101:14;102:14,25;

23-12055-shl    Doc 293    Filed 07/12/24    Entered 07/15/24 09:24:56    Main Document
In the Matter of Rudolph Giuliani
Pg 140 of 142

June 17, 2024

103:4;104:4,8,12;
108:6,16;118:17;
119:5
**today's (3)**
13:18;109:1;116:1
**together (1)**
31:13
**told (6)**
22:7;38:8;88:5;
103:11;106:22;118:2
**tone (1)**
112:11
**took (8)**
21:19;32:1;47:21;
56:23;74:18;81:6;
87:3;92:17
**top (1)**
61:14
**topics (1)**
51:21
**Toro (1)**
69:20
**total (5)**
31:14;40:8,8,14;
52:5
**totaling (2)**
21:25;49:23
**totally (1)**
16:24
**touch (1)**
81:15
**tour (1)**
86:20
**touted (1)**
91:3
**tower (1)**
42:7
**towers (2)**
42:7;94:13
**track (1)**
86:9
**traditional (5)**
10:21;15:1;56:16;
69:19;82:16
**tranche (2)**
106:10;108:13
**transactions (2)**
22:6;47:13
**transcripts (1)**
118:12
**translate (1)**
108:20
**transparency (10)**
29:5;30:15,18,20;
40:25;67:1;69:11;
70:9;81:6;101:14
**transparent (2)**
52:4;104:2
**treat (2)**
115:1,13
**treated (1)**
27:14
**tried (2)**

111:20;112:12
**trouble (3)**
11:14;79:21;106:23
**troubling (3)**
76:20,21;104:16
**true (2)**
76:19;104:3
**trust (1)**
69:4
**Trustee (97)**
9:3;12:20;13:21;
14:17,20;20:4;21:16;
24:1,4,19;26:16,17,
21,25;27:4;31:19;
36:5,24;37:9;40:17,
22;45:22;46:2,7,12,
16;49:7;52:18;53:13,
14,25;54:1,2,5,8,11,
12,15,18,19,24,24;
55:9,9,10,17,18,19;
56:2,3,19,23;57:5,12,
20,22,23,24;58:5,6,
10;61:23;62:4,7,14,
15,16,19,20,25;63:6,
9,13,17,24;64:6,13,
20;65:4,5,8,24,24;
66:1,7;67:5;68:5,12;
72:15;76:4,19;77:16;
78:11,23;79:9;96:4,
21
**trustees' (1)**
64:3
**trustee's (12)**
12:17;20:15;56:25;
57:4,9;59:1;62:2;
64:2;66:3;92:5;
116:16;119:2
**truth (1)**
79:25
**try (5)**
10:24;68:2;90:2;
113:12;114:9
**trying (16)**
29:2,8,10;75:14;
77:2;84:13;93:19;
94:19;108:10;110:5;
115:2,3,6;116:8,21;
117:22
**tunnel (1)**
42:7
**tunnels (2)**
42:6;94:13
**turn (11)**
20:3;27:9;51:22;
58:5;70:1;76:6;87:14;
96:7;97:4,7;110:2
**tweak (1)**
116:22
**tweet (2)**
61:2,8
**tweeting (1)**
46:12
**tweets (1)**

61:9
**twelve (1)**
93:25
**twenty- (1)**
102:11
**twenty-nine (2)**
18:9;88:22
**twice (1)**
60:19
**two (18)**
15:20;16:5;18:8;
26:15;35:20;37:12,
15;38:2;61:12;71:9;
72:17;97:20,22;
100:11;102:22;106:9;
108:2;112:20
**TX (1)**
7:6

## U

**Ultimately (5)**
28:13;45:21;47:5;
57:13;80:23
**umbrella (1)**
82:3
**unanimous (1)**
61:21
**unauthorized (9)**
24:9,14;32:25;
39:25;40:13;43:24;
44:24;51:18;53:19
**uncalled (1)**
16:24
**unclear (1)**
26:7
**under (16)**
15:15;26:16,18,23;
27:10;32:17;47:21;
55:23;74:18;79:10;
80:19;82:20;90:20;
99:24;109:19;112:20
**underscores (2)**
90:12;91:5
**understandable (1)**
66:18
**understands (1)**
110:6
**understood (3)**
33:5;93:14;111:16
**undertake (1)**
44:22
**underway (1)**
75:7
**undoubtedly (1)**
48:14
**unfair (1)**
17:13
**unfortunate (1)**
70:14
**unfortunately (4)**
24:17;69:14;71:19;
110:9

**UNIDENTIFIED (3)**
11:4,8;15:22
**unique (1)**
56:16
**Unit (1)**
5:5
**UNITED (13)**
9:2,3;12:17,20;
54:2,5,11;56:23;62:1,
4,14,16,19
**universe (3)**
26:4,12;38:9
**unless (3)**
10:19;60:6;86:20
**unlike (1)**
46:1
**unliquidated (1)**
91:16
**unnamed (1)**
31:16
**unnecessary (5)**
16:24;45:10;46:10;
48:17;115:19
**unnerved (1)**
16:15
**unpack (1)**
76:10
**unrestricted (1)**
48:19
**Unsecured (8)**
6:12;7:3;11:25;
15:5;45:11;47:1;96:1;
100:6
**unsure (1)**
113:2
**untying (1)**
33:6
**unusual (1)**
68:23
**unwillingness (1)**
30:6
**up (31)**
14:18;16:7;20:11;
30:10;35:11;36:22;
50:25;51:16;52:25;
55:9,10;61:14;70:21;
73:13;77:1;78:24;
79:13;83:21;86:20;
87:17;90:2;93:9,25;
95:22;97:9;100:2,24;
113:13,14;115:22,25
**upcoming (1)**
28:2
**update (3)**
31:10;87:25;90:8
**updated (1)**
32:18
**upkeep (1)**
52:12
**upload (1)**
96:17
**upon (8)**
13:19;26:23;37:5;

54:12;72:18;109:8,8;
117:4
**urge (1)**
29:11
**USC (1)**
21:17
**use (19)**
11:6;16:18,25;
18:24;24:3;29:2;35:7;
39:11;44:3;52:11;
89:8,8;112:6;113:15;
114:5,8,13;115:17,19
**used (15)**
20:9;22:17;24:15,
25,25;35:24;42:18;
53:8;60:7;68:7;70:3;
80:13,16;94:6;105:10
**uses (3)**
29:1;41:6;51:14
**using (9)**
23:12;29:16,16;
30:3;35:4;52:9;57:19;
72:19;112:12
**usual (1)**
76:23

## V

**value (9)**
22:4;31:14;63:15;
65:15,17;67:7;72:18;
74:20;93:3
**value-destructive (1)**
45:9
**variety (2)**
77:14;95:17
**various (11)**
24:21;25:11;29:20;
68:7;71:1;72:7;73:4;
77:12;95:18,18;
108:21
**veil (1)**
53:6
**vein (1)**
85:8
**venture (1)**
28:10
**verification (1)**
24:21
**verse (1)**
18:21
**versed (1)**
57:25
**version (1)**
28:6
**versus (1)**
115:8
**Vesey (1)**
9:19
**video (1)**
61:11
**view (18)**
17:15;23:18,19,24;

23-12055-shl    Doc 293    Filed 07/12/24    Entered 07/15/24 09:24:56    Main Document
In the Matter of Rudolph Giuliani
Pg 141 of 142

June 17, 2024

25:16;26:2;31:19;
32:24;49:17;57:9;
62:20;68:9;77:9,12;
81:24;88:17;93:5;
96:2
**viewed (1)**
74:10
**viewing (1)**
78:7
**views (1)**
116:5
**Vinny (1)**
18:18
**vintage (2)**
23:2;89:21
**violated (1)**
48:14
**virtually (1)**
50:16
**visibility (2)**
33:22;38:1
**voice (2)**
10:13;101:9

**W**

**WABC (4)**
41:15,24;47:2;
94:14
**wages (1)**
41:12
**wait (1)**
84:2
**waiting (6)**
10:3;16:17;22:9;
37:21;99:6;114:10
**walk (2)**
17:19;21:9
**walked (3)**
88:4;89:5;90:11
**wan (1)**
58:17
**wander (1)**
12:14
**Wandrea (1)**
6:4
**wants (8)**
48:8;60:5;65:23;
84:7,20;85:6;98:17;
116:17
**warrant (1)**
59:25
**warranted (1)**
61:23
**Washington (1)**
6:6
**watch (1)**
31:16
**watches (1)**
31:16
**watchword (1)**
101:14
**waterline (1)**

34:3
**watermark (1)**
66:21
**wave (1)**
11:15
**way (39)**
14:23;17:18;18:9;
19:23;20:1,21,24;
25:17;26:6;30:3,19;
34:8;35:15;43:10;
46:5;49:12;50:21;
54:8,21;58:23;64:5,7,
11;65:6;66:12;72:19;
73:5,5;74:12;80:10;
83:7;86:13;92:15;
103:6;110:1;117:7;
118:4;119:11,12
**ways (1)**
115:9
**weaponizing (1)**
57:20
**weeds (1)**
34:5
**week (7)**
17:9;72:24;87:24;
98:4,22;100:8;119:15
**welcome (1)**
13:11
**Wexler (1)**
11:20
**whack-a-mole (1)**
113:13
**whatever's (2)**
21:5;117:7
**what's (17)**
16:21;17:17;18:15,
15,23;23:18;24:22;
25:20,20;26:3;33:22;
61:16;68:15;70:6;
73:17;90:22;99:17
**wheel (1)**
118:3
**whenever (2)**
91:1;118:9
**whereby (2)**
52:1;53:7
**whereupon (2)**
105:11;119:17
**wherever (1)**
11:12
**WHITE (3)**
8:2;20:11;86:21
**whole (13)**
26:12;38:9;58:18;
60:1,9;74:23;109:13;
111:12,12;113:4;
114:19,21;116:25
**wholly (21)**
22:1;23:3;26:7;
27:8;35:9;37:3;40:21;
41:5,6;43:4;44:11;
46:8;48:18;51:14;
53:16;56:5;65:10;

100:11;104:11,22;
107:1
**who's (8)**
10:18;12:13;13:12;
67:24;77:25;83:18;
97:16;101:15
**whose (2)**
83:19;95:21
**WICKOUSKI (1)**
9:22
**wife (2)**
13:4;29:17
**Wi-Fi (5)**
20:10,15,22;21:1,2
**willful (1)**
49:21
**William (1)**
97:23
**WILLIAMS (1)**
8:2
**willing (2)**
44:22;87:24
**WILLKIE (5)**
5:11;6:3;12:10;
59:8;90:6
**Wilmington (1)**
8:4
**Wilshire (1)**
8:19
**wings (1)**
114:10
**WINSTON (1)**
8:9
**wisdom (2)**
30:24;73:12
**wish (3)**
67:16;99:20;119:14
**wishes (1)**
12:14
**withdrawal (2)**
25:19;40:7
**within (2)**
96:21;102:11
**without (12)**
27:12;29:20;37:20;
40:3;45:3;60:11;
66:14;70:24;71:2;
111:6;9;112:3
**wonderful (1)**
86:21
**wondering (1)**
33:13
**wonky (1)**
82:3
**word (1)**
62:20
**words (3)**
26:2;43:11;92:8
**work (14)**
12:23;14:21;28:20;
35:24;42:16;52:1;
59:24;76:8,14;77:7;
84:7;109:25;110:1;

114:14
**working (7)**
42:25;55:17;75:14;
98:23;107:9;109:21;
110:5
**works (2)**
83:9;118:9
**World (2)**
31:15;38:17
**worried (1)**
56:21
**worse (1)**
60:15
**worth (4)**
31:12;57:8,11;
103:24
**wrap (1)**
86:20
**writ (2)**
17:7;30:15
**wrong (2)**
39:12;46:15
**wrongdoings (1)**
26:25

**Y**

**Yacht (2)**
32:12,13
**Yankee (1)**
31:15
**year (1)**
28:15
**year-old (1)**
72:23
**years (1)**
55:11
**yell (1)**
12:21
**yeoman's (2)**
110:12;111:23
**Yep (1)**
48:10
**York (13)**
5:14;6:14;7:15;
8:12;9:5,9,10,12,20;
47:15;53:17;70:20;
75:4

**Z**

**zero (2)**
69:24;90:25
**Zoom (14)**
10:14,18,23;11:1,5,
15;12:18,21;13:1,6,
12;15:8;21:1,2

**0**

**00 (1)**
72:21

**1**

**1 (4)**
27:23;67:1;72:15;
95:11
**1.7 (1)**
61:3
**10 (3)**
103:23;117:16;
118:3
**10,000 (1)**
93:24
**100,000 (4)**
25:23;40:6;41:16,
17
**1000 (1)**
8:19
**10004 (1)**
9:5
**10005 (1)**
9:12
**10019 (1)**
5:14
**10036 (1)**
6:14
**10158 (1)**
7:15
**10281 (1)**
9:20
**10666 (1)**
8:12
**10th (11)**
103:21;114:4,13;
115:17;116:1,1,5,17,
18;117:13;119:15
**11 (18)**
21:17;24:19;26:21;
40:17;50:17;51:11;
54:21;55:8;56:3;62:7,
15,19;63:13;64:3,13;
67:4;117:14,15
**1104 (2)**
21:17;59:25
**1104a (1)**
26:15
**1104a1 (5)**
26:16,23,24;27:10;
51:23
**1104a2 (2)**
26:19;50:2
**1104d (1)**
54:6
**1108 (1)**
56:1
**1115 (1)**
35:8
**11th (1)**
102:7
**120-day (1)**
55:4
**133 (1)**
79:17

**13th (1)**
  51:5
**14,000 (3)**
  42:1;93:24;94:14
**148-million-dollar (1)**
  45:14
**14th (3)**
  41:20;102:4;105:14
**15,000 (3)**
  41:14;93:25;94:15
**150 (3)**
  73:22;75:19;91:15
**150,000 (1)**
  41:17
**1500 (1)**
  8:20
**16 (1)**
  103:25
**16,000 (3)**
  42:7;47:17;94:14
**164 (3)**
  100:1;102:7,9
**17th (1)**
  116:2
**180- (1)**
  93:25
**180,000 (2)**
  75:12;90:16
**180,000-dollar (1)**
  90:10
**1800 (1)**
  7:5
**1875 (1)**
  6:5
**19801 (1)**
  8:4

**2**

**2 (5)**
  18:13;62:18;68:10;
  117:21;118:7
**2:01 (1)**
  86:25
**2:17 (1)**
  86:25
**2:30 (1)**
  95:10
**200 (2)**
  8:11;9:19
**20006 (1)**
  6:6
**2004 (11)**
  21:23;43:3;52:3;
  92:2;97:4;102:3,6,21,
  24;103:8;106:11
**2014 (1)**
  98:11
**2015.3 (3)**
  31:1;38:18;42:22
**2023 (3)**
  22:19;39:15;42:24
**2024 (4)**

47:17;61:3;67:1;
  102:13
**206,000 (2)**
  70:18;71:7
**21,000 (1)**
  47:14
**222 (1)**
  79:18
**22nd (2)**
  41:22;102:5
**2300 (1)**
  7:4
**233 (1)**
  21:18
**24th (3)**
  21:24;102:13;
  111:24
**25 (1)**
  50:21
**250 (1)**
  5:4
**256 (2)**
  51:5;59:22
**258 (1)**
  13:18
**26,000 (1)**
  47:12
**28 (1)**
  9:11
**28th (2)**
  21:15;41:8
**29 (1)**
  50:21

**3**

**3 (2)**
  99:23;102:9
**3:02 (1)**
  119:17
**30,000 (2)**
  22:16;31:14
**327 (1)**
  98:11
**33154 (1)**
  5:6
**341 (9)**
  31:24;32:10;37:18;
  38:5;43:12;79:18;
  80:6,10,22
**3rd (1)**
  61:3

**4**

**4 (1)**
  63:10

**5**

**5 (1)**
  65:23
**5,000 (1)**

69:23
**500 (4)**
  21:25;31:12;49:23;
  52:6
**541a (1)**
  56:1
**542 (1)**
  58:8
**5th (2)**
  37:15;105:10

**6**

**6 (1)**
  56:12
**600 (1)**
  8:3
**605 (1)**
  7:14
**6th (3)**
  102:2,22;103:19

**7**

**7 (3)**
  54:19;56:12;105:11
**70,000 (2)**
  22:18;42:23
**75201 (1)**
  7:6
**787 (1)**
  5:13
**7th (4)**
  37:18;41:9;79:17;
  105:10

**8**

**8 (1)**
  56:13
**8th (1)**
  102:23

**9**

**90017 (1)**
  8:21
**95th (1)**
  5:4