UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **RUDOLPH W. GIULIANI** | : | **Case No. 23-12055 (SHL)** |
| **a/k/a RUDOLPH WILLIAM GIULIANI,** | : | |
| | : | |
| Debtor. | : | |

---------------------------------------------------------------x

**REPLY OF GLOBAL DATA RISK LLC TO
THE DEBTOR'S OPPOSITION TO THE FINAL FEE APPLICATION
OF GLOBAL DATA RISK LLC, SPECIALIZED FORENSIC FINANCIAL
ADVISOR TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
FOR THE PERIOD FROM FEBRUARY 9, 2024 THROUGH JULY 11, 2024**

Global Data Risk LLC ("GDR"), specialized forensic financial advisor to the Official Committee of Unsecured Creditors (the "Committee") of Rudolph W. Giuliani a/k/a Rudolph William Giuliani (the "Debtor") hereby files this reply (this "Reply") to the Debtor's Opposition [Docket No. 314] (the "Opposition") to the *Final Fee Application of Global Data Risk LLC, Specialized Forensic Financial Advisor to the Official Committee of Unsecured Creditors for the Period from February 9, 2024 through July 11, 2024* [Docket No. 310] (the "Application"). In response to the Opposition and in further support of the Application, GDR respectfully states as follows:

**PRELIMINARY STATEMENT**

1.       Even after dismissal of his bankruptcy case, the Debtor has launched another baseless and bad faith crusade in this Court, this time in opposition to GDR's Application for final fees and expenses. It is disappointing, but unsurprising, given the tenor of the case prior to dismissal: after seven and a half months in bankruptcy—all of which were characterized by the Debtor's delay, obfuscation and attempts to reap the rewards of bankruptcy without adhering to its

burdens—the Debtor abruptly reversed course and obtained dismissal of his chapter 11 case in the name of avoiding the looming potential appointment of a chapter 11 trustee.

2.    As has been repeated by the case parties *ad nauseum*, the Debtor chose to file for chapter 11, and he consequently must bear the burdens of what such a filing entailed. Here, that burden is paying administrative expenses for the fees and expenses of professionals retained by the Committee. Akin Gump Strauss Hauer & Feld LLP ("<u>Akin</u>"), which served as counsel to the Committee, did not charge any fees and expenses to the estate, serving in its role entirely pro bono. Similarly, GDR agreed to a significantly reduced, blended hourly rate of $275 for all timekeepers assigned to this matter. In other words, the Debtor, who could not possibly have expected this case to generate zero administrative expenses, got an incredible deal with respect to Committee advisor fees.[1]

3.    Simply put, the Opposition is meritless. The Debtor argues, first, that GDR's fees are duplicative, taking issue primarily with the fact that two or more GDR team members would bill for the same meetings or hearings, which behavior the Debtor cast as "a clear practice of duplicative billing." Opp. ¶ 21. The Debtor then requested a $77,275.00 reduction in fees (*i.e.,* approximately 24% of GDR's requested fees), which would reflect a reduction for all but one timekeeper's fees for a particular event or task. Yet it strains credulity to imagine how else meetings are supposed to work other than by having *multiple people attend*. Limiting, as the Debtor proposes, professionals to one timekeeper's entry for each meeting would affect an absurd

---

[1]    At the July 10, 2024 hearing, the Court noted, "[T]here's no costs that have been incurred by the committee [counsel], because the committee's [counsel is] pro bono. And so I don't think anybody thought that the case would be something that wouldn't incur administrative expenses. . . . But for services that are appropriate for purposes of the case on behalf of the committee, they are what they are." *In re Giuliani*, No. 23-12055 (SHL) (Bankr. S.D.N.Y. July 10, 2024), Hr'g Tr. at 48:18-21, 48:24-49:1.

and completely unfair result that grossly undercompensates advisors for meaningful work achieved as a team.

4.      Second, the Debtor argues that the fees sought by GDR are unreasonable and/or inadequate, pointing to 270.5 hours spent by GDR timekeepers on research-related services.  The Debtor baselessly claims that 270.5 hours of research for one debtor "seems to be inflated, if not excessive" and accordingly requests a reduction in GDR's fees of $74,387.50 (*i.e.*, approximately 23% of GDR's requested fees).  Opp. at ¶ 29, p. 62.  Yet, what the Debtor ignores is that the many hours spent by the Committee's advisors searching for relevant information were necessitated by the Debtor's own obstructionist tactics throughout the case.  Likewise, many of the hours identified by the Debtor as "inflated" or "excessive" were related to the Committee's investigation into the Debtor's assets and finances, which investigation the Committee had to undertake in furtherance of its fiduciary duties and during which the Debtor continually refused to cooperate.

5.      In sum, the arguments lodged by the Debtor in the Opposition are meritless and bad faith.  Accordingly, the Opposition should be overruled, and GDR's fees and expenses should be allowed in the total amount of $322,896.35.[2]

## **REPLY**

### A.      **GDR Did Not Engage in Duplicative Billing.**

6.      The first baseless argument that the Debtor advances in the Opposition is that certain of GDR's fees are duplicative.  Specifically, the Debtor asserts that, because multiple individual timekeepers billed for "attendance at the same event, meeting, or discussion and/or completion of the same service," GDR thereby created "duplicate time entries for any given single service."  Opp. at ¶ 17.  The Opposition then copies and pastes approximately 49 pages of time

---

[2]   This amount reflects an additional voluntary reduction of fees and expenses of $8,801.69 based on discussions between GDR and the Office of the United States Trustee.

entries where GDR timekeepers attended meetings and concludes that the entries indicate "a clear practice of duplicative billing" where "timekeepers would each individually bill for the same respective event."  Opp. at ¶¶ 20, 21.  The Debtor *duplicitously* argues that only one timekeeper should be permitted to bill per "task," deliberately ignoring that the fact that the "tasks" objected to are nearly entirely meetings, as opposed to what most people would describe as tasks, such as drafting an objection or researching a particular issue.  *See, e.g.,* Opp. at p. 40 (taking issue with timekeepers' attendance at a weekly GDR team meeting, a meeting between two timekeepers to jointly work on a discrete task and a weekly meeting with counsel).

7.      Accordingly, the Debtor in effect spends the bulk of the Opposition objecting to the concept of meetings, but it is impossible to understand how GDR otherwise should have conducted its meetings other than by having multiple GDR timekeepers attend.  Indeed, by definition, a meeting is "[a] coming together or gathering of *people, whether few or many*."  Meeting, Black's Law Dictionary (12th ed. 2024) (emphasis added).  Although Bankruptcy Code section 330(a)(4)(A) disallows compensation for "unnecessary duplication of services," meetings and conversations cannot automatically constitute "unnecessary duplication," as such a categorical determination would affect an absurd result.  11 U.S.C. § 330(a)(4)(A).  "Conversations and meetings by definition involve more than one person; otherwise, they are neither conversations nor meetings."  *In re MEP Infrastructure Sols., Inc.*, 654 B.R. 922, 925 (Bankr. N.D. Ill. 2023).  Duplication, on the other hand, refers to a situation where two or more timekeepers perform a task that a single timekeeper could have performed.  *Id.*  Clearly, one person cannot have a conversation or meeting by him or herself, so nothing is being duplicated by team members' participation in conversations and meetings.  *Id.*  As a result, "[o]ffice conferences and meetings between two [timekeepers] are not the unnecessary duplication of services," but such conferences and meetings

must still be "necessary" or "beneficial" and must have taken a "reasonable amount of time" to be compensable.  *Id.* at 924, 926.

8.      Here, the meetings that the Debtor complains of were "necessary to the administration of, or beneficial at the time at which, the service was rendered toward the completion of" the Debtor's case.  11 U.S.C. § 330(a)(3)(C).  To address a few of the recurring meetings objected to by the Debtor:

- GDR's weekly internal meetings were necessary to coordinate the efforts of numerous different timekeepers with respect to various ongoing workstreams, such as GDR's forensic financial accounting, investigative and asset tracing services.  Frequently throughout the chapter 11 case, there were new and rapidly evolving issues that required GDR to respond quickly and efficiently, and weekly team meetings ensured that timekeepers were kept up to speed on developments in the case and were aligned on next steps.

- GDR's and Akin's weekly meetings likewise were necessary to ensure that GDR and Akin were coordinated in responding to developments in the case and addressing the objectives, questions and concerns of the Committee.  Moreover, Akin and GDR used these weekly calls to provide each other with updates on ongoing workstreams, strategize about next steps and prepare for presentations to the Committee at weekly Committee meetings.

- Weekly Committee calls were used to provide the Committee with updates and discuss action items and case strategy.  Committee members used these calls to ask questions of their advisors, and GDR ensured that the number of GDR timekeepers who attended these meetings was appropriate in order to adequately address Committee members' inquiries.  Moreover, Committee meetings frequently resulted in follow up tasks for GDR, so it was important that the GDR timekeepers overseeing the matter were in attendance to plan how best to address these follow ups.  Moreover, it would be unduly burdensome, inefficient and absurd to expect Committee members to attend several separate meetings throughout the week with each individual GDR timekeeper responsible for a distinct workstream solely for the purpose of limiting the number of GDR timekeepers attending meetings.

9.      The Debtor also objects to numerous two-person meetings, which defies logic, since two people are necessary for a conversation, and it would be unfair to require GDR to charge for only one timekeeper's time in attending such a meeting, when both timekeepers' presence is necessary for such meeting to even occur.  *See, e.g.,* Opp. at p. 5 (taking issue with three separate internal meetings each between two GDR timekeepers regarding case strategy and project management planning); *see also In re MEP Infrastructure Sols., Inc.*, 654 B.R. at 925 n.2 (noting

that every task has an opportunity cost and when an individual performs one task, he cannot perform another, so if he cannot bill for the original task, he goes uncompensated).

10.    The Debtor misleadingly cites to two cases, *Seigal v. Merrick* and *In re Navis Realty* as standing for the proposition that timekeepers' billing for the same event is duplicative.  First, *Seigal v. Merrick* is a 1979 case involving a request for attorney's fees to be paid pursuant to the equitable fund doctrine in connection with a class action shareholders' derivative suit.  *Seigal v. Merrick*, 74 Civ. 2475 (CBM), 1979 U.S. Dist. LEXIS 12744, at *1 (S.D.N.Y. Apr. 27, 1079).  The *Seigal* court, in one brief paragraph, stated that the court would not compensate the attorneys for work done by both attorneys when only the presence of one was necessary.  *Id.* at *4.

11.    Meanwhile, *In re Navis Realty* involved an interim fee application in bankruptcy that was rife with deficiencies, such as the lumping of time and abbreviated and cryptic time entries throughout the entire application.  *In re Navis Realty*, 126 B.R. 137 (Bankr. E.D.N.Y. 1991). Moreover, despite being offered an opportunity to modify or supplement the fee application, the applicant declined.  *Id.* at 139.  What is misleading about the Debtor's reference to this case is that the Debtor cites *In re Navis Realty* as having found that only one attorney may charge for intra-office conferences absent any explanation to each attorney's participation.  Opp. at ¶ 20.  Yet, *In re Navis Realty* neither applied this rule nor discussed it other than including it in a list of "generally accepted ***guidelines***."  *In re Navis Realty*, 126 B.R. at 141 (emphasis added).  The real issue in *In re Navis Realty* was that the application utterly failed to provide sufficient detail about the nature and purpose of tasks and meetings, relying on such barebones time entries as "telecon" to justify compensation.  *Id.* at 143.  Here, GDR's application does not contain the same failings, and the time entries in the Application as a general matter note the attendees of meetings, the length of such meetings and the purpose of such meetings. *See, e.g.,* Opp. p. 47 ("Meeting with B. Ebert re:

6

financial analysis."), p. 51 ("Meeting with J. Bass to discuss service in Florida, latest filings and plans with Akin.").

12.     Even if this Court were inclined to apply the guideline from *In re Navis Realty* that no more than one timekeeper may charge for intraoffice conferences unless an explanation of each timekeeper's participation is given, GDR's Application itself and as supplemented by the supplemental declaration of Erik Laykin filed contemporaneously herewith (the "Supplemental Laykin Declaration") passes muster.  *See In re MEP Infrastructure Sols., Inc.*, 654 B.R. at 925 (listing cases but disagreeing with rule).  In the first instance, GDR carefully selected the team members staffed to this matter for their particular skill sets in relation to the forensic accounting, asset tracing and investigations services for which GDR was hired by the Committee.  *See Application of the Official Committee of Unsecured Creditors of Rudolph W. Giuliani to Retain and Employ Global Data Risk LLC as Specialized Forensic Financial Advisor, Effective as of February 9, 2024* [Docket No. 150] (the "Retention Application") at ¶¶ 10-12.

13.     Then, throughout the case, GDR was mindful to ensure that only the appropriate team members were present on calls and meetings and at hearings based on considerations such as timekeepers' specialties and seniority.  For example, the initial case kickoff call (to which the Debtor objects) did not include the full GDR team, although the kickoff call with Akin was directed at providing an overview of the pertinent issues in the case and discussing objectives, strategy and immediate action items, which clearly would have been relevant to all timekeepers.  Instead, the meeting was attended by Mr. Laykin and Mr. Bass, who together shared the responsibility of managing the assignment, Mr. Ebert who coordinated the day-to-day project management of the matter and oversaw all workstreams, Ms. Snow, who was responsible for all forensic accounting services, and Ms. Looney, the junior analyst primarily responsible for internal GDR coordination

and carrying out many of the organizational tasks related to the assignment. Opp. at p. 4, Supp. Laykin Dec. at ¶ 9. As described in the Supplemental Laykin Declaration, this same level of care was employed in limiting attendance to only the necessary timekeepers at weekly GDR meetings, Akin meetings, Committee meetings and hearings. In general, the GDR timekeepers who attended these events were the most senior GDR team members and attended specifically because of their particular skill set and the role they served in connection with this assignment, and more than one person's talents and input were required at the events highlighted in the Debtor's Opposition.

14.     As a final note, the Debtor also objects to certain task-related entries, which fall into two categories. First, the Debtor objects to situations in which two GDR timekeepers coordinated on a particular task. *See, e.g.,* Opp. at p. 41 ("Analysis of financial statement with assistance from J.P. Bass."). These objections are meritless, since it is often valuable to collaborate with other team members in completing a task. *See In re MEP Infrastructure Sols., Inc.*, 654 B.R. at 925 ("Brainstorming with [others] has value: rare is the [individual] who routinely comes up with great ideas on his own.").

15.     The second category of task-related objections is a particularly bad faith objection by the Debtor. Here, the Debtor objects to GDR timekeepers' execution of the same task; however, frequently the time entries identified relate to reviewing the same documents or separately preparing for the same event. *See, e.g.,* Opp. at p. 8 (objecting to three timekeepers' review of the 341 meeting transcript), Opp. at p. 12 (objecting to two timekeepers' separate preparation for the same Committee call), Opp. at p. 15 (objecting to two timekeepers' preparation for the interview of a third party). But how else was GDR supposed to adequately represent the Committee other than by reading relevant documents and preparing for necessary tasks? The Opposition reads as if the Debtor would only consent to the payment of GDR's fees if GDR timekeepers were to use

8

osmosis in transferring information among team members and gleaning information from documents. This cannot be the state of the law on the reasonableness of fees.

16.     In sum, the Debtor's attack on GDR's fees as duplicative is meritless and in bad faith. GDR engaged in thoughtful billing practices and ensured the appropriate timekeepers were present at particular events to adequately represent the Committee.

**B.     The Fees Sought Are Neither Unreasonable Nor Inadequate.**

17.     The Debtor's unfounded campaign against the Application does not end there. The Opposition then asserts that GDR's fees are unreasonable and inadequate, citing to approximately seven pages of time entries detailing research performed by GDR timekeepers as "evidence." *See* Opp. at pp. 54-61. As has been a recurring theme throughout this chapter 11 case, the Debtor disingenuously ignores the realities of the case and the deciding role he played in forcing all parties to where they find themselves today.

18.     Indeed, the Debtor fails to mention that the research he characterizes as "repetitive," "inflated," and "excessive"[3] was necessary because of the Debtor's obstructionist tactics and repeated failure to comply with the Court's orders and directly conforms to GDR's mandate in the Retention Order (as defined below). As the Court noted at the hearing on July 17, 2024 (the "July 17 Hearing"), "there no doubt has been a lot of work for the financial advisers to the committee in trying to deal with [a] situation where . . . there has not been the appropriate level of transparency." *In re Giuliani*, No. 23-12055 (SHL) (Bankr. S.D.N.Y. July 17, 2024), July 17 Hearing Tr. at 25:18-21. Actions have consequences, and the Debtor must now face his.

---

[3]     Opp. at ¶ 29.

    **1.    The Fees Sought and Time Billed Are Commensurate with GDR's Retention Order, the Complexity of the Case and the Noncooperation of the Debtor.**

19.    When determining the reasonableness of professional compensation under Bankruptcy Code section 330, courts in the Southern District of New York consider whether the services rendered by the professional were necessary and beneficial to the case administration. *In re Level 8 Apparel LLC*, No. 16-13164 (JLG), 2023 WL 2940489, at *9 (Bankr. S.D.N.Y. Apr. 13, 2023). Services are generally considered necessary if they benefit the estate. This is an objective test that considers what a reasonable professional would do under the same circumstances. *In re Celsius Network LLC*, No. 22-10964 (MG), 2024 WL 3289579, at *7 (Bankr. S.D.N.Y. July 2, 2024). Whether professional services are "necessary" is determined based on the time that the professional performed the services, not through hindsight, and courts in the Second Circuit broadly interpret this "necessary" standard. *Id.* (citing 3 Collier on Bankruptcy ¶ 330.04[1] (16th ed. 2024)); *see also In re 530 West 28th Street L.P.*, No. 08–13266 (SMB), 2009 WL 4893287, at *9 (Bankr. S.D.N.Y. Dec. 11, 2009) ("A decision reasonable at first may turn out wrong in the end."); *see also In re Yoga Smoga, Inc.*, No. 16-13538 (MEW), 2019 Bankr. LEXIS 348, at *7 (Bankr. S.D.N.Y. Feb. 5, 2019) ("Professionals are not guarantors of success, and they are entitled to reasonable compensation for reasonable services, even if things do not turn out so well as the client had hoped."). Notably, fees cannot be considered "unreasonable" simply because the objecting party perceives the requested fees to be excessive, and a "gestalt reaction that there was too much time spent" is not a sufficient basis to object to a fee application. *In re Blackwood Assocs., L.P.*, 165 B.R. 108, 111-12 (Bankr. E.D.N.Y. 1994) (internal citations omitted).

20.    The Debtor takes umbrage with the amount of time GDR timekeepers specifically spent on research and chronology, arguing that 270.5 hours of research-related services for a five-month span is unreasonable. Opp. at ¶ 29. First, it cannot seriously be argued, particularly in the

context of the fast-paced and demanding world of bankruptcy, that 270.5 hours, split among at least three timekeepers,[4] over a five-month span is unreasonable. That is approximately an 18 hour per month per timekeeper average, certainly not exorbitant, but rather conservative, given the facts and circumstances of this chapter 11 case.

21.    Second, GDR was retained by the Committee to provide these exact services. On April 19, 2024, the Court entered an order [Docket No. 189] (the "Retention Order") approving GDR's retention, effective as of February 9, 2024, to provide the following services:

a)    identify and trace the income and assets of the Debtor;

b)    investigate the Debtor's sources of income, assets and liabilities;

c)    analyze the Debtor's expenses and budgets;

d)    investigate the Debtor's ownership of, or interest in potential assets, including corporations, trusts and real estate;

e)    identify sources of information regarding the Debtor's assets for further investigation and discovery;

f)    assist in the review of documents obtained by the Committee in furtherance of income and asset tracing efforts;

g)    identify and investigate prepetition and postpetition transfers of the Debtor's assets;

h)    assist in the evaluation and analysis of avoidance actions, including fraudulent conveyances and preferential transfers;

i)    assist in the prosecution of Committee investigative activities, including by reviewing the Debtor's pleadings, attending depositions and providing reports or testimony on case issues as requested by the Committee;

j)    if necessary, provide fact and expert witness testimony, reports and declarations in connection with litigation in this chapter 11 case or related adversary proceedings; and

k)    render such other consulting or other assistance as the Committee or its counsel may deem necessary that is generally consistent with the role of a specialized forensic financial advisor for this chapter 11 case and is not duplicative of services provided by other professionals in this chapter 11 case.

---

[4]    Certain GDR timekeepers' names were redacted in the Application, so the Debtor consolidates all research hours by timekeepers whose names are redacted in one table, representing a total of 64 hours. *See* Opp. p. 56-57, ¶ 28 (asserting that, even if the hours of the "[REDACTED]" employee(s) represented time billed by two to three employees, it would still be excessive).

Retention Order at ¶ 2.

22.    The time entries detailed in <u>Exhibit E</u> to the Application show that GDR diligently performed these precise services.  One of GDR's main tasks was to identify and trace assets of the Debtor and their sources and discover potential additional sources of assets to augment the bankruptcy estate.  To do this, GDR necessarily was required to research the Debtor, his associates, and his non-debtor subsidiaries.  If GDR did not perform research, then GDR would not have been able to complete the services that formed the crux of GDR's retention.

23.    Ultimately, GDR timekeepers' detailed time entries clearly show that they were performing diverse tasks within the research category, as well as the other billing categories, in accordance with the Retention Order.  And despite what the Debtor insinuates in the Opposition, GDR's time entries are detailed, consistent and cannot be characterized as "inadequate."  For example, time entries regarding research done by GDR timekeepers consistently detail the subject of the research.[5]  Time entries regarding internal and external calls and meetings describe what was discussed.[6]  Furthermore, whenever multiple GDR timekeepers participated in a call or meeting, the duration of the call/meeting listed in each employee's time entry as well as the narratives of the time entry match up.[7]  Just because the Debtor disagrees with the volume and content of GDR's time entries, does not mean that they are inadequately detailed or that GDR engaged in poor record keeping.  Just because the Debtor says something does not make it so.

24.    Moreover, the amount of time that GDR dedicated to various workstreams related to the chapter 11 case was a direct result of the Debtor's unwillingness to cooperate every step of the way.  As has been emphasized by the case parties throughout the chapter 11 case and in this

---

[5]    *See generally* Application, Ex. E.

[6]    *Id.*

[7]    *Id.*

Court's *Memorandum of Decision* [Docket No. 289], the Debtor deliberately impeded the Committee's every effort to obtain information, including information regarding the property of the estate that would be available for distribution to the Debtor's creditors under a chapter 11 plan.

25.    The Debtor rebuffed the Committee's efforts, ignoring Court orders to produce documents and filing deficient, inaccurate and untimely financial disclosures that made it impossible to understand fully the Debtor's assets, liabilities and cash flow and evaluate the appropriateness of the Debtor's business relationship with his non-debtor subsidiaries.[8]  Since the Debtor would not answer the Committee's questions regarding his and his non-debtor subsidiaries' finances, the source of his funds and potential untapped pockets of value for the estate, GDR was required to expend more time, effort and resources to try to track down those answers.  Moreover, the Debtor's monthly operating reports that were publicly filed were incomplete, contradictory, incoherent and required GDR's professional expertise to even try to decipher.  The Debtor could have cooperated with the Committee and GDR, which would have resulted in less time expended and lower fees.  But, despite the Committee's and GDR's best efforts, the Debtor chose to be obstructive and now is trying to avoid the consequences of his own behavior.  GDR therefore submits that the services it provided were necessary at the time they were performed and that the compensation sought is reasonable under the circumstances.

26.    Ultimately, the Debtor's attempts to frame the 1,181.25 hours billed by GDR over the course of five months as unreasonable are grossly misleading.  Contrary to what the Debtor confoundingly seems to suggest when he references the typical hours worked each year by an individual who works 40-hour weeks,[9] these hours were not worked by one employee, but rather

---

[8]    *See Memorandum of Decision* at pp. 11-16.

[9]    "GDR billed a total of 1,181.25 hours over the course of five months.  To put this into context, there are approximately 2,080 hours in a calendar year, accounting for an employee working a traditional 40 hour work week."  Opp. at ¶ 31.

13 professionals. In fact, the GDR employee with the highest number of total hours billed spent 196.25 hours over the course of GDR's retention period of five months,[10] which is not only less than 40 hours per month but also less than 40 hours per week. So, despite the Debtor's efforts to mislead the Court and any party who reads the Opposition, GDR did not spend an excessive amount of time billing to this case.

> **2.      The Application Already Incorporates a Voluntary Fee Reduction and a Significantly Reduced Blended Hourly Rate.**

27.      In filing the Opposition, the Debtor has clearly forgotten that the final amount of fees requested in the Application already reflect a voluntary fee reduction and a significantly reduced blended hourly rate. Moreover, in reaching an agreed form of proposed dismissal order with all of the case parties, GDR took on the risk of delayed repayment of its fees and expenses by accepting that all fees and expenses in excess of $100,000 will be paid from the proceeds of whichever of the Debtor's properties is sold first and, in the meantime, will be secured by security interests in and liens on the Debtors' properties.[11] *See Order (I) Dismissing Chapter 11 Case, (II) Establishing Procedures for the Allowance and Payment of Professional Fees; and (III) Granting Related Relief* [Docket No. 309].

28.      First, GDR's non-administrative professionals typically charge market hourly rates of $275-$775; however, as one of the terms of its retention, GDR agreed to provide services to the Committee at a blended and discounted hourly rate of $275, not subject to any periodic increases.[12] Of the 13 GDR timekeepers who billed time to the chapter 11 case, there were:

- Four timekeepers whose market hourly rate is $775;
- One timekeeper whose market hourly rate is $650;

---

[10]   *See* Application, Ex. C.

[11]   Unfortunately, knowing the Debtor and his chicanery, it is likely that he will prolong the sale process in a bad faith attempt to avoid fulfilling his obligations and retain the assets for his own benefit. GDR is therefore already bearing significant risk that it gets paid in a timely manner.

[12]   *See* Retention Application at ¶ 17.

- One timekeeper whose market hourly rate is $525;
- Two timekeepers whose market hourly rate is $475;
- Three timekeepers whose market hourly rate is $325; and
- Two timekeepers whose market hourly rate is $275.[13]

Since the majority of GDR timekeepers' normal hourly rates are considerably higher than $275 per hour, the blended and discounted hourly rate represents a significant cost savings compared to what the services GDR provided in the chapter 11 case otherwise would have cost.

29.    GDR has been more than generous to a Debtor who deserves no generosity or benefit of the doubt.  Along with the blended and discounted hourly rate that GDR agreed to as a term of its retention, prior to filing the Application, GDR agreed to a $23,237.50 fee reduction and a $15,682.12 expense reduction, further significantly decreasing the Debtor's tab.[14]  The Debtor is receiving the benefit of Akin's pro bono representation, GDR's blended and discounted hourly rate, GDR's voluntary fee and expense reductions and GDR's agreement to forego payment of all but $100,000 of its fees and expenses until a later date.  But the Debtor could not turn down one last opportunity to show his lack of respect for the bankruptcy process, the Court and all parties involved in the chapter 11 case by filing yet another misleading, bad faith pleading.

30.    GDR is a professional consulting firm that employs sophisticated professionals who perform top-tier investigative services.  GDR was retained by the Committee to assist in fulfilling the Committee's fiduciary duty to the entire unsecured creditor class, a duty that was made particularly difficult to discharge due to the antics and bad behavior of the Debtor.  GDR assiduously executed the services it was hired to perform as laid out in the Retention Order, all at

---

[13]    *See* Application, Ex. C.

[14]    Moreover, as discussed in more detail below, after the filing of the Application, GDR agreed to additional fee and expense reductions totaling $8,801.69 to resolve certain concerns brought by the U.S. Trustee.

a significantly reduced hourly rate.  There is no doubt that GDR deserves to get paid for the work that it completed.

### C.      GDR Further Voluntarily Reduced Its Fees and Expenses After Filing the Application.

31.     Before the deadline to object to the Application, the United States Trustee for the Southern District of New York (the "U.S. Trustee") reached out to GDR with certain informal comments and questions.  GDR and the U.S. Trustee have engaged in productive discussions concerning the Application, and while GDR believes all fees and expenses included in the Application were appropriate, reasonable and necessary, on September 19, 2024, GDR reached an agreement with the U.S. Trustee to voluntarily reduce the fees and expenses for which it is seeking this Court's approval by $7,562.50 and $1,239.19, respectively, to resolve the U.S. Trustee's concerns.  As demonstrated by this additional agreed reduction, GDR has always acted in good faith and cooperatively with the parties in this case.  The same cannot be said for the Debtor.

## CONCLUSION

32.     For all the foregoing reasons and the reasons set forth in the Application, GDR respectfully requests that the Court (i) overrule the Opposition, (ii) grant the relief requested in the Application, (iii) enter the Proposed Order attached hereto as **Exhibit A** and (iv) grant such other and further relief as is just, proper and equitable.

Dated:  September 19, 2024

By:  _/s/ Erik Laykin_____
Erik Laykin
CEO
Global Data Risk LLC

*Specialized Forensic Financial Advisor to the Official Committee of Unsecured Creditor of Rudolph W. Giuliani*

## Exhibit A

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

In re:                                        :      **Chapter 11**
                                              :
**RUDOLPH W. GIULIANI**                        :      **Case No. 23-12055 (SHL)**
**a/k/a RUDOLPH WILLIAM GIULIANI,**            :
                                              :
                 **Debtor.**                   :
                                              :
--------------------------------------------------------------- x

### ORDER GRANTING FINAL FEE APPLICATION OF GLOBAL DATA RISK LLC, SPECIALIZED FORENSIC FINANCIAL ADVISOR TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR THE PERIOD FROM FEBRUARY 9, 2024 THROUGH JULY 11, 2024

Upon consideration of the application [Docket No. 310] (the "Application") of Global Data Risk LLC ("GDR") for allowance on a final basis of compensation and reimbursement of expenses for professional services rendered and expenses incurred during the period commencing February 9, 2024 through July 11, 2024; and a hearing (if applicable) having been held before this Court to consider the Application; and notice having been given pursuant to Federal Rules of Bankruptcy Procedure 2002(a)(6) and (c)(2); and due consideration having been given to any responses thereto; and sufficient cause having been shown therefor, it is hereby

**ORDERED**:

1.      The Application is granted on a final basis to the extent set forth in **Schedule A** attached hereto.

2.      In accordance with the *Order (I) Dismissing Chapter 11 Case, (II) Establishing Procedures for the Allowance and Payment of Professional Fees; and (III) Granting Related Relief* [Docket No. 309] (the "Dismissal Order"), Berger, Fischoff, Shumer, Wexler &

Goodman, LLP is authorized and directed upon entry of this Order to remit payment of the Initial

Professional Fee Amount[1] (as defined in the Dismissal Order) to GDR.

3.      In accordance with Dismissal Order, the Debtor is authorized and directed upon

entry of this Order to remit payment, or facilitate the payment, of the Stub Professional Fee

Amount[2] (as defined in the Dismissal Order) from the proceeds of the first of the following

properties of the Debtor to be sold:  (A) the NYC Apartment (as defined in the Dismissal Order),

and (B) the Florida Condo (as defined in the Dismissal Order), in each case, immediately upon

the closing of such sale.

4.      This Court shall retain jurisdiction to hear and determine all matters arising from

or related to this Order.


Dated: _____, 2024
New York, New York

_____
THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE

---

[1]    Pursuant to the Dismissal Order, the "Initial Professional Fee Amount" means $100,000.00.

[2]    Pursuant to the Dismissal Order, the "Stub Professional Fee Amount" means GDR's approved fees and expenses in excess of the Initial Professional Fee Amount.

Case No.:  23-12055 (SHL)
Case Name:  In re Rudolph W. Giuliani a/k/a Rudolph William Giuliani

## <u>Schedule A</u>

**Final Fee Application Totals**

| Applicant | Total Fees Requested | Total Fees to Be Paid | Total Expenses Requested | Total Expenses to Be Paid |
|---|---|---|---|---|
| Global Data Risk LLC | $324,843.75 | $317,281.25 | $6,854.29 | $5,615.10 |